## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| TRUE TEMPER SPORTS, INC., et al., | : | Case No. 09-_____ (___) |
| | : | |
| Debtors.[1] | : | Joint Administration Requested |
| | : | |

## DECLARATION OF JASON A. JENNE, VICE PRESIDENT AND CHIEF FINANCIAL OFFICER OF TRUE TEMPER SPORTS, INC., IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Jason A. Jenne, hereby declare under penalty of perjury:

1. I am Vice President and Chief Financial Officer of True Temper Sports, Inc. ("True Temper"), a corporation organized under the laws of the State of Delaware and one of the above-captioned debtors and debtors-in-possession (each a "Debtor" and collectively, the "Debtors"). In this capacity, I am familiar with the Debtors' day-to-day operations, businesses, financial affairs, and books and records.

2. On the date hereof (the "Petition Date"), each of the Debtors filed with the Court a voluntary petition (collectively, the "Petitions") for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3. The Non-U.S. subsidiaries (as defined below, and together with the Debtors, the "Company") of True Temper are not seeking relief under chapter 11 of the Bankruptcy Code or any other insolvency laws. These Non-U.S. Subsidiaries are separate legal entities under the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: True Temper Sports, Inc. (2620), True Temper Corporation (4519), and True Temper Sports-PRC Holdings, Inc. (6895). The Debtors' corporate headquarters are located at, and the mailing address for each Debtor is, 8275 Tournament Drive, Suite 200, Memphis, Tennessee 38125.

direction of local management, and except as described herein or in the First Day Motions (as defined below), are generally distinct from the Debtors. The Non-U.S. Subsidiaries will continue to operate in the ordinary course during the pendency of these chapter 11 cases.

4. I submit this declaration (the "Jenne Declaration") to provide an overview of the Debtors and to support the Debtors' Petitions and "first day" motions (each, a "First Day Motion," and collectively, the "First Day Motions"). Except as otherwise indicated herein, all facts set forth in this Jenne Declaration are based upon my personal knowledge of the Company's operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Company's management and advisors, or my opinion based on my experience, knowledge, and information concerning the Company's operations and financial condition. I am authorized to submit this Jenne Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

5. The First Day Motions are intended to enable the Debtors to operate effectively and seek relief aimed at, among other things, ensuring the continuation of the Debtors' business operations without interruption, preserving customer and vendor relationships, maintaining employee morale and establishing safeguards to promote a seamless transition into chapter 11. To familiarize the Court with the Debtors and the relief they will seek on the first day of these cases, this Jenne Declaration is organized as follows: Part I provides an overview of the Debtors' business. Part II provides a description of the Debtors' corporate and capital structure. Part III describes the events leading to the commencement of the chapter 11 cases, the Debtors' out-of-court restructuring efforts, and the Debtors' proposed reorganization. Part IV incorporates and affirms the facts that support the relief requested in the First Day Motions.

46701/0001-5913877v6

## PART I

### I. Overview of the Debtors' Business

#### A. Corporate History

6.     True Temper traces its origin back to the late 1800's, when several independently owned forging companies combined their operations.  In 1902, as a result of a formal restructuring of these operations, True Temper's predecessor, the American Fork and Hoe Company, was formed.

7.     In 1923, the American Fork and Hoe Company began manufacturing steel golf shafts.  Seven years later, when the Royal and Ancient Golf Club of Saint Andrews, golf's governing and decision-making body in Scotland, made the steel shaft legal for tournament play, the American Fork and Hoe Company began marketing steel shafts under the True Temper brand name.  In 1942, True Temper introduced the *Dynamic* line on the PGA tour, which continues to this day.

8.     In 1939, the American Fork and Hoe Company became a publicly owned company and ten years later, changed its name to True Temper.

9.     In 1967, True Temper merged into ATI Allegheny Ludlum.  In 1978, ATI Allegheny Ludlum sold True Temper to Wilkinson Sword in exchange for a 45% interest in Wilkinson Sword.  Two years later, Allegheny International acquired the remainder of Wilkinson Sword, bringing True Temper back to Allegheny ownership.  In 1985, Allegheny sold True Temper to Emhart Corporation, which was subsequently acquired by Black & Decker in 1989.

10.     The Company returned to private ownership in 1998 when Black & Decker sold True Temper to Cornerstone Equity Investors ("Cornerstone"), a private equity firm.  In 2004, Cornerstone sold True Temper to Gilbert Global (as defined and described below).

3

11.     On January 30, 2004, TTS Holdings, LLC, a new Delaware holding company formed by Gilbert Global Equity Partners, L.P. and its affiliated funds ("Gilbert Global"), entered into a stock purchase agreement ("SPA") with True Temper Corporation ("TTC"), a Delaware holding company that is the direct parent of True Temper. Pursuant to the SPA, TTS Holdings, LLC and certain members of the senior management of True Temper purchased all the issued and outstanding shares of TTC (the "Gilbert Global Acquisition"). The Gilbert Global Acquisition was finalized and closed on March 15, 2004. In connection with this acquisition, and effective on March 15, 2004, True Temper repaid all of its outstanding obligations under its existing senior credit facility, redeemed all of its $10^7/_8\%$ senior subordinated notes due 2008, and made certain payments of the net remaining equity of the predecessor company to the selling shareholders.

12.     Throughout its history, True Temper has focused on cutting-edge innovation, manufacturing excellence, and superior service to its customers. As a result, True Temper has been the number one shaft on the PGA Tour for over seventy (70) years.

**B.     The Company's Current Business Operations**

13.     The Company is the leading worldwide supplier and innovator of steel, graphite, and multi-material golf club shafts and performance based recreational sports products.

14.     The Debtors' corporate headquarters are located in Memphis, Tennessee. True Temper leases manufacturing, warehouse, and office facilities located in Memphis, Tennessee; Aberdeen, Amory, Olive Branch, and Robinsonville, Mississippi; San Diego, California; Birmingham, England; Tokyo, Japan, and Hong Kong. As of the Petition Date, the Debtors, in their U.S., European, and Japanese locations, employ approximately 307 employees (the "Employees"), of whom approximately 211 are hourly Employees (the "Hourly Employees") and 96 are salaried Employees (the "Salaried Employees"). Approximately 300 of those

4

Employees are located in the United States, 2 in the United Kingdom (the "UK") and 5 in Japan. In addition, the Debtors normally utilize the services of approximately 5 independent contractors (the "Independent Contractors") and approximately 10 temporary, full-time equivalent hourly workers (the "Temporary Workers"). Approximately 150 of the Hourly Employees at the Debtors' manufacturing plant in Amory, Mississippi are represented by the United Steel Workers of America.

15.     The Company conducts its operations in the United States, United Kingdom, Japan, and Hong Kong through True Temper. The Company's operations in China are conducted through non-U.S. subsidiaries of True Temper Sports-PRC Holdings, Inc. ("TTS-PRC"), namely Ji Neng Composite Materials & Products (Guangzhou) Ltd. ("Ji Neng"), Supertop Enterprises Ltd. ("Supertop"), and True Temper Alloy Materials Co. (Suzhou) Ltd. ("Alloy Materials") (collectively, the "Non-U.S. Subsidiaries"). As set forth above, the Non-U.S. Subsidiaries affiliates are separate legal entities and are not seeking relief under chapter 11 of the Bankruptcy Code or any other insolvency laws.

16.     The Company's operations are conducted through two reportable business segments: (a) golf shafts, and (b) performance sports. The Company evaluates the performance of these segments based on segment sales and gross profit, and has no inter-segment sales.

17.     *Golf Shaft Segment.* The golf shaft segment of the Company manufactures and sells steel, composite, and multi-material golf club shafts for use exclusively in the golf industry. There are three basic components of a golf club: the shaft, the club head, and the grip. The shaft is critical to the performance of a golf club as it is vital in controlling the consistency and distance of a golf shot.

46701/0001-5913877v6

18.    The Company sells shafts to the top golf club original equipment manufacturers ("OEMs"), retailers and distributors in the golf equipment industry, primarily located in the United States, Europe, Japan, Australia, and Southeast Asia.  Typically, distributors resell True Temper products to custom club assemblers, pro shops, and individuals.  The Debtors have long-standing relationships with a highly diversified customer base in excess of 500 customers, including over 400 manufacturers and retailers, and over 50 distributors.

19.    The Company's proprietary golf shafts, which accounted for approximately 25% of its net sales in 2008, are custom designed, and frequently co-branded in partnership with its customers, to accommodate specific golf club head designs.  As an example, proprietary models include co-branded products such as Callaway's *Uniflex*, Nike's *Speedstep* and Ping's *AWT*. Branded products with the *True Temper, Royal Precision, Project X* or *Grafalloy* names and designs are typically sold to golf club OEMs, distributors and various custom club assemblers, and are used to either assemble new clubs or to replace the shafts in existing clubs.

a)    *Steel Golf Shafts*

20.    The Company designs, manufactures, and markets a wide range of steel golf shaft product lines with unique design features and performance characteristics, including: *Dynamic Gold, Dynamic Gold SL, Dynamic Gold Tour Issue, Rifle, Project X, Project X Flighted, SensiCore, Dynalite Gold, TX-90, GS75, GS85, GS95,* and *TT Lite.*  True Temper steel golf shafts can be divided into the following two major product categories: (a) premium grade steel shafts; and (b) commercial grade steel shafts.  In 2008, approximately 70% of the Company's revenue was generated through the sale of steel golf shafts.  The Company estimates that its share of the worldwide steel golf shaft market was approximately 70% to 80% in 2008.

46701/0001-5913877v6

21.     Premium steel shafts are high performance products with tighter design tolerances and quality specifications that have higher average selling prices and generate higher profit margins than commercial grade steel shafts.  The Company is a leading supplier of premium steel shafts to the top golf club OEMs and distributors, including Adams, Callaway, Cleveland, Golfsmith, Golf Works, Mizuno, Nike, Ping, TaylorMade, Titleist and Wilson.  From 1988 to 2008, True Temper steel shafts were played by all of the winners of the PGA's 84 major championships.

22.     The commercial grade steel shafts are manufactured to a different specification and sell for a lower average price to OEMs.  The OEMs then produce and sell opening price point golf club sets, typically to entry-level players who purchase their products through mass channel retail stores.

b)  *Graphite Golf Shafts*

23.     The Company is also one of the world's largest manufacturers of premium graphite (carbon fiber based composites) golf shafts, with an estimated share of approximately 10% of this highly fragmented market.  The Company's graphite shafts are sold under the *Grafalloy* brand name.  The Company manufactures a wide range of graphite golf shaft lines, which are offered in a variety of weights, torques and flexes.  Its graphite golf shafts are currently being played by numerous touring professionals on the PGA, EPGA, LPGA, Champions, and Nationwide Tours.  Similar to steel shafts, graphite shafts can be placed in several categories of performance, quality, and price.  Historically, most of the graphite golf shafts that the Company produced have been higher priced premium grade shafts that were sold to golf equipment distributors, and to OEMs for their custom product offerings.  Beginning in 2004, however, with the establishment of the lower cost manufacturing facility operated by Ji Neng in China, the Company also began selling certain lower priced graphite shafts.

7

### c) Golf Shafts with Combined Materials

24.    During the last several years, the Company has developed golf shafts that combine multiple materials such as steel and graphite into one shaft. Late in 2000, the Company introduced a proprietary custom iron product for a customer that combines a steel shaft with a graphite tip section to produce a shaft that provides a new feel for irons. In 2001, the Company used similar patented technology to introduce the True Temper branded product known as *BiMatrx*. The *BiMatrx* shaft consists of a graphite shaft with a steel tip section that was designed for use in driver and fairway wood applications.

### d) Golf Shafts with New Materials

25.    In early 2007, the Company introduced driver and fairway wood shafts constructed of patented Nanofuse® material, which utilizes today's most advanced nanotechnology to produce a stronger, lighter shaft which incorporates the benefits of both graphite and steel.

26.    ***Performance Sports Segment.*** The performance sports segment of the Company designs, manufactures, and markets high strength, tight tolerance tubular components for a number of recreational sports markets including bicycling, hockey, baseball, softball, and lacrosse.

27.    Through its performance sports segment, the Company has leveraged its existing manufacturing competencies and capitalized on its name brand strength and customer base to provide revenue and profitability diversification beyond the golf equipment industry. The Company focuses on the premium segment of the bicycle market where innovation, quality and branding are highly valued by the consumer, and products are often customized to suit the individual consumer's specific requirements. Such products include steel bicycle frames, and composite bicycle components, such as forks and handlebars.

8

28.     The Company's value-added premium bicycle component products generally have higher margins than component parts made for bicycles sold in mass channel retail stores. In the hockey components market, the Company focuses on composite shafts and full sticks used in a variety of original equipment manufacturers' one-piece and composite sticks. The Debtors have partnerships with several of the leading component suppliers in the hockey market, such as Reebok, Balistik, and Sherwood.

