## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| TRUE TEMPER SPORTS, INC., et al.,[1] | : | Case No. 09-_____ (___) |
| Debtors. | : | |
| | : | Joint Administration Requested |
| | : | |

**MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1) AND 364(E) AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364, AND (III) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(B) AND (C)**

The above-captioned debtors and debtors-in-possession (each a "Debtor" and collectively, the "Debtors") hereby move this Court (the "Motion") for the entry of an interim order (the "Interim Order")[2] and a final order (the "Final Order," and together with the Interim Order, the "DIP Orders") pursuant to sections 105(a), 361, 362, 363 and 364 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"): (I) authorizing the Debtors (a) to enter into a certain debtor-in-possession financing facility (the "Revolving DIP Facility") with General Electric Capital

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: True Temper Sports, Inc. (2620), True Temper Corporation (4519), and True Temper Sports-PRC Holdings, Inc. (6895). The Debtors' corporate headquarters are located at, and the mailing address for each Debtor is, 8275 Tournament Drive, Suite 200, Memphis, Tennessee 38125.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Interim Order.

Corporation, as Revolving DIP Administrative Agent and Co-Collateral Agent, for itself and the Revolving DIP Lenders and that certain debtor-in-possession term loan that constitutes a roll-up of $80 million of the Prepetition First Lien Indebtedness, (the "Roll-Up DIP Loans," and together with the Revolving DIP Facility, the "DIP Facilities") with Credit Suisse Cayman Islands Branch, as Roll Up DIP Administrative Agent for the Roll Up DIP Lenders and as Co-Collateral Agent for the DIP Lenders and GE Capital Markets, Inc. as Sole Bookrunner and Sole Lead Arranger; and (b) to use cash collateral; (II) granting, in accordance with the relative priorities, certain adequate protection to the Prepetition First Lien Secured Parties and to the Prepetition Second Lien Secured Parties; and (III) scheduling a final hearing with respect to the relief requested herein. In support of the Motion, the Debtors rely upon and fully incorporate by reference the Declaration of Jason A. Jenne in Support of Chapter 11 Petitions and First Day Pleadings (the "Jenne Declaration"). In further support of the Motion, the Debtors respectfully state as follows:

## JURISDICTION

1.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 1334 and 157(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

2.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested in this Motion are sections 105(a), 345, 361, 362, 363 and 364 of the Bankruptcy Code. Such relief is warranted under Bankruptcy Rules 2002, 4001, 6004, and 9014 and Local Rule 4001-2.

## BACKGROUND

4.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions in this Court for relief under chapter 11 of the Bankruptcy Code. The factual background regarding the Debtors, including their business operations, their capital and debt structure, and the events

leading to the filing of these bankruptcy cases, is set forth in detail in the Jenne Declaration, filed concurrently herewith and fully incorporated herein by reference.

5.     Prior to the Petition Date, the Debtors solicited votes on the Joint Prepackaged Plan of Reorganization of True Temper Sports, Inc., True Temper Corporation, and True Temper Sports-PRC Holdings, Inc., dated September 30, 2009 (the "Prepackaged Plan" or the "Plan") through their Disclosure Statement with Respect to the Joint Prepackaged Plan of Reorganization of True Temper Sports, Inc., True Temper Corporation, and True Temper Sports-PRC Holdings, Inc, dated September 30, 2009 (the "Disclosure Statement"), both filed contemporaneously herewith.  As described more fully in the Jenne Declaration, the Prepackaged Plan has been accepted by all classes entitled to vote in excess of the statutory thresholds specified in section 1126(c) of the Bankruptcy Code.  The Prepackaged Plan provides, among other things, that (a) the acceptance of the Prepackaged Plan by a holder of an Allowed Second Lien Credit Facility Claim constitutes an agreement by such holder to contribute 100% of its Cash distribution of up to $3,000,000 (but not less than $500,000) on account of its Allowed Claim for deposit into the Trade Account for distribution to Allowed Trade Unsecured Claims in accordance with Article IV. of the Prepackaged Plan and (b) the holders of Senior Subordinated Notes will receive no distribution under the Prepackaged Plan which treatment was agreed to by the Plan Investor who holds an aggregate 45.5% of the face amount of the Senior Subordinated Notes.  As a result of the fact that 27 out of 28 holders of Allowed Second Lien Credit Facility Claims (holding more than 93% of the aggregate amount of such claims) voted to accept the Prepackaged Plan, sufficient cash will be available to pay Trade Unsecured Claims in full.  By separate motion, the Debtors are requesting a hearing to confirm the Prepackaged Plan within 40 to 45 days of the Petition Date.

46701/0001-5882329v5

6.      The Debtors continue to manage and operate their business as debtors-in-possession pursuant to Bankruptcy Code sections 1107 and 1108.

7.      No official committee of unsecured creditors has been appointed in these chapter 11 cases.

## I.      Summary of Prepetition Indebtedness

8.      Prior to the Petition Date, the Debtors funded their operations with three different types of debt financing.  First, the Debtors arranged senior secured bank financing comprised of a term loan, a revolving credit facility, and a letter of credit sub-facility to the revolving credit facility (the "Prepetition First Lien Credit Facility").  The aggregate amount of debt outstanding under the Prepetition First Lien Credit Facility as of the Petition Date was approximately $106 million in principal, plus accrued and unpaid interest (the "Prepetition First Lien Indebtedness"). Second, the Debtors arranged junior secured bank financing comprised of a single term loan (the "Prepetition Second Lien Credit Facility").  The aggregate amount of debt outstanding under the Prepetition Second Lien Facility as of the Petition Date was approximately $45 million in principal, plus accrued and unpaid interest. (the "Prepetition Second Lien Indebtedness").  Third, the Debtors issued long term debt comprised of a single series of senior subordinated notes (the "Prepetition Notes").  The aggregate amount of debt outstanding under the Prepetition Notes as of the Petition Date was approximately $125 million in principal, plus accrued and unpaid interest (the "Prepetition Note Indebtedness").  The Debtors' three primary types of prepetition financing are described in greater detail below.

## A.      Senior Prepetition Secured Debt under the Prepetition First Lien Credit Agreement

9.      True Temper Sports, Inc.  ("True Temper" or the "Borrower") is the borrower under that certain amended and restated Credit Agreement, dated as of March 27, 2006 (as amended, restated, supplemented or otherwise modified prior to the Petition Date, the

"Prepetition First Lien Credit Agreement"), with a syndicate of lenders led by Credit Suisse acting as general administrative agent. The Prepetition First Lien Credit Agreement provided for, among other things:

a. a $128 million term loan – approximately $84,355,460.76 was outstanding as of the Petition Date;

b. a maximum revolving credit facility of $20 million – approximately $17,085,000 was outstanding as of the Petition Date; and

c. a letter of credit sub-facility of $3 million to the revolving credit facility, of which approximately $1.8 million is issued and outstanding.

