# EXHIBIT A

# SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

**SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

dated as of October __, 2009,
among

**TRUE TEMPER CORPORATION,**

**TRUE TEMPER SPORTS, INC.,**
as Borrower

**THE LENDERS PARTY HERETO**

and

**GENERAL ELECTRIC CAPITAL CORPORATION,**
as Administrative Agent,

and

**CREDIT SUISSE, CAYMAN ISLANDS BRANCH,**
as Term Agent

---

**GE CAPITAL MARKETS, INC.,**
as Sole Bookrunner and Sole Lead Arranger

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ........................................................................................ 2
SECTION 1.01. Defined Terms ........................................................................ 2
SECTION 1.02. Terms Generally ..................................................................... 23
SECTION 1.03. Classification of Loans and Borrowings .............................. 24

ARTICLE II THE CREDITS ..................................................................................... 24
SECTION 2.01. Commitments ......................................................................... 24
SECTION 2.02. Loans ...................................................................................... 25
SECTION 2.03. Borrowing Procedure ............................................................ 27
SECTION 2.04. Repayment of Loans; Evidence of Debt .............................. 28
SECTION 2.05. Fees ........................................................................................ 29
SECTION 2.06. Interest on Loans ................................................................... 30
SECTION 2.07. Default Interest ...................................................................... 31
SECTION 2.08. Alternate Rate of Interest ..................................................... 31
SECTION 2.09. Termination and Reduction of Commitments ...................... 31
SECTION 2.10. Conversion and Continuation of Borrowings ...................... 32
SECTION 2.11. Repayment of Term Loans .................................................... 33
SECTION 2.12. Prepayment ............................................................................ 33
SECTION 2.13. Mandatory Prepayments ....................................................... 33
SECTION 2.14. Reserve Requirements; Change in Circumstances .............. 34
SECTION 2.15. Change in Legality ................................................................ 36
SECTION 2.16. Indemnity ............................................................................... 36
SECTION 2.17. Pro Rata Treatment ............................................................... 37
SECTION 2.18. Sharing of Setoffs ................................................................. 37
SECTION 2.19. Payments ................................................................................ 38
SECTION 2.20. Taxes ...................................................................................... 38
SECTION 2.21. Assignment of Commitments Under Certain Circumstances;
Duty to Mitigate ................................................................... 40
SECTION 2.22. Swingline Loans .................................................................... 41
SECTION 2.23. Letters of Credit .................................................................... 43
SECTION 2.24. Application of Payments and Proceeds ................................ 47
SECTION 2.25. Super Priority Nature of Obligations and Agents' Liens ..... 48
SECTION 2.26. Payment of Obligations ........................................................ 48
SECTION 2.27. No Discharge; Survival of Claims ....................................... 48
SECTION 2.28. Release ................................................................................... 48
SECTION 2.29. Waiver of any Priming Rights and Non-Consensual Use of Cash
Collateral .............................................................................. 49

ARTICLE III REPRESENTATIONS AND WARRANTIES ................................... 49
SECTION 3.01. Organization; Powers ........................................................... 49
SECTION 3.02. Authorization; No Conflicts .................................................. 50
SECTION 3.03. Enforceability ........................................................................ 50
SECTION 3.04. Governmental Approvals ...................................................... 50
SECTION 3.05. Financial Statements ............................................................. 50

SECTION 3.06. No Material Adverse Change ................................................................ 51
SECTION 3.07. Title to Properties; Possession Under Leases ....................................... 51
SECTION 3.08. Subsidiaries ......................................................................................... 51
SECTION 3.09. Litigation; Compliance with Laws ...................................................... 52
SECTION 3.10. Agreements .......................................................................................... 52
SECTION 3.11. Federal Reserve Regulations ............................................................... 52
SECTION 3.12. Investment Company Act ..................................................................... 52
SECTION 3.13. Use of Proceeds ................................................................................... 52
SECTION 3.14. Tax Returns .......................................................................................... 53
SECTION 3.15. No Material Misstatements .................................................................. 53
SECTION 3.16. Employee Benefit Plans ...................................................................... 53
SECTION 3.17. Environmental Matters ........................................................................ 54
SECTION 3.18. Insurance .............................................................................................. 55
SECTION 3.19. Security Documents ............................................................................. 55
SECTION 3.20. Location of Real Property .................................................................... 55
SECTION 3.21. Labor Matters ...................................................................................... 55
SECTION 3.22. Intellectual Property ............................................................................ 56
SECTION 3.23. Reorganization Matters ....................................................................... 56
SECTION 3.24. Senior Debt .......................................................................................... 56
SECTION 3.25. Super Priority Nature of Obligations and Agents' Liens ..................... 56

ARTICLE IV CONDITIONS OF LENDING ................................................................... 56
SECTION 4.01. All Credit Events ................................................................................. 57
SECTION 4.02. First Credit Event ................................................................................ 57

ARTICLE V AFFIRMATIVE COVENANTS ................................................................... 60
SECTION 5.01. Existence; Businesses and Properties .................................................. 60
SECTION 5.02. Insurance .............................................................................................. 60
SECTION 5.03. Obligations and Taxes ......................................................................... 60
SECTION 5.04. Financial Statements, Reports, etc ...................................................... 61
SECTION 5.05. Litigation and Other Notices ............................................................... 63
SECTION 5.06. Information Regarding Collateral ........................................................ 63
SECTION 5.07. Maintaining Records; Access to Properties and Inspections ............... 63
SECTION 5.08. Use of Proceeds ................................................................................... 64
SECTION 5.09. [Intentionally Omitted] ....................................................................... 64
SECTION 5.10. Further Assurances .............................................................................. 64
SECTION 5.11. Cash Management ................................................................................ 64
SECTION 5.12. Restructuring Adviser and Cooperation .............................................. 65
SECTION 5.13. Plan of Reorganization ........................................................................ 65

ARTICLE VI NEGATIVE COVENANTS ......................................................................... 65
SECTION 6.01. Indebtedness ........................................................................................ 65
SECTION 6.02. Liens .................................................................................................... 66
SECTION 6.03. Sale and Lease-Back Transactions ...................................................... 67

SECTION 6.04. Investments, Loans and Advances ........................................ 68
SECTION 6.05. Mergers, Consolidations, Sales of Assets and Acquisitions .............. 68
SECTION 6.06. Restricted Payments; Restrictive Agreements ..................... 69
SECTION 6.07. Transactions with Affiliates .......................................... 69
SECTION 6.08. Business of Holdings, the Borrower and Subsidiaries; Limitation
on Hedging Agreements .................................................. 70
SECTION 6.09. Other Indebtedness and Agreements; Amendments to
Acquisition Documentation ............................................... 70
SECTION 6.10. Approved Budget ........................................................ 71
SECTION 6.11. Liquidity and Maximum Cash Balances ........................... 71
SECTION 6.12. Return of Inventory ...................................................... 71
SECTION 6.13. Chapter 11 Claims ...................................................... 71
SECTION 6.14. Critical Vendor and Other Payments ............................. 72
SECTION 6.15. Fiscal Year ................................................................ 72

ARTICLE VII EVENTS OF DEFAULT ......................................................... 72

ARTICLE VIII THE AGENTS AND THE ARRANGER ................................... 76

ARTICLE IX MISCELLANEOUS ................................................................ 78
SECTION 9.01. Notices .................................................................... 78
SECTION 9.02. Survival of Agreement ................................................ 79
SECTION 9.03. Binding Effect ........................................................... 79
SECTION 9.04. Successors and Assigns .............................................. 79
SECTION 9.05. Expenses; Indemnity .................................................. 83
SECTION 9.06. Right of Setoff .......................................................... 84
SECTION 9.07. Applicable Law .......................................................... 85
SECTION 9.08. Waivers; Amendment .................................................. 85
SECTION 9.09. Interest Rate Limitation .............................................. 86
SECTION 9.10. Entire Agreement ....................................................... 86
SECTION 9.11. WAIVER OF JURY TRIAL ........................................... 86
SECTION 9.12. Severability ............................................................... 87
SECTION 9.13. Counterparts .............................................................. 87
SECTION 9.14. Headings .................................................................. 87
SECTION 9.15. Jurisdiction; Consent to Service of Process .................... 87
SECTION 9.16. Confidentiality ........................................................... 88
SECTION 9.17. Parties Including Trustees; Bankruptcy Court Proceedings ......... 88
SECTION 9.18. Pre-Petition Loan Documents ....................................... 89
SECTION 9.19. Conflict of Terms ....................................................... 89
SECTION 9.20. Press Releases and Related Matters .............................. 89

ARTICLE X INTERCREDITOR PROVISIONS ............................................. 90
SECTION 10.01. Enforcement ............................................................ 90
SECTION 10.02. Application of Proceeds ............................................ 92
SECTION 10.03. Releases ................................................................. 92

SECTION 10.04. Insurance ................................................................ 93
SECTION 10.05. Purchase Right ....................................................... 93
SECTION 10.06. Provisions Solely to Define Relative Rights ....................................... 93

<u>Exhibits and Schedules</u>

| | |
|---|---|
| Exhibit A | Form of Administrative Questionnaire |
| Exhibit B | Form of Assignment and Acceptance |
| Exhibit C | Form of Borrowing Request |
| Exhibit D | Form of Disclosure Statement |
| Exhibit E | Form of Guarantee and Collateral Agreement |
| Exhibit F | Form of Interim Order |
| Exhibit G | Form of Lender Addendum |
| Exhibit H | Form of Plan of Reorganization |
| Exhibit I | Form of Revolving Note |
| Exhibit J | Form of Term Note |
| Exhibit K | Form of Exemption Certificate |

| | |
|---|---|
| Schedule 1.01(a) | Existing Letters of Credit |
| Schedule 1.01(b) | Permitted Senior Liens |
| Schedule 1.01(c) | Subsidiary Guarantors |
| Schedule 2.01 | Commitments |
| Schedule 3.08 | Subsidiaries |
| Schedule 3.09 | Litigation; Compliance with Laws |
| Schedule 3.10 | Agreements |
| Schedule 3.18 | Insurance |
| Schedule 3.20 | Owned and Leased Real Property |
| Schedule 4.02 | First Day Orders |
| Schedule 6.01 | Existing Indebtedness |
| Schedule 6.02 | Existing Liens |
| Schedule 6.04 | Existing Investments |

SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT dated as of October __, 2009 among TRUE TEMPER CORPORATION, a Delaware corporation, as a debtor-in-possession ("Holdings"), TRUE TEMPER SPORTS, INC., a Delaware corporation, as a debtor-in-possession (the "Borrower"), the LENDERS from time to time party hereto, GENERAL ELECTRIC CAPITAL CORPORATION ("GE Capital"), as administrative agent and co-collateral agent (in such capacities, collectively, the "Administrative Agent"), and CREDIT SUISSE, CAYMAN ISLANDS BRANCH, as term agent and co-collateral agent (in such capacities, collectively, the "Term Agent"). Capitalized terms used and not otherwise defined have the meanings assigned to them in Section 1.01 herein.

## RECITALS

WHEREAS, on October __, 2009 (the "Petition Date"), Holdings, the Borrower and each of their respective Domestic Subsidiaries commenced Chapter 11 Case Nos. [_____], as administratively consolidated as Chapter 11 Case No. [_____] (each a "Chapter 11 Case" and collectively, the "Chapter 11 Cases") by filing separate voluntary petitions for reorganization under Chapter 11, 11 U.S.C. 101 et seq. (the "Bankruptcy Code"), with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Borrower and its Domestic Subsidiaries continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, prior to the Petition Date, financing was provided to Borrower pursuant to that certain Amended and Restated Credit Agreement, dated as of March 27, 2006 among the Borrower, Holdings, Credit Suisse, as administrative agent and a lender, and the other lenders from time to time signatory thereto (as amended, modified or supplemented through the Petition Date, the "Pre-Petition Loan Agreement");

WHEREAS, the Borrower has requested that Lenders provide a senior secured, super-priority (a) revolving loan facility of Ten Million Dollars ($10,000,000) in the aggregate to fund the working capital requirements of the Borrower and its Subsidiaries during the pendency of the Chapter 11 Cases and (b) term loan facility consisting of a roll-up of up to Eighty Million Dollars ($80,000,000) in "Obligations" (other than "Letters of Credit") under (and as such terms are defined in) the Pre-Petition Loan Agreement (hereinafter referred to as "Prior Lender Obligations");

WHEREAS, Lenders are willing to make certain Post-Petition loans and other extensions of credit to Borrower of up to such amounts upon the terms and conditions set forth herein;

WHEREAS, Borrower has agreed to secure all of its Obligations under the Loan Documents by granting to the Agents, for the benefit of the Secured Parties, a security interest in and lien upon all of its existing and after-acquired personal and real property, subject to the terms of the Interim Order and Final Order;

WHEREAS, Holdings and the Borrower's Domestic Subsidiaries are willing to guarantee all of the Obligations of Borrower under the Loan Documents and to secure all of their obligations under their guarantee by granting to the Agents, for the benefit of the Secured

Parties, a security interest in and lien upon all of their existing and after-acquired personal and real property including, without limitation, all of the Equity Interests of Borrower, subject to the terms of the Interim Order and Final Order; and

WHEREAS, each Subsidiary will receive substantial direct and indirect benefits by reason of the making of loans and other financial accommodations to the Borrower as provided in this Agreement.

NOW, THEREFORE, in consideration of the premises and the agreements hereinafter set forth, the parties hereto hereby agree as follows:

ARTICLE I

Definitions

SECTION 1.01.  Defined Terms.  As used in this Agreement, the following terms shall have the meanings specified below:

"ABR", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"Account Debtor" shall mean "account debtor", as defined in Article 9 of the UCC.

"Adjusted LIBO Rate" shall mean, for each Interest Period, the highest of (a) 3.0% per annum, (b) the offered rate per annum for deposits of dollars for the applicable Interest Period that appears on Reuters Screen LIBOR 01 Page as of 11:00 A.M. (London, England time) two (2) Business Days prior to the first day in such Interest Period or (c) the offered rate per annum for deposits of dollars for an Interest Period of three (3) months that appears on Reuters Screen LIBOR 01 Page as of 11:00 A.M. (London, England time) two (2) Business Days prior to the first day of the applicable Interest Period.  If no such offered rate exists, such rate will be the rate of interest per annum, as determined by Administrative Agent at which deposits of dollars in immediately available funds are offered at 11:00 A.M. (London, England time) two (2) Business Days prior to the first day in such Interest Period by major financial institutions reasonably satisfactory to Administrative Agent in the London interbank market for such Interest Period for the applicable principal amount on such date of determination.

"Administrative Agent" shall have the meaning assigned to such term in the preamble.

"Administrative Questionnaire" shall mean an Administrative Questionnaire in the form of Exhibit A, or such other form as may be supplied from time to time by any Agent.

"Affiliate" shall mean, when used with respect to a specified person, another person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the person specified; provided, however, that, for purposes of Section 6.07, the term "Affiliate" shall also include any person that directly or indirectly owns 10% or more of any class of Equity Interests of the person specified or that is an officer or director of the person specified.

"Agents" shall mean the Administrative Agent and the Term Agent.

"Aggregate Revolving Credit Exposure" shall mean the aggregate amount of the Lenders' Revolving Credit Exposures.

"Agreement" shall mean this Senior Secured Superpriority Debtor-in-Possession Credit Agreement, as from time to time amended, supplemented, amended and restated or otherwise modified and in effect on such date.

"Alternate Base Rate" shall mean, for any day, a rate per annum equal to the highest of (a) the rate last quoted by The Wall Street Journal as the "Prime Rate" in the United States or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by Administrative Agent) or any similar release by the Federal Reserve Board (as determined by Administrative Agent), (b) the sum of 3.0% per annum and the Federal Funds Effective Rate, and (c) the sum of (x) the Adjusted LIBO Rate calculated for each such day based on an Interest Period of three months determined two (2) Business Days prior to such day (but for the avoidance of doubt, not less than 3.0% per annum) plus (y) the 1.0%. Any change in the Alternate Base Rate due to a change in any of the foregoing shall be effective on the effective date of such change in the Federal Funds Effective Rate or the Adjusted LIBO Rate for an Interest Period of three months.

"Applicable Agent" shall mean (a) the Administrative Agent with respect to the administration of the Revolving Credit Commitments, Revolving Loans, L/C Commitment and Swingline Commitment, (including, without limitation, determination of interest rates with respect thereto, collection of principal and interest thereon, and the exercise of rights and remedies with respect thereto) and (b) the Term Agent with respect to the administration of the Term Loan Commitments and Term Loans (including, without limitation, determination of interest rates with respect thereto, collection of principal and interest thereon, and the exercise of rights and remedies with respect thereto).

"Applicable Margin" shall mean, for any day, for each Type of Loan, the rate per annum set forth under the relevant column heading below:

| ABR Term Loans | Eurodollar Revolving Loans | ABR Revolving Loans and Swingline Loans |
|---|---|---|
| 4.25% | 8.00% | 7.00% |

"Approved Budget" shall mean the aggregate, without duplication, of all items that are set forth in the Initial Approved Budget and any Supplemental Approved Budget.

"Asset Sale" shall mean the sale, lease, sale and leaseback, assignment (other than for security purposes), conveyance, transfer, issuance or other disposition (by way of merger, casualty, condemnation or otherwise) (any of the foregoing, a "Disposition") by Holdings, the Borrower or any of the Subsidiaries to any person other than the Borrower or any Subsidiary Guarantor of (a) any Equity Interests of any of the Subsidiaries (other than directors' qualifying

shares) or (b) any other assets of Holdings, the Borrower or any of the Subsidiaries, including Equity Interests of any person that is not a Subsidiary (other than (i) inventory, obsolete or worn out assets, assets that are no longer useful, scrap and Permitted Investments, in each case Disposed of in the ordinary course of business, (ii) the sale or discount by the Borrower or any Subsidiary, in each case without recourse and in the ordinary course of business, of overdue accounts receivable arising in the ordinary course of business, but only in connection with the compromise or collection thereof consistent with customary industry practice (and not as part of any bulk sale or financing transaction), (iii) the Disposition by any Subsidiary that is not a Loan Party of its assets that do not constitute Collateral in connection with a foreclosure by the applicable lenders with respect to any Indebtedness of such Subsidiary to the extent that such assets are collateral security for such Indebtedness, (iv) the licensing of intellectual property in the ordinary course of business, (v) the settlement, release or surrender of tort or other litigation claims, (vi) Dispositions between Subsidiaries that are not Subsidiary Guarantors, and (vii) Investments by the Borrower or any Subsidiary that are expressly permitted by Section 6.04 and that do not involve a Disposition of any assets of Holdings, the Borrower or any of the Subsidiaries to any person other than the Borrower or any Subsidiary Guarantor); provided that any Disposition or series of related Dispositions described in clause (b) above (but not excluded in clauses (i) through (vii) above) having a value not in excess of $250,000 shall be deemed not to be an "Asset Sale" for purposes of this Agreement.

"Assignment and Acceptance" shall mean an assignment and acceptance entered into by a Lender and an assignee (with the consent of any person whose consent is required by Section 9.04), and accepted by the Applicable Agent, in the form of Exhibit B or such other form as shall be approved by the Applicable Agent.

"Bankruptcy Code" shall have the meaning assigned to such term in the recitals to this Agreement.

"Bankruptcy Court" shall have the meaning assigned to such term in the recitals to this Agreement.

"Benefit Plan" shall mean any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Tax Code or Section 307 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Blocked Accounts" shall have the meaning assigned to such term in Section 5.11.

"Board" shall mean the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" shall have the meaning assigned to such term in the preamble.

"Borrowing" shall mean (a) Loans of the same Class and Type made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect and shall include the roll-up of up to $80,000,000 in Prior Lender Obligations into Term Loans pursuant to Section 2.01(a) hereunder, or (b) a Swingline Loan.

"Borrowing Request" shall mean a request by the Borrower in accordance with the terms of Section 2.03 and substantially in the form of Exhibit C, or such other form as shall be approved by the Administrative Agent.

"Breakage Event" shall have the meaning assigned to such term in Section 2.16.

"Business Day" shall mean any day other than a Saturday, Sunday or day on which commercial banks in Chicago or New York City are authorized or required by law to close; provided, however, that when used in connection with a Eurodollar Loan (including with respect to all notices and determinations in connection therewith and any payments of principal, interest or other amounts thereon), the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

"Capital Expenditures" means, for any Person for any period, the aggregate of all expenditures, whether or not made through the incurrence of Indebtedness, by such Person and its Subsidiaries during such period for the acquisition, leasing (pursuant to Capital Lease Obligations), construction, replacement, repair, substitution or improvement of fixed or capital assets or additions to equipment, in each case required to be capitalized under GAAP on a consolidated balance sheet of such Person, excluding interest capitalized during construction.

"Capital Lease Obligations" of any person shall mean the obligations of such person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such person under GAAP, and the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"Carve-Out" shall have the meaning specified in the Interim Order or the Final Order, as then in effect.

"Carve-Out Reserve" shall mean a reserve in the amount of $500,000.

"Change in Control" shall mean (a) the Permitted Holders shall fail to own directly or indirectly, beneficially and of record, Equity Interests representing less than 100% of the aggregate ordinary voting power and aggregate equity value represented by the issued and outstanding Equity Interests in Holdings; (b) if a majority of the seats (other than vacant seats) on the board of directors of Holdings shall at any time be occupied by persons who are not Continuing Directors; (c) if Holdings shall at any time fail to own directly or indirectly, beneficially and of record, 100% of each class of issued and outstanding Equity Interests in the Borrower free and clear of all Liens (other than Liens expressly permitted by clauses (b) and (p) of Section 6.02) and Liens securing any Permitted Second Lien Indebtedness on a second priority basis; or (d) if any change of control (or similar event, however denominated) shall occur under the Subordinated Note Documents.

"Change in Law" shall mean (a) the adoption of any law, rule or regulation after the Closing Date, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender or the Issuing Bank (or, for purposes of Section 2.14, by any lending office of such

Lender or by such Lender's or Issuing Bank's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the Closing Date.

"Chapter 11 Case" and "Chapter 11 Cases" shall have the meaning assigned to such term in the recitals to this Agreement.

"Charges" shall have the meaning assigned to such term in Section 9.09.

"Class", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are Revolving Loans, Term Loans or Swingline Loans and, when used in reference to any Commitment, refers to whether such Commitment is a Revolving Credit Commitment, Term Loan Commitment or Swingline Commitment.

"Closing Date" shall mean October __, 2009.

"Collateral" shall mean all property and assets of the Loan Parties, now owned or hereafter acquired, upon which a Lien is created by any Loan Document.

"Commitment" shall mean, with respect to any Lender, such Lender's Revolving Credit Commitment, Term Loan Commitment and Swingline Commitment.

"Commitment Fee" shall have the meaning assigned to such term in Section 2.05(a).

"Commitment Fee Rate" shall mean a rate per annum equal to 1%.

"Committees" shall mean collectively, the official committee of unsecured creditors and any other official committee formed, appointed, or approved in any Chapter 11 Case and each of such Committees shall be referred to herein as a "Committee".

"Continuing Directors" shall mean, at any time of determination, any member of the board of directors of Holdings who (a) was a member of such board of directors on the Closing Date, (b) was nominated for election or elected to such board of directors with the approval of a majority of the Continuing Directors who were members of such board of directors at the time of such nomination or election or (c) was nominated by the Sponsors pursuant to the Stockholders Agreement.

"Control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract or otherwise, and the terms "Controlling" and "Controlled" shall have meanings correlative thereto.

"Credit Event" shall have the meaning assigned to such term in Section 4.01.

"Default" shall mean any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would constitute an Event of Default.

"Deposit Account Control Agreement" shall mean an agreement among the Agents, the Borrower or a Subsidiary of the Borrower maintaining a deposit account at any bank, and such bank, which agreement shall grant possession of such deposit account to the Agents and shall be reasonably satisfactory to the Agents.

"Discharge of Revolving Obligations" means, (a) payment in full in cash of the Revolving Obligations, (b) termination or cash collateralization equal to 105% of all Letters of Credit and any other contingent Revolving Obligations and (c) termination of the Revolving Credit Commitments, Swingline Commitment and L/C Commitment.

"Disclosure Statement" shall mean, with respect to the Plan, a related disclosure statement in form and substance satisfactory to the Agents, together with any amendments, supplements or other modifications thereto reasonably acceptable to the Agents and substantially in the form of Exhibit D.

"Disposition" shall have the meaning assigned to such term in the definition of "Asset Sale" and the term "Dispose" shall have a correlative meaning.

"dollars" or "$" shall mean lawful money of the United States of America.

"Domestic Subsidiaries" shall mean all Subsidiaries incorporated, formed or organized under the laws of the United States of America, any State thereof or the District of Columbia.

"Environmental Laws" shall mean all former, current and future Federal, state, local and foreign laws (including common law), treaties, regulations, rules, ordinances, codes, decrees, judgments, directives, orders (including consent orders), and agreements in each case, relating to protection of the environment, natural resources, human health and safety or the presence, Release of, threatened Release, or exposure to, Hazardous Materials, or the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling or handling of, or the arrangement for such activities with respect to, Hazardous Materials.

"Environmental Liability" shall mean all liabilities, obligations, damages, losses, claims, actions, suits, judgments, orders, fines, penalties, fees, expenses and costs (including administrative oversight costs, natural resource damages and remediation costs), whether contingent or otherwise, arising out of or relating to (a) compliance or non-compliance with any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Environmental Permit" shall mean any Permit under Environmental Law.

"Equity Commitment and Plan Support Agreement" shall mean that certain Equity Commitment and Plan Support Agreement dated as of September 29, 2009 by and among True Temper Corporation, True Temper Sports, Inc., True Temper Sports – PRC Holdings, Inc., certain holders of the Prior Lender Obligations signatories thereto, certain holders of Permitted Second Lien Indebtedness signatories thereto, Credit Suisse, Cayman Islands Branch, as

Administrative Agent on the Pre-Petition Loan Agreement, and certain equity investors signatories thereto.

"Equity Interests" shall mean shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity interests in any person, or any obligations convertible into or exchangeable for, or giving any person a right, option or warrant to acquire, such equity interests or such convertible or exchangeable obligations.

"Equity Issuance" shall mean any issuance or sale by Holdings or the Borrower of any Equity Interests of Holdings or the Borrower, as applicable, or the receipt by Holdings or the Borrower of any capital contribution, as applicable.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" shall mean any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Section 414(b) or (c) of the Tax Code, or solely for purposes of Section 302 of ERISA and Section 412 of the Tax Code, is treated as a single employer under Section 414 of the Tax Code.

"ERISA Event" shall mean (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Benefit Plan (other than (i) an event for which the 30-day notice period is waived or (ii) the previously reported "loan default" and "active participate reduction" events of which notice was provided to the PBGC prior to the Petition Date); (b) the existence with respect to any Benefit Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Tax Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(d) of the Tax Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Benefit Plan; (d) the incurrence by the Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Benefit Plan or the withdrawal or partial withdrawal of the Borrower or any of its ERISA Affiliates from any Benefit Plan or Multiemployer Plan; (e) the receipt by the Borrower or any of its ERISA Affiliates from the PBGC or a plan administrator of any notice relating to the intention to terminate any Benefit Plan or Plans or to appoint a trustee to administer any Benefit Plan; (f) the adoption of any amendment to a Benefit Plan that would require the provision of security pursuant to Section 401(a)(29) of the Tax Code or Section 307 of ERISA; (g) the receipt by the Borrower or any of its ERISA Affiliates of any notice, or the receipt by any Multiemployer Plan from the Borrower or any of its ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA; (h) the occurrence of a "prohibited transaction" with respect to which the Borrower or any of the Subsidiaries is a "disqualified person" (within the meaning of Section 4975 of the Tax Code) or with respect to which the Borrower or any such Subsidiary could otherwise be liable; or (i) any other event or condition with respect to a Benefit Plan or Multiemployer Plan that could result in liability of the Borrower or any Subsidiary.

"Eurodollar", when used in reference to any Revolving Loan or Borrowing, refers to whether such Revolving Loan, or the Revolving Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Event of Default" shall have the meaning assigned to such term in Article VII.

"Excluded Foreign Subsidiaries" shall mean, at any time, any Foreign Subsidiary that is (or is treated as) for United States federal income tax purposes either (a) a corporation or (b) a pass-through entity owned directly or indirectly by another Foreign Subsidiary that is (or is treated as) a corporation.

"Excluded Taxes" shall mean, with respect to any Agent, any Lender, the Issuing Bank or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) income or franchise taxes imposed on (or measured by) its net income as a result of a present or former connection between such recipient and the jurisdiction imposing such tax (or any political subdivision thereof), other than any such connection arising solely from such recipient having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or any other Loan Document and (b) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrower under Section 2.21(a)), any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party to this Agreement (or designates a new lending office) or is attributable to such Foreign Lender's failure to comply with Section 2.20(d), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Borrower with respect to such withholding tax pursuant to Section 2.20(a).

"Existing Letters of Credit" shall mean the letters of credit issued under the Pre-Petition Loan Agreement and outstanding on the Petition Date as described on Schedule 1.01(a).

"E-System" means any electronic system approved by Administrative Agent, including Intralinks® and ClearPar® and any other internet or extranet-based site, whether such electronic system is owned, operated or hosted by Administrative Agent, any of its Related Parties or any other Person, providing for access to data protected by passcodes or other security system.

