THIS SOLICITATION IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF A JOINT REORGANIZATION PLAN <u>PRIOR</u> TO THE FILING OF VOLUNTARILY REORGANIZATION CASES UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE. BECAUSE NO CHAPTER 11 CASES HAVE YET BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE. FOLLOWING THE COMMENCEMENT OF THEIR CHAPTER 11 CASES, TRUE TEMPER SPORTS, INC., TRUE TEMPER CORPORATION, AND TRUE TEMPER SPORTS-PRC HOLDINGS, INC. EXPECT TO PROMPTLY SEEK AN ORDER OF THE BANKRUPTCY COURT (i) APPROVING (a) THIS DISCLOSURE STATEMENT AS HAVING CONTAINED ADEQUATE INFORMATION AND (b) THE SOLICITATION OF VOTES AS HAVING BEEN IN COMPLIANCE WITH SECTION 1126(b) OF THE BANKRUPTCY CODE AND (ii) CONFIRMING THE REORGANIZATION PLAN DESCRIBED HEREIN.

# DISCLOSURE STATEMENT

**Dated: September 30, 2009**

Prepetition Solicitation of Votes
With Respect to Joint Prepackaged Plan of Reorganization

of

# TRUE TEMPER SPORTS, INC.
# TRUE TEMPER CORPORATION
# TRUE TEMPER SPORTS-PRC HOLDINGS, INC.

TRUE TEMPER SPORTS, INC., TRUE TEMPER CORPORATION AND TRUE TEMPER SPORTS-PRC HOLDINGS, INC. HAVE NOT COMMENCED CASES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AT THIS TIME. THIS DISCLOSURE STATEMENT SOLICITS ACCEPTANCES OF THE PLAN AND CONTAINS INFORMATION RELEVANT TO A DECISION TO ACCEPT OR REJECT THE PLAN.

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND DISCLAIMER ........................................................................1

II.   OVERVIEW OF THE DEBTORS AND THE PLAN .................................................5
      A.   Business Overview...........................................................................................5
      B.   Existing Capital Structure ...............................................................................5
           1.   The First Lien Credit Facility .............................................................. 5
           2.   The Second Lien Credit Facility .......................................................... 6
           3.   The Senior Subordinated Notes ........................................................... 7
           4.   Equity ................................................................................................... 7
      C.   Summary of Plan Terms ...................................................................................7
      D.   Solicitation and Commencement of Chapter 11 Cases...................................10
      E.   General Structure of the Plan .........................................................................10
      F.   DIP Facility.....................................................................................................11
      G.   Summary of Treatment of Claims and Interests Under the Plan ...................11

III.  PLAN VOTING INSTRUCTIONS AND PROCEDURES .......................................15
      A.   Notice to Holders of Claims ..........................................................................15
      B.   Voting Rights...................................................................................................16
      C.   Solicitation Materials .....................................................................................17
      D.   Voting Procedures, Ballots and Voting Deadline...........................................17
      E.   Confirmation Hearing and Deadline for Objections to Confirmation ...................18
      F.   Additional Information ....................................................................................19

IV.   HISTORY AND STRUCTURE OF THE DEBTORS .............................................19
      A.   Corporate History............................................................................................19
      B.   2004 Ownership Change and Current Organizational Structure .........................20
           1.   2004 Ownership Change ..................................................................... 20
           2.   Current Organizational Structure........................................................ 21
      C.   Discussion of the Debtors' Business Segments ..............................................21
           1.   Golf Shaft Segment............................................................................. 21
           2.   Performance Sports Segment .............................................................. 23
           3.   Distribution Sales................................................................................ 23
           4.   Material Source and Supply................................................................. 23
           5.   Seasonality .......................................................................................... 24
           6.   Customers ............................................................................................ 24
           7.   Competition......................................................................................... 24
           8.   Environmental Compliance ................................................................ 25
           9.   Employees; Labor Matters .................................................................. 26
           10.  Properties ............................................................................................ 27
           11.  Intellectual Property............................................................................ 28
           12.  Legal Proceedings............................................................................... 28
           13.  Selected Financial Data....................................................................... 28

|   | D. | Board of Directors, Management and Committees | 29 |
|   |   | 1. | Board of Directors | 29 |
|   |   | 2. | Management | 30 |
|   |   | 3. | Audit Committee | 31 |
|   |   | 4. | Compensation Committee | 31 |
|   |   | 5. | Executive Compensation | 32 |
|   | E. | Events Leading to Restructuring | 33 |
|   |   | 1. | The Downturn in the Golf Equipment Industry | 33 |
|   |   | 2. | Financial Performance Declines in 2009 | 33 |
|   |   | 3. | Defaults | 35 |
|   |   | 4. | Operational Restructuring | 36 |
|   |   | 5. | The Forbearance Agreements | 36 |
|   | F. | Exploring Strategic Alternatives | 37 |
|   |   | 1. | Sale Process Overview | 37 |
|   |   | 2. | Negotiations of the Equity Commitment and Plan Support Agreement | 38 |

V. THE ANTICIPATED CHAPTER 11 CASES .......................................................... 39
  A. Motions to be Filed .......................................................................................... 40
     1. Applications for Retention of Cole Schotz; Mayer Brown; Lazard; and Logan .......................................................................................... 40
     2. Motion for an Order (I) Scheduling a Combined Hearing to Consider Adequacy of Disclosure Statement and Confirmation of the Plan, (II) Establishing Deadlines and Procedures to File Objections, (III) Approving Prepetition Solicitation Procedures, (IV) Approving the Form and Manner of Notice of the Combined Hearing, and (V) Directing the United States Trustee Not to Convene a Meeting of Creditors .................................................................. 40
     3. Motion to Extend Deadline to File Schedules or Waive Requirement to File Schedules upon Confirmation of Plan ..................... 41
     4. Motion to Continue Using Existing Cash Management Systems and for Authority to Enter Into DIP Financing; Use of Cash Collateral .................................................................................................. 41
     5. Motions for Authority to Honor Prepetition Obligations to Customers, Critical Vendors, Insurance Carriers, Taxing Authorities, Shippers and Lien Claimants ................................................. 42
     6. Motion for Authority to Pay Prepetition Employee Wages and Salaries and Associated Benefits ................................................................ 42
  B. Debtor in Possession Financing ....................................................................... 42
  C. Timetable for Chapter 11 Cases ...................................................................... 45

VI. SUMMARY OF THE PLAN OF REORGANIZATION .......................................... 45
  A. Overview of Chapter 11 ................................................................................... 46
  B. Classification and Treatment Of Claims And Interests .................................. 47
     1. Treatment Of Unclassified Claims Under The Plan ............................... 48
     2. Treatment Of Classified Claims And Equity Interests .......................... 49

| | | | |
|---|---|---|---|
| C. | | Substantive Consolidation of Debtors for Purposes of Voting, Confirmation and Distribution | 51 |
| | 1. | The Effect of Substantive Consolidation | 52 |
| | 2. | The Basis for Substantive Consolidation in the Chapter 11 Cases | 52 |
| D. | | Means For Implementation And Execution Of The Plan | 53 |
| | 1. | The Plan Investment | 53 |
| | 2. | Authorization and Issuance of New Common Stock | 53 |
| | 3. | Payment of Trade Unsecured Claims by the Second Lien Lenders | 54 |
| | 4. | Continued Existence and Vesting of Assets in Reorganized Debtors | 54 |
| | 5. | Exit Financing | 55 |
| | 6. | Dissolution of TTC | 56 |
| | 7. | Corporate Action; Effectuating Documents; Further Transactions | 56 |
| | 8. | Exemption from Certain Transfer Taxes | 57 |
| | 9. | Release of Liens | 58 |
| E. | | Treatment of Executory Contracts and Leases | 58 |
| | 1. | Assumed Contracts and Leases | 58 |
| | 2. | Treatment of Change of Control Provisions | 58 |
| | 3. | Payments Related to Assumption of Contracts and Leases | 59 |
| | 4. | Insurance Policies | 59 |
| | 5. | Claims Based on Rejection of Executory Contracts or Unexpired Leases | 59 |
| | 6. | Compensation and Benefit Plans and Treatment of Retirement Plan and Pension Plan | 60 |
| | 7. | Indemnification of Directors and Officers | 60 |
| | 8. | Collective Bargaining Agreement | 61 |
| F. | | Provisions Governing Distributions Under The Plan | 61 |
| | 1. | Distributions for Claims Allowed as of the Effective Date | 61 |
| | 2. | Disbursing Agent(s) | 61 |
| | 3. | Distribution Record Date | 62 |
| | 4. | Means of Cash Payment | 62 |
| | 5. | Calculation of Distribution Amounts of New Common Stock | 62 |
| | 6. | Delivery of Distributions; Undeliverable or Unclaimed Distributions | 63 |
| | 7. | Withholding and Reporting Requirements | 63 |
| | 8. | Allocation of Plan Distributions Between Principal and Interest | 64 |
| | 9. | Setoffs | 64 |
| G. | | Procedures for Resolving Disputed, Contingent and Unliquidated Claims | 64 |
| | 1. | Resolution of Disputed Claims | 64 |
| | 2. | No Distribution Pending Allowance | 65 |
| | 3. | Distributions After Allowance | 65 |
| | 4. | Reservation of Right to Object to Allowance or Asserted Priority of Claims | 65 |
| H. | | Conditions to Confirmation and Effectiveness of the Plan | 65 |
| | 1. | Conditions to Confirmation | 65 |
| | 2. | Conditions to Effective Date | 66 |

46701/0001-5859301v9

        3.     Waiver of Conditions ................................................................ 67
  I.     Retention Of Jurisdiction ...................................................................... 68
  J.     Summary of Other Provisions of the Plan .......................................... 69
        1.     Administrative Claims Bar Date ............................................... 69
        2.     Discharge of Claims and Termination of Interests ................... 70
        3.     Releases by Debtors .................................................................. 70
        4.     Releases by Holders of Claims and Interests ........................... 70
        5.     Exculpation and Limitation of Liability ................................... 71
        6.     Binding Effect .......................................................................... 72
        7.     Injunction ................................................................................. 72
        8.     Severability of Plan Provisions ................................................ 73
        9.     Committees ............................................................................... 73

VII.     CERTAIN FEDERAL AND STATE SECURITIES LAW CONSIDERATIONS ........... 73
  A.     Exemption From Registration Requirements For New Common Stock ............. 73
  B.     Subsequent Transfers of New Common Stock ..................................... 73

VIII.     CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ......... 74
  A.     Certain U.S. Federal Income Tax Consequences to the Debtors ...................... 76
        1.     Tax Treatment of the Merger Transaction ................................ 76
        2.     Alternative Minimum Tax ........................................................ 76
        3.     Cancellation of Debt Income and Reduction of Tax Attributes .............. 76
  B.     Certain U.S. Federal Income Tax Consequences to the Reorganized
      Debtors ........................................................................................... 77
        1.     Tax Basis in Assets .................................................................. 77
        2.     Section 382 Limitation on NOLs ............................................. 78
  C.     Certain U.S. Federal Income Tax Consequences to Holders of Allowed
      First Lien Credit Facility Claims and Allowed Second Lien Credit Facility
      Claims ............................................................................................ 79
        1.     Holders of Allowed First Lien Credit Facility Claims ............. 79
        2.     Holders of Allowed Second Lien Credit Facility Claims ......... 81
  D.     Other Considerations ..................................................................... 82
        1.     Bad Debt Deduction ................................................................. 82
        2.     Limitation on Use of Capital Losses ........................................ 82
  E.     Information Reporting and Withholding ........................................... 83

IX.     FEASIBILITY OF THE PLAN AND BEST INTERESTS OF THE CREDITORS ........ 83
  A.     Feasibility Of The Plan .................................................................. 83
  B.     Acceptance Of The Plan ................................................................. 85
  C.     Best Interests Test .......................................................................... 85
  D.     Liquidation Analysis ...................................................................... 86
  E.     Application of the "Best Interests" of Creditors Test To The Liquidation
      Analysis ......................................................................................... 86
  F.     Confirmation Without Acceptance Of All Impaired Classes: The
      'Cramdown' Alternative ................................................................. 87

X.     CERTAIN RISK FACTORS TO BE CONSIDERED .................................... 88

46701/0001-5859301v9

| | | |
|---|---|---|
| A. | General Considerations | 88 |
| B. | Certain Bankruptcy Considerations | 88 |
| C. | Conditions Precedent to Consummation; Timing | 89 |
| D. | Exit Financing | 89 |
| E. | Inherent Uncertainty of Projections | 89 |
| F. | Operational Risk Factors | 90 |
| G. | Competition | 90 |
| H. | Environmental and Other Regulations | 91 |
| I. | Leverage | 91 |
| J. | Litigation | 92 |
| K. | Adverse Publicity | 92 |
| L. | Labor Matters | 92 |
| M. | Pension Matters | 92 |
| N. | Certain Tax Considerations | 92 |
| O. | Certain Risks Factors Relating to Securities to be Issued Under the Plan | 93 |
| | 1. No Current Public Market for Securities | 93 |
| | 2. Potential Dilution | 93 |
| | 3. Dividends | 93 |
| | 4. Change of Control | 93 |
| XI. | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN | 94 |
| | A. Liquidation Under Chapter 7 or Chapter 11 | 94 |
| | B. Alternative Plan(s) of Reorganization | 94 |
| XII. | THE SOLICITATION; VOTING PROCEDURES | 94 |
| | A. Parties in Interest Entitled to Vote | 94 |
| | B. Classes Entitled to Vote to Accept or Reject the Plan | 95 |
| | C. Waivers of Plan Defaults, Irregularities, Etc. | 95 |
| | D. Withdrawal of Ballots; Revocation | 96 |
| | E. Further Information; Additional Copies | 96 |
| XIII. | CONCLUSION AND RECOMMENDATION | 98 |

## TABLE OF APPENDICES

APPENDIX A      Joint Prepackaged Plan of Reorganization of True Temper Sports, Inc., True Temper Corporation and True Temper Sports-PRC Holdings, Inc.

APPENDIX B      Historical Financial Information

APPENDIX C      Projections

APPENDIX D      Liquidation Analysis

# I.     INTRODUCTION AND DISCLAIMER

True Temper Sports, Inc. ("True Temper"), True Temper Corporation ("TTC"), and True Temper Sports-PRC Holdings, Inc. ("TTS-PRC") (each a "Debtor, and collectively, the "Debtors"), submit this disclosure statement (the "Disclosure Statement") pursuant to section 1125 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*., as amended (the "Bankruptcy Code"), for use in the solicitation of votes (the "Solicitation") on the Joint Prepackaged Plan of Reorganization of True Temper Sports, Inc., True Temper Corporation and True Temper Sports-PRC Holdings, Inc., dated as of September 30, 2009 (including all exhibits thereto and as may be amended from time to time) (the "Plan"). The Plan is being proposed by the Debtors and is anticipated to be filed with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). A copy of the Plan is annexed as Appendix A to this Disclosure Statement. Except as otherwise provided herein, capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan.

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are (i) "impaired" by a plan of reorganization and (ii) entitled to receive a distribution under such plan are entitled to vote on the Plan. In the Debtors' cases, only claims in Classes 2 and 3 are impaired by and entitled to receive a distribution under the Plan, and only the holders of Claims in those Classes are entitled to vote to accept or reject the Plan. Claims or Interests in Classes 1, 4, 7, and 9 are unimpaired by the Plan, and such holders are conclusively presumed to have accepted the Plan. Claims or Interests in Classes 5, 6, and 8, which receive no distribution under the Plan on account of their Claims and Interests, are deemed to have rejected the Plan and the holders of Claims or Interests in each such Classes are not entitled to vote.

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, the need to seek chapter 11 protection, significant events that are expected to occur during the chapter 11 cases, and the anticipated organization, operations, and liquidity of the Debtors upon successful emergence from chapter 11 (the "Reorganized Debtors"). This Disclosure Statement also describes terms and provisions of the Plan, including certain alternatives to the Plan, certain effects of confirmation of the Plan, certain risk factors associated with securities to be issued under the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of claims entitled to vote under the Plan must follow for their votes to be counted.

This Disclosure Statement describes certain aspects of the Plan, the Debtors' operations, the Debtors' Projections, and other related matters. FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN, AND THE EXHIBITS, APPENDICES, AND SCHEDULES THERETO IN THEIR ENTIRETY. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

**THE DEBTORS HAVE NOT COMMENCED BANKRUPTCY CASES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AT THIS TIME.**

BECAUSE NO BANKRUPTCY CASES HAVE BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY ANY BANKRUPTCY COURT WITH RESPECT TO WHETHER IT CONTAINS ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE. NONETHELESS, IF CHAPTER 11 CASES ARE SUBSEQUENTLY COMMENCED, THE DEBTORS EXPECT TO PROMPTLY SEEK AN ORDER OF THE BANKRUPTCY COURT APPROVING THIS DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND DETERMINING THAT THE SOLICITATION OF VOTES ON THE PLAN BY MEANS OF THIS DISCLOSURE STATEMENT WAS IN COMPLIANCE WITH SECTION 1126(b) OF THE BANKRUPTCY CODE.

NO PERSON IS AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION REGARDING THIS DISCLOSURE STATEMENT OR THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS, APPENDICES, AND/OR SCHEDULES ATTACHED HERETO OR INCORPORATED BY REFERENCE OR REFERRED TO HEREIN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. ANY PERSONS DESIRING ANY SUCH ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT CREATE AN IMPLICATION THAT THERE HAS NOT BEEN ANY CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DATE HEREOF UNLESS SO SPECIFIED. EACH HOLDER OF AN IMPAIRED CLAIM ENTITLED TO VOTE SHOULD THEREFORE CAREFULLY REVIEW THE PLAN, THIS DISCLOSURE STATEMENT AND THE EXHIBITS TO BOTH DOCUMENTS IN THEIR ENTIRETY BEFORE CASTING A BALLOT.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE INFORMATION REGARDING THE HISTORY, BUSINESS, AND OPERATIONS OF THE DEBTORS AND THE HISTORICAL FINANCIAL INFORMATION REGARDING THE DEBTORS IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN BUT, AS TO CONTESTED MATTERS AND ADVERSARY PROCEEDINGS, IS NOT TO BE CONSTRUED AS AN ADMISSION OR A STIPULATION BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

THE DEBTORS' MANAGEMENT HAVE REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THE

DEBTORS HAVE USED THEIR BEST EFFORTS TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED.

ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY, INCLUDING SECTION X., "CERTAIN RISK FACTORS TO BE CONSIDERED," OF THIS DISCLOSURE STATEMENT, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

THE PLAN IS PREMISED UPON THE "SUBSTANTIVE CONSOLIDATION" OF THE ESTATES OF THE DEBTORS FOR THE PURPOSES OF VOTING, CONFIRMATION AND MAKING DISTRIBUTIONS TO THE HOLDERS OF ALLOWED CLAIMS UNDER THE PLAN. FOR MORE INFORMATION ON THE EFFECTS OF SUBSTANTIVE CONSOLIDATION, PLEASE REFER TO SECTION VI.C. OF THIS DISCLOSURE STATEMENT.

EXCEPT AS OTHERWISE EXPRESSLY SET FORTH HEREIN, ALL INFORMATION CONTAINED HEREIN HAS BEEN PROVIDED BY THE DEBTORS. MOREOVER, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, WAIVER OR STATEMENT AGAINST INTEREST BUT RATHER SHOULD BE CONSTRUED AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS. THE DEBTORS MAKE THE STATEMENTS AND PROVIDE THE FINANCIAL INFORMATION CONTAINED HEREIN AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED THE TRANSACTIONS CONTEMPLATED HEREIN OR DETERMINED IF THIS DISCLOSURE STATEMENT IS TRUTHFUL OR COMPLETE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF TRUE TEMPER SPORTS, INC., TRUE TEMPER CORPORATION OR TRUE TEMPER SPORTS-PRC HOLDINGS, INC. SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER IS HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER

3

UNDER THE TAX CODE; (B) SUCH DISCUSSION IS INCLUDED HEREBY BY THE DEBTORS IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATING TO THE PLAN, AND CERTAIN FINANCIAL INFORMATION. ALTHOUGH THE DEBTORS BELIEVE THAT ALL SUCH SUMMARIES ARE FAIR AND ACCURATE AS OF THE DATE HEREOF, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF UNDERLYING DOCUMENTS AND TO THE EXTENT THAT THEY MAY CHANGE AS PERMITTED BY THE PLAN AND APPLICABLE LAW. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

**THE PLAN IS SUPPORTED BY THE PLAN INVESTOR, THE FIRST LIEN AGENT, THE PARTICIPATING FIRST LIEN LENDERS, AND THE PARTICIPATING SECOND LIEN LENDERS PURSUANT TO AN EQUITY COMMITMENT AND PLAN SUPPORT AGREEMENT. HOLDERS OF AT LEAST TWO-THIRDS (2/3) IN OUTSTANDING PRINCIPAL AMOUNT OF CLAIMS IN CLASS 2 ENTITLED TO VOTE ON THE PLAN AND CONSTITUTING MORE THAN 50% OF THE AGGREGATE NUMBER OF HOLDERS OF ALLOWED CLAIMS IN CLASS 2 (I.E. AN AMOUNT SUFFICIENT TO SECURE APPROVAL OF THE PLAN UNDER SECTION 1126(C) OF THE BANKRUPTCY CODE) HAVE ALREADY AGREED PURSUANT TO AN EQUITY COMMITMENT AND PLAN SUPPORT AGREEMENT TO VOTE IN FAVOR OF THE PLAN. THE PLAN INVESTOR HOLDS AN AGGREGATE 45.5% OF THE FACE AMOUNT OF THE SENIOR SUBORDINATED NOTES AND HAS AGREED NOT TO SEEK ANY DISTRIBUTION ON ACCOUNT OF ITS SENIOR SUBORDINATED NOTE CLAIMS.**

46701/0001-5859301v9

## II.    OVERVIEW OF THE DEBTORS AND THE PLAN

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Plan.

*The following overview is a general summary only, which is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements and notes thereto appearing elsewhere in this Disclosure Statement and the Plan.*

### A.    Business Overview

The Company (as defined below) is the leading worldwide supplier and innovator of steel, graphite, and multi-material golf club shafts and performance based recreational sports products.  Since the 1930s, the Company has manufactured golf shafts under the widely recognized *True Temper* brand.  In 2008, approximately 70% of its revenue was generated through the sale of steel golf shafts.  The Company believes that its share of the worldwide steel golf market was approximately 70% to 80% in 2008 and that its share is several times greater than that of the next largest market participant.

In addition to golf shafts, through its performance sports business, the Company also designs, manufactures and markets products such as steel bicycle frames, composite bicycle components, such as forks and handlebars, and composite hockey sticks.  In the first six months of 2009, golf shaft net sales represented 85% of total net sales, and performance sports net sales represented 15%.

The Debtors' corporate headquarters are located in Memphis, Tennessee.  The Debtors conduct their operations in the United States, United Kingdom, and Japan through True Temper. The Company's operations in China are conducted through non-U.S. subsidiaries of TTS-PRC, namely Ji Neng Composite Materials & Products (Guangzhou) Ltd. ("Ji Neng"), Supertop Enterprises Ltd. ("Supertop"), and True Temper Alloy Materials Co. (Suzhou) Ltd. ("Alloy Materials") (collectively, the "Non-U.S. Subsidiaries," and together with the Debtors, the "Company").  The Non-U.S. Subsidiaries are separate legal entities and are not seeking relief under chapter 11 of the Bankruptcy Code or any other insolvency laws.

### B.    Existing Capital Structure

The Debtors' principal capital structure consists of secured revolving and term loan facilities, senior subordinated unsecured notes and equity.  As of June 2009, the Debtors had approximately $272 million of funded debt.  The Debtors' principal indebtedness is comprised of: (a) a First Lien Credit Facility; (b) a Second Lien Credit Facility; and (c) the Senior Subordinated Notes (all as defined below).

#### 1.    The First Lien Credit Facility

On or about March 27, 2006, True Temper (the "Borrower") amended and restated its 2004 Senior Credit Facility by entering into the Amended and Restated Credit Agreement (as

5

amended from time to time, the "First Lien Credit Agreement") with a syndicate of lenders led by Credit Suisse acting as general administrative agent (the "First Lien Agent"). The First Lien Credit Agreement, as amended to date, provides for aggregate commitments of $151,000,000, consisting of (a) a $128,000,000 term loan due March 15, 2011 (the "First Lien Term Loan"); (b) a maximum revolving credit facility of $20,000,000 due March 15, 2009 (the "First Lien Revolver"); and (c) a $3 million letter of credit sub-facility to the First Lien Revolver (the "First Lien Letter of Credit Facility" and, together with the First Lien Term Loan and the First Lien Revolver, the "First Lien Credit Facility"). The First Lien Credit Facility is guaranteed by TTC and TTS-PRC (the "Guarantors"). The existing lenders (the "First Lien Lenders") to the First Lien Credit Facility have a first priority lien on substantially all of the assets of the Borrower and Guarantors.

The Borrower has the ability under the First Lien Credit Facility to enter into hedging arrangements to mitigate the Borrower's risk against fluctuation in foreign exchange rates and interest rates. The Borrower's obligations under such arrangements are obligations under the First Lien Credit Facility. The Borrower is exposed to exchange rate fluctuations in the British Pound and Japanese Yen due to sales in those currencies. The Borrower has entered into foreign exchange forward contracts with Wells Fargo Bank, National Association to manage such foreign currency exchange rate exposures. As of September 29, 2009, only one forward contract is in place (the "Forward Contract"). The Borrower uses forward contracts to hedge several components of its revenue and cash collection stream, including, (a) anticipated foreign currency sales, (b) accounts receivable denominated in foreign currencies, and (c) cash balances maintained in foreign currencies. The forward contracts typically have maturities of less than one year. In addition to the forward contracts, the Borrower has entered into interest rate swaps to mitigate the risk against fluctuation in interest rates. Pursuant to an ISDA Master Agreement, dated as of April 23, 2008, the Borrower entered into certain interest rate swaps (the "Swap Agreement") with Credit Suisse International to fix the underlying LIBOR borrowing base rate on $100 million of its variable rate debt under the First Lien Term Loan at approximately 3.20% for a period of approximately 24 months.

As of September 29, 2009, there was (i) $84,602,214.12 in outstanding principal, plus accrued and unpaid interest owing under the First Lien Term Loan; (ii) $17,085,000 in principal, plus accrued and unpaid interest owing under the First Lien Revolver; (iii) approximately $2,106,916 owing on account of the termination value of the Swap Agreement, with such amount subject to fluctuation due to market conditions until the Petition Date, at which time the Swap Agreement shall terminate and the termination value shall become fixed; (iv) $1,800,000 principal value of Existing Letters of Credit outstanding; and (v) approximately $276,000 owing on account of the termination value of the Forward Contract, with such amount subject to fluctuation due to market conditions until the Petition Date, at which time the Forward Contract shall terminate and the termination value shall become fixed.

## 2.    The Second Lien Credit Facility

On or about January 22, 2007, the Borrower entered into the Second Lien Credit Agreement (as amended from time to time, the "Second Lien Credit Agreement") with a syndicate of lenders led by Credit Suisse acting as general administrative agent. On April 9, 2009, Law Debenture Trust Company of New York (the "Second Lien Agent") succeeded Credit

Suisse as the general administrative agent. The Second Lien Credit Agreement, as amended to date, provides for a $45 million term loan due June 30, 2011 (the "Second Lien Credit Facility"). The Second Lien Credit Facility is guaranteed by the Guarantors. The existing lenders (the "Second Lien Lenders") to the Second Lien Credit Agreement have a second priority lien on substantially all of the assets of the Borrower and Guarantors.

As of September 29, 2009, the Borrower had approximately $45 million in principal outstanding under the Second Lien Term Loan, plus accrued and unpaid interest.

### 3. The Senior Subordinated Notes

Pursuant to the Indenture, dated March 15, 2004, True Temper (the "Issuer") issued the Senior Subordinated Notes, which are guaranteed by TTS-PRC. The Bank of New York is the Indenture Trustee for the Senior Subordinated Notes. The Senior Subordinated Notes require semi-annual interest payments due on March 15 and September 15. As of September 29, 2009, approximately $125 million in principal remained outstanding under of the Senior Subordinated Notes, plus accrued and unpaid interest.

### 4. Equity

TTC is authorized to issue 10,615 shares of Series A Preferred Stock, par value $0.01 per share and 10,080,512 shares of Common Stock, par value $0.01 per share. TTS Holdings, LLC, a non-Debtor entity, owns 96.8% of the outstanding Common Stock and Series A Preferred Stock of TTC (a Debtor). The remainder of Common Stock and Series A Preferred Stock of TTC is owned by current and former members of the senior management of True Temper as well as other third parties, each holding less than 1%. TTC owns all of the issued and outstanding common stock of True Temper (a Debtor). There is no public market for the equity securities of True Temper or TTC.

## C. Summary of Plan Terms

Over the last six (6) months, the Debtors, the First Lien Agent, certain of the First Lien Lenders (the "Participating First Lien Lenders"), certain of the Second Lien Lenders (the "Participating Second Lien Lenders"), and the Plan Investor negotiated the substantive terms and conditions of the Debtors' restructuring. On September 29, 2009, the Debtors, the First Lien Agent, the Participating First Lien Lenders, the Participating Second Lien Lenders and the Plan Investor entered into that certain equity commitment and plan support agreement (the "Equity Commitment and Plan Support Agreement") whereby those entities agreed to support the confirmation of and vote to accept the Plan. The Equity Commitment and Plan Support Agreement, among other things, sets forth certain terms of the distributions under the Plan, treatment of Claims and Interests and sets forth the terms of the DIP Facility, the Plan Investment, the New Term Loan, and the New Revolving Credit Facility.