## PART II

**II.     Corporate and Capital Structure of the Debtors**

**A.     Corporate Structure**

29.     The Company's corporate structure consists of a parent holding company, TTS Holdings, LLC (a non-Debtor entity), which directly owns 96.8% of the outstanding common and preferred stock of True Temper Corporation.[2] The remainder of True Temper Corporation is owned by current and former members of the senior management of True Temper as well as other third parties, each holding less than or approximately 1%. True Temper Corporation (a Debtor) owns all of the issued and outstanding common stock of True Temper (a Debtor). Thus, there is no public market for True Temper's equity securities, as True Temper is a wholly owned operating subsidiary of True Temper Corporation.[3] True Temper wholly owns True Temper Sports-PRC Holdings, Inc. ("TTS-PRC"), also a Debtor. TTS-PRC is a Delaware holding company that has provided capital investments and loans to its Non-U.S. Subsidiaries.[4] True

---

[2] As set forth above, TTS Holdings, LLC was formed as part of the Gilbert Global Acquisition in 2004. True Temper Corporation is a Delaware holding company.

[3] As set forth above, the Company conducts its operations in the United States, United Kingdom, Japan, and Hong Kong through True Temper.

[4] As set forth above, the Non-U.S. Subsidiaries are not seeking relief under chapter 11 of the Bankruptcy Code or any other insolvency laws.

46701/0001-5913877v6

Temper sells raw materials to the Non-U.S. Subsidiaries located in China, and purchases finished manufactured products from them. The following is a brief description of the Non-U.S. Subsidiaries:

    a) Ji Neng is wholly owned by TTS-PRC and is a registered Chinese Company. Ji Neng operates a graphite products manufacturing facility in Guangzhou, China.

    b) Supertop is wholly owned by TTS-PRC and is a registered Hong Kong holding company.

    c) Alloy Materials is wholly owned by Supertop and is a registered Chinese Company. Alloy Materials operates a steel products manufacturing facility in Suzhou, China.

**B.**     **Capital Structure**

30.     The Debtors' principal capital structure consists of secured revolving and term loan facilities, senior subordinated unsecured notes, and equity. As of the Petition Date, the Debtors had approximately $275 million of funded debt. The Debtors' principal indebtedness is comprised of: (a) the First Lien Credit Facility (as defined below); (b) the Second Lien Credit Facility (as defined below); (c) the Senior Subordinated Notes (as defined below); and (d) equity.

31.     ***The First Lien Credit Facility.*** On or about March 27, 2006, True Temper (the "Borrower") amended and restated its 2004 Senior Credit Facility by entering into the Amended and Restated Credit Agreement (as amended from time to time, the "First Lien Credit Agreement") with a syndicate of lenders led by Credit Suisse acting as general administrative agent (the "First Lien Agent"). The First Lien Credit Agreement, as amended to date, provides for aggregate commitments of $151,000,000 consisting of (a) a $128,000,000 term loan due March 15, 2011 (the "First Lien Term Loan"); (b) a maximum revolving credit facility, of $20,000,000 due March 15, 2009 (the "First Lien Revolver"); and (c) a $3,000,000 letter of credit sub-facility to the First Lien Revolver (the "First Lien Letter of Credit Facility" and,

together with the First Lien Term Loan and the First Lien Revolver, the "First Lien Credit Facility"). The First Lien Credit Facility is guaranteed by TTC and TTS-PRC (the "Guarantors"). The existing lenders (the "First Lien Lenders") to the First Lien Credit Facility have a first priority lien on substantially all of the assets of the Borrower and Guarantors.

32.     ***Hedging Arrangements under the First Lien Credit Facility.*** The Borrower has the ability under the First Lien Credit Facility to enter into hedging arrangements to mitigate the Borrower's risk against fluctuation in foreign exchange rates and interest rates. The Borrower's obligations under such arrangements are obligations under the First Lien Credit Facility. The Borrower is exposed to exchange rate fluctuations in the British Pound and Japanese Yen due to sales in those currencies. The Borrower has entered into foreign exchange forward contracts with Wells Fargo Bank, National Association to manage such foreign currency exchange rate exposures. The Borrower's last forward contract (the "Forward Contract") expired by its terms on October 5, 2009. The Borrower uses forward contracts to hedge several components of its revenue and cash collection stream, including: (a) anticipated foreign currency sales, (b) accounts receivable denominated in foreign currencies, and (c) cash balances maintained in foreign currencies. The forward contracts typically have maturities of less than one year.

33.     In addition to the forward contracts, the Borrower has entered into interest rate swaps to mitigate the risk of  fluctuation in interest rates. Pursuant to an ISDA Master Agreement dated April 23, 2008, the Borrower entered into certain interest rate swaps (the "Swap Agreement") with Credit Suisse International to fix the underlying LIBOR borrowing base rate on $100 million of its variable rate debt under the First Lien Term Loan at approximately 3.20% for a period of approximately 24 months.

46701/0001-5913877v6

34.    As of the Petition Date, there was: (a) $84,355,460.76 in outstanding principal, plus accrued and unpaid interest owing under the First Lien Term Loan; (b) $17,085,000 in outstanding principal, plus accrued and unpaid interest owing under the First Lien Revolver; (c) $1,800,000 in outstanding principal under the First Lien Letter of Credit Facility; (d) approximately $2,000,000 owing on account of the termination value of the Swap Agreement; and (e) $388,996.35 owing on account of the termination value of the Forward Contract.[5]

35.    *The Second Lien Credit Facility*. On or about January 22, 2007, the Borrower entered into the Second Lien Credit Agreement (as amended from time to time, the "Second Lien Credit Agreement") with a syndicate of lenders led by Credit Suisse acting as general administrative agent. On April 9, 2009, Law Debenture Trust Company of New York (the "Second Lien Agent") succeeded Credit Suisse as the general administrative agent. The Second Lien Credit Agreement, as amended to date, provides for a $45 million term loan due June 30, 2011 (the "Second Lien Credit Facility"). The Second Lien Credit Facility is guaranteed by the Guarantors. The existing lenders (the "Second Lien Lenders") to the Second Lien Credit Agreement have a second priority lien on substantially all of the assets of the Borrower and Guarantors.

36.    As of the Petition Date, the Company had approximately $45 million in principal outstanding under the Second Lien Credit Facility, plus accrued and unpaid interest.

37.    *The Senior Subordinated Notes.* True Temper (the "Issuer") issued unsecured 8 ⅜% senior subordinated notes due 2011 (the "Senior Subordinated Notes") under the Indenture dated March 15, 2004. The Senior Subordinated Notes are guaranteed by True Temper Sports-

---

[5] The amounts owed under the Swap Agreement are subject to fluctuation due to market conditions until the Petition Date. On the Petition Date, the Swap Agreement will terminate and the termination value thereunder will become fixed at such time.

46701/0001-5913877v6

PRC Holdings, Inc. (the "Guarantor"). The Bank of New York is the indenture trustee. The Senior Subordinated Notes require semi-annual interest payments due on March 15 and September 15. As of the Petition Date, approximately $125 million in principal remained outstanding under the Senior Subordinated Notes, plus accrued and unpaid interest.

38.     *Equity.* TTC is authorized to issue 10,080,512 shares of Common Stock and 10,615 shares of Series A Preferred Stock. TTS Holdings, LLC, a non-Debtor entity, owns 96.8% of the outstanding Common Stock and 100% of the Series A Preferred Stock of TTC. The remainder of Common Stock of TTC is owned by current and former members of the senior management of True Temper as well as other third parties, each holding less than or approximately 1%. TTC owns all of the issued and outstanding common stock of True Temper. Thus, there is no public market for the equity securities of True Temper or TTC.

## PART III

**III.    Events Leading to the Chapter 11 Cases and Proposed Reorganization**

39.     As discussed above, the Debtors have approximately $275 million of indebtedness under the First Lien Credit Facility, Second Lien Credit Facility, and the Senior Subordinated Notes. Unfortunately, a series of recent and unforeseen events severely impacted the Debtors' ability to continue servicing their substantial indebtedness and ultimately led to the Debtors' decision to seek to restructure through a prepackaged chapter 11 plan of reorganization. Those events include: (a) the deep recession in the United States (and international) economy, (b) the resulting deterioration in the Debtors' financial performance in 2009, and (c) the Debtors' defaults under the First Lien Credit Facility, Second Lien Credit Facility, and the Senior Subordinated Notes.

46701/0001-5913877v6

## A. The Downturn in the Golf Equipment Industry

40.     Current economic conditions have adversely impacted the golf equipment industry.  As a result of the deep recession, golfers have reduced overall discretionary spending and delayed purchases of golf equipment.  The recession has also caused substantial reductions in overall channel inventory and product launch delays, as retailers, distributors, and OEMs continue to streamline their operations and worldwide distribution networks.

41.     Beginning in the fourth quarter of 2008, the combination of both the reductions in overall discretionary spending and channel inventory levels in the golf equipment industry led to a sharp drop in product orders from the Debtors' customers.  Consequently, the Company's financial performance declined in 2009.

## B. Financial Performance Declines in 2009

42.     For the fiscal year ended December 31, 2008, the Company generated approximately $124 million in net sales.  However, the confluence of the reduction in overall discretionary spending and channel inventory levels adversely impacted the Company's financial performance in the first six months of 2009.  In the six month period ending June 28, 2009, the Company (a) generated net sales of approximately $39.7 million, of which $33.1 million came from the golf shaft segment, and $6.6 million from the performance sports segment; (b) had a gross profit of approximately $6 million, of which $4.5 million came from the golf shaft segment, and $1.5 million from the performance sports segment; and (c) realized a net loss of approximately $24.1 million.

43.     *Net sales* for the first six months of 2009, in comparison to the same period in 2008, decreased by approximately $33.9 million, representing a 46.1% decline in net sales. Sales from the golf shaft segment decreased by approximately $30.1 million, representing a

46701/0001-5913877v6

47.7% decline in golf shaft sales. Sales from the performance sports segment decreased by approximately $3.8 million, representing a 36.6% decline in performance sports sales.

44.     ***Gross profit*** for the first six months of 2009, in comparison to the same period in 2008, decreased by approximately $20.5 million, representing a 77.3% reduction in gross profit. Gross profit as a percentage of net sales decreased to 15.2% in the first six months of 2009 from 36% in the first six months of 2008. The decrease in gross profit as a percentage of net sales was driven by several factors, including: (a) fixed manufacturing costs being spread over significantly lower sales and production volumes in both the golf and performance sports segments, and (b) the mix of products sold being heavily weighted toward lower priced steel and graphite golf shafts, as well as performance sports products, which generally have lower profit margins.

45.     ***Net loss*** for the first six months of 2009 increased to a net loss of $24.1 million as compared to a net loss of $1.7 million in the first six months of 2008. This increase reflects the impact from decreased gross profits (as described above), and costs associated with the Debtors' restructuring efforts (as described below).

46.     As of June 28, 2009, the Company had approximately $180 million in total assets and $319 million in total liabilities on a GAAP basis.

47.     ***EBITDA.*** Despite the recent decline in financial performance, as a result of aggressive expense management and cost controls, the Company was able to deliver positive earnings in the form of adjusted EBITDA for the first six months of 2009 totaling $1.6 million, compared to $20 million in the first six months of 2008. In addition, the Company was able to significantly reduce its working capital and maintain a record level of cash reserves, most

46701/0001-5913877v6

prominently through a nearly 30% reduction in inventory carrying levels during the nine months prior to June 30, 2009.

### C.    The Defaults

48.    On March 16, 2009, the Borrower (True Temper) failed to repay all amounts then due under the First Lien Revolver.  As a result, the Borrower is in default under the First Lien Credit Facility and the First Lien Lenders, prior to the Petition Date, were entitled to immediately accelerate the repayment of all other amounts borrowed and exercise all other available remedies.

49.    Also on March 16, 2009, the Issuer (True Temper) failed to make an interest payment of approximately $5.2 million then due to the holders of the Senior Subordinated Notes. As a result, the Issuer is in default under the Indenture and the holders of the Senior Subordinated Notes, prior to the Petition Date, were entitled to immediately accelerate the repayment of all other amounts borrowed and exercise all other available remedies, if any. Furthermore, interest on the Senior Subordinated Notes is currently accruing at the default rate of 9 ⅛%.

50.    Additionally, the non-payment of principal under the First Lien Credit Facility, and the non-payment of interest under the Indenture as described above, constituted events of default under the Second Lien Credit Facility.  There is also an independent default for failure to pay interest under the Second Lien Credit Facility.  As a result, the Second Lien Lenders, prior to the Petition Date, were entitled to immediately accelerate the repayment of all amounts borrowed under the Second Lien Credit Facility, plus accrued and unpaid interest.