The term loan is due on March 15, 2011, and the revolving credit facility matured on March 15, 2009.

10. True Temper Corporation and True Temper Sports-PRC Holdings, Inc. guaranteed all of the obligations of True Temper (the "Prepetition Senior Obligations") under the Prepetition First Lien Credit Agreement to the Prepetition First Lien Lenders.

11. The Prepetition Senior Obligations are secured by liens on substantially all of the assets of True Temper, True Temper Corporation and True Temper Sports-PRC Holdings, Inc.

i. *Forward Contracts and Interest Rate Swaps*

12. The Borrower has the ability under the Prepetition First Lien Credit Facility to enter into hedging arrangements to mitigate the Borrower's risk against fluctuation in foreign exchange rates and interest rates. The Borrower's obligations under such arrangements are obligations under the Prepetition First Lien Credit Facility. The Borrower is exposed to exchange rate fluctuations in the British Pound and Japanese Yen due to sales in those currencies. The Borrower has entered into foreign exchange forward contracts with Wells Fargo Bank, National Association to manage such foreign currency exchange rate exposures. The

Borrower's last forward contract expired by its terms on October 5, 2009 (the "Forward Contract").

13. In addition to the Forward Contract, the Borrower has entered into interest rate swaps to mitigate the risk against fluctuation in interest rates. Pursuant to an ISDA Master Agreement, dated as of April 23, 2008, the Borrower entered into certain interest rate swaps (the "Swap Agreement") with Credit Suisse International to fix the underlying LIBOR borrowing base rate on $100 million of its variable rate debt under the First Lien Term Loan at approximately 3.20% for a period of approximately 24 months.

14. As of the Petition Date, there was (i) approximately $2,000,000 owing on account of the termination value of the Swap Agreement, and (ii) approximately $388,996.35 owing on account of the termination value of the Forward Contract. Obligations owing under the Swap Agreement and Forward Contract are secured by liens that are pari passu with the lien securing the Prepetition Senior Obligations.

B.     Junior Prepetition Secured Debt Under the Prepetition Second Lien Credit Agreement

15. True Temper is the borrower under that certain Credit Agreement, dated as of dated as of January 22, 2007 (as amended, restated, supplemented or otherwise modified prior to the Petition Date, the "Prepetition Second Lien Credit Agreement"), with a syndicate of lenders led by Credit Suisse acting as general administrative agent.[3] The Prepetition Second  Lien Credit Agreement provided for:

  a.     a term loan of $45 million – approximately $45 million was outstanding as of the Petition Date.

The term loan is matures on June 30, 2011.

---

[3] On April 27, 2009, the Law Debenture Trust Company of New York succeeded Credit Suisse as the general administrative agent.

46701/0001-5882329v5

16. True Temper Corporation and True Temper Sports-PRC Holdings, Inc. guaranteed all of the obligations of True Temper (the "Prepetition Junior Obligations") under the Prepetition Second Lien Credit Agreement to the Prepetition Second Lien Lenders.

17. The Prepetition Junior Obligations are secured by liens on substantially all of the assets of True Temper, True Temper Corporation and True Temper Sports-PRC Holdings, Inc.

C. Senior Note Debt

18. True Temper is obligated under 8 ⅜% unsecured notes due 2011 (the "Prepetition Notes") in the aggregate principal amount of $125 million. The 8 ⅜% unsecured notes were issued by True Temper and are guaranteed by True Temper Sports-PRC Holdings, Inc.

II. The Debtors' Postpetition Financing Needs

19. As more fully set forth in the Jenne Declaration, the Debtors require additional working capital financing in order to preserve and maintain their business. The Revolving DIP Facility will provide the Debtors with up to $10 million of additional financing, inclusive of a letter of credit sub-facility in the aggregate amount of $5 million, to fund the Debtors' operating, working capital and capital expenditure needs during the course of these chapter 11 cases. In addition, the DIP Facilities include the Roll-Up DIP Loans that consist of a term loan that constitutes a roll-up of $80 million of the Prepetition First Lien Indebtedness.

20. The Debtors determined that their best option was to pursue DIP financing with their existing Prepetition First Lien Lenders. Prior to the Petition Date and in connection with their negotiations with the Participating First Lien Lenders, the First Lien Agent, the Participating Second Lien Lenders and the Plan Investors with respect to a consensual restructuring, the Prepetition First Lien Lenders advised the Debtors that they would not agree to be primed by a third-party lender, and the Debtors would likely be unable to otherwise provide adequate protection to permit such priming over the First Lien Lenders' objection.

7

Consequently, the Debtors determined that the DIP Facilities with certain of their Prepetition First Lien Lenders offered the best option – and indeed the only available, viable option – for DIP financing with terms comparable to those offered by the DIP Facilities. The commitment papers for the DIP Facilities are attached as Exhibit A to the Prepackaged Plan. The DIP Facilities will be provided pursuant to that certain Credit Agreement (as amended, modified or supplemented in accordance with the terms of the Interim Order, the "DIP Credit Agreement"), substantially in the form attached hereto as Exhibit A, by and between True Temper (the "Borrower"), True Temper Corporation and True Temper Sports-PRC Holdings, Inc. (the "Guarantors"), General Electric Capital Corporation as DIP Arranger, as Revolving DIP Administrative Agent and Co-Collateral Agent for itself and the Revolving DIP Lenders, and Credit Suisse Cayman Islands Branch ("Credit Suisse"), as "Roll Up DIP Administrative Agent" and together with the Revolving DIP Administrative Agent, the "DIP Administrative Agents") for the Roll Up DIP Lenders and as Co-Collateral Agent for the DIP Lenders and with GE Capital Markets, Inc. as Sole Bookrunner and Sole Lead Arranger.

## RELIEF REQUESTED

21. By this Motion, pursuant to sections 105(a), 361, 362, 363 and 364 of the Bankruptcy Code, Bankruptcy Rule 6004 and Local Rule 4001-2, the Debtors request that this Court enter an Interim Order and Final Order: (I) authorizing the Debtors (a) to enter into the DIP Facilities in accordance with the terms of the DIP Credit Agreement; and (b) use cash collateral; (II) granting, in accordance with the relative priorities, certain adequate protection to the Prepetition First Lien Secured Parties and to the Prepetition Second Lien Secured Parties; and (III) scheduling a final hearing with respect to the relief requested herein.