"Facility" shall mean each of (a) the Term Loan Commitments and the roll-up of up to $80,000,000 in Prior Lender Obligations as Term Loans thereunder (the "Term Loan Facility"), and (b) the Revolving Credit Commitments and the extensions of credit made thereunder (the "Revolving Credit Facility").

"Federal Funds Effective Rate" shall mean, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal Funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day, provided that if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average rate quoted to Administrative Agent on such day on such transactions as determined by Administrative Agent in a commercially reasonable manner.

"Fees" shall mean the Commitment Fees, the L/C Participation Fees and the Issuing Bank Fees.

"Final Order" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court which order shall be satisfactory in form and substance to the Agents, together with all extensions, modifications and amendments thereto, in form and substance satisfactory to each of the Agents, which, among other matters but not by way of limitation, authorizes the Loan Parties to obtain credit, incur (or guaranty) Indebtedness, and grant first priority priming Liens under this Agreement and the other Loan Documents, as the case may be, provides for the super priority of the Secured Parties' claims hereunder and provides for the roll-up of the Prior Lender Obligations as contemplated herein.

"Financial Officer" of any person shall mean the chief financial officer, principal accounting officer, treasurer or controller of such person.

"Foreign Lender" shall mean any Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is located. For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Subsidiary" shall mean any Subsidiary that is not a Domestic Subsidiary.

"GAAP" shall mean generally accepted accounting principles in the United States.

"Governmental Authority" shall mean the government of the United States of America or any other nation, any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Granting Lender" shall have the meaning assigned to such term in Section 9.04(i).

"Guarantee" of or by any person (the "guarantor") shall mean any obligation, contingent or otherwise, of (a) the guarantor or (b) another person (including any bank under a letter of credit) to induce the creation of which the guarantor has issued a reimbursement, counterindemnity or similar obligation, in either case guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation, contingent or otherwise, of the guarantor, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment of such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, (iv) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation or (v) to otherwise assure or

hold harmless the owner of such Indebtedness or other obligation against loss in respect thereof; provided, however, that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.

"Guarantee and Collateral Agreement" shall mean the Guarantee and Collateral Agreement in the form of Exhibit E, to be executed and delivered by Holdings, the Borrower and each Subsidiary Guarantor.

"Guarantors" shall mean Holdings and the Subsidiary Guarantors.

"Hazardous Materials" shall mean any petroleum (including crude oil or fraction thereof) or petroleum products or byproducts, or any pollutant, contaminant, chemical, compound, constituent, or hazardous, toxic or other substances, materials or wastes defined, or regulated as such by, or pursuant to, any Environmental Law, or requires removal, remediation or reporting under any Environmental Law, including asbestos, or asbestos containing material, radon or other radioactive material, polychlorinated biphenyls and urea formaldehyde insulation.

"Hedging Agreement" shall mean any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, fuel or other commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided, however, that no phantom stock or similar plan providing for payments and on account of services provided by current or former directors, officers, employees or consultants of Holdings, the Borrower or any Subsidiary shall be a Hedging Agreement.

"Holdings" shall have the meaning assigned to such term in the preamble.

"Impacted Lender" means any Lender that fails promptly to provide Administrative Agent, upon Administrative Agent's request, satisfactory assurance that such Lender will not become a Non-Funding Lender.

"Indebtedness" of any person shall mean, without duplication, (a) all obligations of such person for borrowed money, (b) all obligations of such person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such person under conditional sale or other title retention agreements relating to property or assets acquired by such person, (d) all obligations of such person in respect of the deferred purchase price of property or services (other than current trade accounts payable incurred in the ordinary course of business), (e) all obligations of such person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Equity Interests in such person, (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such person, whether or not the Indebtedness secured thereby has been assumed, (g) all Guarantees by such person of Indebtedness of others, (h) all Capital Lease Obligations of such person, (i) all obligations, contingent or otherwise, of such person as an account party in respect of letters of credit and letters of guaranty and (j) all obligations, contingent or otherwise, of such person in respect of bankers' acceptances. The Indebtedness of any person shall include the Indebtedness of any

other person (including any partnership in which such person is a general partner) to the extent such person is liable therefor as a result of such person's ownership interest in, or other relationship with, such other person, except to the extent the terms of such Indebtedness provide (including by a non-recourse nature) that such person is not liable therefor.

"Indemnified Taxes" shall mean Taxes other than Excluded Taxes and Other Taxes.

"Indemnitee" shall have the meaning assigned to such term in Section 9.05(b).

"Information" shall have the meaning assigned to such term in Section 9.16.

"Initial Approved Budget" shall have the meaning assigned to such term in Section 4.02 (h).

"Interest Payment Date" shall mean (a) with respect to any ABR Loan, the last Business Day of each month and (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part.

"Interest Period" shall mean, with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is 1, 2 or 3 months thereafter, as the Borrower may elect; provided, however, that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period. Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Interim Order" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to each of the Agents, which, among other matters but not by way of limitation, authorizes, on an interim basis, the Loan Parties to execute and perform under the terms of this Agreement and the other Loan Documents, which order shall be deemed satisfactory to the Agents if such order is substantially in the form of Exhibit F.

"Investments" shall have the meaning assigned to such term in Section 6.04.

"Issue" means, with respect to any Letter of Credit, to issue, extend the expiration date of, renew (including by failure to object to any automatic renewal on the last day such objection is permitted), increase the face amount of, or reduce or eliminate any scheduled decrease in the

face amount of, such Letter of Credit, or to cause any Person to do any of the foregoing. The terms "Issued" and "Issuance" have correlative meanings.

"Issuing Bank" shall mean, as the context may require, (a) Credit Suisse, in its capacity as the issuer of the Existing Letters of Credit hereunder, (b) General Electric Capital Corporation or any of its Affiliates and (c) any other Person that may become an Issuing Bank pursuant to Section 2.23(k), with respect to Letters of Credit Issued by such Person. The Issuing Bank may, in its discretion, arrange for one or more Letters of Credit to be Issued by Affiliates of the Issuing Bank, in which case the term "Issuing Bank" shall include any such Affiliate with respect to Letters of Credit Issued by such Affiliate.

"Issuing Bank Fees" shall have the meaning assigned to such term in Section 2.05(c).

"L/C Commitment" shall mean the commitment of the Issuing Bank to Issue Letters of Credit pursuant to Section 2.23.

"L/C Exposure" shall mean, at any time, the sum of (a) the aggregate undrawn amount of all Letters of Credit at such time and (b) the aggregate amount of all L/C Reimbursement Obligations that have not been reimbursed at such time. The L/C Exposure of any Revolving Credit Lender at any time shall equal its Pro Rata Percentage of the aggregate L/C Exposure at such time.

"L/C Fee Payment Date" shall have the meaning assigned to such term in Section 2.05(c).

"L/C Participation Fee" shall have the meaning assigned to such term in Section 2.05(c).

"L/C Reimbursement Agreement" has the meaning assigned to such term in Section 2.23(a).

"L/C Reimbursement Date" has the meaning assigned to such term in Section 2.23(e).

"L/C Reimbursement Obligation" means, for any Letter of Credit, the obligation of the Borrower to the Issuing Bank thereof, as and when matured, to pay all amounts drawn under such Letter of Credit.

"L/C Request" has the meaning assigned to such term in Section 2.23(b).

"Lender Addendum" shall mean, with respect to any initial Lender, a Lender Addendum in the form of Exhibit G, or such other form as may be supplied by any Agent, to be executed and delivered by such Lender on or prior to the Closing Date.

"Lender-Related Distress Event" shall mean, with respect to any Lender or any Person that directly or indirectly Controls such Lender (each a "Distressed Person"), (a) a voluntary or involuntary case with respect to such Distressed Person under the Bankruptcy Code or any similar bankruptcy laws of its jurisdiction of formation, (b) a custodian, conservator, receiver or similar official is appointed for such Distressed Person or any substantial part of such Distressed Person's assets, (c) such Distressed Person is subject to a forced liquidation, merger, sale or other change of majority Control supported in whole or in part by guaranties or other support

(including, without limitation, the nationalization or assumption of majority ownership or operating Control by) the U.S. government or other Governmental Authority, or (d) such Distressed Person makes a general assignment for the benefit of creditors or is otherwise adjudicated as, or determined by any Governmental Authority having regulatory authority over such Distressed Person or its assets to be, insolvent or bankrupt.

"Lenders" shall mean (a) the persons executing this Agreement as a Lender on the Closing Date and (b) any person that has become a party hereto pursuant to an Assignment and Acceptance. Unless the context otherwise requires, the term "Lenders" shall include the Swingline Lender.

"Letter of Credit" shall mean any letter of credit issued pursuant to Section 2.23 and shall include the Existing Letters of Credit.

"Lien" shall mean, with respect to any asset, (a) any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, encumbrance, collateral assignment, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Loan Documents" shall mean this Agreement, the Security Documents, L/C Reimbursement Agreements, the Interim Order, the Final Order and all other agreements, documents or instruments executed in connection with this Agreement.

"Loan Parties" shall mean Holdings, the Borrower and each Subsidiary (other than a Foreign Subsidiary) that is or becomes a party to a Loan Document or that is otherwise subject to the Interim Order and Final Order.

"Loans" shall mean the Revolving Loans, the Term Loans and the Swingline Loans.

"Margin Stock" shall have the meaning assigned to such term in Regulation U.

"Material Adverse Effect" shall mean a material adverse condition or material adverse change in or materially affecting (a) the business, assets, liabilities, operations or condition (financial or otherwise) of Holdings, the Borrower and the Subsidiaries, taken as a whole, or (b) the validity or enforceability of any of the Loan Documents or the material rights and remedies of the Agents or the Secured Parties thereunder.

"Material Contract" shall mean any contract or other arrangement to which Holdings, the Borrower or any Subsidiary is a party the termination of which could reasonably be expected to have a Material Adverse Effect.

"Material Indebtedness" shall mean Indebtedness (other than the Loans and Letters of Credit), or obligations in respect of one or more Hedging Agreements, of any one or more of Holdings, the Borrower and the Subsidiaries in an aggregate principal amount exceeding $500,000. For purposes of determining Material Indebtedness, the "principal amount" of the

obligations of Holdings, the Borrower or any Subsidiary in respect of any Hedging Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that Holdings, the Borrower for such Subsidiary would be required to pay if such Hedging Agreement were terminated at such time.

"Maturity Date" shall mean the earliest of (a) [_____], 2010, (b) the date of termination of Lenders' obligations to make Revolving Loans or acceleration of maturity of all existing Loans pursuant to Section 7, (c) the date of indefeasible prepayment in full by Borrower of the Obligations and the cancellation and return or cash collateralization of all Letters of Credit and the permanent reduction of all Revolving Credit Commitments to zero dollars ($0) or (d) with respect to a chapter 11 plan that provides for (i) payment in full in cash of all Revolving Obligations and (ii) treatment of Term Obligations (x) in the manner set forth in the Plan, or (y) in any other manner acceptable to Term Lenders representing two-thirds in amount and more than one-half in number of all claims (as defined in the Bankruptcy Code) arising under the Term Loans that has been confirmed by order of the Bankruptcy Court, the earlier of the effective date of such plan of reorganization or the sixtieth day after the date of entry of such confirmation order.

"Maximum Rate" shall have the meaning assigned to such term in Section 9.09.

"Moody's" shall mean Moody's Investors Service, Inc.

"Mortgaged Properties" shall mean each parcel of real property and the improvements thereto owned or leased by a Loan Party (including, without limitation, each such parcel and improvements thereto specified on Schedule 3.20), and shall include each other parcel of real property and improvements thereto acquired after the Closing Date.

"Multiemployer Plan" shall mean a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which the Borrower or any ERISA Affiliate may have any liability.

"Net Cash Proceeds" shall mean (a) with respect to any Asset Sale or Recovery Event, the proceeds thereof in the form of cash and Permitted Investments (including any such proceeds subsequently received (as and when received) in respect of noncash consideration initially received), net of (i) selling expenses (including reasonable and customary broker's or investment banker's fees or commissions, legal fees, transfer and similar taxes incurred by the Borrower and the Subsidiaries in connection therewith and the Borrower's good faith estimate of income taxes paid or payable in connection with such sale, after taking into account any available tax credits or deductions and any tax sharing arrangements), (ii) amounts provided as a reserve, in accordance with GAAP, against any liabilities under any indemnification obligations or purchase price adjustment associated with such Asset Sale (provided that, to the extent and at the time any such amounts are released from such reserve, such amounts shall constitute Net Cash Proceeds) and (iii) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness for borrowed money which is secured by the asset sold in such Asset Sale and which is required to be repaid with such proceeds (other than any such Indebtedness assumed by the purchaser of such asset); provided that, if (A) such proceeds shall result from an Asset Sale or Recovery Event to the extent involving assets, rights or other property of a Subsidiary that is not a Loan Party, (B) the terms of any Indebtedness of such Subsidiary require that such

proceeds be applied to repay such Indebtedness, (C) the Borrower shall deliver a certificate of a Financial Officer to the Administrative Agent within three Business Days of the time of receipt thereof setting forth the Borrower's intent to use such proceeds to repay such Indebtedness of such Subsidiary to the extent required thereby and, if such Indebtedness is revolving credit Indebtedness, to correspondingly reduce commitments with respect thereto, within 30 days of receipt of such proceeds and (D) no Event of Default shall have occurred and be continuing at the time of such certificate, such proceeds shall not constitute Net Cash Proceeds except to the extent not so used at the end of such 30-day period, at which time such proceeds shall be deemed to be Net Cash Proceeds; and (b) with respect to any issuance or disposition of Indebtedness or any Equity Issuance, the cash proceeds thereof, net of all taxes and reasonable and customary fees (including legal fees), commissions, underwriting discounts, costs and other expenses incurred by the Borrower and the Subsidiaries in connection therewith.

"Non-Funding Lender" shall mean any Lender (a) that has failed to fund any payments required to be made by it under the Loan Documents within two (2) Business Days after any such payment is due, (b) that has given verbal or written notice to the Borrower, Administrative Agent or any Lender or has otherwise publicly announced that such Lender believes it will fail to fund all payments required to be made by it or fund all purchases of participations required to be funded by it under this Agreement and the other Loan Documents, (c) as to which Administrative Agent has a good faith belief that such Lender or an Affiliate of such Lender has defaulted in fulfilling its obligations (as a lender, agent or letter of credit issuer) under one or more other syndicated credit facilities or (d) with respect to which one or more Lender-Related Distress Events has occurred with respect to such Lender or any Person that directly or indirectly Controls such Lender and Administrative Agent has determined that such Lender may become a Non-Funding Lender.

"Obligations" shall mean all obligations defined as "Obligations" in the Guarantee and Collateral Agreement and the other Loan Documents.

"Other Taxes" shall mean any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies (including interest, fines, penalties and additions to tax) arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document.

"Payment Account" shall mean a bank account maintained by Administrative Agent into which all the proceeds from the Blocked Accounts shall be transferred as such bank account shall be specified by the Administrative Agent to the Borrower from time to time.

"PBGC" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Permits" shall mean any and all material franchises, licenses, leases, permits, approvals, notifications, certifications, registrations, authorizations, exemptions, qualifications, easements, rights of way, Liens and other rights, privileges and approvals required under any Requirement of Law.

"Permitted Business" shall mean any business conducted or proposed to be conducted by the Borrower and the Subsidiaries on the date of this Agreement or any business that is similar, reasonably related, incidental or ancillary thereto or to the manufacture of sports equipment or metal or graphite products.

"Permitted Holders" shall mean the Sponsor and the Sponsor Related Parties.

"Permitted Investments" shall mean:

     (a)    direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof;

     (b)    investments in commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

     (c)    investments in certificates of deposit, banker's acceptances and time deposits maturing within 270 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any Agent or any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof that has a combined capital and surplus and undivided profits of not less than $500,000,000;

     (d)    fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria of clause (c) above;

     (e)    investments in "money market funds" within the meaning of Rule 2a-7 of the Investment Company Act of 1940, as amended, substantially all of whose assets are invested in investments of the type described in clauses (a) through (d) above; and

     (f)    other short-term investments utilized by Foreign Subsidiaries in accordance with normal investment practices for cash management in investments of a type analogous to the foregoing.

"Permitted Second Lien Indebtedness" shall mean Indebtedness of the Borrower under that certain Second Lien Credit Agreement dated January 22, 2007 (as amended from time to time) by and among the Borrower, as borrower, Holdings and True Temper Sports –PRC Holdings Inc, as guarantors, Law Debenture Trust Company of New York, as agent, and the lenders from time to time signatory thereto, as in effect on the Petition Date, but exclusive of any postpetition interest, fees, expenses and other non-principal amounts except to the extent allowable under Section 506(b) of the Bankruptcy Code.

"Permitted Senior Lien" means any valid, enforceable, and non-avoidable Lien that was perfected prior to the Petition Date which is senior in priority to the Liens securing the Prior

Lender Obligations under applicable law and after giving effect to any subordination or inter-creditor agreements and which is (i) permitted under the Pre-Petition Loan Agreement or (ii) has otherwise been approved in writing by the Agents, in each case, as set forth on <u>Schedule 1.01(b)</u>; provided that this definition shall exclude the Liens arising under the Pre-Petition Loan Documents, which Liens shall be subordinate to the Liens securing the Obligations.

"<u>person</u>" shall mean any natural person, corporation, trust, business trust, joint venture, joint stock company, association, company, limited liability company, partnership, Governmental Authority or other entity.

"<u>Petition Date</u>" shall have the meaning assigned to such term in the recitals to this Agreement.

"<u>Plan</u>" shall mean the Joint Prepackaged Plan of Reorganization of True Temper Sports, Inc., True Temper Corporation, and True Temper Sports-PRC Holdings, Inc., dated September 30, 2009, a copy of which is attached as <u>Exhibit H</u>, together with any amendments, supplements or other modifications thereto and all schedules, annexes and exhibits thereto, as the same may be amended, supplemented or otherwise modified from time to time, in each case, in form and substance satisfactory to each of the Agents.

"<u>Post-Petition</u>" shall mean the time period beginning immediately upon the filing of the Chapter 11 Cases.

"<u>Pre-Petition</u>" shall mean the time period prior to the filing of the Chapter 11 Cases.

"<u>Pre-Petition Loan Agreement</u>" shall have the meaning assigned to such term in the recitals to this Agreement.

"<u>Pre-Petition Loan Documents</u>" shall have the meaning assigned to the term "Loan Documents" in the Pre-Petition Loan Agreement.

"<u>Prior Lender Obligations</u>" shall have the meaning assigned to such term in the recitals to this Agreement.

"<u>Pro Rata Percentage</u>" of any Revolving Credit Lender, at any time, shall mean the percentage of the Total Revolving Credit Commitment represented by such Lender's Revolving Credit Commitment. In the event the Revolving Credit Commitments shall have expired or been terminated, the Pro Rata Percentages of any Revolving Credit Lender shall be determined on the basis of the Revolving Credit Commitments most recently in effect prior thereto.

"<u>Real Property</u>" shall mean all real property owned or leased from time to time by Holdings, the Borrower and the Subsidiaries.

"<u>Recovery Event</u>" shall mean any settlement of or payment in respect of any property or casualty insurance claim or any taking under power of eminent domain or by condemnation or similar proceeding of or relating to any property or asset of Holdings, the Borrower or any Subsidiary.

"Register" shall have the meaning assigned to such term in Section 9.04(d).

"Regulation T" shall mean Regulation T of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Regulation U" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Regulation X" shall mean Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Related Fund" shall mean, with respect to any Lender, any other fund that invests in bank loans and is advised or managed by the same investment advisor or manager as such Lender or by an Affiliate of such investment advisor or manager.

"Related Parties" shall mean, with respect to any specified person, such person's Affiliates and the respective directors, officers, employees, agents and advisors of such person and such person's Affiliates.

"Release" shall mean any release, spill, seepage, emission, leaking, pumping, injection, pouring, emptying, deposit, disposal, discharge, dispersal, dumping, escaping, leaching, or migration into, onto or through the environment or within or upon any building, structure, facility or fixture.

"Required Lenders" shall mean, at any time, Required Revolving Credit Lenders and Required Term Lenders.

"Required Revolving Credit Lenders" shall mean, at any time, the Lenders having Revolving Loans (excluding Swingline Loans), L/C Exposure, Swingline Exposure and unused Revolving Credit Commitments representing at least a majority of the sum of all Revolving Loans outstanding (excluding Swingline Loans), L/C Exposure, Swingline Exposure and unused Revolving Credit Commitments at such time.

"Required Term Lenders" shall mean, at any time, the Lenders having Term Loans representing at least a majority of the sum of all Term Loans outstanding at such time.

"Required Prepayment Percentage" shall mean (a) in the case of any Asset Sale or Recovery Event, 100%; (b) in the case of any Equity Issuance, 100%; and (c) in the case of any issuance or other incurrence of Indebtedness, 100%.

"Requirement of Law" shall mean as to any person, the governing documents of such person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such person or any of its Real Property or personal property or to which such person or any of its property of any nature is subject.

"Responsible Officer" of any person shall mean any executive officer or Financial Officer of such person and any other officer or similar official thereof responsible for the administration of the obligations of such person in respect of this Agreement.

"Restricted Indebtedness" shall mean Indebtedness of Holdings, the Borrower or any Subsidiary, the payment, prepayment, repurchase or defeasance of which is restricted under Section 6.09(b).

"Restricted Payment" shall mean any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in Holdings, the Borrower or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, defeasance, retirement, acquisition, cancellation or termination of any Equity Interests in Holdings, the Borrower or any Subsidiary or any option, warrant or other right to acquire any such Equity Interests in Holdings, the Borrower or any Subsidiary.

"Revolving Credit Borrowing" shall mean a Borrowing comprised of Revolving Loans.

"Revolving Credit Commitment" shall mean, with respect to each Lender, the commitment, if any, of such Lender to make Revolving Loans (and to acquire participations in Letters of Credit and Swingline Loans) hereunder as set forth on the Lender Addendum delivered by such Lender or as set forth on Schedule 2.01, or in the Assignment and Acceptance pursuant to which such Lender assumed its Revolving Credit Commitment, as applicable, as the same may be reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 9.04.

"Revolving Credit Exposure" shall mean, with respect to any Lenders, at any time, the aggregate principal amount at such time of all outstanding Revolving Loans of such Lender, plus the aggregate amount at such time of such Lender's L/C Exposure, plus the aggregate amount at such time of such Lender's Swingline Exposure.

"Revolving Credit Lender" shall mean a Lender with a Revolving Credit Commitment or an outstanding Revolving Loan.

"Revolving Loans" shall mean the revolving loans made by the Lenders to the Borrower pursuant to clause (b) of Section 2.01.

"Revolving Obligations" shall mean, as of any date of determination, (a) the outstanding principal amount of all Revolving Loans, Swingline Loans and L/C Exposure as of such date, (b) all accrued and unpaid interest thereon through such date, (c) all Commitment Fees, L/C Participation Fees and Issuing Bank Fees accrued and unpaid through such date and (d) all unreimbursed expenses and indemnifications (to the extent a claim has been made or is identifiable) to which the Administrative Agent and Revolving Credit Lenders are entitled under the Loan Documents.

"S&P" shall mean Standard & Poor's Ratings Group, Inc.

"Secured Parties" shall have the meaning assigned to such term in the Guarantee and Collateral Agreement.

"Security Documents" shall mean the Guarantee and Collateral Agreement, the Interim Order, the Final Order and each of the other instruments and documents executed and delivered pursuant to any of the foregoing.

"SPC" shall have the meaning assigned to such term in Section 9.04(i).

"Sponsor" shall mean, collectively, Gilbert Global Equity Partners, L.P., Gilbert Global Equity Partners (Bermuda), L.P. and GGEP/SK Equity Partners, LLC.

"Sponsor Related Parties" shall mean (a) any (i) controlling stockholder, partner or member, (ii) majority-owned (or more) subsidiary or (iii) spouse or immediate family member (in the case of an individual), in each case, of the Sponsor or (b) any trust, corporation, partnership, limited liability company or other entity, the beneficiaries, stockholders, partners, members, owners or persons beneficially holding (directly or through one or more subsidiaries) a greater than 50% controlling interest of which consist of the Sponsor and/or such persons referred to in the immediately preceding clause (a).

"Statutory Reserves" shall mean a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board and any other banking authority, domestic or foreign, to which the Applicable Agent or any Lender (including any branch, Affiliate or other fronting office making or holding a Loan) is subject for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board). Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. Statutory Reserves shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Stockholders Agreement" shall mean the Stockholders Agreement dated as of March 15, 2004 among Holdings and its stockholders party thereto.

"Subordinated Note Documents" shall mean the indenture under which the Subordinated Notes are issued and all other instruments, agreements and other documents evidencing or governing the Subordinated Notes or providing for any Guarantee or other right in respect thereof, in each case as in effect on the Petition Date.

"Subordinated Notes" shall mean the Borrower's 8-3/8% Senior Subordinated Notes due 2011, in an aggregate principal amount of $125,000,000.

"subsidiary" shall mean, with respect to any person (herein referred to as the "parent"), any corporation, partnership, limited liability company, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or more than 50% of the general partnership interests are, at

the time any determination is being made, owned, controlled or held, or (b) that is, at the time any determination is made, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" shall mean any subsidiary of the Borrower.

"Subsidiary Guarantor" shall mean, initially, each Subsidiary specified on Schedule 1.01(c) and, at any time thereafter, shall include each other Subsidiary that is not an Excluded Foreign Subsidiary.

"Supplemental Approved Budget" means, in respect of the Initial Approved Budget, supplemental or replacement budgets delivered and approved by the Administrative Agent in accordance with Section 5.04(g) (covering any time period covered by a prior budget or covering additional time periods).

"Swingline Commitment" shall mean the commitment of the Swingline Lender to make loans pursuant to Section 2.22, as the same may be reduced from time to time pursuant to Section 2.09.

"Swingline Exposure" shall mean, at any time, the aggregate principal amount at such time of all outstanding Swingline Loans. The Swingline Exposure of any Revolving Credit Lender at any time shall equal its Pro Rata Percentage of the aggregate Swingline Exposure at such time.

"Swingline Lender" shall mean General Electric Capital Corporation, in its capacity as lender of Swingline Loans hereunder.

"Swingline Loan" shall mean any loan made by the Swingline Lender pursuant to Section 2.22.

"Tax Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"Taxes" shall mean any and all present or future taxes, levies, imposts, duties, deductions, charges, liabilities or withholdings imposed by any Governmental Authority.

"Term Agent" shall have the meaning assigned to such term in the preamble.

"Term Lender" shall mean a Lender with a Term Loan Commitment or an outstanding Term Loan.

"Term Loan Commitment" shall mean, with respect to each Lender, the Roll-Up Amount of such Lender as of the Closing Date as set forth on Schedule 2.01 (the "Roll-Up Amount"). The aggregate amount of the Term Loan Commitments on the Closing Date is $80,000,000.[1]

---

[1] SCHEDULE 2.01 TO INCLUDE OUTSTANDING LOANS AND SWAP AND FORWARD CONTRACT EXPOSURE UNDER THE EXISTING FIRST LIEN AGREEMENT HELD BY PARTIES WHO BECOME

(cont'd)

"Term Loans" shall mean the term loans consisting of rolled-up Prior Lender Obligations deemed made by the Lenders to the Borrower pursuant to Section 2.01(a).

"Term Obligations" shall mean, as of any date of determination, (a) the outstanding principal amount of all Term Loans as of such date, (b) all accrued and unpaid interest thereon through such date and (c) all unreimbursed expenses and indemnifications (to the extent a claim has been made) to which the Term Agent and Term Lenders are entitled under the Loan Documents.

"Total Revolving Credit Commitment" shall mean, at any time, the aggregate amount of the Revolving Credit Commitments, as in effect at such time. The Total Revolving Credit Commitment on the Closing Date is $10,000,000.

"Transactions" shall mean, collectively, (a) the execution, delivery and performance by the Loan Parties of the Loan Documents to which they are a party, (b) the borrowings hereunder, the issuance of Letters of Credit and the use of proceeds of each of the foregoing, (c) the granting of Liens pursuant to the Loan Documents, and (e) any other transactions related to or entered into in connection with any of the foregoing.

"Type", when used in respect of any Loan or Borrowing, shall refer to the Rate by reference to which interest on such Loan or on the Loans comprising such Borrowing is determined. For purposes hereof, the term "Rate" shall include the Adjusted LIBO Rate and the Alternate Base Rate.

"UCC" shall mean the Uniform Commercial Code.

"Uniform Customs" shall have the meaning assigned to such term in Section 9.07.

"wholly owned subsidiary" of any person shall mean a subsidiary of such person of which securities (except for directors' qualifying shares) or other ownership interests representing 100% of the Equity Interests are, at the time any determination is being made, owned, controlled or held by such person or one or more wholly owned subsidiaries of such person or by such person and one or more wholly owned subsidiaries of such person; a "wholly owned Subsidiary" shall mean any wholly owned subsidiary of the Borrower.