With respect to the DIP Facility, as set forth in an exhibit to the Equity Commitment and Plan Support Agreement, the DIP Lenders shall provide (1) the DIP Revolving Credit Facility in the aggregate amount of $10 million, inclusive of a letter of credit sub-facility in an aggregate amount of $5 million and (2) the DIP Roll-Up Loan pursuant to which $80 million of existing

obligations owed in respect of the First Lien Credit Facility (other than the First Lien Credit Facility Letter of Credit Claims) will be deemed satisfied.

As set forth in an exhibit to the Equity Commitment and Plan Support Agreement, the Exit Facility consists of the New Term Loan and the New Revolving Credit Facility. A New Term Loan in the principal amount equal to (i) the aggregate amount of the Allowed First Lien Credit Facility Claims and DIP Roll-Up loans, less (ii) $70 million, that will be deemed funded by the First Lien Lenders and DIP Roll-Up Loan Lenders as of the Effective Date to Reorganized True Temper as borrower and New TTC and Reorganized TTS-PRC as guarantors. As of the Effective Date of the Plan, the New Revolving Credit Facility in an aggregate principal amount of $12.5 million, inclusive of a $5 million letter of credit sublimit (which sublimit will include all letters of credit outstanding under the DIP Facility Agreement as of the Effective Date) will be provided by the New Revolving Credit Facility Lenders to Reorganized True Temper as borrower and New TTC and Reorganized TTS-PRC as guarantors.

Based on the Equity Commitment and Plan Support Agreement, the Debtors are prepared to seek confirmation of the Plan shortly after the Petition Date. Indeed, the Plan is based on a consensual deal with Debtors' key stakeholders and, significantly, contemplates a significant de-leveraging of the Debtors' balance sheets. The Plan provides for, among other things,

- The Plan Investor will invest $70 million in New TT Holdings (which will be used to fund distributions under the Plan) (the "Plan Investment"). In return for its $70 million Cash investment, the Plan Investor will receive 10,000,000 shares of the New Common Stock issued by New TT Holdings pursuant to the provisions thereof (subject to dilution on account of the New Management Incentive Plan and the Second Lien Lender New Common Stock that may be distributable to holders of Allowed Second Lien Credit Facility Claims). New TT Holdings will contribute the Plan Investment and the Second Lien Lender New Common Stock to New True Temper (via New TTC).

- The holders of Allowed First Lien Credit Facility Claims shall receive (i) their pro rata share of $70 million in Cash (minus any cash payments to be distributed under the Plan to the holders of the DIP Roll-Up Loan Claims) plus (ii) with respect to the remaining amount of their Allowed Claims, their pro rata share of the obligations under the New Term Loan.

- The holders of Allowed Second Lien Credit Facility Claims shall receive their pro rata share of: (i) the Second Lien Lender New Common Stock (representing 11.3924% of the New Common Stock issued under the Plan) and (ii) up to $3,000,000 (but not less than $500,000) in Cash to be distributed from cash collateral existing on the Petition Date. The holders of the Second Lien Facility Claims will be required to execute the New Stockholders Agreement prior to receiving their pro rata distribution of the New Common Stock under the Plan. The acceptance of the Plan by a holder of an Allowed Second Lien Credit Facility Claims shall constitute an agreement by such holder to contribute 100% of the Cash distribution

8

on account of its Allowed Claim for deposit into the Trade Account for distribution to Allowed Trade Unsecured Claims in accordance with Article IV. of the Plan.

- The holders of Senior Subordinated Notes shall receive no distribution under the Plan which treatment was agreed to by the Plan Investor who holds an aggregate 45.5% of the face amount of the Senior Subordinated Notes.

- The holders of General Unsecured Claims will not receive or retain any property or interest on account of their General Unsecured Claims.

- The holders of Trade Unsecured Claims (i.e., a General Unsecured Claim arising prior to the Petition Date relating to the receipt of goods or services by the Debtors from trade creditors or service providers, including, without limitation, goods or services provided by the Debtors' Non-U.S. Subsidiaries, in the ordinary course of the Debtors' business) to the extent that such holders of Trade Unsecured Claims (a) do not object to confirmation of the Plan and (b) execute a Trade Unsecured Claim Release, shall be entitled to receive distributions on account of such Trade Unsecured Claims pursuant to Article IV. of the Plan from the proceeds of the Trade Account funded by accepting holders of Allowed Second Lien Credit Facility Claims.

- Each holder of an Allowed Other Priority Claim will be paid in full in Cash or as otherwise provided in the Bankruptcy Code.

- On the Effective Date, each holder of an Allowed Other Secured Claim shall have its Claim Reinstated.

- With respect to the Debtors' Old Equity Interests, the Old Equity Interests in TTC and True Temper will be cancelled and the Old Equity Interests in TTS-PRC will be Reinstated to the extent determined to be appropriate by the Debtors or Reorganized Debtors.

As set forth in the Equity Commitment and Plan Support Agreement, the New Stockholders Agreement will be binding on New TT Holdings, the Plan Investor and each holder of an Allowed Second Lien Credit Facility Claim; *provided, however*, that pursuant to the Plan, each holder of an Allowed Second Lien Credit Facility Claim must execute a counterpart to the New Stockholders Agreement in order to receive shares of New Common Stock under the Plan. The New Stockholders Agreement will include the following relevant terms, which do not purport to be a complete description of the terms and conditions thereof, certain terms and conditions of which have not yet been determined: (i) the composition of the Board of Directors of New TT Holdings; (ii) transfer restrictions with respect to the New Common Stock for parties thereto, including rights of first refusal, drag-along rights, tag-along rights and preemptive rights; and (iii) confidentiality and access to information.

46701/0001-5859301v9

Confirmation of the Plan is expected to occur over a relatively short timeframe. Specifically, the Equity Commitment and Plan Support Agreement provides that (i) confirmation of the Plan must occur within 45 days of the Petition Date and (ii) the effective date of the Plan must occur on or before December 15, 2009. Solely for purposes of the Plan, the enterprise value of the Debtors is assumed to be $113 million, with an equity value of $79 million. This amount represents the price being paid by the Plan Investor to acquire the Debtors and is higher than other bids received by the Debtors in connection with its previous marketing efforts (discussed in detail Section IV.E.6. below). Moreover, and as stated above, the deal contained in the Plan is supported by the First Lien Agent, the Participating First Lien Lenders, the Participating Second Lien Lenders, and the Plan Investor who holds an aggregate 45.5% of the face amount of the Senior Subordinated Notes.

## D.    Solicitation and Commencement of Chapter 11 Cases

Upon finalization of the Equity Commitment and Plan Support Agreement and the terms of the Plan, which included the input and consent of the Plan Investor, First Lien Agent, Participating First Lien Lenders, and the Participating Second Lien Lenders, on or about September 30, 2009, the Debtors (with the assistance of Logan) commenced solicitation of acceptances of the Plan. The solicitation period is presently scheduled to expire on October 7, 2009 at 5:00 p.m. (prevailing Eastern time).

The Debtors maintain that commencement of the Chapter 11 Cases maximizes value for the benefit of their stakeholders. The Debtors, after discussions with the Participating First Lien Lenders and Participating Second Lien Lenders, concluded that the proposed restructuring should be implemented through a prepackaged plan of reorganization. The Debtors believe that the value of their business would be damaged significantly by a prolonged chapter 11 case. The Plan embodies this proposed stand-alone restructuring. The Plan allows the Debtors to de-leverage their balance sheets by eliminating their $125 million debt to the holders of Senior Subordinated Notes, and reducing their funded secured indebtedness from approximately $149 million to $38 million.

The Debtors intend to file the Plan and this Disclosure Statement upon the commencement of a voluntary case under chapter 11 of the Bankruptcy Code. If the requisite acceptances of the Plan have been obtained prior to such filing, the Debtors will seek approval of this Disclosure Statement and consummation of the Plan as quickly as possible.

The Debtors will file the Plan Supplement on or before the date that is five days prior to the Confirmation Hearing. The Plan Supplement will include, without limitation, definitive documentation evidencing the Exit Facility.

## E.    General Structure of the Plan

Claims are treated generally in accordance with the priorities established under the Bankruptcy Code. With the exception of the Claims held by holders in Classes 2 and 3, Claims that have priority status under the Bankruptcy Code or that are secured by valid liens on collateral are to be paid in full or reinstated as provided in the Plan.

10

Under the Plan, there are four classes of Impaired Claims (Class 2, Class 3, Class 5, and Class 6), three classes of Unimpaired Claims (Class 1, Class 4, and Class 7), one class of Impaired Interests (Class 8), and one class of Unimpaired Interests (Class 9).

The Plan must be accepted by one impaired accepting Class (i.e., either Class 2 (First Lien Facility Claims) or Class 3 (the Second Lien Credit Facility Claims) for the Debtors to obtain confirmation of the Plan. For an impaired Class to accept the Plan, (i) the holders of at least two-thirds in amount of the holders of Claims actually voting in such class must vote to accept the Plan and (ii) the holders of more than one-half in number of the Claims actually voting in such class must vote to accept the Plan, in each case not counting the vote of any holder designated under section 1126(e) of the Bankruptcy Code. If neither Class 2 or Class 3 votes to accept the Plan, then the Debtors cannot confirm the Plan. As a result, the Company may need to cease operations and liquidate its assets. See Section XI. "Alternatives to Confirmation and Consummation of the Plan." Pursuant to the terms of the Equity Commitment and Plan Support Agreement, holders of Claims in Class 2 in an aggregate amount and number sufficient to meet the requirements of section 1126(c) for such Class have agreed to vote in favor of the Plan.

## F. DIP Facility

On or shortly after the Petition Date, subject to the approval of the Bankruptcy Court, the Debtors expect to enter into a senior secured superpriority debtor in possession revolving credit facility that will provide the Debtors with up to $10 million in additional liquidity to fund operations during the Chapter 11 Cases (the "DIP Revolving Credit Facility"). In addition, the Debtors expect to enter into a debtor in possession term loan that provides for a roll-up of $80 million of existing obligations owed in respect of the First Lien Credit Facility other than First Lien Credit Facility Letter of Credit Claims (the "DIP Roll-Up Loans" and, together with the DIP Revolving Credit Facility, the "DIP Facility"). The Debtors intend to seek bankruptcy court approval of such DIP Facility at the first day hearing. See Section V.B of this Disclosure Statement for a summary of the principal terms of the DIP Facility.

## G. Summary of Treatment of Claims and Interests Under the Plan

As contemplated by the Bankruptcy Code, Administrative Claims, DIP Revolving Credit, Facility Claims, Professional Fee Claims and Priority Tax Claims are not classified under the Plan. Unless such holders consent to different treatment, Allowed Administrative Claims are to be paid in full on the Distribution Date, or, for ordinary course Administrative Claims, when such claims become due. See Section VI.B.1.(a) for a summary of the treatment proposed under the Plan for DIP Revolving Credit Facility Claims, Section VI.B.1(b) for a summary of the treatment proposed under the Plan for Administrative Claims, Section VI.B.1(c) for a summary of the treatment proposed under the Plan for DIP Roll-Up Loan Claims, Section VI.B.1(d) for Professional Fee Claims and Section VI.B.1.(e) for a summary of the treatment proposed under the Plan for Priority Tax Claims.

The following table summarizes the classification and treatment of the prepetition Claims and Interests under the Plan.

46701/0001-5859301v9

| Description of Claims or Interests | Summary of Treatment | Entitlement to Vote |
|---|---|---|
| **Class 1 - Other Priority Claims**<br><br>Class 1 consists of all Other Priority Claims against any Debtor. | **Class 1 is Unimpaired by the Plan.**<br><br>The legal, equitable and contractual rights of the holders of Other Priority Claims are Unimpaired by the Plan. Except to the extent that the holder of such Claim and the Debtor against which such Other Priority Claim is asserted or the Reorganized Debtors, as the case may be (with the consent of the Plan Investor) agree to a different treatment, each holder of an Allowed Other Priority Claim shall be paid in full in Cash or as otherwise provided in the Bankruptcy Code. | Class 1 is conclusively presumed to have accepted the Plan, and therefore, not entitled to vote. |
| **Class 2 - First Lien Credit Facility Claims**<br><br>Class 2 consists of all First Lien Credit Facility Claims not deemed to be paid to the First Lien Lenders from the proceeds of the DIP Roll-Up Loan, which together shall be Allowed in the amount of approximately $104 million plus accrued and unpaid interest at the default rate and any other unpaid fees and expenses as of the Petition Date, subject to fluctuation until the Petition Date on account of market conditions affecting the termination value of the Swap Agreement and the Forward Contract. | **Class 2 is Impaired by the Plan.**<br><br>The legal, equitable, and contractual rights of the holders of the First Lien Credit Facility Claims are Impaired by the Plan. On the Effective Date, the holders of Allowed First Lien Credit Facility Claims shall receive, in full satisfaction of their Allowed Claims, (i) their pro rata share of $70 million in Cash (minus any cash payments to be distributed under the Plan to the holders of the DIP Roll-Up Loan Claims) plus (ii) with respect to the remaining amount of their Allowed Claims, their pro rata share of the obligations under the New Term Loan. | Class 2 is Impaired under the Plan, and therefore, entitled to vote. |

12

| Description of Claims or Interests | Summary of Treatment | Entitlement to Vote |
|---|---|---|
| **Class 3 - Second Lien Credit Facility Claims**<br><br>Class 3 consists of all Second Lien Credit Facility Claims against any Debtor, which shall be Allowed in the principal amount of $45 million plus accrued and unpaid interest through the Petition Date. | **Class 3 is Impaired by the Plan.**<br><br>The legal, equitable and contractual rights of the holders of Second Lien Credit Facility Claims are Impaired by the Plan. On the Effective Date, holders of Allowed Second Lien Credit Facility Claims shall receive, in full satisfaction of their Allowed Claims, their pro rata share of: (i) the Second Lien Lender New Common Stock and (ii) up to $3,000,000 (but not less than $500,000) in Cash to be distributed from cash collateral existing on the Petition Date. The holders of the Second Lien Facility Claims shall be required to execute the New Stockholders Agreement prior to receiving their pro rata distribution of the New Common Stock under the Plan. The acceptance of the Plan by a holder of an Allowed Second Lien Credit Facility Claims shall constitute an agreement by such holder to contribute 100% of the Cash distribution on account of its Allowed Claim for deposit into the Trade Account for distribution to Allowed Trade Unsecured Claims in accordance with Article IV. of the Plan. | Class 3 is Impaired under the Plan, and therefore, entitled to vote. |
| **Class 4 - Other Secured Claims**<br><br>Class 4 consists of Other Secured Claims against any Debtor. | **Class 4 is Unimpaired by the Plan.**<br><br>The legal, equitable and contractual rights of the holders of Other Secured Claims are Unimpaired by the Plan. Unless the holder of such Claim and the Debtor or Reorganized Debtor, as the case may be, against which such Other Secured Claim is asserted agree to a different treatment, on the Effective Date, each holder of an Allowed Other Secured Claim shall have its Claim Reinstated. Prepetition Liens with respect to such Allowed Other Secured Claims shall survive the Effective Date and shall continue in accordance with contractual or statutory terms until such Allowed other Secured Claim has been paid in full. | Class 4 is conclusively presumed to have accepted the Plan, and therefore, not entitled to vote. |

13

| Description of Claims or Interests | Summary of Treatment | Entitlement to Vote |
|---|---|---|
| **Class 5 - General Unsecured Claims**<br><br>Class 5 consists of all General Unsecured Claims against any Debtor. | **Class 5 is Impaired by the Plan.**<br><br>The legal, equitable and contractual rights of the holders of General Unsecured Claims are Impaired by the Plan. On or as soon as reasonably practicable after the Effective Date, in exchange for their Allowed General Unsecured Claims, each holder thereof shall not receive or retain any property or interest on account of their General Unsecured Claims. However, holders of General Unsecured Claims that are also holders of Trade Unsecured Claims shall be entitled to receive distributions on account of such Trade Unsecured Claims pursuant to Article IV. of the Plan from the proceeds of the Trade Account funded by accepting holders of Allowed Second Lien Credit Facility Claims. | Class 5 is conclusively presumed to have rejected the Plan, and therefore, not entitled to vote. |
| **Class 6 - Senior Subordinated Note Claims**<br><br>Class 6 consists of all Senior Subordinated Note Claims against any Debtor. | **Class 6 is Impaired by the Plan.**<br><br>The legal, equitable, and contractual rights of the holders of the Senior Subordinated Note Claims are Impaired by the Plan. The Senior Subordinated Notes shall be cancelled as of the Effective Date and the holders of Senior Subordinated Note Claims shall not receive or retain any property or interest on account of such Senior Subordinated Note Claims. | Class 6 is conclusively presumed to have rejected the Plan, and therefore, not entitled to vote. |
| **Class 7 - Intercompany Claims**<br><br>Class 7 consists of all Intercompany Claims. | **Class 7 is Unimpaired by the Plan.**<br><br>The legal, equitable and contractual rights of the holders of Intercompany Claims are Unimpaired by the Plan. On or as soon as practicable after the Effective Date, and after consultation with and approval by each of the Plan Investors, with such approval not to be unreasonably withheld, all Intercompany Claims will either be Reinstated to the extent determined to be appropriate by the Debtors or Reorganized Debtors or adjusted, continued, or capitalized, either directly or indirectly, in whole or in part. Any such transaction may be effected on or subsequent to the Effective Date without any further action by the Bankruptcy Court. | Class 7 is conclusively presumed to have accepted the Plan, and therefore, not entitled to vote. |

46701/0001-5859301v9

| Description of Claims or Interests | Summary of Treatment | Entitlement to Vote |
|---|---|---|
| **Class 8 - Old Equity Interests in TTC and True Temper**<br><br>Class 8 consists of all Old Equity Interests in TTC and True Temper. | **Class 8 is Impaired by the Plan.**<br><br>The legal, equitable and contractual rights of the holders of Old Equity Interests in TTC and True Temper are Impaired by the Plan. All Old Equity Interests in TTC and True Temper shall be cancelled as of the Effective Date and the holders of Old Equity Interests in TTC and True Temper shall not receive or retain any property or interest in property under the Plan on account of such Interests. | Class 8 is conclusively presumed to have rejected the Plan, and therefore, not entitled to vote. |
| **Class 9 - Old Equity Interests in TTS-PRC**<br><br>Class 9 consists of all Old Equity Interests in TTS-PRC. | **Class 9 is Unimpaired by the Plan**<br><br>The legal, equitable and contractual rights of the holders of Old Equity Interests in TTS-PRC are Unimpaired by the Plan. On the Effective Date, Old Equity Interests in TTS-PRC shall be Reinstated to the extent determined to be appropriate by the Debtors or Reorganized Debtors. | Class 9 is conclusively presumed to have accepted the Plan, and therefore, not entitled to vote. |

       **The Debtors believe that the Plan provides the best recoveries possible for holders of Claims against the Debtors and thus strongly recommend that you vote to accept the Plan. The Plan is supported by the Plan Investor, the First Lien Agent, the Participating First Lien Lenders, and the Participating Second Lien Lenders pursuant to an Equity Commitment and Plan Support Agreement. Holders of at least two-thirds (2/3) in outstanding principal amount of Claims in Class 2 entitled to vote on the Plan and constituting more than 50% of the aggregate number of holders of Allowed Claims in Class 2 (i.e. an amount sufficient to secure approval of the Plan under section 1126(c) of the Bankruptcy Code) have already agreed, pursuant to an Equity Commitment and Plan Support Agreement, to vote in favor of the Plan. Further the Plan Investor holds an aggregate 45.5% of the face amount of the Senior Subordinated Notes and has agreed not to seek any distribution on account of its Senior Subordinated Note Claims. The Debtors intend to seek to consummate the Plan and cause the Effective Date to occur as quickly as practicable. There can be no assurance, however, as to when or whether the Effective Date will occur. The Debtors believe that the Plan provides distributions to all Classes of Claims that reflect an appropriate resolution of the Claims, taking into account the differing nature and priority of such Claims.**

### III.     PLAN VOTING INSTRUCTIONS AND PROCEDURES

**A.    Notice to Holders of Claims**

       This Disclosure Statement is being transmitted to holders of Claims in Classes 2 and 3. Pursuant to section 1126(g) of the Bankruptcy Code, Claims or Interests in Classes 1, 4 ,7 and 9

are Unimpaired under the Plan and holders of such Claims are not entitled to vote on the Plan. Holders of Claims or Interests in Classes 5, 6, and 8 are conclusively presumed to have rejected the Plan and are not entitled to vote to accept or reject the Plan. Accordingly, holders of Claims in Classes 2 and 3 will be the only holders of Claims that will vote on the Plan. The purpose of this Disclosure Statement is to provide adequate information to enable such Claim holders to make a reasonably informed decision with respect to the Plan prior to exercising their right to vote to accept or reject the Plan.

ALL HOLDERS OF CLAIMS IN CLASSES 2 AND 3 ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR TO REJECT THE PLAN. This Disclosure Statement contains important information about the Plan and considerations pertinent to acceptance or rejection of the Plan.

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN. No solicitation of votes may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Debtors other than the information contained herein.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS, AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE RESULTS. Except with respect to the Projections set forth in Appendix C to this Disclosure Statement (the "Projections") and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement. The Debtors do not intend to update the Projections; thus, the Projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Projections. Further, the Debtors do not anticipate that any amendments or supplements to this Disclosure Statement will be distributed to reflect such occurrences. Accordingly, the delivery of this Disclosure Statement will not under any circumstance imply that the information herein is correct or complete as of any time subsequent to the date hereof.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY AN INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

## B.     Voting Rights

Pursuant to the provisions of the Bankruptcy Code, only holders of claims and interests in classes that are (a) treated as "impaired" by a plan of reorganization and (b) entitled to receive a distribution under such plan are entitled to vote on the plan. Under the Plan, only holders of Claims in Classes 2 and 3 are entitled to vote on the Plan. Claims and Interests in other Classes

are either Unimpaired and their holders are deemed to have accepted the Plan, or they are receiving no distributions under the Plan and their holders are deemed to have rejected the Plan.

Holders of Claims in Classes 2 and 3 may vote on the Plan only if they are holders as of September 29, 2009 (the "Voting Record Date").

## C.    Solicitation Materials

In soliciting votes for the Plan pursuant to this Disclosure Statement, the Debtors, through Logan & Company, Inc. ("Logan" or the "Voting Agent" ), will send to holders of Claims who are entitled to vote copies of (a) this Disclosure Statement and Plan, and (b) one or more Ballots (and return envelopes) to be used in voting to accept or to reject the Plan.

If you are the holder of a Claim who is entitled to vote, but you did not receive a ballot, or if your ballot is damaged or illegible, or if you have any questions concerning voting procedures, you may contact Logan at:

> LOGAN & COMPANY, INC.
> 546 VALLEY ROAD
> UPPER MONTCLAIR, NJ 07043
> TELEPHONE: (973) 509-3190
> ATTENTION: ELIZABETH A. CROCKER

## D.    Voting Procedures, Ballots and Voting Deadline

After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your ballot, you are asked to indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the accompanying ballot. You should complete and sign your original ballot (copies will not be accepted) and return it according to the instructions enclosed with the ballot.

Each ballot reflects the Class of Claims it represents. Accordingly, in voting to accept or reject the Plan, you must use only the ballot(s) sent to you with this Disclosure Statement.

All votes to accept or reject the Plan must be cast by using the ballot enclosed with the Disclosure Statement. PLEASE READ AND CAREFULLY FOLLOW THE VOTING INSTRUCTIONS BEFORE COMPLETING YOUR BALLOT. IN ORDER FOR YOUR VOTE TO BE COUNTED, COMPLETE, SIGN AND DATE YOUR BALLOT AND RETURN IT TO LOGAN SO AS TO BE <u>ACTUALLY</u> <u>RECEIVED</u> BY **OCTOBER 7, 2009 AT 5:00 P.M. EASTERN TIME.** BALLOTS MAY BE SUBMITTED AS FOLLOWS:

| *If by hand delivery, mail or overnight courier:* | *If by facsimile:* | *If by electronic mail:* |
|---|---|---|
| LOGAN & COMPANY, INC.<br>546 Valley Road<br>Upper Montclair, NJ 07043<br>Attn: Elizabeth A. Crocker<br>Phone: (973) 509-3190 | LOGAN & COMPANY, INC.<br>Facsimile: (973) 509-1131<br>Attn: Elizabeth A. Crocker | LOGAN & COMPANY, INC.<br>trt@loganandco.com<br>Attn: Elizabeth A. Crocker |

BALLOTS THAT ARE RECEIVED BUT NOT SIGNED WILL NOT BE COUNTED. DO NOT RETURN ANY STOCK CERTIFICATES, DEBT INSTRUMENTS, OR OTHER EVIDENCES OF YOUR CLAIM WITH YOUR BALLOT.

If you have any questions about (a) the procedure for voting on your Class 2 or Class 3 Claim, (b) the packet of materials that you have received, or (c) the amount of your Claim, or if you wish to obtain, an additional copy of the Plan, this Disclosure Statement, or any appendices or exhibits to such documents, please contact Logan at:

> LOGAN & COMPANY, INC.
> 546 VALLEY ROAD
> UPPER MONTCLAIR, NJ 07043
> TELEPHONE: (973) 509-3190
> ATTENTION: ELIZABETH A. CROCKER

For further information and general instructions on voting to accept or to reject the Plan, see Section XII. of this Disclosure Statement and the instructions accompanying your ballot.

THE DEBTORS URGE ALL HOLDERS OF CLASS 2 AND 3 CLAIMS ENTITLED TO VOTE TO EXERCISE THEIR RIGHT BY COMPLETING THEIR BALLOT AND RETURNING THEM AS QUICKLY AS POSSIBLE. **THE PLAN IS SUPPORTED BY THE PLAN INVESTOR, THE FIRST LIEN AGENT, THE PARTICIPATING FIRST LIEN LENDERS, AND THE PARTICIPATING SECOND LIEN LENDERS PURSUANT TO AN EQUITY COMMITMENT AND PLAN SUPPORT AGREEMENT. HOLDERS OF AT LEAST TWO-THIRDS (2/3) IN OUTSTANDING PRINCIPAL AMOUNT OF CLAIMS IN CLASS 2 ENTITLED TO VOTE ON THE PLAN AND CONSTITUTING MORE THAN 50% OF THE AGGREGATE NUMBER OF HOLDERS OF ALLOWED CLAIMS IN CLASS 2 (I.E. AN AMOUNT SUFFICIENT TO SECURE APPROVAL OF THE PLAN UNDER SECTION 1126(C) OF THE BANKRUPTCY CODE) HAVE ALREADY AGREED PURSUANT TO AN EQUITY COMMITMENT AND PLAN SUPPORT AGREEMENT TO VOTE IN FAVOR OF THE PLAN. THE PLAN INVESTOR HOLDS AN AGGREGATE 45.5% OF THE FACE AMOUNT OF THE SENIOR SUBORDINATED NOTES AND HAVE AGREED NOT TO SEEK ANY DISTRIBUTION ON ACCOUNT OF ITS SENIOR SUBORDINATED NOTE CLAIMS.**

## E.     Confirmation Hearing and Deadline for Objections to Confirmation

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a Confirmation Hearing. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

When the Debtors file petitions for relief under chapter 11 of the Bankruptcy Code, they will request by separate motion that the Bankruptcy Court schedule a combined hearing (the "Combined Hearing") to consider the adequacy of the Disclosure Statement and confirmation of the Plan. Notice of the Combined Hearing will be provided to holders of Claims and Interests or their representatives (the "Combined Hearing Notice") as set forth in the scheduling order of the Bankruptcy Court. Objections to the adequacy of the Disclosure Statement and confirmation of

46701/0001-5859301v9

the Plan must be filed with the Bankruptcy Court by the date designated in the Combined Hearing Notice and will be governed by Bankruptcy Rules 3020(b) and 9014 and local rules of the Bankruptcy Court. UNLESS AN OBJECTION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

## F.     Additional Information

Any questions regarding (1) voting procedures, (2) the Solicitation Package, (3) the amount of a Claim, or (4) a request for an additional copy of the Plan, Disclosure Statement or any Exhibits to such documents should be directed to:

Logan & Company, Inc.
546 Valley Road
Upper Montclair, NJ  07043
E-mail: trt@loganandco.com
Telephone: (973) 509-3190
Attention: Elizabeth A. Crocker

# IV.     HISTORY AND STRUCTURE OF THE DEBTORS

## A.     Corporate History

True Temper traces its origin back to the late 1800's, when several independently owned forging companies combined their operations. In 1902, as a result of a formal restructuring of these operations, True Temper's predecessor, the American Fork and Hoe Company, was formed.

In 1923, the American Fork and Hoe Company began manufacturing steel golf shafts. In 1930, when the Royal and Ancient Golf Club of Saint Andrews, golf's governing and decision-making body in Scotland, made the steel shaft legal for tournament play, the American Fork and Hoe Company began marketing steel shafts under the True Temper brand name. In 1942, True Temper introduced the *Dynamic* line on the PGA tour, which continues to this day.

In 1939, the American Fork and Hoe Company became a public owned company, and in 1949, changed its name to True Temper.

In 1967, True Temper merged into ATI Allegheny Ludlum. In 1978, ATI Allegheny Ludlum sold True Temper to Wilkinson Sword in exchange for a 45% interest in Wilkinson Sword. Two years later, Allegheny International acquired the remainder of Wilkinson Sword, bringing True Temper back to Allegheny ownership. In 1985, Allegheny sold True Temper to Emhart Corporation, which was subsequently acquired by Black & Decker in 1989.