51.    Furthermore, the First Lien Credit Facility and the Second Lien Credit Facility require the Debtors to maintain certain specified financial ratios and tests including minimum

46701/0001-5913877v6

interest coverage and fixed charge coverage ratios and maximum leverage ratios. As of the Petition Date, the Debtors were not in compliance with these ratios.

52.     Due to the events of default described above, all of the Company's debt has been classified as a current liability on its condensed consolidated balance sheets as of June 28, 2009 and December 31, 2008. Prior to the Petition Date, none of the First Lien Lenders, Second Lien Lenders, or any holders of the Senior Subordinated Notes accelerated the payment of principal or interest under any of the applicable agreements.

**D.     The Company's Out-of-Court Restructuring Initiatives**

53.     *The Forbearance Agreements.* On February 20, 2009, the Debtors retained the investment banking firm Lazard Middle Market LLC ("Lazard"), to assist them in exploring strategic alternatives to enhance the Debtors' capital structure and negotiate with the First Lien Lenders, Second Lien Lenders, and holders of the Senior Subordinated Notes. As part of those efforts, Lazard worked with the Debtors' legal advisors to negotiate the terms of a long term forbearance to provide the Debtors with an appropriate amount of time to adequately explore their alternatives.

54.     Effective March 16, 2009, the Debtors entered into a 90-day forbearance agreement with the First Lien Lenders (the "Forbearance Agreement"). Under the terms of the Forbearance Agreement, the First Lien Lenders agreed not to exercise their rights to accelerate repayment until June 16, 2009, provided that the Company adhered to the certain requirements set forth in the Forbearance Agreement. On June 16, 2009, the Forbearance Agreement was amended, extending the expiration of the forbearance period through July 16, 2009. On July 16, 2009, the Forbearance Agreement was amended again, extending the expiration of the Forbearance Agreement through August 17, 2009. On August 17, 2009, the Forbearance Agreement was amended a third time, extending the expiration of the Forbearance Agreement

17

through August 31, 2009. On August 31, 2009, the Forbearance Agreement was amended a fourth time, extending the expiration period of the Forbearance Agreement through September 30, 2009.

55.     During the forbearance period, the Debtors and their advisors engaged in numerous discussions with their key constituents – the First Lien Agent, certain lenders under the First Lien Credit Facility and the Second Lien Credit Facility, and certain holders of the Senior Subordinated Notes – regarding possible restructuring alternatives. In addition, the Debtors undertook other restructuring efforts, as described below.

56.     *Operational Restructuring*. Prior to and during the forbearance period, management implemented aggressive strategic initiatives to enhance operating cash flow and mitigate the impact of the severe economic downturn. Such initiatives included reducing headcount on a global basis, significantly reducing fixed costs at the Company's manufacturing facilities, renegotiating lease terms and rental rates for certain of the Company's facilities, and decreasing discretionary spending on items such as travel, entertainment, and certain marketing expenses.

57.     Furthermore, the Company instituted a number of fixed overhead cost reduction initiatives that were designed to remove $8 million in infrastructure costs on an annual basis. These reductions include position eliminations, utility and energy conservation programs, facility rationalization and freight program consolidation.

58.     *Pursuing a Sale*. In addition to the initiatives described above and the negotiations with key stakeholders described below, the Debtor and their advisors separately explored an alternate path in an effort to ensure that they pursued all feasible value maximization alternatives. Beginning in May of 2009, Lazard, with the Debtors' assistance, began a sale

process and identified and contacted approximately fifty-four (54) potential financial investors and three potential strategic investors they believed might be interested in investing in or acquiring the Debtors, either through an in-court or out-of-court sale process.

59.     Of the investors contacted, thirty-four (34) of them, all of whom were financial investors, signed confidentiality agreements and conducted due diligence with respect to the Debtors, which included: (a) receiving and reviewing a detailed business plan presentation that contained both historical and projected financials, industry information and the Debtors position within the industry, (b) an opportunity to submit in writing certain diligence questions to the Debtors and Lazard, (c) participating in a "town hall style" presentation with management on May 26, 2009, during which the Debtors, among other things, addressed the previously submitted written questions, and (d) having numerous discussions with Lazard. Potential investors that declined to participate in the process cited uncertainty in the Debtors' business plan and the golf industry's recovery as their main reasons for not pursuing the sale transaction.

60.     Following the presentation by the Debtors' management, investors were invited to submit non-binding indications of interest by June 3, 2009. The Debtors received non-binding term sheets from five (5) financial investors, each of which was subject to legal, business and financial due diligence as well as other conditions precedent. The five proposals had an implied enterprise valuation for the Debtors of between $52 million to $100 million. Further, at the time these proposals were prepared and submitted, the Debtors were estimating their cash taxes for the period from 2009 to 2013 to be only $2 million. Moreover, none of the bids provided for any significant cash pay down to the First Lien Lenders and each of the bids would have required the First Lien Lenders to take a discount on their claims and take back a large portion of their

46701/0001-5913877v6

recovery in debt. Finally, none of the bids provided for any recovery to the Second Lien Lenders.

61.     The Debtors and their advisors provided the bids to the First Lien Lenders and discussed them with their financial advisor. Based on the values and types of consideration set out in the bids and the numerous conditions precedent, including legal, business, and financial due diligence, the Debtors, in consultation with the First Lien Lenders and their advisors, declined to move forward with any of the bids. Instead, the Debtors worked with their current stakeholders to formulate and negotiate the transactions embodied in the Plan Support Agreement and Prepackaged Plan (as defined and described below).

62.     *The Equity Commitment and Plan Support Agreement.* Notwithstanding the diligent pursuit of out-of-court alternatives described above, the Debtors were unable to conclude these efforts outside of the chapter 11 process. Accordingly, during the forbearance period, the Debtors commenced negotiations with the First Lien Agent, certain of the First Lien Lenders (the "Participating First Lien Lenders"), certain of the Second Lien Lenders (the "Participating Second Lien Lenders"), and certain holders of the Senior Subordinated Notes (the "Plan Investor") regarding possible restructuring alternatives. These discussions led to the Equity Commitment and Plan Support Agreement dated as of September 29, 2009 (the "Plan Support Agreement"), attached hereto as Exhibit A, with respect to a consensual restructuring on the terms set forth in the exhibits to the Plan Support Agreement.

63.     Pursuant to the Plan Support Agreement, the Participating First Lien Lenders and the Participating Second Lien Lenders agreed to vote in favor of the Joint Prepackaged Plan of Reorganization of True Temper Sports, Inc., True Temper Corporation, and True Temper Sports-

46701/0001-5913877v6

PRC Holdings, Inc., dated September 30, 2009 (the "Prepackaged Plan" or "Plan").[6] Furthermore, the Plan Investor, who holds an aggregate 45.5% of the Senior Subordinated Notes, agreed (a) not to seek any distribution under the Prepackaged Plan on account of its Senior Subordinated Note Claims and (b) to invest $70 million in New TT Holdings, which will be used to fund distributions under the Prepackaged Plan. As consideration for its investment, the Plan Investor will receive 10,000,000 shares of the New Common Stock issued by New TT Holdings, subject to dilution as described more fully in the Prepackaged Plan.

64.     The Debtors, pursuant to the Plan Support Agreement, are required, *inter alia*, to: (i) commence these chapter 11 cases by October 8, 2009; (ii) obtain approval of the Disclosure Statement with Respect to the Joint Prepackaged Plan of Reorganization of True Temper Sports, Inc., True Temper Corporation, and True Temper Sports-PRC Holdings, Inc, dated September 30, 2009 (the "Disclosure Statement") within 45 days of the Petition Date; (iii) obtain confirmation of the Prepackaged Plan within 45 days of the Petition Date; and (iv) have the Prepackaged Plan become effective on or before December 15, 2009. Failure to meet any of the foregoing deadlines is a termination event under the Plan Support Agreement.

65.     In addition to the financial restructuring contemplated in the Plan Support Agreement, the First Lien Agent, the Participating First Lien Lenders, the Participating Second Lien Lenders, and the Plan Investor consented to (i) a new $10 million debtor in-possession revolving credit facility, inclusive of a letter of credit sub-facility in an aggregate amount of $5 million (the "DIP Revolving Credit Facility"); (ii) a debtor-in-possession term loan that constitutes a roll-up of $80 million in outstanding obligations under the First Lien Credit Facility other than First Lien Credit Facility Letter of Credit Claims (the "DIP Roll-Up Loan" and,

---

[6] Capitalized terms not defined in Part III of the Jenne Declaration shall have the meanings ascribed to them in the Prepackaged Plan.

together with the DIP Revolving Credit Facility, the "DIP Facility"); (iii) an exit revolving credit facility in the aggregate principal amount of $12.5 million, inclusive of a $5 million letter of credit sub-facility (the "New Revolving Credit Facility"); and (iv) an exit term loan in the principal amount equal to (a) the aggregate amount of the Allowed First Lien Credit Facility Claims and DIP Roll-Up Loan, less (b) $70 million, that will be deemed funded by the First Lien Lenders and the DIP Roll-Up Loan Lenders as of the Effective Date of the Prepackaged Plan (the "New Term Loan" and, together with the New Revolving Credit Facility, the "Exit Facility"). The DIP Facility will be used to pay transaction costs, fees and expenses which are incurred in connection with the DIP Facility, and to fund the Debtor' general working capital and operating needs and reorganization during the pendency of these chapter 11 cases.

## E. The Proposed Reorganization

66. *Solicitation of Prepackaged Plan*. The Prepackaged Plan and Disclosure Statement are the products of the good-faith, arm's-length negotiations among the Debtors and their financial and legal advisors, the First Lien Agent, the Participating First Lien Lenders, the Second Lien Agent, the Participating Second Lien Lenders, and the Plan Investor.

67. In compliance with the Plan Support Agreement, on September 30, 2009, the Debtors, with the assistance of Logan & Company, Inc. ("Logan" or the "Voting Agent"),[7] delivered copies of the Disclosure Statement, the Prepackaged Plan, and the appropriate ballots (the "Ballots") to holders of Class 2 First Lien Credit Facility Claims (the "Class 2 Creditors") and Class 3 Second Lien Credit Facility Claims (the "Class 3 Creditors").[8] The Debtors

---

[7] The Debtors have applied for authority to retain Logan as their claims, noticing, and balloting agent pursuant to the Motion of the Debtors for Entry of an Order Authorizing the Retention and Employment of Logan & Company, Inc. As Claims, Noticing, and Balloting Agent, filed contemporaneously herewith.

[8] Only the Class 2 Creditors and Class 3 Creditors are entitled to vote on the Prepackaged Plan.

46701/0001-5913877v6

established October 7, 2009 at 5 p.m. (Eastern Time) as the deadline for the receipt of Ballots to accept or reject the Prepackaged Plan. As set forth in the Declaration of Kathleen M. Logan Certifying Voting On, and Tabulation Of, Ballots Accepting and Rejecting Joint Prepackaged Joint Plan of Reorganization of True Temper Sports, Inc., True Temper Corporation, and True Temper Sports-PRC Holdings, Inc. (the "Voting Declaration"), filed concurrently herewith, the proposed Prepackaged Plan has been accepted by all classes entitled to vote in excess of the statutory thresholds in section 1126(c) of the Bankruptcy Code. Specifically, 26 in number and $103,975,404.27 in amount of the Class 2 Creditors, and 27 in number and $42,000,000.00 in amount of Class 3 Creditors of those voting accepted the Prepackaged Plan.

68. *The Prepackaged Plan.* On the Petition Date, the Debtors filed the Disclosure Statement and Prepackaged Plan with this Court. The Prepackaged Plan, which embodies the consensual deal in the Plan Support Agreement, contemplates a significant de-leveraging of the Debtors' balance sheet. The Prepackaged Plan provides for, among other things, (i) the Plan Investor to invest $70 million in New TT Holdings, which will be used to fund distributions under the Prepackaged Plan, and in exchange, the Plan Investor will receive 10,000,000 shares of the New Common Stock issued by New TT Holdings; (ii) distributions to holders of Class 2 Claims (First Lien Credit Facility Claims) of their pro rata share of $70 million in cash and with respect to the remaining amount of their Allowed Claims, their pro rata share of the obligations under the New Term Loan; (iii) distributions to holders of Class 3 Claims (Second Lien Credit Facility Claims) of their pro rata share of Second Lien Lender New Common Stock (representing 11.3924% of the New Common Stock to be issued under the Plan) and up to $3 million (but not less than $500,000) in cash to be distributed from cash collateral existing on the Petition Date; (iv) each accepting holder of Class 3 Claims to contribute 100% of its cash distribution on

46701/0001-5913877v6

account of its Allowed Claim for deposit into a Trade Account for distribution to Allowed Trade Unsecured Claims; (v) no distributions to holders of Class 6 Claims (Senior Subordinated Notes Claims), which treatment was agreed to by the Plan Investor, who holds an aggregate 45.5% of the face amount of the Senior Subordinated Notes; (vi) no distributions to holders of Class 5 Claims (General Unsecured Claims), provided, however, that holders of Trade Unsecured Claims will receive distributions on account of such Trade Unsecured Claims from the proceeds of the Trade Account funded by the accepting holders of Class 3 Claims; (vii) each holder of an Allowed Other Priority Claim to be paid in full in Cash; (viii) each holder of an Allowed Other Secured Claim to have its Claim Reinstated on the Effective Date; (ix) all Intercompany Claims to be Reinstated to the extent determined appropriate by the Debtors or Reorganized Debtors or adjusted, continued, or capitalized, either directly or indirectly, in whole or in part; (x) the Old Equity Interests in TTC and True Temper to be cancelled; and (xi) the Old Equity Interests in TTS-PRC to be Reinstated to the extent determined to be appropriate by the Debtors or Reorganized Debtors.