**III.    Terms and Conditions of the DIP Facilities**

A.      <u>Summary of Principal Terms of the DIP Facilities</u>

      22.     In accordance with Local Rule 4001-2(a)(ii) the significant elements of the DIP

Facilities and the DIP Loan Documents to be executed in connection therewith and to which the

DIP Facilities refer are as follows:[4]

a)     <u>Types of Facilities</u>: A postpetition revolving credit facility with a total commitment of up to $10 million, inclusive of a letter of credit sub-facility in the amount of $5 million. A debtor-in-possession term loan that constitutes a roll-up of up to $80 million in certain outstanding obligations under the Prepetition First Lien Credit Facility on a ratable basis.

b)     <u>Borrower</u>: True Temper Sports, Inc.

c)     <u>Guarantors</u>: True Temper Corporation and True Temper Sports PRC Holdings, Inc.

d)     <u>Administrative Agent and Lenders</u>: General Electric Capital Corporation will serve as Revolving DIP Administrative Agent and as Co-Collateral Agent under the Revolving DIP Facility for itself and the Revolving DIP Lenders. Credit Suisse, acting through its Cayman Islands Branch, will serve as Roll Up DIP Administrative Agent for the Roll Up DIP Lenders and as Co-Collateral Agent for the DIP Lenders.

e)     <u>Lead Arranger; Bookrunner; Syndication Agent</u>: General Electric Capital Corporation will act as sole lead arranger, sole bookrunner, and sole syndication agent under the Revolving DIP Facility.

f)     <u>Commitment and Availability</u>: A maximum total commitment of up to $10 million, inclusive of a letter of credit sub-facility in the amount of $5 million, of which $6 million will be available during the interim period under the Revolving DIP Facility.

g)     <u>Term</u>: The DIP Facilities shall terminate at the earlier of (i) 180 days after the closing date of the DIP Facilities (the "Maturity Date") or (ii) the effective date of

---

[4] The following description of the terms of the DIP Facilities is intended solely to provide the Court and interested parties with a brief overview of the significant terms thereof. For a complete description of the terms and conditions of the DIP Facilities, reference should be made to the DIP Loan Documents. This summary is qualified in its entirety by reference to the provisions of the DIP Loan Documents. In the event of any conflict or inconsistency between the provisions of this Motion and the DIP Loan Documents, the DIP Loan Documents shall control in all respects. Capitalized terms used in this section of the Motion and not otherwise defined herein (including the Interim Order) shall have the meanings ascribed to such terms in the DIP Loan Documents.

the Prepackaged Plan, at which earlier date the DIP Facilities shall be due and payable.

h) <u>Interest Rate</u>: Interest will accrue on outstanding obligations under the DIP Revolving Credit Facility at a rate equal to LIBOR for interest periods of 1, 2, or 3 months (subject to a 3.00% floor) plus 8.00% per annum. Interest will accrue on outstanding obligations under the Roll-Up DIP Loans at a rate equal to the Alternate Base Rate[5] plus 4.25% per annum. Interest will be payable monthly in arrears.

i) <u>Default Interest</u>: Upon the occurrence and during the continuance of any event of default, interest shall accrue on the outstanding amount of the obligations and shall be payable on demand at 2% above the then applicable rate.

j) <u>Commitment Fee</u>: 1% per annum (calculated on the basis of a 360-day year and actual days elapsed) on the average unused daily balance of the DIP Revolving Credit Facility. Such fees shall be payable to the DIP Revolving Administrative Agent monthly in arrears.

k) <u>Letter of Credit Fees</u>: 8% per annum (calculated on the basis of a 360-day year and actual days elapsed) on the face amount of letters of credit, payable to the DIP Revolving Administrative Agent monthly in arrears, plus any charges assessed by the issuing financial institution.

l) <u>Use of Proceeds</u>: For (i) transaction costs, fees and expenses which are incurred in connection with the DIP Revolving Credit Facility, (ii) for working capital and other general corporate purposes (other than the repayment of pre-petition indebtedness that is not authorized by Bankruptcy Court order(s), and (iii) the costs of administration of the chapter 11 cases.

m) <u>DIP Liens</u>:

I. Pursuant to section 364(c)(2) of the Bankruptcy Code, a perfected, binding, continuing, enforceable, non-avoidable, first priority Lien on all unencumbered DIP Collateral and, upon entry of the Final Order, the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the

---

[5] The Alternate Base Rate is defined the DIP Credit Agreement as follows: "the highest of (a) the rate last quoted by <u>The Wall Street Journal</u> as the "Prime Rate" in the United States or, if <u>The Wall Street Journal</u> ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by Administrative Agent) or any similar release by the Federal Reserve Board (as determined by Administrative Agent), (b) the sum of 3.0% per annum and the Federal Funds Effective Rate, and (c) the sum of (x) the Adjusted LIBO Rate calculated for each such day based on an Interest Period of three months determined two (2) Business Days prior to such day (but for the avoidance of doubt, not less than 3.0% per annum) plus (y) the 1.0%. Any change in the Alternate Base Rate due to a change in any of the foregoing shall be effective on the effective date of such change in the Federal Funds Effective Rate or the Adjusted LIBO Rate for an Interest Period of three months."

46701/0001-5882329v5

Bankruptcy Code, and any other avoidance or similar action under the Bankruptcy Code or similar state law and the proceeds thereof ("Avoidance Actions"), whether received by judgment, settlement or otherwise

II.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a perfected junior Lien upon all DIP Collateral that is subject to (x) valid, enforceable, non-avoidable and perfected Liens in existence on the Petition Date and which are identified on Schedule 1.01(b) of the DIP Credit Agreement, (y) Liens in favor of AFCO Premium Credit LLC ("AFCO") with respect to any and all unearned premiums and dividends (but not loss payments) which may become payable under the financed insurance policies listed on the insurance premium financing agreement between the Debtors and AFCO, and (z) valid, enforceable and non-avoidable Liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code and which are identified on Schedule 1.01(b) of the DIP Credit Agreement, other than Liens which are expressly stated to be primed by the Liens to be granted to the DIP Administrative Agents described in clause (III) below (subject to such exception, the "Prepetition Senior Liens"); and

III.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a perfected first priority, senior priming Lien on all DIP Collateral (including, without limitation, Cash Collateral) that is senior to (x) the existing respective Liens in favor of the applicable Prepetition Secured Parties and securing the Prepetition First Lien Indebtedness or the Prepetition Second Lien Indebtedness, as applicable or (y) any existing Liens in favor of any other person or entity (other than the Prepetition Senior Liens), including, without limitation, all Liens junior to the Liens in favor of the Prepetition Secured Parties (the Liens referenced in clauses (x) and (y), collectively, the "Primed Liens"), which Primed Liens, together with any Liens granted on or after the Petition Date to provide adequate protection in respect of any Primed Liens, shall be primed by and made subject and subordinate to the perfected first priority senior priming DIP Liens.