"Withdrawal Liability" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

SECTION 1.02. Terms Generally. The definitions in Section 1.01 shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including", and words of similar import, shall not be limiting and

---

(… cont'd)

**A SIGNATORY TO THE DIP CREDIT AGREEMENT AND PRO RATA PORTION OF SUCH AMOUNTS TO BE ROLLED UP INTO THE TERM LOAN.**

shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". The words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision of this Agreement unless the context shall otherwise require. All references herein to Articles, Sections, Exhibits and Schedules shall be deemed references to Articles and Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require. Except as otherwise expressly provided herein, (a) any definition of, or reference to, any Loan Document, including this Agreement, or any other agreement, instrument or document in this Agreement shall mean such Loan Document or other agreement, instrument or document as amended, restated, supplemented or otherwise modified from time to time (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein) and (b) all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time. Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to in Article VI shall be made, without giving effect to any election under Statement of Financial Accounting Standards 159 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of any Loan Party or any Subsidiary of any Loan Party at "fair value."

SECTION 1.03. Classification of Loans and Borrowings. For purposes of this Agreement, Loans may be classified and referred to by Class (e.g., a "Revolving Loan") or by Type (e.g., a "Eurocurrency Loan") or by Class and Type (e.g., a "Eurocurrency Revolving Loan"). Borrowings also may be classified and referred to by Class (e.g., a "Revolving Borrowing") or by Type (e.g., a "Eurocurrency Borrowing") or by Class and Type (e.g., a "Eurocurrency Revolving Borrowing").

ARTICLE II

The Credits

SECTION 2.01. Commitments. Subject to the terms and conditions hereof and relying upon the representations and warranties set forth herein:

(a) Term Loan Commitments. The parties hereto agree that each Term Lender who becomes a party to this Agreement on the Closing Date shall be deemed to have rolled up a pro-rata portion of its Prior Lender Obligations in an amount equal to the Roll-Up Amount for such Term Lender as set forth in Schedule 2.01 into an outstanding term loan (collectively, the "Term Loans") under this Agreement with a principal amount equal to such Term Lender's Term Loan Commitment. Such Term Loans shall be outstanding Obligations of the Borrower on the Closing Date in an aggregate principal amount equal to the aggregate Term Loan Commitments and shall bear interest and be due and payable to each Term Lender in a principal amount equal to its Term Loan Commitment and in accordance with the terms of this Agreement. For the avoidance of doubt, no actual funding of cash shall be made by the Term Lenders and such designation of Prior Lender Obligations as Term Loans hereunder is not intended to and shall not constitute a payment on account of the Prior Lender Obligations, which shall continue to be outstanding and administered under this Agreement as Term Loans and Obligations and shall be

entitled to all the benefits of the Loan Documents. For the avoidance of doubt, the Term Loans shall continue to be guaranteed by the Guarantee and Collateral Agreement (as defined in the Pre-Petition Loan Agreement) and secured by and entitled to the benefits of all Liens and security interests created and arising under the Security Documents (as defined in the Pre-Petition Loan Agreement), which Liens and security interests shall remain in full force and effect on a continuous basis, unimpaired, uninterrupted and undischarged, and having the same perfected status as if such loans had not been so designated, subject to Article X, the Interim Order and the Final Order. Each such designation of Term Loans shall be applied on a pro rata basis to each class of Prior Lender Obligations held by each Term Lender under the Pre-Petition Loan Agreement as set forth on Schedule 2.01. For the avoidance of doubt, each Term Lender acknowledges and agrees that by accepting the benefits of this Agreement it shall be deemed to have agreed to (i) all provisions hereof, including the duties and obligations of a Lender, and (ii) to the treatment of its respective Term Loan Obligations as provided in the Plan. In addition, on the Closing Date each lender under the Pre-Petition Loan Agreement shall become a party to this Agreement as a Term Lender hereunder by executing and delivering this Agreement. The Term Loans shall be deemed to be an ABR Borrowing on the Closing Date. Amounts paid or prepaid in respect of Term Loans may not be reborrowed. By executing and delivering this Agreement, each Term Lender hereby consents to the treatment of the Term Loan in the manner contemplated by the Plan.

(b)     Revolving Credit Commitments. Each Revolving Credit Lender agrees, severally and not jointly, to make Revolving Loans to the Borrower, at any time and from time to time on or after the Closing Date and until the Maturity Date in accordance with the terms hereof, in an aggregate principal amount at any time outstanding that will not result in such Revolving Credit Lender's Revolving Credit Exposure exceeding such Revolving Credit Lender's Revolving Credit Commitment less such Revolving Credit Lender's Pro Rata Percentage of the Carve-Out Reserve. Within the limits set forth in the preceding sentence and subject to the terms, conditions and limitations set forth herein, the Borrower may borrow, pay or prepay and reborrow Revolving Loans.

SECTION 2.02. Loans. (a) Each Loan (other than Swingline Loans) shall be made as part of a Borrowing consisting of Loans of the same Class and Type made by the Lenders ratably in accordance with their respective Commitments of the applicable Class; provided, however, that the failure of any Lender to make any Revolving Loan required to be made by it shall not in itself relieve any other Lender of its obligation to lend hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to make any Revolving Loan required to be made by such other Lender). Except for Loans deemed made pursuant to Section 2.01(a) and Section 2.02(f), and subject to Section 2.22 relating to Swingline Loans, the Loans comprising any Borrowing shall be in an aggregate principal amount that is (i) an integral multiple of $100,000 and not less than $500,000 or (ii) equal to the remaining available balance of the applicable Commitments.

(b)     Subject to Sections 2.08 and 2.15, each Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrower may request pursuant to Section 2.03. Each Lender may at its option make any Eurodollar Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this

Agreement. Borrowings of more than one Type may be outstanding at the same time; provided, however, that the Borrower shall not be entitled to request any Borrowing that, if made, would result in more than five Eurodollar Borrowings outstanding hereunder at any time. For purposes of the foregoing, Borrowings having different Interest Periods, regardless of whether they commence on the same date, shall be considered separate Borrowings.

(c)     Except with respect to Revolving Loans made pursuant to Section 2.02(f) and subject to Section 2.22 relating to Swingline Loans, each Lender shall make each Revolving Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds to such account as the Administrative Agent may designate not later than 11:00 a.m., New York City time, and the Administrative Agent shall promptly credit the amounts so received to an account designated by the Borrower in the applicable Borrowing Request or, if a Borrowing shall not occur on such date because any condition precedent herein specified shall not have been met, return the amounts so received to the respective Lenders.

(d)     Unless the Administrative Agent shall have received notice from a Lender prior to the date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's portion of such Borrowing, the Administrative Agent may assume that such Lender has made such portion available to the Administrative Agent on the date of such Borrowing in accordance with paragraph (c) of this Section and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount. If the Administrative Agent shall have so made funds available then, to the extent that such Lender shall not have made such portion available to the Administrative Agent, such Lender and the Borrower severally agree to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrower to but excluding the date such amount is repaid to the Administrative Agent at (i) in the case of the Borrower, the interest rate applicable at the time to the Revolving Loans comprising such Borrowing or (ii) in the case of such Lender, a rate determined by the Administrative Agent to represent its cost of overnight or short-term funds (which determination shall be conclusive absent manifest error). If such Lender shall repay to the Administrative Agent such corresponding amount, such amount shall constitute such Lender's Revolving Loan as part of such Borrowing for purposes of this Agreement.

(e)     Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request any Revolving Credit Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

(f)     If the Issuing Bank shall not have received from the Borrower the payment required to be made by Section 2.23(e) with respect to a Letter of Credit within the time specified in such Section, the Issuing Bank will promptly notify the Administrative Agent of the L/C Reimbursement Obligation and the Administrative Agent will promptly notify each Revolving Credit Lender of such L/C Reimbursement Obligation and its Pro Rata Percentage thereof. Each Revolving Credit Lender shall pay by wire transfer of immediately available funds to the Administrative Agent not later than 2:00 p.m., New York City time, on such date (or, if such Revolving Credit Lender shall have received such notice later than 12:00 (noon), New York City time, on any day, not later than 10:00 a.m., New York City time, on the immediately following Business Day), an amount equal to such Lender's Pro Rata Percentage of such L/C

Reimbursement Obligation (it being understood that such amount shall be deemed to constitute an ABR Revolving Loan of such Lender and such payment shall be deemed to have reduced the L/C Exposure), and the Administrative Agent will promptly pay to the Issuing Bank amounts so received by it from the Revolving Credit Lenders. The Administrative Agent will promptly pay to the Issuing Bank any amounts received by it from the Borrower pursuant to Sections 2.23(e) and (f) prior to the time that any Revolving Credit Lender makes any payment pursuant to this paragraph; any such amounts received by the Administrative Agent thereafter will be promptly remitted by the Administrative Agent to the Revolving Credit Lenders that shall have made such payments and to the Issuing Bank, as their interests may appear. If any Revolving Credit Lender shall not have made its Pro Rata Percentage of such L/C Reimbursement Obligation available to the Administrative Agent as provided above, such Lender and the Borrower severally agree to pay interest on such amount, for each day from and including the date such amount is required to be paid in accordance with this paragraph to but excluding the date such amount is paid, to the Administrative Agent for the account of the Issuing Bank at (i) in the case of the Borrower, a rate per annum equal to the interest rate applicable to Revolving Loans pursuant to Section 2.06(a), and (ii) in the case of such Lender, for the first such day, the Federal Funds Effective Rate, and for each day thereafter, the Alternate Base Rate.

SECTION 2.03. Borrowing Procedure. (a) In order to request a Borrowing (other than a Swingline Loan or a deemed Borrowing pursuant to Section 2.01(a) and Section 2.02(f), as to which this Section 2.03 shall not apply), the Borrower shall notify the Administrative Agent by telephone (promptly confirmed by fax) or shall hand deliver or fax to the Administrative Agent a duly completed Borrowing Request (a) in the case of a Eurodollar Borrowing, not later than 12:00 p.m. (noon), New York City time, three Business Days before a proposed Borrowing and (b) in the case of an ABR Borrowing, not later than 12:00 p.m. (noon), New York City time, one Business Day before a proposed Borrowing. Each Borrowing Request shall be irrevocable, shall be signed by or on behalf of the Borrower and shall specify the following information: (i) whether the Borrowing then being requested is to be a Eurodollar Borrowing or an ABR Borrowing; (ii) the date of such Borrowing (which shall be a Business Day); (iii) the number and location of the account to which funds are to be disbursed (which shall be an account that complies with the requirements of Section 2.02(c)); (iv) the amount of such Borrowing; and (v) if such Borrowing is to be a Eurodollar Borrowing, the initial Interest Period with respect thereto; provided, however, that, notwithstanding any contrary specification in any Borrowing Request, (i) each requested Borrowing shall comply with the requirements set forth in Section 2.02 and (ii) after the occurrence and during the continuance of an Event of Default, no Revolving Loan may be made as a Eurodollar Loan. If no election as to the Type of Borrowing is specified in any such notice, then the requested Borrowing shall be an ABR Borrowing. If no Interest Period with respect to any Eurodollar Borrowing is specified in any such notice, then the Borrower shall be deemed to have selected an Interest Period of one month's duration. The Administrative Agent shall promptly advise the applicable Lenders of any notice given in accordance with this Section 2.03 (and the contents thereof), and of each Lender's portion of the requested Borrowing.

(b) Administrative Agent is hereby authorized by each Loan Party and each other Secured Party to establish procedures (and to amend such procedures from time to time) to facilitate administration and servicing of the Loans and other matters incidental thereto. Without limiting the generality of the foregoing, Administrative Agent is hereby authorized to establish

procedures to make available or deliver, or to accept, notices, documents and similar items on, by posting to or submitting and/or completion on, E-Systems. The posting, completion and/or submission by any Loan Party of any communication pursuant to an E System shall constitute a representation and warranty by the Loan Parties that any representation, warranty, certification or other similar statement required by the Loan Documents to be provided, given or made by a Loan Party in connection with any such communication is true, correct and complete except as expressly noted in such communication or E-System.

(c)     The failure of any Non-Funding Lender to make any Revolving Loan, pay any L/C Reimbursement Obligation or any other payment required by it hereunder, or to fund any purchase of any participation to be made or funded by it on the date specified therefor shall not relieve any other Lender (each such other Revolving Credit Lender, an "Other Lender") of its obligations to make such loan or fund the purchase of any such participation on such date, but neither Administrative Agent nor, other than as expressly set forth herein, any Other Lender shall be responsible for the failure of any Non-Funding Lender to make a loan, fund the purchase of a participation or make any other payment required hereunder. Notwithstanding anything set forth herein to the contrary, a Non-Funding Lender shall not have any voting or consent rights under or with respect to any Loan Document or constitute a "Lender" or a "Revolving Credit Lender" (or be, or have its Loans and Commitments, included in the determination of "Required Lenders", "Required Revolving Credit Lenders" or "Lender adversely affected thereby" pursuant to Section 9.08) for any voting or consent rights under or with respect to any Loan Document. Moreover, for the purposes of determining Required Lenders and Required Revolving Credit Lenders, the Loan and Commitments held by Non-Funding Lenders shall be excluded from the total Loans and Commitments outstanding.

SECTION 2.04.  Repayment of Loans; Evidence of Debt.  (a) The Borrower hereby unconditionally promises to pay on the Maturity Date (i) to the Administrative Agent for the account of each Revolving Credit Lender the then unpaid principal amount of each Revolving Loan and (ii) upon a Discharge of Revolving Obligations, to the Term Agent for the account of each Term Lender the then unpaid principal amount of each Term Loan.  The Borrower hereby unconditionally promises to pay to the Swingline Lender the then unpaid principal amount of each Swingline Loan made to the Borrower on the Maturity Date.   In the event that the Maturity Date occurs as a result the confirmation and effectiveness of a plan of reorganization, the unpaid principal amount of the Term Loan will not be required to be repaid in full in cash on the Maturity Date, but instead shall be treated (and each Term Lender hereby consents to such treatment) (i) in the manner set forth in the Plan, or (ii) in any other manner acceptable to Term Lenders representing two-thirds in amount and more than one-half in number of all claims (as defined in the Bankruptcy Code) arising under the Term Loan.

(b)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender to the Borrower from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)     The Administrative Agent shall maintain accounts in which it will record (i) the amount of each Revolving Loan made hereunder, the Type thereof and the Interest Period applicable thereto, (ii) with respect to such Revolving Loans, the amount of any principal or

interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) with respect to such Revolving Loans, the amount of the sum received by the Administrative Agent hereunder from the Borrower or any Guarantor and each Lender's share thereof. The Term Agent shall maintain accounts in which it will record (i) the amount of each Term Loan outstanding hereunder, the Type thereof and the Interest Period applicable thereto, (ii) with respect to such Term Loans, the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) with respect to such Term Loans, the amount of the sum received by the Term Agent hereunder from the Borrower or any Guarantor and each Lender's share thereof.

(d)     The entries made in the accounts maintained pursuant to paragraphs (b) and (c) of this Section shall be prima facie evidence of the existence and amounts of the obligations therein recorded; provided, however, that the failure of any Lender or any Agent to maintain such accounts or any error therein shall not in any manner affect the obligations of the Borrower to repay the Loans made to the Borrower in accordance with the terms of this Agreement.

(e)     Any Lender may request that Loans made by it hereunder be evidenced by a promissory note. In such event, the Borrower shall execute and deliver to such Lender a promissory note payable to such Lender and, if requested by such Lender, its registered assigns, in the form of Exhibit I, if such promissory note relates to Revolving Credit Borrowings, or in the form of Exhibit J, if such promissory note relates to Term Loans, or any other form reasonably acceptable to the Agents. Notwithstanding any other provision of this Agreement, in the event any Lender shall request and receive such a promissory note, the interests represented by such note shall at all times (including after any assignment of all or part of such interests pursuant to Section 9.04) be represented by one or more promissory notes payable to the payee named therein or its registered assigns.

(f)     Administrative Agent shall be entitled to set off the funding shortfall against any Non-Funding Lender's Pro Rata Percentage of all payments received from the Borrower and hold, in a non-interest bearing account, all payments received by Administrative Agent for the benefit of any Non-Funding Lender pursuant to this Agreement as cash collateral for any unfunded reimbursement obligations of such Non-Funding Lender until the Obligations are paid in full in cash, all L/C Reimbursement Obligations have been discharged or cash collateralized and all Commitments have been terminated, and upon such unfunded obligations owing by a Non-Funding Lender becoming due and payable, Administrative Agent shall be authorized to use such cash collateral to make such payment on behalf of such Non-Funding Lender. Any amounts owing by a Non-Funding Lender to Administrative Agent which are not paid when due shall accrue interest at the interest rate applicable during such period to ABR Revolving Loans.

SECTION 2.05. Fees. (a) The Borrower agrees to pay to each Revolving Credit Lender, through the Administrative Agent, on the last Business Day of each month and on each date on which any Revolving Credit Commitment of such Lender shall expire or be terminated as provided herein, a commitment fee (a "Commitment Fee") equal to the Commitment Fee Rate on the average daily unused amount of the Revolving Credit Commitments of such Lender (other than the Swingline Commitment) during the preceding month (or other period commencing with the Closing Date or ending with the Maturity Date or the date on which the Revolving Credit Commitments of such Lender shall expire or be terminated). All Commitment Fees shall be

computed on the basis of the actual number of days elapsed in a year of 360 days. The Commitment Fee due to each Revolving Credit Lender shall commence to accrue on the Closing Date and shall cease to accrue on the date on which the Revolving Credit Commitment of such Lender shall expire or be terminated as provided herein. For purposes of calculating Commitment Fees with respect to Revolving Credit Commitments only, no portion of the Revolving Credit Commitments shall be deemed utilized under Section 2.22 as a result of outstanding Swingline Loans.

(b)     The Borrower agrees to pay (i) to each Revolving Credit Lender, through the Administrative Agent, on the last Business Day of each month and on the date on which the Revolving Credit Commitment of such Lender shall be terminated as provided herein (each, an "L/C Fee Payment Date") a fee (an "L/C Participation Fee") calculated on such Lender's Pro Rata Percentage of the daily aggregate L/C Exposure (excluding the portion thereof attributable to unreimbursed L/C Reimbursement Obligations which are earning interim interest pursuant to Section 2.23(e)) during the preceding month (or shorter period commencing with the Closing Date or ending with the Maturity Date or the date on which all Letters of Credit have been canceled or have expired and the Revolving Credit Commitments of all Lenders shall have been terminated) at a rate per annum equal to the Applicable Margin used to determine the interest rate on Revolving Credit Borrowings comprised of Eurodollar Loans pursuant to Section 2.06; which rate shall be increased by 2.0% at the election of the Administrative Agent or Required Revolving Credit Lenders upon the occurrence and during the continuation of an Event of Default and (ii) to the Issuing Bank, on demand, its customary fees at then prevailing rates, without duplication of fees otherwise payable hereunder (including all per annum fees), charges and expenses of such Issuing Bank in respect of the issuance, negotiation, acceptance, amendment, transfer and payment of each Letter of Credit or otherwise payable pursuant to the application and related documentation under which such Letter of Credit is issued (the fees in this clause (ii), collectively, the "Issuing Bank Fees"). All L/C Participation Fees and Issuing Bank Fees shall be computed on the basis of the actual number of days elapsed in a year of 360 days.

(c)     All Fees shall be paid on the dates due, in immediately available funds, to the Administrative Agent for distribution, if and as appropriate, among the Lenders, except that the Issuing Bank Fees shall be paid directly to the Issuing Bank. Once paid, none of the Fees shall be refundable under any circumstances.

SECTION 2.06.   Interest on Loans. (a) Subject to the provisions of Section 2.07, the Loans comprising each ABR Borrowing, including each Swingline Loan, shall bear interest (computed on the basis of the actual number of days elapsed over a year of 365 or 366 days, as the case may be, when the Alternate Base Rate is determined by reference to clause (a) of the definition thereof and over a year of 360 days at all other times, in each case calculated from and including the date of such ABR Borrowing to but excluding the date of repayment) at a rate per annum equal to the Alternate Base Rate plus the Applicable Margin in effect from time to time.

(b)     Subject to the provisions of Section 2.07, the Revolving Loans comprising each Eurodollar Borrowing shall bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days) at a rate per annum equal to the Adjusted LIBO Rate for the

Interest Period in effect for such Borrowing plus the Applicable Margin in effect from time to time.

(c)     Interest on each Loan shall be payable on the Interest Payment Dates applicable to such Loan except as otherwise provided in this Agreement. The applicable Alternate Base Rate or Adjusted LIBO Rate for each Interest Period or day within an Interest Period, as the case may be, shall be determined by the Applicable Agent, and such determination shall be conclusive absent manifest error.

SECTION 2.07. Default Interest. Upon the occurrence and during the continuation of an Event of Default: (a) at the election of Term Agent or the Required Term Lenders, the Borrower shall on demand from time to time pay interest, to the extent permitted by law, on the Term Loans (from and after the time that the Event of Default first occurred) at the rate otherwise applicable to such Term Loans pursuant to Section 2.06 plus 2.00% per annum; and (b) at the election of Administrative Agent or the Required Revolving Credit Lenders, the Borrower shall on demand from time to time pay interest, to the extent permitted by law, on the Revolving Loans and Swingline Loans (from and after the time that the Event of Default first occurred) at the rate otherwise applicable to such Revolving Loans and Swingline Loans pursuant to Section 2.06 plus 2.00% per annum.

SECTION 2.08. Alternate Rate of Interest. In the event, and on each occasion, that prior to the commencement of any Interest Period for a Eurodollar Borrowing (a) Applicable Agent shall have determined that adequate and reasonable means do not exist for determining the Adjusted LIBO Rate for such Interest Period or (b) Applicable Agent is advised by the Required Revolving Credit Lenders or Required Term Lenders that the Adjusted LIBO Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period, such Agent shall, as soon as practicable thereafter, give written or fax notice of such determination to the Borrower and the Lenders. In the event of any such determination, until Applicable Agent shall have advised the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any request by the Borrower for a Eurodollar Borrowing pursuant to Section 2.03 or 2.10 shall be deemed to be a request for an ABR Borrowing and (ii) any Interest Period election that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective. Each determination by an Agent under this Section 2.08 shall be conclusive absent manifest error.

SECTION 2.09. Termination and Reduction of Commitments. (a) Unless previously terminated in accordance with the terms hereof, the Revolving Credit Commitments, the Swingline Commitment and the L/C Commitment shall automatically terminate on the Maturity Date.

(b)     The Borrower shall pay to the Administrative Agent for the account of the Revolving Credit Lenders, on the date of each termination or reduction, the Commitment Fees on the amount of the Revolving Credit Commitments so terminated or reduced accrued to but excluding the date of such termination or reduction.

SECTION 2.10. <u>Conversion and Continuation of Borrowings</u>. The Borrower shall have the right at any time upon prior irrevocable notice to the Applicable Agent (a) not later than 12:00 p.m. (noon), New York City time, one Business Day prior to conversion, to convert any Eurodollar Borrowing of the Borrower into an ABR Borrowing, (b) not later than 12:00 p.m. (noon), New York City time, three Business Days prior to conversion or continuation, to convert any ABR Borrowing of the Borrower into a Eurodollar Borrowing or to continue any Eurodollar Borrowing of the Borrower as a Eurodollar Borrowing for an additional Interest Period and (c) not later than 12:00 p.m. (noon), New York City time, three Business Days prior to conversion, to convert the Interest Period with respect to any Eurodollar Borrowing of the Borrower to another permissible Interest Period, subject in each case to the following:

(i)     each conversion or continuation shall be made <u>pro rata</u> among the Lenders in accordance with the respective principal amounts of the Loans comprising the converted or continued Borrowing;

(ii)     if less than all the outstanding principal amount of any Borrowing shall be converted or continued, then each resulting Borrowing shall satisfy the limitations specified in <u>Sections 2.02(a)</u> and <u>2.02(b)</u> regarding the principal amount and maximum number of Borrowings of the relevant Type;

(iii)     each conversion shall be effected by each Lender and the Applicable Agent by recording for the account of such Lender the new Loan of such Lender resulting from such conversion and reducing the Loan (or portion thereof) of such Lender being converted by an equivalent principal amount; accrued interest on any Eurodollar Loan (or portion thereof) being converted shall be paid by the Borrower at the time of conversion;

(iv)     if any Eurodollar Borrowing is converted at a time other than the end of the Interest Period applicable thereto, the Borrower shall pay, upon demand, any amounts due to the Lenders pursuant to <u>Section 2.16</u>;

(v)     any portion of a Borrowing maturing or required to be repaid in less than one month may not be converted into or continued as a Eurodollar Borrowing;

(vi)     any portion of a Eurodollar Borrowing that cannot be converted into or continued as a Eurodollar Borrowing by reason of the immediately preceding clause shall be automatically converted at the end of the Interest Period in effect for such Borrowing into an ABR Borrowing; and

(vii)     upon notice to the Borrower from the Applicable Agent given at the request of the Required Revolving Credit Lenders, as applicable, after the occurrence and during the continuance of a Default or Event of Default, no outstanding Revolving Loans may be converted into, or continued as, a Eurodollar Loan.

Each notice pursuant to this <u>Section 2.10</u> shall be irrevocable and shall refer to this Agreement and specify (i) the identity and amount of the Borrowing that the Borrower requests

be converted or continued, (ii) whether such Borrowing is to be converted to or continued as a Eurodollar Borrowing or an ABR Borrowing, (iii) if such notice requests a conversion, the date of such conversion (which shall be a Business Day) and (iv) if such Borrowing is to be converted to or continued as a Eurodollar Borrowing, the Interest Period with respect thereto. If no Interest Period is specified in any such notice with respect to any conversion to or continuation as a Eurodollar Borrowing, the Borrower shall be deemed to have selected an Interest Period of one month's duration. The Applicable Agent shall advise the Lenders of any notice given pursuant to this Section 2.10 and of each Lender's portion of any converted or continued Borrowing. If the Borrower shall not have given notice in accordance with this Section 2.10 to continue any Borrowing into a subsequent Interest Period (and shall not otherwise have given notice in accordance with this Section 2.10 to convert such Borrowing), such Borrowing shall, at the end of the Interest Period applicable thereto (unless repaid pursuant to the terms hereof), automatically be converted or continued into an ABR Borrowing.

SECTION 2.11. Repayment of Term Loans. All Term Loans shall be due and payable on the Maturity Date, together with accrued and unpaid interest on the principal amount to be paid to but excluding the date of payment.

SECTION 2.12. Prepayment. (a) The Borrower shall have the right at any time and from time to time to prepay any Borrowing, in whole or in part, upon at least three Business Days' prior written or fax notice (or telephone notice promptly confirmed by written or fax notice) in the case of Eurodollar Loans, or written or fax notice (or telephone notice promptly confirmed by written or fax notice) at least one Business Day prior to the date of prepayment in the case of ABR Loans, to the Applicable Agent before 12:00 p.m. (noon), New York City time; provided, however, that (a) no such notice shall be required in connection with prepayments from amounts received pursuant to Deposit Account Control Agreements in accordance with Section 5.11, (b) no prepayment of the Term Loans may be made unless and until there has been a Discharge of Revolving Obligations and (c) each partial prepayment shall be in an amount that is an integral multiple of $100,000 and not less than $100,000 (excluding prepayments resulting from amounts received pursuant to Deposit Account Control Agreements in accordance with Section 5.11).

(b)      Each notice of prepayment shall specify the prepayment date and the principal amount of each Borrowing (or portion thereof) to be prepaid, shall be irrevocable and shall commit the Borrower to prepay such Borrowing by the amount stated therein on the date stated therein. All prepayments under this Section 2.12 shall be subject to Section 2.16, but otherwise without premium or penalty. All prepayments under this Section 2.12 shall be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment.

SECTION 2.13. Mandatory Prepayments. (a) In the event of any termination of all the Revolving Credit Commitments, the Borrower shall, on the date of such termination, repay or prepay all its outstanding Revolving Credit Borrowings and all its outstanding Swingline Loans and replace all its outstanding Letters of Credit and/or deposit an amount equal to the L/C Exposure in cash in a cash collateral account established by the Administrative Agent for the benefit of the Secured Parties, unless, in each case, if such termination arises as a result of the actions by the Administrative Agent described in clause (i) of the last paragraph of Article VII,

the Required Revolving Credit Lenders shall otherwise agree.  If as a result of any partial reduction of the Revolving Credit Commitments the Aggregate Revolving Credit Exposure would exceed the Total Revolving Credit Commitment after giving effect thereto less the Carve-Out Reserve, then the Borrower shall, on the date of such reduction, repay or prepay Revolving Credit Borrowings or Swingline Loans (or a combination thereof) and/or cash collateralize Letters of Credit in an amount sufficient to eliminate such excess.

(b)     Upon the completion of any Asset Sale or the occurrence of any Recovery Event (subject in each case to all applicable repayment rights to the extent set forth in the definition of "Net Cash Proceeds"), the Borrower shall apply the Required Prepayment Percentage of the Net Cash Proceeds received with respect thereto to prepay outstanding Obligations in accordance with Section 2.24.

(c)     In the event and on each occasion that an Equity Issuance occurs, the Borrower shall, substantially simultaneously with the occurrence of such Equity Issuance, apply the Required Prepayment Percentage of the Net Cash Proceeds therefrom to prepay outstanding Obligations in accordance with Section 2.24.