True Temper returned to private ownership in 1998 when Black & Decker sold True Temper to Cornerstone Equity Investors ("Cornerstone"), a private equity firm. In 2004, Cornerstone sold True Temper to Gilbert Global (as defined and described below).

46701/0001-5859301v9

## B.     2004 Ownership Change and Current Organizational Structure

### 1.     2004 Ownership Change

On January 30, 2004, TTS Holdings, LLC, a new Delaware holding company formed by Gilbert Global Equity Partners, L.P. and its affiliated funds ("Gilbert Global"), entered into a stock purchase agreement ("SPA") with TTC, a Delaware holding company that is the direct parent of True Temper. Pursuant to the SPA, TTS Holdings, LLC and certain members of the senior management of True Temper purchased all the issued and outstanding shares of TTC (the "Gilbert Global Acquisition"). The Gilbert Global Acquisition was finalized and closed on March 15, 2004. In connection with this acquisition, and effective on March 15, 2004, True Temper repaid all of its outstanding obligations under its existing senior credit facility, redeemed all of its $10^7/_8$% senior subordinated notes due 2008, and made certain payments of the net remaining equity of the predecessor company to the selling shareholders.

On March 15, 2004, as part of the Gilbert Global Acquisition, True Temper entered into a new senior credit facility (the "2004 Senior Credit Facility") which included a $20 million non-amortizing revolving credit facility and a $110 million term loan (as amended from time to time). The term loan required cash interest payments and quarterly principal payments beginning June 30, 2004 and continuing through March 15, 2011. The 2004 Senior Credit Facility was amended and restated in the form of the First Lien Credit Facility.

Also in conjunction with the Gilbert Global Acquisition, True Temper issued the Senior Subordinated Notes. The Senior Subordinated Notes require semi-annual cash interest payments each March 15th and September 15th commencing on September 15, 2004. The Senior Subordinated Notes are redeemable at True Temper's option, under certain circumstances and at certain redemption prices, beginning March 15, 2008.

In connection with the SPA, True Temper entered into a management services agreement with Gilbert Global. In accordance with this agreement, Gilbert Global agreed to provide: (1) general management services; (2) assistance with the identification, negotiation and analysis of acquisitions and dispositions; (3) assistance with the negotiation and analysis of financial alternatives; and (4) other services agreed upon by True Temper and Gilbert Global.

In exchange for such services, Gilbert Global or its nominee received: (1) an annual advisory fee of $0.5 million payable quarterly, plus reasonable out-of-pocket expenses; (2) a transaction fee in an amount equal to 1.25% of the aggregate transaction value in connection with the consummation of any material acquisition, divestiture, financial or refinancing by True Temper or any of its subsidiaries; and (3) a one-time transaction fee of $2.5 million upon the consummation of the recapitalization.

The management services agreement has an initial term of five years, subject to automatic one-year extensions unless the Company or Gilbert Global provides written notice of termination. The annual advisory fee of $0.5 million is contractually subordinated to the Senior Subordinated Notes and the First Lien Credit Facility and Second Lien Credit Facility. Pursuant to the Plan, the management services agreement with Gilbert Global will be rejected.

20

## 2. Current Organizational Structure

The Company's corporate structure consists of a parent holding company, TTS Holdings, LLC, a non-debtor entity, which directly owns the majority of the outstanding common and preferred stock of TTC (a Debtor). TTC owns all of the issued and outstanding common stock of True Temper (a Debtor). True Temper wholly owns TTS-PRC, also a Debtor. TTS-PRC is a Delaware holding company that has provided capital investments and loans to its Non-U.S. Subsidiaries (as defined above). True Temper sells raw materials to the Non-U.S. Subsidiaries located in China, and purchases finished manufactured products from them. The following is a brief description of the Non-U.S. Subsidiaries:

a) Ji Neng is wholly owned by TTS-PRC and is a registered Chinese Company. Ji Neng operates a graphite products manufacturing facility in Guangzhou, China.

b) Supertop Enterprises Ltd. is wholly owned by TTS-PRC and is a registered Hong Kong holding company.

c) Alloy Materials is wholly owned by Supertop and is a registered Chinese Company. Alloy Materials operates a steel products manufacturing facility in Suzhou, China.

## C. Discussion of the Debtors' Business Segments

The Company's operations are conducted through two reportable business segments: (a) golf shafts and (b) performance sports. The Company evaluates the performance of these segments based on segment sales and gross profit, and has no inter-segment sales.

## 1. Golf Shaft Segment

The golf shaft segment of the Company manufactures and sells steel, composite, and multi-material golf club shafts for use exclusively in the golf industry. There are three basic components of a golf club: the shaft, the club head and the grip. The shaft is critical to the performance of a golf club as it is vital in controlling the consistency and distance of a golf shot. The Company primarily sells shafts to the top golf club original equipment manufacturers, retailers and distributors in the golf equipment industry, including Adams, Callaway, Cleveland, Golfsmith, Golf Works, Mizuno, Nike, Ping, TaylorMade, Titleist, and Wilson. Typically, distributors resell the Company's products to custom club assemblers, pro shops and individuals. The Company's proprietary golf shafts, which accounted for approximately 25% of its net sales in 2008, are custom designed, and frequently co-branded in partnership with its customers, to accommodate specific golf club head designs. As an example, proprietary models include co-branded products such as Callaway's *Uniflex*, Nike's *Speedstep* and Ping's *AWT*. Branded products with the *True Temper, Royal Precision, Project X* or *Grafalloy* names and designs are typically sold to golf club original equipment manufacturers, distributors and various custom club assemblers, and are used to either assemble new clubs or to replace the shafts in existing clubs. The Debtors have long-standing relationships with a highly diversified customer base in excess of 500 customers, including over 400 manufacturers and retailers, and over 50

21

distributors. The majority of the Company's sales are to golf club manufacturers and distributors located in the United States, Europe, Japan, Australia, and Southeast Asia.

***Steel Golf Shafts.*** The Company is a leading supplier of premium steel shafts to the top golf club original equipment manufacturers and distributors, including Adams, Callaway, Cleveland, Golfsmith, Golf Works, Mizuno, Nike, Ping, TaylorMade, Titleist and Wilson. From 1988 to 2008, its steel shafts were played by all of the winners of the PGA's 84 major championships. The Company manufactures a wide range of steel golf shaft lines with unique design features and performance characteristics. In 2008, approximately 70% of the Company's revenue was generated through the sale of steel golf shafts. The Company estimates that its share of the worldwide steel golf shaft market was approximately 70% to 80% in 2008. The steel golf shafts can be divided into the following two major product categories: (1) premium grade steel shafts; and (2) commercial grade steel shafts. The Company designs, manufactures and markets a number of steel shaft product lines, including: *Dynamic Gold, Dynamic Gold SL, Dynamic Gold Tour Issue, Rifle, Project X, Project X, Flighted, SensiCore, Dynalite Gold, TX-90, GS75, GS85, GS95,* and *TT Lite.* Premium steel shafts are high performance products with tighter design tolerances and quality specifications that sell for higher average selling prices and generate higher profit margins than commercial grade steel shafts. The commercial grade steel shafts are manufactured to a different specification and sell for a lower average selling price to original equipment manufacturers who produce and sell opening price point golf club sets, typically to entry-level players who purchase their products through mass channel retail stores.

***Graphite Golf Shafts.*** The Company is also one of the world's largest manufacturers of premium graphite (carbon fiber based composites) golf shafts, with an estimated share of approximately 10% of this highly fragmented market. The Company manufactures a wide range of graphite golf shaft lines, which are offered in a variety of weights, torques and flexes. Its graphite golf shafts are currently being played by numerous touring professionals on the PGA, EPGA, LPGA, Champions and Nationwide Tours. The graphite shafts are sold under the *Grafalloy* brand name. Similar to steel, graphite shafts can be placed in several categories of performance, quality and price. Historically, most of the graphite golf shafts that the Company produced were higher quality and higher priced premium grade shafts that are sold to golf equipment distributors, and to original equipment manufacturers for their custom product offerings. Beginning in 2004, with the establishment of the lower cost manufacturing facility operated by Ji Neng in China, the Company also began selling certain lower price point graphite shafts.

***Golf Shafts with Combined Materials.*** During the last several years, the Company has developed golf shafts that combine multiple materials such as steel and graphite into one shaft. Late in 2000, the Company introduced a proprietary custom iron product for a customer that combines a steel shaft with a graphite tip section to produce a shaft that provides a new feel for irons. The Company used similar patented technology to introduce the *True Temper* branded product known as *BiMatrx* in January 2001. The *BiMatrx* shaft consists of a graphite shaft with a steel tip section that was designed for use in driver and fairway wood applications.

***Golf Shafts with New Materials.*** In early 2007, the Company introduced driver and fairway wood shafts constructed of patented Nanofuse® material, which utilizes today's most

advanced nanotechnology to produce a stronger, lighter shaft which incorporates the benefits of both graphite and steel.

## 2.     Performance Sports Segment

The performance sports segment of the Company designs, manufactures, and markets high strength, tight tolerance tubular components for the recreational sports markets, including bicycling, hockey, baseball, softball, and lacrosse. Through its performance sports segment, the Company has leveraged its existing manufacturing competencies and capitalized on its name brand strength and customer base to provide revenue and profitability diversification beyond the golf equipment industry. The Company focuses on the premium segment of the bicycle market where innovation, quality and branding are highly valued by the consumer, and products are often customized to suit the individual consumer's specific requirements. Such products include steel bicycle frames, and composite bicycle components, such as forks and handlebars. The Company's value-added premium bicycle component products generally have higher margins than component parts made for bicycles sold in mass channel retail stores. In the hockey components market, the Company focuses on composite shafts and full sticks used in a variety of original equipment manufacturers' one-piece and composite sticks. The Debtors have partnerships with several of the leading component suppliers in the hockey market, such as Reebok, Balistik, and Sherwood.

## 3.     Distribution Sales

The Company primarily sells its shafts to original equipment manufacturers, retailers and distributors. Typically, distributors resell the Company's products to custom club assemblers, pro shops and individuals. Sales to golf club manufacturers and retailers accounted for approximately 80% to 90% of the Company's net golf shaft sales in 2008, and sales to distributors represented approximately 10% to 20% of the Company's 2008 net golf shaft sales. The Company believes that it has one of the most experienced and respected sales staffs in the industry. The Company's sales and marketing department includes domestic sales managers, international sales managers, a customer service/logistics group and a team of design professionals that provides field support to the Company's sales representatives. The Company believes that its international market presence, which comprised approximately 40% of its total 2008 net sales, provides an opportunity for future growth. The Company markets its products in Japan, Europe, and Asia and maintains a distribution operation in each region.

## 4.     Material Source and Supply

***Raw Materials.*** The Company uses several raw materials to produce steel golf shafts, including several steel alloys sourced from a number of vendors, nickel crowns and plating chemicals, Sensicore inserts and various sundry supplies, boxes and labels. Such raw materials are also used in the manufacture of products in the performance sports segment. Graphite shafts are produced with a variety of composite fiber materials that the Company sources from several different vendors. In addition, graphite shafts are finished with a wide variety of paints, inks and heat transfer labels.

*Natural Gas and Electricity.* The Company also uses a substantial amount of natural gas and electricity in its manufacturing processes. Suppliers for these types of energy sources are limited, and prices are subject to general market and industry conditions.

*Purchase Contracts.* In some cases, the Company has purchased contracts to lock in prices for both nickel and natural gas to be delivered anywhere from one to twenty-four months from the date the contract is consummated. As of December 31, 2008, the Company held either under contract or has purchased approximately 40% of its expected 2009 usage of nickel, and 50% of the expected 2009 usage of natural gas. As of June 28, 2009, the Company had approximately $0.4 million in natural gas purchase contracts, all for calendar year 2009.

## 5. Seasonality

In general, the component supplier sales to golf equipment companies and distributors are seasonal, and tend to precede the warm weather golf season. However, there are exceptions, especially for those suppliers that sell to the high volume opening price point golf club manufacturers who sell their products through mass channel retail stores and generate strong volumes during the holiday gift-giving season in the fourth quarter. Business does experience some seasonal fluctuations, based on a five year average from 2004 through 2008, approximately 57% of the net sales are generated in the first half of the year, and the remaining 43% of the net sales are generated in the second half.

## 6. Customers

The Debtors maintain long-standing relationships with a highly diversified customer base. The Debtors are leading suppliers of shafts to the top golf club original equipment manufacturers and distributors, including Adams, Callaway, Cleveland, Golfsmith, Golf Works, Mizuno, Nike, Ping, TaylorMade, Titleist and Wilson. In addition, the Debtors partnered with several of the leading component suppliers in the hockey market, such as Reebok, Balistik and Sherwood. In 2008, the Debtors had in excess of 500 customers, including over 400 manufacturers and retailers and over 50 distributors. For many years, the Debtors have maintained a broad and diversified customer base in the golf equipment market. In 2008, their top ten (10) customers represented between 70% to 75% of net sales, and their top customer accounted for approximately 18% of net sales. The Debtors have had a positive relationship with their top ten (10) customers for over twenty (20) years.

The Debtors believe that their close customer relationships and responsive service have been significant elements to their success and that their engineering and manufacturing expertise provides a strong competitive advantage in truly partnering with their customer base. The Debtors have developed and co-branded many proprietary shafts with their customers. As an example, the Company produces proprietary customized steel shafts for Callaway, under the *Uniflex* brand; for Ping, under the *AWT* brand; and for Nike, using the *Speedstep* brand.

## 7. Competition

The Company operates in a highly competitive environment. The Company believes that it competes principally on the basis of: (1) its ability to provide a broad range of high quality

steel and graphite shafts at competitive prices; (2) its ability to deliver customized products in large quantities on a timely basis through distribution channels around the world; (3) the acceptance of steel and graphite shafts in general, and its shafts in particular, by professional and amateur golfers alike; and (4) its ability to develop and produce innovative new products that provide performance features which benefit golfers of all skill levels. The Company believes that its share of the worldwide steel golf shaft market was approximately 70% to 80% in 2008 and that its share is several times greater than the share of the next largest market participant. The Company believes that it competes primarily with two other steel golf shaft manufacturers: Far East Machinery Co., Ltd., located in Taiwan which produces primarily commercial grade golf shafts, and Nippon Shaft Co., Ltd., a Japanese manufacturer of primarily premium golf shafts. Unlike steel, the graphite shaft manufacturing industry is highly fragmented with a large number of suppliers selling to only a few customers. The Company believes there are in excess of 25 graphite shaft manufacturers worldwide. A few of these companies reside in North America and many are located in Asia. The Company does not believe that there are any graphite suppliers currently with a market share in graphite that is comparable to the market share the Company has in steel. The Company believes it is one of the six largest producers of branded premium grade graphite shafts in the world and the Company estimates that its market share is approximately 10%. Its major competitors in the premium grade branded graphite shaft market include Aldila, Inc., United Sports Technologies, Inc., Graphite Design International, Fujikura Composites and Mitsubishi. The Company believes that it is the only golf shaft company in the world which is capable, within its own facilities, of manufacturing both steel and graphite golf shafts in large volumes.

8.     **Environmental Compliance**

The Debtors are subject to federal, state and local environmental and workplace health and safety laws and regulations, including requirements governing discharges to the air and water, the handling and disposal of solid and hazardous wastes, and the remediation of contamination associated with releases of hazardous substances. In December 2003, a review was conducted by independent environmental consultants and, based upon such report, the Debtors believe that they are currently in material compliance with environmental and workplace health and safety laws and regulations. Nevertheless, their manufacturing operations involve the use of hazardous substances and, as is the case with manufacturers in general, if a release of hazardous substances occurs or has occurred on or from their facilities, the Debtors may be held liable and may be required to pay the cost of remedying the condition. The amount of any such liability could be material. The Debtors devote significant resources to maintaining compliance with, and believes itself to be currently in material compliance with, their environmental obligations. Despite such efforts, the possibility exists that instances of noncompliance could occur or be identified, the penalties or corrective action costs associated with which could be material. Like any manufacturer, the Debtors are subject to the possibility that they could receive notices of potential liability, pursuant to Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), commonly known as Superfund, or analogous state laws, for cleanup costs associated with onsite or offsite waste recycling or disposal facilities at which waste associated with its operations have allegedly come to be located. Liability under CERCLA is strict, retroactive and joint and several. To the best of the Debtors' knowledge, no notices involving any material liability are currently pending.

### 9. Employees; Labor Matters

#### (a) Employees

As of September 29, 2009, the Debtors, in their U.S., European and Japanese locations, currently employ approximately 307 people, comprised of 201 hourly workers and 96 salaried employees. Approximately 300 of those employees are located in the United States, 2 in the United Kingdom and 5 in Japan. In addition, the Debtors utilize the services of approximately 5 independent contractors and approximately 5 temporary, full-time equivalent hourly workers. The hourly employees at their steel plant in Amory, Mississippi (approximately 150) are represented by the United Steel Workers of America. In August 2007, the United Steel Workers union at their Amory, Mississippi facility voted to accept a new collective bargaining agreement that covers a four-year period beginning in August 2007 and expiring on June 30, 2011. The Debtors believes that their relationships with the union and their employees are good.

#### (b) Retirement Savings Plan

All U.S. based employees, and certain international employees, of True Temper are eligible to participate in a 401(k) plan. In 2009, True Temper suspended its matching of the employee's contributions to the 401(k) plan.

True Temper's U.S. based salaried employees, and certain international employees, are also covered by a non-contributory defined contribution plan (the "Flex-Plus Program"). Contributions to this plan are based on the employee's age and are calculated as a percentage of compensation, ranging from 1% to 3%. This Flex-Plus Program is funded on a current basis. In 2009, True Temper suspended contributions to the Flex-Plus Program.

#### (c) Pension Plan

True Temper's hourly union employees at its Amory, Mississippi plant are covered by The Pension Plan for Hourly Employees of True Temper Sports Incorporated (the "Pension Plan"). The Pension Plan is a non-contributory defined benefit pension plan and is funded in conformity with funding requirements of applicable government regulations. Benefits are based on a negotiated, fixed amount multiplied by the employee's length of service.

Pension obligations are dependent on assumptions used in calculating such amounts. These assumptions include discount rates, expected return on plan assets, rates of salary increase, health care cost trend rates, mortality rates, retirement rates, and other factors. These assumptions are updated on an annual basis, and where appropriate, True Temper consults with its actuaries to provide input and guidance for certain estimates and assumptions. True Temper considers current market conditions, including interest rates, in making these assumptions. True Temper develops the discount rates by considering the yields available on high-quality fixed income investments with maturities corresponding to the related benefit obligation. True Temper's discount rate for its Pension Plan was 6.25% and 6.45% as of December 31, 2008 and 2007, respectively. True Temper develops the expected return on pension plan assets by considering various factors, which include its targeted asset allocation percentages, historic returns, and expected future returns. The expected long-term rate of return

26

assumption for assets in its defined benefit plan was 8.00% for both 2008 and 2007. True Temper's contribution requirements to the Pension Plan are paid on a quarterly basis, and it paid in excess of $2 million in total contributions to the pension plan in 2008. A quarterly deposit is due on October 15, 2009 in the amount of $205,000.00 as well as on January 15, 2010 in the amount of $361,000.00. True Temper estimates that the Pension Plan is underfunded by approximately $6-8 million depending on specific market closing prices (the "Underfunded Amount"). The Underfunded Amount was attributable to economic conditions involving weak equity performance and/or general interest rates that reduced the total value of the assets of the Pension Plan. True Temper has approximately five years to pay the Underfunded Amount, or recognize sufficient asset returns to reduce the Underfunded Amount to zero.

### (d)  Retiree Medical Programs

Certain post-retirement medical, dental and life insurance benefits are provided to those salaried employees who were employed by the Debtors prior to January 1, 2000. In addition, the Debtors' hourly employees receive certain post-retirement medical, dental and life insurance benefits.

### (e)  Severance

True Temper maintains a severance policy which is used as a guideline in establishing severance benefits to any salaried employee that is terminated without cause (the "Severance Policy"). The Severance Policy provides, primarily, for salary continuation for periods ranging from one week to twelve months depending on length of service as well as benefit continuation during the severance period and the cash payout of unused vacation. Generally, one week of severance pay is earned for each year of continuous service, with certain minimum amounts of severance provided for specific levels of management within the Company. Hourly employees receive only medical benefit continuation for a contractually stipulated period of time and are not entitled to a severance payment upon termination. Employees in the UK are entitled to severance consisting of cash payments in accordance with applicable government relations. Union employees typically obtain severance payments upon termination and medical benefit continuation for a contractually stipulated period of time. As of September 29, 2009, there are 5 former salaried employees entitled to receive severance and benefit continuation, and approximately 105 former hourly employees entitled to receive medical and dental benefits.

### 10.  Properties

The Debtors' administrative offices and manufacturing facilities currently occupy approximately 560,000 square feet of leased facilities. The Debtors operate a majority of their manufacturing processes in their Amory facility. The Debtors' executive offices are located in a leased facility in Memphis, Tennessee. The Debtors also lease property in the following locations: (i) San Diego, California for Composite R&D Distributions; (ii) Olive Branch, Mississippi for Steel R&D; and (iii) Robinsonville, Mississippi for testing. In addition, the Debtors promote their products in international markets through sales and distribution offices in Japan and the United Kingdom, and distribute their products in Southeast Asia from their distribution warehouse in Hong Kong.

## 11.     Intellectual Property

As of December 31, 2008, the Company held 51 patents worldwide relating to various products and proprietary technologies, and had four patent applications pending. The Company also holds numerous trademarks related to, among other things, its *True Temper, Grafalloy, Royal Precision* and *Alpha Q* branded products. The Debtors do not believe that their competitive position is dependent solely on patent or trademark protection or that their operations are dependent on any individual patent or trademark.

## 12.     Legal Proceedings

The Debtors have certain contingent liabilities resulting from litigation and claims incidental to the ordinary course of business, including workers' compensation claims. Management believes that the probable resolution of such contingencies will not materially affect the consolidated financial position or results of operations of the Debtors. Furthermore, to the extent such contingent liabilities are not assumed by the Reorganized Debtors pursuant to the Plan, such liabilities shall be treated, to the extent applicable, as General Unsecured Claims pursuant to the terms of the Plan.

## 13.     Selected Financial Data

Set forth in Appendix B is certain consolidated financial data with respect to the Company for each of the last four fiscal years ended December 31, 2008 as well as for the period from January 1, 2009 to June 30, 2009. The information set forth therein should be read in conjunction with the Company's consolidated financial statements, related notes thereto, and the other information included in the Company's Annual Report on Form 10-K for the Fiscal Year Ended December 31, 2005, the Company's Annual Report on Form 10-K for the Fiscal Year Ended December 31, 2006, the Company's Annual Report on Form 10-K for the Fiscal Year Ended December 31, 2007, the Company's Annual Report on Form 10-K for the Fiscal Year Ended December 31, 2008, the Company's Quarterly Report on Form 10-Q for the Three Months Ended March 31, 2009 and the Company's Quarterly Report on Form 10-Q for the Three Months Ended June 28, 2009, all incorporated herein by reference.

**The Company's consolidated financial information and Projections, including those attached hereto as Appendix B and Appendix C have been prepared on a going concern basis. The Company's consolidated historical financial information presented as Appendix B has been derived from the Company's consolidated historical financial statements. Continuing as a going concern contemplates continuity of operations, realization of assets, and payment of liabilities in the ordinary course of business. The accompanying consolidated financial information does not reflect adjustments that might result if the Company is unable to continue as a going concern.**

**In addition, pursuant to SOP 90-7, the accounting for the effects of the reorganization will occur once a plan of reorganization is confirmed by the Bankruptcy Court and there are no remaining contingencies material to completing the implementation of the plan. The "fresh start" accounting principles pursuant to SOP 90-7 provide, among other things, for the Company to determine the value to be assigned to the equity of the**

reorganized Company as of a date selected for financial reporting purposes. The accompanying consolidated financial statements do not reflect: (a) the requirements of SOP 90-7 for fresh start accounting; (b) the realizable value of assets on a liquidation basis or their availability to satisfy liabilities; (c) aggregate prepetition liability amounts that may be allowed for unrecorded claims or contingencies, or their status or priority; or (d) adjustments to the carrying value of assets (including goodwill and other intangibles) or liability amounts that may be necessary as the result of future actions by the Bankruptcy Court. The Projections presented as Appendix C have been prepared on this basis.

The Company's unaudited interim consolidated financial statements do not include all of the disclosures required by accounting principles generally accepted in the United States of America for annual financial statements. In the opinion of management, all adjustments considered necessary for a fair presentation of the interim period results have been included.

**D.  Board of Directors, Management and Committees**

**1.  Board of Directors**

As a debt-only filer, the Company is not required to have a majority of its Board consist of independent directors.

**Richard W. Gaenzle, Jr.** became a member of the board of directors upon consummation of the Gilbert Global Acquisition. He is a founder and has served as Managing Director of Gilbert Global Equity Partners, L.P. since 1997. From 1992 to 1997, he was a principal of Soros Capital L.P., the principal venture capital and leveraged transaction entity of Quantum Group of Funds, and a principal Advisor to Quantum Industrial Holdings Ltd. Prior to joining Soros Capital, Mr. Gaenzle held various positions in the investment banking industry. Mr. Gaenzle is a Director of CPM Holdings, Inc. Mr. Gaenzle received a B.A. from Hartwick College and an M.B.A. from Fordham University.

**Steven J. Gilbert** became a member of and Co-Chairman of the board of directors upon consummation of the Gilbert Global Acquisition. He is a founder and has served as Chairman of the Board of Gilbert Global Equity Partners, L.P. since 1997. From 1992 to 1997, he was the founder and Managing General Partner of Soros Capital L.P., the principal venture capital and leveraged transaction entity of Quantum Group of Funds, and a principal Advisor to Quantum Industrial Holdings Ltd. From 1988 through 1992, he was the Managing Director of Commonwealth Capital Partners, L.P., a private equity investment firm. From 1984 to 1988, Mr. Gilbert was the Managing General Partner of Chemical Venture Partners (now J.P. Morgan Partners), which he founded. Mr. Gilbert is a Director of CPM Holdings, Inc., the Asian Infrastructure Fund and J O Hambro Investment Management, Ltd. Previously, Mr. Gilbert has been a director of numerous public and private companies. Mr. Gilbert received a B.S. from the Wharton School at the University of Pennsylvania, an M.B.A. from the Harvard Graduate School of Business Administration, and a J.D. from Harvard Law School.

**Scott C. Hennessy** has been the President since 1996, and the Chief Executive Officer and Director since October 1998. Mr. Hennessy joined the Company in 1994 as Vice President-

Sales and Marketing. From 1980 to 1994, Mr. Hennessy held various management positions at Black & Decker in sales, marketing and product development. Mr. Hennessy sits on the Board of Governors of the National Golf Foundation. Mr. Hennessy graduated magna cum laude with a B.S. from the University of Delaware.

**Jeffrey W. Johnson** became a member of the board of directors upon consummation of the Gilbert Global Acquisition. He is a founder and has served as Managing Director of Gilbert Global Equity Partners, L.P. since 1997. Mr. Johnson was previously with Goldman, Sachs & Co. in its mergers and acquisitions department, Hallmark Cards, Inc. and Russell Investment Group. He is a director of CPM Holdings, Inc. Mr. Johnson received a B.A. from Claremont McKenna College and an M.B.A. from the Harvard Graduate School of Business Administration.

**Steven Kotler** became a member of and Co-Chairman of the board of directors upon consummation of the Gilbert Global Acquisition. He has served as Vice Chairman of Gilbert Global Equity Partners, L.P. since 2000. Prior to joining Gilbert Global in 2000, Mr. Kotler, for 27 years, was with Schroder & Co. and its predecessor firm, Wertheim & Co., where he served as its Chief Executive Officer and President. Mr. Kotler is a Director of CPM Holdings and The Archstone Partnerships. Previously, Mr. Kotler has served as a Governor of the American Stock Exchange and a director of numerous public and private companies. Mr. Kotler is a graduate of City College of New York.

## 2.    Management

**Stephen M. Brown** has been the Vice President of Human Resources since August 2002. From January 1998 to July 2002, Mr. Brown has served as Director of Human Resources. From September 1996 to December 1997, Mr. Brown served as the Manager-Human Resources. Prior to that, since 1992, Mr. Brown served in various Human Resource management positions with Emerson Electric Company. Mr. Brown received a B.A. from the University of South Carolina.

**Jeremy Erspamer** has been the Senior Director of Customer Planning and Supply Chain since November 2007. From September 2005 to October 2007, Mr. Erspamer served as Director of Global Sales and Logistics. From April 2003 to August 2005, Mr. Erspamer served as the Senior Manager—Global Sales & Logistics. From February 2000 to March 2003, Mr. Erspamer served in expanding roles within the supply chain and finance organizations. Prior to that Mr. Erspamer served in a Restructure Analyst position with Thomas & Betts Corporation. Mr. Erspamer graduated summa cum laude with a B.S. from the University of Tennessee.

**Graeme Horwood** has been the Vice President of Engineering, Research and Development since June 2001. From April 2000 to May 2001, Mr. Horwood served as Senior Manager Technical Services. From 1986 to 2000, Mr. Horwood held various management positions at Apollo Sports Technologies. Mr. Horwood is a Chartered Engineer as well as a member of the Institute of Mechanical Engineers both in the United Kingdom. Mr. Horwood graduated first class honors with a B.S. from Coventry University.