69.      The Debtors are prepared to seek confirmation of the Prepackaged Plan within 45 days of the Petition Date, as required by the Plan Support Agreement.  Indeed, because the Prepackaged Plan is based on a consensual deal with Debtors' key stakeholders and, significantly, contemplates a de-leveraging of the Debtors' balance sheets and a full recovery for Trade Unsecured Claims (from the proceeds of the Trade Account to be funded by accepting holders of Class 3 Claims), confirmation of the Prepackaged Plan is expected to occur over a relatively short timeframe.

70.      In summary, the Debtors view chapter 11 as an essential tool in reorganizing their business and emerging as a healthier and more profitable company.  The Debtors have filed these

chapter 11 cases to effectuate their proposed restructuring and enhance their long-term growth prospects and financial performance. The Debtors will emerge from chapter 11 a substantially deleveraged enterprise, and will be well positioned to maintain their status as the leading worldwide supplier and innovator of steel, graphite, and multi-material golf shafts, and performance based recreational sports products.

## PART IV

**IV.    Facts Relevant to and Support for First Day Motions**

71.    As discussed above, the Debtors have entered the chapter 11 process with the goal of stabilizing their operations and ensuring a smooth transition into chapter 11. To that end, concurrently with the filing of their chapter 11 petitions, the Debtors have filed a number of First Day Motions seeking relief that the Debtors believe is necessary to enable them to operate with minimal disruption and loss of productivity. The Debtors request that the relief requested in each of the First Day Motions be granted as critical elements in ensuring a smooth transition into, and stabilizing and facilitating the Debtors' operations during the pendency of, the chapter 11 cases. I have reviewed each of the First Day Motions discussed below and the facts set forth in each First Day Motion are true and correct to the best of my knowledge and belief with appropriate reliance on corporate officers and advisors.[9]

**A.    Motion of the Debtors for an Order Directing Joint Administration of Their Related Chapter 11 Cases (the "Joint Administration Motion")**

72.    By the Joint Administration Motion, the Debtors request entry of an order directing joint administration of the chapter 11 cases for procedural purposes only, under the case number assigned to True Temper. Specifically, the Debtors request that the Court direct

---

[9] All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the relevant First Day Motion.

46701/0001-5913877v6

the Clerk of Court to maintain one file and one docket for all of the Debtors' chapter 11 cases, for procedural purposes only, which file and docket shall be the file and docket assigned to True Temper. Furthermore, the Debtors request (i) an entry, as set forth in the Joint Administration Motion, be made on the docket of each of the dockets of TTC's and TTS-PRC's chapter 11 cases to reflect the joint administration of the Debtors' chapter 11 cases and (ii) the Court enter an order directing that any creditor filing a proof of claim against any of the Debtors or their respective estates shall file such proof of claim in the chapter 11 case of the particular Debtor against whom such claim is asserted, and not against the jointly administered case, unless such creditor actually asserts a claim against True Temper.

73.     Debtor True Temper Corporation, a Delaware holding corporation, is the parent of Debtor True Temper. True Temper, a Delaware corporation, is the principal operating company for the Debtors and wholly owns Debtor True Temper Sports-PRC Holdings, Inc., also a Delaware corporation. I have been advised that the Debtors are "affiliates" as such term is defined in section 101(2) of the Bankruptcy Code and that this Court is authorized to grant the relief requested in the Joint Administration Motion.

74.     Given the integrated nature of the Debtors' operations, I have been advised that joint administration of the chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest. Many of the motions, hearings, and orders that will arise in the chapter 11 cases will jointly affect each and every Debtor. Furthermore, the entry of an order directing joint administration of the chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections and will allow the United States Trustee and all parties-in-interest to monitor the chapter 11 cases with greater ease and efficiency.

46701/0001-5913877v6

75.     I believe and have been advised that the relief requested in the Joint

Administration Motion is in the best interests of the Debtors' estates, their creditors, and all

other parties-in-interest, and will enable the Debtors to continue to operate their businesses in

chapter 11 without disruption.

76.     Accordingly, on behalf of the Debtors, I respectfully submit that the Joint

Administration Motion should be approved.

**B.      Emergency Motion of Debtors for Order Authorizing Bank of
         America to Honor Prepetition Checks for Payment of Prepetition
         Employee Obligations and Prohibiting Bank of America from Placing
         Holds on Employee Payroll Account (the "Emergency Employee
         Motion")**

77.     By the Emergency Employee Motion, the Debtors seek entry of an order

authorizing Bank of America to honor any Outstanding Checks (i) on account of accrued and

unpaid wages of the Hourly Employees, (ii) for amounts that the Debtors are required by law to

withhold from employee payroll checks in respect of federal, state and local income taxes,

including unemployment contributions and taxes, and social security and medicare taxes, and

(iii) for amounts that the Debtors are required to directly pay in respect of state unemployment

taxes and contributions on behalf of employees.

78.     As set forth above, the Debtors, in their U.S., European, and Japanese locations,

employ approximately 307 Employees, of whom approximately 211 are Hourly Employees and

96 are Salaried Employees.  Approximately 300 of those Employees are located in the United

States, 2 in the UK and 5 in Japan.  Approximately 150 of the Hourly Employees at the

Debtors' manufacturing plant in Amory, Mississippi are represented by the United Steel

Workers of America.

79.     All wages to U.S. Employees are paid from a payroll account at Bank of

America (the "Payroll Account"), and are handled on a centralized basis with the assistance of a

27

third party payroll processor, Automatic Data Processing, Inc. ("ADP"). Although the majority of payroll payments to the Employees are made via direct deposit through electronic transfer of funds, approximately 164 of the Hourly Employees and 21 of the Salaried Employees are paid by check from the Payroll Account.

80.     On Friday, September 25, 2009 and Wednesday, September 30, 2009, the Debtors issued checks to 163 Hourly Employees, and as of the date hereof, four (4) checks (the "September Checks") have not cleared the Payroll Account. On Friday, October 2, 2009, the Debtors issued checks to 164 of the Hourly Employees and 21 of the Salaried Employees, and as of the date hereof, 11 checks (the "October 2 Checks") have not cleared from the Payroll Account. Furthermore, on Wednesday, October 7, 2009, the Debtors issued checks to 163 Hourly Employees, and as of the date hereof, 131 checks (the "October 7 Checks" and together with the October 2 Checks and the September Checks, the "Outstanding Checks") have not cleared from the Payroll Account. The aggregate amount of the wages from the Outstanding Checks is approximately $83,574.73 (the "Wage Payments").[10] To the best of my knowledge, no payee will receive more than $10,950 as a result of the payments authorized herein.

81.     I have been advised that that a day or more might pass before the Employee Motion (discussed below) can be heard and that this Emergency Employee Motion seeks extraordinary relief. In light of the potential delay in obtaining a hearing date, the Debtors are faced with the possibility that Bank of America will not honor the Outstanding Checks for certain Hourly Employees. If Bank of America does not honor the Outstanding Checks, I believe that the morale and confidence of the Debtors' employees will be severely impacted,

---

[10] The Wage Payments consist of vacation pay in the aggregate amount of $10,574.45.

46701/0001-5913877v6

possibly resulting in employees leaving their jobs and a corresponding significant decrease in the value of the Debtors' estates.

82.     At this critical juncture in the Debtors' cases, I believe it is essential that the employee workforce remain in place and properly motivated. If the Debtors fail to meet some of their payroll obligations, even if only due to the timing of the filing of these cases, I believe the employees adversely affected may have little incentive to remain on the job. Even if the employees do not leave their jobs, I believe the Debtors' failure to honor the Outstanding Checks may cause harm to the Debtors' employees and have a significant detrimental effect on employee morale and thus reduce these employees' willingness to aid in the restructuring of the Debtors. Thus, if the Debtors do not obtain authority to honor the outstanding payroll checks, the Debtors' estates will be immediately and irreparably harmed.

83.     Accordingly, on behalf of the Debtors, I respectfully submit that the Emergency Employee Motion should be approved.

**C.      Motion of the Debtors for Entry of an Order Authorizing the Retention and Employment of Logan & Company, Inc. as Claims, Noticing, and Balloting Agent (the "Logan Retention Motion")**

84.     By the Logan Retention Motion, the Debtors request entry of an order authorizing the employment and retention of Logan as the Claims, Noticing and Balloting Agent under the terms and conditions of the agreement dated June 18, 2009 between the Debtors and Logan (the "Services Agreement"), subject to any restrictions set forth in the proposed order approving the Logan Retention Motion.

85.     I have been advised that Local Rule 2002-1(f) requires a debtor to file a motion to retain a claims and noticing agent within ten (10) days of the Petition Date in all cases with more than 200 creditors. Since the Debtors have more than 200 creditors, the filing of the Logan Retention Motion is appropriate in these cases.

46701/0001-5913877v6

86.     Pursuant to the Services Agreement, and as is more fully set forth in the Logan Affidavit, Logan will act as the Claims, Noticing, and Balloting Agent in these cases. As Claims, Noticing, and Balloting Agent, Logan will provide comprehensive administrative-support services to the Court, the Debtors, and other parties-in-interest in these chapter 11 cases. These services include, but are not limited to: (i) serving required notices in these chapter 11 cases; (ii) maintaining all proofs of claim and proofs of interests filed in these chapter 11 cases (collectively, the "Claims"); (iii) docketing all the Claims; (iv) maintaining and transmitting to the Clerk the official claims registers; (v) maintaining current mailing lists of all entities that have filed Claims and notices of appearance; (vi) providing the public access for examination to all Claims at its premises during regular business hours and without charge; (vii) recording all transfers of claims; and (viii) providing balloting and plan solicitation services related to the Debtors' chapter 11 plan.

87.     In connection with the Logan Retention Motion, the Debtors evaluated several potential candidates and competing proposals. Following that review, and in consideration of the number of anticipated claimants and other parties-in-interest, the nature of the Debtors' business, and the scope of the tasks for which the Debtors will require the assistance of a claims, notice and balloting agent, the Debtors concluded that the retention of Logan is in the best interests of the Debtors' estates, their creditors, parties-in-interest, and this Court. Based on Logan's substantial experience in providing similar services in other large chapter 11 cases, including noticing, claims processing and reconciliation, and plan voting and distribution services, I believe that Logan is eminently qualified to serve as Claims, Noticing, and Balloting Agent in these chapter 11 cases.

46701/0001-5913877v6

88. I further believe that the relief requested in the Logan Retention Motion is in the best interests of the Debtors' estates, their creditors, and all other parties-in-interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.

89. Accordingly, on behalf of the Debtors, I respectfully submit that the Logan Retention Motion should be approved.

**D. Motion of the Debtors for an Order (I) Authorizing Continued Use of Existing Cash Management System, (II) Authorizing Continued Use of Existing Bank Accounts and Business Forms, (III) Authorizing the Continuation of Certain Intercompany Transactions, (IV) Waiving the Requirements of 11 U.S.C. § 345(b) on an Interim Basis, and (V) Granting Administrative Expense Status to Postpetition Intercompany Transactions (the "Cash Management Motion")**

90. By the Cash Management Motion, the Debtors seek entry of an order (i) authorizing the Debtors' continued use of their existing cash management system, (ii) authorizing the Debtors to continue using their existing bank accounts and business forms, (iii) authorizing the Debtors to continue intercompany transactions, by and among the Debtors and by and among the Debtors and certain of their non-debtor affiliates, on a postpetition basis, (iv) waiving the requirements of 11 U.S.C. § 345(b) on an interim basis with respect to the Debtors' deposit and investment practices, and (v) granting administrative expense status to postpetition intercompany transactions between and among the Debtors and between and among the Debtors and certain of their non-debtor affiliates. In connection with this relief, the Debtors also seek a waiver of certain of the operating guidelines established by the Office of the United States Trustee for the District of Delaware that generally require the Debtors to close all prepetition bank accounts, open new accounts designated as debtor-in-possession accounts, and obtain new business forms and stationery reflecting the Debtors' status as debtors-in-possession.