n)  <u>Use of Cash Collateral</u>: Permitted use of Cash Collateral in which the Prepetition Secured Parties and/the DIP Secured Parties have a Lien or other interest on the terms and conditions set forth in the DIP Orders.

o)  <u>Adequate Protection For Prepetition Secured Parties</u>:

*Adequate Protection Replacement Liens.* Pursuant to the Interim Order, the Prepetition First Lien Secured Parties and Prepetition

Second Lien Secured Parties will be granted pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, senior replacement Liens upon all of the DIP Collateral, including, upon entry of the Final Order, any Avoidance Actions (the adequate protection replacement liens granted to the Prepetition First Lien Secured Parties, the "First Priority Adequate Protection Replacement Liens" and the adequate protection replacement liens granted to the Prepetition Second Lien Secured Parties, the "Second Priority Adequate Protection Replacement Liens," and together with the First Priority Adequate Protection Replacement Liens, collectively, the "Adequate Protection Replacement Liens"), which Adequate Protection Replacement Liens on such DIP Collateral shall be subject and subordinate to the DIP Liens, the Permitted Senior Liens, and the payment of the Carve-Out to the extent expressly provided in the DIP Loan Documents and the Interim Order.

*Adequate Protection Superpriority Claims.* Pursuant to the Interim Order, the Prepetition First Lien Secured Parties and Prepetition Second Lien Secured Parties will be granted, subject to the payment of the DIP Superpriority Claims and the Carve Out to the extent provided herein and in the DIP Loan Documents, allowed superpriority administrative claims (the adequate protection superpriority claims granted to the Prepetition First Lien Secured Parties, the "First Priority Adequate Protection Superpriority Claims" and the adequate protection superpriority claims granted to the Prepetition Second Lien Secured Parties, the "Second Priority Adequate Protection Superpriority Claims," and together with the First Priority Adequate Protection Superpriority Claims, collectively, the "Adequate Protection Superpriority Claims") as provided for in section 507(b) of the Bankruptcy Code, immediately junior to the DIP Superpriority Claims and payable from and having recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, without limitation, 100% of the capital stock of any first tier foreign subsidiary of any Debtor and, subject to the entry of the Final Order, all Avoidance Actions; provided, however, that (i) the respective Adequate Protection Superpriority Claims of the Prepetition Secured Parties shall have the relative priorities set forth in Paragraph 4(g) of the Interim Order and (ii) the Prepetition Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Adequate Protection Superpriority Claims unless and until (x) all DIP Obligations have indefeasibly been paid in full in cash or, in the case of letters of credit or other DIP Obligations which survive termination, cash collateralized, in each case, in accordance with the DIP Loan Documents and the Interim Order (or, in the case of the Roll Up

DIP Facility, provided the treatment set forth in the Prepackaged Plan, if confirmed and effective, or as otherwise allowed under section 1129(a) of the Bankruptcy Code, the Interim Order and the DIP Loan Documents and (y) all Revolving Credit Commitments under the DIP Loan Documents have been irrevocably terminated (the conditions described in clauses (ii)(x) and (ii)(y), collectively, "Paid in Full" or "Payment in Full").

*Priorities Among Prepetition Secured Parties*. Notwithstanding anything to the contrary in the Interim Order or in any other order of this Court, in determining the relative priorities and rights of the Prepetition Secured Parties (including, without limitation, the relative priorities and rights of the Prepetition Secured Parties with respect to the Prepetition Secured Parties' Adequate Protections and the Adequate Protection Liens), (i) the Second Priority Adequate Protection Replacement Liens and the Second Priority Adequate Protection Super-Priority Claims shall be immediately junior in priority and subject to the First Priority Adequate Protection Replacement Liens and the First Priority Adequate Protection Replacement Liens, respectively, and (ii) all other such relative priorities and rights shall continue to be governed by the Prepetition Loan Documents and the Prepetition Intercreditor Agreement.

*Adequate Protection Payments*. (i) immediate cash payment of all accrued and unpaid prepetition interest (at the applicable default rate of interest) and all accrued unpaid reimbursable fees, costs and expenses, including, without limitation, the fees and expenses of counsel and the fees and expenses and transaction fee for financial advisors, in each case as provided for, and to the extent permitted, in the Prepetition First Lien Loan Documents and retention agreements entered into thereunder; and (ii) cash payment as and when due of all interest (at the applicable default rate of interest) and all reimbursable fees, costs and expenses, in each case as provided for, and to the extent permitted, in the Prepetition First Lien Loan Documents, during the period from and including the Petition Date through and including the Cash Collateral Termination Date (the immediately preceding clauses (i) and (ii), collectively, the "Adequate Protection Payments") and without the need to file (or for the applicable professionals to file) any applications for payment of same.

*Carve-Out*. Each of the DIP Liens, DIP Superpriority Claims, Prepetition Liens, Adequate Protection Replacement Liens and Adequate Protection Superpriority Claims shall be subject and subordinate to payment of the Carve-Out in the amount of $500,000 solely in the event of the delivery of a Carve-Out Trigger

Notice after the occurrence and during the continuance of an Event of Default under, and as defined in, the DIP Loan Documents

p) <u>Collateral Rights</u>: In the event that any party who has both received notice of the Interim Hearing and holds a Lien on the DIP Collateral or Prepetition Collateral that is junior and/or subordinate to any of the DIP Liens, the Adequate Protection Replacement Liens or the Prepetition Liens in such DIP Collateral or Prepetition Collateral receives or is paid the proceeds of such DIP Collateral or Prepetition Collateral, or receives any other payment with respect thereto from any other source, prior to indefeasible Payment in Full of all DIP Obligations under the DIP Loan Documents, such junior or subordinate Lienholder shall be deemed to have received, and shall hold, the proceeds of any such Prepetition Collateral or other DIP Collateral in trust for the DIP Agents, the other DIP Secured Parties, the Prepetition Secured Parties and shall immediately turnover such proceeds to the applicable DIP Administrative Agent.