(d)     In the event that any Loan Party or any subsidiary of a Loan Party shall receive Net Cash Proceeds from the issuance or other incurrence of Indebtedness of any Loan Party or any subsidiary of a Loan Party (other than Indebtedness permitted pursuant to Section 6.01 herein), the Borrower shall, substantially simultaneously with the receipt of such Net Cash Proceeds by such Loan Party or such subsidiary, apply an amount equal to the Required Prepayment Percentage of such Net Cash Proceeds to prepay outstanding Obligations in accordance with Section 2.24.

(e)     [intentionally omitted];

(f)     [intentionally omitted];

(g)     The Borrower shall deliver to the Agents, at the time of each prepayment required under this Section 2.13, (i) a certificate signed by a Financial Officer of the Borrower setting forth in reasonable detail the calculation of the amount and date of such prepayment and (ii) to the extent practicable, at least three days prior written notice of such prepayment.  Each notice of prepayment shall specify the prepayment date, the Type of each Loan being prepaid and the principal amount of each Loan (or portion thereof) to be prepaid.  All prepayments of Borrowings pursuant to this Section 2.13 shall be subject to Section 2.16, but shall otherwise be without premium or penalty.

SECTION 2.14.  Reserve Requirements; Change in Circumstances.  (a) Notwithstanding any other provision of this Agreement, if any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender, any Agent or the Issuing Bank (except any such reserve requirement which is reflected in the Adjusted LIBO Rate) or

(ii)     impose on any Lender, any Agent or the Issuing Bank or the London interbank market any other condition affecting this Agreement or Eurodollar Loans made by such Lender or any Letter of Credit or participation therein,

and the result of any of the foregoing shall be to increase the cost to such Lender or the Issuing Bank of making or maintaining any Eurodollar Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to any Lender, any Agent or the Issuing Bank of issuing or maintaining any Letter of Credit or purchasing or maintaining a participation therein or to reduce the amount of any sum received or receivable by such Lender or the Issuing Bank hereunder (whether of principal, interest or otherwise) by an amount deemed by such Lender, such Agent or the Issuing Bank to be material, then the Borrower will pay to such Lender, such Agent or the Issuing Bank, as the case may be, upon demand such additional amount or amounts as will compensate such Lender, such Agent or the Issuing Bank, as the case may be, for such additional costs incurred or reduction suffered.

(b)     If any Lender, any Agent or the Issuing Bank shall have determined that any Change in Law regarding capital adequacy has or would have the effect of reducing the rate of return on such Lender's, such Agent's or the Issuing Bank's capital or on the capital of such Lender's, such Agent's or the Issuing Bank's holding company, if any, as a consequence of this Agreement or the Loans made by, or participations in Letters of Credit purchased by, such Lender or the Letters of Credit Issued by the Issuing Bank to a level below that which such Lender, such Agent or the Issuing Bank or such Lender's, such Agent's or the Issuing Bank's holding company could have achieved but for such Change in Law (taking into consideration such Lender's, such Agent's or the Issuing Bank's policies and the policies of such Lender's, such Agent's or the Issuing Bank's holding company with respect to capital adequacy) by an amount deemed by such Lender, such Agent or the Issuing Bank to be material, then from time to time the Borrower shall pay to such Lender, such Agent or the Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender, such Agent or the Issuing Bank or such Lender's, such Agent's or the Issuing Bank's holding company for any such reduction suffered.

(c)     A certificate of a Lender, an Agent or the Issuing Bank setting forth the amount or amounts necessary to compensate such Lender, such Agent or the Issuing Bank or its holding company, as applicable, as specified in paragraph (a) or (b) of this Section shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender, such Agent or the Issuing Bank, as the case may be, the amount or amounts shown as due on any such certificate delivered by it within 10 days after its receipt of the same.

(d)     Failure or delay on the part of any Lender, any Agent or the Issuing Bank to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's, such Agent's or the Issuing Bank's right to demand such compensation; provided that the Borrower shall not be under any obligation to compensate any Lender, any Agent or the Issuing Bank under paragraph (a) or (b) above for increased costs or reductions with respect to any period prior to the date that is 270 days prior to such request if such Lender, such Agent or the Issuing Bank knew or could reasonably have been expected to know of the circumstances giving rise to such increased costs or reductions and of the fact that such circumstances would result in

a claim for increased compensation by reason of such increased costs or reductions; provided further that the foregoing limitation shall not apply to any increased costs or reductions arising out of the retroactive application of any Change in Law within such 270-day period. The protection of this Section shall be available to each Lender, each Agent and the Issuing Bank regardless of any possible contention of the invalidity or inapplicability of the Change in Law that shall have occurred or been imposed.

SECTION 2.15.  Change in Legality.  (a)  Notwithstanding any other provision of this Agreement, if any Change in Law shall make it unlawful for any Lender to make or maintain any Eurodollar Loan or to give effect to its obligations as contemplated hereby with respect to any Eurodollar Loan, then, by written notice to the Borrower and to the Applicable Agent:

(i)  such Lender may declare that Eurodollar Loans will not thereafter (for the duration of such unlawfulness) be made by such Lender hereunder (or be continued for additional Interest Periods and ABR Loans will not thereafter (for such duration) be converted into Eurodollar Loans), whereupon any request for a Eurodollar Borrowing (or to convert an ABR Borrowing to a Eurodollar Borrowing or to continue a Eurodollar Borrowing for an additional Interest Period) shall, as to such Lender only, be deemed a request for an ABR Loan (or a request to continue an ABR Loan as such for an additional Interest Period or to convert a Eurodollar Loan into an ABR Loan, as the case may be), unless such declaration shall be subsequently withdrawn; and

(ii)  such Lender may require that all outstanding Eurodollar Loans made by it be converted to ABR Loans, in which event all such Eurodollar Loans shall be automatically converted to ABR Loans as of the effective date of such notice as provided in paragraph (b) below.

In the event any Lender shall exercise its rights under (i) or (ii) above, all payments and prepayments of principal that would otherwise have been applied to repay the Eurodollar Loans that would have been made by such Lender or the converted Eurodollar Loans of such Lender shall instead be applied to repay the ABR Loans made by such Lender in lieu of, or resulting from the conversion of, such Eurodollar Loans. Any such conversion of a Eurodollar Loan under (i) above shall be subject to Section 2.16.

(b)  For purposes of this Section 2.15, a notice to the Borrower by any Lender shall be effective as to each Eurodollar Loan made by such Lender, if lawful, on the last day of the Interest Period then applicable to such Eurodollar Loan; in all other cases such notice shall be effective on the date of receipt by the Borrower.

SECTION 2.16.  Indemnity.  The Borrower shall indemnify each Lender against any loss (other than (x) any loss of margin over funding cost or (y) anticipated profit) or expense that such Lender may sustain or incur as a consequence of (a) any event, other than a default by such Lender in the performance of its obligations hereunder, which results in (i) such Lender receiving or being deemed to receive any amount on account of the principal of any Eurodollar Loan prior to the end of the Interest Period in effect therefor, (ii) the conversion of any Eurodollar Loan to an ABR Loan, or the conversion of the Interest Period with respect to any

Eurodollar Loan, in each case other than on the last day of the Interest Period in effect therefor or (iii) any Eurodollar Loan to be made by such Lender (including any Eurodollar Loan to be made pursuant to a conversion or continuation under Section 2.10) not being made after notice of such Loan shall have been given by the Borrower hereunder (any of the events referred to in this clause (a) being called a "Breakage Event") or (b) any default in the making of any payment or prepayment required to be made hereunder. In the case of any Breakage Event, such loss shall include an amount equal to the excess, as reasonably determined by such Lender, of (i) its cost of obtaining funds for the Eurodollar Loan that is the subject of such Breakage Event for the period from the date of such Breakage Event to the last day of the Interest Period in effect (or that would have been in effect) for such Loan over (ii) the amount of interest likely to be realized by such Lender in redeploying the funds released or not utilized by reason of such Breakage Event for such period. A certificate of any Lender setting forth any amount or amounts which such Lender is entitled to receive pursuant to this Section 2.16 shall be delivered to the Borrower and shall be conclusive absent manifest error.

SECTION 2.17. Pro Rata Treatment. Except as provided below in this Section 2.17 with respect to Swingline Loans and as required under Section 2.15, each Borrowing, each payment or prepayment of principal of any Borrowing, each payment of interest on the Loans, each payment of the Commitment Fees, each reduction of the Revolving Credit Commitments and each conversion of any Borrowing to or continuation of any Borrowing as a Borrowing of any Type shall be allocated pro rata among the Lenders constituting Revolving Credit Lenders or Term Lenders, as the case may be, in accordance with their respective applicable Commitments (or, if such Commitments shall have expired or been terminated, in accordance with the respective principal amounts of their outstanding Loans). For purposes of determining the available Revolving Credit Commitments of the Lenders at any time, each outstanding Swingline Loan shall be deemed to have utilized the Revolving Credit Commitments of the Lenders (including those Lenders which shall not have made Swingline Loans) pro rata in accordance with such respective Revolving Credit Commitments. Each Lender agrees that in computing such Lender's portion of any Borrowing to be made hereunder, each Agent may, in its discretion, round each Lender's percentage of such Borrowing to the next higher or lower whole dollar amount.

SECTION 2.18. Sharing of Setoffs. Each Lender agrees that if it shall, through the exercise of a right of banker's lien, setoff or counterclaim against the Borrower or any other Loan Party, or pursuant to a secured claim under Section 506 of Title 11 of the United States Code or other security or interest arising from, or in lieu of, such secured claim, received by such Lender under any applicable bankruptcy, insolvency or other similar law or otherwise, or by any other means, obtain payment (voluntary or involuntary) in respect of any Loan or Loans or L/C Reimbursement Obligation as a result of which such payment exceeds the amount such Lender would have been entitled to receive if all payments had gone to, and been distributed by, the Administrative Agent in accordance with the provisions of Section 2.24 of the Credit Agreement, such Lender shall purchase for cash from other applicable Secured Parties such participations in their Obligations as necessary for such Lender to share such excess payment with such Secured Parties to ensure such payment is applied as though it had been received by the Administrative Agent and applied in accordance with Section 2.24.

SECTION 2.19. Payments. (a) The Borrower shall make each payment (including principal of or interest on any Borrowing or any L/C Reimbursement Obligation or any Fees or other amounts) hereunder and under any other Loan Document not later than 12:00 (noon), New York City time, on the date when due in immediately available dollars, without setoff, defense or counterclaim. Each such payment (other than (i) Issuing Bank Fees, which shall be paid directly to the Issuing Bank, and (ii) principal of and interest on Swingline Loans, which shall be paid directly to the Swingline Lender except as otherwise provided in Section 2.22(e) ) shall be made to the Applicable Agent at its offices designated by such Agent to the Borrower. All payments hereunder and under each other Loan Document shall be made in dollars. Each Agent shall distribute such payments to the Lenders promptly upon receipt in like funds as received.

(b)    Except as otherwise expressly provided herein, whenever any payment (including principal of or interest on any Borrowing or any Fees or other amounts) hereunder or under any other Loan Document shall become due, or otherwise would occur, on a day that is not a Business Day, such payment may be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest or Fees, if applicable.

SECTION 2.20. Taxes. (a) Any and all payments by or on account of any obligation of the Borrower or any other Loan Party hereunder or under any other Loan Document shall be made free and clear of and without deduction for any Indemnified Taxes or Other Taxes; provided that if any Indemnified Taxes or Other Taxes are required to be withheld or deducted from such payments, then (i) the sum payable by the Borrower shall be increased as necessary so that after all required deductions or withholding (including deductions or withholdings applicable to additional sums payable under this Section) the Applicable Agent or such Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower or such other Loan Party shall make (or cause to be made) such deductions and (iii) the Borrower or such other Loan Party shall pay (or cause to be paid) the full amount deducted to the relevant Governmental Authority in accordance with applicable law. In addition, the Borrower or any other Loan Party hereunder shall pay (or cause to be paid) any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(b)    The Borrower shall jointly and severally indemnify each Agent and each Lender, within 10 days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by such Agent or such Lender, as the case may be, or any of their respective Affiliates, on or with respect to any payment by or on account of any obligation of the Borrower or any Loan Party hereunder or under any other Loan Document (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) and any penalties, interest and expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority; provided that if the Borrower determines in good faith that a reasonable basis exists for contesting any Indemnified Taxes or Other Taxes for which an increase in the amount of such payment is made or for which indemnification has been demanded pursuant to this Section 2.20, such Lender or such Agent, as applicable, shall reasonably cooperate with the Borrower in challenging such Indemnified Taxes or Other Taxes at the Borrower's expense if so requested by the Borrower in writing to the extent that such

cooperation is not, in such Lender's or such Agent's reasonable discretion, unduly burdensome or disadvantageous. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender, or by an Agent on its behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(c)     As soon as practicable after any payment of Indemnified Taxes or Other Taxes pursuant to Section 2.20(a), and in any event within 30 days of any such payment being due, the Borrower shall deliver (or cause to be delivered) to the Agents the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Agents.

(d)     Any Foreign Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which the Borrower is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to the Borrower (with a copy to the Agents) such properly completed and executed documentation prescribed by applicable law or reasonably requested by the Borrower as will permit such payments to be made without withholding or at a reduced rate; provided that such Lender is legally entitled to complete, execute and deliver such documentation and in such Lender's judgment such completion, execution or delivery would not materially prejudice the legal position of such Lender. In addition, each Foreign Lender shall (i) furnish on or before it becomes a party to the Agreement either (a) two accurate and complete originally executed U.S. Internal Revenue Service Form W-8BEN (or successor form) or (b) an accurate and complete U.S. Internal Revenue Service Form W-8ECI (or successor form), certifying, in either case, to such Foreign Lender's legal entitlement to an exemption or reduction from U.S. federal withholding tax with respect to all interest payments hereunder, and (ii) provide a new Form W8BEN (or successor form) or Form W-8ECI (or successor form) upon the expiration or obsolescence of any previously delivered form to reconfirm any complete exemption from, or any entitlement to a reduction in, U.S. federal withholding tax with respect to any interest payment hereunder; provided that any Foreign Lender that is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code and is relying on the so-called "portfolio interest exemption" shall also furnish a "Non-Bank Certificate" in the form of Exhibit K together with a Form W8BEN. Notwithstanding any other provision of this paragraph, a Foreign Lender shall not be required to deliver any form pursuant to this paragraph that such Foreign Lender is not legally able to deliver.

(e)     Any Lender that is a United States person, as defined in Section 7701(a)(30) of the Internal Revenue Code, and is not an exempt recipient within the meaning of Treasury Regulations Section 1.6049-4(c) shall deliver to the Borrower (with a copy to the Agents) two accurate and complete original signed copies of Internal Revenue Service Form W-9, or any successor form that such person is entitled to provide at such time in order to comply with United States back-up withholding requirements.

(f)     Without prejudice to the survival of any other agreement of the Borrower hereunder, the agreements and obligations of the Borrower contained in this Section 2.20 shall survive the payment in full of all amounts due hereunder.

(g)     In the event that any Lender or any Agent receives a refund in respect of Indemnified Taxes or Other Taxes as to which it has been paid additional amounts by the Borrower pursuant to clause (a) of this Section or indemnified by the Borrower pursuant to clause (b) of this Section and such Lender or such Agent, as applicable, reasonably determines that such refund is attributable to such additional amounts or indemnification, then such Lender or such Agent, as applicable, shall promptly notify the Agents and the Borrower and shall within 30 Business Days after the refund is actually received remit to the Borrower an amount as such Lender or such  Agent, as applicable, determines to be the proportion of the refunded amount as will leave such Lender or such Agent, as applicable, after such remittance, in no better or worse position than it would have been if the Indemnified Taxes or Other Taxes had not been imposed and the corresponding additional amounts or indemnification payment not been made.  Nothing in this Section 2.20(g) shall oblige any Lender or any Agent to disclose to the Borrower or any other person any information regarding its tax affairs or tax computations or interfere with the right of any Lender or any Agent to arrange its tax affairs in whatever manner it thinks fit and, in particular, no Lender or Agent shall be under any obligation to claim relief from its corporate profits or similar tax liability in credits or deductions available to it and, if it does claim, the extent, order and manner in which it does so shall be at its absolute discretion.

SECTION 2.21.  Assignment of Commitments Under Certain Circumstances; Duty to Mitigate.  (a)  In the event (i) any Lender or the Issuing Bank delivers a certificate requesting compensation pursuant to Section 2.14, (ii) any Lender or the Issuing Bank delivers a notice described in Section 2.15, (iii) the Borrower is required to pay any additional amount to any Lender or the Issuing Bank or any Governmental Authority on account of any Lender or the Issuing Bank pursuant to Section 2.20 or (iv) any Lender does not consent to a proposed amendment, modification or waiver of this Agreement requested by the Borrower which requires the consent of all of the Lenders or all of the Lenders under any Facility to become effective (and which is approved by at least the Required Revolving Credit Lenders and/or the Required Term Lenders, as applicable), the Borrower may, at its sole expense and effort (including with respect to the processing and recordation fee referred to in Section 9.04(b)), upon notice to such Lender or the Issuing Bank and the Agents, require such Lender or the Issuing Bank to transfer and assign, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all of its interests, rights and obligations under this Agreement to an assignee that shall assume such assigned obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that (x) such assignment shall not conflict with any law, rule or regulation or order of any court or other Governmental Authority having jurisdiction, (y) solely with respect to replacements of Lenders pursuant to clauses (i), (ii) or (iii) of this Section, the Borrower shall have received the prior written consent of the Agents (and, if a Revolving Credit Commitment is being assigned, of the Issuing Bank), which consent shall not unreasonably be withheld or delayed, and (z) the Borrower or such assignee shall have paid to the affected Lender or the Issuing Bank in immediately available funds an amount equal to the sum of the principal of and interest accrued to the date of such payment on the outstanding Loans or L/C Reimbursement Obligations of such Lender or the Issuing Bank, respectively, plus all Fees and other amounts accrued for the account of such Lender or the Issuing Bank hereunder (including any amounts under Section 2.14 and Section 2.16); provided further that, if prior to any such transfer and assignment the circumstances or event that resulted in such Lender's or the Issuing Bank's claim for compensation under Section 2.14 or notice under Section 2.15 or the amounts paid pursuant to Section 2.20, as the case may be, cease to cause such Lender or the Issuing

Bank to suffer increased costs or reductions in amounts received or receivable or reduction in return on capital, or cease to have the consequences specified in Section 2.15, or cease to result in amounts being payable under Section 2.20, as the case may be (including as a result of any action taken by such Lender or the Issuing Bank pursuant to paragraph (b) below), or if such Lender or the Issuing Bank shall waive its right to claim further compensation under Section 2.14 in respect of such circumstances or event or shall withdraw its notice under Section 2.15 or shall waive its right to further payments under Section 2.20 in respect of such circumstances or event, as the case may be, then such Lender or the Issuing Bank shall not thereafter be required to make any such transfer and assignment hereunder. In connection with any such replacement, if the replaced Lender does not execute and deliver to the Agents a duly completed Assignment and Acceptance reflecting such replacement within five Business Days of the date on which the replacement Lender executes and delivers such Assignment and Acceptance to the replaced Lender, then such replaced Lender shall be deemed to have executed and delivered such Assignment and Acceptance.

(b)     If (i) any Lender or the Issuing Bank shall request compensation under Section 2.14, (ii) any Lender or the Issuing Bank delivers a notice described in Section 2.15 or (iii) the Borrower is required to pay any additional amount to any Lender or the Issuing Bank or any Governmental Authority on account of any Lender or the Issuing Bank, pursuant to Section 2.20, then such Lender or the Issuing Bank shall use reasonable efforts (which shall not require such Lender or the Issuing Bank to incur an unreimbursed loss or unreimbursed cost or expense or otherwise take any action inconsistent with its internal policies or legal or regulatory restrictions or suffer any disadvantage or burden deemed by it to be significant) (x) to file any certificate or document reasonably requested in writing by the Borrower or (y) to assign its rights and delegate and transfer its obligations hereunder to another of its offices, branches or affiliates, if such filing or assignment would reduce its claims for compensation under Section 2.14 or enable it to withdraw its notice pursuant to Section 2.15 or would reduce amounts payable pursuant to Section 2.20, as the case may be, in the future. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender or the Issuing Bank in connection with any such filing or assignment, delegation and transfer.

SECTION 2.22. Swingline Loans. (a) Swingline Commitment. Subject to the terms and conditions hereof and relying upon the representations and warranties, set forth herein, the Swingline Lender agrees to make loans to the Borrower, at any time and from time to time after the Closing Date, and until the earlier of the Maturity Date and the termination of the Revolving Credit Commitments in accordance with the terms hereof, in an aggregate principal amount at any time outstanding that will not result in (i) the aggregate principal amount of all Swingline Loans exceeding $2,500,000 in the aggregate or (ii) the Aggregate Revolving Credit Exposure, after giving effect to any Swingline Loan, exceeding the Total Revolving Credit Commitment less the Carve-Out Reserve. Each Swingline Loan shall be in a principal amount that is an integral multiple of $100,000. The Swingline Commitment may be terminated or reduced from time to time as provided herein. Within the foregoing limits, the Borrower may borrow, pay or prepay and reborrow Swingline Loans hereunder, subject to the terms, conditions and limitations set forth herein.

(b)     Swingline Loans. The Borrower shall notify the Administrative Agent by fax, or by telephone (confirmed by fax), not later than 12:00 p.m. (noon), New York City time, on the

day of a proposed Swingline Loan to be made to it. Such notice shall be delivered on a Business Day, shall be irrevocable and shall refer to this Agreement and shall specify the requested date (which shall be a Business Day) and amount of such Swingline Loan. The Administrative Agent will promptly advise the Swingline Lender of any notice received from the Borrower pursuant to this paragraph (b). The Swingline Lender may, in its sole discretion, make each Swingline Loan available to the Borrower by means of a credit to the account of the Borrower identified in such notice promptly on the date such Swingline Loan is so requested.

(c)     Prepayment. The Borrower shall have the right at any time and from time to time to prepay any Swingline Loan, in whole or in part, in a principal amount that is an integral multiple of $100,000 (or, if all outstanding Swingline Loans are being prepaid, the aggregate principal amount of all such outstanding Swingline Loans), upon giving written or fax notice (or telephone notice promptly confirmed by written or fax notice) to the Swingline Lender and to the Administrative Agent before 12:00 (noon), New York City time, on the date of prepayment at the Swingline Lender's address for notices specified in the Lender Addendum delivered by the Swingline Lender. All principal payments of Swingline Loans shall be accompanied by accrued interest on the principal amount being repaid to the date of payment.

(d)     Interest. Each Swingline Loan shall be an ABR Loan and, subject to the provisions of Section 2.07, shall bear interest as provided in Section 2.06(a).

(e)     Participations. If no Revolving Lender is a Non-Funding Lender, the Swingline Lender may by written notice given to the Administrative Agent not later than 10:00 a.m., New York City time, on any Business Day require the Revolving Credit Lenders to acquire participations on such Business Day in all or a portion of the Swingline Loans outstanding. Such notice shall specify the aggregate amount of Swingline Loans in which Revolving Credit Lenders will participate. The Administrative Agent will, promptly upon receipt of such notice, give notice to each Revolving Credit Lender, specifying in such notice such Lender's Pro Rata Percentage of such Swingline Loan or Loans. If any Revolving Credit Lender is a Non-Funding Lender, that Non-Funding Lender's participation obligations with respect to the Swingline Loans shall be allocated to and assumed by the other Revolving Credit Lenders in accordance with their Pro Rata Percentage of the Revolving Loans (calculated as if the Non-Funding Lender's Pro Rata Percentage was reduced to zero and each other Revolving Credit Lender's Commitment Percentage had been increased proportionately). If any Revolving Credit Lender is a Non-Funding Lender, upon receipt of the demand described above, each Revolving Credit Lender that is not a Non-Funding Lender will be obligated to pay to Administrative Agent for the account of the Swingline Lender its pro rata share of the outstanding Swingline Loans (increased as described above); provided that no Revolving Credit Lender shall be required to fund any amount which would result in its Revolving Loan Exposure exceedimg its Revolving Credit Commitment. In furtherance of the foregoing, each Revolving Credit Lender hereby absolutely and unconditionally agrees, upon receipt of notice as provided above, to pay the amount owing by it to the Administrative Agent for the account of the Swingline Lender. Each Revolving Credit Lender acknowledges and agrees that its obligation to acquire participations in Swingline Loans pursuant to this paragraph is absolute and unconditional and shall not be affected by any circumstance whatsoever, including the occurrence and continuance of a Default or an Event of Default, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever. Each Revolving Credit Lender shall comply with its obligation under this

paragraph by wire transfer of immediately available funds, in the same manner as provided in Section 2.02(c) with respect to Loans made by such Lender (and Section 2.02(c) shall apply, mutatis mutandis, to the payment obligations of the Lenders under this Section) and the Administrative Agent shall promptly pay to the Swingline Lender the amounts so received by it from the Lenders. The Administrative Agent shall notify the Borrower of any participations in any Swingline Loan acquired pursuant to this paragraph and thereafter payments in respect of such Swingline Loan shall be made to the Administrative Agent and not to the Swingline Lender. Any amounts received by the Swingline Lender from the Borrower (or other party on behalf of the Borrower) in respect of a Swingline Loan after receipt by the Swingline Lender of the proceeds of a sale of participations therein shall be promptly remitted to the Administrative Agent; any such amounts received by the Administrative Agent shall be promptly remitted by the Administrative Agent to the Lenders that shall have made their payments pursuant to this paragraph and to the Swingline Lender, as their interests may appear. The purchase of participations in a Swingline Loan pursuant to this paragraph shall not relieve the Borrower (or other party liable for obligations of the Borrower) of any default in the payment thereof.

SECTION 2.23. Letters of Credit. (a) Commitment and Conditions. On the terms and subject to the conditions contained herein, each Issuing Bank (except for Credit Suisse) may Issue, at the request of the Borrower, in accordance with such Issuing Bank's usual and customary business practices, and for the account of the Borrower, Letters of Credit (denominated in dollars and with face amounts that are multiples of $50,000) from time to time on any Business Day during the period from the Closing Date through the Maturity Date (but not after 7 days prior to the date set forth in clause (a) of the definition of Maturity Date); provided, however, that such Issuing Bank shall not be under any obligation to Issue any Letter of Credit upon the occurrence of any of the following, after giving effect to such Issuance:

(i)     (A) the Aggregate Revolving Credit Exposure would exceed the Total Revolving Credit Commitment less the Carve-Out Reserve or (B) the L/C Exposure would exceed $5,000,0000;

(ii)     the expiration date of such Letter of Credit (A) is not a Business Day or (B) is later than 7 days prior to the date set forth in clause (a) of the definition of Maturity Date; or

(iii)     (A) any fee due in connection with, and on or prior to, such Issuance has not been paid, (B) such Letter of Credit is requested to be Issued in a form that is not acceptable to such Issuing Bank or (C) such Issuing Bank shall not have received, each in form and substance reasonably acceptable to it and duly executed by the Borrower, the documents that such Issuing Bank generally uses in the ordinary course of its business for the Issuance of letters of credit of the type of such Letter of Credit (collectively, the "L/C Reimbursement Agreement").

For each such Issuance, the applicable Issuing Bank may, but shall not be required to, determine that, or take notice whether, the conditions precedent set forth in Section 4.01 have been satisfied or waived in connection with the Issuance of any Letter of Credit; provided, however, that no Letter of Credit shall be Issued during the period starting on the first Business Day after the receipt by such Issuing Bank of notice from the Administrative Agent or the Required Revolving

Credit Lenders that any condition precedent contained in Section 4.01 is not satisfied and ending on the date all such conditions are satisfied or duly waived. Each Issuing Bank, Agents, Lenders and Borrower hereby agree that as of the Closing Date, the Existing Letters of Credit shall (i) be rolled-up into this Agreement and deemed issued and outstanding under this Agreement and shall constitute Letters of Credit and L/C Exposure under this Agreement and the other Loan Documents as of the Closing Date and (ii) expire on their terms, not be renewed and, on the terms and subject to the conditions contained herein, be replaced with Letters of Credit issued hereunder by an Issuing Bank other than Credit Suisse. If (i) any Lender is a Non-Funding Lender or Administrative Agent determines that any of the Lenders is an Impacted Lender and (ii) the reallocation of that Non-Funding Lender's or Impacted Lender's L/C Exposure to the other Revolving Credit Lenders would reasonably be expected to cause the Revolving Credit Exposure of any Revolving Credit Lender to exceed its Revolving Credit Commitment, taking into account the amount of outstanding Revolving Loans and expected advances of Revolving Loans as determined by Administrative Agent, then no Letters of Credit may be issued or renewed unless the Non-Funding Lender or Impacted Lender has been replaced, the L/C Exposure of that Non-Funding Lender or Impacted Lender has been cash collateralized, or the Revolving Credit Commitments of the other Lenders have been increased by an amount sufficient to satisfy Administrative Agent that all future L/C Exposure will be covered by all Revolving Credit Lenders who are not Non-Funding Lenders or Impacted Lenders.