**Jason A. Jenne** has been the Chief Financial Officer and Treasurer since January 2005 and Vice President since August 2003. From September 2002 to August 2003, Mr. Jenne served

30

as the Director of Corporate Finance. From September 1998 to September 2002, Mr. Jenne served as the Corporate Controller. From 1993 to 1998, Mr. Jenne served in various Finance and Accounting positions at Emerson Electric Company. Mr. Jenne graduated magna cum laude with a B.S. from Southern Illinois University.

**Raeford P. Lucas** has been the Vice President, Sales and Marketing since November 2008. From November 2007 to November 2008, Mr. Lucas served as Vice President, Global Golf Sales. From November 2006 to November 2007, Mr. Lucas served as Vice President of Sales. From June 2006 to October 2006, Mr. Lucas served as Vice President and General Manager of Royal Precision and Precision Brands. From 2000 to June 2006, Mr. Lucas held various management positions at Royal Precision Inc., including Executive Vice President of Sales and Marketing. Prior to that, Mr. Lucas worked at Outdoor Technologies Group as the General Manager of the Fenwick Golf division. Mr. Lucas received a B.S. from North Carolina State University.

**Adrian H. McCall** has been the Senior Vice President and General Manager of Performance Sports since November 2008. From November 2007 to November 2008, Mr. McCall served as Senior Vice President of Global Distribution and Sales. From August 2002 to November 2007, Mr. McCall served as Senior Vice President of Global Distribution and Sales. From March 1999 to July 2002, Mr. McCall served as Vice President of International Sales and Marketing since March 1999. From September 1995 to March 1999, Mr. McCall served as Director of International Sales and Marketing. From May 1992 to September 1995, Mr. McCall served as Director of International Operations of The Upper Deck Company, a manufacturer and distributor of baseball cards. Mr. McCall graduated cum laude with a B.S. from the University of Hartford.

### 3. Audit Committee

Steven Kotler, Jeffrey W. Johnson and Richard W. Gaenzle, Jr. are members of the Audit Committee, and Mr. Kotler chairs this committee. The Audit Committee is empowered to: (1) appoint, fix the compensation of, and oversee the work of the Company's independent registered public accounting firm (including the power to resolve any disagreements between management and the independent registered public accounting firm), with the independent registered public accounting firm reporting directly to the Audit Committee; (2) pre-approve all audit services and permissible non-audit services; and (3) engage and determine funding for independent counsel and other advisors as it may relate to certain financial or administrative matters of the Company. The Company is not a "listed company" under SEC rules and is therefore not required to have an audit committee comprised of independent directors. The Board of Directors has determined that, with the exception of the independence requirement, Mr. Kotler would be an "audit committee financial expert" within the meaning of the rules of the Securities and Exchange Commission.

### 4. Compensation Committee

Steven J. Gilbert, Steven Kotler and Jeffrey W. Johnson are members of the Compensation Committee, and Mr. Gilbert chairs this committee. The Compensation Committee is responsible for monitoring the Company's adherence with its compensation

philosophy, including ensuring that the compensation paid to its executive officers is fair, reasonable and competitive. The Compensation Committee also has the full power and authority to interpret the provisions and supervise the administration of the True Temper Corporation 2004 Equity Incentive Plan, including the determination and/or approval of awards to be granted thereunder, and any and all other power and authority to review, interpret and/or administer compensation and benefit programs as may be delegated by the Company's board of directors to the Compensation Committee from time to time.

## 5.    Executive Compensation

*Base Salary.* The Debtors provide Executives and other employees with base salary to compensate them for services rendered during the fiscal year. Base salaries are set to recognize the experience, skills, knowledge and responsibilities required of the Executives in their respective roles. Base salaries are reviewed annually, and will be adjusted from time to time to realign salaries with market levels after taking into account individual responsibilities, performance and experience. Base salaries are established for a given position taking into consideration the factors discussed above together with available market or comparable salary data.

*Performance-Based Executive Incentive Compensation Plan.* The Debtors maintain a performance based executive incentive compensation plan (the "EICP"). The EICP establishes objectives for the calculation of annual cash bonuses for each Executive, subject to Compensation Committee oversight and modification. The EICP provides for annual incentive bonuses which are intended to compensate Executives for achieving or exceeding Company financial goals and for achieving individual annual performance goals. The EICP uses a sliding scale applied to financial performance targets with corresponding achievement levels. No bonus is earned unless a minimum target is achieved. Additional bonus may be earned should the targets be exceeded.

On August 10, 2005, TTC issued, to certain employees in return for service, a total of 525,400 stock options and stock appreciation rights ("Equity Incentive Awards") to purchase common stock of TTC for $13.56 per share. These Equity Incentive Awards have a term of ten years, and vest and become exercisable at various times and under various conditions through August 10, 2012; with certain acceleration features based on performance criteria and change of control provisions. During the year ended December 31, 2008, a total of 60,000 Equity Incentive Awards were granted and none were exercised or forfeited.

There have been no Equity Incentive Awards granted, exercised or forfeited in 2009. The weighted average remaining contractual life of the Equity Incentive Awards is between six and seven years.

In addition, TTC has 354,000 equity awards which vest only upon a sale of TTC and achievement of certain other terms as described in the awards. As of June 28, 2009, the events required for vesting of these awards are not expected to occur in the near term.

32

## E. Events Leading to Restructuring

As discussed in Section II.B. above, the Debtors had approximately $272 million of indebtedness under the First Lien Credit Facility, Second Lien Credit Facility, and the Senior Subordinated Notes. Unfortunately, a series of recent and unforeseen events severely impacted the Debtors' ability to continue servicing their substantial indebtedness and ultimately led to the Debtors' decision to seek to restructure through a prepackaged chapter 11 plan of reorganization. Those events include (a) the deep recession in the United States (and international) economy, (b) the resulting deterioration in the Company's financial performance in 2009, and (c) the Debtors' default under the First Lien Credit Facility, Second Lien Credit Facility, and the Senior Subordinated Notes.

Due to the current global economic and retail market conditions, and the resulting impact on the overall golf industry, the Debtors were in noncompliance of certain financial covenants under the First Lien Credit Facility and Second Lien Credit Facility as of March 29, 2009 and June 28, 2009; and as of March 16, 2009, the Debtors were in default on these credit agreements and its Senior Subordinated Notes (as more fully described below).

### 1. The Downturn in the Golf Equipment Industry

Current economic conditions have taken its toll on the golf equipment industry. As a result of the deep recession, golfers have significantly reduced overall discretionary spending and delayed purchases of golf equipment. The recession has also caused substantial reductions in overall channel inventory and product launch delays, as retailers, distributors, and original equipment manufacturers continue to streamline their operations and worldwide distribution networks.

Beginning in the fourth quarter of 2008, the combination of both the reductions in overall discretionary spending and channel inventory levels in the golf equipment industry led to a sharp drop in product orders from the Debtors' customers. Consequently, the Company's financial performance declined in 2009.

### 2. Financial Performance Declines in 2009

For the fiscal year ended December 31, 2008, the Company generated approximately $124 million in net sales. However, the confluence of the reduction in overall discretionary spending and channel inventory levels, as described above, adversely impacted the Company's financial performance in the first six months of 2009. In the six month period ending June 28, 2009, the Company (a) generated net sales of approximately $39.7 million, of which $33.1 million came from the golf shaft segment, and $6.6 million from the performance sports segment; (b) had a gross profit of approximately $6 million, of which $4.5 million came from the golf shaft segment, and $1.5 million from the performance sports segment and (c) realized a net loss of approximately $24.1 million. As a result of aggressive expense management and cost controls, the Company was able to deliver positive earnings in the form of adjusted EBITDA for the first six months of 2009 totaling $1.6 million, compared to $20.0 million in the first six months of 2008. In addition, the Company was able to significantly reduce its working capital

and maintain a record level of cash reserves, most prominently through a nearly 30% reduction in inventory carrying levels during the nine months prior to June 30, 2009.

*Net sales* for the first six months of 2009 decreased approximately $33.9 million, or 46.1% to $39.7 million from $73.6 million in the first six months of 2008. Golf shaft sales decreased approximately $30.1 million, or 47.7%, to $33.1 million compared to the $63.2 million realized in the first six months of 2008. The decrease in net sales is primarily related to a decrease in the unit volume of premium steel golf shafts due to a reduction in overall consumer discretionary spending associated with the current economic recession, combined with an overall reduction in the channel inventory located at both the retail and wholesale levels.

Performance sports sales decreased approximately $3.8 million, or 36.6%, to $6.6 million from $10.4 million in the first six months of 2008 primarily due to the economic and recessionary pressures described above.

Net sales to international customers decreased approximately $12.1 million, or 46.7%, to $13.9 million in the first six months of 2009 from $26.0 million in the first six months of 2008. This decrease is primarily related to a decrease in the unit volume of premium steel golf shafts due to a reduction in overall global consumer discretionary spending associated with the current economic recession.

*Gross profit* for the first six months of 2009 decreased $20.5 million, or 77.3%, to $6.0 million from $26.5 million in the first six months of 2008. Gross profit as a percentage of net sales decreased to 15.2% in the first six months of 2009 from 36.0% in the first six months of 2008. The decrease in gross profits as a percentage of net sales was driven by several factors, but resulted primarily from (i) fixed manufacturing costs being spread over significantly lower sales and production volumes in both golf and performance sports segments, and (ii) the mix of products sold being more heavily weighted toward lower priced steel and granite golf shafts as well as performance sports products which generally have lower overall margins. The Company has implemented a number of cost reduction initiatives intended to aggressively offset the negative impact to gross profit margins. In order to position the Company to meet the currently reduced demand for steel golf shafts, total U.S. workforce has been significantly reduced. In addition, the Company has instituted a number of fixed overhead cost reduction initiatives that are designed to remove $8.0 million in infrastructure costs on an annual basis. These reductions include position eliminations, utility and energy conservation programs, facility rationalization and freight program consolidation.

*Selling, General and Administrative Expenses ("SG&A")* for the first six months of 2009 decreased approximately $2.4 million, or 28.3%, to $6.0 million from $8.3 million in the first six months of 2008. This decrease is primarily due to cost reduction programs in response to current economic conditions including reducing headcount, renegotiating lease and rental rates for certain of the Company's facilities, and reducing discretionary spending on items such as travel, entertainment, advertising and promotion. SG&A as a percentage of net sales increased to 15.1% from 11.3% in the first six months of 2008 due to the decrease in net sales described above.

***Operating (Loss) Income*** for the first six months of 2009 decreased approximately $22.0 million, to an operating loss of $11.8 million from operating income of $10.2 million in the first six months of 2008. This decrease reflects the impact from gross profit, SG&A, and restructuring, business development, start-up and transition costs described above.

***Interest Expense, Net*** for the first six months of 2009 increased approximately $0.4 million, or 3.5%, to $12.2 million from $11.8 million in the first six months of 2008. This increase was due primarily to an increase in the weighted average interest rate for the Debtors' variable and fixed rate debt as the Debtors have been incurring interest at default rates under their various debt agreements since March 15, 2009.

***Net Loss*** for the first six months of 2009 increased to a net loss of $24.1 million as compared to a net loss of $1.7 million in the first six months of 2008. This increase reflects the impact from gross profit, SG&A, restructuring, business development, start-up and transition costs, interest expense, and income tax expense (benefit) described above.

As of June 28, 2009, the Company had approximately $180 million in total assets and $319 million in total liabilities on a GAAP basis.

## 3.     Defaults

On March 16, 2009, the Borrower (True Temper) failed to repay all amounts then due under the First Lien Revolver. As a result, the Borrower is in default under the First Lien Credit Facility and the First Lien Lenders are entitled to immediately accelerate the repayment of all other amounts borrowed and exercise all other available remedies.

Also on March 16, 2009, the Issuer (True Temper) failed to make an interest payment of approximately $5.2 million then due to the holders of the Senior Subordinated Notes. As a result, the Issuer is in default under the Indenture and the holders of the Senior Subordinated Notes are entitled to immediately accelerate the repayment of all other amounts borrowed and exercise all other available remedies, if any. Furthermore, interest on the Senior Subordinated Notes is currently accruing at the default rate of 9 ⅛%.

Additionally, the non payment of principal under the First Lien Credit Facility, and the non payment of interest under the Indenture as described above, constituted events of default under the Second Lien Credit Facility. There is also an independent default for failure to pay interest under the Second Lien Credit Facility. As a result, the Second Lien Lenders are entitled to immediately accelerate the repayment of all amounts borrowed under the Second Lien Credit Facility, plus accrued and unpaid interest.

Furthermore, the First Lien Credit Facility and the Second Lien Credit Facility require the Debtors to maintain certain specified financial ratios and tests including minimum interest coverage and fixed charge coverage ratios and maximum leverage ratios. As of June 28, 2009, the Debtors were not in compliance with these ratios.

Due to the events of default described above, all of the Company's debt has been classified as a current liability on its condensed consolidated balance sheets as of June 28, 2009

and December 31, 2008. As of the date hereof, neither the First Lien Lenders, Second Lien Lenders, or any holders of the Senior Subordinated Notes have accelerated the payment of principal or interest under any of the applicable agreements.

## 4.      Operational Restructuring

Management has implemented aggressive strategic initiatives to enhance operating cash flow and mitigate the impact of the severe economic downturn. Such initiatives included reducing headcount on a global basis by approximately 50%, significantly reducing fixed costs at the Company's manufacturing facilities, renegotiating lease terms and rental rates for certain of the Company's facilities, and decreasing discretionary spending on items such as travel, entertainment, and certain marketing expenses.

In addition, the Company instituted a number of fixed overhead cost reduction initiatives that were designed to remove $8 million in infrastructure costs on an annual basis. These reductions include position eliminations, utility and energy conservation programs, facility rationalization and freight program consolidation.

Notwithstanding the Company's aggressive efforts to enhance revenue, reduce expenses, and increase cash flow, the impact of an unprecedented economic downturn and substantial debt service requirements left the Company with weak operating results and significant liquidity challenges in 2009. This will result in the commencement of the Chapter 11 Cases to effectuate the restructuring set forth in the Plan.

## 5.      The Forbearance Agreements

On February 20, 2009, the Debtors retained the investment banking firm, Lazard Middle Market LLC ("Lazard"), to assist them in exploring strategic alternatives to enhance the Debtors' capital structure and negotiate with the First Lien Lenders, Second Lien Lenders, and holders of the Senior Subordinated Notes. As part of those efforts, Lazard worked with the Debtors' legal advisors to negotiate the terms of a long term forbearance to provide the Debtors with an appropriate amount of time to adequately explore their alternatives.

Effective March 16, 2009, the Debtors entered into a 90-day forbearance (the "Forbearance Agreement") with the First Lien Lenders. Under the terms of the Forbearance Agreement, the First Lien Lenders agreed not to exercise their rights to accelerate repayment until June 16, 2009, provided that the Debtors adhered to the certain requirements set forth in the Forbearance Agreement. On June 16, 2009, the Forbearance Agreement was amended, extending the expiration of the forbearance period through July 16, 2009. On July 16, 2009, the Forbearance Agreement was amended again, extending the expiration of the Forbearance Agreement through August 17, 2009. On August 17, 2009, the Forbearance Agreement was amended again, extending the expiration of the Forbearance Agreement through August 31, 2009. On August 31, 2009, the Forbearance Agreement was amended again, extending the expiration of the Forbearance Agreement through September 30, 2009. Upon expiration of the forbearance period, the Forbearance Agreement will be immediately and automatically terminated and be of no further force or effect.

During the term of the Forbearance Agreement, the Debtors and their advisors engaged in numerous discussions with their key constituents - the First Lien Agent, the Participating First Lien Lenders, the Participating Second Lien Lenders, and Plan Investor - regarding possible restructuring alternatives. The Plan Investor includes Newport Global Investors, J.P. Morgan Investment Management Inc. and Northeast Investors and they hold 45.5% of the face amount of the outstanding Senior Subordinated Notes. Those negotiations led to the execution of the Equity Commitment and Plan Support Agreement.

## F. Exploring Strategic Alternatives

### 1. Sale Process Overview

While the Debtors and their advisors were negotiating and pursuing stand alone restructuring discussions with their stakeholders, the Debtors' advisors separately explored an alternate path in an effort to ensure that they pursued all feasible value maximization alternatives. Beginning in May of 2009, Lazard, with the Debtors' assistance, began a sale process and identified and contacted approximately fifty-four (54) potential financial investors and three potential strategic investors it believed might be interested in investing in or acquiring the Debtors either through an in-court or out-of-court sale process.

Lazard identified the potential financial investors based on a number of factors, including their known desire to invest in companies in the consumer products sector, their desire to acquire financially troubled companies and their ability to quickly complete diligence as well as their ability to implement a transaction through a chapter 11 bankruptcy case, if necessary. With respect to the strategic investors, Lazard identified certain investors involved in the manufacturing, production or sale of similar products or with an interest in consumer products generally that might, as a result, be interested in investing in or acquiring the Debtors. Of the investors contacted, thirty-four (34) of them (all financial investors) signed confidentiality agreements and conducted due diligence with respect to the Debtors, which included: (a) receiving and reviewing a detailed business plan presentation that included both historical and projected financials, industry information and the Debtors' position within the industry, (b) an opportunity to submit in writing certain diligence questions to the Company and Lazard, (c) participating in a "town hall style" presentation with management on May 26, 2009, during which the Debtors, among other things, addressed the previously submitted written questions, and (d) having numerous discussions with Lazard. Potential investors that declined to participate in the process cited uncertainty in the Debtors' business plan and the golf industry's recovery as their main reasons for not pursuing the transaction.

Following the presentation by the Debtors' management, investors were invited to submit non-binding indications of interest by June 3, 2009. The Debtors received non-binding term sheets from five (5) financial investors, each of which was subject to legal, business and financial due diligence as well as other conditions precedent. The five proposals had an implied enterprise valuation for the Debtors of between $52 million to $100 million. Further, at the time these proposals were prepared and submitted, the Debtors were estimating their cash taxes for the period from 2009 – 2013 to be only $2 million, approximately $29 million less than contained in the Projections attached to this Disclosure Statement. Moreover, none of the bids provided for any significant cash pay down to the First Lien Lenders and each of the bids would

have required the First Lien Lenders to take a discount on their claims and take back a large portion of their recovery in debt. Finally, none of the bids provided for any recovery to the Second Lien Lenders.

The Debtors and their advisors provided the bids to the First Lien Lenders and discussed them with their financial advisor. Based on the values and types of consideration set out in the bids and the numerous conditions precedent, including legal, financial and business diligence, the Company, in consultation with the First Lien Lenders and their advisors, declined to move forward with any of the bids. Instead, the Debtors worked with their current stakeholders to formulate and negotiate the transactions embodied in the Plan and described in detail below.

## 2. Negotiations of the Equity Commitment and Plan Support Agreement

After good-faith, arm's-length negotiations, the Debtors were able to reach an agreement with the First Lien Agent, the Participating First Lien Lenders, the Participating Second Lien Lenders, and the Plan Investor with respect to a consensual restructuring on the terms set forth in the exhibits to the Equity Commitment and Plan Support Agreement, and formalized by the Equity Commitment and Plan Support Agreement. Based on the Equity Commitment and Plan Support Agreement, the Debtors are prepared to seek confirmation of the Plan shortly after the Petition Date.

The Plan is based on a consensual deal with Debtors' key stakeholders and, significantly, contemplates a significant de-leveraging of the Debtors' balance sheets. In addition, the Plan provides for the following:

- The holders of Allowed First Lien Credit Facility Claims shall receive, in full satisfaction of their Allowed Claims, (i) their pro rata share of $70 million in Cash (minus any cash payments to be distributed under the Plan to holders of the DIP Roll-Up Loan Claims) plus (ii) with respect to the remaining amount of their Allowed Claims, their pro rata share of the obligations under the New Term Loan.

- The holders of Allowed Second Lien Credit Facility Claims will receive their pro rata share of: (i) the Second Lien Lender New Common Stock (representing 11.3924% of the New Common Stock issued under the Plan) and (ii) up to $3,000,000 (but not less than $500,000) in Cash to be distributed from cash collateral existing on the Petition Date. The holders of the Second Lien Facility Claims will be required to execute the New Stockholders Agreement prior to receiving their pro rata distribution of the New Common Stock under the Plan. The acceptance of the Plan by a holder of an Allowed Second Lien Credit Facility Claims will constitute an agreement by such holder to contribute 100% of the Cash on account of its Allowed Claim for deposit into the Trade Account for distribution to Allowed Trade Unsecured Claims in accordance with Article IV. of the Plan.

- The holders of Senior Subordinated Notes will receive no distribution under the Plan which treatment was agreed to by the Plan Investor who holds an aggregate 45.5% of the face amount of the Senior Subordinated Notes.

- All Intercompany Claims will either be Reinstated to the extent determined to be appropriate by the Debtors or Reorganized Debtors or adjusted, continued, or capitalized, either directly or indirectly, in whole or in part.

- All Old Equity Interests in TTC and True Temper will be cancelled as of the Effective Date and the holders of Old Equity Interests in TTC and True Temper will not receive or retain any property or interest in property under the Plan on account of such Interests.

- All Old Equity Interests in TTS-PRC will be Reinstated to the extent determined to be appropriate by the Debtors or Reorganized Debtors.

Confirmation of the Plan is expected to occur over a relatively short timeframe. Specifically, the Equity Commitment and Plan Support Agreement contemplates that the effective date of the Plan must occur on or before December 15, 2009. Solely for purposes of the Plan, the enterprise value of the Debtors is assumed to be $113 million, with an equity value of $79 million. This amount represents the priced being paid by the Plan Investor to acquire the Debtors (including assumed liabilities) and is higher than the bids received prepetition. Moreover, and as stated above, the deal contained in the Plan is supported by the First Lien Agent, the Participating First Lien Lenders, the Participating Second Lien Lenders, and the Plan Investor who holds an aggregate 45.5% of the face amounts of the Senior Subordinated Notes.

## V.     THE ANTICIPATED CHAPTER 11 CASES

If the Debtors receive the requisite votes for acceptance of the Plan, the Debtors intend to file voluntary petitions for relief under chapter 11 of the Bankruptcy Code. At that time, all actions and proceedings against the Debtors and all acts to obtain property from the Debtors will be stayed under section 362 of the Bankruptcy Code. The Debtors will continue to operate their business and manage their property as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

The Debtors do not expect the Chapter 11 Cases to be protracted. To expedite their emergence from chapter 11, the Debtors on the Petition Date, in addition to filing this Disclosure Statement and the Plan, will file motions seeking the relief detailed below, among other relief, from the Bankruptcy Court. Such relief, if granted, will facilitate the administration of the Chapter 11 Cases; there can be no assurance, however, that the Bankruptcy Court will grant the relief sought.

In summary, the Debtors view chapter 11 as an essential tool in restructuring their balance sheet and emerging as a healthier and more profitable company. The Debtors will file chapter 11 cases to effectuate their proposed restructuring and enhance their long-term growth

prospects and financial performance. The Debtors will emerge from chapter 11 a substantially deleveraged enterprise, and will be well positioned to maintain their status as the leading worldwide supplier and innovator of steel, graphite, and multi-material golf shafts, and performance based recreational sports products.

## A. Motions to be Filed

The Debtors intend to seek certain orders from the Bankruptcy Court designed to minimize disruptions of business operations and to facilitate their reorganization. These include, but are not limited to, those described below.

### 1. Applications for Retention of Cole Schotz; Mayer Brown; Lazard; and Logan

The Debtors intend to seek retention of Cole, Schotz, Meisel, Forman & Leonard, P.A. ("Cole Schotz") and Mayer Brown LLP ("Mayer Brown"), as bankruptcy counsel for the Debtors, to represent the Debtors and assist the Debtors in connection with the Chapter 11 Cases. Cole Schotz and Mayer Brown have been intimately involved with the negotiation and development of the Plan and preparation of the "first day" pleadings to be filed with the Bankruptcy Court. The Debtors intend to seek retention of Lazard as investment bankers for the Debtors. In addition, the Debtors intend to seek retention of Logan as claims, noticing and balloting agent for the Debtors.

### 2. Motion for an Order (I) Scheduling a Combined Hearing to Consider Adequacy of Disclosure Statement and Confirmation of the Plan, (II) Establishing Deadlines and Procedures to File Objections, (III) Approving Prepetition Solicitation Procedures, (IV) Approving the Form and Manner of Notice of the Combined Hearing, and (V) Directing the United States Trustee Not to Convene a Meeting of Creditors

The Debtors intend to seek an order scheduling a combined hearing on the adequacy of the disclosure in the Disclosure Statement and the confirmation of the Prepackaged Plan, on the earliest date that is convenient for the Bankruptcy Court to conduct such a hearing. The Debtors will request that this combined hearing occur within 40 days after the Petition Date. Pursuant to the Bankruptcy Rules, the Debtors must provide notice of the combined hearing to approve the Disclosure Statement and confirmation of the Plan to creditors and equity holders. The Debtors will also seek approval of the form and manner of the notice of the combined hearing, and approval of the prepetition solicitation procedures employed to solicit acceptance of the Plan.

In addition, because the Debtors have commenced the solicitation prior to the filing of the Chapter 11 Cases and expect to obtain approval of the Plan from those classes entitled to vote, cause exists under section 341(e) of the Bankruptcy Code for the Bankruptcy Court to order the United States Trustee to not convene a meeting of creditors. The Debtors will therefore seek such an order from the Bankruptcy Court.

40

### 3. Motion to Extend Deadline to File Schedules or Waive Requirement to File Schedules upon Confirmation of Plan

The Debtors will request entry of an order granting additional time to file their schedules and statements of financial affairs. The Debtors have more than 200 creditors throughout the United States, United Kingdom and Japan. The breadth of the Debtors' business operations require the Debtors to maintain voluminous books and records and complex accounting systems. Given the size, complexity, and geographical diversity of their business operations, the number of creditors, and the fact that certain prepetition invoices may not yet have been received or entered into the Debtors' financial accounting system, the large amount of information that must be assembled to prepare the schedules and statements of financial affairs would be unnecessarily burdensome to the Debtors, particularly as certain of the information contained in the schedules and statements of financial affairs is available in this Disclosure Statement and the Plan. As a result, the Debtors will request a 45-day extension to file the schedules and statements of financial affairs, without prejudice to their rights to seek further extensions.

Moreover, to the extent confirmation of the Plan occurs before the expiration of any such extended period, the Debtors will request that such confirmation be deemed to act as a waiver of the requirement to file the schedules and statements of financial affairs. Such relief is common in prepackaged chapter 11 bankruptcy cases because those parties entitled to vote have already had the opportunity to obtain an understanding of the assets and liabilities of the debtors based on the information in the disclosure statement provided to them prior to the petition date.

### 4. Motion to Continue Using Existing Cash Management Systems and for Authority to Enter Into DIP Financing; Use of Cash Collateral

Because the Debtors expect the Plan to be confirmed in 40-45 days of the Petition Date, and because of the administrative hardship that any operating changes would impose on them, the Debtors intend to seek authority to continue using their existing cash management system, bank accounts and business forms and to follow their internal investment and deposit guidelines in accordance with, and as more fully described in, the DIP Facility Agreement. Absent the Bankruptcy Court's authorization of the continued use of the cash management system, the Debtors' business operations would be impeded to the detriment of their estates and their creditors.

Continued use of the existing cash management system will facilitate the Debtors' smooth and orderly transition into chapter 11, minimize the disruption of their businesses while in chapter 11 and expedite their emergence from chapter 11. As a result of set up time and expenses, requiring the Debtors to adopt and implement a new cash management system would likely increase the costs of the Chapter 11 Cases. For the same reasons, requiring the Debtors to cancel their existing bank accounts and establish new accounts or requiring the Debtors to create new business forms would only frustrate the Debtors' efforts to reorganize expeditiously.

Moreover, the Debtors believe that the DIP Facility is critical to the Debtors' operations during the pendency of the Chapter 11 Cases. The Debtors thus will seek authorization to enter into the DIP Financing and to use cash collateral, as that term is defined in section 363(a) of the Bankruptcy Code. See Section V.B. hereof.

41

5. **Motions for Authority to Honor Prepetition Obligations to Customers, Critical Vendors, Insurance Carriers, Taxing Authorities, Shippers and Lien Claimants**

The Debtors have pre-petition obligations to various third parties, including customers, "critical" vendors, insurance carriers, taxing authorities, and shippers and other lien claimants. The Debtors believe that the continuation of their positive relationships with such parties are imperative to their continued business operations and reorganization efforts, and that payment of such obligations in the ordinary course of business are essential to preserve and enhance the value of the Debtors' estates.

Accordingly, the Debtors will request the Court to exercise its equitable powers and authorize the Debtors to pay their pre-petition obligations to certain customers, critical vendors, insurance carriers, taxing authorities, and shippers and other lien claimants up to amounts set forth in the orders entered by the Bankruptcy Court.

6. **Motion for Authority to Pay Prepetition Employee Wages and Salaries and Associated Benefits**

The Debtors believe that they have valuable assets in their work force, and that any delay in paying prepetition compensation or benefits to their employees, independent contractors and temporary workers would significantly jeopardize the Debtors' relationships with employees, independent contractors and temporary workers and irreparably harm morale at a time when the need for continued dedication, confidence, and cooperation of the Debtors' employees, independent contractors and temporary workers is most critical. Accordingly, the Debtors will seek authority to pay compensation and benefits which were accrued but unpaid as of the Petition Date.