91. In the ordinary course of business, the Debtors use a centralized cash management system to collect funds from their operations and to pay operating and

administrative expenses, (the "Centralized Cash Management System"). The Centralized Cash Management System is similar to the centralized cash management systems used by other companies to collect, transfer, and disburse funds in a cost-effective and efficient manner. The Centralized Cash Management System is carefully managed through oversight procedures and controls implemented by the Debtors' treasury department. Through their control over the Centralized Cash Management System, the Debtors are able to facilitate cash forecasting and reporting, monitor collection and disbursement of funds, and maintain control over the administration of various bank accounts required to effect the collection, disbursement, and movement of cash.

92.     The Centralized Cash Management System primarily operates through the United States, the United Kingdom and Japanese bank accounts that the Debtors' maintain at Bank of America ("BofA"), Mizuho Bank ("Mizuho"), and Regions Bank ("Regions"), with one primary operating account at BofA (the "BofA Operating Account") acting as the central operating account for the entire system. Revenues typically reach the BofA Operating Account through transfers from (i) the UK Deposit Accounts, the Mizuho Deposit Accounts and the Wells Fargo Multicurrency Accounts and (ii) the various receivables accounts and lockboxes at BofA and Mizuho.

93.     The Debtors seek authority to continue using the Centralized Cash Management System on a postpetition basis as more fully described in the Cash Management Motion. It is critical that the Debtors remain able to manage cash and centrally coordinate transfers of funds in order to efficiently and effectively operate their business operations. Disrupting the Debtors' current cash management procedures would impair the Debtors' ability to preserve and enhance

46701/0001-5913877v6

their respective going concern value and to successfully reorganize during these chapter 11 cases.

94.     The Centralized Cash Management System allows the Debtors to centrally manage all of their cash flow needs and includes the necessary accounting controls to enable the Debtors, as well as their creditors and this Court, to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable. The Debtors will continue to maintain detailed records reflecting all postpetition transfers of funds. Any changes to the Debtors' bank accounts or their treasury systems that report on account activity and generate wire transfers would be disruptive to the Debtors' business operations and could undermine the effectiveness of such systems.

95.     Therefore, it is both essential and in the best interests of the Debtors' respective estates and creditors that the Centralized Cash Management System be maintained. Furthermore, the Debtors' reorganization efforts will be facilitated by preserving the "business as usual" atmosphere and avoiding the distractions that would be associated with disruptions in the Centralized Cash Management System.

96.     Furthermore, in the normal course of their business operations, the Debtors and certain of their non-debtor affiliates engage in various intercompany transactions. As a result, on any given date, there are numerous intercompany claims (the "Intercompany Claims") that reflect intercompany receivables and payments made in the ordinary course between and among the Debtors and between and among the Debtors and certain of their non-debtor affiliates (the "Intercompany Transactions"). The Debtors maintain records of all Intercompany Transactions and can ascertain, trace and account for all Intercompany Transactions between and among the Debtors and between and among the Debtors and their non-debtor affiliates. To ensure that

33

each individual Debtor will not fund, at the expense of its creditors, the operations of another entity, the Debtors respectfully request that, pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, all Intercompany Claims against a Debtor by another Debtor or a non-debtor affiliate arising after the Petition Date as a result of an Intercompany Transaction be accorded administrative priority expense status. If all Intercompany Claims are accorded administrative priority expense status, each entity will continue to bear ultimate repayment responsibility for such ordinary course transactions.

97.     I have been advised of the restrictions imposed by section 345(b) of the Bankruptcy Code. Prior to the Petition Date, the Debtors established a money market account at Bank of America Securities ("BofA Securities") to hold limited excess cash (the "Money Market Account"). As of the Petition Date, the Debtors held approximately $10,036 in the Money Market Account. The Money Market funds are invested in the Columbia Management Treasury Fund and that fund is AAA rated. The Debtors do not invest any other funds, including any of the funds on deposit in the BofA Operating Account. The Debtors request that the Court waive the requirements of section 345(b) on an interim basis and permit them to continue investing funds in the U.S. Bank account in accordance with their prepetition practices. All of the Debtors' U.S. Bank Accounts that the Debtors seek to continue to use are federally insured. The Debtors' UK Bank Accounts are insured in an amount up to $50,000 GBP and the Debtors' Japan Bank Accounts are insured in an amount up to 10,000 JPY. Given that the Bank Accounts are business accounts and considering the relative security of the Centralized Cash Management System, I believe that such funds are not at risk.

98.     I have also been advised of the U.S. Trustee Guidelines requiring the Debtors to comply with the requirement that chapter 11 debtors close all existing bank accounts after filing

a petition for reorganization and open new "debtor-in-possession" accounts in certain financial institutions designated as authorized depositories by the U.S. Trustee. I believe this requirement would create significant and undue hardship on the Debtors. Transferring bank accounts will be disruptive, time consuming and expensive. The Debtors therefore seek a waiver of the U.S. Trustee requirement that their bank accounts be closed and that new postpetition bank accounts be opened.

99.     In sum, the Debtors need to maintain their Centralized Cash Management System in order to ensure smooth collections and disbursements in the ordinary course of their business. It is critical that the Debtors remain able to manage cash and centrally coordinate transfers of funds in order to efficiently and effectively operate their business operations. Disrupting the Debtors' current cash management procedures would impair the Debtors' ability to preserve and enhance their respective going concern value and to successfully reorganize during these chapter 11 cases. As described above, the Debtors have already filed the Prepackaged Plan and Disclosure Statement, and the Plan was accepted by the parties entitled to vote. Because the Debtors anticipate exiting chapter 11 in 45 to 60 days, disrupting the existing Cash Management System in these circumstances would serve no purpose and could be destructive to the Debtors' value as an organized entity.

100.     Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

46701/0001-5913877v6

**E. Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Enter into an Insurance Premium Financing Agreement with AFCO Premium Credit LLC, (B) Make the Down Payment and Any Installment Payments Under the Insurance Premium Financing Agreement, (C) Continue Prepetition Insurance Programs in the Ordinary Course of Business, and (D) Pay All Related Prepetition Obligations and (II) Approving the Insurance Premium Financing Agreement with Respect to Payment and Security for AFCO Premium Credit LLC (the "Insurance Motion")**

101.    By the Insurance Motion, the Debtors seek entry of an order authorizing the Debtors to: (a) enter into an insurance premium financing agreement (the "Premium Financing Agreement") with AFCO Premium Credit LLC ("AFCO"), (b) make, in the Debtors' discretion, the down payment and any installment payments under the Premium Financing Agreement as such payments come due, (c) continue all of the Debtors' prepetition insurance programs in the ordinary course of business, and (d) pay all related prepetition obligations; and (ii) approving the Premium Financing Agreement with respect to payment and security for AFCO.  In light of the importance of maintaining the insurance coverage with respect to their business activities, the Debtors believe and I agree that it is in the best interests of the Debtors' estates and creditors for this Court to authorize the Debtors to enter into the Premium Financing Agreement and honor their obligations under the Insurance Policies and the Premium Financing Agreement.  Any other alternative would likely require considerable cash expenditures, could result in the Debtors obtaining insurance coverage on less desirable terms than their existing coverage, and could be detrimental to the Debtors' restructuring efforts.

102.    In connection with the operation of their business, the Debtors maintain multiple insurance policies.  The Debtors' insurance policies expired on September 30, 2009 and, as a result, the Debtors obtained new insurance policies or tail coverage prior to the Petition Date to provide the Debtors with protection in the United States, the United Kingdom and Japan (each an "Insurance Policy" and, collectively, the "Insurance Policies").  All of the premiums for the

36

Debtors' U.S. Insurance Policies for the policy period from September 30, 2008 through September 30, 2009 were financed through a financing agreement with AFCO. Prior to the Petition Date, the Debtors approached AFCO to negotiate a financing agreement for the premiums under the U.S. Insurance Policies that are due to be paid by as early as October 15, 2009 but no later than October 30, 2009 in the total aggregate amount of $1,323,806.09.

103. The Debtors were represented in their negotiations with AFCO and their Insurance Carriers or underwriters, as applicable, by Marsh USA Inc. ("Marsh"). The employment of Marsh has allowed the Debtors to obtain the insurance coverage necessary to operate their business in a reasonable and prudent manner. I believe it is in the best interests of their creditors and estates to continue their business relationship with Marsh. Accordingly, the Debtors seek the Court's authorization to continue their prepetition practice of paying brokerage fees to Marsh in connection with their representation of the Debtors in various ongoing negotiations with the Debtors' insurers, including amounts attributable to prepetition periods in the amount of $104,000.00.

104. The Debtors reached agreement with AFCO on the terms of the Premium Financing Agreement prior to the Petition Date; however, AFCO was not willing to enter into the Premium Financing Agreement until it was approved by this Court and provided AFCO with protections under Bankruptcy Code section 364(c)(2). Due to the fact that the first premiums under the U.S. Insurance Policies is due on October 15, 2009, the Debtors seek authorization to, among other things, enter into the Premium Financing Agreement and pay the down payment so that AFCO will timely pay the premiums under the applicable Insurance Policy when due.

46701/0001-5913877v6

105.     In light of the importance of maintaining the insurance coverage with respect to their business activities, I believe that it is in the best interests of the Debtors' estates and creditors for this Court to authorize the Debtors to enter into the Premium Financing Agreement, and honor their obligations under the Insurance Policies and the Premium Financing Agreement.  Any other alternative would likely require considerable cash expenditures and could be detrimental to the Debtors' restructuring efforts.

106.     The Debtors have compelling business reasons for seeking to keep their Insurance Policies in effect.  The insurance coverage provided under the Insurance Policies is essential for preserving the value of the Debtors' assets and I am informed that in many cases, such coverage is required by various regulations, laws, and contracts that govern the Debtors' business operations, including the operating guidelines established by the Office of the United States Trustee.

107.     The Debtors maintain the Insurance Policies in the amounts and types of coverage in accordance with state, local and other applicable laws governing the multiple jurisdictions in which the Debtors do business, as well as in accordance with their contractual obligations.  The Insurance Policies provide coverage for, among other things, real property, directors and officers, general liability, product liability, automobile liability, crime insurance, fiduciary liability, earthquake insurance, foreign liability, umbrella/excess liability, machinery and employment practices liability.

108.     Under the Premium Financing Agreement, the Debtors seek to finance the premiums for all of their U.S. insurance policies.  The Premium Financing Agreement provides that the Debtors pay an initial down payment in the amount of $456,196.00 and then monthly installments to AFCO in the amount of $110,245.19 to cover the total amount of premiums

financed of $867,610.09 and, in exchange, AFCO agrees to pay the full annual insurance premiums, in advance, to the Insurance Carriers.

109.     I have been advised that the Debtors' obligations under the Premium Financing Agreement would be secured by (i) all unearned premiums or dividends which may become payable to the Debtors under each of the Insurance Policies that are covered by the Premium Financing Agreement as well as (ii) any loss payments which reduce the unearned premiums under each of the Insurance Policies that are covered by the Premium Financing Agreement (subject to any mortgagee or loss payee interests). AFCO has requested that any order approving the Premium Financing Agreement provide that AFCO has protections under section 364(c)(2) of the Bankruptcy Code with respect to all unearned premiums or dividends that may become payable and loss payments which reduce the unearned premiums. Under the Premium Financing Agreement, in the event of non-payment by the Debtors, I have been advised that AFCO is appointed as the attorney in fact for all named insureds under the Insurance Policies and are granted the authority to, among other things, cancel the Insurance Policies.

110.     The Debtors are required to pay the down payment by October 13, 2009 and the first installment by October 30, 2009. By this Motion, the Debtors seek authority to pay (i) the down payment in the amount of $456,196.00, and (ii) all monthly installments under the Premium Financing Agreement, which total approximately $881,961.52.

111.     The Debtors have compelling business reasons for seeking to enter into the Premium Financing Agreement and keeping their Insurance Policies in effect. Entering into the Premium Financing Agreement will reduce the Debtors' initial obligations with respect to maintaining the Insurance Policies and, instead, allow the Debtors to make smaller payments over time to AFCO. The insurance coverage provided under the Insurance Policies is essential

for preserving the value of the Debtors' assets and, in many cases, such coverage is required by various regulations, laws, and contracts that govern the Debtors' business operations.

112.     If the Debtors are unable to finance the premiums for the Insurance Policies under the Premium Financing, the Debtors will be forced to use funds from the DIP Facility that would otherwise be used to operate their businesses in order to maintain the coverage under the Insurance Policies without interruption.  Assuming that the Court authorizes the Debtors to enter into the Premium Financing Agreement, the Debtors request authority to make the down payment and monthly installment payments under the Premium Financing Agreement.