q) <u>Events of Default</u>: Events of default as are usual and customary for debtor-in-possession financings of this kind, including, without limitation, (i) failure to make payments when due, (ii) defaults under other post-petition agreements or instruments of indebtedness, (iii) noncompliance with covenants, including the Plan of Reorganization Covenants, and any other failure by the Borrower or any Guarantor to diligently pursue confirmation of the Prepackaged Plan, (iv) breaches of representations and warranties, (vi) termination of any material contract, (vii) bankruptcy of any foreign subsidiary of Borrower or any Guarantor, (vii) failure to satisfy or stay execution of judgments in excess of specified amounts, (viii) ERISA-related events of default, (ix) impairment of security interests in Collateral, (x) invalidity of guarantees, (xi) "change of control", (xii) entry of an order or Borrower or any Guarantor's seeking the entry of an order (A) approving additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted by the definitive DIP Facility Documents, (B) granting any lien upon or affecting any Collateral other than liens permitted under the definitive DIP Facility Documents, (C) except as provided in the DIP Orders, permitting the use of cash collateral of the Agents without the prior written consent of each Agent, or (D) authorizing or approving any other action adverse to the Agents and the DIP Lenders or their rights and remedies or their interest in the Collateral, (xiii) entry of an order dismissing, or Borrower or any Guarantor seeking the dismissal of, any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a Chapter 7 case, (xiv) entry of an order, or Borrower or any Guarantor's seeking the entry of an order, appointing a Chapter 11 trustee or an examiner in any of the Chapter 11 Cases having enlarged powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code), (xv) entry of an order granting or Borrower or any Guarantor seeking the entry of an order granting, any other superpriority claim, modifying the DIP Credit Facility, the Interim DIP Order or the Final DIP Order, or granting relief from the automatic stay to permit any secured creditor (other than the Agents and the DIP Lenders) to enforce or otherwise take action with respect to any Collateral, or any breach by Borrower or any Guarantor of any provision of either DIP Order, (xvi) the

14

payment by any Debtor of any pre-petition claim without the prior written consent of each Agent unless such payment is permitted by the Budget, (xvii) the commencement of any action against any of the Agents, the DIP Lenders, the Pre-Petition First Lien Agent and the Pre-Petition First Lien Lenders by or on behalf of Borrower or any of its affiliates, officers or employees, (xviii) the Interim DIP Order shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal, in the case of any modification or amendment, without the prior written consent of each Agent, (xix) the Final DIP Order shall not have been entered by the Bankruptcy Court on or before the date that is 30 days after the entry of the Interim DIP Order, (xx) the Final DIP Order shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated or subject to stay pending appeal, in the case of any modification or amendment, without the prior written consent of each Agent and the DIP Lenders, (xxi) the allowance of any claim under Section 506(c) of the Bankruptcy Code or otherwise against any or all of the Agents, the DIP Lenders and the Collateral, or against any or all of the Pre-Petition First Lien Agent and the Pre-Petition First Lien Lenders or the collateral securing the Existing First Lien Facility, (xxii) the filing of any plan of reorganization or any amendment thereto or related disclosure statement other than the Prepackaged Plan and related disclosure statement, or the entry of an order confirming any such plan of reorganization or approving any such disclosure statement or any such amendment, in each case that is not acceptable to the Agents and, (xxiii) any termination or modification of the exclusivity periods set forth in Section 1121 of the Bankruptcy Code, or (xxiv) any breach (other than by the DIP Agents) or termination of the Plan Support Agreement or any failure of the Plan Support Agreement to remain in full force and effect.

r)      Rights and Remedies Upon DIP Order Event of Default:

(A)      Pursuant to the Interim Order, any automatic stay otherwise applicable to the DIP Secured Parties will be modified, without requiring prior notice to or authorization of, this Court, to the extent necessary to permit the DIP Secured Parties to exercise (i) immediately upon the occurrence and during the continuance of an Event of Default, all rights and remedies under the Interim Order, the DIP Loan Documents other than those rights and remedies against the DIP Collateral as provided in clause (ii) below, and (ii) upon the occurrence and during the continuance of an Event of Default and the giving of five (5) business days' prior written notice (the "Enforcement Notice") to the Debtors (with a copy to the United States Trustee and the respective lead counsel to any Committee, the Prepetition Agents and the Prepetition Indenture Trustee), all rights and remedies against the DIP Collateral provided for in any DIP Loan Documents or applicable law (including, without limitation, the right to set off against accounts maintained by the Debtors with any DIP Agent, any other DIP Secured Party, any Prepetition Secured Party or any of their

respective affiliates); provided, however, that notwithstanding anything to the contrary in clause (ii) above, immediately following the giving of an Enforcement Notice by the applicable DIP Administrative Agent (or the DIP Collateral Agent acting at the direction of the applicable DIP Administrative Agent): (w) the Debtors shall deliver and cause the delivery of the proceeds of DIP Collateral to the applicable DIP Administrative Agent as provided in the DIP Loan Documents; (x) the applicable DIP Administrative Agent shall apply such proceeds in accordance with the provisions of the DIP Loan Documents; (y) the Debtors shall have no right to use any of such proceeds, nor any other Cash Collateral other than towards the satisfaction of the DIP Obligations and the payment of the Carve-Out, as provided in the Interim Order and in the applicable DIP Loan Documents; and (z) any obligation otherwise imposed on any or all of the DIP Agents and the other DIP Secured Parties to provide any loan, advance or other financial accommodation to the Debtors pursuant to the DIP Facilities shall immediately be suspended. Following the giving of an Enforcement Notice by the applicable DIP Administrative Agent, the Debtors and any Committee shall be entitled to an emergency hearing before this Court solely for the purpose of contesting whether an Event of Default has occurred, and section 105 of the Bankruptcy Code may not be invoked by the Debtor, the Committee or any other party in interest to restrict or preclude any DIP Secured Party from exercising any rights or remedies set forth in the Interim Order or the DIP Loan Documents. If the Debtors and any Committee do not contest the right of the DIP Secured Parties to exercise their rights and remedies based upon whether an Event of Default has occurred within such five (5) business-day time period or if the Debtors or any Committee do timely contest the occurrence of an Event of Default and the Court after notice and hearing declines to find that no such Event of Default has occurred, the automatic stay, as to the DIP Secured Parties, shall automatically terminate at the end of such notice period.

(B) Subject to the immediately preceding paragraph, upon the occurrence of an Event of Default, the DIP Agents and the other DIP Secured Parties are authorized to exercise their rights and remedies and to proceed against any or all of the DIP Collateral under or pursuant to the DIP Loan Documents, the Interim Order and applicable law, including without limitation, exercising any of the Debtors' rights with respect to the Debtors' interests in the Joint Venture Entities and the Debtors' interests in leaseholds, including without limitation, selling, leasing or otherwise transferring any of the Debtors' interests in any Joint Venture Entity or leasehold notwithstanding any contractual provision that would otherwise prohibit, restrict, condition or delay any or all of

16

the DIP Agents and the other DIP Secured Parties from taking any such action. All proceeds realized in connection with the exercise of the rights and remedies of the DIP Secured Parties shall be turned over to the applicable DIP Administrative Agent for application to the DIP Obligations under, and in accordance with the provisions of, the DIP Loan Documents; provided, that in the event of the liquidation of the Debtors' estates after an Event of Default and the termination of the Revolving Credit Commitments, the unused amount of the Carve-Out shall be funded into a segregated account exclusively (i) first, from proceeds of any unencumbered assets of the Debtors, and (ii) then from Cash Collateral received by any DIP Agent subsequent to the date of termination of the Revolving Credit Commitments and prior to the distribution of any such Cash Collateral to any other parties in interest.