(b)     Notice of Issuance. The Borrower shall give the relevant Issuing Bank and the Administrative Agent a notice of any requested Issuance of any Letter of Credit, which shall be effective only if received by such Issuing Bank and the Administrative Agent not later than 11:00 a.m. on the third Business Day prior to the date of such requested Issuance. Such notice may be made in a writing in a form acceptable to such Issuing Bank (an "L/C Request") or by telephone if confirmed promptly, but in any event within one Business Day and prior to such Issuance, with such an L/C Request.

(c)     Reporting Obligations of Issuing Bank. Each Issuing Bank agrees to provide the Administrative Agent (which, after receipt, the Administrative Agent shall provide to each Revolving Credit Lender), in form and substance satisfactory to the Administrative Agent, each of the following on the following dates: (i) on or prior to (A) any Issuance of any Letter of Credit by such Issuing Bank, (B) any drawing under any such Letter of Credit or (C) any payment (or failure to pay when due) by the Borrower of any related L/C Reimbursement Obligation, notice thereof, which shall contain a reasonably detailed description of such Issuance, drawing or payment, (ii) upon the request of the Administrative Agent (or any Revolving Credit Lender through the Administrative Agent), copies of any Letter of Credit Issued by such Issuing Bank and any related L/C Reimbursement Agreement and such other documents and information as may reasonably be requested by the Administrative Agent and (iii) on the first Business Day of each calendar week or, in the case of Credit Suisse as Issuing Bank, upon the request of the Administrative Agent, a schedule of the Letters of Credit Issued by such Issuing Bank, in form and substance reasonably satisfactory to the Administrative Agent, setting forth the L/C Exposure for such Letters of Credit outstanding on the last Business Day of the previous calendar week.

(d)     Acquisition of Participations. Upon any Issuance of a Letter of Credit in accordance with the terms of this Agreement resulting in any increase in the L/C Exposure, each

Revolving Credit Lender shall be deemed to have acquired, without recourse or warranty, an undivided interest and participation in such Letter of Credit and the related L/C Exposure in an amount equal to such Lender's Pro Rata Percentage of such L/C Exposure.

(e)    Reimbursement Obligations of the Borrower.  The Borrower agrees to pay to the Issuing Bank of any Letter of Credit each L/C Reimbursement Obligation owing with respect to such Letter of Credit no later than the first Business Day after the Borrower receives notice from such Issuing Bank that payment has been made under such Letter of Credit or that such L/C Reimbursement Obligation is otherwise due (the "L/C Reimbursement Date") with interest thereon computed as set forth in clause (i) below.  In the event that any Issuing Bank incurs any L/C Reimbursement Obligation not repaid by the Borrower as provided in this clause (e) (or any such payment by the Borrower is rescinded or set aside for any reason), such Issuing Bank shall promptly notify the Administrative Agent of such failure (and, upon receipt of such notice, the Administrative Agent shall forward a copy to each Revolving Credit Lender) and, irrespective of whether such notice is given, such L/C Reimbursement Obligation shall be payable on demand by the Borrower with interest thereon computed (i) from the date on which such L/C Reimbursement Obligation arose to the L/C Reimbursement Date, at the interest rate applicable during such period to Revolving Loans that are ABR Loans and (ii) thereafter until payment in full, at the interest rate applicable during such period to past due Revolving Loans that are ABR Loans.

(f)    Reimbursement Obligations of the Revolving Credit Lenders.  If no Revolving Credit Lender is a Non-Funding Lender, upon receipt of the notice described in clause (e) above from the Administrative Agent, each Revolving Credit Lender shall pay to the Administrative Agent for the account of such Issuing Bank its Pro Rata Percentage of such L/C Reimbursement Obligation.  If any Revolving Credit Lender is a Non-Funding Lender, that Non-Funding Lender's L/C Exposure shall be reallocated to and assumed by the other Revolving Credit Lenders in accordance with their Pro Rata Percentage of such L/C Exposure (calculated as if the Non-Funding Lender's Pro Rata Percentage was reduced to zero and each other Revolving Credit Lender's Pro Rata Percentage had been increased proportionately).  If any Revolving Credit Lender is a Non-Funding Lender, upon receipt of the notice described in clause (e) above from the Administrative, each Revolving Credit Lender that is not a Non-Funding Lender shall pay to the Administrative for the account of such Issuing Bank its pro rata share (increased as described above) of the L/C Exposure that from time to time remains outstanding; provided that no Revolving Credit Lender shall be required to fund any amount which would result in its Revolving Loan Exposure exceeding its Revolving Credit Commitment.  By making such payment, such Lender shall be deemed to have made a Revolving Loan to the Borrower, which, upon receipt thereof by such Issuing Bank, the Borrower shall be deemed to have used in whole to repay such L/C Reimbursement Obligation.  Any such payment that is not deemed a Revolving Loan shall be deemed a funding by such Lender of its participation in the applicable Letter of Credit and the related L/C Exposure.  Such participation shall not otherwise be required to be funded.  Upon receipt by any Issuing Bank of any payment from any Lender pursuant to this clause (f) with respect to any portion of any L/C Reimbursement Obligation, such Issuing Bank shall promptly pay over to such Lender all payments received after such payment by such Issuing Bank with respect to such portion.

(g)     Obligations Absolute.  The obligations of the Borrower and the Revolving Credit Lenders pursuant to clauses (d), (e) and (f) above shall be absolute, unconditional and irrevocable and performed strictly in accordance with the terms of this Agreement irrespective of (i) (A) the invalidity or unenforceability of any term or provision in any Letter of Credit, any document transferring or purporting to transfer a Letter of Credit, any Loan Document (including the sufficiency of any such instrument), or any modification to any provision of any of the foregoing, (B) any document presented under a Letter of Credit being forged, fraudulent, invalid, insufficient or inaccurate in any respect or failing to comply with the terms of such Letter of Credit or (C) any loss or delay, including in the transmission of any document, (ii) the existence of any setoff, claim, abatement, recoupment, defense or other right that any Person (including any Loan Party) may have against the beneficiary of any Letter of Credit or any other Person, whether in connection with any Loan Document or any other transaction, or the existence of any other withholding, abatement or reduction, (iii) in the case of the obligations of any Revolving Credit Lender, (A) the failure of any condition precedent set forth in Section 4.01 to be satisfied (each of which conditions precedent the Revolving Credit Lenders hereby irrevocably waive) or (B) any adverse change in the condition (financial or otherwise) of any Loan Party and (iv) any other act or omission to act or delay of any kind of any Secured Party or any other Person or any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section 2.23, constitute a legal or equitable discharge of any obligation of the Borrower or any Revolving Credit Lender hereunder.

(h)     [intentionally Omitted].

(i)     [Intentionally Omitted].

(j)     Cash Collateralization.  If any Event of Default shall occur and be continuing, the Borrower shall, (i) on the Business Day it receives notice, if such notice is received by 11a.m. (New York City time) on such Business Day, and (ii) within one Business Day following the Business Day it receives notice, if such notice is received after 11a.m. (New York City time) on such Business Day, in each case from the Administrative Agent or the Required Revolving Credit Lenders (or, if the maturity of the Revolving Loans has been accelerated, Required Revolving Credit Lenders thereof and of the amount to be deposited, deposit in an account with the Administrative Agent, for the ratable benefit of the Revolving Credit Lenders, an amount in cash equal to 105% of the L/C Exposure as of such date.  Such deposit shall be held by the Administrative Agent as collateral for the payment and performance of the obligations of the Borrower under this Agreement.  The Administrative Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over such account. Other than any interest earned on the investment of such deposits in Permitted Investments, which investments shall be made at the option and sole discretion of the Administrative Agent, such deposits shall not bear interest.  Interest or profits, if any, on such investments shall accumulate in such account.  Moneys in such account shall (i) automatically be applied by the Administrative Agent to reimburse the Issuing Bank for L/C Reimbursement Obligations for which it has not been reimbursed, (ii) be held for the satisfaction of the reimbursement obligations of the Borrower for the L/C Exposure at such time and (iii) if the maturity of the Revolving Loans has been accelerated (but subject to the consent of Required Revolving Credit Lenders, be applied to satisfy the Obligations.  If the Borrower is required to provide an amount of cash collateral hereunder as a result of the occurrence of an Event of Default, such amount (to

the extent not applied as aforesaid) shall be returned to the Borrower within three Business Days after all Events of Default have been cured or waived.

(k)  Resignation of Issuing Banks and Additional Issuing Banks. Any Issuing Bank may resign at any time by delivering notice of such resignation to the Administrative Agent, effective on the date set forth in such notice or, if no such date is set forth therein, on the date such notice shall be effective. Upon such resignation, the Issuing Bank shall remain an Issuing Bank and shall retain its rights and obligations in its capacity as such (other than any obligation to Issue Letters of Credit but including the right to receive fees or to have Lenders participate in any L/C Reimbursement Obligation thereof) with respect to Letters of Credit issued by such Issuing Bank prior to the date of such resignation and shall otherwise be discharged from all other duties and obligations under the Loan Documents. Credit Suisse, in its capacity as the issuer of the Existing Letters of Credit, shall be deemed to have delivered such notice on the Closing Date. The Borrower may, at any time and from time to time with the consent of the Administrative Agent (which consent shall not be unreasonably withheld) and such Lender, designate one or more additional Lenders to act as an issuing bank under the terms of the Agreement. Any Lender designated as an issuing bank pursuant to this paragraph shall be deemed to be an "Issuing Bank" (in addition to being a Lender) in respect of Letters of Credit issued or to be issued by such Lender, and, with respect to such Letters of Credit, such term shall thereafter apply to the other Issuing Bank and such Lender.

SECTION 2.24. Application of Payments and Proceeds. Except as otherwise provided in the Interim Order or Final Order, as applicable, with respect to payment of the Carve-Out, all payments, distributions or proceeds of Collateral received at any time by, or payable or distributable at any time to, any Agent or any Lender on account of any Obligations (including, without limitation, amounts received in the Payment Account or otherwise pursuant to a Deposit Account Control Agreement) shall be applied as follows:

first, to payment of fees and expenses of Agents payable or reimbursable by the Loan Parties under this Agreement;

second, to payment of all accrued unpaid Commitment Fees, L/C Participation Fees and Issuing Bank Fees;

third, to payment of all accrued unpaid interest on the Swingline Loans and Revolving Loans;

fourth, to payment of principal of the Swingline Loans, Revolving Loans and L/C Reimbursement Obligations that are outstanding (with, at the election of Administrative Agent or Required Revolving Credit Lenders during the continuation of an Event of Default, a permanent reduction of the Revolving Credit Commitments and Swingline Commitments) and cash collateralization of all Letters of Credit in accordance with Section 2.23(j);

fifth, to pay or, in the case of contingent Revolving Obligations, cash collateralize other Revolving Obligations

sixth, to payment of all accrued and unpaid interest on the Term Loans;

seventh, to a cash collateral reserve (to be held by the Administrative Agent) as security for the Obligations and to be applied to any amounts referenced in the first through sixth categories above, and upon the occurrence of the Discharge of Revolving Obligations, to be applied pursuant to the eighth through eleventh categories below;

eighth, to payment of principal on the Term Loans;

ninth, to payment of all other Obligations then outstanding;

tenth, to payment of all other obligations and liabilities required by the terms of the Interim Order and Final Order, as then in effect; and

eleventh, any remainder shall be for the account of and paid to whomever may be lawfully entitled thereto.

In carrying out the foregoing, (i) amounts received shall be applied in the numerical order provided above until exhausted prior to the application to the next succeeding category and (ii) each of the Agents, Lenders or other Persons entitled to payment under any of the clauses above shall receive an amount equal to its pro rata share of amounts available to be applied pursuant to such clauses above. Any payments on the Obligations received by the Term Agent or any Term Lender in contravention of this Section 2.24 shall be segregated and held in trust and forthwith paid over to the Administrative Agent for application to the Obligations in accordance with this Section 2.24.

SECTION 2.25. Super Priority Nature of Obligations and Agents' Liens. The priority of Agents' Liens on the Collateral owned by the Loan Parties shall be set forth in the Interim Order and the Final Order. Notwithstanding anything in the Loan Documents to the contrary, the Liens held by the Agents on the Collateral shall be for the benefit of the Secured Parties.

SECTION 2.26. Payment of Obligations. Upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents, Agents, Lenders and Issuing Banks shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court.

SECTION 2.27. No Discharge; Survival of Claims. Holdings and Borrower, on behalf of itself and its Subsidiaries, agree that (a) the Obligations hereunder shall not be discharged by the entry of an order confirming a plan of reorganization in any Chapter 11 Case (and Borrower, on behalf of itself and its Subsidiaries, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (b) except as provided in Article II.B. of the Plan, the superpriority administrative claim granted to the Agents, Lenders and Issuing Banks pursuant to the Interim Order and Final Order and described therein and the Liens granted to the Agents pursuant to the Interim Order and Final Order and described therein shall not be affected in any manner by the entry of an order confirming a plan of reorganization in any Chapter 11 Case.

SECTION 2.28. Release. Holdings and Borrower, on behalf of itself and its Subsidiaries, hereby acknowledges effective upon entry of the Final Order, that neither Holdings, Borrower nor any of its Subsidiaries has any defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or

eliminate all or any part of the Loan Parties' liability to repay the Secured Parties as provided in this Agreement or to seek affirmative relief or damages of any kind or nature from any Secured Party. Borrower, in its own right and with respect to its Subsidiaries and the Loan Parties' bankruptcy estates, and on behalf of all their respective successors, assigns, Subsidiaries and any Affiliates and any Person acting for and on behalf of, or claiming through them, (collectively, the "Releasing Parties"), hereby fully, finally and forever release and discharge each Secured Party and all of each Secured Party's past and present officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them (collectively, the "Released Parties") of and from any and all past, present and future actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, the Loan Documents, the Interim Order, the Final Order and the transactions contemplated hereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing.

SECTION 2.29. Waiver of any Priming Rights and Non-Consensual Use of Cash Collateral. Upon the Closing Date, and on behalf of themselves and their estates, and for so long as any Obligations shall be outstanding, Holdings and Borrower, on behalf if itself and its Subsidiaries, hereby irrevocably waives (i) any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Liens securing the Obligations, or to approve a claim of equal or greater priority than the Obligations, except as permitted under the Interim Order and Final Order, and (ii) any right, pursuant to Section 363 of the Bankruptcy Code or otherwise, to use Collateral proceeds or any other cash collateral (as defined in the Bankruptcy Code) in any manner not permitted by the Loan Documents or otherwise without the consent of the Agents and the Required Lenders.

ARTICLE III

Representations and Warranties

Each of Holdings and the Borrower jointly and severally represents and warrants to the Agents, the Issuing Bank and each of the Lenders that:

SECTION 3.01. Organization; Powers. Holdings, the Borrower and each of the Subsidiaries (a) is duly organized or formed, validly existing and (if applicable) in good standing under the laws of the jurisdiction of its organization or formation, (b) has all requisite power and authority to own and operate its property and assets, to lease the property it operates as lessee

and to carry on its business as now conducted and as proposed to be conducted, (c) is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except where the failure so to qualify, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect and (d) upon entry by the Bankruptcy Court of the Interim Order (or the Final Order, when applicable), has the power and authority to execute, deliver and perform its obligations under this Agreement, each of the other Loan Documents to which it is or will be a party and each other agreement or instrument contemplated hereby to which it is or will be a party, including, in the case of the Borrower, to borrow hereunder, in the case of each Loan Party, to grant the Liens contemplated to be granted by it under the Loan Documents and, in the case of each Subsidiary Guarantor, to Guarantee the Obligations as contemplated by the Guarantee and Collateral Agreement.

SECTION 3.02. <u>Authorization; No Conflicts</u>. Upon entry by the Bankruptcy Court of the Interim Order (or the Final Order, when applicable), the Transactions (a) have been duly authorized by all requisite corporate, partnership or limited liability company and, if required, stockholder, partner or member action and (b) will not (i) violate (A) any provision of law, statute, rule or regulation, or of the certificate or articles of incorporation or other constitutive documents or by-laws of Holdings, the Borrower or any Subsidiary, (B) any order of any Governmental Authority or arbitrator or (C) any provision of any indenture, material agreement or other material instrument to which Holdings, the Borrower or any Subsidiary is a party or by which any of them or any of their property is or may be bound, (ii) be in conflict with, result in a breach of or constitute (alone or with notice or lapse of time or both) a default under, or give rise to any right to accelerate or to require the prepayment, repurchase or redemption of any obligation under any such indenture, agreement or other instrument or (iii) result in the creation or imposition of any Lien upon or with respect to any property or assets now owned or hereafter acquired by Holdings, the Borrower or any Subsidiary (other than Liens created under the Loan Documents).

SECTION 3.03. <u>Enforceability</u>. This Agreement has been duly executed and delivered by each of Holdings and the Borrower and upon entry by the Bankruptcy Court of the Interim Order (or the Final Order, when applicable), constitutes, and each other Loan Document when executed and delivered by each Loan Party party thereto will constitute, a legal, valid and binding obligation of such Loan Party enforceable against such Loan Party in accordance with its terms.

SECTION 3.04. <u>Governmental Approvals</u>. No action, consent or approval of, registration or filing with, Permit from, notice to, or any other action by, any Governmental Authority is or will be required in connection with the Transactions, except for entry by the Bankruptcy Court of the Interim Order (or the Final Order, when applicable).

SECTION 3.05. <u>Financial Statements</u>. (a) The Borrower has heretofore furnished to the Lenders its consolidated balance sheets and statements of income, stockholder's equity and cash flows as of and for the fiscal year ended December 31, 2008 audited by and accompanied by the opinion of KPMG LLP, independent public accountants. Such financial statements present fairly in all material respects the financial condition and results of operations and cash flows of the Borrower and its consolidated Subsidiaries as of such dates and for such periods. Such balance sheets and the notes thereto disclose all material liabilities, direct or contingent, of the Borrower

and its consolidated Subsidiaries as of the dates thereof. Such financial statements were prepared in accordance with GAAP applied on a consistent basis.

(b)    [RESERVED]

SECTION 3.06. <u>No Material Adverse Change</u>. No event, change or condition has occurred since July 31, 2009 (other than the filing of the Chapter 11 Cases) that has caused, or could reasonably be expected to cause, a Material Adverse Effect.

SECTION 3.07. <u>Title to Properties; Possession Under Leases</u>. (a) Each of Holdings, the Borrower and the Subsidiaries has good and marketable title to, or valid leasehold interests in, all its material properties and assets (including material Real Property), except for (i) defects in title that, in the aggregate, are not substantial in amount and do not materially detract from the value of the property subject thereto or materially interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes, (ii) Liens expressly permitted by <u>Section 6.02</u> and (iii) leasehold interests that terminate in the ordinary course of business in accordance with their terms and not on account of a tenant default. Each material parcel of Real Property is free from material structural defects and all building systems contained therein are in good working order and condition, ordinary wear and tear excepted, suitable for the purposes for which they are currently being used.

(b)    Each of Holdings, the Borrower and the Subsidiaries, and, to the knowledge of the Borrower, each other party thereto, has complied with all obligations under all leases to which it is a party and all such leases are legal, valid, binding and in full force and effect and are enforceable in accordance with their terms, except, in each case, for such noncompliance or such failures to be in full force and effect that could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect. Each of Holdings, the Borrower and the Subsidiaries enjoys peaceful and undisturbed possession under all such material leases. The Borrower has delivered to the Agents true, complete and correct copies of all leases (whether as landlord or tenant) of Real Property existing as of the Closing Date the Borrower has promptly after execution delivered to the Agents true, complete and correct copies of all leases (whether as landlord or tenant) of Mortgaged Properties executed at any time after the Closing Date.

(c)    The Borrower has obtained all material Permits, licenses, variances and certificates (including certificates of occupancy) required by applicable law to be obtained and necessary to the use and operation of each parcel of Real Property, except where the failure to have such Permit, license, certificate or variance could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

SECTION 3.08. <u>Subsidiaries</u>. <u>Schedule 3.08</u> sets forth as of the Closing Date a list of all Subsidiaries, including each Subsidiary's exact legal name (as reflected in such Subsidiary's certificate or articles of incorporation or other constitutive documents) and jurisdiction of incorporation or formation and the percentage ownership interest of Holdings or the Borrower (direct or indirect) therein, and identifies each Subsidiary that is Loan Party. The shares of capital stock or other Equity Interests so indicated on <u>Schedule 3.08</u> are (where applicable) fully paid and non-assessable and are owned by Holdings or the Borrower, directly or indirectly, free and clear of all Liens (other than Liens expressly permitted by <u>clauses (b)</u> or <u>(c)</u> of <u>Section 6.02</u>).

SECTION 3.09. Litigation; Compliance with Laws. (a) Except for the Chapter 11 Cases, there are no actions, suits or proceedings at law or in equity or by or before any arbitrator or Governmental Authority now pending or, to the knowledge of Holdings or the Borrower, threatened against or affecting Holdings, the Borrower or any Subsidiary or any business, property or rights of any such person (i) that involve any Loan Document or the Transactions or (ii) except as set forth on Schedule 3.09, as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(b)     Since the date of this Agreement, there has been no change in the status of the matters disclosed on Schedule 3.09 that, individually or in the aggregate, has resulted in, or materially increased the likelihood of, a Material Adverse Effect.

(c)     None of Holdings, the Borrower or any of the Subsidiaries or any of their respective material properties or assets is in violation of, nor will the continued operation of their material properties and assets as currently conducted violate, any law, rule or regulation (including any zoning, building, Environmental Law, ordinance, code or approval or any building permits) or any restrictions of record or agreements affecting the Mortgaged Property, or is in default with respect to any judgment, writ, injunction, decree or order of any Governmental Authority, where, in each case in this paragraph (c), such violation or default, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

SECTION 3.10. Agreements. None of Holdings, the Borrower or any of the Subsidiaries is in default in any manner under any provision of any agreement or instrument, or subject to any corporate restriction, that, individually or in the aggregate, has resulted or could reasonably be expected to result in a Material Adverse Effect (other than defaults disclosed on Schedule 3.10).

SECTION 3.11. Federal Reserve Regulations. (a) None of Holdings, the Borrower or any of the Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.

(b)     None of the transactions contemplated by this Agreement (including the making of the Loans and the use of the proceeds thereof, including any refinancing or retirement of Indebtedness with the proceeds thereof) will violate or result in the violation of any of the provisions of the Regulations of the Board, including Regulation T, U or X. If requested by any Lender or the Administrative Agent, the Borrower will furnish to the Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form G-3 or FR Form U-1 referred to in Regulation U.

SECTION 3.12. Investment Company Act. None of Holdings, the Borrower or any of the Subsidiaries is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended.

SECTION 3.13. Use of Proceeds. The Borrower will use the proceeds of the Revolving Loans solely to pay fees and expenses relating to the Transactions and for general corporate purposes in accordance with Section 6.10 and in each case in a manner consistent with the terms

and conditions in the Interim Order and Final Order as then in effect. The Borrower will request the issuance of Letters of Credit (other than the Existing Letters of Credit) solely to support payment obligations incurred in the ordinary course of business by the Borrower and the Subsidiary Guarantors which in no event support Pre-Petition obligations of the Loan Parties or their Subsidiaries.

SECTION 3.14. <u>Tax Returns</u>. Each of Holdings, the Borrower and each of the Subsidiaries has timely filed or timely caused to be filed all Federal, state, material local and foreign tax returns or materials required to have been filed by it and all such tax returns are correct and complete in all material respects. Each of Holdings, the Borrower and each of the Subsidiaries has timely paid or timely caused to be paid all Taxes due and payable by it and all assessments received by it, except Taxes that are being contested in good faith by appropriate proceedings and for which Holdings, the Borrower or such Subsidiary, as applicable, shall have set aside on its books adequate reserves in accordance with GAAP. Each of Holdings, the Borrower and each of the Subsidiaries has made adequate provision in accordance with GAAP for all Taxes not yet due and payable. None of the Holdings, the Borrower or any of the Subsidiaries intends to treat the Loans or any of the transactions contemplated by any Loan Document as being a "reportable transaction" (within the meaning of Treasury Regulation Section 1.6011-4).

SECTION 3.15. <u>No Material Misstatements</u>. Each of Holdings and the Borrower has disclosed to the Agents and the Lenders all agreements, instruments and corporate or other restrictions to which Holdings, the Borrower or any of the Subsidiaries is subject, and all other matters known to any of them, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. None of any factual information, report, financial statement, exhibit or schedule furnished by or on behalf of Holdings, the Borrower or any Subsidiary to the Agents or any Lender for use in connection with the transactions contemplated by the Loan Documents or in connection with the negotiation of any Loan Document or included therein or delivered pursuant thereto, when taken as a whole, contained, contains or will contain (in each case as of the date of its delivery to the Agents or any Lender) any material misstatement of fact or omitted, omits or will omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were, are or will be made, not misleading; <u>provided</u> that to the extent any such information, report, financial statement, exhibit or schedule was based upon or constitutes a forecast or projection, each of Holdings and the Borrower represents only that it acted in good faith and utilized assumptions believed by management of Holdings and the Borrower to be reasonable at the time made in the preparation of such information, report, financial statement, exhibit or schedule (it being understood by the Lenders and the Agents that such financial information as it relates to future events is not to be viewed as fact and that actual results during the period or periods covered by such financial information may differ from the projected results set forth therein).

SECTION 3.16. <u>Employee Benefit Plans</u>. Each of the Borrower and each of its ERISA Affiliates is in compliance in all material respects with the applicable provisions of ERISA and the Tax Code and the regulations and published interpretations thereunder. No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events, could reasonably be expected to result in a Material Adverse Effect. The present value

of all benefit liabilities under each Benefit Plan (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of December 31, 2008, exceed by more than $9,000,000 the fair market value of the assets of such Benefit Plan, and the present value of all benefit liabilities of all underfunded Benefit Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of December 31, 2008, exceed by more than $9,000,000 the fair market value of the assets of all such underfunded Benefit Plans.

SECTION 3.17. <u>Environmental Matters</u>. Except with respect to matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, none of Holdings, the Borrower or any of the Subsidiaries:

(a)    has failed to comply with any Environmental Law or to take, in a timely manner, all actions necessary to obtain, maintain, renew and comply with any Environmental Permit, and all such Environmental Permits are in full force and effect and not subject to any administrative or judicial appeal;

(b)    has become a party to any governmental, administrative or judicial proceeding or possesses knowledge of any such proceeding that has been threatened under Environmental Law;

(c)    has received written notice of, become subject to, or is aware of any facts or circumstances that could form the basis for, any Environmental Liability other than those which have been fully and finally resolved and for which no obligations remain outstanding;

(d)    possesses knowledge that any Mortgaged Property (A) is subject to any Lien, restriction on ownership, occupancy, use or transferability imposed pursuant to Environmental Law or (B) contains or previously contained Hazardous Materials of a form or type or in a quantity or location that could reasonably be expected to result in any Environmental Liability;

(e)    possess knowledge that there has been a Release or threat of Release of Hazardous Materials at or from the Mortgaged Properties (or from any facilities or other properties formerly owned, leased or operated by Holdings, the Borrower or any of the Subsidiaries) in violation of, or in amounts or in a manner that could give rise to liability under, any Environmental Law;

(f)    has generated, treated, stored, transported, or Released Hazardous Materials from the Mortgaged Properties (or from any facilities or other properties formerly owned, leased or operated by Holdings, the Borrower or any of the Subsidiaries) in violation of, or in a manner or to a location that could give rise to liability under, any Environmental Law;

(g)    is aware of any facts, circumstances, conditions or occurrences in respect of any of the facilities and properties owned, leased or operated that could (A) form the basis of any action, suit, claim or other judicial or administrative proceeding relating to liability under or noncompliance with Environmental Law on the part of Holdings, the

Borrower or any of the Subsidiaries or (B) interfere with or prevent continued compliance with Environmental Laws by Holdings, the Borrower or the Subsidiaries; or

(h)     has pursuant to any order, decree, judgment or agreement by which it is bound or has assumed the Environmental Liability for any Person.

SECTION 3.18.  Insurance.  Schedule 3.18 sets forth a true, complete and correct description of all insurance maintained by or on behalf of Holdings, the Borrower and the Subsidiaries as of the Closing Date.  As of the Closing Date, such insurance is in full force and effect and all premiums have been duly paid.  Holdings, the Borrower and the Subsidiaries are insured by financially sound and reputable insurers and such insurance is in such amounts and covering such risks and liabilities (and with such deductibles, retentions and exclusions) as are in the Borrower's reasonable judgment in accordance with normal and prudent industry practice. None of Holdings, the Borrower or any of the Subsidiaries (a) has received notice from any insurer (or any agent thereof) that substantial capital improvements or other substantial expenditures will have to be made in order to continue such insurance, the cost of which improvements or expenditures could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or (b) has any reason to believe that it will not be able to renew its existing coverage as and when such coverage expires or to obtain similar coverage from similar insurers at a cost that could not reasonably be expected to result in a Material Adverse Effect.