**B. Debtor in Possession Financing**

Upon approval from the Bankruptcy Court, the Debtors expect to enter into the DIP Facility, the principal terms of which are summarized below.[1]

| SUMMARY OF DIP FACILITY | |
| --- | --- |
| **Borrower** | True Temper Sports, Inc. |
| **Guarantors** | True Temper Corporation and True Temper Sports-PRC Holdings, Inc. |

---

[1] In the case of any inconsistency between this summary and the DIP Facility Agreement, the terms of the DIP Facility Agreement shall control. Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the DIP Facility Agreement. The commitment for the DIP Revolving Credit Facility is attached to the Plan as Exhibit A.

| SUMMARY OF DIP FACILITY | |
|---|---|
| **DIP Revolving Credit Facility Lenders** | General Electric Capital Corporation and the First Lien Lenders in individual participation amounts to be determined |
| **DIP Revolving Agent** | General Electric Capital Corporation |
| **DIP Revolving Credit Facility** | A senior secured, superpriority debtor-in-possession revolving credit facility pursuant to the DIP Facility Agreement, which facility shall provide for postpetition extensions of credit in a maximum amount of $10 million, inclusive of a letter of credit sub-facility in an aggregate amount of $5 million (which in turn includes all First Lien Credit Facility Letter of Credit Claims), subject to and in accordance with the terms and conditions of the DIP Facility Agreement. Outstanding letters of credit under the First Lien Credit Facility will be rolled up into the letter of credit subfacility on the date in which all closing conditions are satisfied. |
| **DIP Roll-Up Loan** | A debtor-in-possession term loan evidenced by the DIP Facility that constitutes a roll-up of $80 million in outstanding obligations under the First Lien Credit Facility other than First Lien Credit Facility Letter of Credit Claims, which shall constitute part of the DIP Revolving Credit Facility. |
| **DIP Roll-Up Loan Lenders** | The First Lien Lenders each in its capacity as a term loan lender under the DIP Facility Agreement. |
| **DIP Roll-Up Agent** | Credit Suisse |
| **Termination Date** | The earlier of (i) 180 days after the closing date of the DIP Facility (the "Maturity Date") or (ii) the effective date of the Plan, at which earlier date the DIP Facility shall be due and payable. |

46701/0001-5859301v9

# SUMMARY OF DIP FACILITY

| | |
|---|---|
| **Security and Priority** | To secure all obligations of Borrower and Guarantors under the DIP Facility, the DIP Revolving Agent and the DIP Roll-Up Agent will each receive (on behalf of itself and its respective lenders) a fully perfected first priority security interest in all of the existing and after acquired real and personal, tangible and intangible, assets of the Borrower and Guarantors.<br><br>Such security interest shall have priority over (i) the security interests securing the First Lien Credit Facility and the Second Lien Credit Facility, and (ii) any and all security interests of any creditor that are junior to the prepetition security interests securing the First Lien Credit Facility. |
| **Interest** | Interest will accrue on outstanding obligations under the DIP Facility at a rate equal to LIBOR (3.00% floor) plus 8.00% per annum. Interest on the DIP Facility will be payable in cash. |
| **Commitment and Other Fees** | Letter of Credit Fee equal to 8.00% per annum (calculated on the basis of a 360-day year and actual days elapsed) on the face amount of letters of credit, payable to the DIP Revolving Agent monthly in arrears, plus any charges assessed by the issuing financial institution.<br><br>Unused Facility Fee equal to 1.00% per annum (calculated on the basis of a 360-day year and actual days elapsed) on the average unused daily balance of the DIP Revolving Credit Facility, payable to the DIP Revolving Agent monthly in arrears. |
| **Use of Proceeds** | The proceeds of the DIP Revolving Credit Facility will be used (i) to pay transaction costs, fees and expenses which are incurred in connection with the DIP Facility, and (ii) for working capital and other general corporate purposes (other than the repayment of pre-petition indebtedness that is not authorized by Bankruptcy Court order(s). |
| **Fees and Expenses** | The Revolving DIP Agent shall receive from the Borrower, on a monthly basis, current cash payment of all reasonable fees and expenses (including, without limitation, the reasonable fees and expenses of its legal counsels).<br><br>The DIP Roll-Up Agent shall receive from the Borrower, on a monthly basis, current cash payment of all reasonable fees and expenses (including, without limitation, the reasonable fees and expenses of the DIP Roll-Up Agent's counsel and financial advisor). |

46701/0001-5859301v9

| SUMMARY OF DIP FACILITY | |
|---|---|
| **Events of Default** | Events of default will include, but not be limited to, as are usual and customary for debtor-in-possession financings of this kind. |
| **Voluntary Prepayments** | The DIP Facility may be prepaid in whole or in part without premium or penalty; provided that no voluntary prepayment of the DIP Roll-Up Loans shall be permitted until the DIP Revolving Credit Facility has been repaid in full and all commitments under the DIP Revolving Credit Facility have been terminated. |

## C.  Timetable for Chapter 11 Cases

Assuming that the Bankruptcy Court approves the Debtors' scheduling motion with respect to the Disclosure Statement and Confirmation Hearing, the Debtors anticipate that the Disclosure Statement and Confirmation Hearing would occur within 40-45 days of the Petition Date.  There can be no assurance, however, that the Bankruptcy Court's orders to be entered on the Petition Date will permit the Chapter 11 Cases to proceed as expeditiously as anticipated.

## VI.  SUMMARY OF THE PLAN OF REORGANIZATION

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, TO THE EXHIBIT ATTACHED THERETO, AND THE PLAN SUPPLEMENT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS, THE REORGANIZED DEBTORS, AND OTHER PARTIES IN INTEREST.  IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

46701/0001-5859301v9

The Plan described herein provides for the restructuring of the Debtors' liabilities in a manner designed to maximize recoveries to holders of claims against and interests in the Debtors.

The terms of the Plan are based upon, among other things, the Debtors' assessment of their ability to achieve the goals of their business plan, make the Distributions contemplated under the Plan, and pay their continuing obligations in the ordinary course of their businesses. Under the Plan, Claims against and Interests in the Debtors are divided into Classes according to their relative seniority and other criteria.

If the Plan is confirmed by the Bankruptcy Court and consummated, (i) the Claims in certain Classes will be reinstated or modified and receive distributions equal to the full amount of such Claims, (ii) the Claims of certain other Classes will be modified and receive distributions constituting a partial recovery on such Claims, and (iii) the Claims and Interests in certain other Classes will receive no recovery on such Claims or Interests. On the Distribution Date and at certain times thereafter, the Disbursing Agent will distribute Cash, New Common Stock, and other property in respect of certain Classes of Claims as provided in the Plan. The Classes of Claims against and Interests in the Debtors created under the Plan, the treatment of those Classes under the Plan, and the other property to be distributed under the Plan, are described below.

The Debtors believe that (i) through the Plan, holders of Allowed Claims will obtain a substantially greater recovery from the estates of the Debtors than the recovery they would receive if (a) the Debtors filed the Chapter 11 Cases without prior approval of the Plan by the First Lien Agent, the Participating First Lien Lenders, the Participating Second Lien Lenders, and the Plan Investor or (b) the Debtors filed petitions under chapter 7 of the Bankruptcy Code; and (ii) the Plan will afford the Debtors the opportunity and ability to continue their business as a viable going concern and preserve ongoing employment for the Debtors' employees.

## A.    Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of its creditors and shareholders. Upon the filing of a petition for relief under chapter 11, section 362 of the Bankruptcy Code provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the chapter 11 cases.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor of, or equity security holder in, the debtor, whether or not such

creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan. Subject to certain limited exceptions, and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes for such debt the obligations specified under the confirmed plan, and terminates all rights and interests of equity security holders.

A "pre-packaged" plan of reorganization is one in which a debtor seeks approval of a plan of reorganization from affected creditors before filing for bankruptcy. Because solicitation of acceptances takes place before the bankruptcy filing, the amount of time required for the bankruptcy case is often less than in more conventional bankruptcy cases. Greater certainty of results and reduced costs are other benefits generally associated with pre-packaged bankruptcy cases.

## B.      Classification and Treatment Of Claims And Interests

Section 1122 of the Bankruptcy Code provides that a plan of reorganization must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1122 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than DIP Revolving Credit Facility Claims, DIP Roll-Up Loan Claims, Administrative Claims, Priority Tax Claims and Professional Fee Claims, which, pursuant to section 1123(a)(1), do not need to be classified). The Debtors also are required, under section 1122 of the Bankruptcy Code, to classify Claims against and Interests in the Debtors into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law, but it is possible that a holder of a Claim or Interest may challenge the Debtors' classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In that event, the Debtors intend, to the extent permitted by the Bankruptcy Code, the Plan, and the Bankruptcy Court, to make such reasonable modifications of the classifications under the Plan to permit confirmation and to use the Plan acceptances received for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting holder ultimately is deemed to be a member. Any such reclassification could adversely affect the Class in which such holder initially was a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

The amount of any Impaired Claim that ultimately is allowed by the Bankruptcy Court may vary from any estimated allowed amount of such Claim and, accordingly, the total Claims ultimately allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the value of the property that ultimately will be received by a particular holder of an Allowed Claim under the Plan may be adversely (or favorably) affected by the aggregate amount of Claims ultimately allowed in the applicable Class.

46701/0001-5859301v9

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized below. The Debtors believe that the consideration, if any, provided under the Plan to holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual and statutory subordination) of such Claims and Interests and the fair value of the Debtors' assets. In view of the deemed rejection by Classes 5, 6 and 8, however, as set forth below, the Debtors will seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code. Specifically, section 1129(b) of the Bankruptcy Code permits confirmation of a chapter 11 plan in certain circumstances even if the plan has not been accepted by all impaired classes of claims and interests. See Section IX.F below. Although the Debtors believe that the Plan can be confirmed under section 1129(b), there can be no assurance that the Bankruptcy Court will find that the requirements to do so have been satisfied.

### 1. Treatment Of Unclassified Claims Under The Plan

#### (a) DIP Revolving Credit Facility Claims

Except to the extent that a holder of an Allowed DIP Revolving Credit Facility Claim and the Debtors or the Reorganized Debtors, as the case may be, agree to a different treatment, each Allowed DIP Revolving Credit Facility Claim (if any) shall be paid in full in Cash on the Effective Date from the proceeds of the New Revolving Credit Facility; provided, however, that the DIP Revolving Credit Facility Claims in respect of letters of credit issued (or deemed issued) pursuant to the DIP Facility Agreement shall be assumed by the Reorganized Debtors in accordance with the terms of the New Revolving Credit Facility.

#### (b) Administrative Claims

Except to the extent that a holder of an Allowed Administrative Claim and the Debtor against which such Allowed Administrative Claim is asserted or the Reorganized Debtors, as the case may be (with the consent of the Plan Investor), agree to different treatment, each holder of an Allowed Administrative Claim shall be paid in full in Cash or as otherwise provided in the Bankruptcy Code.

#### (c) DIP Roll-Up Loan Claims

Pursuant to the DIP Facility Agreement, and as a precondition to the roll-up of the First Lien Credit Facility Claims thereunder, each DIP Roll-Up Loan Lender will be required to agree to receive, and shall receive on the Effective Date, in full satisfaction of their DIP Roll-Up Loan Claims: (i) their pro rata share of $70 million in Cash plus (ii) with respect to the remaining amount of their Allowed Claims (if any), their pro rata share of the obligations under the New Term Loan.

#### (d) Professional Fee Claims

All final requests for compensation or reimbursement of costs and expenses pursuant to sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code for services rendered to the Debtors or any Committee (if appointed) prior to the Effective Date must be filed with the

Bankruptcy Court and served on the Reorganized Debtors and their counsel no later than 60 days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Objections to applications of such Professionals or other entities for compensation or reimbursement of costs and expenses must be filed and served on the Reorganized Debtors and their counsel and the requesting Professional or other entity no later than 25 days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application for compensation or reimbursement was served. The Reorganized Debtors may pay charges that they incur on and after the Effective Date for professionals' fees, disbursements, expenses or related support services in the ordinary course of business and without application to the Bankruptcy Court.

### (e) Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim and the Debtor against which such Priority Tax Claims is asserted or the Reorganized Debtors, as the case may be (with the consent of the Plan Investor), agree to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the option of the Debtors or the Reorganized Debtors, as the case may be (with the consent of the Plan Investor), (a) cash on the Effective Date in an amount equal to such Allowed Priority Tax Claim, or (b) over a period through the fifth anniversary of the Petition Date, deferred cash payments in an aggregate amount equal to such Allowed Priority Tax Claim, plus interest on such aggregate amount over such period. All Allowed Priority Tax Claims which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

## 2. Treatment Of Classified Claims And Equity Interests

### (a) Other Priority Claims (Class 1)

The legal, equitable and contractual rights of the holders of Other Priority Claims are Unimpaired by the Plan. Except to the extent that the holder of such Claim and the Debtor against which such Other Priority Claim is asserted or the Reorganized Debtors, as the case may be (with the consent of the Plan Investor) agree to a different treatment, each holder of an Allowed Other Priority Claim shall be paid in full in Cash or as otherwise provided in the Bankruptcy Code.

### (b) First Lien Credit Facility Claims (Class 2)

The legal, equitable, and contractual rights of the holders of the DIP Roll-Up Claims and/or First Lien Credit Facility Claims are Impaired by the Plan. On the Effective Date, the holders of Allowed First Lien Credit Facility Claims shall receive, in full satisfaction of their Allowed Claims, (i) their pro rata share of $70 million in Cash (minus any cash payments to be distributed under the Plan to holders of the DIP Roll-Up Loan Claims) plus (ii) with respect to the remaining amount of their Allowed Claims, their pro rata share of the obligations under the New Term Loan.

46701/0001-5859301v9

### (c) Second Lien Credit Facility Claims (Class 3)

The legal, equitable and contractual rights of the holders of Second Lien Credit Facility Claims are Impaired by the Plan. On the Effective Date, holders of Allowed Second Lien Credit Facility Claims shall receive, in full satisfaction of their Allowed Claims their pro rata share of: (i) the Second Lien Lender New Common Stock (representing 11.3924% of the New Common Stock issued under the Plan) and (ii) up to $3,000,000 (but not less than $500,000) in Cash to be distributed from cash collateral existing on the Petition Date. The holders of the Second Lien Credit Facility Claims will be required to execute the New Stockholders Agreement prior to receiving their pro rata distribution of the New Common Stock under the Plan. The acceptance of the Plan by a holder of an Allowed Second Lien Credit Facility Claims shall constitute an agreement by such holder to contribute 100% of the Cash distribution on account of its Allowed Claim for deposit into the Trade Account for distribution to Allowed Trade Unsecured Claims in accordance with Article IV. of the Plan.

### (d) Other Secured Claims (Class 4)

The legal, equitable and contractual rights of the holders of Other Secured Claims are Unimpaired by the Plan. Unless the holder of such Claim and the Debtor or Reorganized Debtor, as the case may be, against which such Other Secured Claim is asserted agree to a different treatment, on the Effective Date, each holder of an Allowed Other Secured Claim shall have its Claim Reinstated. Prepetition Liens with respect to such Allowed Other Secured Claims shall survive the Effective Date and shall continue in accordance with contractual or statutory terms until such Allowed other Secured Claim has been paid in full.

### (e) General Unsecured Claims (Class 5)

The legal, equitable and contractual rights of the holders of General Unsecured Claims are Impaired by the Plan. On or as soon as reasonably practicable after the Effective Date, in exchange for their Allowed General Unsecured Claims, each holder thereof shall not receive or retain any property or interest on account of their General Unsecured Claims. However, holders of General Unsecured Claims that are also holders of Trade Unsecured Claims shall be entitled to receive distributions on account of such Trade Unsecured Claims pursuant to Article IV. of the Plan from the proceeds of the Trade Account funded by accepting holders of Allowed Second Lien Credit Facility Claims.

### (f) Senior Subordinated Note Claims (Class 6)

The legal, equitable, and contractual rights of the holders of the Senior Subordinated Note Claims are Impaired by the Plan. The Senior Subordinated Notes shall be cancelled as of the Effective Date and the holders of Senior Subordinated Note Claims shall not receive or retain any property or interest on account of such Senior Subordinated Note Claims.

### (g) Intercompany Claims (Class 7)

The legal, equitable and contractual rights of the holders of Intercompany Claims are Unimpaired by the Plan. On or as soon as practicable after the Effective Date, and after

consultation with and approval by each of the Plan Investors, with such approval not to be unreasonably withheld, all Intercompany Claims will either be Reinstated to the extent determined to be appropriate by the Debtors or Reorganized Debtors or adjusted, continued, or capitalized, either directly or indirectly, in whole or in part. Any such transaction may be effected on or subsequent to the Effective Date without any further action by the Bankruptcy Court.

### (h)     Old Equity Interests in TTC and True Temper (Class 8)

The legal, equitable and contractual rights of the holders of Old Equity Interests in TTC and True Temper are Impaired by the Plan. All Old Equity Interests in TTC and True Temper shall be cancelled as of the Effective Date and the holders of Old Equity Interests in TTC and True Temper shall not receive or retain any property or interest in property under the Plan on account of such Interests.

### (i)     Old Equity Interests in TTS-PRC (Class 9)

The legal, equitable and contractual rights of the holders of Old Equity Interests in TTS-PRC are Unimpaired by the Plan. On the Effective Date, Old Equity Interests in TTS-PRC shall be Reinstated to the extent determined to be appropriate by the Debtors or Reorganized Debtors.

## C.     Substantive Consolidation of Debtors for Purposes of Voting, Confirmation and Distribution

The Plan provides for substantive consolidation of the Debtors' Estates, but solely for purposes of voting, confirmation, and making distributions to the holders of Allowed Claims under the Plan. On the Effective Date, and solely for purposes of voting, confirmation, and making distributions to the holders of Allowed Claims under the Plan: (a) all guarantees of any Debtor of the payment, performance or collection of another Debtor with respect to Claims against such Debtor will be eliminated and cancelled; (b) any single obligation of multiple Debtors shall be treated as a single obligation in the Chapter 11 Cases; and (c) all guarantees by a Debtor with respect to Claims against one or more of the other Debtors will be treated as a single obligation in the Chapter 11 Cases. On the Effective Date, and in accordance with the terms of the Plan, all Claims based upon guarantees of collection, payment, or performance made by a Debtor as to the obligation of another Debtor will be released and of no further force and effect. Except as set forth in Article I.F. of the Plan, such substantive consolidation will not affect (a) the legal and/or corporate structure of the Reorganized Debtors, (b) any obligations under any leases or contracts assumed in the Plan or otherwise after the Petition Date, and (c) pre-and post-Petition Date Liens, guarantees and security interests that are required to be maintained (x) in connection with contracts that were entered into during the Debtors' Chapter 11 Cases or that have been or will be assumed pursuant to section 365 of the Bankruptcy Code and the Plan, (y) in connection with the terms of the DIP Facility, the DIP Facility Agreement, the Exit Facility and the Exit Facility Loan Documents, and (z) pursuant to the terms and conditions contained in the Plan. From and after the Effective Date, each of the Reorganized Debtors will be deemed a separate and distinct entity, properly capitalized, vested with all of the assets of such debtor as they existed prior to the Effective Date and having the liabilities and obligations provided for under the Plan.

46701/0001-5859301v9

Notwithstanding anything to the contrary herein, on or after the Effective Date, after consultation with and approval by each of the Plan Investors, with such approval not to be unreasonably withheld, any and all Intercompany Claims will be adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid, continued, or discharged to the extent reasonably determined appropriate by the Reorganized Debtors. Any such transaction may be effected on or subsequent to the Effective Date without any further action by the Bankruptcy Court or by the stockholders of any of the Reorganized Debtors.

Notwithstanding the substantive consolidation of the Estates for the purposes set forth in Article I.F. of the Plan, each Reorganized Debtor shall pay all fees payable under section 1930 of title 28 of the United States Code on all disbursements, including Plan Distributions and disbursements in and outside of the ordinary course of business, until the entry of a Final Decree in its Reorganization Case, dismissal of its Reorganization Case, or conversion of its Reorganization Case to a case under chapter 7 of the Bankruptcy Code.

## 1. The Effect of Substantive Consolidation

Pursuant to Article I. of the Plan, the Debtors will be deemed consolidated solely for the purposes of voting, confirmation and making distributions to the holders of Allowed Claims under the Plan. Substantive consolidation is an equitable remedy that a bankruptcy court may apply in the chapter 11 cases of affiliated debtors, among other instances. Substantive consolidation of the estates of multiple debtors in a bankruptcy case effectively combines the assets and liabilities of multiple debtors for certain purposes under a plan. The effect of substantive consolidation is the pooling of the assets of, and claims against, consolidated debtors, satisfying liabilities from a common fund and combining the creditors of consolidated debtors for purposes of voting on the reorganization plan. In the absence of substantive consolidation, the creditors of an individual debtor could only look to the assets of that debtor to fully or partially satisfy such creditor's claim.

## 2. The Basis for Substantive Consolidation in the Chapter 11 Cases

Substantive consolidation of the Debtors is an important element of the Debtors' successful implementation of a plan of reorganization. The Debtors submit that the proposed substantive consolidation structure is supported by the applicable legal standards, practical considerations and the Debtors' prepetition operations and financial affairs. As all of the Debtors are obligors with respect to all Claims relating to, or arising under, the First Lien Credit Facility and Second Lien Credit Facility, there is no Debtor for which the value of its prepetition assets exceeds the amount of the First Lien Credit Facility and Second Lien Credit Facility Claims that would be asserted against it. Therefore, in the Debtors' view, it is extremely unlikely that separate plans for each of the Debtors would produce an entitlement to a recovery for any creditor that is more than what is available under the Plan. The Debtors are not seeking to substantively consolidate offensively (i.e., with a primary purpose of disadvantaging tactically a group of creditors in the plan process or altering creditors' rights). Moreover, holders of Claims in Classes 2 and 3 (i.e., the First Lien Lenders and Second Lien Lenders), that relied on the legal separateness of the Debtors as obligors and guarantors, respectively, and are the only creditors that could arguably be negatively affected by this provision in the Plan, are anticipated to accept the Plan as a Class.

## D.      Means For Implementation And Execution Of The Plan

### 1.      The Plan Investment

As consideration for its $70 million Cash investment in New TT Holdings (which will be used to fund distributions under the Plan) (the "Plan Investment"), the Plan Investor will receive 10,000,000 shares of the New Common Stock issued by New TT Holdings pursuant to the provisions hereof, subject to dilution on account of the New Management Incentive Plan and the Second Lien Lender New Common Stock that may be distributable to holders of Allowed Second Lien Credit Facility Claims. Prior to the transactions described in the following paragraph, New TT Holdings will contribute the Plan Investment and the Second Lien Lender New Common Stock to New True Temper (via New TTC).

On the Effective Date, (i) TTC will contribute 100% of the stock of True Temper to TTC Sub, a wholly owned subsidiary of TTC, (ii) True Temper will convert into a single-member limited liability company, (iii) following such conversion, all Prepetition liabilities of True Temper (excluding any liabilities to be assumed or entered into by Reorganized True Temper under the Plan) shall be deemed transferred and assigned to, and assumed by TTC Sub, and (iv) immediately following the assignment of such liabilities, True Temper will be merged with New True Temper, a wholly-owned subsidiary of New TTC, pursuant to the terms of the True Temper Merger Agreement, with New TTC owning 100% of New True Temper as the surviving company. As consideration for the preceding merger transaction: New True Temper will (a) pay $70 million Cash to fund distributions under the Plan, (b) assume or enter into all obligations to be assumed or entered into by Reorganized True Temper herein, including, without limitation, the obligations under Exit Facility and (c) pay the Second Lien Lender New Common Stock to the holders of Second Lien Facility Claims.

### 2.      Authorization and Issuance of New Common Stock

On the Effective Date, the Plan Investor and the holders of Allowed Second Lien Facility Claims will hold all of the issued and outstanding shares of the New Common Stock directly or indirectly as each determines to be reasonably necessary. The holders of the New Common Stock will enter into a New Stockholders Agreement, which will cover inspection rights, information rights (including annual audited and quarterly unaudited financial statements), registration rights with respect to the New Common Stock, preemptive rights, and such other provisions as agreed to by each of the Plan Investors. The holders of Second Lien Credit Facility Claims will be required to execute the New Stockholders Agreement prior to receiving any distribution of New Common Stock under the Plan.

The New Common Stock issued under the Plan will be subject to dilution based upon (i) the issuance of New Common Stock pursuant to the New Management Incentive Plan as set forth in Article IV. of the Plan and (ii) any other shares of New Common Stock issued post-emergence or issuable post-emergence upon exercise or conversion of any options, warrants, convertible securities, exercisable securities or other securities issues post-emergence (collectively, the "Other Equity Issuances").

The issuance of the New Common Stock to the holders of Allowed Second Lien Facility Claims under the Plan will be authorized under section 1145 of the Bankruptcy Code as of the Effective Date without further act or action by any Person, except as may be required by New TT Holdings' Certificate of Incorporation, New TT Holdings' By-Laws, or applicable law, regulation, order or rule; and all documents evidencing same will be executed and delivered as provided for in the Plan or the Plan Supplement.

For the avoidance of doubt, the New Common Stock issued to the holders of Allowed Second Lien Credit Facility Claims pursuant to the Plan shall be New Common Stock issued by New TT Holdings (which will be in addition to the New Common Stock issued to the Plan Investor). Accordingly, the aggregate number of shares of New Common Stock distributed to the holders of Allowed Second Lien Facility Claims shall be equal to 11.3924% of the total number of shares to be issued to (i) the holders of Allowed Second Lien Facility Claims and (ii) the Plan Investor combined pursuant to the Plan (subject, among other things, to the restriction on the issuance of fractional shares in Article V.F. of the Plan).

## 3. Payment of Trade Unsecured Claims by the Second Lien Lenders

On or before the Effective Date, the Disbursing Agent will establish, for the benefit of the holders of the Allowed Trade Unsecured Claims, the Trade Account, which will be funded on the Effective Date by the Cash component of the distribution payable to the holders of Second Lien Credit Facility Claims that accept the Plan. Each holder of an Allowed Trade Unsecured Claim that (a) does not object to the confirmation of this Plan and (b) executes a Trade Unsecured Claim Release will receive payment from the Trade Account: (i) equal to the full Cash principal amount of its Allowed Claim, on the later of (A) the Effective Date or as soon as practicable thereafter, (B) as soon as practicable after the date a Trade Unsecured Claim becomes an Allowed Claim, and (C) the date such Claim becomes due and payable in the ordinary course of the Debtors' or Reorganized Debtors' business, as applicable; or (ii) on such other terms and conditions as may be agreed between the holder of such Allowed Trade Unsecured Claim, on the one hand, and the Reorganized Debtors, on the other hand (any of the foregoing, a "Trade Unsecured Claim Payment"). All Trade Unsecured Claim Payments will be made to the appropriate holders of such Claims, free and clear of all Liens, claims and encumbrances. After all distributions to holders of Allowed Trade Unsecured Claims have been distributed the undistributed amount remaining in the Trade Account, if any, will become the sole and exclusive property of the Second Lien Agent (for the pro rata benefit of those holders of Second Lien Credit Facility Claims that accepted the Plan and thereby agreed to fund the Trade Account).

## 4. Continued Existence and Vesting of Assets in Reorganized Debtors

After the Effective Date, the Reorganized Debtors will continue to exist as separate legal entities in accordance with the applicable law in the respective jurisdiction in which they are incorporated or organized and pursuant to their respective organizational documents in effect prior to the Effective Date, except to the extent such organizational documents are amended, restated or replaced under the Plan. Notwithstanding anything else to the contrary in the Plan, the Unimpaired Claims of a particular Debtor or Reorganized Debtor will remain the obligations solely of such Debtor or Reorganized Debtor and will not become obligations of any other Debtor or Reorganized Debtor by virtue of the Plan, the Chapter 11 Cases, or otherwise.

On and after the Effective Date, all property of the Estates, and all Litigation Claims, and any property acquired by the Debtors under or in connection with the Plan, will vest in the Reorganized Debtors free and clear of all Claims, Interests, Liens, charges, other encumbrances, and interests except as otherwise expressly provided in the Plan, the Confirmation Order or the Exit Facility Loan Documents. On and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property and compromise or settle any Claims without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, the Reorganized Debtors may pay charges that they incur on and after the Effective Date for professionals' fees, disbursements, expenses or related support services without application to the Bankruptcy Court.

### 5. Exit Financing

Subject to, and upon the occurrence of, the Effective Date, and without further notice to or order or other approval of the Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any person or entity (including the boards of directors of the Debtors), except for the Confirmation Order and as otherwise required by the Exit Facility Loan Documents, the Reorganized Debtors will be authorized to enter into and perform and receive the proceeds of the Exit Facility, and to execute and deliver the Exit Facility Documents, in each case consistent with the terms of the Plan and the commitment papers attached as Exhibit A to the Plan or otherwise on terms and conditions acceptable to the applicable Exit Agent(s). Confirmation of the Plan will be deemed (i) approval of the Exit Facility and the Exit Facility Loan Documents, and all transactions contemplated thereby, including, without limitation, any supplemental or additional syndication of the Exit Facility, and all actions to be take, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and (ii) authorization of the Reorganized Debtors to enter into and execute the Exit Loan Documents and such other documents as the Exit Agents and/or Exit Lenders under the Exit Facility may require to effectuate the treatment afforded to such lenders pursuant to the Exit Facility, subject to such modifications as the Reorganized Debtors may deem to be reasonably necessary to consummate the Exit Facility with the prior written consent of the applicable Exit Agent(s).

On the Effective Date, the proceeds of the New Revolving Credit Facility will be used in part to repay in full on the Effective Date all of the DIP Revolving Credit Facility Claims except for DIP Revolving Credit Facility Claims in respect of then outstanding letters of credit issued (or deemed issued) under the DIP Facility, which DIP Revolving Credit Facility Claims will be assumed by the Reorganized Debtors as part of the New Revolving Credit Facility in accordance with the terms thereof, and such payments shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. In addition, the proceeds of the New Revolving Credit Facility may be used for any other purpose permitted under the New Revolving Credit Facility, including the funding of the obligations under the Plan and satisfaction of ongoing working capital needs.