113.     Failure to perform their obligations under the Premium Financing Agreement could mean that the coverage under the Insurance Policies could be voided.  Disruption of the Debtors' insurance coverage would expose the Debtors to serious potential risks, including:  (i) incurring direct liability for the payment of claims that otherwise would have been paid by the Insurance Providers under the Insurance Policies; (ii) incurring material costs and other losses that otherwise would have been reimbursed by the Insurance Providers under the Insurance Policies; (iii) losing their good-standing certifications to conduct business in states that require the Debtors to maintain certain levels of insurance coverage; (iv) the inability to obtain similar types of insurance coverage; and (v) incurring higher costs for re-establishing lapsed policies or obtaining new insurance coverage.  Any or all of these consequences could be seriously harmful to the Debtors' business and restructuring efforts, and I believe would expose the Debtors to higher costs and an increased risk of loss.

46701/0001-5913877v6

114.     Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance

Motion should be approved.

**F.     Motion for an Order (I) Authorizing: (A) Payment of Prepetition Employee Wages, Salaries, Commissions and Other Compensation; (B) Payment of Prepetition Compensation Owed to Independent Contractors and Temporary Workers; (C) Reimbursement of Prepetition Employee Business Expenses; (D) Payments for Which Prepetition Payroll and Tax Deductions Were Made; (E) Contributions to Prepetition Employee Benefit Programs and Continuation of Such Programs in the Ordinary Course; (F) Payment of Workers' Compensation Obligations; and (G) Payment to Third Parties of All Costs and Expenses Incident to the Foregoing Payments and Contributions; and (II) Authorizing and Directing Applicable Banks and Other Financial Institutions to Honor and Pay All Checks and Transfers Drawn on the Debtors' Payroll Accounts to Make the Foregoing Payments (the "Employee Motion")**

115.     By the Employee Motion, the Debtors seek entry of an order (i) authorizing, but

not directing, the Debtors, in accordance with their stated policies, to: (a) pay all prepetition

wages, salaries, and other compensation owed to the Debtors' employees; (b) pay all prepetition

compensation owed to individuals who work regularly as the Debtors' independent contractors

and temporary workers; (c) reimburse all prepetition business expenses to employees; (d) make

all payments for which prepetition payroll and tax deductions were made; (e) honor prepetition

obligations under certain employee benefit programs and continue such programs in the ordinary

course; (f) honor workers' compensation obligations; (g) make all payments to third parties

relating to the foregoing payments and contributions; and (ii) authorizing and directing

applicable banks and other financial institutions to honor and pay all checks and transfers drawn

on the Debtors' payroll accounts to make the foregoing payments.

116.     As stated above, the Debtors, in their U.S., European and Japanese locations,

currently employ approximately 307 Employees, of whom approximately 211 are Hourly

41

Employees and 96 are Salaried Employees. Approximately 300 of those Employees are located in the United States (the "U.S."), two (2) in the United Kingdom (the "UK") and five (5) in Japan. In addition, the Debtors normally utilize the services of approximately five (5) Independent Contractors and approximately ten (10) Temporary Workers. Approximately 150 of these Employees (the "Union Employees") are represented by a union and covered under a collective bargaining agreement.

117. I have been advised that the Employee Wages and Benefits that the Debtors seek to pay with respect to the Unpaid Wages and Reimbursable Expenses are entitled to priority status under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, to the extent they do not exceed $10,950.00 per Employee, Independent Contractor, and Temporary Worker. The Debtors would therefore be required to pay these claims in full in order to confirm a plan of reorganization. The Prepackaged Plan provides that Other Priority Claims will be paid in full. [11] Thus, I have been further advised that granting the relief requested herein would only affect the timing, and not the amount, of the payment of such amounts to the extent that they constitute priority claims.

118. The Deductions and the Payroll Taxes principally represent Employee earnings that governments (in the case of taxes), Employees (in the case of voluntarily withheld amounts), and judicial authorities (in the case of involuntarily withheld amounts) have designated for deduction from Employees' paychecks. The failure to pay these benefits could result in hardship to certain Employees and an administrative burden for the Debtors. Indeed, the Debtors expect inquiries from garnishors regarding the Debtors' failure to submit, among other things, child

---

[11] Other Priority Claims is defined under the Prepackaged Plan as "a Claim entitled to priority under section 507(a) of the Bankruptcy Code other than a DIP Facility Claim, Administrative Claim, Professional Fee Claim or Priority Tax Claim."

46701/0001-5913877v6

support and alimony payments that are not the Debtors' property, but, rather, have been withheld from Employees' paychecks on such parties' behalf. Moreover, if the Debtors cannot remit these amounts, I have been advised that the Employees may face legal action due to the Debtors' failure to submit such payments.

119. I have also been advised that maintaining the Workers' Compensation Programs is justified because applicable states or other governmental entities mandate this coverage. Furthermore, with respect to workers' compensation claims, the risk that eligible claimants will not receive timely payments with respect to employment-related injuries could have a severe effect on the financial well-being and morale of the Debtors' Employees and their willingness to remain in the Debtors' employ.

120. Furthermore, the majority of the Debtors' Employees rely exclusively on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses. Consequently, these Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid compensation, benefits, and reimbursable expenses. Moreover, if the Debtors are unable to satisfy such obligations, morale and loyalty will be jeopardized at a time when Employee support is critical. In the absence of such payments, I believe the Employees may seek alternative employment opportunities, thereby hindering the Debtors' ability to meet their customer obligations, and likely diminishing creditors' confidence in the Debtors. In addition, the loss of valuable Employees and the recruiting efforts that would be required to replace such Employees would be a massive and costly distraction at a time when the Debtors should be focusing on stabilizing their operations.

46701/0001-5913877v6

121. In addition, the Debtors request that all applicable banks and other financial institutions be authorized and directed to receive, process, honor, and pay all checks presented for payment and to honor all fund transfer requests made by the Debtors related to the Employee Wages and Benefits and the Reimbursable Expenses, whether such checks were presented or fund transfer requests were submitted prior to or after the Petition Date. The Debtors represent that these checks are drawn on identifiable bank accounts. Accordingly, checks other than those for the Employee Wages and Benefits and the Reimbursable Expenses will not be honored inadvertently. Moreover, the Debtors represent that they have sufficient cash reserves, together with anticipated access to debtor in possession financing, to promptly pay all of the Employee Wages and Benefits and the Reimbursable Expenses, to the extent described herein, on an ongoing basis and in the ordinary course of their businesses.

122. In sum, the Employees' skills and their knowledge and understanding of True Temper's infrastructure, operations and customer relations are essential to the effective operation and reorganization of the Debtors' business. Without continued services of the Employees, I believe an effective reorganization of the Debtors will not be possible.

123. Accordingly, on behalf of the Debtors, I respectfully submit that the Employee Motion should be approved.

**G.      Motion of the Debtors for Entry of an Interim and Final Order (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Providers Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate Assurance of Payment (the "Utilities Motion")**

124. By the Utilities Motion, the Debtors seek entry of an interim and final order: (i) prohibiting the utility providers from altering, refusing or discontinuing service to the Debtors on account of prepetition invoices, including the making of demands for security deposits or

accelerated payment terms; (ii) providing that the utility providers have "adequate assurance of payment" within the meaning of section 366 of the Bankruptcy Code, based, inter alia, on the Debtors' establishment of a segregated account containing an amount equal to fifty percent (50%) of the Debtors' estimated average monthly cost of utility service, which may be adjusted by the Debtors for reasons specified herein following the final hearing on this Motion; and (iii) establishing procedures for resolving requests for additional adequate assurance and authorizing the Debtors to provide adequate assurance of future payment to the Utility Providers.

125.    In connection with the operation of their businesses and management of their properties, the Debtors obtain electricity, natural gas, water, telephone services, and/or other similar services (collectively, the "Utility Services") from a number of utility providers (collectively, the "Utility Providers"). Annexed to the Utilities Motion as Exhibit C is a nonexclusive list of approximately 23 Utility Providers and their affiliates that provide Utility Services to the Debtors as of the Petition Date. The relief requested in the Utilities Motion is for all Utility Providers providing Utility Services to the Debtors and is not limited to those listed on the Utility Service List.

126.    In 2009, the Debtors paid an average of approximately $350,000 per month on account of Utility Services. Historically, the Debtors have had a very good payment history with the Utility Companies. Moreover, to the best of their knowledge, there are few, if any, defaults or arrearages of any significance with respect to the Debtors' undisputed invoices for Utility Services. To provide adequate assurance of payment for future services to the Utility Providers as set forth in section 366(c) of the Bankruptcy Code, the Debtors propose to deposit an initial sum equal to fifty percent (50%) of the Debtors' estimated average monthly cost of Utility Services (the "Adequate Assurance Deposit"), into an interest-bearing, newly-created,

segregated account (the "Adequate Assurance Account") within twenty (20) days of the Petition Date, pending further order of this Court. Because the Debtors' approximate monthly spending on Utility Services is approximately $350,000, the Adequate Assurance Deposit will be approximately $175,000.

127.     The Debtors submit that the Adequate Assurance Deposit, together with the Debtors' ability to pay for future Utility Services in the ordinary course of business with their post-petition financing (collectively, the "Proposed Adequate Assurance"), constitute sufficient adequate assurance to the Utility Companies, especially in light of the anticipated short length of these chapter 11 cases. Accordingly, upon entry of the final order, any Utility Provider that has failed to submit a request for the Proposed Adequate Assurance or otherwise file an Objection to the Utilities Motion as described below, shall he deemed to have been provided with adequate assurance of payment as required by section 366 of the Bankruptcy Code and shall be prohibited from discontinuing, altering, or refusing to provide Utility Services, including as a result of unpaid charges for prepetition Utility Services.

128.     The Debtors further request that this Court order that pending a final hearing on the Utilities Motion, all Utility Providers are prohibited from discontinuing, altering, or refusing service to the Debtors, or discriminating against, the Debtors on account of the commencement of these chapter 11 cases or any unpaid prepaid charges.

129.     I believe and am advised that the proposed Adequate Assurance Procedures set forth in the Utilities Motion are necessary in the chapter 11 cases, because if such procedures are not approved, the Debtors could be forced to address numerous requests by the Utility Providers in a disorganized manner during the critical first weeks of the chapter 11 cases. I

have been further advised that the proposed Adequate Assurance Procedures protect the Debtors without materially prejudicing the Utility Providers

130.    I believe that uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization. Discontinuation of utility service could essentially shut down operations, and any significant disruption of operations could put the chapter 11 cases in jeopardy. Indeed, any interruption of utility services, even for a brief period of time, would negatively affect the Debtors' operations, customer relationships, revenues, and profits, seriously jeopardizing the Debtors' reorganization efforts and, ultimately, value and creditor recoveries. It is, therefore, critical that utility services continue uninterrupted during the chapter 11 cases.

131.    Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be approved.

**H.    Motion of the Debtors for an Order Authorizing the Debtors to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue Prepetition Customer Programs and Practices in the Ordinary Course of Business (the "Customer Programs Motion")**

132.    By the Customer Programs Motion, the Debtors request the entry of an order granting the Debtors authority to (i) perform their prepetition obligations related to the Customer Programs (as defined below) as they determine advisable, and (ii) continue, renew, replace, modify and/or terminate any of the Customer Programs, as the Debtors determine advisable, in the ordinary course of business and without further application to this Court.

133.    Prior to the Petition Date, and in the ordinary course of their business operations, the Debtors engaged in certain practices to develop and sustain a positive reputation with their customers and in the marketplace for their products (collectively, the "Customer Programs"). The Customer Programs, many of which are customary in the Debtors' industries, include

among others, vendor programs, pre-payments and adjustments. Each of these Customer Programs is described in greater detail in the Customer Programs Motion. The goals of the Customer Programs are to meet competitive pressures, ensure customer satisfaction and generate goodwill for the Debtors, thereby retaining current customers, attracting new ones, and ultimately enhancing the Debtors' revenue and profitability.

134. The Debtors desire to continue during the postpetition period those Customer Programs that they believe are beneficial to their businesses. The Debtors believe, and I agree that such relief is necessary to preserve critical customer relationships. Indeed, the total operational and administrative cost to the Debtors to continue the Customer Programs is relatively insignificant when compared to the revenue that the Debtors generate from their customers. Accordingly, the Debtors are seeking the authority to continue the Customer Programs on a postpetition basis in the ordinary course of business.