(C)     Subject to entry of a Final Order, and notwithstanding anything contained in the Interim Order to the contrary, and without limiting any other rights or remedies of the DIP Agents or the other DIP Secured Parties contained in the Interim Order or the DIP Loan Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Loan Documents, upon five (5) business days' written notice to the Debtors and any landlord, lienholder, licensor or other third party owner of any leased or licensed premises or intellectual property that an Event of Default under the DIP Loan Documents has occurred and is continuing, the applicable DIP Administrative Agent (or the DIP Collateral Agent acting at the direction of the applicable DIP Administrative Agent) (i) may, unless otherwise provided in any separate agreement by and between the applicable landlord or licensor, and the applicable DIP Administrative Agent (or the DIP Collateral Agent acting at the direction of the applicable DIP Administrative Agent) (the terms of which shall be reasonably acceptable to the parties thereto), enter upon any leased or licensed premises of the Debtors for the purpose of exercising any remedy with respect to Collateral located thereon and (ii) shall be entitled to all of the Debtors' rights and privileges as lessee or licensee under the applicable license and to use any and all trademarks, trade names, copyrights, licenses, patents or any other similar assets of the Debtors, which are owned by or subject to a Lien of any third party and which are used by Debtors in its businesses, in either the case of subparagraph (i) or (ii) of this paragraph without interference from lienholders or licensors thereunder, subject to such Lienholders or licensors rights under applicable law, provided, however, that the applicable DIP Administrative Agent (or the DIP Collateral Agent acting at the direction of the applicable DIP Administrative Agent), on behalf of the DIP Secured Parties, shall pay only rent and additional rent,

17

fees, royalties or other obligations of the Debtors that first arise after the written notice referenced above from the applicable DIP Administrative Agent (or the DIP Collateral Agent acting at the direction of the applicable DIP Administrative Agent) and that are payable during the period of such occupancy or use by such DIP Agent calculated on a *per diem* basis. Nothing in the Interim Order shall require the Debtors, the DIP Agents or the other DIP Secured Parties to assume any lease or license under Bankruptcy Code section 365(a) as a precondition to the rights afforded to the DIP Agents and the other DIP Secured Parties in this paragraph.

(D) The automatic stay imposed under Bankruptcy Code section 362(a) is hereby modified pursuant to the terms of the DIP Credit Agreement as necessary to (i) permit the Debtors to grant the Adequate Protection Replacement Liens and the DIP Liens and to incur all liabilities and obligations to the Prepetition Secured Parties and the DIP Secured Parties under the DIP Loan Documents, the DIP Facilities and the Interim Order, (ii) authorize the DIP Secured Parties and the Prepetition Secured Parties to retain and apply payments under the Interim Order, and (iii) otherwise to the extent necessary to implement and effectuate the provisions of the Interim Order.

## IV. Highlighted Provisions Pursuant to Local Rule 4001-2

23. In accordance with Local Rule 4001-2(a)(i)(A)-(G), the Debtors also draw the Court's attention to certain material provisions of the DIP Facilities, to the extent applicable, which are set out at the following sections of the Interim Order and the DIP Credit Agreement:

a) <u>Provisions that grant cross-collateralization protection (other than replacement liens or other adequate protection) to the prepetition secured creditors.</u> The Interim Order and the DIP Credit Agreement do not contemplate the cross-collateralization of pre-petition and post-petition obligations (other than replacement liens or other adequate protection).

b) <u>Provisions or findings of fact that bind the estate or other parties in interest with respect to the validity, perfection or amount of secured debt or limitations on investigation.</u> The Interim Order does <u>not</u> contemplate the acknowledgement by the Debtors and their estates with respect to the validity, enforceability and perfection of the prepetition liens which will be binding on the Debtors and their estates without a reference to an investigatory period. The release of claims provided by the Debtors and their estates as set forth in paragraph D(iv) of the Interim Order is subject to a reservation of certain rights of an official committee of unsecured creditors as set forth in paragraph 6 of the Interim Order.

18

c)  Provisions that seek to waive, without notice, whatever rights the estate may have under section 506(c).  The proposed DIP Facilities do not require the Debtors to waive the estate's 506(c) rights as part of the Interim Order, however, such a waiver is contemplated in the Final Order.  (See Interim Order ¶ 8).

d)  Provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and avoidance actions.  The proposed DIP Facilities do not immediately grant to the DIP Lenders a lien on avoidance actions; however, the Final Order does contemplate that the DIP Lenders obtain a lien on avoidance actions.  (See Interim Order ¶ 2(e)(I)).

e)  Provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in section 552 (roll-over provisions):  The DIP Facilities consist of a debtor-in-possession term loan that constitutes a roll-up of $80 million in outstanding obligations under the Prepetition First Lien Credit Facility.  Under the facts and circumstances, interim approval of the Roll-Up DIP Loans is appropriate because: (i) the only parties affected by the Roll-Up are the Prepetition First Lien Lenders that agree to such treatment and (ii) the Prepetition First Lien Lenders would not consent to the DIP Financing absent the roll-up under the Prepackaged Plan.  (See Interim Order ¶ 2; DIP Credit Agreement ¶2.01(a)).

f)  Provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professional retained by the debtor with respect to a professional fee carve-out.  The Interim Order and the DIP Facility Agreement do not contemplate disparate treatment for professionals retained by a statutorily appointed creditors' committee from professionals retained by the Debtors with respect to the professional fee carve-out.

g)  Provisions that prime any secured lien without the consent of that lienor.  The Interim Order and the DIP Credit Agreement do propose to prime known secured liens without the consent of such lien holder; however, such lien holders have been deemed to have consented under the terms of the Plan Support Agreement.  Specifically each of the Prepetition First Lien Agent and Prepetition First Lien Lenders holding at least two-thirds in amount and one-half in number of claims in respect of the Prepetition First Lien Indebtedness (which Prepetition First Lien Lenders, as the requisite lenders under the Prepetition First Lien Credit Agreement, can consent on behalf of all Prepetition First Lien Lenders) and Prepetition Second Lien Lenders holding at least 87% in aggregate amount of claims in respect of the Prepetition Second Lien Indebtedness consented to the entry of the Interim Order and the relief provided therein, and pursuant to the terms of the Prepetition First Lien Credit Agreement or Prepetition Second Lien Credit Agreement, as applicable, the respective consents of such Prepetition First Lien Lenders and Prepetition Second Lien Lenders is sufficient to permit the imposition of a senior lien and binding on all Prepetition First Lien Lenders and

Prepetition Second Lien Lenders. (See Interim Order ¶ 2(e)(III); DIP Credit Agreement ¶ 3.23(b)).