SECTION 3.19.  Security Documents.  (a)  Upon the entry by the Bankruptcy Court of the Interim Order (or the Final Order, when applicable) the Agents, for the benefit of the Secured Parties, shall have a legal, valid and enforceable security interest in the Collateral described in the Loan Documents and proceeds thereof which security interest shall constitute a fully perfected first priority Lien on, and security interest in, all right, title and interest of the Loan Parties in such Collateral and the proceeds thereof, as security for the Obligations, in each case prior and superior in right to any other Person, including, without limitation, the Liens securing the Prior Lender Obligations and any Permitted Second Lien Indebtedness (subject to Permitted Senior Liens and the Carve-Out).

SECTION 3.20.  Location of Real Property.  Schedule 3.20 lists completely and correctly as of the Closing Date all Real Property and the addresses thereof, indicating for each parcel whether it is owned or leased, including in the case of leased Real Property, the landlord name, lease date and lease expiration date.

SECTION 3.21.  Labor Matters.  As of the Closing Date, there are no strikes, lockouts or slowdowns against Holdings, the Borrower or any Subsidiary pending or, to the knowledge of Holdings or the Borrower, threatened.  The hours worked by and payments made to employees of Holdings, the Borrower and the Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Federal, state, local or foreign law dealing with such matters, except for such violations that could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.  All payments due from Holdings, the Borrower or any Subsidiary, or for which any claim may be made against Holdings, the Borrower or any Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of Holdings, the Borrower or such

Subsidiary, except for such failures that could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

SECTION 3.22. <u>Intellectual Property</u>. Each of Holdings, the Borrower and each of the Subsidiaries owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property material to its business, and the use thereof by Holdings, the Borrower and the Subsidiaries does not infringe upon the rights of any other person, except for any such infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

SECTION 3.23. <u>Reorganization Matters</u>.

(a)     The Chapter 11 Cases were commenced on the Petition Date and proper notice has been given of (x) the motion seeking approval of the Loan Documents and the Interim Order and Final Order, (y) the hearing for the approval of the Interim Order, and (z) promptly after the scheduling thereof, the hearing for the approval of the Final Order.

(b)     After the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against the Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, subject, as to priority only to the Carve-Out and Permitted Senior Liens.

(c)     The Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect has not been reversed, stayed, modified or amended.

SECTION 3.24. <u>Senior Debt</u>. The Obligations constitute "<u>Senior Debt</u>" under and as defined in the Subordinated Note Documents.

SECTION 3.25. <u>Super Priority Nature of Obligations and Agents' Liens</u>. The priority of Agents' Liens on the Collateral owned by the Loan Parties shall be set forth in the Interim Order and the Final Order. Notwithstanding anything in the Loan Documents to the contrary, the Liens held by the Agents on the Collateral shall be for the benefit of the Secured Parties.

ARTICLE IV

Conditions of Lending

The obligations of the Lenders to make Loans and the obligations of the Issuing Bank to Issue Letters of Credit are subject to the satisfaction of the following conditions:

SECTION 4.01. All Credit Events. On the date of each Borrowing, including each Borrowing of a Swingline Loan but excluding the conversion of a Eurodollar Borrowing to an ABR Borrowing (or vice versa) or the continuation or conversion of the Interest Period of a Eurodollar Borrowing into another permitted Interest Period, and on the date of each Issuance of a Letter of Credit (each such event being called a "Credit Event"):

(a)     The Administrative Agent shall have received a notice of such Borrowing as required by Section 2.03 (or such notice shall have been deemed given in accordance with Section 2.03) or, in the case of the Issuance of a Letter of Credit, the Issuing Bank and the Administrative Agent shall have received an L/C Request as required by Section 2.23(b) or, in the case of the Borrowing of a Swingline Loan, the Swingline Lender and the Administrative Agent shall have received a notice requesting such Swingline Loan as required by Section 2.22(b).

(b)     The representations and warranties set forth in each Loan Document shall be true and correct in all material respects on and as of the date of such Credit Event with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date.

(c)     At the time of and immediately after such Credit Event, no Event of Default or Default shall have occurred and be continuing.

(d)     The Bankruptcy Court shall have entered (i) the Interim Order on or before October 16, 2009 and (ii) the Final Order on or before November 16, 2009.

Each Credit Event shall be deemed to constitute a joint and several representation and warranty by each of Holdings and the Borrower on the date of such Credit Event as to the matters specified in paragraphs (b), (c) and (d) of this Section 4.01.

SECTION 4.02. First Credit Event. On the Closing Date:

(a)     The Agents shall have received a favorable written opinion dated as of the Closing Date of Mayer Brown LLP, special counsel for the Loan Parties, in form and substance reasonably satisfactory to the Agents.

(b)     The Agents shall have received (i) a copy of the certificate or articles of incorporation or other formation documents, including all amendments thereto, of each Loan Party, certified as of a recent date by the Secretary of State of the state of its organization, and a certificate as to the good standing of each Loan Party as of a recent date, from such Secretary of State; (ii) a certificate of the Secretary or Assistant Secretary of each Loan Party dated the Closing Date and certifying (A) that attached thereto is a true and complete copy of the by-laws of such Loan Party as in effect on the Closing Date and at all times since a date prior to the date of the resolutions described in clause (B) below, (B) that attached thereto is a true and complete copy of resolutions duly adopted by the Board of Directors of such Loan Party authorizing the execution, delivery and performance of the Loan Documents to which such person is a party, in the case of

the Borrower, the borrowings hereunder, in the case of each Loan Party, the granting of the Liens contemplated to be granted by it under the Security Documents and, in the case of each Subsidiary Guarantor, the Guaranteeing of the Obligations as contemplated by the Guarantee and Collateral Agreement, and that such resolutions have not been modified, rescinded or amended and are in full force and effect, (C) that the certificate or articles of incorporation or other formation documents of such Loan Party have not been amended since the date of the last amendment thereto shown on the certificate of good standing furnished pursuant to clause (i) above and (D) as to the incumbency and specimen signature of each officer executing any Loan Document or any other document delivered in connection herewith on behalf of such Loan Party; (iii) a certificate of another officer as to the incumbency and specimen signature of the Secretary or Assistant Secretary executing the certificate pursuant to (ii) above; and (iv) such other documents as the Agents, the Issuing Bank or the Lenders may reasonably request.

(c)     The Agents shall have received a certificate, dated the Closing Date and signed by a Financial Officer of the Borrower, confirming compliance with the conditions precedent set forth in paragraphs (b), (c) and (d) of Section 4.01.

(d)     The Agents shall have received (i) this Agreement, executed and delivered by a duly authorized officer of each of Holdings and the Borrower, (ii) the Guarantee and Collateral Agreement, executed and delivered by a duly authorized officer of each of Holdings and the Borrower and each Subsidiary Guarantor, (iii) if requested by any Lender pursuant to Section 2.04, a promissory note or notes conforming to the requirements of such Section and executed and delivered by a duly authorized officer of the Borrower, (iv) if required by Agents, a Lender Addendum executed and delivered by each Lender and accepted by the Borrower and (v) such other agreements, documents and instruments as Agents shall require.

(e)     The Agents shall have received the results of a recent Lien and judgment search in each relevant jurisdiction with respect to Holdings, the Borrower and those of the Subsidiaries that shall be Subsidiary Guarantors or shall otherwise have assets that are included in the Collateral, and such search shall reveal no Liens on any of the assets of Holdings, the Borrower or any of such Subsidiaries except for Liens expressly permitted by Section 6.02.

(f)     The Agents shall have received U.S. GAAP unaudited consolidated balance sheets and related statements of income, stockholders' equity and cash flows of the Borrower for each fiscal month (after August 31, 2009) ended 30 days before the Closing Date.

(g)     All material governmental and third party consents and approvals with respect to the Transactions and the other transactions contemplated hereby to the extent required shall have been obtained, all applicable appeal periods shall have expired and there shall be no litigation, governmental, administrative or judicial action, actual or threatened, that could reasonably be expected to restrain, prevent or impose materially burdensome conditions on the Transactions or the other transactions contemplated hereby.

(h)     Agents shall have received the initial cash flow budget, depicting on a weekly basis, line-items for projected (i) receipts, (ii) disbursements (including ordinary course operating expenses, bankruptcy-related expenses, capital expenditures, asset sales and fees and expenses of the Agents and Lenders and any other fees and expenses relating to the Transactions) and (iii) liquidity consisting of unused Revolving Credit Commitment plus unrestricted and available cash on hand, in each case for each week from the first day of the week in which the Closing Date occurs through the last day of the week that is 13 weeks thereafter, to be attached to the Interim Order which shall be in form and substance satisfactory to the Agents (the "Initial Approved Budget"), together with a good faith estimate of all initial payments to be made by the Loan Parties within the first week following the Closing Date.

(i)     The Bankruptcy Court shall have entered the Interim Order in substantially the form of Exhibit F to this Agreement or with such changes as shall be satisfactory to the Agents.

(j)     The "first day" orders described on Schedule 4.02 in form and substance satisfactory to the Agents shall have been entered in the Chapter 11 Cases, and no other first day motions shall have been filed.

(k)     The Lenders and the Agents shall have received all fees required to be paid hereunder or otherwise agreed between the Borrower and the Lenders or the Agents, as applicable, and all reasonable out-of-pocket expenses (including the reasonable fees and expenses of outside legal counsel and financial advisors of the Agents), on or before the Closing Date.

(l)     [Intentionally omitted].

(m)     The Agents shall be satisfied with the cash management arrangements and related agreements made and entered into by the Borrower to comply with the provisions set forth in Section 5.11 hereof.

(n)     Agents shall have received all documentation and other information required by bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the U.S.A. Patriot Act.

(o)     The Equity Commitment and Plan Support Agreement shall be in full force and effect.

(p)     [Intentionally omitted].

(q)     As of the Closing Date, and after giving effect to all payments to be made upon consummation of the Transactions and filing of the Chapter 11 Cases, the sum of Borrower's unused Revolving Credit Commitments (less the Carve-Out Reserve) plus unrestricted and available cash on hand shall be at least $9,500,000.

(r)     The Borrower shall have filed the Plan and Disclosure Statement with the Bankruptcy Court, and shall have filed a motion, in form and substance satisfactory to the

Agents, seeking Bankruptcy Court approval of the Disclosure Statement and related vote solicitation procedures.

(s)     The Agents shall have received a true and correct copy of the balance sheet of the Borrower and its Subsidiaries as of September 30, 2009.

ARTICLE V

Affirmative Covenants

Each of Holdings and the Borrower covenants and agrees with each Lender that so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan, all Fees and all other expenses or amounts payable under any Loan Document shall have been paid in full and all Letters of Credit have been canceled or have expired and all amounts drawn thereunder have been reimbursed in full, each of Holdings and the Borrower will, and will cause each of the Subsidiaries to:

SECTION 5.01.  Existence; Businesses and Properties.  (a)  Do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence, except as otherwise expressly permitted under Section 6.05.

(b)     Do or cause to be done all things necessary to obtain, preserve, renew, extend and keep in full force and effect the rights, licenses, permits, franchises, authorizations, patents, copyrights, trademarks and trade names material to the conduct of its business; maintain and operate such business in substantially the manner in which it is presently conducted and operated; comply in all material respects with all applicable laws, rules, regulations and decrees and orders of any Governmental Authority, whether now in effect or hereafter enacted; and at all times maintain and preserve all property material to the conduct of such business and keep such property in good repair, working order and condition and from time to time make, or cause to be made, all needful and proper repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith may be properly conducted at all times.

SECTION 5.02.  Insurance.  (a)  Keep its insurable properties adequately insured at all times by financially sound and reputable insurers; maintain such other insurance, to such extent and against such risks (and with such deductibles, retentions and exclusions) as is customary with companies in the same or similar businesses operating in the same or similar locations, including liability insurance against claims for personal injury or death or property damage occurring upon, in, about or in connection with the use of any properties owned, occupied or controlled by it; maintain such other insurance as may be required by law; and maintain such other insurance as otherwise required by the Loan Documents.

(b)     On or prior to the date that is thirty (30) days after the Closing Date, deliver insurance certificates satisfying the requirements of the Loan Documents the Agents.

SECTION 5.03.  Obligations and Taxes.  To the extent permitted by the Bankruptcy Code or otherwise approved by the Bankruptcy Court, pay its Post-Petition Material Indebtedness promptly and in accordance with their terms and pay and discharge promptly when

due all material Post-Petition taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property, before the same shall become delinquent or in default, as well as all Post-Petition lawful claims for labor, materials and supplies or otherwise that, if unpaid, could reasonably be expected to give rise to a Lien upon such properties or any part thereof; provided, however, that such payment and discharge shall not be required with respect to any such tax, assessment, charge, levy or claim so long as the validity or amount thereof shall be contested in good faith by appropriate proceedings and the Borrower or the applicable Subsidiary shall have set aside on its books adequate reserves with respect thereto in accordance with GAAP and such contest operates to suspend collection of the contested obligation, tax, assessment or charge and enforcement of a Lien and, in the case of a Mortgaged Property, there is no reasonable risk of forfeiture of such property.

SECTION 5.04. Financial Statements, Reports, etc. In the case of the Borrower, furnish to the Agents for distribution to each Lender:

(a) within 90 days after the end of each fiscal year (beginning with the fiscal year ending on December 31, 2009), its consolidated balance sheet and related statements of income, stockholders' equity and cash flows showing the financial condition of the Borrower and its consolidated Subsidiaries as of the close of such fiscal year and the results of its operations and the operations of such Subsidiaries during such year, together with comparative figures for the immediately preceding fiscal year, all audited by KPMG LLP or other independent public accountants of recognized national standing and accompanied by an opinion of such accountants (which shall not be qualified in any material respect) to the effect that such consolidated financial statements fairly present the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied;

(b) within 30 days after the end of each month, its consolidated and consolidating balance sheet and related statements of income, stockholders' equity and cash flows showing the financial condition of the Borrower and its Subsidiaries as of the close of such month and the results of its operations and the operations of such Subsidiaries during such month and the then elapsed portion of the fiscal year, and comparative figures for the same periods in the immediately preceding fiscal year, all certified by one of its Financial Officers as fairly presenting the financial condition and results of operations of the Borrower and its Subsidiaries on a consolidated and consolidating basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(c) (i) concurrently with any delivery of financial statements under paragraph (a) above, a letter from the accounting firm opining on such statements (which letter may be limited to accounting matters or other items that independent certified public accountants are permitted to cover in such letters pursuant to their professional standards and customs and may disclaim responsibility for legal interpretations) stating whether, in connection with their audit examination, anything has come to their attention which would cause them to believe that there has been a violation of any of the provisions of this Agreement or, if any such a violation has occurred, specifying the nature thereof; provided that no such letter shall be required to the extent that (x) it is prohibited at such

time by the then current recommendations of the American Institute of Certified Public Accountants or any other applicable accounting governing body or (y) such accounting firm has at such time a firm-wide policy prohibiting the delivery of such a letter and such firm does not at such time provide such letters in connection with any other credit agreements, and (ii) concurrently with any delivery of financial statements under paragraph (a) or (b) above, a certificate of a Financial Officer of the Borrower certifying that no Event of Default or Default has occurred or, if such an Event of Default or Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto;

(d)      within 90 days after the end of each fiscal year of the Borrower, a detailed consolidated budget for the following fiscal year (including a projected consolidated balance sheet and related statements of projected operations and cash flows as of the end of and for such following fiscal year and setting forth the assumptions used for purposes of preparing such budget) and promptly when available, any significant revisions of such budget.[2]

(e)      promptly after the receipt thereof by Holdings, the Borrower or any of the Subsidiaries, a copy of any "management letter" (in final form) received by any such person from its certified public accountants and the management's response thereto;

(f)      not later than Thursday of each week (or if such day is not a Business Day, the next succeeding Business Day) commencing after the delivery of the Initial Approved Budget, (i) a supplement to the Initial Approved Budget extending the Initial Approved Budget for an additional week and (ii) a comparison of each line item set forth in the most recent Approved Budget for the week most recently ended on a Friday against the actual performance for such week with respect to each line item (and on a cumulative basis from the Petition Date to the date of such report), in each case with written explanations of material variances, in form and substance reasonably satisfactory to the Agents and certified as complete and accurate by the chief financial officer of the Borrower; and

(g)      Borrower may deliver to Administrative Agent proposed updates to the most recent Approved Budget from time to time; provided that the Loan Parties shall still be subject to and be governed by the terms of the Approved Budget then in effect and the Administrative Agent and Revolving Credit Lenders shall have no obligation to fund to such updated budget unless and until the Administrative Agent has provided its prior written approval of such updated budget.

(h)      promptly, from time to time, such other information regarding the operations, business affairs and financial condition of Holdings, the Borrower or any Subsidiary, or compliance with the terms of any Loan Document, as any Agent or any Lender (acting through an Agent) may reasonably request.

---

[2] Please note that this period will be separately determined with respect to the exit facility.

SECTION 5.05. <u>Litigation and Other Notices</u>. Furnish to the Agents, the Issuing Bank and each Lender written notice and/or copies of the following promptly after any Responsible Officer obtains knowledge and/or receipt thereof:

(a)     any Event of Default or Default, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto;

(b)     the filing or commencement of, or any threat or notice of intention of any person to file or commence, any action, suit or proceeding, whether at law or in equity or by or before any arbitrator or Governmental Authority, against Holdings, the Borrower or any Subsidiary that involves, in the Borrower's good faith judgment, a reasonable possibility of an adverse determination and which, if adversely determined, could reasonably be expected to result in a Material Adverse Effect;

(c)     the occurrence of any ERISA Event described in <u>clause (b)</u> of the definition thereof or any other ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in liability of Holdings, the Borrower and the Subsidiaries in an aggregate amount of $5,000,000 or greater;

(d)     any development that has resulted in, or could reasonably be expected to result in, a Material Adverse Effect; and

(e)     all pleadings, motions, applications and judicial information filed by or on behalf of Loan Parties with the Bankruptcy Court or provided to the U.S. Trustee (or any monitor or interim receiver, if any, appointed in any Chapter 11 Case) or the Committee, at the time such document is filed with the Bankruptcy Court, or provided by or to the U.S. Trustee or the Committee.

SECTION 5.06. <u>Information Regarding Collateral</u>. Furnish to each Agent (a) prompt written notice of any change (i) in any Loan Party's corporate name, (ii) in any Loan Party's corporate structure or (iii) in any Loan Party's Federal Taxpayer Identification Number and (b) on the date of delivery of financial statements and certificates required by Section 5.04(a), written notice of any change, if any, in the location of Collateral with a fair market value (as determined by the Borrower) in excess of $500,000. Each of Holdings and the Borrower also agrees promptly to notify each Agent if any material portion of the Collateral is damaged or destroyed.

SECTION 5.07. <u>Maintaining Records; Access to Properties and Inspections</u>. Keep proper books of record and account in which full, true and correct entries in conformity with GAAP and all requirements of law are made of all dealings and transactions in relation to its business and activities. Each of Holdings and the Borrower will, and will cause each of its subsidiaries to, permit any representatives designated by any Agent or any Lender to visit and inspect (including with respect to environmental matters) the financial records and the properties of Holdings or the Borrower, as the case may be, or any of its subsidiaries at reasonable times (but, in the case of any Lenders, not more than one time each year for all Lenders and at such Lenders' expense, unless an Event of Default is continuing) and to make extracts from and copies of such financial records, and permit any representatives designated by any Agent or any

Lender (acting through the Agents) to discuss the affairs, finances and condition of Holdings or the Borrower, as the case may be, or any of its subsidiaries with the officers thereof and independent accountants therefor; provided that the Borrower shall be given an opportunity to have a designated representative present at any discussions with such independent accountants if available at such time and shall be given at least five Business Days' notice of such discussions.

SECTION 5.08. Use of Proceeds. Use the proceeds of the Loans and request the issuance of Letters of Credit only for the purposes set forth in Section 3.13 and Section 6.10.

SECTION 5.09. [Intentionally Omitted].

SECTION 5.10. Further Assurances. From time to time duly authorize, execute and deliver, or cause to be duly authorized, executed and delivered, such additional instruments, certificates, financing statements, agreements or documents, and take all such actions, as any Agent may reasonably request, for the purposes of implementing or effectuating the provisions of this Agreement and the other Loan Documents, or of more fully perfecting or renewing the rights of the Agents and the Secured Parties with respect to the Collateral (or with respect to any additions thereto or replacements or proceeds or products thereof or with respect to any other property or assets hereafter acquired by Holdings, the Borrower or any Subsidiary which may be deemed to be part of the Collateral) pursuant hereto or thereto. Upon the exercise by any Agent or any Lender of any power, right, privilege or remedy pursuant to this Agreement or the other Loan Documents which requires any consent, approval, recording, qualification or authorization of any Governmental Authority, each of Holdings and the Borrower will execute and deliver, or will cause the execution and delivery of, all applications, certifications, instruments and other documents and papers that such Agent or such Lender may be required to obtain from Holdings, the Borrower or any of the Subsidiaries for such governmental consent, approval, recording, qualification or authorization.

SECTION 5.11. Cash Management. Maintain one or more deposit accounts (the "Blocked Accounts") at financial institutions acceptable to the Agents and shall deliver, or cause to be delivered, to the Agents Deposit Account Control Agreements duly authorized, executed and delivered by the banks that maintains the Blocked Accounts. The Borrower shall further execute and deliver, and shall cause each of its Subsidiaries to execute and deliver, such agreements and documents as the Agents may reasonably require to grant the Agents control over the Blocked Accounts. Without limiting the provisions of the Guarantee and Collateral Agreement, the Borrower shall not establish, and shall cause each of its Subsidiaries not to establish, any deposit account not existing as of the Closing Date, unless the Borrower or its Subsidiaries (as applicable) have complied in full with the provisions of this Section 5.11 with respect to such deposit account. The Borrower shall, and shall cause its Subsidiaries to, deposit all proceeds of Collateral into the Blocked Accounts, and shall instruct all Account Debtors to make payment into the Blocked Accounts. All amounts received by the Borrower and its Subsidiaries that is a Loan Party in respect of any Collateral, in addition to all other cash received from any other source, shall upon receipt of such amount or cash, be deposited in the Blocked Accounts. After the occurrence and during the continuance of an Event of Default, at the election of Administrative Agent, on each Business Day, Borrower shall, and shall cause each of its Subsidiaries to, disburse by ACH or wire transfer to the Payment Account, all available cash balances and cash receipts from all Blocked Accounts. Amounts in the Payment

Account or otherwise received by any Agent pursuant to a Deposit Account Control Agreement shall be applied to the Obligations in accordance with Section 2.24.

SECTION 5.12. <u>Restructuring Adviser and Cooperation</u>. Borrower shall continue to retain Lazard Middle Market, LLC (or another advisor reasonably acceptable to the Agents) on terms and conditions reasonably satisfactory to the Agents. Borrower shall, and shall cause its Subsidiaries to, (a) grant the Agents with reasonable access to such advisers as the Agents shall reasonably request, (b) cooperate with the Agents' financial advisors, auditors, appraisers and any other consultants engaged from time to time at the discretion of the Agents; <u>provided</u>, that all such access granted to Agents in this Section 5.12 shall be coordinated among the Agents, the Borrower and such third party.

SECTION 5.13. <u>Plan of Reorganization</u>. The Loan Parties shall obtain Bankruptcy Court approval of, and/or confirmation of, and/or consummate, as the case may be, the Plan and related Disclosure Statement as follows:

(a)    On or before the 45th day after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance satisfactory to the Agents, approving the Disclosure Statement and related solicitation procedures.

(b)    On or before the 45th day after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance satisfactory to the Agents, confirming the Plan.

(c)    On or before December 15, 2009, the Plan shall have become effective in accordance with its terms.

ARTICLE VI

<u>Negative Covenants</u>

Each of Holdings and the Borrower covenants and agrees with each Lender that, so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan, all Fees and all other expenses or amounts payable under any Loan Document have been paid in full and all Letters of Credit have been cancelled or have expired and all amounts drawn thereunder have been reimbursed in full, neither Holdings nor the Borrower will, nor will it cause or permit any of the Subsidiaries to:

SECTION 6.01. Indebtedness. Incur, create, assume or permit to exist any Indebtedness, except:

(a)    Indebtedness existing on the Closing Date consisting of Prior Lender Obligations, Permitted Second Lien Indebtedness, Subordinated Notes and other Indebtedness set forth in <u>Schedule 6.01</u>; <u>provided</u>, that no payments may be made on any such Indebtedness except in respect of the Prior Lender Obligations (i) that have been rolled-up into Term Loans under <u>Section 2.01(a)</u> and only to the extent such payments are permitted under this Agreement or (ii) as otherwise provided in the Interim Order or the Final Order;

(b)     Indebtedness created hereunder and under the other Loan Documents;

(c)     unsecured intercompany Indebtedness of Holdings, the Borrower and the Subsidiaries to the extent permitted by Section 6.04(a);

(d)     [intentionally omitted];

(e)     Capital Lease Obligations in an aggregate principal amount not exceeding $100,000 at any time outstanding;

(f)     Indebtedness under performance, surety, appeal or indemnity bonds or with respect to workers' compensation claims, in each case incurred in the ordinary course of business; and

(g)     Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds in the ordinary course of business; provided that such Indebtedness is promptly covered by the Borrower or any Subsidiary.

SECTION 6.02.  Liens.  Create, incur, assume or permit to exist any Lien on any property or assets (including Equity Interests or other securities of any person, including any Subsidiary) now owned or hereafter acquired by it or on any income or revenues or rights in respect of any thereof, except:

(a)     Liens on property or assets of the Borrower and the Subsidiaries existing on the Closing Date and set forth in Schedule 6.02; provided that such Liens shall secure only those obligations which they secure on the Closing Date;

(b)     any Lien created under the Loan Documents and the Pre-Petition Loan Documents;

(c)     Liens for taxes not yet due or which are being contested in compliance with Section 5.03;

(d)     carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business and securing obligations that are not overdue for a period of more than 30 days or which are being contested in compliance with Section 5.03;

(e)     pledges and deposits made in the ordinary course of business in compliance with workmen's compensation, unemployment insurance and other social security laws or regulations;

(f)     pledges and deposits to secure the performance of bids, trade contracts (other than for Indebtedness), leases (other than Capital Lease Obligations), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(g)     zoning restrictions, easements, rights-of-way, restrictions on use of Real Property and other similar encumbrances incurred in the ordinary course of business which, in the aggregate, are not substantial in amount and do not materially detract from the value of the property subject thereto or interfere with the ordinary conduct of the business of the Borrower or any of the Subsidiaries or the ability of the Borrower or any of the Subsidiaries to utilize such property for its intended purpose;

(h)     [intentionally omitted];

(i)     [intentionally omitted];

(j)     any interest or title of a lessor, sublessor or licensor under any lease (including a capital lease) or license entered into by the Borrower or any of its Subsidiaries in the ordinary course of business and covering only the assets so leased or licensed, as the case may be, and including any Liens arising from precautionary UCC financing statements filed under any such lease;

(k)     Liens on cash deposits and other funds maintained with a depositary institution, in each case arising in the ordinary course of business by virtue of any statutory or common law provision relating to banker's liens, including Section 4-210 of the UCC;

(l)     Liens of sellers of goods to the Borrower or any of the Subsidiaries arising under Section 2-502 of the UCC in the ordinary course of business; provided that such Liens apply only to the goods sold and secure only the unpaid purchase price for such goods and related expenses;

(m)     Liens in favor of customs and revenue authorities arising as a matter of law and securing payment of customs duties in connection with the importation of goods;

(n)     [intentionally omitted];

(o)     Liens on the Collateral securing obligations in respect of Permitted Second Lien Indebtedness (or any Guarantees thereof) to the extent provided under the terms of the Interim Order and Final Order; provided that all such Liens are subordinated to the Liens securing the Obligations and the Prior Lender Obligations on terms and conditions satisfactory to the Agents; and

(p)     The Carve-Out and Permitted Senior Liens.

Notwithstanding the foregoing, Liens permitted under Sections 6.7(a) through (p) (except (b) and (p) above) shall at all times be junior and subordinate to the Liens securing the Obligations under the Loan Documents.

SECTION 6.03.  Sale and Lease-Back Transactions.  Enter into any arrangement, directly or indirectly, with any person whereby it shall sell or transfer any property, real or personal or mixed, used or useful in its business, whether now owned or hereafter acquired, and thereafter

rent or lease such property or other property which it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

SECTION 6.04. <u>Investments, Loans and Advances</u>. Purchase, hold or acquire any Equity Interests, evidences of indebtedness or other securities of, make or permit to exist any loans or advances or capital contributions to, or make or permit to exist any investment or any other interest in, any other person (all of the foregoing, "<u>Investments</u>"), except:

      (a)    (i) Investments by Holdings, the Borrower and the Subsidiaries existing on the Closing Date in the Equity Interests of, or in the form of loans or advances to, the Borrower and the Subsidiaries; <u>provided</u>, that no payments shall be made on any such loans or advances unless such payment is being made to Borrower or any Subsidiary Guarantors and (ii) additional Investments by the Borrower to the Subsidiary Guarantors in the form of loans or advances; <u>provided</u> that such loan or advance shall be unsecured;

      (b)    Permitted Investments;

      (c)    Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

      (d)    the Borrower and the Subsidiaries may make loans and advances in the ordinary course of business to their respective employees so long as the aggregate principal amount thereof at any time outstanding (determined without regard to any write-downs or write-offs of such loans and advances) shall not exceed $50,000;

      (e)    Investments existing on the Closing Date and set forth on <u>Schedule 6.04</u>;

      (f)    extensions of trade credit in the ordinary course of business; and

      (g)    Investments made as a result of the receipt of non-cash consideration from a Disposition of any asset in compliance with <u>Section 6.05</u>.