Upon occurrence of the Effective Date, the commitments under the DIP Facility will have terminated. Notwithstanding the foregoing, all obligations of the Debtors to the DIP Facility

Agents and the DIP Lenders under the DIP Facility Agreement that are expressly stated in the DIP Facility Agreement as surviving such agreement's termination will, as so specified, survive without prejudice and remain in full force and effect and shall (x) in the case of any surviving DIP Revolving Credit Facility Claims, be part of the New Revolving Credit Facility, and (y) in the case of any surviving DIP Roll-Up Loan Claims, be part of the New Term Loan.

The Exit Facility Loan Documents will constitute legal, valid, binding and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the Exit Facility Loan Documents are being extended, and will be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, will not be subject to recharacterization for any purposes whatsoever, and will not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any other applicable non-bankruptcy law. On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facility Loan Documents (i) will be deemed to be approved, (ii) will be legal, binding and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facility Loan Documents, (iii) will be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Facility Loan Documents, and (iv) will not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the persons and entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties. On and after the Effective Date, the Liens and security interests securing the New Revolving Credit Facility will be senior to the Liens and security interests securing the New Term Loan, and the relative Lien, payment and enforcement priorities of the New Revolving Credit Facility and New Term Loan shall be governed by the terms of an intercreditor agreement in form and substance satisfactory to the Exit Agents.

### 6. Dissolution of TTC

On or after the Effective Date and upon completion of any and all actions required to be taken by TTC pursuant to the terms of the Plan or any agreement entered into by TTC in connection herewith, TTC shall be dissolved under applicable law.

### 7. Corporate Action; Effectuating Documents; Further Transactions

Upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved in all respects, including (i) adoption or assumption, as applicable, of executory contracts and unexpired leases, (ii) selection of the directors and officers for the Reorganized Debtors, (iii) the entry into the Exit Facility and the execution and delivery of the Exit Facility

56

Loan Documents, (iv) the distribution of the New Common Stock, (v) the merger transaction contemplated in Article IV. of the Plan, and (vi) all other actions contemplated by the Plan (whether to occur before, on or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan will be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors or officers of the Debtors or the Reorganized Debtors. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors (including, any vice-president, president, chief executive officer, treasurer or chief financial officer of any Debtor or Reorganized Debtor), as applicable, will be authorized and directed, in the name of and on behalf of the Reorganized Debtors, to execute, deliver, file, certify, attest to or record such contracts, instruments, releases, indentures and other agreements or documents, and take such actions, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan including (i) the Exit Facility, (ii) the organizational documents relating to the Reorganized Debtors, (iii) the merger and other documentation relating to the merger transaction described in Article IV. of the Plan) and (iv) any and all other agreements, documents, securities and instruments relating to the foregoing. The authorizations and approvals contemplated by Article III. of the Plan will be effective notwithstanding any requirements under nonbankruptcy law. The issuance of the New Common Stock to the holders of Second Lien Credit Facility Claims will be exempt from the requirements of section 16(b) of the Securities and Exchange Act of 1934 (pursuant to rule 16b-3 promulgated thereunder) with respect to any acquisition of such securities by an officer or director (or a director deputized for purposes thereof) as of the Effective Date.

8.      **Exemption from Certain Transfer Taxes**

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of any security, or the making delivery, filing, or recording of any instrument of transfer under, or in connection with, the Plan (including, for this purpose, in connection with the organizational documents relating to the Reorganized Debtors, the Exit Facility Loan Documents, and the merger and other documents relating to the transactions described in Article IV. of the Plan) will not be taxed under any law imposing a recording tax, stamp tax, transfer tax, or similar tax. Furthermore, and without limiting the foregoing, any transfers from a Debtor to a Reorganized Debtor or to any other Person pursuant to the Plan, as contemplated by the Plan or pursuant to any agreement regarding the transfer of title to or ownership of any of the Debtors' property in the United States, will not be subject to any document recording tax, stamp tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording tax, or other similar tax or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, will comply with the requirements of section 1146(c) of the Bankruptcy Code, will forego the collection of any such tax or governmental assessment, and will accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

46701/0001-5859301v9

### 9. Release of Liens

Except as otherwise expressly provided in the Plan, the Exit Facility Loan Documents, the Confirmation Order or in any document, instrument or other agreement created in connection with the Plan, on the Effective Date, all mortgages, deeds of trust, liens or, other security interests against the property of the Debtors or the Estates automatically will be released, and the holders of such mortgages, deeds of trust, liens, or other security interests shall execute such documents as may be necessary or desirable to reflect or effectuate such releases.

## E. Treatment of Executory Contracts and Leases

### 1. Assumed Contracts and Leases

Except as otherwise expressly provided in the Plan or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, as of the Effective Date the Debtors will be deemed to have assumed (and in the case of TTC to have assumed and assigned to New TTC) each executory contract and unexpired lease to which one or more of the Debtors is a party unless such contract or lease (i) previously was assumed or rejected by the Debtors, (ii) previously expired or terminated pursuant to its own terms, (iii) is listed on the schedule of rejected contracts and leases in substantially the form set forth in the Plan Supplement, or (iv) is the subject of a motion to assume or reject filed on or before the Confirmation Date. The Confirmation Order will constitute an order of the Bankruptcy Court under sections 365 and 1123 of the Bankruptcy Code approving the contract and lease assumptions described above as of the Effective Date. The Debtors reserve the right, at any time prior to the Confirmation Date, to seek to reject any executory contract or unexpired lease to which one or more of the Debtors is a party.

Each executory contract and unexpired lease that is assumed and relates to the use, ability to acquire or occupancy of real property will include (i) all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affect such executory contract or unexpired lease and (ii) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, usufructs, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other interests in real estate or rights *in rem* related to such premises, unless any of the foregoing agreements has been rejected pursuant to an order of the Bankruptcy Court or is the subject of a motion to reject filed on or before the Confirmation Date.

### 2. Treatment of Change of Control Provisions

The entry of the Confirmation Order, consummation of the Plan, issuance of the New Common Stock under the Plan and/or any other acts taken to implement the Plan (including, without limitation, the merger transactions described in Article IV. of the Plan) will not constitute a "change in control" under any provision of any contract, agreement or other document which provides for the occurrence of any event, the granting of any right, or any other change in the then-existing relationship between the parties upon a "change in control" of the Debtors.

46701/0001-5859301v9

### 3. Payments Related to Assumption of Contracts and Leases

Any monetary amounts by which any executory contract or unexpired lease to be assumed (or, in the case of TTC, to be assumed and assigned to New TTC) under the Plan is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by Cure. If there is a dispute regarding (i) the nature or amount of any Cure, (ii) the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (iii) any other matter pertaining to assumption, Cure will occur following the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the assumption; provided, however, that the Debtors or Reorganized Debtors, as applicable, will be authorized to reject any executory contract or unexpired lease to the extent the Debtors or the Reorganized Debtors, in the exercise of their sound business judgment, conclude that the Cure obligation as determined by the Final Order, renders assumption of such executory contract or unexpired leases unfavorable to the Debtors or the Reorganized Debtors. At least 15 days prior to the Confirmation Hearing, the Debtors will provide for notices of proposed assumption and proposed cure amounts to be sent to applicable third parties and for procedures for objecting thereto and resolution of disputes by the Bankruptcy Court. Any objection by a counterparty to an executory contract or unexpired lease to a proposed assumption or related cure amount must be filed, served, and actually received by the Debtors at least three days prior to the Confirmation Hearing. Any counterparty to an executory contract or unexpired lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount.

Assumption of any executory contract or unexpired lease pursuant to the Plan or otherwise will result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time prior to the effective date of assumption. Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed will be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

### 4. Insurance Policies

All of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as executory contracts under the Plan. On the Effective Date, the Debtors will be deemed to have assumed (or in the case of TTC, assumed and assigned to New TTC) all insurance policies and any agreements, documents, and instruments relating to coverage of Claims covered by those insurance policies, subject to all rights, remedies and defenses of the Debtors under any agreements, insurance policies and applicable law.

### 5. Claims Based on Rejection of Executory Contracts or Unexpired Leases

If the rejection by the Debtors, pursuant to the Plan or otherwise, of an executory contract or unexpired lease gives rise to a Claim, a proof of Claim must be served upon the Debtors and their counsel within 30 days after the later of (i) notice of entry of the Confirmation Order or (ii)

other notice that the executory contract or unexpired lease has been rejected. Any Claims not served within such time periods will be forever barred from assertion against the Debtors, the Reorganized Debtors, the Estates and their property. All Allowed Claims arising from the rejection of executory contracts or leases will be classified as General Unsecured Claims and will be treated in accordance with Article III.E.5 of the Plan.

### 6. Compensation and Benefit Plans and Treatment of Retirement Plan and Pension Plan

Except as otherwise expressly provided in the Plan or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, all of the Debtors' programs, plans, agreements and arrangements relating to employee compensation and benefits, including programs, plans, agreements and arrangements subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code and including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance plans, incentive plans, life, accidental death and dismemberment insurance plans, and employment, severance, salary continuation and retention agreements entered into before the Petition Date and not since terminated, will be deemed to be, and will be treated as though they are, executory contracts that are assumed under Article VII.A of the Plan, and the Debtors' obligations under such programs, plans, agreements and arrangements will survive confirmation of the Plan, except for executory contracts or plans that previously have been rejected, are the subject of a motion to reject or have been specifically waived by the beneficiaries of any plans or contracts. In addition, pursuant to the requirements of section 1129(a)(13) of the Bankruptcy Code, the Plan provides for the continuation of payment by the Debtors of all "retiree benefits," as defined in section 1114(a) of the Bankruptcy Code, if any, at previously established levels.

Pursuant to the Plan, the Debtors and Reorganized Debtors (including New TTC which shall assume any and all obligations of TTC under the Pension Plan), as applicable, shall continue the Pension Plan in accordance with its terms, and the Debtors or the Reorganized Debtors, as applicable, will satisfy the minimum funding standards pursuant to 26 U.S.C. § 412 and 29 U.S.C. § 1082, and administer the Pension Plan in accordance with the provisions of ERISA and the Internal Revenue Code. Notwithstanding any provision of the Plan or the Confirmation Order to the contrary, the Pension Plan will be continued and administered in accordance with ERISA and the Internal Revenue Code.

### 7. Indemnification of Directors and Officers

The Debtors' indemnification obligations in favor of its current and former officers and directors contained in the certificate of incorporation and bylaws, as the case may be, of the Debtors as of the Petition Date will be included in any new and/or any amended and restated organizational documents (including any limited liability company agreements) of the Reorganized Debtors. All Claims of the Debtors' current and former officers and directors for indemnity made prior to the Petition Date (including the D&O Claims made prior to the Petition Date) will be deemed to be Class 5 General Unsecured Claims hereunder, and all Claims of the Debtors' current and former officers and directors for indemnity made on and after the Petition Date (including in respect of matters arising prior to the Petition Date) will be deemed to be Administrative Claims hereunder; *provided, however*, that nothing contained herein shall affect

the right (including in respect of any claims made prior to the Petition Date) of any current or former director or officer of any Debtor to coverage under any director and officer insurance policy maintained by the Debtors or the Reorganized Debtors from time to time.

### 8. Collective Bargaining Agreement

On the Effective Date, the Debtors will assume the Collective Bargaining Agreement.

## F. Provisions Governing Distributions Under The Plan

### 1. Distributions for Claims Allowed as of the Effective Date

Except as otherwise provided herein or as ordered by the Bankruptcy Court, distributions to be made on account of or in exchange for Claims that are Allowed Claims as of the Effective Date will be made on the Distribution Date; *provided, however*, that payments of Allowed DIP Roll-Up Loan Claims and/or Allowed First Lien Credit Facility Claims will be made by the Disbursing Agent to the DIP Roll-Up Loan Agent and/or the First Lien Agent, as applicable, on the Effective Date. All Cash distributions will be made (i) in the case of distributions on account of Allowed DIP Roll-Up Loan Claims and/or Allowed First Lien Credit Facility Claims, from proceeds from the Plan Investment and (ii) in the case of all other distributions, from available Cash of the Debtors or Reorganized Debtors, as the case may be. Any distribution under the Plan of property other than Cash will be made by the Debtors and/or the Reorganized Debtors in accordance with the terms of the Plan.

### 2. Disbursing Agent(s)

The Disbursing Agent(s) will make all distributions required under the Plan (subject to the provisions of Articles II, III and IV of the Plan); *provided, however*, that with respect to a holder of a Claim whose distribution is governed by an agent or other agreement which is administered by an indenture trustee, agent or servicer, such distributions will be deposited with the appropriate agent or servicer, who shall then deliver such distributions to the holders of Claims in accordance with the provisions of the Plan and the terms of the relevant indenture or other governing agreement; *provided further, however,* that distributions to the such agent (other than the Debtors or the Reorganized Debtors) under the Plan will be deemed payment in full, regardless of whether such agent (other than the Debtors or the Reorganized Debtors) ultimately distributes such distribution to the appropriate Claim holder.

Disbursing Agent(s) other than the Debtors, including any agent or servicer, will receive, without further Bankruptcy Court approval, reasonable compensation for distribution services rendered pursuant to the Plan and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services from the Reorganized Debtors on terms acceptable to the Reorganized Debtors. No Disbursing Agent will be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. If otherwise so ordered, all costs and expenses of procuring any such bond will be paid by the Reorganized Debtors.

### 3. Distribution Record Date

As of the close of business on the Distribution Record Date, the various transfer registers for Class 2 Claims and Class 3 Claims as maintained by the Debtors, or their respective agents, including the First Lien Agent and Second Lien Agent, will be deemed closed, and there will be no further changes in the record holders of any of the Class 2 Claims and Class 3 Claims. Neither the Debtors, the First Lien Agent or the Second Lien Agent will have any obligation to recognize any transfer of Class 2 Claims or Class 3 Claims occurring on or after the Distribution Record Date. The Debtors, the First Lien Agent and the Second Lien Agent will be entitled to recognize and deal for all purposes under the Plan only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

### 4. Means of Cash Payment

Cash payments under the Plan will be in U.S. funds by checks drawn on a domestic bank selected by the Reorganized Debtors, or by wire transfer from a domestic bank, at the option of the Reorganized Debtors. Cash payments to foreign creditors may be made, at the option of the Reorganized Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### 5. Calculation of Distribution Amounts of New Common Stock

No fractional New Common Stock will be issued or distributed under the Plan or by New TT Holdings, or any Disbursing Agent, agent or servicer. Each Person entitled to receive New Common Stock will receive the total number of whole New Common Stock to which such Person is entitled. Whenever any distribution to a particular Person would otherwise call for distribution of a fraction of New Common Stock, New TT Holdings, or any Disbursing Agent, agent or servicer, will allocate separately one whole New Common Stock to such Person in order of the fractional portion of their entitlements, starting with the largest such fractional portion, until all remaining whole New Common Stock have been allocated. Upon the allocation of a whole New Common Stock to a Person in respect of the fractional portion of its entitlement, such fractional portion will be deemed canceled. If two or more Persons are entitled to equal fractional entitlements and the number of Persons so entitled exceeds the number of whole New Common Stock which remain to be allocated, New TT Holdings, or any Disbursing Agent, agent or servicer, after consulting with the Plan Investor, will allocate the remaining whole New Common Stock to such holders by random lot or such other impartial method as the Plan Investor and New TT Holdings, or any Disbursing Agent, agent or servicer deems fair. Upon the allocation of all of the whole New Common Stock authorized under the Plan, all remaining fractional portions of the entitlements will be canceled and shall be of no further force and effect. No New Common Stock will be issued and no other property will be distributed under the Plan or by New TT Holdings, or any Disbursing Agent, agent or servicer on account of entitlements to a fractional New Common Stock which fall below a threshold level to be determined by New TT Holdings, or any Disbursing Agent, agent or servicer, in consultation with the Plan Investor, after allocation of whole New Common Stock in respect of fractional entitlements as described above. Accordingly, a Person who otherwise would be entitled to receive a distribution of a fractional

New Common Stock will not receive any such distribution if the number of fractional shares of New Common Stock such Person was to receive falls below such threshold.

### 6. Delivery of Distributions; Undeliverable or Unclaimed Distributions

Distributions to holders of Allowed Claims will be made by the Disbursing Agent or, in the case of the First Lien Credit Facility and Second Lien Credit Facility, by the First Lien Agent or Second Lien Agent, respectively, (i) at each holder's address set forth in the Debtors' books and records, unless such address is superseded by a proof of claim or interest or transfer of claim filed pursuant to Bankruptcy Rule 3001, (ii) at the address in any written notice of address change delivered to the Disbursing Agent, (iii) in the case of the First Lien Credit Facility, at the address set forth in the First Lien Agent's system, or (iv) in the case of the Second Lien Credit Facility, at the address set forth in the Second Lien Agent's system. If any holder's distribution is returned as undeliverable, no further distributions to such holder will be made, unless and until the Disbursing Agent, the First Lien Agent or the Second Lien Agent, as applicable, is notified of such holder's then current address, at which time all missed distributions will be made to such holder without interest. Amounts in respect of undeliverable distributions of Cash made through the Disbursing Agent will be returned to Reorganized True Temper until such distributions are claimed. Amounts in respect of undeliverable distributions of New Common Stock made through the Disbursing Agent will be returned to Reorganized True Temper until such distributions are claimed. The First Lien Agent, Second Lien Agent and/or Disbursing Agent will deliver any non-deliverable Cash to Reorganized True Temper no later than ten (10) Business Days following the first anniversary of the Effective Date. The Disbursing Agent will deliver any non-deliverable New Common Stock to New TT Holdings no later than ten (10) Business Days following the first anniversary of the Effective Date. All claims for undeliverable distributions must be made within one year after the Effective Date, after which date the claim of any holder or successor to such holder with respect to such property will be discharged and forever barred. In such cases, any Cash for distribution on account of or in exchange for unclaimed or undeliverable distributions will become property of Reorganized True Temper free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary. Any New Common Stock held for distribution on account of such Claim will be canceled and of no further force or effect. Nothing contained in the Plan will require any Disbursing Agent, including, but not limited to, Reorganized True Temper, New TT Holdings, New TTC, Reorganized TTS-PRC, the Second Lien Agent, or the First Lien Agent to attempt to locate any holder of an Allowed Claim.

### 7. Withholding and Reporting Requirements

In connection with the Plan and all distributions thereunder, the Reorganized Debtors, the Disbursing Agent, the First Lien Agent and the Second Lien Agent will comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions will be subject to any such withholding and reporting requirements. The Reorganized Debtors will be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements. Notwithstanding any other provision of the Plan, each holder of an Allowed Claim that is to receive a distribution of Cash and/or New Common Stock pursuant to the Plan will have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any

governmental unit, including income, withholding and other tax obligations, on account of such distribution.

### 8. Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution will, for the Debtors' federal income tax purposes, be allocated on the Debtors' books and records to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

### 9. Setoffs

Except as provided in the Plan, the Debtors may, but will not be required to, set off or offset against any Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors may have against the Claim's holder (except for claims released by the Debtors pursuant to Section XII.G. of the Plan); *provided, however,* that neither the failure to do so nor the allowance of any Claim hereunder will constitute a waiver or release by the Debtors of any claim that the Debtors may have against such holder. Nothing in the Plan will be deemed to expand rights to setoff under applicable law.

## G. Procedures for Resolving Disputed, Contingent and Unliquidated Claims

### 1. Resolution of Disputed Claims

Except as provided otherwise in the Plan or by order of the Bankruptcy Court, holders of Claims will not be required to file proofs of Claim with the Bankruptcy Court. The amount and validity of any disputed, contingent and/or unliquidated Claim will be determined, resolved or adjudicated, as the case may be, in the manner in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced; *provided, however,* that the Debtors and the Reorganized Debtors reserve the right to file with the Bankruptcy Court, on or before the Claims Objection Deadline, an objection to any Claim as to which the holder of such Claim has filed a proof of Claim in the Chapter 11 Cases. The Debtors and the Reorganized Debtors will be authorized to, and will, resolve all Disputed Claims by withdrawing or settling such objections thereto, or by litigating to judgment in the Bankruptcy Court or such other court having jurisdiction the validity, nature, and/or amount thereof.

In addition, the Debtors, the Reorganized Debtors or the holder of a contingent or unliquidated Claim may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Reorganized Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as

determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and are not necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any permitted mechanism.

### 2. No Distribution Pending Allowance

No payments or distributions, if any contemplated by the Plan, will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim.

### 3. Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, a distribution, if any, will be made to the holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court or other applicable court of competent jurisdiction allowing any Disputed Claim becomes a Final Order, or the date upon which other final resolution has been reached to Allow such Claim, the Disbursing Agent shall provide to the holder of such Claim the distribution to which such holder is entitled under the Plan. Notwithstanding the foregoing, the Disbursing Agent shall not be required to make distributions more frequently than once every 90 days.

### 4. Reservation of Right to Object to Allowance or Asserted Priority of Claims

Nothing herein will waive, prejudice or otherwise affect the rights of the Debtors, the Reorganized Debtors or the holders of any Claim to object at any time, including after the Effective Date, to the allowance or asserted priority of any Claim, other than with respect to Claims that are deemed allowed pursuant to Article II and Article III of the Plan.

## H. Conditions to Confirmation and Effectiveness of the Plan

### 1. Conditions to Confirmation

The following are conditions precedent to confirmation of the Plan, each of which must be satisfied or waived in accordance with the Plan:

(1) The Bankruptcy Court will have approved the disclosure statement with respect to the Plan in form and substance satisfactory to the Debtors, the Plan Investor, and the First Lien Agent, which approval may be in the Confirmation Order;

(2) The Confirmation Order will be in form and substance satisfactory to the Debtors, the Plan Investor, and the First Lien Agent;

(3) The Plan Supplement will have been filed and will include final, executed

versions of the Exit Facility, in form and substance satisfactory to the Debtors, the Plan Investor and the First Lien Agent; and

(4)     The Debtors will have currently paid all accrued post-petition fees, interest and expenses to the DIP Roll-Up Agent and the First Lien Agent, with such interest accruing at the default interest rate provided for in the First Lien Credit Facility Agreement, on all obligations outstanding under the DIP Roll-Up Loans and the First Lien Credit Facility (respectively).

## 2.     Conditions to Effective Date

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in accordance with the Plan:

(1)     The Confirmation Order, in form and substance acceptable to the Debtors, the Plan Investor, the DIP Facility Agents, the First Lien Agent, and the Exit Agents, confirming the Plan will have been entered and must provide, among other things, that:

(a)     the provisions of the Confirmation Order are nonseverable and mutually dependent;

(b)     all executory contracts or unexpired leases assumed by the Debtors during the Chapter 11 Cases or under the Plan (including any executory contracts or unexpired leases to be assumed by TTC and assigned to New TTC) shall remain in full force and effect for the benefit of the Reorganized Debtors or their assignee notwithstanding any provision in such contract or lease (including those described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits such assignment or transfer or that enables, permits or requires termination of such contract or lease;

(c)     except as expressly provided in the Plan, the Exit Facility Loan Documents, or the Confirmation Order, the Debtors are discharged effective upon the Confirmation Date, subject to the occurrence of the Effective Date, from any "debt" (as that term is defined in section 101(12) of the Bankruptcy Code), and the Debtors' liability in respect thereof shall be extinguished completely, whether such debt (i) is reduced to judgment or not, liquidated or unliquidated, contingent or noncontingent, asserted or unasserted, fixed or unfixed, matured or unmatured, disputed or undisputed, legal or equitable, or known or unknown, or (ii) arose from (a) any agreement of the Debtors that has either been assumed or rejected in the Chapter 11 Cases or pursuant to the Plan, (b) any obligation the Debtors incurred before the Confirmation Date or (c) any conduct of the Debtors prior to the Confirmation Date, or that otherwise arose before the Confirmation Date, including, without limitation, all interest, if any, on any such debts, whether such interest accrued before or after the Petition Date;

(2)     (A) The Reorganized Debtors shall have entered into the New Revolving Credit Facility and New Term Loan, which shall be consistent with the commitment papers attached as Exhibit A to the Plan, and otherwise acceptable in form and substance to the Plan Investor, the Exit Agents and the First Lien Agent, and (B) all conditions precedent to the consummation of

the Exit Facility shall have been waived or satisfied in accordance with the terms thereof, and funding pursuant to the New Revolving Credit Facility shall have occurred.

(3)     The Confirmation Order shall have become a Final Order and shall not be the subject of an unresolved request for revocation under section 1144 of the Bankruptcy Code.

(4)     The necessary persons and entities shall have executed definitive documentation to effect the transactions contemplated by the Plan including, without limitation, the New Stockholders Agreement, the True Temper Merger Agreement, the Exit Facility and any new and/or amended and restated organizational documents for each of the Reorganized Debtors.

(5)     The Plan Investment shall have been consummated and all documents to be executed in connection therewith shall have been executed and delivered, and all conditions precedent thereto shall have been satisfied or waived by the parties thereto, including, without limitation, the delivery of the $70 million Cash payment to New TT Holdings.

(6)     The Debtors shall have executed and delivered all documents necessary to effectuate the issuance of the New Common Stock in form and substance reasonably satisfactory to the Plan Investor.

(7)     All authorizations, consents and regulatory approvals required, if any, in connection with the consummation of the Plan shall have been obtained.

(8)     The Debtors or the Reorganized Debtors shall have currently paid all accrued post-petition fees, interest and expenses to the DIP Roll-Up Agent and the First Lien Agent, with such interest accruing at the default interest rate provided for in the First Lien Credit Facility Agreement, on all obligations outstanding under the DIP Roll-Up Loans and the First Lien Credit Facility (respectively).

(9)     The Debtors or the Reorganized Debtors shall have reimbursed the First Lien Agent, the Second Lien Agent and the Exit Agents, without the need to file a fee application with the Bankruptcy Court, for all reasonable fees and expenses incurred in connection with the negotiations of the Plan, the Exit Facility and other matters relating to the Chapter 11 Cases, including, without limitation, the reasonable fees and expenses of counsel and financial advisors to the First Lien Agent (including, without limitation, any success fees related thereto) and the Second Lien Agent.

(10)     All other actions, documents and agreements necessary to implement the Plan shall have been effected or executed.

(11)     December 15, 2009 shall not have passed.

### 3.     Waiver of Conditions

Each of the conditions (other than entry of orders) set forth in Articles VIII. and IX.A. of the Plan may be waived in whole or in part by the Person whom is entitled to satisfaction of that condition without any notice to other parties in interest or the Bankruptcy Court and without a hearing. The failure to satisfy or waive any condition to the Effective Date may be asserted by

the Debtors, the Plan Investor, the First Lien Agent, the Participating First Lien Lenders, the Participating Second Lien Lenders or the Exit Agents regardless of the circumstances that give rise to the failure of such condition to be satisfied. The failure of any or all of the Debtors, the Plan Investor, the First Lien Agent, the Participating First Lien Lenders, the Participating Second Lien Lenders and the Exit Agents to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each such right will be deemed an ongoing right that may be asserted at any time.

## I. Retention Of Jurisdiction

Under sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding the Plan's confirmation and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction (except with respect to the matters described under clause (1) below, as to which jurisdiction shall not be exclusive) over all matters arising out of or related to the Chapter 11 Cases and the Plan, to the fullest extent permitted by law, including jurisdiction to:

(1)     Determine any and all objections to the allowance of Claims;

(2)     Determine any and all motions to estimate Claims at any time, regardless of whether the Claim to be estimated is the subject of a pending objection, a pending appeal, or otherwise;

(3)     Hear and determine all Professional Fee Claims and other Administrative Claims;

(4)     Hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which one or more of the Debtors is a party or with respect to which the Debtors may be liable, including, if necessary, the nature or amount of any required Cure or the liquidation of any Claims arising therefrom;

(5)     Hear and determine any and all adversary proceedings, motions, applications and contested or litigated matters arising out of, under or related to, the Chapter 11 Cases;

(6)     Enter such orders as may be necessary or appropriate to execute, implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

(7)     Hear and determine disputes arising in connection with the interpretation, implementation, consummation or enforcement of the Plan and all contracts, instruments and other agreements executed in connection with the Plan;

(8)     Hear and determine any request to modify the Plan or to cure any defect or omission or reconcile any inconsistency in the Plan or any order of the Bankruptcy Court;

(9)     Issue and enforce injunctions or other orders, or take any other action that may be necessary or appropriate to restrain any interference with the implementation, consummation or enforcement of the Plan or the Confirmation Order;

46701/0001-5859301v9

(10)     Enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified or vacated;

(11)     Hear and determine any matters arising in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

(12)     Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases;

(13)     Recover all assets of the Debtors and property of the Debtors' Estates, wherever located;

(14)     Hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(15)     Hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge;

(16)     Hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under or not inconsistent with, provisions of the Bankruptcy Code; and

(17)     Enter a final decree closing the Chapter 11 Cases.