135. In addition, in light of the fact that some of the Customer Programs, as they relate to prepetition arrangements between the Debtors and their customers, may represent unperformed prepetition obligations, the Debtors are seeking this Court's authorization to perform all prepetition obligations under the Customer Programs. Because the industry in which the Debtors operate is highly competitive, some of the Debtors' customers may cease to purchase the Debtors' products and may turn to other sources if the Debtors fail to timely perform their prepetition obligations under the Customer Programs. Therefore, unless the Debtors are able to assure their customer base that they will honor the Customer Programs during these chapter 11 cases, the Customers may seek alternative suppliers, which would result in an immediate loss of revenue and cash flow for the Debtors.

46701/0001-5913877v6

136. Accordingly, on behalf of the Debtors, I respectfully submit that the Customer Program Motions should be approved.

**I.  Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and (II) Authorizing Banks to Honor Related Checks and Electronic Transfers (the "Taxes Motion")**

137. By the Taxes Motion, the Debtors seek entry of interim and final orders authorizing them to pay in the ordinary course of business, in their discretion, the various taxes and related obligations that accrued or that arose before the Petition Date that will become due during the pendency of these cases. On an interim basis, the Debtors only seek authorization to pay certain Monthly and Quarterly Taxes, not to exceed $20,000, that will become due within 30 days of the Petition Date.

138. The Debtors seek the relief requested in the event and to the extent that: (a) the various taxes and related obligations that accrued prior to the Petition Date: (i) were not paid prepetition, (ii) were not processed prepetition or (iii) were paid in an amount that was less than is actually owed, including amounts subsequently determined upon any audit or otherwise to be owed for periods prior to the Petition Date; (b) any payments made prepetition were rejected, lost or otherwise not received in full by any Taxing Authority, or (c) any taxes and related obligations accrued or were incurred prepetition that will become due during the pendency of these cases in the ordinary course of business. The Debtors estimate that as of the Petition Date, their accrued and unpaid prepetition taxes were approximately $600,000. Furthermore, the Debtors estimate that during the pendency of these cases the amount of such Prepetition Taxes to be paid to the various Taxing Authorities will not exceed $620,000 (the "Tax Cap").

139. In the ordinary course of business, the Debtors incur various taxes and related obligations that are payable directly to various state, local and foreign taxing authorities

49

(collectively, the "Taxing Authorities"). The Debtors have operations in the United States, the United Kingdom, and Japan; accordingly, they are obligated to pay the taxes to various Taxing Authorities throughout the United States, the United Kingdom and Japan. Although the Debtors and I believe that they are current on all of the prepetition taxes that have become due as of the Petition Date, because such prepetition taxes are paid on a periodic basis (and in arrears), there is a lag between the time when the Debtors incur an obligation to pay the prepetition taxes and the date such prepetition taxes become due. Various Taxing Authorities may therefore have claims against the Debtors for prepetition taxes that have accrued but remain unpaid as of the Petition Date, and for certain other prepetition taxes that will come due during the pendency of these cases.

140.    The Debtors further request that the order approving this Motion authorize applicable banks and financial institutions (the "Banks") to honor and process electronic transfers or checks issued by any of the Debtors on account of any prepetition taxes that have not cleared as of the Petition Date, and to rely on the Debtors' representations as to which checks are issued and authorized to be paid in accordance with this Motion without any duty of further inquiry and without liability for following the Debtors' instructions.

141.    Payment of the prepetition Taxes is critical to the Debtors' continued, uninterrupted operations. Furthermore, I have been advised that the Debtors' failure to pay the Taxes could affect adversely the Debtors' business operations because the Taxing Authorities could suspend the Debtors' operations, file liens, or seek to lift the automatic stay. In addition, certain Taxing Authorities may take precipitous action against the Debtors' directors and officers for unpaid Taxes, which undoubtedly would distract those key employees from their duties related to the Debtors' restructuring.

46701/0001-5913877v6

142.     Consequently, I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties-in-interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.

143.     Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes Motion should be approved.

**J.      Motion of the Debtors for an Order Authorizing the Payment of Prepetition Claims of Shippers, Warehousemen and Other Lien Claimants (the "Shippers Motion")**

144.     By the Shippers Motion, the Debtors seek entry of an order authorizing them, in their discretion, to pay certain prepetition claims of shippers, vendors, warehousemen, brokers and other lien claimants in the ordinary course of business, in the aggregate amount not to exceed $306,000 without further order of this court.

145.     The Debtors' businesses are necessarily shipping intensive and are dependent upon timely delivery and receipt of raw materials and finished goods.  The Debtors receive daily shipments of the raw materials and supplies that are required to operate their facilities and produce products for their customers daily.  Additionally, the Debtors routinely ship finished goods from factories to their distribution centers or to warehouses prior to shipping such goods to their customers.  Finally, the Debtors ship finished goods from various locations to their customers.

146.     An integral component of the Debtors' day-to-day operations is the efficient flow of raw materials and finished goods to and from their domestic facilities and Japan, Hong Kong and the United Kingdom.  The Debtors' supply and delivery system depends upon the use of reputable domestic and international common carriers, less-than-truckload ("LTL") carriers, ocean and air carriers and parcel carriers, (collectively, the "Shippers"), as well as a network of

third-party warehousemen who store goods in transit on behalf of the Debtors (the "Warehousemen").

147.     In many instances, the Debtors, as well as several of their customers, try to operate on a "just-in-time" inventory system, which means that their ability to produce goods depends on the frequent and uninterrupted delivery of materials and components that are required for their manufacturing operations.  To ensure that their delivery network runs smoothly, the Debtors use nearly 20 third parties for its U.S. shipments and several additional third parties for its foreign delivery of goods, including the Shippers and Warehousemen.  The Debtors engage Shippers to transport, store and deliver raw materials, goods and components to the Debtors, as well as finished products to the Debtors' customers and to perform Customs Services.  The Debtors contract with Warehousemen to store raw materials and finished goods which are in inventory.

148.     In the ordinary course of business, Shippers and Warehousemen regularly have possession of raw materials, supplies, and finished goods produced by the Debtors and intended for delivery to their customers.  The Debtors expect that, as of the Petition Date, certain of the Shippers and Warehousemen will have outstanding invoices for goods that were delivered to the Debtors and Debtors' customers prior to the Petition Date.

149.     I am informed that under most state laws, a Shipper or a Warehouseman may have a lien on the goods in its possession, which lien secures the charges or expenses incurred in connection with the transportation or storage of such goods.  Additionally, I am also informed that pursuant to section 363(e) of the Bankruptcy Code, the Shippers or Warehousemen, as bailees, may be entitled to adequate protection in the form of a possessory lien.  As a result, certain Shippers and Warehousemen may refuse to deliver or release goods in

46701/0001-5913877v6

their possession or control, as applicable, before the prepetition amounts owed to them by the Debtors (collectively, the "Shipping and Warehousing Claims") have been satisfied and their liens redeemed.

150.    Additionally, a significant portion of the Debtors' business relies on the timely importation of goods and component parts from Asia, Europe and North America for use in the Debtors' manufacturing process or for sale.  From time to time, certain of the products produced by the Debtors at their domestic locations are sold to foreign customers.  Accordingly, in the ordinary course of their businesses, the Debtors' Shippers and customs brokers (the "Brokers") provide the services that enable the Debtors to comply with the complex customs laws and regulations of the United States and other jurisdictions (the "Customs Services").  The Customs Services are a vital link in the Debtors' integrated distribution system because the Shippers and Brokers complete paperwork necessary for customs clearance, prepare tariff import summaries, facilitate exportation of the Debtors' products, obtain tariff numbers and perform numerous other essential services for the Debtors.

151.    The Debtors pay the Shippers and Brokers fees for their Customs Services (collectively, the "Customs Fees") and reimburse the Shippers and Brokers for any funds advanced on behalf of the Debtors (a) to pay fees to the United States Customs Service (the "Customs Service") relating to work in process or finished goods delivered to or from locations outside the United States (collectively, the "Customs Duties"); and (b) for charges of certain ocean, air and land shippers and certain miscellaneous storage and handling expenses (collectively, the "Advances").  As of the Petition Date, certain of the Shippers and Brokers had outstanding claims for the payment of Customs Fees, Customs Duties and Advances (collectively, the "Customs Claims").

46701/0001-5913877v6

152.     In addition to the Shippers, Warehousemen and Brokers, the Debtors also routinely transact business with a number of other third parties (collectively, the "Lien Claimants"). I am informed that under applicable state law, these Lien Claimants have the potential to assert liens against the Debtors and their property if the Debtors fail to pay for goods or services rendered prior to the Petition Date ("Statutory Liens"). The Lien Claimants provide equipment, raw materials and perform various services for the Debtors, including (i) manufacturing tooling and other capital and non-capital equipment and parts necessary for the Debtors' operations and (ii) rendering essential services related to the Debtors' manufacturing facilities, such as machine repair and maintenance.

153.     Although the Debtors have generally made timely payments to the Lien Claimants, as of the Petition Date, some of the Lien Claimants may not have been paid in full for certain prepetition goods, equipment and services, which I understand, may result in such Lien Claimants asserting, and perfecting, Statutory Liens against the Debtors' relevant locations or the Debtors' goods or equipment. Additionally, certain Lien Claimants may refuse to perform their ongoing obligations to the Debtors, including manufacturing, installation, and servicing obligations, unless their claims are paid in full.

154.     Without authority to make these payments, it is probable that several, if not all, of the shippers will cease doing business with the Debtors, thereby affecting the Debtors' manufacturing processes and delivery of goods. At this critical time in the Debtors' chapter 11 cases, it is important that the delivery of raw materials and finished product remain uninterrupted. Without this required consistency, I believe the Debtors are likely to lose customers which will severely hamper the Debtors' reorganization prospects and significantly decrease the value of the Debtors' estates. As discussed more fully in the Shippers Motion, the

46701/0001-5913877v6

Debtors strongly believe, and I agree that (i) continuation of their positive relationships with the Shippers, Warehousemen, Brokers and Lien Claimants is imperative to their continued business operations and reorganization efforts, (ii) the payment of the Shipping and Warehousing Claims, Customs Claims and Lien Claimant Claims is essential to preserve and enhance the value of the Debtors' estates.

155.    Accordingly, on behalf of the Debtors, I respectfully submit that the Shippers Motion should be approved.

**K.      Motion of the Debtors for an Order Authorizing the Payment of Prepetition Claims of Certain (I) Critical Vendors and (II) Administrative Claimholders (the "Critical Vendors Motion")**

156.    By the Critical Vendors Motion, the Debtors seek entry of an order pursuant to sections 105(a), 363, 1107 and 1108 of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004 and Local Rule 2015-2(a): (i) authorizing the Debtors to pay, in their discretion, subject to the terms and conditions set forth in the Critical Vendors Motion (a) the prepetition claims of certain Critical Vendors and (b) the prepetition claims of certain Priority Vendors and (ii) authorizing banks and other financial institutions to receive, process, honor, and pay any and all checks and transfer requests evidencing amounts paid by the Debtors, whether presented prior to or after the Petition Date.

157.    Given the paramount importance of the goods and services provided by the Critical Vendors, and in order to ensure that the Debtors continue to receive such goods and services, it is imperative that the Debtors are permitted to pay the Critical Vendor Claims.  To continue to receive goods provided by the Priority Vendors in the ordinary course of business and without interruption, it is necessary for the Debtors to pay the Priority Vendor Claims.

158.    The Debtors believe and I agree that payment of the Critical Vendor Claims is vital to the Debtors' reorganization efforts because, in several instances, the Critical Vendors

are the only source from which the Debtors can procure certain goods and services within a timeframe and at a price that will permit the Debtors to continue operating their businesses. A failure to pay the Critical Vendor Claims would likely result in many of the Critical Vendors refusing to provide goods and services to the Debtors postpetition, and may force the Debtors to obtain such goods and services elsewhere at a higher price or in a quantity or quality that is insufficient to satisfaction the Debtors' requirements.

159.     The Debtors have examined whether the payment of Critical Vendor Claims is necessary and will ensure that the Debtors have access to adequate amounts of trade credit on a postpetition basis.  Specifically, the Debtors have reviewed their accounts payable and have undertaken a process to identify those vendors who are essential to the Debtors' operations.  The Debtors have also developed certain procedures (for which they seek the Court's approval in the Critical Vendors Motion) that when implemented, will ensure that vendors receiving payment of Critical Vendor Claims will continue to supply trade credit necessary to the Debtors' operations on a postpetition basis and in accordance with the terms of the parties' prepetition dealings. Along with other members of the Debtors' management team, I have identified those vendors that are most essential to the Debtors' operations using the following criteria: (a) whether the vendor in question is a "sole-source" provider, (b) whether certain customizations prevent the Debtors from obtaining a vendor's goods or services from alternative sources within a reasonable timeframe, (c) if a vendor is not a sole source provider, whether the Debtors have sufficient goods in inventory to continue operations while a replacement vendor is secured, and (d) whether a vendor meeting the standards of (a) or (b) is likely to refuse to continue providing goods or services to the Debtors postpetition if its prepetition outstanding balances are not paid.