24.     The provisions above are all justified under the circumstances of these cases to avoid immediate and irreparable harm to the Debtors' estates pending a final hearing. The DIP Lenders would not agree to provide the credit facility without the inclusion of such terms, each of which was heavily negotiated among the parties. In addition, the Debtors determined in the exercise of their sound business judgment that agreeing to such provisions was appropriate under the circumstances of these cases in light of the unavailability of other adequate financing alternatives.

## BASIS FOR RELIEF REQUESTED

25.     It is vital to the success of the Debtors' reorganization efforts that they immediately obtain access to sufficient postpetition financing and access to cash collateral. The preservation of the Debtors' business and the Debtors' ability to reorganize successfully depend heavily on the expeditious approval of this Motion. Absent the Court's approval of the interim relief sought herein, the Debtors face a substantial risk of severe disruption to their business operations and irreparable damage to their relationships with their vendors and customers.

A.      The Debtors Satisfy the Requirements for Obtaining Credit Under Section 364(c) of the Bankruptcy Code

26.     The Debtors propose to obtain financing under the DIP Facilities by providing security interests and liens as set forth above pursuant to sections 364(c) and (d) of the Bankruptcy Code. The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code"[6] is a finding, made after notice and a hearing, that the debtors-

---

[6] Section 364(c) of the Bankruptcy Code provides that:

(continued...)

in-possession are "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense." See In re Garland Corp., 6 B.R. 456, 461 n.11 (1st Cir. BAP 1980) (secured credit under section 364(c)(2) is authorized, after notice and a hearing, upon showing that unsecured credit cannot be obtained); In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa.), modified on other grounds, 75 B.R. 553 (1987) (debtor seeking unsecured credit under section 364(c) of the Bankruptcy Code must prove that it was unable to obtain unsecured credit pursuant to section 364(b) of the Bankruptcy Code); In re Ames Dept. Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code).

27.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

a)     the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim;

b)     the credit transaction is necessary to preserve the assets of the estate; and

c)     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

In re Ames Dep't Stores, 115 B.R. at 37-39; see also In re St. Mary Hospital, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); In re Crouse Group, Inc., 71 B.R. at 549.

---

(...continued)

(c)     If the trustee [or debtor-in-possession] is unable to obtain unsecured credit allowable under § 503(b)(l) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –

(1)     with priority over any and all administrative expenses of the kind specified in § 503(b) or 507(b) of this title;

(2)     secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)     secured by a junior lien on property of the estate that is subject to a lien.

28.     While the Debtors were in the process of negotiating the terms of the DIP Facilities, the Debtors also attempted to identify other sources of postpetition financing to determine whether they could obtain debtor-in-possession financing on better terms.  Based on current capital markets conditions and discussions with potential lenders, the Debtors determined that postpetition financing on an unsecured basis or on a junior priority basis to prepetition secured parties would be unobtainable.  Moreover, without postpetition financing, the Debtors would be unable to operate their business as a going concern, which would significantly impair the value of the Debtors' assets and limit their ability to repay their debts and liabilities.  Finally, given the Debtors' circumstances, the Debtors believe the terms of the DIP Facility are fair, reasonable and adequate, all as more fully set forth below.

B.     The Debtors Satisfy the Requirements for Obtaining Credit Under Section 364(d) of the Bankruptcy Code

29.     If a debtor is unable to obtain credit solely under the provisions of section 364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien (i.e., a "priming lien").  See 11 U.S.C. § 364(d).  Section 364(d)(1) of the Bankruptcy Code authorizes a debtor-in-possession to incur superpriority senior secured debtor or "priming" liens if: (a) the debtor is unable to obtain financing from another source, and (b) the interests of the secured creditors whose liens are being primed by the DIP financing are adequately protected.  See 11 U.S.C. § 364(d)(1)(A) and (B). As explained above, the financing under the DIP Facilities constituted the only viable financing options with terms comparable to those offered by the DIP Facility, and the Priming Liens are an essential part of the protections provided to the DIP Lenders thereunder.  Moreover, as explained below, the interests of the Prepetition Secured Parties whose liens are being primed, are adequately protected under the terms of the Interim Order.

46701/0001-5882329v5

C.     Standards For Adequate Protection

30.     The Bankruptcy Code does not explicitly define "adequate protection." However, section 361 suggests that adequate protection may be provided by (i) periodic cash payments to the extent that there is a decrease in the lien holder's interest in the property; (ii) providing additional or replacement liens; or (iii) other relief resulting in the realization of the "indubitable equivalent" of the lien holder's interest in the property. See 11 U.S.C. § 361. The third possibility is regarded as a "catch-all" provision, affording courts discretion, on a case-by-case basis, to determine what level of protection is appropriate to provide a secured party. See In re Swedeland Dev. Group. Inc., 16 F.3d 552, 564 (3d Cir. 1994).

31.     The goal of adequate protection is to protect a secured lender against a diminution in the value of its collateral during the reorganization process. See, e.g, Swedeland, 16 F.3d at 564; In re 848 Brickell Ltd., 243 B.R. 142, 148 (S.D. Fla. 1998). This is true whether the prepetition creditor is oversecured or undersecured - the protection to which the secured creditor is entitled is protection against any subsequent decrease in such creditor's interest in collateral that may be occasioned by the debtor's use thereof. See 11 U.S.C. § 361. Accordingly, it follows that if the value of the prepetition creditor's interest in collateral is not being diminished by the priming of its liens by a DIP facility, the creditor is not entitled to adequate protection. See In re Continental Airlines, Inc., 154 B.R. 176, 180 (Bankr. D. Del. 1993) (prepetition creditors only entitled to adequate protection to the extent of the decline in value of their interests in collateral); see also In re Integrated Health Services, Inc., 260 B.R. 71, 74 (Bankr. D. Del. 2001) (same).