SECTION 6.05. <u>Mergers, Consolidations, Sales of Assets and Acquisitions</u>. (a) Merge into or consolidate with any other person, or permit any other person to merge into or consolidate with it, or liquidate or dissolve, or Dispose of (in one transaction or in a series of transactions) all or substantially all the assets (whether now owned or hereafter acquired) of the Borrower or less than all the Equity Interests of any Subsidiary, or purchase, lease or otherwise acquire (in one transaction or a series of transactions) all or substantially all of the assets of any other person, except for (i) the purchase and sale by the Borrower or any Subsidiary of inventory or the Disposition of obsolete or worn-out assets, assets that are no longer useful or scrap, in each case in the ordinary course of business, (ii) the sale or discount by the Borrower or any Subsidiary, in each case without recourse and in the ordinary course of business, of overdue accounts receivable arising in the ordinary course of business, but only in connection with the compromise or collection thereof consistent with customary industry practice (and not as part of any bulk sale or financing transaction), (iii) [intentionally omitted]; (iv) the Disposition by any Subsidiary that is not a Loan Party of its assets that do not constitute Collateral in connection with a foreclosure by the applicable lenders with respect to any Indebtedness of such Subsidiary to the extent that

such assets are collateral security for such Indebtedness, (v) the licensing of intellectual property in the ordinary course of business and (vi) the settlement, release or surrender of tort or other litigation claims.

(b)     Engage in any Asset Sale otherwise permitted under paragraph (a) above unless (i) such Asset Sale is for consideration at least 100% of which is cash, (ii) such consideration is at least equal to the fair market value of the assets being Disposed of and (iii) the fair market value of all assets Disposed of pursuant to this paragraph (b)(i) shall not exceed $250,000 in the aggregate for all Dispositions.

SECTION 6.06.  Restricted Payments; Restrictive Agreements.  (a)  Declare or make, or agree to declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so; provided, however, that (i) any Subsidiary may declare and pay dividends or make other distributions, including in the form of additional Equity Interests, ratably to its equity holders, and (ii) the Borrower may make Restricted Payments to Holdings to the extent necessary to pay general corporate and overhead expenses incurred by Holdings in the ordinary course of business but only to the extent permitted by, and up to the amount set forth in, the Approved Budget; provided that all Restricted Payments made to Holdings pursuant to clause (ii) shall be used by Holdings for the purpose specified herein within 20 days of the receipt thereof.

(b)     Enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (i) the ability of Holdings, the Borrower or any Subsidiary to create, incur or permit to exist any Lien upon any of its property or assets, or (ii) the ability of any Subsidiary to pay dividends or other distributions with respect to any of its Equity Interests or to make or repay loans or advances to the Borrower or any other Subsidiary or to Guarantee Indebtedness of the Borrower or any other Subsidiary; provided that (A) the foregoing shall not apply to restrictions and conditions imposed by law or by any Loan Document or any Pre-Petition Loan Document, (B) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary or its assets pending such sale, provided such restrictions and conditions apply only to the Subsidiary or its assets that are to be sold and such sale is permitted hereunder, (C) the foregoing shall not apply to restrictions and conditions imposed on any Subsidiary that is not a Loan Party by the terms of any Indebtedness of such Subsidiary permitted to be incurred hereunder, (D) clause (i) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness, (E) clause (i) of the foregoing shall not apply to restrictions or conditions imposed by the Subordinated Note Documents as in effect on the Closing Date (it being understood that such restrictions and conditions are unenforceable during the pendency of the Chapter 11 Cases) and (F) clause (i) of the foregoing shall not apply to customary provisions in leases and other contracts restricting the assignment thereof and (G) the foregoing shall not apply to restrictions and conditions imposed by the definitive credit documentation with respect to any Permitted Second Lien Indebtedness (it being understood that such restrictions and conditions are unenforceable during the pendency of the Chapter 11 Cases).

SECTION 6.07.  Transactions with Affiliates.  Except for transactions by or among Loan Parties, sell or transfer any property or assets to, or purchase or acquire any property or assets

from, or otherwise engage in any other transactions with, any of its Affiliates, except that (a) Holdings, the Borrower or any Subsidiary may engage in any of the foregoing transactions in the ordinary course of business at prices and on terms and conditions not less favorable to Holdings, the Borrower or such Subsidiary than could be obtained on an arm's-length basis from unrelated third parties, (b) Restricted Payments may be made to the extent provided in Section 6.06, and (c) the Transactions may be consummated, including the making of any payments on the Closing Date in connection therewith.  In no event shall a Loan Party or any Subsidiary of a Loan Party perform or provide any management, consulting, administrative or similar services to or for any Person other than another Loan Party, a Subsidiary of a Loan Party or a customer who is not an Affiliate in the ordinary course of business.

SECTION 6.08.  Business of Holdings, the Borrower and Subsidiaries; Limitation on Hedging Agreements.

(a)     With respect to Holdings, engage in any business activities or have any assets or liabilities other than (i) its ownership of the Equity Interests in the Borrower, (ii) liabilities incidental thereto, including its liabilities pursuant to the Plan, the Loan Documents or the definitive credit documentation with respect to any Permitted Second Lien Indebtedness (or any refinancing of such Permitted Second Lien Indebtedness that is permitted hereunder), and (iii) liabilities under the Pre-Petition Loan Documents.

(b)     With respect to the Borrower and the Subsidiaries, engage at any time in any business or business activity other than a Permitted Business.

(c)     Enter into any Hedging Agreement other than (a) any such agreement or arrangement entered into in the ordinary course of business and consistent with prudent business practice to hedge or mitigate risks to which the Borrower or any Subsidiary is exposed in the conduct of its business or the management of its liabilities or (b) any such agreement entered into to hedge against fluctuations in interest rates or currency incurred in the ordinary course of business and consistent with prudent business practice; provided that in each case such agreements or arrangements shall not have been entered into for speculation purposes.

SECTION 6.09.  Other Indebtedness and Agreements; Amendments to Acquisition Documentation.  (a) Permit any waiver, supplement, modification, amendment, termination or release of any indenture, instrument or agreement pursuant to which any Material Indebtedness of any Loan Party is outstanding if the effect of such waiver, supplement, modification, amendment, termination or release would materially increase the obligations of the obligor or confer additional material rights on the holder of such Indebtedness in a manner adverse to any Loan Party or the Lenders.

(b)     (i) Make any distribution, whether in cash, property, securities or a combination thereof, in respect of, or pay, or offer or commit to pay, or directly or indirectly redeem, repurchase, retire or otherwise acquire for consideration, or set apart any sum for the aforesaid purposes, any Indebtedness that is subordinated to the Obligations, including the Subordinated Notes and any Permitted Second Lien Indebtedness.

SECTION 6.10. Approved Budget. Subject to the terms and conditions set forth below, and except as the Administrative Agent and Required Revolving Credit Lenders otherwise consent in writing in their reasonable discretion, the proceeds of Revolving Loans made under this Agreement shall be used by the Borrower solely for the purposes and up to the amounts set forth in the Approved Budget during the applicable period:

      (a)    at the end of each 1-week period set forth in the Approved Budget commencing with the week ending October 18, 2009, the aggregate cumulative expenditures and disbursements by the Loan Parties for the period from the Petition Date through the last day of such 1-week period shall not exceed one hundred ten percent (110%) of the aggregate cumulative amount budgeted for such cumulative time period pursuant to the Approved Budget;

      (b)    at the end of each 1-week period set forth in the Approved Budget commencing with the week ending October 18, 2009, the aggregate cumulative sales receipts by the Borrower for the period from the Petition Date through the last day of such 1-week period shall be at least ninety (90%) of the aggregate cumulative amount budgeted for such cumulative time period pursuant to the Approved Budget; and

      (c)    except for cumulative calculations in any measurement period as expressly set forth above, no unused portion of any line item in the Approved Budget may be carried backward to the same or any other line item for any prior 1-week period in the Approved Budget.

Administrative Agent and Lenders (i) may assume that the Borrower will comply with the Approved Budget, subject to the terms and conditions set forth herein, (ii) shall have no duty to monitor such compliance and (iii) shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Approved Budget. The line items in the Approved Budget for payment of interest, expenses and other amounts to Agents and Lenders are estimates only, and the Loan Parties remain obligated to pay any and all Obligations in accordance with the terms of the Loan Documents. Nothing in any Approved Budget shall constitute an amendment or other modification of this Agreement or other lending limits set forth herein.

SECTION 6.11. Liquidity and Maximum Cash Balances. The sum of Borrower's unused Revolving Credit Commitments (less the Carve-Out Reserve) plus unrestricted and available cash on hand shall equal at least $2,500,000 at all times. Holdings, Borrower and its Subsidiaries shall not maintain more than $2,000,000 in cash and Permitted Investments in the aggregate at any time when there is outstanding Revolving Credit Exposure.

SECTION 6.12. Return of Inventory. Enter into any agreement to return any of its Inventory outside the ordinary course of business to any of its creditors for application against any Pre-Petition Indebtedness, Pre-Petition trade payables or other Pre-Petition claims under Section 546(h) of the Bankruptcy Code.

SECTION 6.13. Chapter 11 Claims. Incur, create, assume, suffer to exist or permit any other superpriority administrative claim which is pari passu with or senior to the claims of

Agents and Lenders against the Loan Parties, except as set forth in the Interim Order and Final Order, as then in effect.

SECTION 6.14. <u>Critical Vendor and Other Payments</u>. Make (i) any Pre-Petition "critical vendor" payments or other payments on account of any creditor's Pre-Petition unsecured claims, (ii) payments on account of claims or expenses arising under section 503(b)(9) of the Bankruptcy Code, (iii) payments in respect of a reclamation program or (iv) payments under any management incentive plan or on account of claims or expenses arising under Section 503(c) of the Bankruptcy Code, except in each case in amounts and on terms and conditions that (a) are approved by order of the Bankruptcy Court and (b) are expressly permitted by any Approved Budget.

SECTION 6.15. <u>Fiscal Year</u>. With respect to Holdings or the Borrower, change its fiscal year-end to a date other than December 31.

ARTICLE VII

Events of Default

SECTION 7.01. In case of the happening of any of the following events ("<u>Events of Default</u>"):

      (a)    any representation or warranty made or deemed made in or in connection with any Loan Document or the Borrowings or issuances of Letters of Credit hereunder, or any representation, warranty, statement or information contained in any report, certificate, financial statement or other instrument furnished in connection with or pursuant to any Loan Document, shall prove to have been false or misleading in any material respect when so made, deemed made or furnished;

      (b)    default shall be made in the payment of any principal of any Loan or the reimbursement with respect to any L/C Reimbursement Obligation when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or by acceleration thereof or otherwise;

      (c)    default shall be made in the payment of any interest on any Loan or L/C Reimbursement Obligation or any Fee or any other amount (other than an amount referred to in <u>(b)</u> above) due under any Loan Document, when and as the same shall become due and payable, and such default shall continue unremedied for a period of three Business Days;

      (d)    default shall be made in the due observance or performance by Holdings, the Borrower or any Subsidiary of any covenant, condition or agreement contained in <u>Section 5.01(a)</u>, <u>5.04(f)</u>, <u>5.05</u>, <u>5.08</u>, <u>5.11</u>, <u>5.12</u>, or <u>5.13</u>, or in <u>Article VI</u>;

      (e)    default shall be made in the due observance or performance by Holdings, the Borrower or any Subsidiary of any covenant, condition or agreement contained in any Loan Document (other than those specified in <u>clauses (b)</u>, <u>(c)</u> or <u>(d)</u> above) and such default shall continue unremedied for a period of 30 days following the earlier of

(i) knowledge thereof by a Responsible Officer of a Loan Party and (ii) written notice thereof by any Agent or any Lender to a Loan Party;

(f)       except for defaults occasioned by the filing of the Chapter 11 Cases and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits any Loan Party from complying or permits any Loan Party not to comply, a default or breach occurs under any agreement, document or instrument entered into either (x) Pre-Petition and which is assumed after the Petition Date or is not subject to the automatic stay provisions of Section 362 of the Bankruptcy Code, or (y) Post-Petition, to which any Loan Party is a party that is not cured within any applicable grace period therefor, and such default or breach (i) involves the failure to make any payment when due in respect of any Indebtedness (other than the Obligations) of any Loan Party in excess of $500,000 in the aggregate, or (ii) causes such Indebtedness, or permits any holder of such Indebtedness or a trustee to cause such Indebtedness, to become due prior to its stated maturity or prior to its regularly scheduled dates of payment;

(g)       any Material Contract shall be terminated for any reason;

(h)       an involuntary proceeding shall be commenced or an involuntary petition shall be filed in a court of competent jurisdiction seeking (i) relief in respect of any Foreign Subsidiary, or of a substantial part of the property or assets of any Foreign Subsidiary, under any foreign bankruptcy, insolvency, receivership or similar law, (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Foreign Subsidiary or for a substantial part of the property or assets of any Foreign Subsidiary or (iii) the winding-up or liquidation of any Foreign Subsidiary; and such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(i)       any Foreign Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking relief under any foreign bankruptcy, insolvency, receivership or similar law, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or the filing of any petition described in (g) above, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Foreign Subsidiary or for a substantial part of the property or assets of any Foreign Subsidiary, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors, (vi) become unable, admit in writing its inability or fail generally to pay its debts as they become due or (vii) take any action for the purpose of effecting any of the foregoing;

(j)       one or more Post-Petition judgments for the payment of money in an aggregate amount in excess of $250,000 (excluding therefrom any amount covered by insurance as to which the applicable insurer has acknowledged in writing its obligation to cover) shall be rendered against Holdings, the Borrower, any Subsidiary or any combination thereof and the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action

shall be legally taken by a judgment creditor to levy upon assets or properties of Holdings, the Borrower or any Subsidiary to enforce any such judgment;

(k)     an ERISA Event described in clause (b) of the definition thereof shall have occurred or any other ERISA Event shall have occurred that, when taken together with all other such ERISA Events, could reasonably be expected to result in liability of the Borrower and its ERISA Affiliates in an aggregate amount exceeding $250,000;

(l)     any Guarantee under the Guarantee and Collateral Agreement for any reason shall cease to be in full force and effect (other than in accordance with its terms), or any Guarantor shall deny in writing that it has any further liability under its Guarantee (other than as a result of the discharge of such Guarantor in accordance with the terms of the Loan Documents);

(m)     any Lien purported to be created under any Loan Document shall cease to be, or shall be asserted by the Borrower or any other Loan Party not to be, a valid, perfected and, with respect to the Secured Parties, first priority (except as otherwise expressly provided in this Agreement or such Loan Document) Lien on any material Collateral covered thereby;

(n)     there shall have occurred a Change in Control;

(o)     entry of an order, or any Loan Party seeking the entry of an order, (i) approving additional financing under Section 364(c) or (d) of the Bankruptcy Code, (ii) granting any lien upon or affecting any Collateral other than liens permitted under this Agreement, (iii) permitting the use of cash collateral without the prior written consent of each Agent, or (iv) authorizing or approving any other action adverse to the Secured Parties or their rights and remedies or their interest in the Collateral;

(p)     entry of an order dismissing, or any Loan Party seeking the dismissal of, any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a Chapter 7 case;

(q)     entry of an order, or any Loan Party seeking the entry of an order, appointing a Chapter 11 trustee or an examiner in any of the Chapter 11 Cases having enlarged powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code);

(r)     entry of an order granting, or any Loan Party seeking the entry of an order granting, any other superpriority claim, modifying the Loan Documents, the Interim Order or the Final Order, or granting relief from the automatic stay to permit any secured creditor (other than the Secured Parties) to enforce or otherwise take action with respect to any Collateral, or any breach by any Loan Party of any provision of either the Interim Order or Final Order;

(s)     the payment by any Loan Party of any Pre-Petition claim without the prior written consent of each Agent unless such payment is permitted by the Approved Budget;

(t)     the commencement of any action against any of the Secured Parties or against any of the "Secured Parties" (as defined in the Pre-Petition Loan Agreement) by or on behalf of any Loan Party or any of its Affiliates, officers or employees;

(u)     the Interim Order shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal, in the case of any modification or amendment, without the prior written consent of each Agent;

(v)     the Final Order shall not have been entered by the Bankruptcy Court on or before the date that is 30 days after the entry of the Interim Order;

(w)     the Final Order shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated or subject to stay pending appeal, in the case of any modification or amendment, without the prior written consent of each Agent and the Lenders;

(x)     the allowance of any claim under Section 506(c) of the Bankruptcy Code or otherwise against any or all of the Secured Parties and the Collateral, or against any or all of the "Secured Parties" (as defined in the Pre-Petition Loan Agreement) or the "Collateral" (as defined in the Pre-Petition Loan Agreement) securing the "Obligations" (as defined in the Pre-Petition Loan Agreement);

(y)     the filing of any plan of reorganization or any amendment thereto or related disclosure statement other than the Plan and related Disclosure Statement, or the entry of an order confirming any such plan of reorganization or approving any such disclosure statement or any such amendment, in each case that is not acceptable to the Agents;

(z)     any termination or modification of the exclusivity periods set forth in Section 1121 of the Bankruptcy Code, or

(aa)     any breach or termination of the Equity Commitment and Plan Support Agreement (other than by the Agents) or any failure of the Equity Commitment and Plan Support Agreement to remain in full force and effect;

then, and in every such event, and at any time thereafter during the continuance of such event either or both of the following actions may be taken: (i) the Administrative Agent may, and at the request of the Required Revolving Credit Lenders shall, by notice to the Borrower, terminate forthwith the Revolving Credit Commitments, the Swingline Commitment and the L/C Commitment and (ii) the Applicable Agent may, and shall at the request of the Required Revolving Credit Lenders in the case of the Revolving Credit Facility, or Required Term Lenders in the case of the Term Loan Facility, declare the Loans then outstanding under the Revolving Credit Facility or Term Loan Facility, as applicable, to be forthwith due and payable in whole or in part, whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and any unpaid accrued Fees and all other liabilities of the Borrower accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which

are hereby expressly waived by the Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding, and, subject to Article X, the Agents shall have the right to take all or any actions and exercise any remedies available to a secured party under the Loan Documents or applicable law or in equity. The Required Revolving Credit Lenders may, by notice to the Administrative Agent, rescind a termination of the Revolving Credit Commitments and Swingline Commitment described in clause (i) above in this paragraph and the Required Revolving Credit Lenders or Required Term Lenders, as applicable, may, by notice to the Applicable Agent, rescind an acceleration of the applicable Loans described in clause (ii) above in this paragraph.

## ARTICLE VIII

### The Agents and the Arranger

Each of the Lenders and the Issuing Bank hereby irrevocably appoints each of the Administrative Agent and the Term Agent (for purposes of this Article VIII, the Administrative Agent and the Term Agent are referred to collectively as the "Agents") its agent and authorizes the Agents to take such actions on its behalf and to exercise such powers as are delegated to such Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto. Without limiting the generality of the foregoing, the Agents are hereby expressly authorized by the Lenders to execute any and all documents (including releases and the Security Documents) with respect to the Collateral and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Loan Documents.

Each Person serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent, and such Person and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with Holdings, the Borrower or any Subsidiary or any of their respective Affiliates as if it were not an Agent hereunder.

No Agent shall have any duties or obligations except those expressly set forth in the Loan Documents. Without limiting the generality of the foregoing, (a) no Agent shall be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) no Agent shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that such Agent is required to exercise in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in this Agreement), and (c) except as expressly set forth in the Loan Documents, no Agent shall have any duty to disclose, nor shall it be liable for the failure to disclose, any information relating to Holdings, the Borrower or any of the Subsidiaries that is communicated to or obtained by the Person serving as any Agent or any of its Affiliates in any capacity. No Agent shall be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in this Agreement) or in the absence of its own gross negligence or willful misconduct. No Agent shall be deemed to have knowledge of any Default unless and until written notice thereof is given to such Agent by Holdings, the Borrower or a Lender, and no Agent shall be

responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to such Agent.

Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper person. Each Agent may also rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper person, and shall not incur any liability for relying thereon. Each Agent may consult with legal counsel (who may be counsel for Holdings or the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Each Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by it. Each Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent.

Subject to the appointment and acceptance of a successor Agent as provided below, each Agent may resign at any time by notifying the Lenders, the Issuing Bank and the Borrower. Upon any such resignation of the Administrative Agent, the Required Revolving Credit Lenders shall have the right to appoint a successor, subject to the Borrower's approval (not to be unreasonably withheld or delayed) so long as no Default or Event of Default shall have occurred and be continuing. Upon any such resignation of the Term Agent, the Required Term Lenders shall have the right to appoint a successor, subject to the Borrower's approval (not to be unreasonably withheld or delayed) so long as no Default or Event of Default shall have occurred and be continuing. If no successor shall have been so appointed by the Required Revolving Credit Lenders or Required Term Lenders, as applicable, and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may, on behalf of the Lenders and the Issuing Bank, appoint a successor Agent. Upon the acceptance of its appointment as Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder. The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After an Agent's resignation hereunder, the provisions of this Article and Section 9.05 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while acting as Agent.

GE Capital Markets, Inc., in its capacity as arranger hereunder, shall have no duties or responsibilities, and shall incur no liability, under this Agreement or any other Loan Document.

Each Lender acknowledges that it has, independently and without reliance upon the Agents or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Agents or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement or any other Loan Document, any related agreement or any document furnished hereunder or thereunder.

To the extent required by any applicable law, the Applicable Agent may withhold from any interest payment to any Lender an amount equivalent to any applicable withholding tax. If the Internal Revenue Service or any other Governmental Authority asserts a claim that the Applicable Agent did not properly withhold tax from amounts paid to or for the account of any Lender because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify the Applicable Agent of a change in circumstance which rendered the exemption from, or reduction of, withholding tax ineffective or for any other reason, such Lender shall indemnify the Applicable Agent fully for all amounts paid, directly or indirectly, by the Applicable Agent as tax or otherwise, including any penalties or interest and together with all expenses (including legal expenses, allocated internal costs and out-of-pocket expenses) incurred.

## ARTICLE IX

### Miscellaneous

SECTION 9.01. Notices. Notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax, as follows:

(a)    if to Holdings or the Borrower, to it at True Temper Sports, Inc., 8275 Tournament Drive, Suite 200, Memphis, TN 38125, Attention of Vice President and Chief Financial Officer (Fax No. (901) 746-2161), with a copy to Thomas M. Vitale at Mayer Brown LLP, 1675 Broadway, New York, NY 10019 (Fax No. (212) 849 5510);

(b)    if to the Term Agent, to Credit Suisse, Cayman Islands Branch, Eleven Madison Avenue, New York, NY 10010, Attention of Loan Services Manager (Fax No. (212) 325-8304); and

(c)    if to the Administrative Agent, to General Electric Capital Corporation, 500 West Monroe Street, Chicago, IL 60661, Attn: True Temper Account Officer (Fax: 312-441-7211); with a copy to: General Electric Capital Corporation, 201 Merritt 7, PO Box 5201, Norwalk, CT 06851, Attn: General Counsel - Global Sponsor Finance (Fax: 203-956-4216); with a copy to: General Electric Capital Corporation, 500 West Monroe

Street, Chicago, IL 60661, Attn: Corporate Counsel - Global Sponsor Finance (Fax: 312-441-6876); and

(d)    if to a Lender, to it at its address (or fax number) set forth in the Lender Addendum or the Assignment and Acceptance pursuant to which such Lender shall have become a party hereto.

All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service or sent by fax or on the date five Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 9.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 9.01.

SECTION 9.02. Survival of Agreement. All covenants, agreements, representations and warranties made by Holdings or the Borrower herein and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Lenders and the Issuing Bank and shall survive the making by the Lenders of the Loans and the issuance of Letters of Credit by the Issuing Bank, regardless of any investigation made by the Lenders or the Issuing Bank or on their behalf, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any Fee or any other amount payable under this Agreement or any other Loan Document is outstanding and unpaid or any Letter of Credit is outstanding and so long as the Commitments have not been terminated. The provisions of Sections 2.14, 2.16, 2.20 and 9.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Loans, the expiration of the Commitments, the expiration of any Letter of Credit, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document or any investigation made by or on behalf of any Agent, any Lender or the Issuing Bank.

SECTION 9.03. Binding Effect. This Agreement shall become effective in accordance with the provisions of the Interim Order and Final Order, as then in effect.

SECTION 9.04. Successors and Assigns. (a) Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the permitted successors and assigns of such party; and all covenants, promises and agreements by or on behalf of Holdings, the Borrower, the Agents, the Issuing Bank or the Lenders that are contained in this Agreement shall bind and inure to the benefit of their respective successors and assigns.

(b)    Subject to the Equity Commitment and Plan Support Agreement, each Lender may assign to one or more assignees all or a portion of its interests, rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); provided, however, that (i) the Administrative Agent must give its prior written consent to such assignment (which consent shall not be unreasonably withheld or delayed) in respect of the Revolving Credit Facility and Term Agent must give its prior written consent to such assignment (which consent shall not be unreasonably withheld or delayed) in respect of the Term Facility

other than any assignment of Term Loans to a Lender or an Affiliate or Related Fund of a Lender, (ii) in the case of any assignment of a Revolving Credit Commitment, each of the Issuing Bank, the Swingline Lender and the Borrower must give its prior written consent to such assignment (which consent shall not be unreasonably withheld or delayed); provided that the consent of the Borrower shall not be required to any such assignment during the continuance of any Event of Default, (iii) the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Applicable Agent) shall not be less than $1,000,000 (or, if less, the entire remaining amount of such Lender's Commitment or Loans) and shall be in an amount that is an integral multiple of $1,000,000 (or the entire remaining amount of such Lender's Commitment or Loans), unless otherwise agreed by the Applicable Agent, (iv) the parties to each such assignment shall execute and deliver to the Applicable Agent an Assignment and Acceptance (such Assignment and Acceptance to be (A) electronically executed and delivered to the Applicable Agent via an electronic settlement system then acceptable to the Applicable Agent, which shall initially be the settlement system of ClearPar, LLC, or (B) manually executed and delivered together with a processing and recordation fee of $3,500) and (v) the assignee, if it shall not be a Lender immediately prior to the assignment, shall deliver to the Applicable Agent an Administrative Questionnaire. Upon acceptance and recording pursuant to paragraph (e) of this Section 9.04, from and after the effective date specified in each Assignment and Acceptance, (A) the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement and (B) the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.14, 2.16, 2.20 and 9.05, as well as to any Fees accrued for its account and not yet paid).

(c)     By executing and delivering an Assignment and Acceptance, the assigning Lender thereunder and the assignee thereunder shall be deemed to confirm to and agree with each other and the other parties hereto as follows: (i) such assigning Lender warrants that it is the legal and beneficial owner of the interest being assigned thereby free and clear of any adverse claim and that its Revolving Credit Commitment, and the outstanding balances of its Term Loans and Revolving Loans, in each case without giving effect to assignments thereof which have not become effective, are as set forth in such Assignment and Acceptance, (ii) except as set forth in (i) above, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto, or the financial condition of Holdings, the Borrower or any Subsidiary or the performance or observance by Holdings, the Borrower or any Subsidiary of any of its obligations under this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto; (iii) such assignee represents and warrants that it is legally authorized to enter into such Assignment and Acceptance; (iv) such assignee confirms that it has received a copy of this Agreement, together with copies of the most recent financial statements referred to in Section 3.05(a) or delivered pursuant to Section 5.04 and such other documents and

information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (v) such assignee will independently and without reliance upon any Agent, such assigning Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (vi) such assignee appoints and authorizes each Agent to take such action as agent on its behalf and to exercise such powers under this Agreement as are delegated to the Agents by the terms hereof, together with such powers as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(d)     The Applicable Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal amount of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive absent manifest error and the Borrower, the Agents, the Issuing Bank, and the Lenders may treat each person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, the Issuing Bank, the Agents and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(e)     Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an assignee, an Administrative Questionnaire completed in respect of the assignee (unless the assignee shall already be a Lender hereunder) and the written consent of the Applicable Agent and, if required, the written consent of the Borrower, the Swingline Lender and the Issuing Bank to such assignment, the Applicable Agent shall (i) accept such Assignment and Acceptance and (ii) record the information contained therein in the Register. No assignment shall be effective unless it has been recorded in the Register as provided in this paragraph (e).

(f)     Each Lender may without the consent of the Borrower, the Swingline Lender, the Issuing Bank or any Agent sell participations to one or more banks or other entities in all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans); provided, however, that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the participating banks or other entities shall be entitled to the benefit of the cost protection provisions contained in Sections 2.14, 2.16 and 2.20 to the same extent as if they were Lenders (but, with respect to any particular participant, to no greater extent than the Lender that sold the participation to such participant) and (iv) the Borrower, the Agents, the Issuing Bank and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, and such Lender shall retain the sole right to enforce the obligations of the Borrower relating to the Loans or L/C Reimbursement Obligations and to approve any amendment, modification or waiver of any provision of this Agreement (other than amendments, modifications or waivers decreasing any fees payable hereunder or the amount of principal of or the rate at which interest is payable on the Loans (in each case to the extent participated in by such participant), extending any scheduled principal payment date or date fixed for the payment

of interest on the Loans (in each case to the extent participated in by such participant), increasing or extending the Commitments (in each case to the extent participated in by such participant) or releasing any Guarantor or all or any substantial part of the Collateral).