## J.     Summary of Other Provisions of the Plan

### 1.     Administrative Claims Bar Date

All Administrative Expense Requests must be made by application filed with the Bankruptcy Court and served on counsel for the Debtors no later than the Administrative Claims Bar Date.  In the event that the Debtors or Reorganized Debtors object to an Administrative Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim. Notwithstanding the foregoing, (a) no application seeking payment of an Administrative Claim need be filed with respect to an undisputed post-petition obligation which was paid or is payable by a Debtor in the ordinary course of business; provided, however, that in no event shall a post-petition obligation that is contingent or disputed and subject to liquidation through pending or prospective litigation, including, but not limited to, obligations arising from personal injury, property damage, products liability, consumer complaints, employment law (excluding claims arising under workers' compensation law), secondary payor liability, or any other disputed legal or equitable claim based on tort, statute, contract, equity, or common law, be considered to be an obligation which is payable in the ordinary course of business; and (b) no application seeking payment of an Administrative Claim need be filed with respect to Cure owing under an executory contract or unexpired lease if the amount of Cure is fixed by order of the Bankruptcy Court.

## 2. Discharge of Claims and Termination of Interests

Except as otherwise provided in the Plan or in the Confirmation Order, all consideration distributed under this Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Interests (other than those Claims and Interests that are Unimpaired or Reinstated under the Plan) of any nature whatsoever against the Debtors or any of its assets or properties, and regardless of whether any property will have been distributed or retained pursuant to this Plan on account of such Claims and Interests. Upon the Effective Date, each of the Debtors and the Reorganized Debtors will be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims and Interests (other than those Claims and Interests that are not Impaired or Reinstated under the Plan), including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

## 3. Releases by Debtors

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors, and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date of the Plan, the Released Parties will be deemed released and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative Claims, asserted or that could be asserted by or on behalf of the Debtors, the Reorganized Debtors, or the Estates, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the purchase, sale, or rescission of the purchase or sale of any of the Senior Subordinated Notes, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the related Disclosure Statement, the related Plan Supplement, or related agreements, instruments, or other documents, including but not limited to the Exit Facility, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined in a final and non-appealable order of a court of competent jurisdiction to constitute willful misconduct or gross negligence by such Released Party.**

## 4. Releases by Holders of Claims and Interests

**As of the Effective Date of the Plan, for good and valuable consideration, the adequacy of which is confirmed pursuant to the Plan, (i) each holder of a Claim that votes**

to accept the Plan, solely in its capacity as the holder of such Claim, and (ii) to the fullest extent permissible under applicable law, as such law may be extended or interpreted after the Effective Date, each person or entity (other than a Debtor), which has held, holds or may hold a Claim or Interest in or relating to the Debtors, will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Debtors, the Reorganized Debtors, and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative Claims, asserted or that could be asserted by or on behalf of any such holder, person or entity, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such holder, person or entity would have been legally entitled to assert in its own right (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the purchase, sale, or rescission of the purchase or sale of any of the Senior Subordinated Notes, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the related Disclosure Statement, the related Plan Supplement, or related agreements, instruments, or other documents, including but not limited to the Exit Facility, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined in a final and non-appealable order of a court of competent jurisdiction to constitute willful misconduct or gross negligence of such Released Party. Notwithstanding anything to the contrary contained in the Plan, the Disclosure Statement or the Confirmation Order, no Released Party will be discharged, exculpated, or released on any claim, now existing or hereafter arising, under ERISA with respect to the Pension Plan, and there shall be no injunction against the assertion of any such claim.  Notwithstanding anything to the contrary in the foregoing, the releases set forth in Articles XII.G.1 and XII.G.2 of the Plan do not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

5.    Exculpation and Limitation of Liability

The Reorganized Debtors, the Debtors, the Estates, any Committee, each of the Plan Investors, Gilbert Global, the First Lien Lenders, the First Lien Agent, the Second Lien Lenders, the Second Lien Agent, the DIP Facility Agents, the DIP Lenders, the Exit Facility Agents and the Exit Lenders, and any and all of their respective current or former members, officers, directors, managers, employees, equity holders, partners, affiliates, advisors, attorneys, agents or representatives, or any of their successors or assigns, will not have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of their respective members, officers, directors, managers, employees, equity holders, partners, affiliates, advisors, attorneys, agents or representatives, or any of their successors or assigns, for any act or omission in connection with, relating to or arising out of, the administration of the Chapter 11 Cases, the

71

negotiation of the terms of the Plan, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their willful misconduct or gross negligence, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities with respect to the Chapter 11 Cases and the Plan.

Notwithstanding any other provision of the Plan, but without limiting the releases provided in the Plan or affecting the status or treatment of any Claim Allowed pursuant to the Plan, no holder of a Claim or Interest, no other party in interest, none of their respective members, officers, directors, managers, employees, equity holders, partners, affiliates, subsidiaries, advisors, attorneys, agents or representatives, and no successors or assigns of the foregoing, will have any right of action against the Reorganized Debtors, the Debtors, their Estates, any Committee, each of the Plan Investors, Gilbert Global, the First Lien Lenders, the First Lien Agent, the Second Lien Lenders, the Second Lien Agent, the DIP Facility Agents, the DIP Lenders, the Exit Facility Agent and the Exit Lenders or any of their respective current or former members, officers, directors, managers, employees, equity holders, partners, affiliates, subsidiaries, advisors, attorneys, agents or representatives, or any of their successors or assigns, for any act or omission in connection with, relating to or arising out of, the administration of the Chapter 11 Cases, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their willful misconduct or gross negligence.

6.    **Binding Effect**

The Plan will be binding upon and inure to the benefit of the Debtors, all present and former holders of Claims against and Interests in the Debtors, whether or not such holders will receive or retain any property or interest in property under the Plan, their respective successors and assigns, including, without limitation, the Reorganized Debtors, and all other parties in interest in the Chapter 11 Cases.

7.    **Injunction**

Except as provided in the Plan or the Confirmation Order, as of the Confirmation Date, subject to the occurrence of the Effective Date, all Persons that have held, currently hold or may hold Claims or Interests that have been released pursuant to Article XII.G of the Plan, discharged pursuant to Article XII.F of the Plan, or are subject to exculpation pursuant to Article XII.I of the Plan will be permanently enjoined from taking any of the following actions against the Debtors or their property, or any of the Released Parties, on account of Claims or Interests: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien or encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors; and (v) commencing or continuing any action, in each case in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

46701/0001-5859301v9

By accepting distribution pursuant to the Plan, each holder of an Allowed Claim receiving distributions pursuant to the Plan will be deemed to have specifically consented to the injunctions set forth in Article XII.H of the Plan.

### 8. Severability of Plan Provisions

If, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, including, without limitation terms and provisions contained in Article I.F. and Article IV.C. of the Plan, the Bankruptcy Court, at the request of the Debtors (with the consent of the Plan Investor and the First Lien Agent), will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.

### 9. Committees

On the Effective Date, the duties of any Committee (if appointed) will terminate, except with respect to any application for compensation or reimbursement of costs and expenses in connection with services rendered prior to the Effective Date.

## VII. CERTAIN FEDERAL AND STATE SECURITIES LAW CONSIDERATIONS

### A. Exemption From Registration Requirements For New Common Stock

Prior to commencement of the Chapter 11 Cases, the Debtors are relying upon section 4(2) of the Securities Act of 1933 (the "Securities Act") and rule 506 thereunder and similar provisions of applicable state securities laws to except the offer of the New Common Stock from the registration requirements of the Securities Act and applicable state securities laws. The Debtors will rely on section 1145 of the Bankruptcy Code to exempt the issuance of the New Common Stock from the registration requirements of the Securities Act and any state securities laws. Section 1145 of the Bankruptcy Code exempts from registration the offer or sale of securities of the debtor or a successor to a debtor under a chapter 11 plan if such securities are offered or sold in exchange for a claim against, or equity interest in, or a claim for an administrative expense in a case concerning, the debtor or a successor to the debtor under the Plan. The Debtors believe that New TT Holdings is a successor to the Debtors under the Plan for purposes of section 1145 of the Bankruptcy Code and that the offer of the New Common Stock under the Plan satisfies the requirements of section 1145 and is therefore exempt from the registration requirements of the Securities Act and state securities laws.

### B. Subsequent Transfers of New Common Stock

In general, recipients of the New Common Stock will be able to resell the New Common Stock without registration under the Securities Act or other federal securities laws pursuant to the

exemption provided by Section 4(1) of the Securities Act, unless the holder of such stock is an "underwriter" within the meaning of section 1145(b) of the Bankruptcy Code. In addition, the New Common Stock generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states. However, recipients of the New Common Stock issued under the Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

Section 1145(b) of the Bankruptcy Code defines "underwriter" as one who (a) purchases a claim with a view to distribution of any security to be received in exchange for such claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution, or (d) is an "issuer" of the relevant security, as such term is used in Section 2(11) of the Securities Act. Under Section 2(11) of the Securities Act, an "issuer" includes any "affiliate" of the issuer, which means any person directly or indirectly through one or more intermediaries controlling, controlled by or under common control with the issuer.

To the extent that recipients of the New Common Stock under the Plan are deemed to be "underwriters," such persons cannot rely on the exemption from registration under the Securities Act provided by Section 4(1) of that Act for resales of the New Common Stock. Persons deemed to be underwriters may, however, be permitted to sell such New Common Stock or other securities without registration pursuant to the provisions of Rule 144 under the Securities Act. This rule permits the public resale of securities received by "underwriters" pursuant to a chapter 11 plan subject to applicable conditions, which may include holding periods, availability of information regarding the issuer, volume limitations, restrictions on manner of sale, and/or notice requirements.

GIVEN THE COMPLEX NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER WITH RESPECT TO THE NEW COMMON STOCK, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN THE SHARES OF NEW COMMON STOCK ISSUED UNDER THE PLAN. THE DEBTORS RECOMMEND THAT HOLDERS OF CLAIMS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES WITHOUT REGISTRATION UNDER THE SECURITIES ACT.

## VIII.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain significant United States federal income tax consequences of the implementation of the Plan to the Debtors and certain holders of Claims.

This summary is based on the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"), Treasury Regulations and proposed Treasury Regulations issued thereunder, Internal Revenue Service (the "IRS") rulings and pronouncements and judicial interpretations and practice, all as in effect on the date hereof. Due to the unsettled nature of several of the tax

issues presented by the Plan, the differences among creditors in the nature of their Claims, and the possibility that future events, including amendments to the Internal Revenue Code or the Treasury Regulations and new court decisions, could change the United States federal tax consequences of the transactions, the tax consequences described below are only general descriptions that are subject to significant uncertainties. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. There can be no assurance that the IRS will not challenge one or more of the tax consequences of the Plan described below.

The following summary does not address the federal income tax consequences to holders not entitled to vote on the Plan, including holders whose Claims are entitled to reinstatement or payment in full in cash under the Plan or holders whose Claims are to be extinguished without any distribution. Moreover, this summary does not apply to holders of Claims that are not "United States persons" (as such term is defined in the Internal Revenue Code) or that are otherwise subject to special treatment under the United States federal income tax law (including, without limitation, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, broker-dealers in securities, mutual funds, small business investment companies and regulated investment companies). The following discussion assumes that holders of Claims hold only Claims in a single Class and that holders of Claims hold such Claims as "capital assets" within the meaning of section 1221 of the Internal Revenue Code. In addition, this discussion assumes that the various debt and other arrangements to which the Debtor is a party will be respected for U.S. federal income tax purposes in accordance with their form. This summary does not purport to cover all aspects of United States federal income taxation that may apply to the Debtors and holders of Claims based upon their particular circumstances. Moreover, this summary does not discuss any tax consequences that may arise under any laws other than United States federal income tax law, including under state, local or foreign tax law.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. NO STATEMENT IN THIS DISCLOSURE STATEMENT SHOULD BE CONSTRUED AS LEGAL OR TAX ADVICE. HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO THEM OF THE CONSUMMATION OF THE PLAN, AS WELL ANY TAX CONSEQUENCES ARISING UNDER ANY STATE, LOCAL OR FOREIGN TAX LAWS, OR ANY OTHER FEDERAL TAX LAWS. THE DEBTORS AND THEIR ADVISORS DO NOT ASSUME ANY RESPONSIBILITY OR LIABILITY FOR THE TAX CONSEQUENCES THE HOLDER OF A CLAIM MAY INCUR AS A RESULT OF THE TREATMENT AFFORDED ITS CLAIM OR INTEREST UNDER THE PLAN.

**IRS CIRCULAR 230 DISCLOSURE**: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY

TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE INTERNAL REVENUE CODE. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT WRITTEN TO SUPPORT THE MARKETING OR PROMOTION OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## A. Certain U.S. Federal Income Tax Consequences to the Debtors

### 1. Tax Treatment of the Merger Transaction

For U.S. federal income tax purposes, the Debtors intend to treat the merger transaction described in Section VI.A herein as if (i) True Temper (and possibly TTS-PRC, if New True Temper elects to file an election pursuant to Section 338(h)(10) of the Internal Revenue Code) sold all of its assets to New True Temper for an amount equal to the consideration paid by New True Temper (including the $70 million in Cash, the New Common Stock and the assumption of certain of True Temper's liabilities by New True Temper, including, without limitation, the obligations under the Exit Facility), and in connection therewith (ii) True Temper paid such consideration to fund distributions under the Plan. As a result of the merger or the transactions undertaken by the Debtors in anticipation of the merger, the Debtors may realize gain (or loss) in an amount equal to the excess (or shortfall) of the fair market value of the merger consideration over the Debtors' bases in their assets. To the extent Debtors recognize any gain from these transactions, net operating loss ("NOL") carryforwards may be available to offset such gains.

### 2. Alternative Minimum Tax

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the taxable year. To the extent Debtors recognize any gain as a result of the merger or the transactions undertaken by the Debtors in anticipation of the merger, such gain may be subject to the AMT. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated, with further adjustments required if AMTI, determined without regard to adjusted current earnings ("ACE"), differs from ACE. In addition, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, under current law only 90% of its AMTI generally may be offset by available NOL carryforwards. However, this 90% limitation does not apply to losses incurred in the current taxable year. A corporation that pays AMT generally is later allowed a nonrefundable credit (equal to a portion of its prior year AMT liability) against its regular federal income tax liability in future taxable years when it is no longer subject to the AMT.

### 3. Cancellation of Debt Income and Reduction of Tax Attributes

As a result of the Plan, the Debtors' aggregate outstanding indebtedness will be substantially reduced. In general, absent an exception, a debtor will recognize CODI upon discharge of its outstanding indebtedness for an amount less than its adjusted issue price. The

76

amount of CODI, in general, is the excess of (a) the adjusted issue price of the indebtedness discharged, over (b) the sum of the issue price of any new indebtedness of the taxpayer, the amount of cash paid and the fair market value of any other consideration given in exchange for such indebtedness at the time of the exchange. A debtor is not, however, required to include any amount of CODI in gross income if such debtor is under the jurisdiction of a court in a chapter 11 bankruptcy proceeding and the discharge of debt occurs pursuant to that proceeding (the "Bankruptcy Exception"). Instead, as a price for the exclusion of CODI under the foregoing rule, Section 108 of the Internal Revenue Code requires the debtor to reduce (as of the first day of the taxable year following the year of the debt discharge) its tax attributes by the amount of CODI that it excluded from gross income. As a general rule, tax attributes will be reduced in the following order: (a) NOLs, (b) most tax credits, (c) capital loss carryovers, (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject), (e) passive activity loss and credit carryovers, and (f) foreign tax credits.

The Debtors expect to report consolidated net operating loss ("NOL") carryforwards for U.S. federal income tax purposes of approximately $93 million as of the Petition Date. As a result of the consummation of the Plan, the Debtors expect to realize substantial CODI that will be subject to the Bankruptcy Exception. The extent of such CODI and the resulting NOL reduction will depend significantly on the issue price of the New Term Loan and the New Revolving Credit Facility (determined in the manner described below) and the fair market value of the New Common Stock. The issue price of the New Term Loan and the New Revolving Credit Facility and the fair market value of the New Common Stock cannot be known with certainty until after the Effective Date. Although the exact amount of NOL reduction cannot be predicted with certainty, it is currently anticipated that the amount of CODI will exceed the amount of the NOLs, thereby eliminating the NOLs. However, the NOLs would only be eliminated following the calculation of the Debtors' taxable income for the year in which the CODI is realized. Accordingly, NOL carryforwards may be available to offset any gain the Debtors may realize as a result of the merger and the transactions undertaken by the Debtors in anticipation of the merger described in Section VI.A herein.

With respect to the reduction of tax basis in a debtor's assets, only the basis of property held at the beginning of the taxable year following the year in which excluded CODI is realized is subject to reduction. Because the Debtors' assets will have been deemed sold to New True Temper pursuant to the merger, Debtors do not anticipate holding any assets that would be subject to tax basis reduction in the year following the CODI realization.

## B.    Certain U.S. Federal Income Tax Consequences to the Reorganized Debtors

### 1.    Tax Basis in Assets

As of the Effective Date the Reorganized Debtors' aggregate tax basis in the assets deemed purchased pursuant to the merger should equal the fair market value of the merger consideration at the time of the exchange.

46701/0001-5859301v9

## 2.     Section 382 Limitation on NOLs

Under Section 382 of the Internal Revenue Coe, if a corporation or a consolidated group with NOLs (a "Loss Corporation") undergoes an "ownership change," the Loss Corporation's use of its pre-change NOLs (and certain other tax attributes) generally will be subject to an annual limitation in the post-change period.  In general, an "ownership change" occurs if the percentage of the value of the Loss Corporation's stock owned by one or more direct or indirect "five percent shareholders" increases by more than fifty percentage points over the lowest percentage of value owned by the five percent shareholders at any time during the applicable testing period (an "Ownership Change").  The testing period generally is the shorter of (i) the three-year period preceding the testing date or (ii) the period of time since the most recent Ownership Change of the corporation.  Subject to the special bankruptcy rules discussed below, the amount of the annual limitation on a Loss Corporation's use of its pre-change NOLs (and certain other tax attributes) is generally equal to the product of the applicable long-term tax-exempt rate (as published by the IRS for the month in which the Ownership Change occurs) and the value of the Loss Corporation's outstanding stock immediately before the Ownership Change (excluding certain capital contributions).  If a Loss Corporation has a net unrealized built-in gain ("NUBIG") immediately prior to the Ownership Change, the annual limitation may be increased during the subsequent five-year period (the "Recognition Period").  If a Loss Corporation has a net unrealized built-in loss ("NUBIL") immediately prior to the Ownership Change, certain losses recognized during the Recognition Period also would be subject to the annual limitation and thus would reduce the amount of pre-change NOLs that could be used by the Loss Corporation during the five-year period.

It is possible that any NOLs of TTS-PRC allocable to periods prior to the Effective Date may be subject to limitation under Section 382.  Although the merger will be treated as a deemed sale of True Temper's assets to New True Temper, if New True Temper does not elect to file an election pursuant to Section 338(h)(10) of the Internal Revenue Code, the conveyance of TTS-PRC stock pursuant to the merger will be treated as a stock sale.  As such, TTS-PRC would undergo an Ownership Change.  The remainder of this discussion assumes that such an Ownership Change with respect to TTS-PRC would occur on the Effective Date, though it is possible the IRS could take the position that the Ownership Change occurred on the date the Plan is confirmed by the Bankruptcy Court.  If the IRS took the position that the ownership change occurred on the Confirmation Date, the consequences of such change could be other than as described below.  Because an Ownership Change with respect to TTS-PRC that occurs on the Effective Date would occur in a case brought under the Bankruptcy Code, certain special rules would apply in determining the Debtors' ability to utilize NOLs attributable to tax periods preceding the Effective Date in post-Effective Date tax periods.

If an Ownership Change occurs pursuant to a bankruptcy plan, the debtor's use of its pre-change NOLs will be subject to an annual limitation as determined under IRC Section 382(l)(6).  In such case, the amount of the annual limitation generally will be equal to the product of the applicable long-term tax-exempt rate and the value of the debtor's outstanding stock immediately after the bankruptcy reorganization, provided such value may not exceed the value of the debtor's gross assets immediately before the Ownership Change, subject to certain adjustments.  Depending on whether the debtor has a NUBIG or NUBIL immediately prior to the Ownership

Change, the annual limitation may be increased or decreased during the Recognition Period. However, if any pre-change NOLs of the debtor already are subject to an annual limitation at the time of an Ownership Change subject to IRC Section 382(l)(6), those NOLs will be subject to the lower of the two annual limitations.

NOLs not utilized in a given year due to the annual limitation may be carried forward for use in future years until their expiration dates. To the extent the TTS-PRC's annual limitation exceeds its income and subject to certain limitations, the Reorganized Debtors' consolidated group's taxable income in a given year, the excess will increase the annual limitation in future taxable years.

**C.     Certain U.S. Federal Income Tax Consequences to Holders of Allowed First Lien Credit Facility Claims and Allowed Second Lien Credit Facility Claims**

**1.     Holders of Allowed First Lien Credit Facility Claims**

Pursuant to the Plan, holders of Allowed First Lien Credit Claims will receive, in full satisfaction of such Claims, (1) their pro rata share of $70 million in cash plus (2) with respect to the remaining amount of their Allowed Claims (if any), their pro rata share of the obligations under the New Term Loan.

**(a)     Receipt of Cash**

A holder that receives Cash in exchange for its Claim pursuant to the Plan generally will recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (1) the amount of Cash received in exchange for its Claim and (2) the holder's adjusted tax basis in its Claim. Such gain or loss should be capital in nature (subject to the "market discount" and "accrued interest" rules described below) and should be long term capital gain or loss if the Claims were held for more than one year by the holder.

**(b)     Receipt of a Share of the New Term Loan**

Under applicable Treasury Regulations, the significant modification of a debt instrument will result in a deemed exchange of the "old" debt instrument for a "new" debt instrument and will be a taxable event upon which gain or loss may be recognized in certain circumstances. A modification of a debt instrument is significant if the modified instrument differs materially either in kind or extent from the original debt instrument. Pursuant to the Plan, a holder of Allowed First Lien Credit Claims may receive a share of the New Term Loan in satisfaction of the old amounts owed it under the First Lien Term Credit Facility. This will likely result in a signification modification of the indebtedness of the First Lien Term Credit Facility that remains outstanding following the distribution of $70 million in cash. The remainder of this discussion assumes that the  New Term Loan constitutes a significant modification to the outstanding indebtedness under the First Lien Term Credit Facility.

The receipt by a holder of a share of the New Term Loan should result in the recognition of gain or loss equal to the difference between (1) the issue price of the share of the New Term Loan received (determined in the manner described below) and (2) the holder's tax

basis in the Claims surrendered by the holder. Such gain or loss should be capital in nature (subject to the "market discount" and "accrued interest" rules described below) and should be long term capital gain or loss if the Claims were held for more than one year by the holder.

A holder's tax basis in the New Term Loan received on the Effective Date should equal the issue price of the New Term Loan, as applicable. A holder's holding period for the New Term Loan received on the Effective Date should begin on the day following the Effective Date.

### (1)   Issue Price of a Debt Instrument

The determination of "issue price" for purposes of this analysis will depend, in part, on whether the debt instruments issued to a holder, or the debt instruments surrendered by a holder, under the Plan are traded on an "established securities market" at any time during the sixty (60) day period ending thirty (30) days after the Effective Date. In general, a debt instrument (or the property exchanged therefor) will be treated as traded on an established market if (a) it is listed on (i) a qualifying national securities exchange, (ii) certain qualifying interdealer quotation systems, or (iii) certain qualifying foreign securities exchanges; (b) it appears on a system of general circulation that provides a reasonable basis to determine fair market value; or (c) the price quotations are readily available from dealers, brokers or traders. The issue price of a debt instrument that is traded on an established market (or, where the debt instrument is not so traded, that is issued for property so traded) would be the fair market value of such debt instrument (or, where the debt instrument is not so traded, such other property so traded) on the issue date as determined by such trading. The issue price of a debt instrument that is neither so traded nor issued for property so traded would be its stated principal amount (provided that the interest rate on the debt instrument exceeds the applicable IRS federal rate).

### (2)   Accrued Interest

To the extent that any amount received by a holder of a Claim is attributable to accrued interest, such amount should be taxable to the holder as interest income. Conversely, a holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest on the Claims was previously included in the holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

Although the manner in which consideration is to be allocated between accrued interest and principal for these purposes is unclear under present law, the Debtors intend to take the position that consideration paid pursuant to the Plan will be allocable first to the principal amount of such Claim as determined for U.S. federal income tax purposes and then to accrued interest, if any, with respect to such Claim. There is no assurance that such allocation will be respected by the IRS for U.S. federal income tax purposes.

### (3)   Market Discount

Under the "market discount" provisions of sections 1276 through 1278 of

the Internal Revenue Code, some or all of the gain realized by a holder of a Claim who exchanges the Claim for a portion of the New Term Loan and/or New Common Stock on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "accrued market discount" on the Claim. In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (1) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (2) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the Claim, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity). Any gain recognized by a holder on the taxable disposition of Claims that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claims were considered to be held by the holder (unless the holder elected to include market discount in income as it accrued).

## 2.    Holders of Allowed Second Lien Credit Facility Claims

Pursuant to the Plan, the holders of Allowed Second Lien Credit Claims will receive their pro rata share of, (i) 11.3924% of New Common Stock, and (ii) up to $3,000,000 (but not less than $500,000) in Cash to be distributed from cash collateral existing on the Petition Date.

### (a)    Holders who Receive New Common Stock

Subject to the "Accrued Interest" and "Market Discount" rules described above, a holder that receives New Common Stock in exchange for old amounts owed it under the Second Lien Term Credit Facility will recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (1) the holder's adjusted tax basis in its old share of the Second Lien Term Credit Facility, and (2) the fair market value of the New Common Stock exchanged therefor. Such gain or loss should be capital in nature (subject to the "Accrued Interest" and "Market Discount" rules described above) and should be long term capital gain or loss if the Claims were held for more than one year by the holder. A holder's holding period in the New Common Stock will begin on the day after the Effective Date.

### (1)    Distributions

A holder of New Common Stock generally will be required to include in gross income as ordinary dividend income the amount of any distributions paid on the New Common Stock to the extent such distributions are paid out of New TT Holdings' current or accumulated earnings and profits as determined for federal income tax purposes. Distributions not treated as dividends for federal income tax purposes will constitute a return of capital and will first be applied against and reduce a holder's adjusted tax basis in the New Common Stock, but not below zero. Any excess amount will be treated as gain from a sale or exchange of the New Common Stock. Holders that are treated as corporations for U.S. federal income tax purposes may be entitled to a dividends received deduction with respect to distributions out of earnings and profits.

### (2) Sale or Other Taxable Disposition

A holder of New Common Stock will recognize gain or loss upon the sale or other taxable disposition of New Common Stock equal to the difference between the amount realized upon the disposition and the holder's adjusted tax basis in the New Common Stock. Subject to the rules described above in the "Market Discount" discussion and the recapture rules under Section 108(e)(7) of the Internal Revenue Code, any such gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the holder has held the New Common Stock for more than one year as of the date of disposition. Under the Section 108(e)(7) recapture rules, a holder may be required to treat gain recognized on the taxable disposition of the New Common Stock as ordinary income if the holder took a bad debt deduction with respect to its old share of the Second Lien Term Credit Facility or recognized an ordinary loss on the exchange of its old share of the Second Lien Term Credit Facility for New Common Stock. Holders should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses. There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

### (b) Receipt of Cash

The tax treatment of a holder that receives Cash in exchange for its Claim pursuant to the Plan is addressed in the discussion above on "Holders of Allowed First Lien Credit Facility Claims—Receipt of Cash."

## D. Other Considerations

### 1. Bad Debt Deduction

A holder who, under the Plan, receives in respect of a Claim an amount less than the holder's tax basis in the Claim may be entitled to a bad debt deduction in some amount under Section 166(a) of the Internal Revenue Code. The rules governing character, timing and amount of bad debt deductions place considerable emphasis on the facts and circumstances of the holder, the obligor and the instrument with respect to which a deduction is claimed. Each holder of a Claim, therefore, is urged to consult its tax advisors with respect to its ability to take such a deduction. Section 108(e)(7) of the Internal Revenue Code provides that any gain recognized on the subsequent sale, exchange, redemption or other disposition of stock of a corporation received by a creditor in satisfaction of the corporation's indebtedness may be treated as ordinary income to the extent the creditor previously claimed ordinary loss deductions with respect to the satisfied debt.

### 2. Limitation on Use of Capital Losses

Holders of Claims who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For non-corporate holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (1) $3,000 ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains.

46701/0001-5859301v9

Holders, other than corporations, may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years.

Corporate holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

## E. Information Reporting and Withholding

Payments of Allowed Claims under the Plan may be subject to applicable information reporting and backup withholding (at the applicable rate). Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

## IX. FEASIBILITY OF THE PLAN AND BEST INTERESTS OF THE CREDITORS

## A. Feasibility Of The Plan

In connection with confirmation of the Plan, the Bankruptcy Court will be required to determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors.

To support their belief in the feasibility of the Plan, the Debtors have relied upon the Projections, which are annexed to this Disclosure Statement as Appendix C.

The Projections indicate that the Reorganized Debtors should have sufficient cash flow to pay and service their debt obligations and to fund their operations. Accordingly, the Debtors believe that the Plan complies with the financial feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

The Projections set forth in the attached Appendix C cover the operations of the Reorganized Debtors through fiscal year 2013. The Projections are based on numerous assumptions, including confirmation and consummation of the Plan in accordance with its terms; realization of the operating strategy of the Reorganized Debtors; industry performance; no material adverse changes in applicable legislation or regulations, or the administration thereof, or generally accepted accounting principles; no material adverse changes in general business and economic conditions; no material adverse changes in competition; the Reorganized Debtors' retention of key management and other key employees; adequate financing; the absence of material contingent or unliquidated litigation, indemnity, or other claims; and other matters,

many of which will be beyond the control of the Reorganized Debtors and some or all of which may not materialize.