46701/0001-5913877v6

160.    The Priority Vendor Claims consist primarily of claims related to production and factory supplies along with equipment tooling and repair items (collectively "Priority Vendors"), all of which have been sent to or received by the Debtors in the ordinary course of business within the 20-day period prior to the Petition Date.  The goods provided by the Priority Vendors are invaluable to the continued operation of the Debtors' business because most of the production manufacturing equipment used by the Debtors is unique to the golf industry, with limited suppliers for repair parts and tooling in the United States.  In addition, the Debtors have operated their facilities on very short lead times for manufacturing and factory supplies, thus, any interruption in the continued flow of manufacturing and factory supplies, if the Debtors are required to identify new suppliers, could have a significant detrimental effect on the overall production cycle, and negatively impact the Debtors' business.

161.    It is imperative for the Debtors to maintain good standing with the Priority Vendors in order to ensure their continued access to production manufacturing supplies and tooling, as well as general factory supplies, in order to maintain product production and meet their ongoing sales and customer needs.  Accordingly, to operate their business, I believe the Debtors must maintain a continuing and timely flow of such goods to the Debtors' facilities across the United States.

162.    The Debtors propose to condition the payment of Critical Vendor Claims and Priority Vendor Claims on the agreement of the individual Critical Vendor to continue supplying goods and services to the Debtors on terms that are as or more favorable to the Debtors as the most favorable trade terms, practices, and programs in effect between the Critical Vendor or the Priority Vendor and the Debtor in the twelve months prior to the Petition Date (the "Customary Trade Terms"), or such other trade terms as are agreed to by the Debtors

57

and the Critical Vendor or the Priority Vendor. The Debtors further propose that all payments

of Critical Vendor Claims shall be applied first to the Critical Vendor's claims for goods

received by the Debtors within the 20 prior to the Petition Date and the remainder, if any, to the

Critical Vendor's claims for goods received by the Debtors prior to the 20 day period before the

Petition Date. The Debtors reserve the right to negotiate new trade terms with any Critical

Vendor or Priority Vendor as a condition to payment of any Critical Vendor Claim or Priority

Vendor Claim.

163. I believe that maintaining the goods and services provided by the Critical

Vendors is vital to the Debtors' continuing business operations and the success of these chapter

11 cases. In addition, the Debtors have conducted an extensive analysis and review of the

Debtors immediate trade needs and supplier base and have concluded that there is a significant

risk that the Critical Vendors will cease doing business with the Debtors unless their Critical

Vendor Claims are paid. Should any Critical Vendor stop supplying the Debtors, or choose to

significantly downgrade the Debtors' trade terms, I believe their businesses would be

significantly and perhaps irreparably disrupted because their manufacturing facilities would

lack the requisite materials and services needed to supply products to customers. This, in turn,

would affect the Debtors' customers', supply chain and operations. Such a scenario would

drastically affect the Debtors' revenues, cash flows and profitability and could lead to large

customer damage claims against the Debtors. As such, I submit that the amount of the Critical

Vendor Cap is small relative to the likely damage to the Debtors' businesses and estates should

the relief requested herein not be granted. Under the Prepackaged Plan, Holders of Trade

Unsecured Claims will be paid in full from the proceeds to the Trade Account to be funded by

accepting holders of Class 3 Claims. Accordingly, not only will the Debtors' other creditors

not be impaired by payment of the Critical Vendor Claims, such creditors will in fact benefit by this Court's empowering the Debtors to negotiate payment to Critical Vendors to achieve a smooth transition into bankruptcy with minimal disruption to its operations. In light of the foregoing, I submit that payment of the Critical Vendor Claims is plainly in the best interests of their estates and creditors.

164. The Prepackaged Plan provides that Administrative Claims will be paid in full. Instead of satisfying Priority Vendor Claims after confirmation of the Prepackaged Plan (at which time such payments may be too late to benefit the estates), the Debtors seek to pay these claims as and when they become due in the ordinary course of business, while such payments can still induce the individual vendor to adhere to favorable trade terms and to conduct business with the Debtors on a going-forward basis.

165. I believe that payment of the Priority Vendor Claims is in the best interests of the Debtors' estates because: (a) favorable trade terms will prevent the contraction of the Debtors' liquidity and (b) this Court's time and resources will not be burdened with numerous motions from individual vendors requesting payment on account of their administrative priority expense claims.

166. Accordingly, on behalf of the Debtors, I respectfully submit that the Critical Vendors Motion should be approved.

46701/0001-5913877v6

**L.    Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors (A) to Obtain Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1) and 364(E) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364, and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(B) and (C) (the "DIP Motion")**

167.    By the DIP Motion, the Debtors seek entry of an interim order and a final order: (I) authorizing the Debtors (a) to enter into a certain debtor-in-possession financing facility (the "Revolving DIP Facility") with General Electric Capital Corporation, as Revolving DIP Administrative Agent and Co-Collateral Agent, for itself and the Revolving DIP Lenders and that certain debtor-in-possession term loan that constitutes a roll-up of $80 million of the Prepetition First Lien Indebtedness, (the "Roll-Up DIP Loans," and together with the Revolving DIP Facility, the "DIP Facilities") with Credit Suisse Cayman Islands Branch, as Roll Up DIP Administrative Agent for the Roll Up DIP Lenders and as Co-Collateral Agent for the DIP Lenders and GE Capital Markets, Inc. as Sole Bookrunner and Sole Lead Arranger; and (b) to use cash collateral; (II) granting, in accordance with the relative priorities, certain adequate protection to the Prepetition First Lien Secured Parties and to the Prepetition Second Lien Secured Parties; and (III) scheduling a final hearing with respect to the relief requested herein.

168.    The Revolving DIP Facility will provide the Debtors with up to $10 million of additional financing, inclusive of a letter of credit sub-facility in the aggregate amount of $5 million, to fund the Debtors' operating, working capital and capital expenditure needs during the course of these chapter 11 cases.  In addition, the DIP Facilities include the Roll-Up DIP Loans that consist of a term loan that constitutes a roll-up of $80 million of the Prepetition First Lien Indebtedness.

46701/0001-5913877v6

169. The Debtors determined that their best option was to pursue DIP financing with their existing Prepetition First Lien Lenders. Prior to the Petition Date and in connection with their negotiations with the Participating First Lien Lenders, the First Lien Agent, the Participating Second Lien Lenders and the Plan Investors with respect to a consensual restructuring, the Prepetition First Lien Lenders advised the Debtors that they would not agree to be primed by a third-party lender, and the Debtors would likely be unable to otherwise provide adequate protection to permit such priming over the First Lien Lenders' objection. Consequently, the Debtors determined that the DIP Facilities with certain of their Prepetition First Lien Lenders offered the best option -- and indeed the only available, viable option -- for DIP financing with terms comparable to those offered by the DIP Facilities.

170. A denial of the Debtors' requested relief will cause immediate and irreparable harm to the Debtors and their estates, and will also have a detrimental effect on the collateral. Absent access to the DIP Facilities and the use of the cash collateral, the Debtors would have no ability to meet their ongoing obligations to suppliers, vendors, employees and other creditors. If the Debtors are unable to pay their ongoing obligations, they will not be able to operate. In contrast, the Debtors' access to the DIP Facilities and continued use of cash collateral will ensure that the "going concern" value of their assets are preserved, a value substantially greater than the value which would be realized from a piecemeal liquidation of those assets if the Debtors were forced to cease operations immediately.

171. I believe the Debtors have made a concerted, good-faith effort to obtain credit on the most favorable terms that are available. The proposed terms of the DIP Facilities are fair and reasonable under the circumstances and were negotiated extensively by well-represented, independent parties in good faith and at arms-length.

46701/0001-5913877v6

172.    Accordingly, on behalf of the Debtors, I respectfully submit that the DIP Motion should be approved.

**M.    Motion of the Debtors for an Order (I) Scheduling a Combined Hearing to Consider the Adequacy of the Disclosure Statement and Confirmation of the Prepackaged Plan ; (II) Establishing Deadlines and Procedures to File Objections; (III) Approving the Form and Manner of Notice of the Combined Hearing; (IV) Approving the Prepetition Solicitation Procedures; and (V) Directing the United States Trustee Not to Convene a Meeting of Creditors (the "Solicitation Procedures Motion")**

173.    By the Solicitation Procedures Motion, the Debtors respectfully request entry of an order: (i) scheduling a combined hearing (the "Combined Hearing") to consider the adequacy of the Disclosure Statement and confirmation of the Prepackaged Plan; (ii) establishing deadlines and procedures to file objections; (iii) approving the form and manner of notice of the Combined Hearing; (iv) approving the Prepetition Solicitation Procedures; and (v) directing the U.S. Trustee not to convene a meeting of creditors.

174.    Below is a table highlighting the dates relevant to the Prepetition Solicitation Procedures and setting forth the Debtors' proposed dates for the mailing of the notice of the Combined Hearing, the Combined Hearing, the Objection Deadline, and Reply Deadline.

| Proposed Timetable | |
| --- | --- |
| Record Date | September 29, 2009 |
| Commencement of Prepetition Solicitation | September 30, 2009 |
| Voting Deadline | October 7, 2009 |
| Petition Date | October 8, 2009 |
| Mailing of Combined Hearing Notice | October 10, 2009 |
| Objection Deadline | November 9, 2009 |
| Reply Deadline (if any) | November 12, 2009 |
| Combined Hearing | November 16, 2009 |

46701/0001-5913877v6

175.     As set forth above, the Debtors commenced solicitation of the Prepackaged Plan prior to the Petition Date.  By the Solicitation Procedures Motion, the Debtors request the Court to approve their solicitation, balloting, tabulation, and related activities, all of which were undertaken and completed prior to the Petition Date.  Specifically, the Debtors seek approval of the Record Date, Voting Period, the Solicitation Package and transmittal thereof, and the voting and tabulation procedures, which are all described more fully in the Solicitation Procedures Motion.

176.     Furthermore, the Debtors request the Court to schedule a Combined Hearing to consider the adequacy of the Disclosure Statement and confirmation of the Prepackaged Plan on or about November 16, 2009, and establish a related Objection Deadline and Reply Deadline. As set forth above, the most sensitive and complex task required to effectuate a successful reorganization - the negotiation of consensual agreements with critical creditor constituencies - has already been accomplished in advance of the Petition Date.  I believe that a protracted stay in chapter 11 will inexorably harm the Debtors' ability to preserve the value of their business due to the risk of misinformation about the nature of the proceedings creating uncertainty in the marketplace and negatively impacting the Debtors' relationships with customers and suppliers. The Debtors, therefore, intend to proceed expeditiously to confirm the Prepackaged Plan and emerge from chapter 11 as quickly as possible.

177.     Thus, the Debtors respectfully submit, and I agree, that there is no reason to delay consideration of the adequacy of the Disclosure Statement and confirmation of the Prepackaged Plan.  It is in the best interests of the Debtors' estates and creditors to proceed with the confirmation process as expeditiously as possible.  Scheduling the Combined Hearing on or

46701/0001-5913877v6

about November 16, 2009 will reduce administrative expenses to the estates, minimize the adverse effects of the chapter 11 filing on the Debtors' business, and foster judicial economy.

178.    The Debtors further request approval of the notice of the Combined Hearing. The Combined Hearing Notice includes the following information: (i) a notice of the commencement of these cases; (ii) a summary of the treatment provided by the Prepackaged Plan to each class of Claims and Interest; (iii) certain provisions of the Prepackaged Plan relating to discharge, releases, injunction, exculpation, subordination, and binding effect; (iv) the date, time, and place of the Combined Hearing; (v) instructions for obtaining copies of the Disclosure Statement and Prepackaged Plan; and (vi) the Objection Deadline and the procedures for filing objections to the Disclosure Statement and the Prepackaged Plan.

179.    In addition, I have been advised by the Debtors that cause exists for this Court to direct the U.S. Trustee not to convene a 341 Meeting and not to appoint any statutory committee, unless the Prepackaged Plan is not confirmed within seventy-five (75) days of the Petition Date.

180.    In light of the prepackaged nature of these cases, the short duration of time which the Debtors expect to be in bankruptcy, and the fact that the Prepackaged Plan, which was overwhelmingly accepted by creditors entitled to vote thereon, I believe the relief requested in the Solicitation Procedures Motion is in the best interests of the Debtors, their creditors, and all parties-in-interest and, therefore, should be granted.

181.    Accordingly, on behalf of the Debtors, I respectfully submit that the Solicitation Procedures Motion should be approved.

46701/0001-5913877v6

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 7, 2009

Respectfully submitted,

_Jason A. Jenne_
**Jason A. Jenne**
**Vice President and Chief Financial Officer**