D.     The Interests of the Prepetition Secured Parties are Adequately Protected

32.     The measures of protection provided to the Pre-Petition Secured Parties in the proposed Interim Order, pursuant to and in accordance with sections 361, 363(e) and 364(d)(1)

23

of the Bankruptcy Code, constitute adequate protection for any diminution in the value of their collateral resulting from, among other things, (i) the use of the cash collateral, (ii) the incurrence by the Debtors of the DIP Facilities and priming liens upon the collateral to the extent provided for in the DIP Orders, (iii) the use, sale, lease, other disposition or depreciation of the collateral, and (iv) the imposition of the automatic stay. Specifically, the proposed Interim Order provides the following regarding adequate protection:

(a) for the Prepetition First Lien Secured parties, (i) immediate payment of all accrued and unpaid interest (at the default rate of interest) and all accrued unpaid reimbursable fess, costs and expenses, and (ii) cash payments as and when due of all interest (at the applicable default rate of interest) and all reimbursable fees, costs and expenses (including, without limitation, the fees and expenses of counsel and the fees, expenses and transaction fee for financial advisors;

(b) for the Prepetition Second Lien Secured Parties, cash payment as and when due of all reimbursable fees, costs and expenses of the Second Lien Agent in an aggregate amount not to exceed $25,000;

(c) an allowed first priority super-priority administrative expense claim for the Prepetition First Lien Secured Parties and an allowed second priority administrative expense claim for the Prepetition Second Lien Secured Parties, subject to the payment of the DIP Super-Priority Claims and the Carve-Out; and

(d) first priority adequate protection replacement liens for the Prepetition First Lien Secured Parties and second priority adequate protection replacement liens for the Prepetition Second Lien Secured Parties, upon all of the property of True Temper and the Guarantors pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, which security interests and liens shall be subject to and subordinate to the DIP Liens, the Permitted Senior Liens and the Carve-Out.

The Debtors submit that the foregoing provisions adequately protect the Prepetition Secured Parties for any potential diminution in the value of their collateral subsequent to the Petition Date.

46701/0001-5882329v5

E.    No Comparable Alternative to the DIP Facilities is Currently Available

33.    The Debtors have made a concerted, good-faith effort to obtain credit on the most favorable terms that are available.  The proposed terms of the DIP Facilities are fair and reasonable under the circumstances and were negotiated extensively by well-represented, independent parties in good faith and at arms-length.  Accordingly, the Lenders under the DIP Facility should be accorded the benefits of section 364(e) of the Bankruptcy Code in respect of such agreement.

34.    Bankruptcy courts consistently defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious.  See In re Trans World Airlines. Inc., 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that an interim loan, receivables facility and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment...[were] reasonable under the circumstances and in the best interest of [the debtor] and its creditors"); cf. Group of Inst. Investors v. Chicago, Mil., St. P. & Pac. Ry., 318 U.S. 523, 550 (1943) (holding that decisions regarding assumption or rejection of leases are left to business judgment of the debtor); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to the board room and not to this Court.").  In fact, "[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."  Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).  Consistent with this authority, the Debtors respectfully submit that the Court should approve the Debtors' decision to accept and enter into the DIP Facility.

25

F.  Approval of the DIP Facility Is In the Best Interests of the Debtors' Estates

35.  A denial of the Debtors' requested relief will cause immediate and irreparable harm to the Debtors and their estates, and will also have a detrimental effect on the collateral. Absent access to the DIP Facilities and the use of the cash collateral, the Debtors would have no ability to meet their ongoing obligations to suppliers, vendors, employees and other creditors. If the Debtors are unable to pay their ongoing obligations, they will not be able to operate. In contrast, the Debtors' access to the DIP Facilities and continued use of cash collateral will ensure that the "going concern" value of their assets are preserved, a value substantially greater than the value which would be realized from a piecemeal liquidation of those assets if the Debtors were forced to cease operations immediately.

36.  Finally, this Court has entered similar debtor-in-possession financing orders in other prepackaged cases in this district. See, e.g., In re JGW Holdco, LLC, et al., Case No. 09-11731 (CSS) (Bankr. D. Del. May 22, 2009; In re Source Interlink Companies, Inc., et al., Case No. 09-11424 (KG) (Bankr. D. Del. April 29, 2009); and In re Hilex Poly Co., et al., Case No. 08-10890 (KJC) (Bankr. D. Del. May 7, 2008).

37.  The Debtors submit for all these reasons that ample justification exists for the relief requested herein.

## REQUEST FOR INTERIM RELIEF

38.  Bankruptcy Rule 4001(b) permits a court to approve a debtor's request for use of cash collateral during the 15 day period following the filing of a motion for authority to use cash collateral "as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2). Similarly, Bankruptcy Rule 4001(c) permits a court to approve a debtor's request for authority to obtain financing during the same period "to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R.

26

Bankr. P. 4001(c)(2). In examining such requests under Bankruptcy Rule 4001, courts apply the same business judgment standard as is applicable to other business decisions. See e.g., Ames, 115 B.R. at 38. The Debtors submit that, for the reasons set forth herein, authority to use obtain postpetition financing and use of cash collateral on an interim basis as requested in this Motion is necessary to avert immediate and irreparable harm to the Debtors' business.

39. To the extent Bankruptcy Rule 6004(h) is applicable to this Motion, the Debtors also seek a waiver of the ten-day stay under Bankruptcy Rule 6004(h).

## REQUEST FOR FINAL HEARING

40. Pursuant to Bankruptcy Rule 400l(b)(2) and (c)(2), the Debtors respectfully request that the Court set a date for the Final Hearing that is no later than thirty (30) days following the Petition Date.

## NOTICE

41. Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) the United States Securities and Exchange Commission; (iii) the Pension Benefit Guaranty Corporation; (iv) the Internal Revenue Service; (v) the Office of the United States Attorney for the District of Delaware; (vi) those entities or individuals listed on the Debtors' consolidated list of largest unsecured creditors; (vii) counsel to the agents for the Debtors' prepetition lenders; and (viii) counsel to the agents for the Debtors' proposed postpetition lenders. Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m). In light of the nature of the relief requested herein, the Debtors respectfully submit that no other or further notice is necessary.

46701/0001-5882329v5

WHEREFORE, the Debtors respectfully request that the Court enter an Interim Order, in substantially the form attached hereto as Exhibit B, (i) granting the relief requested herein and (ii) granting such other relief and further relief as the Court may deem just and proper.

Dated: October 8, 2009
     Wilmington, Delaware

By: _____
    Norman L. Pernick (No. 2290)
    Marion M. Quirk (No. 4136)
    Karen M. McKinley (No. 4372)
    Sanjay Bhatnagar (No. 4829)
    COLE, SCHOTZ, MEISEL,
    FORMAN & LEONARD, P.A.
    500 Delaware Avenue, Suite 1410
    Wilmington, Delaware 19801
    Tel: (302) 652-3131
    Fax: (302) 652-3117

    -and-

    Frederick D. Hyman
    Craig E. Reimer
    MAYER BROWN LLP
    1675 Broadway
    New York, NY 10019-5820
    Tel: (212) 506-2500
    Fax: (212) 262-1910

    Proposed Counsel for the Debtors
    and Debtors-in-Possession