(g)     Any Lender or participant may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 9.04, disclose to the assignee or participant or proposed assignee or participant any information relating to the Borrower furnished to such Lender by or on behalf of the Borrower; provided that, prior to any such disclosure of information designated by the Borrower as confidential, each such assignee or participant or proposed assignee or participant shall execute an agreement whereby such assignee or participant shall agree (subject to customary exceptions) to preserve the confidentiality of such confidential information on terms no less restrictive than those applicable to the Lenders pursuant to Section 9.16.

(h)     Any Lender may at any time assign all or any portion of its rights under this Agreement to secure extensions of credit to such Lender or in support of obligations owed by such Lender and, in the case of any Lender that is a fund that invests in bank loans, such Lender may pledge all or any portion of its rights under this Agreement to any holder of, trustee for, or other representative of any holders of, obligations owed or securities issued by such fund as security for such obligations or securities; provided that no such assignment or pledge described in this clause (h) shall release a Lender from any of its obligations hereunder or substitute any such assignee or pledgee for such Lender as a party hereto.

(i)     Notwithstanding anything to the contrary contained herein, any Lender (a "Granting Lender") may grant to a special purpose funding vehicle (an "SPC"), identified as such in writing from time to time by the Granting Lender to the Agents and the Borrower, the option to provide to the Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make to the Borrower pursuant to this Agreement; provided that (i) nothing herein shall constitute a commitment by any SPC to make any Loan and (ii) if an SPC elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Each party hereto hereby agrees that no SPC shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender). In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPC, it will not institute against, or join any other person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof. In addition, notwithstanding anything to the contrary contained in this Section 9.04, any SPC may (i) with notice to, but without the prior written consent of, the Borrower and the Agents and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by the Borrower and Agents) providing liquidity and/or credit support to or for the account of such SPC to support the funding or maintenance of Loans and (ii) disclose on a confidential basis

any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPC.

(j) Neither Holdings nor the Borrower shall assign or delegate any of its rights or duties hereunder without the prior written consent of the Agents, the Issuing Bank and each Lender, and any attempted assignment without such consent shall be null and void.

SECTION 9.05. Expenses; Indemnity. (a) Holdings and the Borrower agree, jointly and severally, to pay, on a monthly basis, all reasonable out-of-pocket costs and expenses incurred by the Agents and the Issuing Bank and the Swingline Lender in connection with (i) the preparation and administration of this Agreement and the other Loan Documents or in connection with any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions hereby or thereby contemplated shall be consummated) or incurred by the Agents, the Issuing Bank or any Lender in connection with the enforcement or protection of its rights in connection with this Agreement and the other Loan Documents or in connection with the Loans made or Letters of Credit Issued hereunder, including in each case the fees and disbursements of Latham & Watkins LLP, counsel for the Administrative Agent, Gibson, Dunn & Crutcher LLP, counsel for the Term Agent and any financial advisor engaged by the Term Agent, and, in connection with any such enforcement or protection, the reasonable fees and disbursements of any counsel for any Agent and one other transaction counsel acting on behalf of the Issuing Bank and the Lenders, together with any other local and special counsel reasonably required in connection with such enforcement or protection and (ii) (A) the obtaining of approval of the Loan Documents by the Bankruptcy Court and (B) the preparation and review of pleadings, documents and reports related to any Chapter 11 Case and any subsequent case under Chapter 7 of the Bankruptcy Code, attendance at meetings, court hearings or conferences related to any Chapter 11 Case and any subsequent case under Chapter 7 of the Bankruptcy Code, and general monitoring of any Chapter 11 Case and any subsequent case under Chapter 7 of the Bankruptcy Code.

(b) Holdings and the Borrower agree, jointly and severally, to indemnify each Agent, each Lender, the Issuing Bank and each Related Party of any of the foregoing persons (each such person being called an "Indemnitee") against, and to hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related costs and expenses, including reasonable counsel fees and disbursements, incurred by or asserted against any Indemnitee arising out of, in any way connected with, or as a result of (i) the execution or delivery of this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties thereto of their respective obligations thereunder or the consummation of the Transactions and the other transactions contemplated hereunder or thereby, (ii) the use of the proceeds of the Loans or issuance of Letters of Credit, (iii) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto, or (iv) any actual or alleged presence or Release of Hazardous Materials on any property owned or operated by Holdings, the Borrower or any of the Subsidiaries, or any Environmental Liability related in any way to Holdings, the Borrower or any of the Subsidiaries; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related costs and expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from primarily the gross negligence, willful misconduct or bad faith of such Indemnitee

(and, upon any such determination, any indemnification payments with respect to such losses, claims, damages, liabilities or related costs and expenses previously received by such Indemnitee shall be promptly reimbursed by such Indemnitee).

(c)  To the extent that Holdings and the Borrower fail to pay any amount required to be paid by them to any Agent or Issuing Bank or the Swingline Lender under paragraph (a) or (b) of this Section, each Revolving Credit Lender, with respect to any amounts owed to the Administrative Agent, Issuing Bank or the Swingline Lender, and each Term Lender, with respect to any amounts owed to the Term Agent severally agrees to pay to such Agent or the Issuing Bank or the Swingline Lender, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against any Agent or the Issuing Bank or the Swingline Lender in its capacity as such.  For purposes hereof, a Revolving Credit Lender's or Term Lender's "pro rata share" shall be determined based upon its share of (i) in the case of the Revolving Credit Lenders, the sum of the Aggregate Revolving Credit Exposure and unused Commitments at the time and (ii) in the case of the Term Lenders, the sum of the outstanding Term Loans.

(d)  To the extent permitted by applicable law, neither Holdings nor the Borrower shall assert, and each hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions, any Loan or Letter of Credit or the use of the proceeds thereof.

(e)  The provisions of this Section 9.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the Transactions or the other transactions contemplated hereby, the repayment of any of the Loans, the expiration of the Commitments, the expiration of any Letter of Credit, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of any Agent, any Lender or the Issuing Bank.  All amounts due under this Section 9.05 shall be payable on written demand therefor.

SECTION 9.06.  Right of Setoff.  If an Event of Default shall have occurred and be continuing, each Lender is hereby authorized at any time and from time to time, except to the extent prohibited by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender to or for the credit or the account of Holdings or the Borrower against any of and all the obligations of Holdings or the Borrower now or hereafter existing under this Agreement and other Loan Documents held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or such other Loan Document and although such obligations may be unmatured.  The rights of each Lender under this Section 9.06 are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.  For the avoidance of doubt, any set-off pursuant to this Section 9.06 shall be subject to the pro-rata sharing requirement in Section 2.18.

SECTION 9.07. <u>Applicable Law</u>. TO THE EXTENT NOT GOVERNED BY THE PROVISIONS OF THE BANKRUPTCY CODE, THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN LETTERS OF CREDIT AND AS EXPRESSLY SET FORTH IN OTHER LOAN DOCUMENTS) SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK. EACH LETTER OF CREDIT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED IN ACCORDANCE WITH, THE LAWS OR RULES DESIGNATED IN SUCH LETTER OF CREDIT, OR IF NO SUCH LAWS OR RULES ARE DESIGNATED, THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS MOST RECENTLY PUBLISHED AND IN EFFECT, ON THE DATE SUCH LETTER OF CREDIT WAS ISSUED, BY THE INTERNATIONAL CHAMBER OF COMMERCE (THE "UNIFORM CUSTOMS") AND, AS TO MATTERS NOT GOVERNED BY THE UNIFORM CUSTOMS, THE LAWS OF THE STATE OF NEW YORK.

SECTION 9.08. <u>Waivers; Amendment</u>. (a) No failure or delay of any Agent, any Lender or the Issuing Bank in exercising any power or right hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Agents, the Issuing Bank and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Borrower or any other Loan Party therefrom shall in any event be effective unless the same shall be permitted by <u>paragraph (b)</u> below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice or demand on Holdings or the Borrower in any case shall entitle Holdings or the Borrower to any other or further notice or demand in similar or other circumstances.

(b)     Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by Holdings, the Borrower and (i) the Required Revolving Credit Lenders (without the consent of any other Lenders) to the extent any amendment, modification, termination or waiver is with respect to <u>Sections 2.01(b), 2.02, 2.03, 2.22, 2.23, 4.01</u> (in respect of the Revolving Credit Facility), <u>5.04(f)</u>, <u>5.04(g)</u> or <u>6.10</u>, or (ii) the Required Lenders to the extent any amendment, modification, termination or waiver is with respect to any other provision in this Agreement or any other Loan Documents; <u>provided</u>, <u>however</u>, that no such agreement shall (A) decrease the principal amount of, or extend the maturity of or any scheduled principal payment date (subject to the last sentence of <u>Article VII</u>) or date for the payment of any interest on any Loan or any date for reimbursement of an L/C Reimbursement Obligation, or waive or excuse any such payment or any part thereof, or decrease the rate of interest on any Loan or L/C Reimbursement Obligation, without the prior written consent of each Lender adversely affected thereby, (B) increase or extend the Commitment or decrease or extend the date for payment of any Fees of any Lender without the prior written consent of such Lender, (C) amend or modify the <u>pro rata</u> requirements of <u>Section 2.17</u>, the provisions of <u>Section 9.04(j)</u>, the provisions of <u>Section 2.24</u>, the provisions of this Section or the percentage set forth in the definition of the term "Required Lenders," or release any Guarantor (other than in accordance with the terms of

the Guarantee and Collateral Agreement), without the prior written consent of each Lender adversely affected thereby, (D) release all or substantially all of the Collateral without the prior written consent of each Lender, (E) change the provisions of any Loan Document in a manner that by its terms adversely affects the rights in respect of payments due to Lenders holding Loans of one Class differently from the rights of Lenders holding Loans of any other Class except as already set forth in this Agreement without the prior written consent of Lenders holding a majority in interest of the outstanding Loans and unused Commitments of each adversely affected Class, (F) modify the protections afforded to an SPC pursuant to the provisions of Section 9.04(i) without the written consent of such SPC or (G) amend or modify the percentage set forth in the definition of the term "Required Revolving Credit Lenders" or "Required Term Lenders" without the prior written consent of each Lender adversely affected thereby; provided further that no such agreement shall amend, modify or otherwise affect the rights or duties of any Agent or the Issuing Bank or the Swingline Lender hereunder or under any other Loan Document without the prior written consent of such Agent or the Issuing Bank or the Swingline Lender, as applicable.

SECTION 9.09. Interest Rate Limitation. Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan or participation in any L/C Reimbursement Obligation, together with all fees, charges and other amounts which are treated as interest on such Loan or participation in such L/C Reimbursement Obligation under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan or participation in accordance with applicable law, the rate of interest payable in respect of such Loan or participation hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan or participation but were not payable as a result of the operation of this Section 9.09 shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or participations or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

SECTION 9.10. Entire Agreement. This Agreement and the other Loan Documents constitute the entire contract between the parties relative to the subject matter hereof. Any other previous agreement among the parties with respect to the subject matter hereof is superseded by this Agreement and the other Loan Documents. Nothing in this Agreement or in the other Loan Documents, expressed or implied, is intended to confer upon any person (other than the parties hereto and thereto, their respective successors and assigns permitted hereunder (including any Affiliate of the Issuing Bank that Issues any Letter of Credit) and, to the extent expressly contemplated hereby, the Related Parties of each Agent, the Issuing Bank and the Lenders ) any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Loan Documents.

SECTION 9.11. WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS. EACH PARTY HERETO

(A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 9.11</u>.

SECTION 9.12. <u>Severability</u>. In the event any one or more of the provisions contained in this Agreement or in any other Loan Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction). The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 9.13. <u>Counterparts</u>. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract, and shall become effective as provided in <u>Section 9.03</u>. Delivery of an executed signature page to this Agreement or of a Lender Addendum by facsimile transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

SECTION 9.14. <u>Headings</u>. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 9.15. <u>Jurisdiction; Consent to Service of Process</u>. (a) Each of Holdings and the Borrower hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Bankruptcy Court and appellant courts from the Bankruptcy Court, in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that any Agent, or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or the other Loan Documents against either Holdings or the Borrower or its properties in the courts of any jurisdiction.

(b)     Each of Holdings and the Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in the Bankruptcy Court and appellate courts from the Bankruptcy Court. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)     Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 9.16.  Confidentiality.  Each Agent, the Issuing Bank and the Lenders agrees to maintain the confidentiality of the Information, except that Information may be disclosed (a) to its and its Affiliates' officers, directors, employees and agents, including accountants, legal counsel and other advisors (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority or quasi-regulatory authority (such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) in connection with the exercise of any remedies hereunder or under the other Loan Documents or any suit, action or proceeding relating to the enforcement of its rights hereunder or thereunder, (e) subject to a prior or contemporaneous agreement containing provisions substantially the same as those of this Section 9.16, to (i) any actual or prospective assignee of or participant in any of its rights or obligations under this Agreement and the other Loan Documents or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to Holdings, the Borrower or any Subsidiary or any of their respective obligations, (f) with the consent of Holdings or the Borrower or (g) to the extent such Information becomes publicly available other than as a result of a breach of this Section 9.16. Each Agent, the Issuing Bank and the Lenders agrees not to use any Information except for evaluating the performance of Holdings, the Borrower and the Subsidiaries hereunder and enforcing the rights, remedies and obligations hereunder and under the other Loan Documents. For the purposes of this Section, "Information" shall mean all information received from Holdings or the Borrower and related to the Borrower or its business, other than any such information that was available to any Agent, the Issuing Bank or any Lender on a nonconfidential basis prior to its disclosure by Holdings or the Borrower; provided that, in the case of Information received from Holdings or the Borrower after the Closing Date, such information is clearly identified at the time of delivery as confidential.  Any person required to maintain the confidentiality of Information as provided in this Section 9.16 shall be considered to have complied with its obligation to do so if such person has exercised the same degree of care to maintain the confidentiality of such Information as such person would accord its own confidential information.  Notwithstanding any other express or implied agreement, arrangement or understanding to the contrary, each of the parties hereto agrees that each other party hereto (and each of its employees, representatives or agents) are permitted to disclose to any persons, without limitation, the tax treatment and tax structure of the Loans and the other transactions contemplated by the Loan Documents and all materials of any kind (including opinions and tax analyses) that are provided to the Loan Parties, the Lenders, the Arranger or any Agent related to such tax treatment and tax aspects.  To the extent not inconsistent with the immediately preceding sentence, this authorization does not extend to disclosure of any other information or any other term or detail not related to the tax treatment or tax aspects of the Loans or the transactions contemplated by the Loan Documents.

SECTION 9.17.  Parties Including Trustees; Bankruptcy Court Proceedings.  This Agreement, the other Loan Documents, and all Liens and other rights and privileges created hereby or pursuant hereto or to any other Loan Document shall be binding upon each Loan Party,

the estate of each Loan Party, and any trustee, other estate representative or any successor in interest of any Loan Party in any Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code. This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of the Agents, the Issuing Bank and the Lenders and their respective assigns, transferees and endorsees. The Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of any Chapter 11 Case or any other bankruptcy case of any Loan Party to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of any Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that any Agent file financing statements or otherwise perfect its Liens under applicable law. No Loan Party may assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the other Loan Documents without the prior express written consent of the Agents, the Issuing Bank and the Lenders. Any such purported assignment, transfer, hypothecation or other conveyance by any Loan Party without the prior express written consent of the Agents, the Issuing Bank and the Lenders shall be void. The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of each Loan Party, the Agents, the Issuing Bank and Lenders with respect to the transactions contemplated hereby and no Person shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Loan Documents.

SECTION 9.18. Pre-Petition Loan Documents. The Borrower, on behalf of itself and the other Loan Parties, hereby agrees that (i) this Agreement is separate and distinct from the Pre-Petition Loan Agreement and (ii) the Pre-Petition Loan Agreement and other Pre-Petition Loan Documents are in full force and effect. The Borrower further agrees, on behalf of itself and the other Loan Parties, that by entering into this Agreement, Lenders do not waive any Default or Event of Default under the Pre-Petition Loan Documents or any of their liens, claims, priorities, rights and remedies thereunder.

SECTION 9.19. Conflict of Terms. Except as otherwise provided in this Agreement or any of the other Loan Documents by specific reference to the applicable provisions of this Agreement, and subject to the immediately following sentence, if any provision contained in this Agreement conflicts with any provision in any of the other Loan Documents, the provision contained in this Agreement shall govern and control. NOTWITHSTANDING THE FOREGOING, IF ANY PROVISION IN THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT CONFLICTS WITH ANY PROVISION IN THE INTERIM ORDER OR FINAL ORDER, AS THEN IN EFFECT, THE PROVISION IN THE INTERIM ORDER OR FINAL ORDER, AS THEN IN EFFECT, SHALL GOVERN AND CONTROL.

SECTION 9.20. Press Releases and Related Matters. Each Loan Party executing this Agreement agrees that neither it nor its affiliates will in the future issue any press releases or other public disclosure using the name of General Electric Capital Corporation, Credit Suisse or their respective Affiliates or referring to this Agreement or the other Loan Documents without at least 2 Business Days' prior notice to General Electric Capital Corporation and Credit Suisse, and without the prior written consent of General Electric Capital Corporation and Credit Suisse, unless (and only to the extent that) such Loan Party or Affiliate will consult with General Electric Capital Corporation and Credit Suisse, before issuing such press release or other public

disclosure or unless such public disclosure is made in connection with compliance by such Loan Party or Affiliate with its obligations under applicable law. Each Loan Party consents to the publication by any Agent or any Lender of a tombstone or similar advertising material relating to the financing transactions contemplated by this agreement using Borrower's name, product photographs, logo or trademark. Such Agent or such Lender shall provide a draft of any such tombstone or similar advertising material to Borrower for review and comment prior to the publication thereof. Borrower authorizes and permits General Electric Capital Corporation and Credit Suisse to use the name, logo and/or trademark of Borrower in connection with certain promotional materials that General Electric Capital Corporation and Credit Suisse intends to disseminate to the public. Each Agent reserves the right to provide to industry trade organizations information necessary and customary for inclusion in league table measurements.

## ARTICLE X

### Intercreditor Provisions

SECTION 10.01. <u>Enforcement</u>.

(a)     Except to the extent the Administrative Agent and the Required Revolving Credit Lenders have otherwise consented in writing, until the Discharge of Revolving Obligations has occurred, the Term Agent and Term Lenders (i) will not exercise or seek to exercise any rights or remedies (including setoff and the right to credit bid their debt) with respect to any Collateral (including the exercise of any right under any lockbox agreement, control account agreement, landlord waiver or bailee's letter or similar agreement or arrangement to which the Term Agent or any Term Lender is a party) or institute any action or proceeding with respect to such rights or remedies (including any actions seeking relief from the automatic stay under the Chapter 11 Cases), and (ii) will not contest, protest or object to any exercise of rights and remedies brought by the Administrative Agent or any Revolving Credit Lender relating to the Collateral or otherwise (including any actions seeking relief from the automatic stay under the Chapter 11 Cases); <u>provided</u> that if the Term Loans have become due and payable (whether at maturity or by acceleration), subject at all times to the provisions of <u>Section 10.02</u>, after expiration of a 90 day period (the **"Standstill Period"**) which shall commence on the date the Term Loans become due and payable, the Term Agent may take action to enforce its Liens on the Collateral upon 5 days' prior written notice to the Administrative Agent (which notice may be given prior to the completion of such 90 day period, but not prior to the 60th day of such period), but only so long as the Administrative Agent is not diligently pursuing in good faith the exercise of its enforcement rights or remedies (excluding setoff so long as proceeds of any such setoff are turned over to the Administrative Agent for application against the Obligations in accordance with <u>Section 2.24</u>) against, or diligently attempting to vacate any stay or enforcement of its Liens on, all or any material portion of the Collateral.

(b)     Until the earlier of the Discharge of Revolving Obligations and the expiration of the Standstill Period (unless the Administrative Agent is diligently pursuing in good faith the exercise of its enforcement rights or remedies (excluding setoff so long as proceeds of any such setoff are turned over to the Administrative Agent for application

against the Obligations in accordance with <u>Section 2.24</u>) against, or diligently attempting to vacate any stay or enforcement of its Liens on, all or any material portion of the Collateral), the Administrative Agent and the Revolving Credit Lenders shall, except as otherwise expressly provided herein, have the exclusive right to enforce rights, exercise remedies (including set-off and the right to credit bid their debt) and make determinations regarding the release, disposition, or restrictions with respect to the Collateral without any consultation with or the consent of the Term Agent or any Term Lender. In exercising rights and remedies with respect to the Collateral, the Administrative Agent and the Revolving Credit Lenders may enforce the provisions of the Loan Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion. Such exercise and enforcement shall include the rights of an agent appointed by them to sell or otherwise dispose of Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured creditor under the UCC and of a secured creditor under the Bankruptcy Code.

      (c)      Notwithstanding the foregoing, the Term Agent and any Term Lender may:

      (i)      <u>file a claim or statement of interest with</u> respect to the Term Obligations;

      (ii)      take any action (not adverse to the priority status of the Liens on the Collateral securing the Revolving Obligations, or the rights of Administrative Agent or any Revolving Credit Lender to exercise remedies in respect thereof) in order to create, perfect, preserve or protect its Lien on the Collateral;

      (iii)      file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any person objecting to or <u>otherwise</u> seeking the disallowance of the claims of the Term Agent and Term Lenders, including any claims secured by the Collateral, if any, in each case in accordance with the terms of this Agreement;

      (iv)      <u>vote</u> on any plan of reorganization, file any proof of claim, make other filings and make any arguments and motions that are, in each case, in accordance with the terms of this Agreement, with respect to the Term Obligations and the Collateral;

      (v)      exercise any of its rights or remedies with respect to the Collateral after the termination of the Standstill Period to the extent permitted by Section 10.01(a); and

      (vi)      present a cash bid at any hearing under Section 363 of the Bankruptcy Code or with respect to any other Collateral disposition.

      The Term Agent and each of the Term Lenders agrees that it will not take or receive any Collateral or any proceeds of Collateral in connection with the exercise of any right or remedy (including set-off) with respect to any Collateral in its capacity as a creditor, unless and until the

Discharge of Revolving Obligations has occurred. Without limiting the generality of the foregoing, unless and until the Discharge of Revolving Obligations has occurred, except as expressly provided in <u>Section 10.01(a)</u> and this <u>Section 10.01(c)</u>, the sole right of the Term Agent and the Term Lenders with respect to the Collateral is to hold a Lien on the Collateral pursuant to the Loan Documents for the period and to the extent granted therein and to receive a share of the proceeds thereof, if any, after the Discharge of Revolving Obligations has occurred.

    (d)    Subject to <u>Sections 10.01(a)</u> and <u>(c)</u>:

    (i)    the Term Agent and the Term Lenders agree that the Term Agent and the Term Lenders will not take any action that would hinder any exercise of remedies by the Administrative Agent and Revolving Credit Lenders under the Loan Documents or that is otherwise prohibited hereunder, including any sale, lease, exchange, transfer or other disposition of the Collateral, whether by foreclosure or otherwise; and

    (ii)    the Term Agent and the Term Lenders hereby waive any and all rights they may have as a junior lien creditor (but not any rights or remedies as an unsecured creditor) to object to the manner in which the Administrative Agent or the Revolving Credit Lenders seek to enforce or collect the Revolving Obligations or the Liens securing the Revolving Obligations granted in any of the Collateral undertaken in accordance with this Agreement, regardless of whether any action or failure to act by or on behalf of the Administrative Agent or Revolving Credit Lenders is adverse to the interest of the Term Lenders.

    (e)    Except as specifically set forth in <u>Sections 10.01(a)</u> and <u>(d)</u> and <u>Section 10.02</u>, nothing in this Agreement shall prohibit the receipt by the Term Agent or any Term Lender of the required payments in respect of the Term Obligations so long as such receipt is not in violation of the Loan Documents or the direct or indirect result of the exercise by the Term Agent or any Term Lender of rights or remedies as a secured creditor (including set-off) or enforcement in contravention of this Agreement of any Lien held by any of them. Nothing in this Agreement shall prohibit the exercise by the Term Agent or any Term Lender of any remedies as an unsecured creditor.

    SECTION 10.02. <u>Application of Proceeds</u>. So long as the Discharge of Revolving Obligations has not occurred, any proceeds of Collateral received in connection with the sale or other disposition of, or collection on, such Collateral upon the exercise of remedies, shall be remitted to and applied by the Administrative Agent to the Obligations in accordance with <u>Section 2.24</u>. So long as the Discharge of Revolving Obligations has not occurred, any Collateral or proceeds thereof received by the Term Agent or any Term Lender in connection with the exercise of any right or remedy (including set-off) relating to the Collateral in contravention of this Agreement shall be segregated and held in trust and forthwith paid over to the Administrative Agent for application to the Obligations in accordance with <u>Section 2.24</u>.

    SECTION 10.03. <u>Releases</u>. If in connection with the exercise of the Administrative Agent's rights and remedies in respect of the Collateral provided for in <u>Section 10.01</u>, the Administrative Agent releases any of its Liens on any part of the Collateral or releases any

Subsidiary Guarantor from its obligations under its guarantee of the Obligations, then the Liens, if any, of the Term Agent on such Collateral, and the obligations of such Subsidiary Guarantor under its guarantee of the Obligations, shall be automatically, unconditionally and simultaneously released. The Term Agent and Term Lenders promptly shall execute and deliver to the Administrative Agent or such Subsidiary Guarantor such termination statements, releases and other documents as the Administrative Agent or such Subsidiary Guarantor may request to effectively confirm such release.

SECTION 10.04. Insurance. Unless and until the Discharge of Revolving Obligations has occurred, the Administrative Agent shall have the sole and exclusive right to adjust settlement for any insurance policy covering the Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding (or any deed in lieu of condemnation) affecting the Collateral, as long as any proceeds are applied towards the repayment of Obligations or reinvested in accordance with the provisions of this Agreement. Unless and until the Discharge of Revolving Obligations has occurred, all proceeds of any such policy and any such award (or any payments with respect to a deed in lieu of condemnation) if in respect to the Collateral shall be paid to the Administrative Agent for application in accordance with Section 2.24. Until the Discharge of Revolving Obligations has occurred, if the Term Agent or any Term Lender shall, at any time, receive any proceeds of any such insurance policy or any such award or payment in contravention of this Agreement, it shall pay such proceeds over to the Administrative Agent for application in accordance with Section 2.24.

SECTION 10.05. Purchase Right. Without prejudice to the enforcement of the Administrative Agent's and each Revolving Credit Lender's remedies, the Administrative Agent and Revolving Credit Lenders shall, at the time of any election to exercise remedies against the Collateral by Administrative Agent or any Revolving Credit Lender and within 5 Business Days following an acceleration of the Revolving Obligations, offer the Term Lenders to purchase the entire aggregate amount of outstanding Revolving Obligations at par plus accrued interest and fees (without regard to any prepayment penalty or premium), without warranty or representation or recourse, on a pro rata basis. The Term Lenders shall irrevocably accept or reject such offer within ten (10) Business Days of the receipt thereof, provided that after such period, if not all Term Lenders have accepted such offer, Term Lenders who have accepted the offer may purchase the remaining Revolving Obligations within a period of an additional (5) Business Days. The parties shall endeavor to close promptly thereafter and shall work in good faith to transfer all rights and obligations under the Revolving Loans to the Term Lenders who have accepted the offer. If the Term Lenders accept such offer, it shall be exercised pursuant to documentation mutually acceptable to each of the Agents (which shall include, without limitation, the survival of all indemnity rights in favor of the Administrative Agent, Issuing Banks and Revolving Credit Lenders). If the Term Lenders reject such offer (or do not so irrevocably accept such offer within the required timeframe), the Revolving Credit Lenders shall have no further obligations pursuant to this Section 10.05.

SECTION 10.06. Provisions Solely to Define Relative Rights. The provisions of this Article X are and are intended solely for the purpose of defining the relative rights of the Administrative Agent, Issuing Banks and Revolving Credit Lenders on the one hand and the Term Agent and Term Lenders on the other hand. None of the Loan Parties or any other creditor thereof shall have any rights under this Article X. Nothing in this Article X is intended to or

shall impair the obligations of the Loan Parties, which are absolute and unconditional, to pay the Revolving Obligations and the Term Obligations as and when the same shall become due and payable in accordance with their terms.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

TRUE TEMPER CORPORATION

By:_____
    Name.
    Title:


TRUE TEMPER SPORTS, INC.

By:_____
    Name:
    Title:

GENERAL ELECTRIC CAPITAL
CORPORATION, as Administrative Agent, Co-
Collateral Agent, an Issuing Bank, a Revolving
Credit Lender and a Term Lender


By:_____
    Name:
    Title:


CREDIT SUISSE, CAYMAN ISLANDS
BRANCH, as Term Agent, Co-Collateral Agent, an
Issuing Bank and a Term Lender


By:_____
    Name:
    Title:


By:_____
    Name:
    Title:


[OTHER LENDERS]