To the extent that the assumptions inherent in the Projections are based upon future business decisions and objectives, they are subject to change. In addition, although they are presented with numerical specificity and are based on assumptions considered reasonable by the Debtors, the assumptions and estimates underlying the Projections are subject to significant business, economic, and competitive uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtors. Accordingly, the Projections are only estimates and are necessarily speculative in nature. It can be expected that some or all of the assumptions in the Projections will not be realized and that actual results will vary from the Projections, which variations may be material and are likely to increase over time. In light of the foregoing, readers are cautioned not to place undue reliance on the Projections. The Projections were not prepared in accordance with standards for projections promulgated by the American Institute of Certified Public Accountants or with a view to compliance with published guidelines of the SEC regarding projections or forecasts. The Projections have not been, audited, reviewed, or compiled by the Debtors' independent public accountants. The Debtors will be required to adopt "fresh start' accounting upon their emergence from chapter 11. The projected financial information contained in this Disclosure Statement should not be regarded as a representation or warranty by the Debtors, the Debtors' advisors, or any other Person that the Projections can or will be achieved.

The Projections should be read together with the information in Section X. of this Disclosure Statement entitled "Certain Risk Factors to be Considered," which sets forth important factors that could cause actual results to differ from those in the Projections.

The Debtors do not intend to update or otherwise revise the Projections, including any revisions to reflect, events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events, even if any or all of the underlying assumptions do not come to fruition. Furthermore, the Debtors do not intend to update or revise the Projections to reflect changes in, general economic or industry conditions.

The Debtors will face a number of risks with respect to their continuing business operations upon emergence from chapter 11, including but not limited to the following: the Debtors' ability to improve profitability and generate positive operating cash flow; the Debtors ability to sustain sales increases in future years, which is dependent upon an overall economic recovery and the resulting impact on the global golf industry; the Debtors' ability to increase capital expenditures in the future to invest in capital projects; the Debtors' response to the entry of new competitors into its markets; the Debtors' ability to upgrade their information systems and implement new technology and business processes to service a global distribution base; the Debtors' ability to implement new customer service programs; the Debtors' ability to implement effective pricing and promotional programs; the Debtors' ability to reserve appropriately for self insurance liabilities; potential changes in federal, state or local laws or regulations; general economic conditions in the Debtors' operating regions; stability of raw material and energy costs; increases in labor and employee benefit costs, such as health care and pension expenses; changes in accounting standards, taxation requirements and bankruptcy laws.

## B.     Acceptance Of The Plan

As a condition to Confirmation, the Bankruptcy Code requires that each Class of Impaired Claims vote to accept the Plan, except under certain circumstances.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the Plan. Thus, holders of Claims in each of Classes 2 and 3 will have voted to accept the Plan only if two-thirds (2/3) in amount and a majority in number of the Claims actually voting in each Class cast their ballots in favor of acceptance. Holders of Claims who fail to vote are not counted as either accepting or rejecting a plan.

## C.     Best Interests Test

As noted above, even if a plan is accepted by each class of claims and interests, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the best interests of all holders of claims or interests that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor were liquidated under chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its chapter 11 case were converted to a chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of their collateral and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the chapter 7 case and the chapter 11 cases. Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the debtors in its chapter 11 case (such as compensation of attorneys, financial advisors, and accountants) that are allowed in the chapter 7 cases, litigation costs, and claims arising from the operations of the debtor during the pendency of the chapter 11 cases. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity security interests. The liquidation would also prompt the rejection of a large number of executory contracts and unexpired leases and thereby significantly enlarge the total pool of unsecured claims by reason of resulting rejection damages claims.

46701/0001-5859301v9

Once the bankruptcy court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under the plan, then the plan is not in the best interests of creditors and equity security holders.

## D.     Liquidation Analysis

A liquidation analysis prepared with respect to each of the Debtors is attached as Appendix D to this Disclosure Statement. The Debtors believe that any liquidation analysis is speculative. For example, the liquidation analysis necessarily contains an estimate of the amount of Claims which will ultimately become Allowed Claims. This estimate is based solely upon the Debtors' incomplete review of the Debtors' books and records. No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the liquidation analysis. The estimate of the amount of Allowed Claims set forth in the liquidation analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under the Plan.

The Debtors believe the methodology used to prepare the liquidation analysis attached hereto as Appendix D is appropriate and that the assumptions and conclusions set forth therein are fair and reasonable under the circumstances and represent a reasonable exercise of the Debtors' business judgment with respect to such matters.

## E.     Application of the "Best Interests" of Creditors Test To The Liquidation Analysis

Notwithstanding the difficulties in quantifying recoveries to creditors with precision, the Debtors believe that taking into account the liquidation analysis and the transaction value set by the Plan Investor's purchase price for the Reorganized Debtors, the Plan meets the "best interests" test of Bankruptcy Code section 1129(a)(7). The Debtors believe that the holders of Claims in Impaired Classes will receive at least as much under the Plan than they would in a liquidation in a hypothetical chapter 7 case. Creditors will receive a better recovery through the distributions contemplated by the Plan because the continued operation of the Debtors as going concerns rather than a forced liquidation will allow realization of more value for the Debtors' assets. Moreover, as a result of the reorganization of the Debtors, creditors such as the Debtors' employees would retain their jobs and most likely make few if any other claims against the estate. Lastly, in the event of liquidation, the aggregate amount of unsecured claims which would receive no distribution would no doubt increase significantly. All of these factors lead to the conclusion that recoveries under the Plan would be at least as much, and in many cases significantly greater, than the recoveries available in a chapter 7 liquidation.

46701/0001-5859301v9

**F.    Confirmation Without Acceptance Of All Impaired Classes:  The 'Cramdown' Alternative**

In view of the deemed rejection by holders of Claims in Classes 5 and 6 and the holders of Interests in Class 8 the Debtors will seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code.  The Debtors further reserve the right to seek a "cramdown" confirmation of the Plan with respect to the Claims in Classes 2 and 3 in the event the holders of such Claims vote to reject the Plan.  Specifically, section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it.  The Bankruptcy Court may confirm a plan at the request of the debtors if the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted the plan.  A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

The Debtors believe the Plan does not discriminate unfairly with respect to the Claims and Interests in Classes 5, 6 and 8.  Such Classes include Claims or Interests that are subordinated to other Claims under section 510(b) or (c) of the Bankruptcy Code or section 726(a)(2)(C), (a)(3), (a)(4), or (a)(5) of the Bankruptcy Code as incorporated into section 1129(a)(7) of the Bankruptcy Code, or are otherwise not entitled to payment under the absolute priority rule until all other Creditors have been paid in full.  Because (i) all holders of Claims and Interests in Classes 5, 6 and 8 are treated similarly to holders of Claims or Interests in other Classes of equal rank and/or (ii) any differing treatment between holders of Claims in such Classes and holders of Claims in Class 7 (Intercompany Claims) or Class 9 (Old Equity Interests in TTS-PRC) is irrelevant in light of the limited substantive consolidation of the Debtors described in Section VI.C. hereof, there is no unfair discrimination with respect to such holders of Claims and Interests.

A plan is fair and equitable as to a class of unsecured claims that rejects a plan if the plan provides (i) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim or (ii) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (i) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest or (ii) that the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property at all.

The Debtors believe that they will meet the "fair and equitable" requirements of section 1129(b) of the Bankruptcy Code with respect to holders of Claims in Classes 5 and 6 and holders of Interests in Class 8 because (i) no holders of junior claims or interests will receive Distributions under the Plan and (ii) the distributions (if any) to holders of Claims in Class 7

(Intercompany Claims) and Class 9 (Old Equity Interests in TTS-PRC) are irrelevant in light of the limited substantive consolidation of the Debtors as discussed in Section VI.C. hereof.

As to Classes 2 and 3 and in the event it becomes necessary to "cramdown" the Plan over the rejection of any such Classes, the Debtors will demonstrate at the Confirmation Hearing that the Plan does not discriminate unfairly and is fair and equitable with respect to such Classes. The fair and equitable test for secured claims, which is applicable to Classes 2 and 3, is that the plan provides (i) that the holders of secured claims retain the liens in the property securing such claims to the extent of the allowed amount of such claims, and that the holders of such claims receive on account of such claims deferred cash payments totaling at least the allowed amount of such claims, of a value, as of the effective date of the plan, of at least the value of such holders' interest in the estate's interest in such property; (ii) for the sale of any property subject to the liens securing such claims, free and clear of such liens, with the liens attaching to the proceeds of such sale, and such liened proceeds being treated either pursuant to (i) or (iii); or (iii) for the realization by such holders of the indubitable equivalent of such claims. The treatment proposed for Classes 2 and 3 satisfies the fair and equitable test and can be crammed down, if necessary.

## X.     CERTAIN RISK FACTORS TO BE CONSIDERED

The holders of Claims against and Interests in the Debtors should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference, including any filings made by the Company with the Securities Exchange Commission), before deciding whether to vote to accept or reject the Plan. These risk factors should not, however, be regarded as constituting the only risks associated with the Plan and its implementation.

### A.     General Considerations

The Plan sets forth the means for satisfying the Claims against and Interests in each of the Debtors. Certain Claims and Interests receive no distributions pursuant to the Plan. Nevertheless, reorganization of the Debtors' businesses and operations under the proposed Plan avoids the potentially adverse impact of a liquidation on the Debtors' customers, suppliers, employees, communities, and other stakeholders.

### B.     Certain Bankruptcy Considerations

Even if all voting Impaired Classes vote in favor of the Plan, and even if with respect to any Impaired Class deemed to have rejected the Plan, the requirements for "cramdown" are met, the Bankruptcy Court, which, as a court of equity, may exercise substantial discretion, may choose not to confirm the Plan. Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of the Debtors, see Section IX.A herein, and that the value of distributions to dissenting holders of Claims and Interests will not be less than the value such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. See Section IX.B herein. Although the Debtors believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion. See Section IX.D for a liquidation analysis of the Debtors.

The Debtors' future results are dependent upon the successful confirmation and implementation of a plan of reorganization. Failure to obtain this approval in a timely manner could adversely affect the Debtors' operating results, as the Debtors' ability to obtain financing to fund their operations and their relations with customers and suppliers may be harmed by protracted bankruptcy proceedings. Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for their liabilities that will be subject to a plan of reorganization. Once a plan of reorganization is approved and implemented, the Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders, customers, and suppliers to do business with a company that recently emerged from bankruptcy proceedings.

## C.  Conditions Precedent to Consummation; Timing

The Plan provides for certain conditions that must be satisfied (or waived) prior to the Confirmation Date and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

## D.  Exit Financing

The Plan contemplates that the Reorganized Debtors will obtain exit financing in an amount sufficient to satisfy the DIP Revolving Credit Facility Claims, support other required payments under the Plan, and conduct their post-reorganization operations. As discussed above, the Debtors have made significant progress in their negotiations with certain of the First Lien Lenders under the First Lien Credit Facility to secure such financing and have a signed commitment that is attached as Exhibit A to the Plan. The proposed exit financing also contemplates a New Term Loan in the principal amount equal to (i) the aggregate amount of the Allowed First Lien Credit Facility Claims and DIP Roll-Up Loan Claims, less (ii) $70 million. Although the Debtors are hopeful that such exit financing will be obtained in a timely manner, in light of current market conditions it is uncertain whether the Debtors will be able to secure such financing on a timely basis, whether the amount ultimately obtained will be sufficient to fund the required payments under the Plan as well as the operations of the Reorganized Debtors, and whether the terms of such financing will enable the Debtors to adequately service their debt going forward.

## E.  Inherent Uncertainty of Projections

The Projections set forth in the attached Appendix C cover the operations of the Reorganized Debtors through fiscal year 2013. These Projections are based on numerous assumptions, including confirmation and consummation of the Plan in accordance with its terms; realization of the operating strategy of the Reorganized Debtors; industry performance; no material adverse changes in applicable legislation or regulations, or the administration thereof, or generally accepted accounting principles; no material adverse changes in general business and economic conditions; no material adverse changes in competition; the Reorganized Debtors' retention of key management and other key employees; adequate financing; the absence of material contingent or unliquidated litigation, indemnity, or other claims; and other matters,

89

many of which will be beyond the control of the Reorganized Debtors and some or all of which may not materialize.

To the extent that the assumptions inherent in the Projections are based upon future business decisions and objectives, they are subject to change. In addition, although they are presented with numerical specificity and are based on assumptions considered reasonable by the Debtors, the assumptions and estimates underlying the Projections are subject to significant business, economic, and competitive uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtors. Accordingly, the Projections are only estimates and are necessarily speculative in nature. It can be expected that some or all of the assumptions in the Projections will not be realized and that actual results will vary from the Projections, which variations may be material and are likely to increase over time. In light of the foregoing, readers are cautioned not to place undue reliance on the Projections. The Projections were not prepared in accordance with standards for projections promulgated by the American Institute of Certified Public Accountants or with a view to compliance with published guidelines of the SEC regarding projections or forecasts. The Projections have not been audited, reviewed, or compiled by the Debtors' independent public accountants. The projected financial information contained in this Disclosure Statement should not be regarded as a representation or warranty by the Debtors, the Debtors' advisors, or any other Person that the Projections can or will be achieved.

## F.     Operational Risk Factors

The Debtors face a number of risks with respect to their continuing business operations, including but not limited to the following: (i) their ability to improve profitability and generate positive operating cash flow; (ii) their ability to implement new product development efforts; (iii) their ability to increase capital expenditures in the future; (iv) their response to the entry of new competitors into their markets; (v) fluctuations in the cost and availability of raw materials and energy sources; (vi) the loss of any major customers; (vii) their ability to retain key personnel; (viii) changes in foreign currencies; (ix) their ability to reserve appropriately for self-insurance liabilities due to the variability of such factors as claims experience, medical inflation, legislative changes, jury verdicts, and the effects of the chapter 11 filings; (x) changes in federal, state or local laws or regulations affecting manufacturing, distribution, or retailing, including environmental regulations; (xi) stability of product costs; (xii) increases in labor and employee benefit costs, such as health care and pension expenses; (xiii) changes in accounting standards, taxation requirements and bankruptcy laws; (xiv) changes in the popularity of golf and discretionary customer spending; (xv) the growth of the market for golf clubs; (xvi) changes in the global economy and the global credit markets; and (xvii) their ability to achieve necessary efficiency and productivity levels at their manufacturing facilities.

## G.     Competition

Like the Debtors, the Reorganized Debtors will face future competition, which could harm their financial condition and results of operations. Principal competitors include: Far East Machinery Co., Ltd. and Nippon Shaft Co., Ltd. The Company must compete based upon a number of factors, including (i) quality, (ii) delivery, (iii) customer service, (iv) design/performance and (v) price. The Reorganized Debtors' ability to respond to the entry of competitors into their markets thus represents an additional risk factor.

46701/0001-5859301v9

## H.  Environmental and Other Regulations

The Debtors are not aware of any environmental condition at any of their properties that it considers material.  However, it is possible that the environmental investigations of their properties might not have revealed all potential environmental liabilities or might have underestimated certain potential environmental issues.  It is also possible that future environmental laws and regulations, or new interpretations of existing environmental laws, will impose material environmental liabilities on the Debtors, or that current environmental conditions of properties that the Debtors own or operate will be adversely affected by hazardous substances associated with other nearby properties or the actions of unrelated third parties.  The costs to defend any future environmental claims, perform any future environmental remediation, satisfy any environmental liabilities, or respond to changed environmental conditions could have a material adverse effect on the Debtors' financial condition and operating results.

## I.  Leverage

The Debtors believe that they will emerge from chapter 11 with a reasonable level of debt that can be effectively serviced in accordance with their business plan.  Circumstances, however, may arise which might cause the Debtors to conclude that they are overleveraged, which could have significant negative consequences, including:  (1) it may become more difficult for the Reorganized Debtors to satisfy their obligations with respect to all of their obligations; (2) the Reorganized Debtors may be vulnerable to a prolonged downturn in the market in which they operate or a prolonged downturn in the economy in general; (3) the Reorganized Debtors may be required to dedicate a substantial portion of their cash flow from operations to fund working capital, capital expenditures, and other general corporate requirements; (4) the Reorganized Debtors may be limited in their flexibility to plan for, or react to, changes in their businesses and the industry in which they operate or entry of new competitors into their markets; (5) the Reorganized Debtors may be placed at a competitive disadvantage compared to their competitors that have less debt, including with respect to implementing effective pricing and promotional programs; and (6) the Reorganized Debtors may be limited in borrowing additional funds.

The covenants in the Exit Facility may also restrict the Reorganized Debtors' flexibility.  Such covenants may place restrictions on the ability of the Reorganized Debtors to incur indebtedness; pay dividends and make other restricted payments or investments; sell assets; make capital expenditures; engage in certain mergers and acquisitions; and refinance existing indebtedness.

Additionally, there may be factors beyond the control of the Reorganized Debtors that could impact their ability to meet debt service requirements.  The ability of the Reorganized Debtors to meet debt service requirements will depend on their future performance, which, in turn, will depend on the Reorganized Debtors' ability to sustain sales conditions in the markets in which the Reorganized Debtors operate, the economy generally, and other factors that are beyond their control. The Debtors can provide no assurance that the businesses of the Reorganized Debtors will general sufficient cash flow from operations or that future borrowings will be available in amounts sufficient to enable the Reorganized Debtors to pay their indebtedness or to fund their other liquidity needs.  Moreover, the Reorganized Debtors may need to refinance all or a portion of their indebtedness on or before maturity.  The Debtors

cannot make assurances that the Reorganized Debtors will be able to refinance any of their indebtedness on commercial reasonable terms or at all. If the Reorganized Debtors are unable to make scheduled debt payments or comply with the other provisions of their debt instruments, their various lenders will be permitted under certain circumstances to accelerate the maturity of the indebtedness owing to them and exercise other remedies provided for in those instruments and under applicable law.

## J.      Litigation

The Reorganized Debtors will be subject to various claims and legal actions arising in the ordinary course of their businesses. The Debtors are not able to predict the nature and extent of any such claims and actions and cannot guarantee that the ultimate resolution of such claims and actions will not have a material adverse effect on the Reorganized Debtors.

## K.      Adverse Publicity

Adverse publicity or news coverage relating to the Reorganized Debtors, including but not limited to publicity or news coverage in connection with the chapter 11 cases, may negatively impact the Debtors' efforts to establish and promote name recognition and a positive image after the Effective Date.

## L.      Labor Matters

Certain of the Debtors' employees are subject to a collective bargaining agreement. If the Debtors are unable to renew the collective bargaining agreement when it expires, it is possible that the union could take action in the form of a strike or work stoppage. Such actions, higher costs in connection with the renegotiated collective bargaining agreement or significant labor disputes could adversely affect the Debtors' business.

## M.      Pension Matters

As discussed in Section IV.C.9. herein, the assets of the Pension Plan decreased leaving the Pension Plan underfunded by approximately $6-8 million. The Underfunded Amount was attributable to economic conditions involving weak equity performance and/or general interest rates that reduced the total value of the assets of the Pension Plan. True Temper has approximately five years to pay the Underfunded Amount, or recognize sufficient asset returns to reduce the Underfunded Amount to zero. This yearly payback amount will vary depending upon the valuation method selected and the relative stability of investment returns and interest rates over this time frame. If the Pension Plan continues to experience a decline in the value of plan assets, or if interest rates should decline significantly, the required contributions to the Pension Plan would increase accordingly, potentially putting an additional strain on True Temper's liquidity.

## N.      Certain Tax Considerations

There are a number of income tax considerations, risks, and uncertainties associated with consummation of the Plan. Interested parties should read carefully the discussions set forth in

Section VIII. of this Disclosure Statement regarding certain U.S. federal income tax consequences of the transactions proposed by the Plan to the Debtors and the Reorganized Debtors and to certain holders of Claims who are entitled to vote to accept or reject the Plan.

**O.      Certain Risks Factors Relating to Securities to be Issued Under the Plan**

### 1.      No Current Public Market for Securities

The New Common Stock to be issued pursuant to the Plan are securities for which there is currently no market, and there can be no assurance as to the development or liquidity of any market for the New Common Stock. If a trading market does not develop or is not maintained, holders of the New Common Stock may experience difficulty in reselling such securities or may be unable to sell them at all. Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in this Disclosure Statement depending upon many factors, including, without limitation, prevailing interest rates, markets for similar securities, industry conditions and the performance of, and investor expectations for the Reorganized Debtors.

Furthermore, Persons to whom the New Common Stock is issued pursuant to the Plan may prefer to liquidate their investments rather than hold such securities on a long-term basis. Accordingly, any market that does develop for such securities may be volatile. Other factors, such as the current intention of Reorganized TTC not to pay dividends for the foreseeable future, may further depress any market for the New Common Stock.

### 2.      Potential Dilution

The 10,000,000 shares of New Common Stock distributed on the Effective Date to the Plan Investor will be subject to dilution on account of (a) the New Common Stock issued pursuant to the New Management Incentive Plan, including issuances upon the exercise of options and (b) the Second Lien Lender New Common Stock that may be distributable to holders of Allowed Second Lien Credit Facility Claims.

In the future, similar to all companies, additional equity financings or other share issuances by New TT Holdings could adversely affect the market price of the New Common Stock.

### 3.      Dividends

The Debtors do not anticipate that cash dividends or other distributions will be paid with respect to the New Common Stock in the foreseeable future.

### 4.      Change of Control

The certificate of incorporation and by-laws of New TT Holdings, New TTC and New True Temper may contain provisions that may have the effect of delaying, deterring, or preventing a change in control of New TT Holdings, New TTC and/or New True Temper.

# XI. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe that the Plan affords holders of Claims the greatest opportunity for recovery on account of their Claims and, therefore, is in the best interests of such holders. If the Plan is not confirmed, however, the hypothetical alternatives include (a) liquidation of Debtors under chapter 7 of the Bankruptcy Code, or (b) an alternative plan of reorganization.

## A. Liquidation Under Chapter 7 or Chapter 11

If no plan can be confirmed, the chapter 11 cases could be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be appointed to liquidate the remaining assets of the Debtors for distribution to the creditors in accordance with the priorities established by the Bankruptcy Code. The trustee would retain professionals and liquidate the Debtors' remaining assets, and if necessary, investigate and pursue causes of action. The Debtors believe that the conversion of the cases to chapter 7 would increase the costs of administration, and reduce and delay the distribution to holders of Allowed Claims. Further, any proceeds available to satisfy Claims would be paid in the priority established in the Bankruptcy Code – Secured Claims, Administrative Claims, Priority Claims, Priority Tax Claims, and General Unsecured Claims. Under a chapter 7 liquidation, the Debtors believe that any recovery to Allowed First Lien Credit Facility Claims and Allowed Second Lien Credit Facility Claims in a chapter 7 case would be less than that provided for under the Plan. For the reasons noted above, the Debtors have concluded that holders of Allowed Claims are more likely than not to receive an amount under the Plan that is more than the amount such holder would receive under a chapter 7 liquidation.

## B. Alternative Plan(s) of Reorganization

If the Plan is not confirmed, the Debtors or any other party-in-interest could attempt to formulate a different plan. Such a plan might involve either a reorganization and continuation of the Debtors businesses or an orderly liquidation of assets, or a combination of both.

The Debtors' business could suffer from increased costs, erosion of customer confidence and liquidity difficulties if they remained debtors-in-possession during a lengthy chapter 11 process while trying to negotiate a plan. The Debtors believe that the Plan which is the result of extensive negotiations between the Plan Investor, the First Lien Agent, the Participating First Lien Lenders, and the Participating Second Lien Lenders, enables holders of Claims to realize the greatest possible value under the circumstances and that, compared to any later alternative plan of reorganization, the Plan has the greatest chance to be confirmed and consummated.

# XII. THE SOLICITATION; VOTING PROCEDURES

## A. Parties in Interest Entitled to Vote

Under Section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii)

notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, a holder of a claim or interest may vote to accept or to reject a plan if (i) the claim or interest is "allowed," which means generally that no party in interest has objected to such claim or interest, and (ii) the claim or interest is impaired by the plan. If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the plan. Claims in Classes 1, 4, 7, and 9 are unimpaired under the Plan, and holders of such Claims and Interests are therefore not entitled to vote. Holders of Claims in Classes 5 and 6 are impaired and presumed to have rejected the Plan and are not entitled to vote. Holders of Interests in Class 8 are impaired and deemed to reject the Plan and are not entitled to vote. Accordingly, only holders of Claims in Classes 2 and 3 are entitled to vote on the Plan.

By signing and returning the Ballot, each holder of a Class 2 Claim or a Class 3 Claim will be confirming that such holder (i) as of the Record Date, is the holder of a Class 2 Claim or Class 3 Claim, as applicable, or the authorized agent of such a holder and (ii) he/she/it has full power and authority to vote to accept or reject the Plan.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code seems such holder to have rejected the plan, and accordingly, holders of such claims and interests do not actually vote on the plan. If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan, and accordingly, holders of such claims and interests are not entitled to vote on the plan.

## B.     Classes Entitled to Vote to Accept or Reject the Plan

Only holders of Claims in Classes 2 and 3 are entitled to vote to accept or reject the Plan. By operation of law, each unimpaired Class of Claims is deemed to have accepted the Plan and each impaired Class of Claims or Interests that will receive nothing under the Plan is deemed to have rejected the Plan, and therefore, the holders of Claims or Interests in such Classes are not entitled to vote to accept or reject the Plan. Consequently, Classes 1, 4, 7, and 9 are deemed to have accepted the Plan and Classes 5, 6 and 8 are deemed to have rejected the Plan; and therefore, none of the holders of Claims or Interests in such Classes are entitled to vote to accept or reject the Plan.

## C.     Waivers of Plan Defaults, Irregularities, Etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of ballots will be determined by the Voting Agent and the Debtors, in their sole discretion, which determination will be final and binding. As indicated below under "Withdrawal of Ballots; Revocation," effective withdrawals of ballots must be delivered to the Voting Agent prior to the Voting Deadline. The Debtors reserve the absolute right to contest the validity of any such withdrawal. The Debtors also reserve the right to reject any and all ballots not in proper form, the acceptance

of which would, in the opinion of the Debtors or their counsel, be unlawful. The Debtors further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular ballot. The interpretation (including the ballot and the respective instructions thereto) by the Debtors, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determine. Neither the Debtors nor any other Person will be under any duty to provide notification of defects or irregularities with respect to deliveries of ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

## D.      Withdrawal of Ballots; Revocation

Any party who has delivered a valid ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Voting Agent at any time prior to the Voting Deadline. To be valid, a notice to withdrawal must (i) contain the description of the Claim(s) to which it relates and the aggregate principal amount represented by such Claim(s), (ii) be signed by the withdrawing party in the same manner as the ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the vote sought to be withdrawn, and (iv) to be the Voting Agent in a timely manner at Logan & Company, Inc., Attention: Elizabeth A. Crocker, 546 Valley Road, Upper Montclair, New Jersey 07043. The Debtors intend to consult with the Voting Agent to determine whether any withdrawals of ballots were received and whether the requisite acceptances of the Plan have been received. As stated above, the Debtors expressly reserve the absolute right to contest the validity of any such withdrawals of ballots.

Unless otherwise directed by the Bankruptcy Court, a purported notice of withdrawal of ballots which is not received in a timely manner by the Voting Agent will not be effective to withdraw a previously cast ballot.

Any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed ballot may revoke such ballot and change his or its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed ballot for acceptance or rejection of the Plan. In the case where more than one timely, properly completed ballot is received, only the ballot which bears the latest date will be counted for purposes of determining whether the requisite acceptances have been received.

## E.      Further Information; Additional Copies

If you have any questions or require further information about the voting procedures for voting your Claim or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits or appendices to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d) or order of the Bankruptcy Court), please contact Logan at:

LOGAN & COMPANY INC.
546 VALLEY ROAD
UPPER MONTCLAIR, NEW JERSEY
TELEPHONE: (973) 509-3190
FAX: (973) 509-1131
EMAIL:TRT@LOGANANDCO.COM

46701/0001-5859301v9

# XIII.    CONCLUSION AND RECOMMENDATION

The Debtors believe that confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will result in the greatest recoveries to holders of Claims and Interests.  Other alternatives would involve significant delay, uncertainty and substantial additional administrative costs.

Consequently, the Debtors urge all holders of Claims entitle to vote to ACCEPT the Plan, and to evidence their acceptance by duly completing and returning their Ballots so that they are actually received by Logan on or before 5:00 p.m., Eastern Time, on October 7, 2009.

Dated:  September 30, 2009

TRUE TEMPER SPORTS, INC.


By:  /s/ Jason A. Jenne
Name:  Jason A. Jenne
Title:  Chief Financial Officer

TRUE TEMPER CORPORATION


By:  /s/ Jason A. Jenne
Name:  Jason A. Jenne
Title:  Chief Financial Officer

TRUE TEMPER SPORTS-PRC
HOLDINGS, INC.


By:  /s/ Jason A. Jenne
Name:  Jason A. Jenne
Title:  Chief Financial Officer

46701/0001-5859301v9

**Counsel:**

By: /s/ Marion M. Quirk

**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
Norman L. Pernick (No. 2290)
Marion M. Quirk (No. 4136)
Karen M. McKinley (No. 4372)
Sanjay Bhatnagar (No. 4829)
500 Delaware Avenue
Suite 1410
Wilmington, DE 19801
Telephone: 302-652-3131
Facsimile: 302-652-3117

-and-

**MAYER BROWN LLP**
Frederick D. Hyman
Craig E. Reimer
675 Broadway
New York, NY 10019-5820
Telephone: 212-506-2500
Facsimile: 212-262-1910

46701/0001-5859301v9