**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------- x

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| TRUE TEMPER SPORTS, INC.[1] | : Case No. 09-_____ (___) |
| TRUE TEMPER CORPORATION[2] | : |
| TRUE TEMPER SPORTS-PRC | : |
| HOLDINGS, INC.[3] | : |
| | : |
| Debtors. | : |

---------------------------------------------------- x

**JOINT PREPACKAGED PLAN OF REORGANIZATION**
**OF TRUE TEMPER SPORTS, INC., TRUE TEMPER CORPORATION**
**AND TRUE TEMPER SPORTS-PRC HOLDINGS, INC.**

Dated: Wilmington, Delaware
        September 30, 2009

---

[1] Tax I.D. 52-2112620

[2] Tax I.D. 09-0224519

[3] Tax I.D. 71-0916895

# TABLE OF CONTENTS

ARTICLE I. DEFINITIONS, RULES OF INTERPRETATION AND COMPUTATION OF TIME.....................................................................................................1
- A. Scope of Definitions; Rules of Construction .............................1
- B. Definitions........................................................................1
- C. Rules of Interpretation ......................................................13
- D. Computation of Time.........................................................14
- E. Exhibits .........................................................................14
- F. Substantive Consolidation of Debtors for Purposes of Voting, Confirmation and Distribution....................................................14

ARTICLE II. TREATMENT OF UNCLASSIFIED CLAIMS .........................15
- A. DIP Revolving Credit Facility Claims......................................15
- B. DIP Roll-Up Loan Claims ...................................................16
- C. Administrative Claims .......................................................16
- D. Priority Tax Claims...........................................................16
- E. Professional Fee Claims......................................................16

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS.....................................................................................17
- A. Introduction...................................................................17
- B. Summary of Classified Claims and Interests.............................17
- C. Acceptance by Impaired Classes ...........................................18
- D. Cramdown.....................................................................18
- E. Treatment of Classes.........................................................18
- F. Allowed Claims ...............................................................21
- G. Postpetition Interest .........................................................21
- H. Special Provision Regarding Unimpaired Claims .......................21

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN .............21
- A. Plan Investment...............................................................21
- B. Authorization and Issuance of New Common Stock....................22
- C. Payment of Trade Unsecured Claims by the Second Lien Lenders..........23
- D. Continued Existence and Vesting of Assets in Reorganized Debtors..........................................................23
- E. Exit Financing.................................................................24
- F. Transfer of Assets, Intercompany Claims and Intercompany Obligations to New TTC........................................................25
- G. Cancellation of Old Equity Interests in TTC and True Temper and Agreements.....................................................................26
- H. Dissolution of TTC ..........................................................26
- I. New Management Incentive Plan ...........................................26

i

| J. | Certificates of Incorporation, By-Laws and Operating Agreements | 27 |
| K. | Directors and Officers | 27 |
| L. | Preservation of Rights of Action; Settlement of Litigation Claims | 27 |
| M. | Corporate Action; Effectuating Documents; Further Transactions | 28 |
| N. | Exemption from Certain Transfer Taxes | 28 |
| O. | Release of Liens | 29 |

**ARTICLE V. PROVISIONS GOVERNING DISTRIBUTIONS** .................................. 29

| A. | Distributions for Claims Allowed as of the Effective Date | 29 |
| B. | Disbursing Agent(s) | 29 |
| C. | Distribution Record Date | 30 |
| D. | Means of Cash Payment | 30 |
| E. | Calculation of Distribution Amounts of New Common Stock | 30 |
| F. | Delivery of Distributions; Undeliverable or Unclaimed Distributions | 31 |
| G. | Withholding and Reporting Requirements | 32 |
| H. | Allocation of Plan Distributions Between Principal and Interest | 32 |
| I. | Setoffs | 32 |

**ARTICLE VI. PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS** ........................................ 32

| A. | Resolution of Disputed Claims | 32 |
| B. | No Distribution Pending Allowance | 33 |
| C. | Distributions After Allowance | 33 |
| D. | Reservation of Right to Object to Allowance or Asserted Priority of Claims | 34 |

**ARTICLE VII. TREATMENT OF CONTRACTS AND LEASES** .......................... 34

| A. | Assumed Contracts and Leases | 34 |
| B. | Treatment of Change of Control Provisions | 34 |
| C. | Payments Related to Assumption of Contracts and Leases | 35 |
| D. | Insurance Policies | 35 |
| E. | Claims Based on Rejection of Executory Contracts or Unexpired Leases | 36 |
| F. | Compensation and Benefit Plans and Treatment of Retirement Plan and Pension Plan | 36 |
| G. | Indemnification of Directors and Officers | 36 |
| H. | Collective Bargaining Agreement | 37 |

**ARTICLE VIII. CONDITIONS PRECEDENT TO THE PLAN'S CONFIRMATION** .. 37

**ARTICLE IX. CONDITIONS PRECEDENT TO EFFECTIVE DATE** .......................... 37

| A. | Conditions to Effective Date | 37 |
| B. | Waiver of Conditions | 39 |

46701/0001-5942655v16

ARTICLE X. MODIFICATIONS AND AMENDMENTS ..............................................40

ARTICLE XI. RETENTION OF JURISDICTION.................................................................40

ARTICLE XII. MISCELLANEOUS PROVISIONS ..........................................................41
A.          Corporate Action.........................................................................................41
B.          Administrative Claims Bar Date .................................................................42
C.          Payment of Statutory Fees ..........................................................................42
D.          Severability of Plan Provisions...................................................................42
E.          Successors and Assigns...............................................................................43
F.          Discharge of Claims and Termination of Interests .....................................43
G.          Releases.......................................................................................................43
H.          Injunction ....................................................................................................45
I.          Exculpation and Limitation of Liability .....................................................45
J.          Waiver of Enforcement of Subordination...................................................46
K.          Term of Injunctions or Stays......................................................................46
L.          Binding Effect.............................................................................................46
M.          Committees .................................................................................................46
N.          Notices to Debtors, Plan Investor, First Lien Agent, Second Lien
               Agent and DIP Facility Agents ..................................................................46
O.          Governing Law ...........................................................................................51
P.          Prepayment .................................................................................................51
Q.          Section 1125(e) of the Bankruptcy Code....................................................51

## TABLE OF EXHIBITS

EXHIBIT A          DIP FINANCING COMMITMENT AND
                             EXIT FINANCING COMMITMENT

# INTRODUCTION

True Temper Sports, Inc., True Temper Corporation and True Temper Sports-PRC Holdings, Inc. propose the following plan of reorganization under chapter 11 of the Bankruptcy Code (as defined below).

# ARTICLE I.
## DEFINITIONS, RULES OF INTERPRETATION
## AND COMPUTATION OF TIME

### A.   Scope of Definitions; Rules of Construction

Except as expressly provided or unless the context otherwise requires, capitalized terms not otherwise defined in this Plan shall have the meanings ascribed to them in this Article I. Any term used in the Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules (as defined below), shall have the meaning ascribed to it therein. Where the context requires, any definition applies to the plural as well as the singular number.

### B.   Definitions

1.1   "Administrative Claim" means a Claim arising under Bankruptcy Code sections 507(a)(2), 507(a)(3) and 507(b) for costs and expenses of administration of the Chapter 11 Cases under Bankruptcy Code, including (a) any actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the business of the Debtors (such as wages, salaries and commissions for services and payments for goods, leased equipment and premises) and (b) all other claims entitled to administrative claim status pursuant to a Final Order of the Bankruptcy Court, but excluding DIP Facility Claims, Priority Tax Claims, Other Priority Claims and Professional Fee Claims.

1.2   "Administrative Claims Bar Date" means the deadline to file an Administrative Expense Request which shall be the date that is sixty (60) days after the Effective Date or the first Business Day following such day.

1.3   "Administrative Expense Request" means a request for payment of an Administrative Claim.

1.4   "Allowed" means, with respect to a Claim within a particular Class, an Allowed Claim of the type described in such Class.

1.5   "Allowed Claim" means a Claim (i) as to which no objection or request for estimation has been filed on or before the Claims Objection Deadline or the expiration of such other applicable period fixed by the Bankruptcy Court or the Plan; (ii) as to which any objection has been settled, waived, withdrawn or denied by a Final Order or in accordance with the Plan; or (iii) that is allowed (a) by a Final Order, (b) by an agreement between the holder of such Claim and the Debtors or the Reorganized Debtors or (c) pursuant to the

terms of the Plan; *provided, however,* that, notwithstanding anything herein to the contrary, by treating a Claim as an "Allowed Claim" under (i) above (the expiration of the Claims Objection Deadline or other applicable deadline), the Debtors do not waive their rights to contest the amount and validity of any disputed, contingent and/or unliquidated Claim in the time, manner and venue in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced. An Allowed Claim (i) includes a Disputed Claim to the extent such Disputed Claim becomes Allowed after the Effective Date and (ii) shall be net of any valid setoff exercised with respect to such Claim pursuant to the provisions of the Bankruptcy Code and applicable law. Unless otherwise specified herein, in section 506(b) of the Bankruptcy Code or by Final Order of the Bankruptcy Court, "Allowed Claim" shall not, for purposes of distributions under the Plan, include interest on such Claim accruing from or after the Petition Date.

1.6     "Alloy Materials" means True Temper Alloy Materials Co. (Suzhou) Ltd., a registered Chinese Company.

1.7     "Avoidance Actions" shall have the meaning ascribed to it in Article IV.L. hereof.

1.8     "Ballot(s)" means each of the ballot forms distributed to each Holder of a Claim or Interest entitled to vote to accept or reject this Plan.

1.9     "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. 101-1532, as now in effect or hereafter amended.

1.10     "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or any other court with jurisdiction over the Chapter 11 Cases.

1.11     "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure, the Official Bankruptcy Forms, the Federal Rules of Civil Procedure, and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, as now in effect or hereafter amended, as applicable to the Chapter 11 Cases or proceedings therein, as the case may be.

1.12     "Business Day" means any day, excluding Saturdays, Sundays or "legal holidays" (as defined in Bankruptcy Rule 9006(a)), on which commercial banks are open for business in New York, New York.

1.13     "Cash" means legal tender of the United States or equivalents thereof.

1.14     "Chapter 11 Cases" means the chapter 11 cases of the Debtors.

1.15     "Claim" means a claim, as defined in section 101(5) of the Bankruptcy Code.

1.16     "Claims Objection Deadline" means the first Business Day that is the latest of (i) the Effective Date; (ii) as to a particular Claim, 180 days after the filing of a proof of claim, or request for payment of, such Claim; or (iii) such other date as may be established

by the Bankruptcy Court.

1.17 "Class" means one of the classes of Claims or Interests listed in Article III. below.

1.18 "Collateral" means any property or interest in property of the Estate subject to a lien or security interest to secure the payment or performance of a Claim, which lien or security interest is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable law.

1.19 "Collective Bargaining Agreement" means the collective bargaining agreement with the United Steel Workers covering True Temper's union employees at its facility in Amory, Mississippi.

1.20 "Committee" means any official committee appointed in the Chapter 11 Cases, as such committee may be reconstituted from time to time.

1.21 "Confirmation Date" means the date of entry of the Confirmation Order on the docket of the Bankruptcy Court.

1.22 "Confirmation Hearing" means the Bankruptcy Court's hearing to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.23 "Confirmation Objection Deadline" means the date to be set by the Bankruptcy Court by which all objections to confirmation of the Plan must be filed and served upon parties in interest.

1.24 "Confirmation Order" means the Bankruptcy Court's order confirming the Plan under section 1129 of the Bankruptcy Code.

1.25 "Cure" means the payment of Cash by the Debtors, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary to cure defaults under an executory contract or unexpired lease of one or more of the Debtors and to permit the Debtors to assume that contract or lease under section 365(a) of the Bankruptcy Code.

1.26 "Debtors" means True Temper Sports, Inc., True Temper Corporation and True Temper Sports-PRC Holdings, Inc. in their capacity as debtors and debtors-in-possession under sections 1107 and 1108 of the Bankruptcy Code and, as to acts or rights on or after the Effective Date or when the context otherwise so requires, the post-confirmation entity reorganized hereunder.

1.27 "D&O Claims" means any Claim arising from the Debtors' indemnification obligations under their constituent documents or other written agreements and/or pursuant to applicable general corporation law or other applicable business organization law, including those Claims described in Article VII.G hereof.

1.28 "DIP Facility" means the DIP Revolving Credit Facility and the DIP

Roll-Up Loan.

1.29    "DIP Facility Agents" means means the DIP Revolving Agent and the DIP Roll-Up Agent.

1.30    "DIP Facility Agreement" means that certain debtor-in-possession credit agreement to be executed on or prior to the Petition Date by and among the Debtors, the DIP Facility Agents, the DIP Revolving Credit Facility Lenders and the DIP Roll-Up Loan Lenders, and the other parties thereto, together with the commitment papers attached hereto as Exhibit A with respect to the debtor-in-possession facility referenced therein and all instruments and agreements related thereto and consistent with the commitment papers attached hereto as Exhibit A in each case, in form and substance acceptable to the DIP Facility Agents, and as amended, supplemented, restated or otherwise modified from time to time in accordance with the terms thereof.

1.31    "DIP Facility Claim" means the DIP Revolving Facility Claims and the DIP Roll-Up Loan Claims.

1.32    "DIP Lenders" means the DIP Revolving Credit Facility Lenders and the DIP Roll-Up Loan Lenders.

1.33    "DIP Revolving Agent" means General Electric Capital Corporation (or any affiliate thereof), and its successors and assigns, as administrative agent and arranger and in any and all other agency capacities under the DIP Revolving Credit Facility.

1.34    "DIP Revolving Credit Facility" means that certain senior secured, superpriority debtor-in-possession revolving credit facility pursuant to the DIP Facility Agreement, which facility shall provide for postpetition extensions of credit in a maximum amount of $10 million, inclusive of a letter of credit sub-facility in an aggregate amount of $5 million (which in turn includes all First Lien Credit Facility Letter of Credit Claims), subject to and in accordance with the terms and conditions of the DIP Facility Agreement.

1.35    "DIP Revolving Facility Claim" means a Claim arising under or as a result of the DIP Revolving Credit Facility.

1.36    "DIP Revolving Credit Facility Lender" means the lender(s) under the DIP Revolving Credit Facility.

1.37    "DIP Roll-Up Agent" means Credit Suisse, and its successors and assigns, as administrative agent and in any and all other agency capacities under the DIP Roll-Up Loan.

1.38    "DIP Roll-Up Loan" means that certain debtor-in-possession term loan evidenced by the DIP Facility that constitutes a roll-up of $80 million of the First Lien Credit Facility Claims other than First Lien Credit Facility Letter of Credit Claims, which shall constitute part of the DIP Revolving Credit Facility.

1.39    "DIP Roll-Up Loan Claim" means a Claim arising under or in respect of the

4

DIP Roll-Up Loan.

1.40    "DIP Roll-Up Loan Lenders" means the First Lien Lenders each in its capacity as a term loan lender under the DIP Facility Agreement.

1.41    "Disallowed Claim" means any Claim against the Debtors which has been disallowed, in whole or in part, by Final Order or written agreement between the Debtors and the holder of such Claim, to the extent of such disallowance.

1.42    "Disbursing Agent" means New True Temper or any party designated by New True Temper, in its sole discretion, to serve as disbursing agent under the Plan.

1.43    "Disclosure Statement" means the written disclosure statement that relates to the Plan, as amended, supplemented or modified from time to time, and that is prepared and distributed in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3018.

1.44    "Disputed Claim" means any Claim, or any portion thereof, that is not an Allowed Claim or a Disallowed Claim.

1.45    "Distribution Date" means the date, occurring as soon as practicable after the Effective Date (but in no event more than 10 Business Days thereafter), on which the Disbursing Agent first makes distributions to holders of Allowed Claims as provided in Article V. of the Plan.

1.46    "Distribution Record Date" means the Confirmation Date.

1.47    "Effective Date" means a date selected by the Debtors, which date shall be on or as soon as practicable after the first Business Day on which all conditions to the consummation of the Plan set forth in Article IX.A have been satisfied or waived.

1.48    "Equity Commitment and Plan Support Agreement" means that certain equity commitment and plan support agreement dated as of September 25, 2009, by and among the Debtors, the First Lien Agent, the Participating First Lien Lenders, the Participating Second Lien Lenders and the Plan Investor.

1.49    "ERISA" means the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1301-1461, and the regulations promulgated thereunder.

1.50    "Estates" means the estates of the Debtors in the Chapter 11 Cases of the Debtors, as created under section 541 of the Bankruptcy Code.

1.51    "Existing Letters of Credit" means the letters of credit outstanding under the letter of credit sub-facility to the First Lien Credit Facility.

1.52    "Exit Agents" means the New Term Loan Agent and the New Revolving Credit Facility Agent.

1.53 "Exit Facility" means the New Term Loan and the New Revolving Credit Facility.

1.54 "Exit Facility Loan Documents" means the credit agreements, notes, the commitment papers attached hereto as Exhibit A with respect to the New Revolving Credit Facility and all other loan and security documents relating to either or both of the New Term Loan and the New Revolving Credit Facility, and all other agreements, instruments and documents executed in connection therewith, in each case, in form and substance acceptable to the Exit Agents, and as the same may be amended, restated, supplemented or otherwise modified from time to time.

1.55 "Exit Lenders" means collectively the New Revolving Credit Facility Lenders and the New Term Lenders.

1.56 "Final Order" means an order or judgment, entered by the Bankruptcy Court or other court of competent jurisdiction, that has not been amended, modified or reversed, and as to which (i) no stay is in effect, (ii) the time to seek rehearing, file a notice of appeal or petition for certiorari has expired and (iii) no appeal, request for a stay, petition seeking certiorari, or other review is pending; *provided, however,* that the possibility that a motion under section 502(j) of the Bankruptcy Code, Rule 59 or 60 of the Federal Rules of Civil Procedure, or any analogous rule (whether federal or state) may be but has not then been filed with respect to such order shall not cause such order not to be a Final Order.

1.57 "First Lien Agent" means Credit Suisse as administrative agent and collateral agent under the First Lien Credit Facility.

1.58 "First Lien Credit Facility Agreement" means the Amended and Restated First Lien Credit Agreement dated as of March 27, 2006 (as amended from time to time) by and among True Temper, as borrower, TTC and TTS-PRC, as guarantors, the First Lien Agent and the First Lien Lenders.

1.59 "First Lien Credit Facility" means that certain prepetition first priority credit facility consisting of (i) $84,602,214.12 outstanding principal, plus accrued and unpaid interest as of the Petition Date under the term loan due March 15, 2011; (ii) $17,085,000 principal, plus accrued and unpaid interest as of the Petition Date under the revolving credit facility due March 15, 2009; (iii) approximately $2,106,916 on account of the termination value of the Swap Agreement, with such amount subject to fluctuation due to market conditions until the Petition Date, at which time the Swap Agreement shall terminate and the termination value shall become fixed; (iv) $1,800,000 principal value of Existing Letters of Credit; and (v) approximately $276,000 on account of the termination value of the Forward Contract, with such amount subject to fluctuation due to market conditions until the Petition Date, at which time the Forward Contract shall terminate and the termination value shall become fixed.

1.60 "First Lien Credit Facility Claim" means a Claim of a First Lien Lender in respect of the First Lien Credit Facility.

1.61 "First Lien Credit Facility Letter of Credit Claims" means the First Lien Credit Facility Claims in respect of the Existing Letters of Credit.

1.62 "First Lien Lenders" means the holders of Claims under the First Lien Credit Facility.

1.63 "Forward Contract" means that certain foreign exchange forward contract dated October 6, 2008 by and among True Temper and Wells Fargo Bank, N.A.

1.64 "General Unsecured Claim" means a Claim that is not a DIP Facility Claim, Administrative Claim, Professional Fee Claim, Priority Tax Claim, Other Priority Claim, Other Secured Claim, First Lien Credit Facility Claim, Second Lien Credit Facility Claim, Senior Subordinated Note Claim or Intercompany Claim.

1.65 "Gilbert Global" means Gilbert Global Equity Partners, L.P., Gilbert Global Equity Partners Bermuda, L.P., GGEP-SK, LLC and their respective affiliated funds and any other entity through which any of the foregoing entities hold interests in TTC or any affiliate thereof.

1.66 "Impaired" means, when used with reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.67 "Indenture Trustee" means the Bank of New York as trustee for the Senior Subordinated Notes.

1.68 "Intercompany Claim" means any Claim held by a Debtor against another Debtor, including without limitation: (a) any account reflecting intercompany book entries by a Debtor with respect to another Debtor, (b) any Claim not reflected in such book entries that is held by a Debtor against another Debtor, and (c) any derivative Claim asserted by or on behalf of one Debtor against another Debtor. For the avoidance of doubt, the term Intercompany Claim does not include any Claim held by the Non-U.S. Subsidiaries against the Debtors or any Claim held by the Debtors against the Non-U.S. Subsidiaries.

1.69 "Intercompany Obligation" means the obligation of a Debtor to another Debtor on account of an Intercompany Claim.

1.70 "Interest" means any legal, equitable, contractual or other right of any Person (including any 401(k) plan or plan participant) in the ownership of True Temper, TTC or TTS-PRC, whether or not transferable and whether or not reflected in a stock certificate or agreement that is not a Claim, and the legal, equitable, contractual or other rights of any Person to acquire or receive any of the foregoing that is not a Claim.

1.71 "Internal Revenue Code" means the Internal Revenue Code of 1986, as amended.

1.72 "Ji Neng" means Ji Neng Composite Materials & Products (Guangzhou) Ltd., a registered Chinese company.

7

1.73    "Lien" has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.74    "Litigation Claims" means all claims, rights of action, suits or proceedings, whether in law or in equity, whether known or unknown, that the Debtors or their Estates may hold against any Person, except such claims that are released under the Plan or the Confirmation Order.

1.75    "New Board" shall have the meaning set forth in Article IV.K.

1.76    "New Common Stock" means the 20,000,000 of new common shares, par value $0.001 per share, of New TT Holdings to be authorized and/or issued under Article IV.B of the Plan as of the Effective Date, substantially in the form set forth in the Plan Supplement.

1.77    "New Management Incentive Plan" means that certain post-Effective Date management incentive plan, substantially in the form set forth in the Plan Supplement, which shall be implemented by the New Board of New TTC and which may consist of, among other things, restricted stock and/or performance based options, and will take into account other bonus and compensation plans.

1.78    "New Revolving Credit Facility" means the revolving credit facility in an aggregate principal amount of $12.5 million, inclusive of a $5 million letter of credit sublimit (which sublimit shall include all letters of credit outstanding under the DIP Facility Agreement as of the Effective Date), as set forth in the Plan Supplement and in form and substance acceptable to the Exit Agents, provided by the New Revolving Credit Facility Lenders, as of the Effective Date to Reorganized True Temper as borrower and New TTC and Reorganized TTS-PRC as guarantors, consistent with the commitment papers attached hereto as Exhibit A.

1.79    "New Revolving Credit Facility Agent" means General Electric Capital Corporation (or any affiliate thereof), and its successors and assigns, as administrative agent and arranger and in any and all other agency capacities under the New Revolving Credit Facility.

1.80    "New Revolving Credit Facility Lenders" means the lenders under the New Revolving Credit Facility.

1.81    "New Stockholders Agreement" means the stockholders agreement, to be dated as of the Effective Date, among New TT Holdings and the holders of the New Common Stock, substantially in the form set forth in the Plan Supplement.

1.82    "New Term Loan" means a first lien term loan in the principal amount equal to (i) the aggregate amount of the Allowed First Lien Credit Facility Claims and DIP Roll-Up Loan Claims, less (ii) $70 million, as set forth in the Plan Supplement and in form and substance acceptable to the New Term Loan Agent and the New Revolving Credit Facility Agent, deemed to be funded by the First Lien Lenders and DIP Roll-Up Loan

46701/0001-5942655v16

Lenders as of the Effective Date to Reorganized True Temper as borrower and New TTC and Reorganized TTS-PRC as guarantors.

1.83    "New Term Loan Agent" means Credit Suisse, and its successors and assigns, as administrative agent and in any and all other agency capacities under the New Term Loan.

1.84    "New Term Lenders" means the lenders under the New Term Loan.

1.85    "New TTC" means New True Temper Corporation, Inc., a Delaware corporation wholly owned by New TT Holdings.

1.86    "New TT Holdings" means New True Temper Holdings Corporation, Inc., a Delaware corporation formed by the Plan Investor.

1.87    "New True Temper" means New True Temper Sports, Inc., a Delaware Corporation wholly-owned by New TTC.

1.88    "Non-U.S. Subsidiaries" means Ji Neng, Supertop and True Temper Alloy.

1.89    "Old Equity Interests" means all equity interests in True Temper, TTC and TTS-PRC outstanding prior to the Effective Date including, without limitation, any preferred stock, common stock, stock options or other rights to purchase the stock of True Temper, TTC and TTS-PRC, together with any warrants, conversion rights, rights of first refusal, subscriptions, commitments, agreements, or other rights to acquire or receive any stock or other equity ownership interests in True Temper, TTC and TTS-PRC prior to the Effective Date, specifically including the TTC Equity Interests.

1.90    "Other Priority Claim" means a Claim entitled to priority under section 507(a) of the Bankruptcy Code other than a DIP Facility Claim, Administrative Claim, Professional Fee Claim or Priority Tax Claim.

1.91    "Other Secured Claim" means a Claim other than a First Lien Credit Facility Claim or a Second Lien Credit Facility Claim that is secured by a valid, duly perfected lien as of the Petition Date on property in which the Estates have an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in the Estates' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code.

1.92    "Participating First Lien Lender" means any First Lien Lender that is a party to the Equity Commitment and Plan Support Agreement.

1.93    "Participating Second Lien Lender" means any Second Lien Lender that is a party to the Equity Commitment and Plan Support Agreement.

1.94    "Pension Plan" means The Pension Plan for Hourly Employees of True Temper Sports Incorporated, a non-contributory defined benefit pension plan covering

hourly union employees at True Temper's Amory, Mississippi plant.

1.95    "Person" means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, estate, trust, governmental unit or other entity as defined in section 101(15) of the Bankruptcy Code.

1.96    "Petition Date" means the date on which the Debtors filed their petitions for relief commencing the Chapter 11 Cases.

1.97    "Plan" means this plan of reorganization and all exhibits and schedules hereto, including without limitation, the Plan Supplement, each as amended, modified or supplemented from time to time as permitted hereunder and by the Bankruptcy Code.

1.98    "Plan Investment" shall have the meaning set forth in Article IV.A.

1.99    "Plan Investor" means collectively those investors identified in the Equity Commitment and Plan Support Agreement as "Plan Investors" from time to time who agree to make an investment in New TT Holdings pursuant to this Plan in exchange for New Common Stock, pursuant to the New Stockholders Agreement.

1.100    "Plan Supplement" means the compilation of documents that the Debtors shall file with the Bankruptcy Court on or before the date that is five days prior to the Confirmation Hearing.

1.101    "Postpetition Interest" means interest accruing on and after the Petition Date on a Claim.

1.102    "Principal and Interest" means the aggregate principal amount of a Claim plus accrued and unpaid interest thereon to the Petition Date.

1.103    "Priority Tax Claim" means a Claim that is entitled to priority under section 507(a)(8) of the Bankruptcy Code.

1.104    "Professional" means any professional employed in the Chapter 11 Cases pursuant to section 327 or 1103 of the Bankruptcy Code.

1.105    "Professional Fee Claim" means a Claim of a Professional for compensation or reimbursement of costs and expenses relating to services incurred after the Petition Date and prior to and including the Effective Date.

1.106    "Pro Rata" means with reference to any distribution on account of or in exchange for any Claim in any Class, the proportion that the amount of a Claim (numerator) bears to the aggregate amount of all Claims (including Disputed Claims, but excluding Disallowed Claims) (denominator) in such Class.

1.107    "Reinstate," "Reinstated" or "Reinstatement" means (i) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the holder of such

Claim so as to leave such Claim unimpaired in accordance with section 1124 of the Bankruptcy Code or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (a) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (b) reinstating the maturity of such Claim as such maturity existed before such default; (c) compensating the holder of such Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and (d) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the holder of such Claim; *provided, however,* that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, and affirmative covenants regarding corporate existence, prohibiting certain transactions or actions contemplated by the Plan, or conditioning such transactions or actions on certain factors, shall not be required to be reinstated in order to accomplish Reinstatement and shall be deemed cured on the Effective Date.

1.108 "Released Party" means each of: (a) the First Lien Agent, in its capacity as such; (b) the First Lien Lenders, in their capacity as such; (c) the Second Lien Agent, in its capacity as such; (d) the Second Lien Lenders, in their capacity as such; (e) each of the Plan Investors, in their capacity as such; (f) Gilbert Global; (g) the Creditors Committee, if any, in their capacity as such; (h) the DIP Facility Agents and DIP Lenders, in their capacities as such; (i) with respect to each of the foregoing entities in clauses (a) through (h), such person's current and former affiliates, subsidiaries, officers, directors, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case in their capacity as such, and only if serving in such capacity; (j) the Debtors and Reorganized Debtors; and (k) the Debtors', the Reorganized Debtors' and New TT Holdings's current and former officers, partners, members, directors, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case in their capacity as such, and only if serving in such capacity.

1.109 "Reorganized Debtors" means collectively New TTC, Reorganized True Temper, and Reorganized TTS-PRC.

1.110 "Reorganized True Temper" means True Temper on and after the Effective Date including as converted into a limited liability company and any successor by merger pursuant to the transactions described in Article IV.A. hereof.

1.111 "Reorganized TTS-PRC" means TTS-PRC on and after the Effective Date.

1.112 "Second Lien Agent" means Law Debenture Trust Company of New York as administrative agent under the Second Lien Credit Facility.

1.113 "Second Lien Credit Facility Agreement" means that certain Second Lien Credit Agreement dated January 22, 2007 (as amended from time to time) by and among

True Temper, as borrower, TTC and TTS-PRC, as guarantors, the Second Lien Agent and the Second Lien Lenders.

1.114 "Second Lien Credit Facility" means the $45 million term loan due June 30, 2011 provided for under the Second Lien Credit Facility Agreement.

1.115 "Second Lien Credit Facility Claim" means a claim of a Second Lien Lender arising under the Second Lien Credit Facility.

1.116 "Second Lien Lender" means a lender under the Second Lien Credit Facility.

1.117 "Second Lien Lender New Common Stock" means the 1,285,714 shares of New Common Stock to be distributed to the holders of Allowed Second Lien Credit Facility Claims under the Plan, representing 11.3924% of the total New Common Stock to be issued under the Plan, subject to dilution on account of the New Management Incentive Plan.

1.118 "Security" shall have the meaning ascribed to it in Section 101(49) of the Bankruptcy Code.

1.119 "Senior Subordinated Note Claim" means a claim arising under the Senior Subordinated Notes.

1.120 "Senior Subordinated Note Indenture" means that certain Indenture, dated as of March 15, 2004, by and among True Temper, as issuer, TTS-PRC, as a guarantor, and the Bank of New York, as indenture trustee.

1.121 "Senior Subordinated Notes" means the unsecured 8 ⅜% senior subordinated notes due 2011 issued by True Temper under the Senior Subordinated Note Indenture.

1.122 "Supertop" means Supertop Enterprises Ltd., a registered Hong Kong holding company.

1.123 "Swap Agreement" means that certain ISDA Master Agreement dated as of April 23, 2008 between True Temper and Credit Suisse International.

1.124 "Trade Account" means an account established on or prior to the Effective Date by the Disbursing Agent for the purposes described in Article IV.C. of the Plan.

1.125 "Trade Unsecured Claim" means any General Unsecured Claim arising prior to the Petition Date relating to the receipt of goods or services by the Debtors from trade creditors or service providers, including, without limitation, goods or services provided by the Non-U.S. Subsidiaries, in the ordinary course of the Debtors' business. For the avoidance of doubt, Trade Unsecured Claims shall not include any General Unsecured Claim arising from or related to the rejection of any executory contract and/or unexpired lease.

1.126 "Trade Unsecured Claim" shall have the meaning ascribed to it in Article IV.C. hereof.

1.127 "Trade Unsecured Claim Release" means a release to be executed by a holder of a Trade Unsecured Claim in order to receive a Trade Unsecured Claim Payment, in substantially the form set forth in the Plan Supplement.

1.128 "True Temper" means True Temper Sports, Inc., a Delaware Corporation.

1.129 "True Temper Alloy" means True Temper Alloy Materials Co. (Suzhou) Ltd., a registered Chinese company.

1.130 "True Temper Merger Agreement" means the merger agreement pursuant to which Reorganized True Temper will be merged with New True Temper as described in Section IV.A herein, substantially in the form set forth in the Plan Supplement.

1.131 "TTC" means True Temper Corporation, a Delaware Corporation.

1.132 "TTC Common Stock" means the common stock, par value $0.01 per share, of TTC, issued and outstanding immediately prior to the Effective Date.

1.133 "TTC Equity Interests" means the TTC Common Stock and the TTC Preferred Stock.

1.134 "TTC Preferred Stock" means the Series A Preferred Stock, par value $0.01 per share of TTC issued and outstanding immediately prior to the Effective Date.

1.135 "TTC Sub" means True Temper Corporation Subsidiary, a Delaware corporation to be formed by and wholly owned by TTC.

1.136 "TTS Holdings" means TTS Holdings, LLC, a Delaware holding company formed by Gilbert Global.

1.137 "TTS-PRC" means True Temper Sports-PRC Holdings, a Delaware corporation.

1.138 "Unimpaired" means, with reference to a Claim or Interest, a Claim or Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

## C. Rules of Interpretation

In the Plan (a) any reference to a contract, instrument, release, indenture or other agreement or document as being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or on such terms and conditions, (b) any reference to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified or supplemented, (c) unless otherwise specified, all references to Sections, Articles, Schedules and Exhibits are references to Sections, Articles, Schedules and Exhibits of or to

the Plan, (d) the words "herein" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan, (e) captions and headings to Articles and Sections are for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan, and (f) the rules of construction in section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

The Plan is the product of extensive discussions between and among, *inter alia*, the Debtors, the Plan Investor and certain of the First Lien Lenders and Second Lien Lenders. Each of the foregoing was or had the opportunity to be represented by counsel and either (a) participated in the formulation and documentation of or (b) was afforded the opportunity to review and provide comments on the Plan, the Disclosure Statement, and the documents ancillary thereto. Accordingly, the general rule of contract construction known as "*contra preferentem*" shall not apply to the construction or interpretation of any provision of this Plan, the Disclosure Statement, or any contract, instrument, release, exhibit, or other agreement or document generated in connection herewith.

**D.    Computation of Time**

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**E.    Exhibits**

All exhibits (as amended from time to time following their initial filing with the Bankruptcy Court) are incorporated into and are a part of the Plan as if set forth in full herein, and, to the extent not attached hereto, such exhibits shall be filed with the Bankruptcy Court as part of the Plan Supplement. To the extent any exhibit contradicts the non-exhibit portion of the Plan, unless otherwise ordered by the Bankruptcy Court the non-exhibit portion of the Plan shall control.

**F.    Substantive Consolidation of Debtors for Purposes of Voting, Confirmation and Distribution**

This Plan provides for substantive consolidation of the Debtors' Estates, but solely for purposes of voting, confirmation, and making distributions to the holders of Allowed Claims under the Plan. On the Effective Date, and solely for purposes of voting, confirmation, and making distributions to the holders of Allowed Claims under the Plan: (a) all guarantees of any Debtor of the payment, performance or collection of another Debtor with respect to Claims against such Debtor shall be eliminated and cancelled; (b) any single obligation of multiple Debtors shall be treated as a single obligation in the Chapter 11 Cases; and (c) all guarantees by a Debtor with respect to Claims against one or more of the other Debtors shall be treated as a single obligation in the Chapter 11 Cases. On the Effective Date, and in accordance with the terms of the Plan, all Claims based upon guarantees of collection, payment, or performance made by a Debtor as to the obligation of another Debtor shall be released and of no further force and effect. Except as set forth in this Article I.F., such substantive consolidation shall not affect (a) the legal and/or corporate structure of the Reorganized Debtors, (b) any obligations under any leases or

contracts assumed in this Plan or otherwise after the Petition Date, and (c) pre-and post-Petition Date Liens, guarantees and security interests that are required to be maintained (x) in connection with contracts that were entered into during the Debtors' Chapter 11 Cases or that have been or will be assumed pursuant to section 365 of the Bankruptcy Code and this Plan, (y) in connection with the terms of the DIP Facility, the DIP Facility Agreement, the Exit Facility and the Exit Facility Loan Documents, and (z) pursuant to the terms and conditions contained in this Plan. From and after the Effective Date, each of the Reorganized Debtors will be deemed a separate and distinct entity, properly capitalized, vested with all of the assets of such debtor as they existed prior to the Effective Date and having the liabilities and obligations provided for under this Plan.

Notwithstanding anything to the contrary herein, on or after the Effective Date, after consultation with and approval by each of the Plan Investors, with such approval not to be unreasonably withheld, any and all Intercompany Claims will be adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid, continued, or discharged to the extent reasonably determined appropriate by the Reorganized Debtors. Any such transaction may be effected on or subsequent to the Effective Date without any further action by the Bankruptcy Court or by the stockholders of any of the Reorganized Debtors.

Notwithstanding the substantive consolidation of the Estates for the purposes set forth in this Article I.F., each Reorganized Debtor shall pay all fees payable under section 1930 of title 28 of the United States Code on all disbursements, including distributions pursuant to the Plan and disbursements in and outside of the ordinary course of business, until the entry of a final decree in its Chapter 11 Case, dismissal of its Chapter 11 Case, or conversion of its Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code.

## ARTICLE II.
## TREATMENT OF UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Revolving Credit Facility Claims, DIP Roll-Up Loan Claims, Administrative Claims, Priority Tax Claims and Professional Fee Claims are not classified and holders of such Claims are not entitled to vote on the Plan.

### A.      DIP Revolving Credit Facility Claims

Except to the extent that a holder of an Allowed DIP Revolving Credit Facility Claim and the Debtors or the Reorganized Debtors, as the case may be, agree to a different treatment, each Allowed DIP Revolving Credit Facility Claim (if any) shall be paid in full in Cash on the Effective Date from the proceeds of the New Revolving Credit Facility; *provided, however*, that the DIP Revolving Credit Facility Claims in respect of letters of credit issued (or deemed issued) pursuant to the DIP Facility Agreement shall be assumed by the Reorganized Debtors in accordance with the terms of the New Revolving Credit Facility.

46701/0001-5942655v16

**B.      DIP Roll-Up Loan Claims**

Pursuant to the DIP Facility Agreement, and as a precondition to the roll-up of the First Lien Credit Facility Claims thereunder, each DIP Roll-Up Loan Lender will be required to agree to receive, and shall receive on the Effective Date, in full satisfaction of their DIP Roll-Up Loan Claims: (i) their pro rata share of $70 million in Cash plus (ii) with respect to the remaining amount of their Allowed Claims (if any), their pro rata share of the obligations under the New Term Loan.

**C.      Administrative Claims**

Except to the extent that a holder of an Allowed Administrative Claim and the Debtor against which such Allowed Administrative Claim is asserted or the Reorganized Debtors, as the case may be (with the consent of the Plan Investor), agree to different treatment, each holder of an Allowed Administrative Claim shall be paid in full in Cash or as otherwise provided in the Bankruptcy Code.

**D.      Priority Tax Claims**

Except to the extent that a holder of an Allowed Priority Tax Claim and the Debtor against which such Priority Tax Claim is asserted or the Reorganized Debtors, as the case may be (with the consent of the Plan Investor), agree to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the option of the Debtors or the Reorganized Debtors, as the case may be (with the consent of the Plan Investor), (a) cash on the Effective Date in an amount equal to such Allowed Priority Tax Claim, or (b) over a period through the fifth anniversary of the Petition Date, deferred cash payments in an aggregate amount equal to such Allowed Priority Tax Claim, plus interest on such aggregate amount over such period. All Allowed Priority Tax Claims which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

**E.      Professional Fee Claims**

All final requests for compensation or reimbursement of costs and expenses pursuant to sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code for services rendered to the Debtors or any Committee (if appointed) prior to the Effective Date must be filed with the Bankruptcy Court and served on the Reorganized Debtors and their counsel no later than 60 days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Objections to applications of such Professionals or other entities for compensation or reimbursement of costs and expenses must be filed and served on the Reorganized Debtors and their counsel and the requesting Professional or other entity no later than 25 days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application for compensation or reimbursement was served. The Reorganized Debtors may pay charges that they incur on and after the Effective Date for professionals' fees, disbursements, expenses or related support services in the ordinary course of business and without application to the Bankruptcy Court.

# ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### A.  Introduction

The Plan places all Claims and Interests, except Claims provided for in Article II, which are not classified, in the Classes listed below.  A Claim or Interest is placed in a particular Class only to the extent that it falls within the description of that Class, and is classified in other Classes to the extent that any portion thereof falls within the description of other Classes.

### B.  Summary of Classified Claims and Interests

| Class | Impaired/Unimpaired; Entitlement to Vote |
|---|---|
| Class 1 - Other Priority Claims | Unimpaired - Conclusively presumed to have accepted the Plan, and therefore, not entitled to vote. |
| Class 2 – First Lien Credit Facility Claims | Impaired - Entitled to vote. |
| Class 3 - Second Lien Credit Facility Claims | Impaired - Entitled to vote. |
| Class 4 - Other Secured Claims | Unimpaired - Conclusively presumed to have accepted the Plan and, therefore, not entitled to vote. |
| Class 5 - General Unsecured Claims | Impaired - Conclusively presumed to have rejected the Plan and, therefore, not entitled to vote. |
| Class 6 - Senior Subordinated Note Claims | Impaired - Conclusively presumed to have rejected the Plan and, therefore, not entitled to vote. |
| Class 7 - Intercompany Claims | Unimpaired - Conclusively presumed to have accepted the Plan and, therefore, not entitled to vote. |
| Class 8 - Old Equity Interests in TTC and True Temper | Impaired – conclusively presumed to have rejected the Plan and, therefore, not entitled to vote. |

46701/0001-5942655v16

| Class | Impaired/Unimpaired; Entitlement to Vote |
|---|---|
| Class 9 – Old Equity Interests in TTS-PRC | Unimpaired – conclusively presumed to have accepted the Plan and, therefore, not entitled to vote. |

## C. Acceptance by Impaired Classes

Impaired Classes 2 and 3 shall have accepted the Plan if (i) the holders of at least two-thirds in amount of the Allowed Claims actually voting in such classes have voted to accept the Plan and (ii) the holders of more than one-half in number of the Allowed Claims actually voting in such classes have voted to accept the Plan, in each case not counting the vote of any holder designated under section 1126(e) of the Bankruptcy Code.

## D. Cramdown

To the extent necessary, the Debtors will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to modify the Plan to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

## E. Treatment of Classes

Pursuant to the terms of the Plan, each of the holders of Claims and Interests in Classes 1 through 9 will receive the treatment described below.

1. *Class 1 - Other Priority Claims*

   a. *Claims in Class:* Class 1 consists of all Other Priority Claims against any Debtor.

   b. *Treatment:* The legal, equitable and contractual rights of the holders of Other Priority Claims are Unimpaired by the Plan. Except to the extent that the holder of such Claim and the Debtor against which such Other Priority Claim is asserted or the Reorganized Debtors, as the case may be (with the consent of the Plan Investor) agree to a different treatment, each holder of an Allowed Other Priority Claim shall be paid in full in Cash or as otherwise provided in the Bankruptcy Code.

2. *Class 2 – First Lien Credit Facility Claims*

   a. *Claims in Class:* Class 2 consists of all First Lien Credit Facility Claims not deemed to be paid to the First Lien Lenders from the proceeds of the DIP Roll-Up Loan, which together shall be Allowed in the amount of approximately $104 million plus accrued and unpaid interest at the default rate and any other unpaid fees and expenses as of the Petition Date, subject to fluctuation until the Petition Date on account of

18

market conditions affecting the termination value of the Swap Agreement and the Forward Contract.

        b.      *Treatment*: The legal, equitable, and contractual rights of the holders of the First Lien Credit Facility Claims are Impaired by the Plan. On the Effective Date, the holders of Allowed First Lien Credit Facility Claims shall receive, in full satisfaction of their Allowed Claims, (i) their pro rata share of $70 million in Cash (minus any cash payments to be distributed under the Plan to the holders of the DIP Roll-Up Loan Claims) plus (ii) with respect to the remaining amount of their Allowed Claims, their pro rata share of the obligations under the New Term Loan.

        3.      *Class 3 - Second Lien Credit Facility Claims*

        a.      *Claims in Class:* Class 3 consists of all Second Lien Credit Facility Claims against any Debtor, which shall be Allowed in the principal amount of $45 million plus accrued and unpaid interest through the Petition Date.

        b.      *Treatment:* The legal, equitable and contractual rights of the holders of Second Lien Credit Facility Claims are Impaired by the Plan. On the Effective Date, holders of Allowed Second Lien Credit Facility Claims shall receive, in full satisfaction of their Allowed Claims, their pro rata share of: (i) the Second Lien Lender New Common Stock and (ii) up to $3,000,000 (but not less than $500,000) in Cash to be distributed from cash collateral existing on the Petition Date. The holders of the Second Lien Facility Claims shall be required to execute the New Stockholders Agreement prior to receiving their pro rata distribution of the New Common Stock under the Plan. The acceptance of the Plan by a holder of an Allowed Second Lien Credit Facility Claim shall constitute an agreement by such holder to contribute 100% of the Cash distribution on account of its Allowed Claim for deposit into the Trade Account for distribution to Allowed Trade Unsecured Claims in accordance with Article IV. of the Plan.

        4.      *Class 4 - Other Secured Claims*

        a.      *Claims in Class:* Class 4 consists of Other Secured Claims against any Debtor.

        b.      *Treatment:* The legal, equitable and contractual rights of the holders of Other Secured Claims are Unimpaired by the Plan. Unless the holder of such Claim and the Debtor or Reorganized Debtor, as the case may be, against which such Other Secured Claim is asserted agree to a different treatment, on the Effective Date, each holder of an Allowed Other Secured Claim shall have its Claim Reinstated. Prepetition Liens with respect to such Allowed Other Secured Claims shall survive the Effective Date and shall continue in accordance with contractual or statutory terms until such Allowed other Secured Claim has been paid in full.

        5.      *Class 5 - General Unsecured Claims*

        a.      *Claims in Class:* Class 5 consists of all General Unsecured Claims

46701/0001-5942655v16

against any Debtor.

b.      *Treatment:* The legal, equitable and contractual rights of the holders of General Unsecured Claims are Impaired by the Plan. On or as soon as reasonably practicable after the Effective Date, in exchange for their Allowed General Unsecured Claims, each holder thereof shall not receive or retain any property or interest on account of their General Unsecured Claims. However, holders of General Unsecured Claims that are also holders of Trade Unsecured Claims shall be entitled to receive distributions on account of such Trade Unsecured Claims pursuant to Article IV. of the Plan from the proceeds of the Trade Account funded by accepting holders of Allowed Second Lien Credit Facility Claims.

6.      *Class 6 - Senior Subordinated Note Claims*

a.      *Claims in Class:* Class 6 consists of all Senior Subordinated Note Claims against any Debtor.

b.      *Treatment:* The legal, equitable, and contractual rights of the holders of the Senior Subordinated Note Claims are Impaired by the Plan. The Senior Subordinated Notes shall be cancelled as of the Effective Date and the holders of Senior Subordinated Note Claims shall not receive or retain any property or interest on account of such Senior Subordinated Note Claims.

7.      *Class 7 - Intercompany Claims*

a.      *Claims in Class*: Class 7 consists of all Intercompany Claims.

b.      *Treatment:* The legal, equitable and contractual rights of the holders of Intercompany Claims are Unimpaired by the Plan. On or as soon as practicable after the Effective Date, and after consultation with and approval by each of the Plan Investors, with such approval not to be unreasonably withheld, all Intercompany Claims will either be Reinstated to the extent determined to be appropriate by the Debtors or Reorganized Debtors or adjusted, continued, or capitalized, either directly or indirectly, in whole or in part. Any such transaction may be effected on or subsequent to the Effective Date without any further action by the Bankruptcy Court.

8.      *Class 8 - Old Equity Interests in TTC and True Temper*

a.      *Interests in Class*: Class 8 consists of all Old Equity Interests in TTC and True Temper.

b.      *Treatment:* The legal, equitable and contractual rights of the holders of Old Equity Interests in TTC and True Temper are Impaired by the Plan. All Old Equity Interests in TTC and True Temper shall be cancelled as of the Effective Date and the holders of Old Equity Interests in TTC and True Temper shall not receive or retain any property or interest in property under the Plan on account of such Interests.

46701/0001-5942655v16

9. *Class 9 – Old Equity Interest in TTS-PRC*

a. *Interests in Class:* Class 9 consists of all Old Equity Interests in TTS-PRC.

b. *Treatment:* The legal, equitable and contractual rights of the holders of Old Equity Interests in TTS-PRC are Unimpaired by the Plan. On the Effective Date, Old Equity Interests in TTS-PRC shall be Reinstated to the extent determined to be appropriate by the Debtors or Reorganized Debtors.

## F. Allowed Claims

Notwithstanding any provision herein to the contrary, the Debtors and/or the Reorganized Debtors, shall only make distributions to holders of Allowed Claims. No holder of a Disputed Claim will receive any distribution on account thereof until and to the extent that its Disputed Claim becomes an Allowed Claim.

## G. Postpetition Interest

In accordance with section 502(b)(2) of the Bankruptcy Code, the amount of all Claims against the Debtors shall be calculated as of the Petition Date. Except as otherwise explicitly provided herein, in an order of the Bankruptcy Court or in a section of the Bankruptcy Code, no holder of a Claim shall be entitled to or receive Postpetition Interest.

## H. Special Provision Regarding Unimpaired Claims

Except as otherwise provided in the Plan, nothing shall affect the Debtors' rights and defenses, both legal and equitable, with respect to any Unimpaired Claim (including Unimpaired Claims that are Allowed pursuant to the Plan), including, without limitation, all rights with respect to legal and equitable defenses to setoffs or recoupments against Unimpaired Claims, and the Debtors' failure to object to such Claims in the Chapter 11 Cases shall be without prejudice to the Reorganized Debtors' right to contest or defend against such Claims in (i) any appropriate non-bankruptcy forum as if such Chapter 11 Cases had not been commenced or (ii) the Bankruptcy Court (such forum to be selected at the Debtors' or the Reorganized Debtors' option).

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

## A. Plan Investment

As consideration for its $70 million Cash investment in New TT Holdings (which will be used to fund distributions under the Plan) (the "Plan Investment"), the Plan Investor will receive 10,000,000 shares of the New Common Stock issued by New TT Holdings pursuant to the provisions hereof, subject to dilution on account of the New Management Incentive Plan and the Second Lien Lender New Common Stock that may be distributable to holders of Allowed Second Lien Credit Facility Claims. Prior to the transactions described in the following paragraph, New TT Holdings will contribute the Plan

21

Investment and the Second Lien Lender New Common Stock to New True Temper (via New TTC).

On the Effective Date, (i) TTC will contribute 100% of the stock of True Temper to TTC Sub, a wholly owned subsidiary of TTC, (ii) True Temper will convert into a single-member limited liability company, (iii) following such conversion, all Prepetition liabilities of True Temper (excluding any liabilities to be assumed or entered into by Reorganized True Temper under the Plan) shall be deemed transferred and assigned to, and assumed by TTC Sub, and (iv) immediately following the assignment of such liabilities, True Temper will be merged with New True Temper, a wholly-owned subsidiary of New TTC, pursuant to the terms of the True Temper Merger Agreement, with New TTC owning 100% of New True Temper as the surviving company. As consideration for the preceding merger transaction: New True Temper will (a) pay $70 million Cash to fund distributions under the Plan, (b) assume or enter into all obligations to be assumed or entered into by Reorganized True Temper herein, including, without limitation, the obligations under Exit Facility and (c) pay the Second Lien Lender New Common Stock to the holders of Second Lien Facility Claims.

## B. Authorization and Issuance of New Common Stock

On the Effective Date, the Plan Investor and the holders of Allowed Second Lien Facility Claims will hold all of the issued and outstanding shares of the New Common Stock directly or indirectly as each determines to be reasonably necessary. The holders of the New Common Stock shall enter into a New Stockholders Agreement, which shall cover inspection rights, information rights (including annual audited and quarterly unaudited financial statements), registration rights with respect to the New Common Stock, preemptive rights, and such other provisions as agreed to by each of the Plan Investors. The holders of Second Lien Credit Facility Claims will be required to execute the New Stockholders Agreement prior to receiving any distribution of New Common Stock under the Plan.

The New Common Stock issued under the Plan shall be subject to dilution based upon (i) the issuance of New Common Stock pursuant to the New Management Incentive Plan as set forth in Article IV. of the Plan and (ii) any other shares of New Common Stock issued post-emergence or issuable post-emergence upon exercise or conversion of any options, warrants, convertible securities, exercisable securities or other securities issues post-emergence (collectively, the "Other Equity Issuances").

The issuance of the New Common Stock to the holders of Allowed Second Lien Facility Claims under the Plan shall be authorized under section 1145 of the Bankruptcy Code as of the Effective Date without further act or action by any Person, except as may be required by New TT Holdings's Certificate of Incorporation, New TT Holdings's By-Laws, or applicable law, regulation, order or rule; and all documents evidencing same shall be executed and delivered as provided for in the Plan or the Plan Supplement.

For the avoidance of doubt, the New Common Stock issued to the holders of Allowed Second Lien Credit Facility Claims pursuant to the Plan shall be New Common

Stock issued by New TT Holdings (which will be in addition to the New Common Stock issued to the Plan Investor). Accordingly, the aggregate number of shares of New Common Stock distributed to the holders of Allowed Second Lien Facility Claims shall be equal to 11.3924% of the total number of shares to be issued to (i) the holders of Allowed Second Lien Facility Claims and (ii) the Plan Investor combined pursuant to the Plan (subject, among other things, to the restriction on the issuance of fractional shares in Article V.F. hereof).

## C.     Payment of Trade Unsecured Claims by the Second Lien Lenders

On or before the Effective Date, the Disbursing Agent will establish, for the benefit of the holders of the Allowed Trade Unsecured Claims, the Trade Account, which will be funded on the Effective Date by the Cash component of the distribution payable to the holders of Second Lien Credit Facility Claims that accept the Plan. Each holder of an Allowed Trade Unsecured Claim that (a) does not object to the confirmation of this Plan and (b) executes a Trade Unsecured Claim Release shall receive payment from the Trade Account: (i) equal to the full Cash principal amount of its Allowed Claim, on the later of (A) the Effective Date or as soon as practicable thereafter, (B) as soon as practicable after the date a Trade Unsecured Claim becomes an Allowed Claim, and (C) the date such Claim becomes due and payable in the ordinary course of the Debtors' or Reorganized Debtors' business, as applicable; or (ii) on such other terms and conditions as may be agreed between the holder of such Allowed Trade Unsecured Claim, on the one hand, and the Reorganized Debtors, on the other hand (any of the foregoing, a "Trade Unsecured Claim Payment"). All Trade Unsecured Claim Payments shall be made to the appropriate holders of such Claims, free and clear of all Liens, claims and encumbrances. After all distributions to holders of Allowed Trade Unsecured Claims have been distributed the undistributed amount remaining in the Trade Account, if any, shall become the sole and exclusive property of the Second Lien Agent (for the pro rata benefit of those holders of Second Lien Credit Facility Claims that accepted the Plan and thereby agreed to fund the Trade Account).

## D.     Continued Existence and Vesting of Assets in Reorganized Debtors

After the Effective Date, the Reorganized Debtors shall continue to exist as separate legal entities in accordance with the applicable law in the respective jurisdiction in which they are incorporated or organized and pursuant to their respective organizational documents in effect prior to the Effective Date, except to the extent such organizational documents are amended, restated or replaced under this Plan. Notwithstanding anything else to the contrary in this Plan, the Unimpaired Claims of a particular Debtor or Reorganized Debtor shall remain the obligations solely of such Debtor or Reorganized Debtor and shall not become obligations of any other Debtor or Reorganized Debtor by virtue of this Plan, the Chapter 11 Cases, or otherwise.

On and after the Effective Date, all property of the Estates, and all Litigation Claims, and any property acquired by the Debtors under or in connection with the Plan, shall vest in the Reorganized Debtors free and clear of all Claims, Interests, Liens, charges, other encumbrances, and interests except as otherwise expressly provided in the Plan, the

Confirmation Order or the Exit Facility Loan Documents. On and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property and compromise or settle any Claims without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, the Reorganized Debtors may pay charges that they incur on and after the Effective Date for professionals' fees, disbursements, expenses or related support services without application to the Bankruptcy Court.

## E.    Exit Financing

Subject to, and upon the occurrence of, the Effective Date, and without further notice to or order or other approval of the Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any person or entity (including the boards of directors of the Debtors), except for the Confirmation Order and as otherwise required by the Exit Facility Loan Documents, the Reorganized Debtors shall, and are authorized to, enter into and perform and receive the proceeds of the Exit Facility, and to execute and deliver the Exit Facility Documents, in each case consistent with the terms of the Plan and the commitment papers attached hereto as Exhibit A or otherwise on terms and conditions acceptable to the applicable Exit Agent(s). Confirmation of the Plan shall be deemed (i) approval of the Exit Facility and the Exit Facility Loan Documents, and all transactions contemplated thereby, including, without limitation, any supplemental or additional syndication of the Exit Facility, and all actions to be take, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and (ii) authorization of the Reorganized Debtors to enter into and execute the Exit Loan Documents and such other documents as the Exit Agents and/or Exit Lenders under the Exit Facility may require to effectuate the treatment afforded to such lenders pursuant to the Exit Facility, subject to such modifications as the Reorganized Debtors may deem to be reasonably necessary to consummate the Exit Facility with the prior written consent of the applicable Exit Agent(s).

On the Effective Date, the proceeds of the New Revolving Credit Facility shall be used in part to repay in full on the Effective Date all of the DIP Revolving Credit Facility Claims except for DIP Revolving Credit Facility Claims in respect of then outstanding letters of credit issued (or deemed issued) under the DIP Facility, which DIP Revolving Credit Facility Claims shall be assumed by the Reorganized Debtors as part of the New Revolving Credit Facility in accordance with the terms thereof, and such payments shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. In addition, the proceeds of the New Revolving Credit Facility may be used for any other purpose permitted under the New Revolving Credit Facility, including the funding of the obligations under the Plan and satisfaction of ongoing working capital needs.

Upon occurrence of the Effective Date, the commitments under the DIP Facility shall have terminated. Notwithstanding the foregoing, all obligations of the Debtors to the

DIP Facility Agents and the DIP Lenders under the DIP Facility Agreement which are expressly stated in the DIP Facility Agreement as surviving such agreement's termination shall, as so specified, survive without prejudice and remain in full force and effect and shall (x) in the case of any surviving DIP Revolving Credit Facility Claims, be part of the New Revolving Credit Facility, and (y) in the case of any surviving DIP Roll-Up Loan Claims, be part of the New Term Loan.

The Exit Facility Loan Documents shall constitute legal, valid, binding and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the Exit Facility Loan Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to recharacterization for any purposes whatsoever, and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any other applicable non-bankruptcy law. On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facility Loan Documents (i) shall be deemed to be approved, (ii) shall be legal, binding and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facility Loan Documents, (iii) shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Facility Loan Documents, and (iv) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the persons and entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties. On and after the Effective Date, the Liens and security interests securing the New Revolving Credit Facility shall be senior to the Liens and security interests securing the New Term Loan, and the relative Lien, payment and enforcement priorities of the New Revolving Credit Facility and New Term Loan shall be governed by the terms of an intercreditor agreement in form and substance satisfactory to the Exit Agents.

**F.      Transfer of Assets, Intercompany Claims and Intercompany Obligations to New TTC**

On the Effective Date, all assets, including, without limitation, Intercompany Claims held by TTC shall be assigned to New TTC and all of TTC's Intercompany Obligations shall be assumed by New TTC with any and all such Intercompany Claims subject to adjustment as set forth in Article I.F. hereof.

46701/0001-5942655v16

### G. Cancellation of Old Equity Interests in TTC and True Temper and Agreements

Except as otherwise provided for herein, or in any contract, instrument or other agreement or document created in connection with the Plan, on the Effective Date and concurrently with the consummation of the merger transaction described in Article IV. hereof, the Old Equity Interests in TTC and True Temper and any other promissory notes, share certificates, whether for preferred or common stock (including treasury stock), other instruments evidencing any Claims or Interests, relating to the Old Equity Interests in TTC and/or True Temper and all options, warrants, calls, rights, puts, awards, commitments or any other agreements of any character to acquire such Interests shall be deemed canceled and of no further force and effect, without any further act or action under any applicable agreement, law, regulation, order or rule, and the obligations of the Debtors under the notes, share certificates and other agreements and instruments governing such Claims and Interests related to the Old Equity Interests in TTC and/or True Temper shall be discharged. The holders of or parties to such canceled notes, share certificates and other agreements and instruments shall have no rights arising from or relating to such notes, share certificates and other agreements and instruments or the cancellation thereof, except the rights provided pursuant to the Plan.

### H. Dissolution of TTC

On or after the Effective Date and upon completion of any and all actions required to be taken by TTC pursuant to the terms of this Plan or any agreement entered into by TTC in connection herewith, TTC shall be dissolved under applicable law.

### I. New Management Incentive Plan

On or as soon as reasonably practicable after Effective Date, the New Board will establish and implement the New Management Incentive Plan, including, among other things, an allocation of a percentage of the fully diluted New Common Stock outstanding on the Effective Date, such allocation to be determined by the Plan Investor prior to the hearing for the approval of the Disclosure Statement, and the awards thereof to be determined by New TT Holdings's New Board, which allocation may consist of, among other things, restricted stock and/or time and performance based options, and will take account of any other bonus and compensation plans. The members of management and the employees entitled to participate in the New Management Incentive Plan, and the awards for each, will be determined by the New Board in its sole and absolute discretion.

Except as otherwise provided herein, any pre-existing understandings, either oral or written, between the Debtors and any current or former director, officer, or employee as to entitlement to participate in any pre-existing equity or other incentive plan of any kind shall be null and void as of the Effective Date and shall not be binding on New TT Holdings with respect to the New Management Incentive Plan or any other incentive plan implemented after the Effective Date. All decisions as to entitlement to participate after the Effective Date in any new incentive plan shall be within the sole and absolute discretion of the New Board.

## J. Certificates of Incorporation, By-Laws and Operating Agreements

The certificate of incorporation and by-laws of New TT Holdings, New TTC and New True Temper shall be included in the Plan Supplement and shall (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code; and (ii) authorize the issuance of New Common Stock in an amount not less than the amount necessary to permit the distributions thereof required or contemplated by this Plan.

On the Effective Date, or as soon thereafter as is practicable, the Reorganized Debtors shall file any and all necessary forms and applications required in order to effectuate the changes to the Reorganized Debtors organizational structure as provided in this Plan. After the Effective Date, the Reorganized Debtors may amend and restate their organizational documents as permitted by applicable law.

## K. Directors and Officers

The new board of directors of New TT Holdings (the "New Board"), New TTC, New True Temper, and Reorganized TTS-PRC shall consist of individuals identified and agreed to by the Plan Investor and listed in the Plan Supplement. TTC's current officers will serve as officers of New TTC after the Effective Date, subject to the terms of any applicable employment agreements and the rights of the New Board. On and after the Effective Date, (i) the current officers of True Temper will serve as officers of Reorganized True Temper, subject to any applicable employment agreements and (ii) the current officers of Reorganized TTS-PRC will serve as officers of Reorganized TTS-PRC, subject to any applicable employment agreements.

## L. Preservation of Rights of Action; Settlement of Litigation Claims

Except as otherwise provided in the Plan, the Confirmation Order or in any document, instrument, release or other agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors will retain all of the Litigation Claims and any and all Litigation Claims held by TTC shall be assigned to New TTC. The Reorganized Debtors may enforce, sue on, settle or compromise (or decline to do any of the foregoing) any or all of such Litigation Claims. The failure of the Debtors to specifically list any claim, right of action, suit or proceeding herein or in the Plan does not, and will not be deemed to, constitute a waiver or release by the Debtors of such claim, right of action, suit or proceeding, and the Reorganized Debtors will retain the right to pursue additional claims, rights of action, suits or proceedings. In addition, at any time after the Petition Date and before the Effective Date, notwithstanding anything in the Plan to the contrary, the Debtors may settle some or all of the Litigation Claims with the approval of the Bankruptcy Court pursuant to Bankruptcy Rule 9019. Notwithstanding the foregoing, the Debtors hereby release any claims, causes of action or rights arising under sections 510(c), 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code (collectively, "Avoidance Actions").

27

## M.    Corporate Action; Effectuating Documents; Further Transactions

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (i) adoption or assumption, as applicable, of executory contracts and unexpired leases, (ii) selection of the directors and officers for the Reorganized Debtors, (iii) the entry into the Exit Facility and the execution and delivery of the Exit Facility Loan Documents, (iv) the distribution of the New Common Stock, (v) the merger transaction contemplated in Article IV. hereof, and (vi) all other actions contemplated by the Plan (whether to occur before, on or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors or officers of the Debtors or the Reorganized Debtors. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors (including, any vice-president, president, chief executive officer, treasurer or chief financial officer of any Debtor or Reorganized Debtor), as applicable, shall be authorized and directed, in the name of and on behalf of the Reorganized Debtors, to execute, deliver, file, certify, attest to or record such contracts, instruments, releases, indentures and other agreements or documents, and take such actions, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan including (i) the Exit Facility, (ii) the organizational documents relating to the Reorganized Debtors, (iii) the merger and other documentation relating to the merger transaction described in Article IV. hereof) and (iv) any and all other agreements, documents, securities and instruments relating to the foregoing. The authorizations and approvals contemplated by this Section shall be effective notwithstanding any requirements under nonbankruptcy law. The issuance of the New Common Stock to the holders of Second Lien Credit Facility Claims shall be exempt from the requirements of section 16(b) of the Securities and Exchange Act of 1934 (pursuant to rule 16b-3 promulgated thereunder) with respect to any acquisition of such securities by an officer or director (or a director deputized for purposes thereof) as of the Effective Date.

## N.    Exemption from Certain Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of any security, or the making delivery, filing, or recording of any instrument of transfer under, or in connection with, the Plan (including, for this purpose, in connection with the organizational documents relating to the Reorganized Debtors, the Exit Facility Loan Documents, and the merger and other documents relating to the transactions described in Article IV. hereof) shall not be taxed under any law imposing a recording tax, stamp tax, transfer tax, or similar tax. Furthermore, and without limiting the foregoing, any transfers from a Debtor to a Reorganized Debtor or to any other Person pursuant to the Plan, as contemplated by the Plan or pursuant to any agreement regarding the transfer of title to or ownership of any of the Debtors' property in the United States, shall not be subject to any document recording tax, stamp tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording tax, or other similar tax or

28

governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## O.    Release of Liens

Except as otherwise expressly provided herein, the Exit Facility Loan Documents, the Confirmation Order or in any document, instrument or other agreement created in connection with the Plan, on the Effective Date, all mortgages, deeds of trust, liens or, other security interests against the property of the Debtors or the Estates automatically shall be released, and the holders of such mortgages, deeds of trust, liens, or other security interests shall execute such documents as may be necessary or desirable to reflect or effectuate such releases.

## ARTICLE V.
## PROVISIONS GOVERNING DISTRIBUTIONS

## A.    Distributions for Claims Allowed as of the Effective Date

Except as otherwise provided herein or as ordered by the Bankruptcy Court, distributions to be made on account of or in exchange for Claims that are Allowed Claims as of the Effective Date shall be made on the Distribution Date; *provided, however*, that payments of Allowed DIP Roll-Up Loan Claims and/or Allowed First Lien Credit Facility Claims shall be made by the Disbursing Agent to the DIP Roll-Up Agent and/or the First Lien Agent, as applicable, on the Effective Date. All Cash distributions shall be made (i) in the case of distributions on account of Allowed DIP Roll-Up Loan Claims and/or Allowed First Lien Credit Facility Claims, from proceeds from the Plan Investment and (ii) in the case of all other distributions, from available Cash of the Debtors or Reorganized Debtors, as the case may be. Any distribution under the Plan of property other than Cash shall be made by the Debtors and/or the Reorganized Debtors in accordance with the terms of the Plan.

## B.    Disbursing Agent(s)

The Disbursing Agent(s) shall make all distributions required under the Plan (subject to the provisions of Articles II, III and IV hereof); *provided, however*, that with respect to a holder of a Claim whose distribution is governed by an agent or other agreement which is administered by an indenture trustee, agent or servicer, such distributions shall be deposited with the appropriate agent or servicer, who shall then deliver such distributions to the holders of Claims in accordance with the provisions of the Plan and the terms of the relevant indenture or other governing agreement; *provided further, however,* that distributions to such agent (other than the Debtors or the Reorganized Debtors) under the Plan will be deemed payment in full, regardless of whether such agent (other than the Debtors or the Reorganized Debtors) ultimately

29

distributes such distribution to the appropriate Claim holder.

Disbursing Agent(s) other than the Debtors, including any agent or servicer, shall receive, without further Bankruptcy Court approval, reasonable compensation for distribution services rendered pursuant to the Plan and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services from the Reorganized Debtors on terms acceptable to the Reorganized Debtors. No Disbursing Agent shall be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. If otherwise so ordered, all costs and expenses of procuring any such bond shall be paid by the Reorganized Debtors.

## C. Distribution Record Date

As of the close of business on the Distribution Record Date, the various transfer registers for Class 2 Claims and Class 3 Claims as maintained by the Debtors, or their respective agents, including the First Lien Agent and Second Lien Agent, shall be deemed closed, and there shall be no further changes in the record holders of any of the Class 2 Claims and Class 3 Claims. Neither the Debtors, the First Lien Agent or the Second Lien Agent shall have any obligation to recognize any transfer of Class 2 Claims or Class 3 Claims occurring on or after the Distribution Record Date. The Debtors, the First Lien Agent and the Second Lien Agent shall be entitled to recognize and deal for all purposes under the Plan only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

## D. Means of Cash Payment

Cash payments under the Plan will be in U.S. funds by checks drawn on a domestic bank selected by the Reorganized Debtors, or by wire transfer from a domestic bank, at the option of the Reorganized Debtors. Cash payments to foreign creditors may be made, at the option of the Reorganized Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

## E. Calculation of Distribution Amounts of New Common Stock

No fractional New Common Stock shall be issued or distributed under the Plan or by New TT Holdings, or any Disbursing Agent, agent or servicer. Each Person entitled to receive New Common Stock shall receive the total number of whole New Common Stock to which such Person is entitled. Whenever any distribution to a particular Person would otherwise call for distribution of a fraction of New Common Stock, New TT Holdings, or any Disbursing Agent, agent or servicer, shall allocate separately one whole New Common Stock to such Person in order of the fractional portion of their entitlements, starting with the largest such fractional portion, until all remaining whole New Common Stock have been allocated. Upon the allocation of a whole New Common Stock to a Person in respect of the fractional portion of its entitlement, such fractional portion shall be deemed canceled. If two or more Persons are entitled to equal fractional entitlements and the number of Persons so entitled exceeds the number of whole New Common Stock which remain to be allocated, New TT Holdings, or any Disbursing Agent, agent or servicer, after

30

consulting with the Plan Investor, shall allocate the remaining whole New Common Stock to such holders by random lot or such other impartial method as the Plan Investor and New TT Holdings, or any Disbursing Agent, agent or servicer deems fair. Upon the allocation of all of the whole New Common Stock authorized under the Plan, all remaining fractional portions of the entitlements shall be canceled and shall be of no further force and effect. No New Common Stock will be issued and no other property will be distributed under the Plan or by New TT Holdings, or any Disbursing Agent, agent or servicer on account of entitlements to a fractional New Common Stock which fall below a threshold level to be determined by New TT Holdings, or any Disbursing Agent, agent or servicer, in consultation with the Plan Investor, after allocation of whole New Common Stock in respect of fractional entitlements as described above. Accordingly, a Person who otherwise would be entitled to receive a distribution of a fractional New Common Stock will not receive any such distribution if the number of fractional shares of New Common Stock such Person was to receive falls below such threshold.

**F.      Delivery of Distributions; Undeliverable or Unclaimed Distributions**

        Distributions to holders of Allowed Claims shall be made by the Disbursing Agent or, in the case of the First Lien Credit Facility and Second Lien Credit Facility, by the First Lien Agent or Second Lien Agent, respectively, (i) at each holder's address set forth in the Debtors' books and records, unless such address is superseded by a proof of claim or interest or transfer of claim filed pursuant to Bankruptcy Rule 3001, (ii) at the address in any written notice of address change delivered to the Disbursing Agent, (iii) in the case of the First Lien Credit Facility, at the address set forth in the First Lien Agent's system, or (iv) in the case of the Second Lien Credit Facility, at the address set forth in the Second Lien Agent's system. If any holder's distribution is returned as undeliverable, no further distributions to such holder shall be made, unless and until the Disbursing Agent, the First Lien Agent or the Second Lien Agent, as applicable, is notified of such holder's then current address, at which time all missed distributions shall be made to such holder without interest. Amounts in respect of undeliverable distributions of Cash made through the Disbursing Agent shall be returned to Reorganized True Temper until such distributions are claimed. Amounts in respect of undeliverable distributions of New Common Stock made through the Disbursing Agent shall be returned to Reorganized True Temper until such distributions are claimed. The First Lien Agent, Second Lien Agent and/or Disbursing Agent shall deliver any non-deliverable Cash to Reorganized True Temper no later than ten (10) Business Days following the first anniversary of the Effective Date. The Disbursing Agent shall deliver any non-deliverable New Common Stock to New TT Holdings no later than ten (10) Business Days following the first anniversary of the Effective Date. All claims for undeliverable distributions must be made within one year after the Effective Date, after which date the claim of any holder or successor to such holder with respect to such property will be discharged and forever barred. In such cases, any Cash for distribution on account of or in exchange for unclaimed or undeliverable distributions shall become property of Reorganized True Temper free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary. Any New Common Stock held for distribution on account of such Claim shall be canceled and of no further force or effect. Nothing contained in the Plan shall require any Disbursing Agent,

including, but not limited to, Reorganized True Temper, New TT Holdings, New TTC, Reorganized TTS-PRC, the Second Lien Agent, or the First Lien Agent to attempt to locate any holder of an Allowed Claim.

## G. Withholding and Reporting Requirements

In connection with the Plan and all distributions thereunder, the Reorganized Debtors, the Disbursing Agent, the First Lien Agent and the Second Lien Agent shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions shall be subject to any such withholding and reporting requirements. The Reorganized Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements. Notwithstanding any other provision of the Plan, each holder of an Allowed Claim that is to receive a distribution of Cash and/or New Common Stock pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution.

## H. Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for the Debtors' federal income tax purposes, be allocated on the Debtors' books and records to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

## I. Setoffs

Except as provided in the Plan, the Debtors may, but shall not be required to, set off or offset against any Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors may have against the Claim's holder (except for claims released by the Debtors pursuant to section XII.G. of the Plan); *provided, however,* that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any claim that the Debtors may have against such holder. Nothing herein shall be deemed to expand rights to setoff under applicable law.

## ARTICLE VI.
## PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS

## A. Resolution of Disputed Claims

Except as provided otherwise in the Plan or by order of the Bankruptcy Court, holders of Claims shall not be required to file proofs of Claim with the Bankruptcy Court. The amount and validity of any disputed, contingent and/or unliquidated Claim shall be determined, resolved or adjudicated, as the case may be, in the manner in which such

Claim would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced; *provided, however,* that the Debtors and the Reorganized Debtors reserve the right to file with the Bankruptcy Court, on or before the Claims Objection Deadline, an objection to any Claim as to which the holder of such Claim has filed a proof of Claim in the Chapter 11 Cases. The Debtors and the Reorganized Debtors shall be authorized to, and shall, resolve all Disputed Claims by withdrawing or settling such objections thereto, or by litigating to judgment in the Bankruptcy Court or such other court having jurisdiction the validity, nature, and/or amount thereof.

In addition, the Debtors, the Reorganized Debtors or the holder of a contingent or unliquidated Claim may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Reorganized Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and are not necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any permitted mechanism.

## B. No Distribution Pending Allowance

No payments or distributions, if any contemplated by the Plan, will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim.

## C. Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, a distribution, if any, will be made to the holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court or other applicable court of competent jurisdiction allowing any Disputed Claim becomes a Final Order, or the date upon which other final resolution has been reached to Allow such Claim, the Disbursing Agent shall provide to the holder of such Claim the distribution to which such holder is entitled under the Plan. Notwithstanding the foregoing, the Disbursing Agent shall not be required to make distributions more frequently than once every 90 days.

46701/0001-5942655v16

**D.     Reservation of Right to Object to Allowance or Asserted Priority of Claims**

Nothing herein will waive, prejudice or otherwise affect the rights of the Debtors, the Reorganized Debtors or the holders of any Claim to object at any time, including after the Effective Date, to the allowance or asserted priority of any Claim, other than with respect to Claims that are deemed allowed pursuant to Article II and Article III of the Plan.

# ARTICLE VII.
## TREATMENT OF CONTRACTS AND LEASES

**A.     Assumed Contracts and Leases**

Except as otherwise expressly provided in the Plan or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, as of the Effective Date the Debtors shall be deemed to have assumed (and in the case of TTC to have assumed and assigned to New TTC) each executory contract and unexpired lease to which one or more of the Debtors is a party unless such contract or lease (i) previously was assumed or rejected by the Debtors, (ii) previously expired or terminated pursuant to its own terms, (iii) is listed on the schedule of rejected contracts and leases in substantially the form set forth in the Plan Supplement, or (iv) is the subject of a motion to assume or reject filed on or before the Confirmation Date. The Confirmation Order shall constitute an order of the Bankruptcy Court under sections 365 and 1123 of the Bankruptcy Code approving the contract and lease assumptions described above as of the Effective Date. The Debtors reserve the right, at any time prior to the Confirmation Date, to seek to reject any executory contract or unexpired lease to which one or more of the Debtors is a party.

Each executory contract and unexpired lease that is assumed and relates to the use, ability to acquire or occupancy of real property shall include (i) all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affect such executory contract or unexpired lease and (ii) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, usufructs, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other interests in real estate or rights *in rem* related to such premises, unless any of the foregoing agreements has been rejected pursuant to an order of the Bankruptcy Court or is the subject of a motion to reject filed on or before the Confirmation Date.

**B.     Treatment of Change of Control Provisions**

The entry of the Confirmation Order, consummation of the Plan, issuance of the New Common Stock under the Plan and/or any other acts taken to implement the Plan (including, without limitation, the merger transaction described in Article IV. hereof) shall not constitute a "change in control" under any provision of any contract, agreement or other document which provides for the occurrence of any event, the granting of any right, or any other change in the then-existing relationship between the parties upon a "change in

control" of the Debtors.

## C. Payments Related to Assumption of Contracts and Leases

Any monetary amounts by which any executory contract or unexpired lease to be assumed (or, in the case of TTC, to be assumed and assigned to New TTC) under the Plan is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by Cure. If there is a dispute regarding (i) the nature or amount of any Cure, (ii) the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (iii) any other matter pertaining to assumption, Cure shall occur following the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the assumption; *provided, however*, that the Debtors or Reorganized Debtors, as applicable, shall be authorized to reject any executory contract or unexpired lease to the extent the Debtors or the Reorganized Debtors, in the exercise of their sound business judgment, conclude that the Cure obligation as determined by the Final Order, renders assumption of such executory contract or unexpired leases unfavorable to the Debtors or the Reorganized Debtors. At least 15 days prior to the Confirmation Hearing, the Debtors shall provide for notices of proposed assumption and proposed cure amounts to be sent to applicable third parties and for procedures for objecting thereto and resolution of disputes by the Bankruptcy Court. Any objection by a counterparty to an executory contract or unexpired lease to a proposed assumption or related cure amount must be filed, served, and actually received by the Debtors at least three days prior to the Confirmation Hearing. Any counterparty to an executory contract or unexpired lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount.

Assumption of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time prior to the effective date of assumption. Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

## D. Insurance Policies

All of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as executory contracts under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed (or in the case of TTC, assumed and assigned to New TTC) all insurance policies and any agreements, documents, and instruments relating to coverage of Claims covered by those insurance policies, subject to all rights, remedies and defenses of the Debtors under any agreements, insurance policies and applicable law.

### E. Claims Based on Rejection of Executory Contracts or Unexpired Leases

If the rejection by the Debtors, pursuant to the Plan or otherwise, of an executory contract or unexpired lease gives rise to a Claim, a proof of Claim must be served upon the Debtors and their counsel within 30 days after the later of (i) notice of entry of the Confirmation Order or (ii) other notice that the executory contract or unexpired lease has been rejected. Any Claims not served within such time periods will be forever barred from assertion against the Debtors, the Reorganized Debtors, the Estates and their property. All Allowed Claims arising from the rejection of executory contracts or leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.E.5 of the Plan.

### F. Compensation and Benefit Plans and Treatment of Retirement Plan and Pension Plan

Except as otherwise expressly provided in the Plan or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, all of the Debtors' programs, plans, agreements and arrangements relating to employee compensation and benefits, including programs, plans, agreements and arrangements subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code and including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance plans, incentive plans, life, accidental death and dismemberment insurance plans, and employment, severance, salary continuation and retention agreements entered into before the Petition Date and not since terminated, will be deemed to be, and will be treated as though they are, executory contracts that are assumed under Article VII.A of the Plan, and the Debtors' obligations under such programs, plans, agreements and arrangements will survive confirmation of the Plan, except for executory contracts or plans that previously have been rejected, are the subject of a motion to reject or have been specifically waived by the beneficiaries of any plans or contracts. In addition, pursuant to the requirements of section 1129(a)(13) of the Bankruptcy Code, the Plan provides for the continuation of payment by the Debtors of all "retiree benefits," as defined in section 1114(a) of the Bankruptcy Code, if any, at previously established levels.

Pursuant to the Plan, the Debtors and Reorganized Debtors (including New TTC which shall assume any and all obligations of TTC under the Pension Plan), as applicable, shall continue the Pension Plan in accordance with its terms, and the Debtors or the Reorganized Debtors, as applicable, shall satisfy the minimum funding standards pursuant to 26 U.S.C. § 412 and 29 U.S.C. § 1082, and administer the Pension Plan in accordance with the provisions of ERISA and the Internal Revenue Code. Notwithstanding any provision of the Plan or the Confirmation Order to the contrary, the Pension Plan shall be continued and administered in accordance with ERISA and the Internal Revenue Code.

### G. Indemnification of Directors and Officers

The Debtors' indemnification obligations in favor of its current and former officers and directors contained in the certificate of incorporation and bylaws, as the case may be, of the Debtors as of the Petition Date shall be included in any new and/or any amended and

restated organizational documents (including any limited liability company agreements) of the Reorganized Debtors. All Claims of the Debtors' current and former officers and directors for indemnity made prior to the Petition Date (including the D&O Claims made prior to the Petition Date) shall be deemed to be Class 5 General Unsecured Claims hereunder, and all Claims of the Debtors' current and former officers and directors for indemnity made on and after the Petition Date (including in respect of matters arising prior to the Petition Date) shall be deemed to be Administrative Claims hereunder; *provided, however*, that nothing contained herein shall affect the right (including in respect of any claims made prior to the Petition Date) of any current or former director or officer of any Debtor to coverage under any director and officer insurance policy maintained by the Debtors or the Reorganized Debtors from time to time.

**H.    Collective Bargaining Agreement**

On the Effective Date, the Debtors intend to assume the Collective Bargaining Agreement.

**ARTICLE VIII.**
**CONDITIONS PRECEDENT TO THE PLAN'S CONFIRMATION**

The following are conditions precedent to confirmation of the Plan, each of which must be satisfied or waived in accordance with the Plan:

(1)    The Bankruptcy Court shall have approved the disclosure statement with respect to the Plan in form and substance satisfactory to the Debtors, the Plan Investor, and the First Lien Agent, which approval may be in the Confirmation Order.

(2)    The Confirmation Order shall be in form and substance satisfactory to the Debtors, the Plan Investor, and the First Lien Agent.

(3)    The Plan Supplement shall have been filed and shall include final, executed versions of the Exit Facility, in form and substance satisfactory to the Debtors, the Plan Investor and the First Lien Agent.

(4)    The Debtors shall have currently paid all accrued post-petition fees, interest and expenses to the DIP Roll-Up Agent and the First Lien Agent, with such interest accruing at the default interest rate provided for in the First Lien Credit Facility Agreement, on all obligations outstanding under the DIP Roll-Up Loans and the First Lien Credit Facility (respectively).

**ARTICLE IX.**
**CONDITIONS PRECEDENT TO EFFECTIVE DATE**

**A.    Conditions to Effective Date**

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in accordance with the Plan:

46701/0001-5942655v16

(1)    The Confirmation Order, in form and substance acceptable to the Debtors, the Plan Investor, the DIP Facility Agents, the First Lien Agent, and the Exit Agents, confirming the Plan shall have been entered and must provide, among other things, that:

(a)    the provisions of the Confirmation Order are nonseverable and mutually dependent;

(b)    all executory contracts or unexpired leases assumed by the Debtors during the Chapter 11 Cases or under the Plan (including any executory contracts or unexpired leases to be assumed by TTC and assigned to New TTC) shall remain in full force and effect for the benefit of the Reorganized Debtors or their assignee notwithstanding any provision in such contract or lease (including those described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits such assignment or transfer or that enables, permits or requires termination of such contract or lease;

(c)    except as expressly provided in the Plan the Exit Facility Loan Documents, or the Confirmation Order, the Debtors are discharged effective upon the Confirmation Date, subject to the occurrence of the Effective Date, from any "debt" (as that term is defined in section 101(12) of the Bankruptcy Code), and the Debtors' liability in respect thereof shall be extinguished completely, whether such debt (i) is reduced to judgment or not, liquidated or unliquidated, contingent or noncontingent, asserted or unasserted, fixed or unfixed, matured or unmatured, disputed or undisputed, legal or equitable, or known or unknown, or (ii) arose from (a) any agreement of the Debtors that has either been assumed or rejected in the Chapter 11 Cases or pursuant to the Plan, (b) any obligation the Debtors incurred before the Confirmation Date or (c) any conduct of the Debtors prior to the Confirmation Date, or that otherwise arose before the Confirmation Date, including, without limitation, all interest, if any, on any such debts, whether such interest accrued before or after the Petition Date;

(2)    (A) The Reorganized Debtors shall have entered into the New Revolving Credit Facility and New Term Loan, which shall be consistent with the commitment papers attached as Exhibit A hereto, and otherwise acceptable in form and substance to the Plan Investor, the Exit Agents and the First Lien Agent, and (B) all conditions precedent to the consummation of the Exit Facility shall have been waived or satisfied in accordance with the terms thereof, and funding pursuant to the New Revolving Credit Facility shall have occurred.

(3)    The Confirmation Order shall have become a Final Order and shall not be the subject of an unresolved request for revocation under section 1144 of the Bankruptcy Code.

(4)    The necessary persons and entities shall have executed definitive documentation to effect the transactions contemplated by the Plan including, without limitation, the New Stockholders Agreement, the True Temper Merger Agreement, the Exit Facility and any new and/or amended and restated organizational documents for each

38

of the Reorganized Debtors.

(5)     The Plan Investment shall have been consummated and all documents to be executed in connection therewith shall have been executed and delivered, and all conditions precedent thereto shall have been satisfied or waived by the parties thereto, including, without limitation, the delivery of the $70 million Cash payment to New TT Holdings.

(6)     The Debtors shall have executed and delivered all documents necessary to effectuate the issuance of the New Common Stock in form and substance reasonably satisfactory to the Plan Investor.

(7)     All authorizations, consents and regulatory approvals required, if any, in connection with the consummation of the Plan shall have been obtained.

(8)     The Debtors or the Reorganized Debtors shall have currently paid all accrued post-petition fees, interest and expenses to the DIP Roll-Up Agent and the First Lien Agent, with such interest accruing at the default interest rate provided for in the First Lien Credit Facility Agreement, on all obligations outstanding under the DIP Roll-Up Loans and the First Lien Credit Facility (respectively).

(9)     The Debtors or the Reorganized Debtors shall have reimbursed the First Lien Agent, the Second Lien Agent and the Exit Agents, without the need to file a fee application with the Bankruptcy Court, for all reasonable fees and expenses incurred in connection with the negotiations of the Plan, the Exit Facility and other matters relating to the Chapter 11 Cases, including, without limitation, the reasonable fees and expenses of counsel and financial advisors to the First Lien Agent (including, without limitation, any success fees related thereto) and the Second Lien Agent.

(10)     All other actions, documents and agreements necessary to implement the Plan shall have been effected or executed.

(11)     December 15, 2009 shall not have passed.

## B.     Waiver of Conditions

Each of the conditions (other than entry of orders) set forth in Articles VIII. and IX.A. above may be waived in whole or in part by the Person whom is entitled to satisfaction of that condition without any notice to other parties in interest or the Bankruptcy Court and without a hearing. The failure to satisfy or waive any condition to the Effective Date may be asserted by the Debtors, the Plan Investor, the First Lien Agent, the Participating First Lien Lenders, the Participating Second Lien Lenders or the Exit Agents regardless of the circumstances that give rise to the failure of such condition to be satisfied. The failure of any or all of the Debtors, the Plan Investor, the First Lien Agent, the Participating First Lien Lenders, the Participating Second Lien Lenders and the Exit Agents to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any

46701/0001-5942655v16

time.

# ARTICLE X.
## MODIFICATIONS AND AMENDMENTS

The Debtors may alter, amend or modify the Plan or any exhibits or schedules hereto under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date with the consent of the Plan Investor, the First Lien Agent, and the Exit Agents. The Debtors reserve the right to include any amended exhibits or schedules in the Plan Supplement. After the Confirmation Date and prior to substantial consummation of the Plan, as defined in section 1101(2) of the Bankruptcy Code, the Debtors may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, and to accomplish such matters as may be necessary to carry out the purposes and effects of the Plan so long as such proceedings do not adversely affect the treatment of holders of Claims under the Plan; *provided, however,* that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court.

# ARTICLE XI.
## RETENTION OF JURISDICTION

Under sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding the Plan's confirmation and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction (except with respect to the matters described under clause (1) below, as to which jurisdiction shall not be exclusive) over all matters arising out of or related to the Chapter 11 Cases and the Plan, to the fullest extent permitted by law, including jurisdiction to:

(1)     Determine any and all objections to the allowance of Claims;

(2)     Determine any and all motions to estimate Claims at any time, regardless of whether the Claim to be estimated is the subject of a pending objection, a pending appeal, or otherwise;

(3)     Hear and determine all Professional Fee Claims and other Administrative Claims;

(4)     Hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which one or more of the Debtors is a party or with respect to which the Debtors may be liable, including, if necessary, the nature or amount of any required Cure or the liquidation of any Claims arising therefrom;

(5)     Hear and determine any and all adversary proceedings, motions, applications and contested or litigated matters arising out of, under or related to, the Chapter 11 Cases;

46701/0001-5942655v16

(6)    Enter such orders as may be necessary or appropriate to execute, implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

(7)    Hear and determine disputes arising in connection with the interpretation, implementation, consummation or enforcement of the Plan and all contracts, instruments and other agreements executed in connection with the Plan;

(8)    Hear and determine any request to modify the Plan or to cure any defect or omission or reconcile any inconsistency in the Plan or any order of the Bankruptcy Court;

(9)    Issue and enforce injunctions or other orders, or take any other action that may be necessary or appropriate to restrain any interference with the implementation, consummation or enforcement of the Plan or the Confirmation Order;

(10)    Enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified or vacated;

(11)    Hear and determine any matters arising in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

(12)    Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases;

(13)    Recover all assets of the Debtors and property of the Debtors' Estates, wherever located;

(14)    Hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(15)    Hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge;

(16)    Hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under or not inconsistent with, provisions of the Bankruptcy Code; and

(17)    Enter a final decree closing the Chapter 11 Cases.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

### A.    Corporate Action

Prior to, on or after the Effective Date (as appropriate), all matters expressly

41

provided for under the Plan that would otherwise require approval of the interest holders, managers or directors of the Debtors shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to the applicable General Corporation Law of the State of Delaware without any requirement of further action by the interest holders or directors of the Debtors.

## B.     Administrative Claims Bar Date

All Administrative Expense Requests must be made by application filed with the Bankruptcy Court and served on counsel for the Debtors no later than the Administrative Claims Bar Date.  In the event that the Debtors or Reorganized Debtors object to an Administrative Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim.  Notwithstanding the foregoing, (a) no application seeking payment of an Administrative Claim need be filed with respect to an undisputed post-petition obligation which was paid or is payable by a Debtor in the ordinary course of business; provided, however, that in no event shall a post-petition obligation that is contingent or disputed and subject to liquidation through pending or prospective litigation, including, but not limited to, obligations arising from personal injury, property damage, products liability, consumer complaints, employment law (excluding claims arising under workers' compensation law), secondary payor liability, or any other disputed legal or equitable claim based on tort, statute, contract, equity, or common law, be considered to be an obligation which is payable in the ordinary course of business; and (b) no application seeking payment of an Administrative Claim need be filed with respect to Cure owing under an executory contract or unexpired lease if the amount of Cure is fixed by order of the Bankruptcy Court.

## C.     Payment of Statutory Fees

All fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date.  All such fees that arise after the Effective Date but before the closing of the Chapter 11 Cases shall be paid by the Reorganized Debtors.

## D.     Severability of Plan Provisions

If, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, including, without limitation terms and provisions contained in Article I.F. and Article IV.C. of the Plan, the Bankruptcy Court, at the request of the Debtors (with the consent of the Plan Investor and the First Lien Agent), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.

46701/0001-5942655v16

### E. Successors and Assigns

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of that Person.

### F. Discharge of Claims and Termination of Interests

Except as otherwise provided herein or in the Confirmation Order, all consideration distributed under this Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Interests (other than those Claims and Interests that are Unimpaired or Reinstated under this Plan) of any nature whatsoever against the Debtors or any of its assets or properties, and regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims and Interests. Upon the Effective Date, each of the Debtors and the Reorganized Debtors shall be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims and Interests (other than those Claims and Interests that are not Impaired or Reinstated under this Plan), including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

### G. Releases

1. *Releases by Debtors*

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors, and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date of the Plan, the Released Parties shall be deemed released and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative Claims, asserted or that could be asserted by or on behalf of the Debtors, the Reorganized Debtors, or the Estates, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the purchase, sale, or rescission of the purchase or sale of any of the Senior Subordinated Notes, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the related Disclosure Statement, the related Plan Supplement, or related agreements, instruments, or other documents, including but not limited to the Exit Facility, or any**

other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined in a final and non-appealable order of a court of competent jurisdiction to constitute willful misconduct or gross negligence by such Released Party.

2. *Releases by Holders of Claims and Interests*

As of the Effective Date of the Plan, for good and valuable consideration, the adequacy of which is hereby confirmed, (i) each holder of a Claim that votes to accept the Plan, solely in its capacity as the holder of such Claim, and (ii) to the fullest extent permissible under applicable law, as such law may be extended or interpreted after the Effective Date, each person or entity (other than a Debtor), which has held, holds or may hold a Claim or Interest in or relating to the Debtors, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Debtors, the Reorganized Debtors, and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative Claims, asserted or that could be asserted by or on behalf of any such holder, person or entity, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such holder, person or entity would have been legally entitled to assert in its own right (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the purchase, sale, or rescission of the purchase or sale of any of the Senior Subordinated Notes, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the related Disclosure Statement, the related Plan Supplement, or related agreements, instruments, or other documents, including but not limited to the Exit Facility, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined in a final and non-appealable order of a court of competent jurisdiction to constitute willful misconduct or gross negligence of such Released Party. Notwithstanding anything to the contrary contained in the Plan, the Disclosure Statement or the Confirmation Order, no Released Party shall be discharged, exculpated, or released on any claim, now existing or hereafter arising, under ERISA with respect to the Pension Plan, and there shall be no injunction against the assertion of any such claim. Notwithstanding anything to the contrary in the foregoing, the releases set forth in Articles XII.G.1 and XII.G.2 of the Plan do not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

46701/0001-5942655v16

## H. Injunction

Except as provided in the Plan or the Confirmation Order, as of the Confirmation Date, subject to the occurrence of the Effective Date, all Persons that have held, currently hold or may hold Claims or Interests that have been released pursuant to Article XII.G, discharged pursuant to Article XII.F, or are subject to exculpation pursuant to Article XII.I are permanently enjoined from taking any of the following actions against the Debtors or their property, or any of the Released Parties, on account of Claims or Interests: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien or encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors; and (v) commencing or continuing any action, in each case in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

By accepting distribution pursuant to the Plan, each holder of an Allowed Claim receiving distributions pursuant to the Plan shall be deemed to have specifically consented to the injunctions set forth in this Article XII.H.

## I. Exculpation and Limitation of Liability

The Reorganized Debtors, the Debtors, the Estates, any Committee, each of the Plan Investors, Gilbert Global, the First Lien Lenders, the First Lien Agent, the Second Lien Lenders, the Second Lien Agent, the DIP Facility Agents, the DIP Lenders, the Exit Agents and the Exit Lenders and any and all of their respective current or former members, officers, directors, managers, employees, equity holders, partners, affiliates, advisors, attorneys, agents or representatives, or any of their successors or assigns, shall not have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of their respective members, officers, directors, managers, employees, equity holders, partners, affiliates, advisors, attorneys, agents or representatives, or any of their successors or assigns, for any act or omission in connection with, relating to or arising out of, the administration of the Chapter 11 Cases, the negotiation of the terms of the Plan, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their willful misconduct or gross negligence, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities with respect to the Chapter 11 Cases and the Plan.

Notwithstanding any other provision of the Plan, but without limiting the releases provided in the Plan or affecting the status or treatment of any Claim Allowed pursuant to the Plan, no holder of a Claim or Interest, no other party in interest, none of their respective members, officers, directors, managers, employees, equity holders, partners, affiliates, subsidiaries, advisors, attorneys, agents or representatives, and no successors or assigns of the foregoing, shall have any right of action against the Reorganized Debtors, the Debtors, their Estates, any Committee, each of the Plan Investors, Gilbert Global, the First Lien Lenders, the First Lien Agent, the Second Lien Lenders, the Second Lien Agent, the DIP

46701/0001-5942655v16

Facility Agents, the DIP Lenders, the Exit Agents and the Exit Lenders or any of their respective current or former members, officers, directors, managers, employees, equity holders, partners, affiliates, subsidiaries, advisors, attorneys, agents or representatives, or any of their successors or assigns, for any act or omission in connection with, relating to or arising out of, the administration of the Chapter 11 Cases, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their willful misconduct or gross negligence.

**J.      Waiver of Enforcement of Subordination**

*All subordination rights that a holder of a Claim or Interest may have with respect to any distribution to be made pursuant to the Plan will be discharged and terminated, and all actions related to the enforcement of such subordination rights hereby are permanently enjoined. Accordingly, distributions (if any) pursuant to the Plan to holders of Allowed Claims will not be subject to payment to a beneficiary of such terminated subordination rights, or to levy, garnishment, attachment or other legal process by a beneficiary of such terminated subordination rights.*

**K.      Term of Injunctions or Stays**

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**L.      Binding Effect**

The Plan shall be binding upon and inure to the benefit of the Debtors, all present and former holders of Claims against and Interests in the Debtors, whether or not such holders will receive or retain any property or interest in property under the Plan, their respective successors and assigns, including, without limitation, the Reorganized Debtors, and all other parties in interest in the Chapter 11 Cases.

**M.      Committees**

On the Effective Date, the duties of any Committee (if appointed) shall terminate, except with respect to any application for compensation or reimbursement of costs and expenses in connection with services rendered prior to the Effective Date.

**N.      Notices to Debtors, Plan Investor, First Lien Agent, Second Lien Agent and DIP Facility Agents**

Any notice, request or demand required or permitted to be made or provided under the Plan shall be (i) in writing, (ii) served by (a) certified mail, return receipt requested, (b)

46701/0001-5942655v16

hand delivery, (c) overnight delivery service, (d) first-class mail or (e) facsimile transmission, and (iii) deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(1)    IF TO THE DEBTORS:

True Temper Sports, Inc.
8275 Tournament Drive, Suite 200
Memphis, Tennessee 38125
Attention: Vice President and Chief Financial Officer
Facsimile: 901-746-2161

With a copy served upon counsel to the Debtors:

Cole, Schotz, Meisel, Forman & Leonard, P.A.
500 Delaware Avenue
Suite 1410
Wilmington, DE 19801
Attention: Norman L. Pernick
Marion M. Quirk
Karen M. McKinley
Sanjay Bhatnagar
Telephone: 302-652-3131
Facsimile: 302-652-3117

Mayer Brown LLP
1675 Broadway
New York, NY 10019-5820
Attention: Frederick D. Hyman
Craig E. Reimer
Telephone: 212-506-2500
Facsimile: 212-262-1910

46701/0001-5942655v16

IF TO THE PLAN INVESTOR:

Newport Global Advisors LP
21 Waterway Rd., Suite 150
The Woodlands, TX 77380
Attn: Tim Janszen
Facsimile: 713-559-7499

Providence Equity LLC
Lever House
390 Park Avenue
New York, NY 10022
Attn: Jesse Du Bey
Facsimile: 212-521-0845

Gilbert Global Equity Capital, L.L.C.
277 Park Avenue, 49th Floor
New York, New York 10172
Attn: Jeffrey W. Johnson
Facsimile: 212-584-6211

J.P. Morgan Asset Management Inc.
8044 Montgomery Road, Suite 555
Cincinnati, Ohio 45236
Attn: Chad Engelbert
Facsimile: 513-985-3217

Charles Kenahan
7 Tip Top Road
Swampscott, Ma 01907
Facsimile: 617-946-4244

S. Robert Levine
c/o Armstrong Asset Management
120 Aviation Avenue
Portsmouth, NH 03801
Fax: 603-334-6428

Sarah Fuller
610 High Street
Westwood, Ma 02090
Fax: 781-296-2766

46701/0001-5942655v16

Robert Adler
35 Bradford Road
Wellesley, Ma 02481
Fax: 617-812-3078

With copies to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Attention: Andrew N. Rosenberg
Facsimile: 212-757-3990


(2)     IF TO THE FIRST LIEN AGENT

Credit Suisse
Eleven Madison Avenue
New York, New York 10010
Attention: Bryan Matthews
Facsimile: 212-322-2978

With copies to:

Gibson Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166
Attention: David M. Feldman
Facsimile: 212-351-6366

(3)     IF TO SECOND LIEN AGENT

Law Debenture Trust Company of New York
400 Madison Avenue, 4th Floor
New York, New York 10017
Attention: Robert Bice, Senior Vice President
Facsimile: 212-750-1361

With copies to:

Brown Rudnick LLP
One Financial Center
Boston, Massachusetts 02111
Attention: Steven D. Pohl
Facsimile: 617-856-8201

(4)     IF TO THE DIP ROLL-UP AGENT

Credit Suisse
Eleven Madison Avenue
New York, New York 10010
Attention: Bryan Matthews
Facsimile:  212-322-2978

With copies to:

Gibson Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166
Attention: David M. Feldman
Facsimile: 212-351-6366

(5)     IF TO THE DIP REVOLVING AGENT

General Electric Capital Corporation
500 West Monroe Street
Chicago, IL 60661
Attention: True Temper Account Officer
Facsimile: 312-441-7211

With a copy to:

General Electric Capital Corporation
201 Merritt 7
P.O. Box 5201
Norwalk, CT 06851
Attn: General Counsel – Global Sponsor Finance
Facsimile: 203-956-4216

- and -

General Electric Capital Corporation
500 West Monroe Street
Chicago, IL 60661
Attn: Corporate Counsel – Global Sponsor Finance
Facsimile: 312-441-6876

50

With copies to:

Latham & Watkins LLP
233 South Wacker Drive, Suite 5800
Chicago, Il 60606
Attention: Richard A. Levy
Facsimile: 312-993-9767

## O. Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), (i) the laws of the State of Delaware shall govern the construction and implementation of the Plan, (ii) except as expressly provided otherwise in any agreements, documents and instruments executed in connection with the Plan, the laws of the State of Delaware shall govern the construction and implementation of such agreements, documents and instruments, and (iii) the laws of the state of incorporation, organization or formation of the Debtors shall govern corporate governance matters with respect to the Debtors, in each case without giving effect to the principles of conflicts of law thereof.

## P. Prepayment

Except as otherwise provided in the Plan or the Confirmation Order, the Debtors shall have the right to prepay, without penalty, all or any portion of an Allowed Claim upon authorization of the Bankruptcy Court; *provided, however,* that any such prepayment shall not be violative of, or otherwise prejudice, the relative priorities and parities among the Classes of Claims.

## Q. Section 1125(e) of the Bankruptcy Code

As of the Confirmation Date, the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code. The Debtors and each of their affiliates, agents, directors, officers, employees, investment bankers, financial advisors, attorneys and other professionals have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of the New Common Stock under the Plan, and therefore are not, and on account of such offer, issuance and solicitation will not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of the New Common Stock under the Plan.

46701/0001-5942655v16

Dated: Wilmington, Delaware
September 30, 2009

TRUE TEMPER SPORTS, INC.


By:  /s/ Jason A. Jenne
    Name:  Jason A. Jenne
    Title:  Chief Financial Officer

TRUE TEMPER CORPORATION


By:  /s/ Jason A. Jenne
    Name:  Jason A. Jenne
    Title:  Chief Financial Officer

TRUE TEMPER SPORTS-PRC
HOLDINGS, INC.


By:  /s/ Jason A. Jenne
    Name:  Jason A. Jenne
    Title:  Chief Financial Officer

46701/0001-5942655v16

**Counsel:**

By:  /s/ Marion M. Quirk

**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
Norman L. Pernick (No. 2290)
Marion M. Quirk (No. 4136)
Karen M. McKinley (No. 4372)
Sanjay Bhatnagar (No. 4829)
500 Delaware Avenue
Suite 1410
Wilmington, DE 19801
Telephone: 302-652-3131
Facsimile: 302-652-3117

-and-

**MAYER BROWN LLP**
Frederick D. Hyman
Craig E. Reimer
675 Broadway
New York, NY 10019-5820
Telephone: 212-506-2500
Facsimile: 212-262-1910

46701/0001-5942655v16

# **EXHIBIT A**

DIP FINANCING COMMITMENT

AND

EXIT FINANCING COMMITMENT

CONFIDENTIAL

September 30, 2009

True Temper Sports, Inc.
8275 Tournament Drive
Suite 200
Memphis, TN 38125
Attention: Scott Hennessy, President and CEO
          Jason Jenne, CFO

<u>True Temper Sports, Inc.</u>
$10,000,000 Senior Secured Superpriority Debtor-in-Possession Revolving Credit Facility and
$12,500,000 Senior Secured Exit Revolving Credit Facility
Commitment Letter

Ladies and Gentlemen:

You (as "<u>Borrower</u>") have advised each of General Electric Capital Corporation ("<u>GE Capital</u>") and GE Capital Markets, Inc. ("<u>GECM</u>" and, together with GE Capital, the "<u>Commitment Parties</u>," "<u>we</u>" or "<u>us</u>") that you and certain of your subsidiaries intend to file petitions for relief (collectively, the "<u>Bankruptcy Case</u>") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, <u>et seq</u> (the "<u>Bankruptcy Code</u>") and implement a restructuring by means of a "pre-packaged" plan of reorganization (the "<u>Plan</u>" and the transactions contemplated thereby, the "<u>Transaction</u>") as further provided in that certain Equity Commitment and Plan Support Agreement of even date herewith (the "<u>Plan Support Agreement</u>") among the Borrower and certain affiliates thereof, certain financial institutions signatory thereto as "Consenting First Lien Lenders" or "Consenting Second Lien Lenders", as applicable, and certain third party investors signatory thereto as the "Plan Investors", in each case subject to the jurisdiction of the United States Bankruptcy Court for District of Delaware (the "<u>Bankruptcy Court</u>"). You have further advised us that, in connection with the Transaction, you intend to obtain (a) during the pendency of the Bankruptcy Case, a senior secured superpriority debtor-in-possession credit facility (the "<u>DIP Credit Facility</u>") consisting of (i) a revolving credit facility in an amount equal to $10,000,000 (the "<u>DIP Revolving Credit Facility</u>") and (ii) a roll-up of up to $80,000,000 in senior secured obligations under the Existing First Lien Facility outstanding on the date the Bankruptcy Case is filed into term loans governed by the DIP Credit Facility (the "<u>DIP Term Credit Facility</u>") and (b) upon the Borrower's emergence from the Bankruptcy Case, a senior secured plan of reorganization credit facility (the "<u>Exit Credit Facility</u>" and, together with the DIP Credit Facility, the "<u>Credit Facilities</u>") consisting of (i) a revolving credit facility in an amount equal to $12,500,000 (the "<u>Exit Revolving Credit Facility</u>" and, together with the DIP Revolving Credit Facility, the "<u>Revolving Credit Facilities</u>") and (ii) a term loan credit facility in an aggregate amount equal to all outstanding amounts under the DIP Term Credit Facility and Existing First Lien Facility on the effective date of the Plan after giving effect to a principal repayment of $70,000,000 made with proceeds of cash equity contributions in accordance with the Plan (the "<u>Exit Term Credit Facility</u>" and together with the DIP Term Credit Facility, the "<u>Term Credit Facilities</u>"), in each case on the terms and conditions described in the Term Sheets.

In connection with the Transaction, GE Capital (in such capacity, the "<u>Initial Lender</u>") is pleased to advise you of its commitment to provide, directly or through an affiliate or funding source, the Revolving Credit Facilities and to act as the sole administrative agent and the sole collateral agent for the Revolving

Credit Facilities, all upon and subject to the general terms and conditions set forth herein, in the Summary of Terms attached hereto as <u>Exhibit A</u> with respect to the DIP Credit Facility (the "<u>DIP Term Sheet</u>"), in the Summary of Terms attached hereto as <u>Exhibit B</u> with respect to the Exit Credit Facility, (the "<u>Exit Term Sheet</u>" and collectively with the DIP Term Sheet, the "<u>Term Sheets</u>" and, the Term Sheets together with this letter, collectively, this "<u>Commitment Letter</u>"), in each case incorporated herein by reference, and in the Fee Letter (as defined below). Subject to the aforementioned terms and conditions, GECM (in such capacity the "<u>Lead Arranger</u>") is pleased to advise you of its agreement to act as sole lead arranger for the Revolving Credit Facilities and book-running manager for the Revolving Credit Facilities. Capitalized terms used in the text of this Commitment Letter without definition have the meanings assigned to such terms in the Term Sheets.

<u>Syndication.</u>

The Initial Lender intends and reserves the right, prior to and after the execution of definitive documentation for the Credit Facilities (the "<u>Credit Facilities Documentation</u>"), to syndicate all or a portion of its commitments under this Commitment Letter or its loans and commitments under the Credit Facilities Documentation, as the case may be, to one or more banks, financial institutions or other institutional lenders pursuant to a syndication to be managed by GECM (the Initial Lender and such financial institutions becoming parties to such Credit Facilities Documentation being collectively referred to as the "<u>Lenders</u>"). The syndication of all or a portion of the Initial Lender's commitments under this Commitment Letter and/or its loans and commitments under the Revolving Credit Facilities is hereinafter referred to as the "<u>Primary Syndication</u>." Any assignments of the Initial Lender's commitments under this Commitment Letter or its loans and commitments under the Revolving Credit Facilities entered into to complete the Primary Syndication shall not be subject to the consent, minimum amounts and fee provisions set forth in the assignment provisions of either this Commitment Letter or the Credit Facilities Documentation.

The Lead Arranger will commence the Primary Syndication promptly after your acceptance of this Commitment Letter and the Fee Letter (as defined below). It is understood and agreed that GECM will, in consultation with you, manage and control all aspects of the Primary Syndication, including selection of prospective Lenders, determination of when the Lead Arranger will approach prospective Lenders and the time of acceptance of Lenders' commitments, any naming rights, titles or roles to be awarded to Lenders, and the final allocations of the commitments among Lenders. It is further understood and agreed that (i) no additional agents, arrangers or book-running managers shall be appointed, or other titles, names or roles conferred to any Lender or any other person or entity, by you in respect of the Revolving Credit Facilities; <u>provided</u>, that Credit Suisse or another financial institution acceptable to Borrower and GE Capital may serve as administrative agent and collateral agent solely with respect to the Term Credit Facilities, (ii) the amount and distribution of fees among the Lenders will be as set forth the Term Sheets or the Fee Letter and (iii) no Lender will be offered by, or receive from, you compensation of any kind for its participation in the Revolving Credit Facilities, except as expressly provided for in this Commitment Letter or the Fee Letter or with the prior written consent of GECM.

You agree to actively assist and cooperate (and use your commercially reasonable efforts to cause each of your affiliates and all other necessary persons to assist and cooperate) with the Lead Arranger in connection with the Primary Syndication. Such assistance shall include, without limitation (a) promptly preparing and providing to the Lead Arranger all information with respect to Borrower and its subsidiaries, the Transaction and the other transactions contemplated hereby, including financial information and projections (the "<u>Projections</u>") and copies of due diligence, accounting or similar reports or memoranda prepared at your direction by legal, accounting, tax, environmental or other advisors in connection with the Transaction (in each case subject to non-disclosure and non-reliance letters reasonably acceptable to the Lead Arranger), in each case, as the Lead Arranger may reasonably request

- 2 -

in connection with the Primary Syndication, (b) participating in meetings with prospective Lenders and other relevant meetings (including meetings with rating agencies), (c) providing direct contact during the Primary Syndication between Borrower's senior management, representatives and advisors, on the one hand, and prospective Lenders, on the other hand, and (d) using your commercially reasonable efforts to ensure that the Lead Arranger's syndication efforts benefit from Borrower's financial and banking relationships.

At GECM's request, you agree to assist in the preparation of confidential information memoranda, presentations and other Evaluation Material (as defined below) regarding the Borrower and its affiliates and the Revolving Credit Facilities to be used in connection with the Primary Syndication and to provide customary confirmation of, prior to such materials being made available to prospective Lenders, the material completeness and accuracy of such materials.

Until the earlier of the completion of the Primary Syndication (as determined by GECM in its discretion) and 30 days following the closing of the Exit Credit Facility, and except as expressly contemplated in the Plan, Borrower shall not (and Borrower shall cause Borrower's affiliates not to), without the prior written consent of GECM, offer, issue, place, syndicate or arrange any debt or preferred equity securities or debt facilities (including any renewals, restatements, restructuring or refinancings of any existing debt or preferred equity securities or debt facilities), attempt or agree to do any of the foregoing, announce or authorize the announcement of any of the foregoing, or engage in discussion concerning any of the foregoing.

Information

You hereby represent and covenant (and it is a condition to the Initial Lender's commitment hereunder) that (a) all information other than the Projections and general economic or specific industry information developed by, and obtained from, third-party sources (when taken as a whole, the "Information") that has been or will be made available to the Commitment Parties and/or the Lenders by you or any of your affiliates or representatives is or will be, when furnished, complete and correct in all material respects and does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made and (b) the Projections that have been or will be made available to the Commitment Parties by you or any of your affiliates or representatives have been or will be prepared in good faith based upon reasonable assumptions at the time made (it being understood and agreed that financial projections are not a guarantee of financial performance and actual results may differ from financial projections and such differences may be material). You agree that if at any time prior to the closing of the Revolving Credit Facilities any of the representations in the preceding sentence would be incorrect if the Information or Projections were being furnished, and such representations were being made, at such time, then you will promptly supplement the Information or the Projections, as the case may be, so that such representations will be correct under those circumstances. You understand that in arranging and syndicating the Revolving Credit Facilities the Lead Arranger may use and rely on the Information and Projections without independent verification thereof.

You hereby authorize and agree, on behalf of yourself and your affiliates, that the Information, the Projections and all other information provided by or on behalf of you and your affiliates to the Commitment Parties regarding Borrower and its affiliates, the Transaction and the other transactions contemplated hereby in connection with the Credit Facilities (collectively, "Evaluation Material") may be disseminated by or on behalf of the Commitment Parties, and made available, to prospective Lenders and other persons, who have agreed to be bound by customary confidentiality undertakings (including, "click-through" agreements), all in accordance with the Lead Arranger's standard loan syndication practices (whether transmitted electronically by means of a website, e-mail or otherwise, or made available orally

- 3 -

or in writing, including at prospective Lender or other meetings). You hereby further authorize the Lead Arranger to download copies of Borrower's logos from its websites and post copies thereof on an Intralinks® or similar workspace and use such logos on any confidential information memoranda, presentations and other marketing and materials prepared in connection with the Primary Syndication.

<u>Fee Letter</u>.

As consideration for the Commitment Parties' agreements hereunder you agree to pay (or to cause to be paid) to the Initial Lender, the Lead Arranger and such other specified parties, if any, the fees as set forth in the Term Sheets and in the Fee Letter dated the date hereof and delivered herewith with respect to the Revolving Credit Facilities (the "<u>Fee Letter</u>").

<u>Conditions</u>.

The commitment and agreements of the Initial Lender hereunder with respect to the DIP Revolving Credit Facility, and the agreements of the Lead Arranger to provide the services described herein with respect to the DIP Revolving Credit Facility, are subject to the following: (a) the execution and delivery of the Credit Facilities Documentation relating to the DIP Revolving Credit Facility consistent with the DIP Term Sheet and, to the extent not inconsistent therewith, otherwise reasonably acceptable to the Initial Lender and its counsel, (b) the Bankruptcy Court's entry of the Interim DIP Order and the Final DIP Order (as those terms are defined in DIP Term Sheet), in each case consistent with the DIP Term Sheet and, to the extent not inconsistent therewith, otherwise acceptable to the Initial Lender and its counsel, (c) the Initial Lender not becoming aware after the date hereof of any information not previously disclosed to the Initial Lender affecting Borrower, its subsidiaries or the Transaction that is inconsistent in a material and adverse manner with any such information disclosed to the Initial Lender prior to the date hereof, (d) the other conditions set forth in the DIP Term Sheet and your compliance in all material respects with the terms and provisions of this Commitment Letter and the Fee Letter, (e) the Plan Support Agreement shall be in full force and effect and shall not have been amended, supplemented or otherwise modified without the consent of the Lead Arranger, and no Agreement Termination Event (as defined in the Plan Support Agreement) shall have occurred and be continuing and (f) the DIP Term Credit Facility shall have closed simultaneously with the DIP Revolving Credit Facility on terms consistent with the DIP Term Sheet and, to the extent not inconsistent therewith, otherwise reasonably acceptable to the Initial Lender and its counsel.

The commitment and agreements of the Initial Lender hereunder with respect to the Exit Revolving Credit Facility, and the agreements of the Lead Arranger to provide the services described herein with respect to the Exit Revolving Credit Facility, are subject to the following: (a) satisfaction or waiver of all conditions of the commitments of the Initial Lender and the Lead Arranger with respect to the Revolving DIP Credit Facility and the closing of such Revolving DIP Credit Facility, (b) the execution and delivery of the Credit Facilities Documentation relating to the Exit Revolving Credit Facility consistent with the Exit Term Sheet and, to the extent not inconsistent therewith, otherwise reasonably acceptable to the Initial Lender and its counsel, (c) the Bankruptcy Court's entry of a confirmation order, in form and substance satisfactory to the Initial Lender, confirming the Plan, and the occurrence of the effective date of the Plan, (d) the Initial Lender not becoming aware after the date hereof of any information not previously disclosed to the Initial Lender affecting Borrower, its subsidiaries or the Transaction that is inconsistent in a material and adverse manner with any such information disclosed to the Initial Lender prior to the date hereof, (e) the other conditions set forth in the Exit Term Sheet and your compliance in all material respects with the terms and provisions of this Commitment Letter and the Fee Letter, (f) the Plan Support Agreement shall be in full force and effect and shall not have been amended, supplemented or otherwise modified without the consent of the Lead Arranger, and no Agreement Termination Event (as defined in the Plan Support Agreement) shall have occurred and be continuing and (g) the Exit Term

- 4 -

Credit Facility shall have closed simultaneously with the Exit Revolving Credit Facility on terms consistent with the Exit Term Sheet and, to the extent not inconsistent therewith, otherwise reasonably acceptable to the Initial Lender and its counsel.

The terms and conditions of the DIP Revolving Credit Facility and the Exit Revolving Credit Facility are not limited to those set forth herein and in the Term Sheets and the Fee Letter. Those matters that are not covered by the provisions hereof and of the Term Sheets and the Fee Letter are subject to the approval and agreement of the Initial Lender and you.

<u>Expenses</u>.

By signing this Commitment Letter, regardless of whether any or all of the Credit Facilities close, you agree to pay upon demand to the Commitment Parties all fees and expenses (including, but not limited to, all reasonable costs and fees of external legal counsel, environmental consultants, appraisers, auditors and other consultants and advisors, due diligence reports, recording and transfer fees and taxes, title charges and survey costs) incurred by them in connection with this Commitment Letter, the Fee Letter, the Transaction, the Credit Facilities and the transactions contemplated hereby (and the negotiation, documentation, closing and syndication thereof).

<u>Confidentiality</u>.

The Commitment Parties are delivering this Commitment Letter to you with the understanding that you will not disclose the contents of this Commitment Letter, the Fee Letter or the Commitment Parties' involvement with or the Initial Lender's commitments to provide or the Lead Arranger's agreement to arrange the Revolving Credit Facilities to any third party (including, without limitation, any financial institution or intermediary) without the Initial Lender's prior written consent other than to (a) those individuals who are your and the investors' (under the Plan) directors, officers, employees or advisors in connection with the Credit Facilities and (b) as may be compelled in a judicial or administrative proceeding or as otherwise required by law including as part of the Plan and Disclosure Statement (in which case you agree to inform the Initial Lender promptly thereof). You agree to inform all such persons under clause (a) who receive information concerning the Commitment Parties, this Commitment Letter or the Fee Letter that such information is confidential and may not be used for any purpose other than in connection with the Transaction and may not be disclosed to any other person. The Commitment Parties reserve the right to review and approve, in advance, all materials, press releases, advertisements and disclosures that you prepare or that is prepared on your behalf that contain the Initial Lender's or any affiliate's name or describe the Initial Lender's financing commitment or the Lead Arranger's role and activities with respect to the Credit Facilities.

<u>Indemnity</u>.

Regardless of whether any or all of the Credit Facilities close, you agree to (a) indemnify, defend and hold each of the Commitment Parties, each Lender, and their respective affiliates and the principals, directors, officers, employees, representatives, agents and third party advisors of each of them (each, an "<u>Indemnified Person</u>"), harmless from and against all losses, disputes, claims, expenses (including, but not limited to, attorneys' fees), damages, and liabilities of any kind (including, without limitation, any environmental liabilities) which may be incurred by, or asserted against, any such Indemnified Person in connection with, arising out of, or relating to, this Commitment Letter, the Fee Letter, the Credit Facilities, the use or the proposed use of the proceeds thereof, the Transaction, any other transaction contemplated by this Commitment Letter, any other transaction related thereto and any claim, litigation, investigation or proceeding relating to any of the foregoing (each, a "<u>Claim</u>", and collectively, the "<u>Claims</u>"), regardless of whether such Indemnified Person is a party thereto, and (b) reimburse each Indemnified Person upon

- 5 -

demand for all legal and other expenses incurred by it in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuit, investigation, claim or other proceeding relating to any of the foregoing (each, an "Expense"); provided that no Indemnified Person shall be entitled to indemnity hereunder in respect of any Claim or Expense to the extent that the same is found by a final, non-appealable judgment of a court of competent jurisdiction to have resulted directly from the gross negligence or willful misconduct of such Indemnified Person. Under no circumstances shall the Commitment Parties or any of their respective affiliates be liable for any punitive, exemplary, consequential or indirect damages that may be alleged to result in connection with, arising out of, or relating to, any Claims, this Commitment Letter, the Fee Letter, the Credit Facilities, the use or the proposed use of the proceeds thereof, the Transaction, any other transaction contemplated by this Commitment Letter and any other transaction related thereto. Furthermore, you hereby acknowledge and agree that the use of electronic transmission is not necessarily secure and that there are risks associated with such use, including risks of interception, disclosure and abuse. You agree to assume and accept such risks by hereby authorizing the transmission of electronic transmissions, and you agree that each of the Commitment Parties or any of their respective affiliates will not have any liability for any damages arising from the use of such electronic transmission systems.

Sharing Information; Absence of Fiduciary Relationship.

You acknowledge that the Commitment Parties and their affiliates may be providing debt financing, equity capital or other services to other companies in respect of which you may have conflicting interests regarding the transactions described herein and otherwise. None of the Commitment Parties or any of their respective affiliates will furnish confidential information obtained from you and your officers, directors, employees, attorneys, accountants or other advisors by virtue of the transactions contemplated by this Commitment Letter or its other relationships with you to other companies. You also acknowledge that none of the Commitment Parties or any of their respective affiliates has any obligation to use in connection with the transactions contemplated by this Commitment Letter, or furnish to you and your officers, directors, employees, attorneys, accountants or other advisors, confidential information obtained by the Commitment Parties or any of their respective affiliates from other companies.

You further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between you, on the one hand, and or any of the Commitment Parties, on the other hand, has been or will be created in respect of any of the transactions contemplated by this Commitment Letter, irrespective of whether the Commitment Parties and/or their respective affiliates have advised or are advising you on other matters and (b) you will not bring or otherwise assert any claim against any of the Commitment Parties for breach of fiduciary duty or alleged breach of fiduciary duty and agree that none of the Commitment Parties shall have any liability (whether direct or indirect) to you in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on behalf of or in right of you, including your stockholders, employees or creditors.

Assignments and Amendments.

This Commitment Letter shall not be assignable by you without the prior written consent of us (and any purported assignment without such consent shall be null and void), and is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and the Indemnified Persons. The Initial Lender may transfer and assign its commitment hereunder, in whole or in part, to any of its affiliates or to any prospective Lender in connection with the Primary Syndication or otherwise.

This Commitment Letter may not be amended or waived except by an instrument in writing signed by you and us. The Commitment Parties may perform the duties and activities described hereunder through

- 6 -

any of their respective affiliates and the provisions of the paragraph entitled "Indemnity" shall apply with equal force and effect to any of such affiliates so performing any such duties or activities.

Counterparts and Governing Law.

This Commitment Letter may be executed in counterparts, each of which shall be deemed an original and all of which counterparts shall constitute one and the same document. Delivery of an executed signature page of this Commitment Letter by facsimile or electronic (including "PDF") transmission shall be effective as delivery of a manually executed counterpart hereof.

The laws of the State of New York shall govern all matters arising out of, in connection with or relating to this Commitment Letter, including, without limitation, its validity, interpretation, construction, performance and enforcement.

Venue and Submission to Jurisdiction.

You consent and agree that the state or federal courts located in New York County, State of New York, shall have exclusive jurisdiction to hear and determine any claims or disputes between or among any of the parties hereto pertaining to this Commitment Letter, the Fee Letter, any transaction relating hereto or thereto, any other financing related thereto, and any investigation, litigation, or proceeding in connection with, related to or arising out of any such matters, provided, that you acknowledge that any appeal from those courts may have to be heard by a court located outside of such jurisdiction. You expressly submit and consent in advance to such jurisdiction in any action or suit commenced in any such court, and hereby waive any objection, which either of them may have based upon lack of personal jurisdiction, improper venue or inconvenient forum.

Waiver of Jury Trial.

THE PARTIES HERETO, TO THE EXTENT PERMITTED BY LAW, WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING ARISING OUT OF, IN CONNECTION WITH OR RELATING TO, THIS COMMITMENT LETTER, THE FEE LETTER, THE CREDIT FACILITIES AND ANY OTHER TRANSACTION CONTEMPLATED HEREBY. THIS WAIVER APPLIES TO ANY ACTION, SUIT OR PROCEEDING WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE.

Survival.

The provisions of this letter set forth under this heading and the headings "Syndication", "Information", "Expenses", "Confidentiality", "Indemnity", "Assignments and Amendments", "Counterparts and Governing Law", "Venue and Submission to Jurisdiction" and "Waiver of Jury Trial" shall survive the termination or expiration of this Commitment Letter and shall remain in full force and effect regardless of whether the Credit Facilities close or the Credit Facilities Documentation shall be executed and delivered; provided that in the event the DIP Credit Facility and/or the Exit Revolving Credit Facility close or the Credit Facilities Documentation with respect to either Credit Facility shall be executed and delivered, the provisions under the heading "Syndication" shall survive only until the completion of the Primary Syndication with respect to the DIP Revolving Credit Facility and the Exit Revolving Credit Facility.

Integration.

This Commitment Letter, the Fee Letter and that certain expense reimbursement letter dated as of August 25, 2009 between you and GE Corporate Financial Services, Inc. supersede any and all discussions,

negotiations, understandings or agreements, written or oral, express or implied, between or among the parties hereto and any other person as to the subject matter hereof.

Patriot Act.

We hereby notify you that pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "PATRIOT Act"), each Lender may be required to obtain, verify and record information that identifies Borrower, which information includes the name, address, tax identification number and other information regarding Borrower that will allow such Lender to identify Borrower in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective as to each Lender.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

Please indicate your acceptance of the terms hereof and of the Fee Letter by signing in the appropriate space below and in the Fee Letter and returning to GE Capital on behalf of the Commitment Parties such signature pages by 5:00 p.m. (Chicago time) on September 30, 2009 accompanied by the fees payable upon such execution pursuant to the Fee Letter. Unless extended in writing by the Commitment Parties, the commitments contained herein shall automatically expire on the first to occur of (a) with respect to all Credit Facilities, upon the date and time referred to in the previous sentence unless you shall have executed and delivered a copy of this Commitment Letter and the Fee Letter accompanied by payment of such fees as provided above, (b) in the case of the Commitment Parties' commitments with respect to the DIP Revolving Credit Facility, upon the first to occur of (i) any material breach by the Borrower of its obligations under this Commitment Letter or the Fee Letter or (ii) at 5:00 p.m. (Chicago time) on October 16, 2009 unless prior to such time (A) the Interim DIP Order (as defined in the DIP Term Sheet) shall have been entered by the Bankruptcy Court, in form and substance satisfactory to the Commitment Parties, authorizing the Borrower to enter into, and perform under, the Credit Facilities Documentation relating to the DIP Credit Facility, and (B) the closing of the DIP Credit Facility, on the terms and subject to the conditions contained herein and in the DIP Term Sheet, has been consummated, and (c) in the case of the Commitment Parties' commitments with respect to the Exit Revolving Credit Facility, upon the first to occur of (i) the effective date of the Plan, (ii) the abandonment, withdrawal, revocation or termination of the Plan, (iii) a material breach by Borrower under this Commitment Letter or the Fee Letter, or (iv) the date that is 180 days after the closing date of the DIP Revolving Credit Facility, unless the closing of the Exit Revolving Credit Facility, on the terms and subject to the conditions contained herein and in the Exit Term Sheet, has been consummated on or before such date concurrently with the consummation of the Plan.

Sincerely,

GENERAL ELECTRIC CAPITAL CORPORATION

By: _____
Name: K CRAIG GALLEHUGH
Title: DULY AUTHORIZED SIGNATORY


GE CAPITAL MARKETS, INC.

By: _____
Name:
Title:


AGREED AND ACCEPTED
THIS _____ DAY OF SEPTEMBER, 2009.

TRUE TEMPER SPORTS, INC.

By: _____
Name:
Title:

[Signature Page to the Commitment Letter]

Sincerely,

GENERAL ELECTRIC CAPITAL CORPORATION

By: _____
Name:
Title:


GE CAPITAL MARKETS, INC.

By: _____
Name: David Nation
Title: M.D.


AGREED AND ACCEPTED
THIS _____ DAY OF SEPTEMBER, 2009.

TRUE TEMPER SPORTS, INC.

By: _____
Name:
Title:

Sincerely,

GENERAL ELECTRIC CAPITAL CORPORATION

By: _____
Name:
Title:


GE CAPITAL MARKETS, INC.

By: _____
Name:
Title:


AGREED AND ACCEPTED
THIS ___30th___ DAY OF SEPTEMBER, 2009.

TRUE TEMPER SPORTS, INC.

By: _____
Name: Jason Jenne
Title: VP + CFO

<u>$10,000,000 Senior Secured Superpriority Debtor-in-Possession Revolving Credit Facility</u>

Summary of Terms
September 30, 2009

This is the DIP Term Sheet described as Exhibit A in that certain letter dated September 30, 2009, of which this Exhibit A is a part. Capitalized terms used herein without definition shall have the meanings assigned to such terms in the letter referenced above.

| | |
|---|---|
| <u>BORROWER</u>: | True Temper Sports, Inc., as a debtor and debtor in possession in its Chapter 11 Case. |
| <u>GUARANTORS</u>: | True Temper Corporation and its direct and indirect domestic subsidiaries (other than Borrower), as debtors and debtors in possession in their Chapter 11 Cases. |
| REVOLVING <u>DIP AGENT</u>: | General Electric Capital Corporation ("<u>GE Capital</u>" or "<u>Revolving DIP Agent</u>"). |
| <u>ROLL-UP DIP AGENT</u>: | Credit Suisse ("<u>Roll-Up DIP Agent</u>," and together with the Revolving DIP Agent, the "<u>Agents</u>"). |
| SOLE LEAD ARRANGER <u>AND SOLE BOOKRUNNER</u>: | GE Capital Markets, Inc. |
| REVOLVING <u>DIP LENDERS</u>: | GE Capital and any other Pre-Petition First Lien Lenders (defined below) electing to participate in the DIP Revolving Credit Facility (defined below), collectively in such capacity, the "<u>Revolving DIP Lenders</u>." |
| ROLL-UP <u>DIP LENDERS</u>: | The Pre-Petition First Lien Lenders (collectively in such capacity, the "<u>Roll-Up DIP Lenders</u>", and together with the Revolving DIP Lenders, |

1

the "DIP Lenders").

**PRE-PETITION FACILITIES:**

(i) A senior secured credit agreement (the "Existing First Lien Facility") provided by Credit Suisse, as agent ("Pre-Petition First Lien Agent"), the Swap Counterparty (defined below) and certain other lenders (the "Pre-Petition First Lien Lenders") consisting of (a) a revolving credit facility of $20,000,000, including a letter of credit subfacility and a swing line subfacility; (b) a $128,000,000 term loan facility (initial principal amount); (c) the amounts owing by the Borrower upon the termination of certain interest rate swaps, entered into by the Borrower pursuant to the ISDA Master Agreement, dated as of April 23, 2008 (the "Swap Agreement") with Credit Suisse International (the "Swap Counterparty"); and (d) the amounts owing by the Borrower upon the termination of certain foreign exchange forward contracts dated September 17, 2008 and October 6, 2008 between Borrower and Wells Fargo Bank, N.A. (the "Forward Contracts"); (ii) a $45,000,000 second lien term loan facility (initial principal amount) (the "Existing Second Lien Facility"); and (iii) a $125,000,000 senior unsecured subordinated note facility (initial principal amount) (the "Existing Subordinated Note Facility", and together with the Existing First Lien Facility, and the Existing Second Lien Facility, the "Existing Facilities").

**DIP REVOLVING CREDIT FACILITY:**

A $10,000,000 revolving loan facility (including a Letter of Credit Subfacility of up to $5,000,000 (the "DIP Revolving Credit Facility"). Outstanding Letters of Credit under the Existing First Lien Facility will be rolled up into the Letter of Credit Subfacility on the Closing Date (which shall be the date on which all closing conditions are satisfied, herein, the "Closing Date") and will be guaranteed or otherwise backed on a pro-rata basis by all Revolving DIP Lenders. Letters of credit issued after the Closing Date (including letters of credit issued after the Closing Date to replace letters of credit rolled up into the Letter of Credit Subfacility, which rolled up letters of credit shall expire on their terms and not be renewed) will be issued by either a bank designated by GE Capital or by GE Capital and/or one of its affiliates on terms acceptable to the Revolving DIP Agent and will be guaranteed or otherwise backed on a pro-rata basis by all Revolving DIP Lenders. The DIP Revolving Credit Facility will also include a swingline subfacility of up to $2,500,000.

2

| DIP TERM CREDIT FACILITY: | The DIP Credit Facility shall include a roll-up of up to $80,000,000 in outstanding obligations under the Existing First Lien Facility on a ratable basis (including, without limitation, any amounts owing by the Borrower upon the termination of the Swap Agreement and the Forward Contracts but excluding outstanding letters of credit which will be rolled up into the Letter of Credit Subfacility of the DIP Revolving Credit Facility as described above) into term loans ("Term Loans") (herein, the "DIP Term Credit Facility" and together with the DIP Revolving Credit Facility, the "DIP Credit Facility"). The DIP Term Credit Facility shall be junior to the DIP Revolving Credit Facility as provided in the "Security and Priority" section of this Term Sheet. Except as otherwise provided herein, the DIP Term Credit Facility shall have the same terms and conditions applicable to the DIP Revolving Credit Facility. |
|---|---|
| TERMINATION DATE: | The earlier of (i) 180 days after the closing date of the DIP Credit Facility (the "Maturity Date") or (ii) the effective date of a plan of reorganization in the Chapter 11 Case, at which earlier date the DIP Credit Facility shall be due and payable. |
| AVAILABILITY: | Subject to the liquidity requirements determined from the Budget (as hereinafter defined), the face amount of all letters of credit under the Letter of Credit Subfacility will be reserved in full against availability. As an example, if $1,000,000 in letters of credit are outstanding and no revolving loans are outstanding, the availability under the Letter of Credit Subfacility will be $4,000,000 and the availability under the DIP Revolving Credit Facility will be $9,000,000. |
| USE OF PROCEEDS: | The proceeds of the DIP Revolving Credit Facility will be used in compliance with the terms of the Budget (as defined below) (i) to pay transaction costs, fees and expenses which are incurred in connection with the DIP Credit Facility, and (ii) for working capital and other general corporate purposes (other than the repayment of pre-petition indebtedness that is not authorized by Bankruptcy Court order(s), which order(s) shall be in form and substance reasonably satisfactory to the Agents, all subject to certain restrictions to be set forth in the Interim DIP Order and the Final DIP Order (as those terms are defined below) and the final DIP Facility Documentation (as defined below). |
| BUDGET: | As used herein, "Budget" means the following, in form and substance |

satisfactory to the Agents (with the initial Budget being satisfactory to both Agents and any modification or supplement thereto covering the same or additional time periods requiring the prior written consent of Revolving DIP Agent only in its discretion): a weekly cash budget for a period from the Petition Date until the Maturity Date setting forth, on a line-item basis, (x) projected cash receipts, (y) projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses, capital expenditures, asset sales and fees and expenses of the Agents and DIP Lenders (including counsel therefor) and any other fees and expenses relating to the DIP Credit Facility), and (z) total available liquidity (consisting of unused availability under the DIP Revolving Credit Facility and unrestricted cash on hand).

The Borrower shall also provide a Budget variance report/reconciliation (the "Variance Report") on Thursday of each week for the week most recently ended (i) showing by line item actual cash receipts, disbursements and total available liquidity for the immediately preceding week, noting therein all variances, on a line-item basis, from amounts set forth for such period in the Budget, and shall include explanations for all material variances, and (ii) certified by the chief financial officer of the Borrower.

INTEREST:

Interest will be payable on the unpaid principal amount of all loans at a rate per annum equal to, at the option of Borrower, (a) to the Base Rate (as defined below) plus the Applicable Margin (as defined below), payable monthly in arrears or (b) with respect to the DIP Revolving Credit Facility only, so long as no event of default then exists, a rate per annum equal to the Eurodollar Rate (as defined below) plus the Applicable Margin, payable at the end of the relevant interest period.

"Base Rate" means a floating rate of interest per annum equal to the highest of the rate last quoted by The Wall Street Journal (or another national publication selected by the applicable Agent) as the U.S. "Prime Rate," (b) the federal funds rate plus 300 basis points, and (c) the sum of the three-month Eurodollar Rate plus 1.00%. "Eurodollar Rate" means, for each interest period, the offered rate for deposits in U.S. dollars in the London interbank market for the relevant interest period which is published by the British Bankers' Association, and currently appears on Reuters Screen LIBOR01 Page, as of 11:00 a.m. (London time) on the day which is two (2) business days prior to the first day of such interest period adjusted for reserve requirements. When selecting the Eurodollar

Rate option, Borrower will be entitled to choose 1, 2 or 3 month interest periods.

All interest will be calculated based on a 360-day year (or in the case of Base Rate Loans calculated by reference to the "Prime Rate", a 365/366-day year) and actual days elapsed. The Credit Facilities Documentation in respect of the DIP Credit Facility will set forth appropriate detail describing the exact method of calculation and relevant reserve requirements for the interest rates referred to above as well as Eurodollar Rate breakage provisions, Eurodollar Rate borrowing mechanics and other Eurodollar Rate definitions, provided, that at no time shall the Eurodollar Rate be deemed to be below 3.00%.

The "Applicable Margin" (on a per annum basis) means:

(a) with respect to the Term Loan, 4.25% per annum; and

(b) with respect to loans under the DIP Revolving Credit Facility, 7.00% per annum, in the case of Base Rate loans, and 8.00% per annum, in the case of Eurodollar Rate loans.

FEES:

Letter of Credit Fee equal to 8.00% per annum (calculated on the basis of a 360-day year and actual days elapsed) on the face amount of letters of credit, payable to the Revolving DIP Agent monthly in arrears, plus any charges assessed by the issuing financial institution.

Unused Facility Fee equal to 1.0% per annum (calculated on the basis of a 360-day year and actual days elapsed) on the average unused daily balance of the DIP Revolving Credit Facility, payable to the Revolving DIP Agent monthly in arrears.

DEFAULT RATES:

Default interest and the Letter of Credit Fee increased 2% above the rate or Letter of Credit Fee otherwise applicable.

SECURITY AND PRIORITY:

To secure all obligations of Borrower and Guarantors under the DIP Credit Facility, each Agent, on behalf of itself and the respective DIP Lenders, will receive, pursuant to Section 364(c)(2) and Section 364(d) of the U.S. Bankruptcy Code, through the final documents evidencing

the DIP Credit Facility (collectively, the "DIP Facility Documents") and Bankruptcy Court orders acceptable to the Agents, a fully perfected first priority security interest in all of the existing and after acquired real and personal, tangible and intangible, assets of Borrower and Guarantors including, without limitation, all cash, cash equivalents, bank accounts, accounts, other receivables, chattel paper, contract rights, inventory, instruments, documents, securities (whether or not marketable), equipment, fixtures, real property interests, franchise rights, patents, tradenames, trademarks, copyrights, intellectual property, general intangibles, avoidance actions to the extent provided in the DIP Orders (as defined below), investment property, supporting obligations, letter of credit rights, commercial tort claims, causes of action and all substitutions, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds (collectively, the "Collateral"); provided that the DIP Facility Documents shall provide for all payments or distributions in respect of the DIP Credit Facility to be first applied to the DIP Revolving Credit Facility and then to the DIP Term Credit Facility. Without limiting the foregoing, pursuant to Section 364(d) of the Bankruptcy Code, the security interests securing the DIP Revolving Credit Facility and the DIP Term Credit Facility shall have priority over (i) the security interests securing the Existing First Lien Facility and the Existing Second Lien Facility, and (ii) any and all security interests of any creditor that are junior to the prepetition security interests securing the Existing First Lien Facility. Except as set forth in the immediately preceding sentence, the security interests securing the DIP Revolving Credit Facility and the DIP Term Credit Facility shall be junior to all valid, enforceable, non-avoidable, perfected security interests in existence as of the Petition Date and all valid, enforceable, non-avoidable security interests in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (herein, the "Senior Interests").

The Agents will receive a pledge of all of the issued and outstanding capital stock of Borrower and the Guarantors (other than True Temper Corporation) and a security interest in all of the assets of each Guarantor. The Agents will receive a pledge of only 65% of the voting stock of all first tier foreign subsidiaries.

All Collateral will be free and clear of other liens, claims, and encumbrances, except for the Senior Interests, junior liens securing the Existing First Lien Facility, Existing Second Lien Facility and other

encumbrances reasonably acceptable to the Agents. In addition, Agents' liens and all junior liens on the Collateral will be subject to a Carve-Out (as defined below), the amount of such Carve-Out to be acceptable to the Agents and reserved in full against availability.

The obligations under the DIP Credit Facility will be guaranteed jointly and severally among the Guarantors and Borrower and will have superpriority over any and all other administrative expenses pursuant to Section 364(c)(1) of the U.S. Bankruptcy Code, subject to the Carve-Out. Without limiting the foregoing, the superpriority administrative claim status of the DIP Credit Facility shall extend to the unpledged 35% portion of the voting stock of foreign subsidiaries and all proceeds therefrom.

The term "Carve-Out" shall mean, collectively, (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. §1930(a), (ii) after the occurrence and during the continuance of an Event of Default (as defined below) an amount to be mutually agreed upon (the "Carve-Out Cap"), which amount may be used subject to the terms of the interim and final DIP orders to pay any fees or expenses incurred by the Borrower and any statutory committees appointed in the Chapter 11 Cases (each, a "Committee") that remain unpaid subsequent to the payment of such fees and expenses from available funds remaining in the Borrower's and Guarantors' estates for such creditors, in respect of (A) compensation for services rendered or reimbursement of expenses allowed and awarded by the Bankruptcy Court to the Borrower's or any Committee's professionals and (B) the reimbursement of expenses allowed by the Bankruptcy Court incurred by the Committee members in the performance of their duties (but excluding fees and expenses of third party professionals employed by such members) ("Committee Fees"), in each case, incurred after the delivery of a Carve-Out Trigger Notice (as defined below), and (iii) any accrued and unpaid Committee Fees incurred prior to the receipt of the Carve-Out Trigger Notice, whether or not such accrued and unpaid fees have yet been invoiced to the Borrower or submitted for approval to the Bankruptcy Court

The term "Carve-Out Trigger Notice" shall mean a written notice delivered by either Agent to the Borrower's lead counsel, the U.S. Trustee, and lead counsel to any Committee which notice may be delivered following the occurrence and during the continuation of an

Event of Default, expressly stating that the Carve-Out Cap is invoked.

Notwithstanding the foregoing, so long as the Carve-Out Trigger Notice has not been delivered, the Borrower shall be permitted to pay, as the same may become due and payable, fees and expenses payable under 11 U.S.C. § 330 and § 331 pursuant to court order, and the same shall not reduce the Carve-Out Cap.

No portion of the Carve-Out, any cash collateral or proceeds of the DIP Credit Facility may be used for the payment of the fees and expenses of any person incurred challenging, or in relation to the challenge of, (i) the liens or claims of any or all of the Agents, the DIP Lenders, and the Pre-Petition First Lien Agent and Pre-Petition First Lien Lenders, or the initiation or prosecution of any claim or action against any or all of the Agents and the DIP Lenders, including any claim under Chapter 5 of the Bankruptcy Code, in respect of the Existing Facilities and (ii) any claims or causes of actions (including any claims or causes of action under Chapter 5 of the Bankruptcy Code) against any or all of the Pre-Petition First Lien Agent and Pre-Petition First Lien Lenders, their respective advisors, agents and sub-agents, including formal discovery proceedings in anticipation thereof, and/or challenging any lien of any or all of the Pre-Petition First Lien Agent and Pre-Petition First Lien Lenders. No more than $25,000 of the Carve-Out, any cash collateral or proceeds of the DIP Credit Facility may be used by any Committee or any representative of the estate to investigate claims and/or liens of the agents and lenders under the Existing Facilities.

ADEQUATE
PROTECTION:

The obligations under the Existing First Lien Facility that are not rolled up into the DIP Term Credit Facility shall receive adequate protection satisfactory to Agents which shall be specified in the DIP Orders, provided, however, that such adequate protection shall include, at a minimum, payment of all accrued and unpaid prepetition and current payment all postpetition interest (at the applicable default rate of interest) and all accrued and unpaid prepetition and all postpetition reimbursable fees, costs and expenses as provided in the Existing First Lien Facility, and the granting of adequate protection liens (the "First Lien Adequate Protection Liens"). To the extent that the agent and lenders under the Existing Second Lien Facility have allowed secured claims, the agent and lenders under the Existing Second Lien Facility shall be granted, pursuant to Sections 361 and 363(e) of the Bankruptcy Code, post-

CH\1119037.12

petition replacement liens on the same categories of collateral on which the agents and lenders under the Existing Second Lien Facility had liens as of the date of commencement of the Chapter 11 Cases (the "Second Lien Adequate Protection Liens") equal in amount to the post-petition aggregate diminution in the value of such interests. The Second Lien Adequate Protection Liens shall be subject and subordinate only to (a) the Carve-Out, (b) certain permitted liens, (c) liens securing the DIP Credit Facility and (d) the First Lien Adequate Protection Liens. No payments shall be made in respect of the Existing Subordinated Note Facility.

SPECIAL PROVISIONS
FOR ROLL-UP
FACILITY:

The Roll-Up DIP Lenders' claims under the DIP Term Credit Facility will not be required to be repaid in cash on the Maturity Date, but instead shall be treated (i) in the manner set forth in the Plan (defined below) and in Exhibit A-1 attached hereto, or (ii) in any other manner mutually acceptable to the Borrower and holders of claims in respect of the DIP Term Credit Facility representing two-thirds in amount and more than one-half in number of all claims thereunder. Notwithstanding the foregoing, if the Plan has not been confirmed and become effective by a date to be determined in the final DIP Facility Documentation (or such later date to which the Requisite Lenders have agreed in writing), the Roll-Up DIP Lenders' claims under the DIP Term Credit Facility shall become due and payable in full in cash.

FEES AND EXPENSES:

GE Capital shall receive from the Borrower, on a monthly basis, current cash payment of all reasonable fees and expenses (including, without limitation, the reasonable fees and expenses of its legal counsels). The Roll-Up DIP Agent shall receive from the Borrower, on a monthly basis, current cash payment of all reasonable fees and expenses (including, without limitation, the reasonable fees and expenses of the Roll-Up DIP Agent's legal counsels and financial advisor).

INTERCREDITOR
RIGHTS:

The relative rights and obligations of the Revolving DIP Agent and the Roll-Up DIP Agent shall be set forth in intercreditor provisions in the final DIP Facility Documentation, the specific terms of which are to be

CH\1119037.12

consistent with the term sheet in the Plan and mutually acceptable to the Agents.

**PLAN OF REORGANIZATION COVENANTS:**

The Borrower and Guarantors shall file and obtain Bankruptcy Court approval and/or confirmation of, and/or consummate, as the case may be, (i) a plan of reorganization incorporating the terms and conditions contained in Exhibit A-1 attached hereto and, to the extent not inconsistent therewith, otherwise in form and substance satisfactory to the Agents (such plan, together with any amendments, supplements or other modifications thereto and all exhibits thereto, as the same may be amended, supplemented or otherwise modified from time to time, in each case, in form and substance satisfactory to the Agents, collectively, the "<u>Plan</u>") and (ii) related disclosure statement in form and substance satisfactory to the Agents (together with any amendments, supplements or other modifications thereto acceptable to the Agents, the "<u>Disclosure Statement</u>"), in accordance with the covenants and timetable set forth below (the "<u>Plan of Reorganization Covenants</u>"):

- On or about the date the Bankruptcy Case is filed (herein, the "<u>Petition Date</u>"), the Borrower and Guarantors shall not file "first day" motions seeking relief, other than those acceptable to the Agents.
- On or before the Closing Date, the Borrowers and Guarantors shall have filed the Plan and Disclosure Statement with the Bankruptcy Court, and shall have filed a motion, in form and substance satisfactory to the Agents, seeking Bankruptcy Court approval of the Disclosure Statement and related vote solicitation procedures.
- On or before the 45th day after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance satisfactory to the Agents, approving the Disclosure Statement and related solicitation procedures.
- On or before the 45th day after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance satisfactory to the Agents, confirming the Plan.
- On or before December 15, 2009, the Plan shall have become effective in accordance with its terms.

CH\1119037.12

VOLUNTARY
PREPAYMENTS:     The DIP Credit Facility may be prepaid in whole or in part without premium or penalty; provided that no voluntary prepayment of the loans under the DIP Term Credit Facility shall be permitted until the DIP Revolving Credit Facility has been repaid in full and all commitments under the DIP Revolving Credit Facility have been terminated.

MANDATORY
PREPAYMENTS:     Customary mandatory prepayment upon a disposition of assets (including condemnation and insurance proceeds) subject to ordinary course of business exceptions to be mutually agreed upon.

Amounts paid as mandatory prepayments (and amounts collected by Revolving DIP Agent through blocked accounts) will be applied as follows:

first, to payment of fees and expenses of Agents;

second, to payment of all accrued unpaid scheduled fees;

third, to payment of all accrued unpaid interest on the swingline loans and revolving loans;

fourth, to payment of principal of the swingline loans, revolving loans and letter of credit reimbursement obligations and cash collateralization of all letters of credit;

fifth, to pay or, in the case of contingent obligations in respect of the DIP Revolving Credit Facility, cash collateralize other obligations in respect of the DIP Revolving Credit Facility;

sixth, to payment of all accrued and unpaid interest on the Term Loans;

seventh, to a cash collateral reserve (to be held by the Revolving DIP Agent) and to be applied to any amounts referenced in the first through fifth categories above, and upon the occurrence of the payment in full (and/or cash collateralization) of all obligations under the DIP Revolving Credit facility and termination of commitments thereunder, to be applied pursuant to the seventh through eleventh categories below;

<blockquote>

eighth, to payment of principal on the Term Loans;

ninth, to payment of all other obligations then outstanding under the DIP Credit Facility;

tenth, to payment of all other obligations and liabilities required by the terms of the Interim DIP Order and Final DIP Order, as then in effect; and

eleventh, any remainder shall be for the account of and paid to whomever may be lawfully entitled thereto.

</blockquote>

**DOCUMENTATION:**

The documentation in respect of the DIP Credit Facility (herein, the "DIP Facility Documentation") will be mutually acceptable to the Borrower, the Agents and the DIP Lenders and will contain customary representations and warranties; conditions precedent; affirmative, negative and financial covenants; indemnities; and events of default and remedies as required by Agents and consistent with the terms hereof. Related material documents to the DIP Facility Documentation to be acceptable to Agents. All orders of the Bankruptcy Court approving or authorizing the DIP Credit Facility, and all motions relating thereto, shall be in form and substance acceptable to Agents.

**FINANCIAL AND OTHER REPORTING**

The final DIP Facility Documents will require Borrower, on a monthly basis, to provide to the Agents internally prepared financial statements. Annually, Borrower will be required to provide audited financial statements and a board approved operating plan for the subsequent year. All financial statements (other than audited statements) shall be prepared on a consolidated and consolidating basis. In addition, copies of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of Borrower or any Guarantor with the Bankruptcy Court or the U.S. Trustee in the Chapter 11 Case, or distributed by or on behalf of Borrower or such Guarantor to any Committee, and such other reports and information respecting Borrower's or any Guarantor's business, financial condition or prospects as either Agent may, from time to time, reasonably request shall be provided to the Agents.

CH\1119037.12

| | |
|---|---|
| <u>FINANCIAL COVENANTS</u>: | A weekly tested Budget variance covenant to be determined and maintenance of minimum Liquidity (unused availability under the DIP Revolving Credit Facility plus unrestricted cash on hand) requirement of $3,000,000. |
| <u>REQUISITE LENDERS</u>: | Amendments and waivers will require the approval of "<u>Requisite Lenders</u>" which shall constitute (i) Revolving DIP Lenders holding more than 50% of total revolving commitments or exposure under the DIP Revolving Credit Facility and (ii) Roll-Up DIP Lenders holding more than 50% of total exposure under the DIP Term Credit Facility, except that (A) with respect to matters relating to the interest rates, maturity, the definition of Requisite Lenders and certain other customary provisions, consent of each DIP Lender directly and adversely affected thereby shall be required, (B) consent of Revolving DIP Lenders holding more than 50% of total revolving commitments or exposure under the DIP Revolving Credit Facility (and not the consent of Requisite Lenders) shall be required with respect to any changes to the DIP Revolving Credit Facility and with respect certain other matters to be determined that affect the DIP Revolving Credit Facility, and (C) consent of Roll-Up DIP Lenders holding more than 50% of total exposure under the DIP Term Credit Facility (and not the consent of Requisite Lenders) shall be required with respect to any changes to the DIP Term Credit Facility and with respect certain other matters to be determined that affect the DIP Term Credit Facility. |
| <u>OTHER TERMS AND CONDITIONS</u> | (All to be acceptable to each Agent). Such terms and conditions shall include, but not be limited to, the following:<br><br>Execution and delivery prior to the Petition Date of an Equity Commitment and Plan Support Agreement (the "<u>Plan Support Agreement</u>") among, *inter alia*, the Borrower, Guarantors, and holders of claims in respect of the Existing First Lien Facility representing two-thirds in amount and more than one-half in number of all claims thereunder.<br><br>Limitations on payments in respect of prepetition obligations and limitations on Borrower's and Guarantors' ability to grant adequate protection in favor of third parties. |

CH\1119037.12

Entry by the Bankruptcy Court of interim and final orders in form and substance satisfactory to each Agent and its respective counsel approving the DIP Credit Facility (the "Interim DIP Order" and "Final DIP Order", and collectively, the "DIP Orders").

Each Agent's rights of inspection, access to facilities, management and auditors.

Cash management system for Borrower and each Guarantor. The Agents will have cash dominion by means of lock boxes and blocked account agreements.

Limitation on use of letters of credit to support pre-petition obligations.

Commercially reasonable insurance protection in light of Borrower's and each Guarantors' industry, size, and risk and the collateral protection (terms, underwriter, scope, and coverage to be acceptable to each Agent); the Agents named as loss payee (property/casualty) and additional insured (liability); and non-renewal/cancellation/amendment riders to provide 30 days advance notice to the Agents.

Bankruptcy Court-ordered access to all locations in support of the orderly liquidation of Borrower and Guarantors and the Collateral as deemed appropriate by each Agent.

Receipt of all necessary or appropriate third party and governmental waivers and consents.

Limitations on commercial transactions, management agreements, service agreements, and borrowing transactions between Borrower and any Guarantor and their respective officers, directors, employees and affiliates.

Limitations on, or prohibitions of, payment of management fees to affiliates.

Prohibitions of mergers, acquisitions, the sale of Borrower and certain Guarantors, their stock or a material portion of their assets except as contemplated hereby.

Prohibitions of a direct or indirect change in senior management or

control of Borrower or any Guarantor.

Limitations on capital expenditures.

As of the Closing Date, a minimum liquidity requirement of $10,000,000.

Customary yield protection provisions, including, without limitation, provisions as to capital adequacy, illegality, changes in circumstances and withholding taxes.

Satisfactory opinions of counsel from Borrower's and each Guarantor's counsel (including local counsel as requested) reasonably acceptable to each Agent.

The Interim DIP Order and Final DIP Order to be entered no later than October 16, 2009 and November 16, 2009, respectively, and to include, without limitation, provisions (i) modifying the automatic stay to permit the creation and perfection of the Agents' and DIP Lenders' liens on the Collateral; (ii) providing for the automatic vacation of such stay to permit the enforcement of the Agents' and/or DIP Lenders' remedies under the DIP Credit Facility, including without limitation the enforcement, upon five business days' prior written notice, of such remedies against the Collateral following the occurrence of an event of default under the DIP Credit Facility; (iii) prohibiting the assertion of claims arising under Section 506(c) of the Bankruptcy Code against any or all of the Agents and the DIP Lenders or the commencement of other actions adverse to the Agents or any DIP Lender or their respective rights and remedies under the DIP Credit Facility or the Interim DIP Order or the Final DIP Order; (iv) prohibiting the incurrence of debt or granting of liens with priority equal to or greater than the Agents' and DIP Lenders' liens under the DIP Credit Facility; (v) prohibiting any granting or imposition of liens other than liens set forth in the DIP Orders or otherwise acceptable to each Agent; (vi) requiring all landlords to provide access to Collateral and subordinate all landlord's or other similar liens to the liens securing the DIP Credit Facility; (vii) authorizing and approving the DIP Credit Facility and the transactions contemplated hereby, including without limitation the granting of the superpriority claims, the first-priority and priming security interests and liens upon the Collateral to the extent provided herein; (viii) finding that the DIP Lenders are extending credit to the Borrower in good faith

15

within the meaning of Section 364(e) of the Bankruptcy Code; (ix) containing a determination by the Bankruptcy Court that, subject to an investigation period by the Committee, the claims in respect of the Existing First Lien Facility constitute legal, valid and binding obligations of the Borrower and Guarantors, enforceable in accordance with its terms and not subject to avoidance, recharacterization, recovery, attack, off-set, counterclaim, defenses or claims of any kind pursuant to the Bankruptcy Code or other applicable law and that the liens securing the Existing First Lien Facility are legal, valid, perfected, enforceable and non-avoidable (with a finding that the Borrower and Guarantors stipulate and agree that the claims in respect of the Existing First Lien Facility constitute legal, valid and binding obligations of the Borrower and Guarantors, enforceable in accordance with its terms and not subject to avoidance, recharacterization, recovery, attack, off-set, counterclaim, defenses or claims of any kind pursuant to the Bankruptcy Code or other applicable law and that the liens securing the Existing First Lien Facilities are legal, valid, perfected, enforceable and non-unavoidable); (x) approving the Adequate Protection described in the Term Sheet under the heading "Adequate Protection"; and (xi) authorizing and approving the DIP Term Credit Facility and the liens and priorities securing or supporting the same.

Events of default as are usual and customary for debtor-in-possession financings of this kind (subject to customary cure periods to be mutually agreed upon), including, without limitation, (i) failure to make payments when due, (ii) defaults under other post-petition agreements or instruments of indebtedness, (iii) noncompliance with covenants, including the Plan of Reorganization Covenants, and any other failure by the Borrower or any Guarantor to diligently pursue confirmation of the Plan, (iv) breaches of representations and warranties, (vi) termination of any material contract, (vii) bankruptcy of any foreign subsidiary of Borrower or any Guarantor, (vii) failure to satisfy or stay execution of judgments in excess of specified amounts, (viii) ERISA-related events of default, (ix) impairment of security interests in Collateral, (x) invalidity of guarantees, (xi) "change of control" (to be defined in a mutually agreed upon manner), (xii) entry of an order or Borrower or any Guarantor's seeking the entry of an order (A) approving additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted by the definitive DIP Facility Documents, (B) granting any lien upon or affecting any Collateral other than liens permitted under the definitive DIP Facility Documents, (C) except as

CH\1119037.12

provided in the DIP Orders, permitting the use of cash collateral of the Agents without the prior written consent of each Agent, or (D) authorizing or approving any other action adverse to the Agents and the DIP Lenders or their rights and remedies or their interest in the Collateral, (xiii) entry of an order dismissing, or Borrower or any Guarantor seeking the dismissal of, any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a Chapter 7 case, (xiv) entry of an order, or Borrower or any Guarantor's seeking the entry of an order, appointing a Chapter 11 trustee or an examiner in any of the Chapter 11 Cases having enlarged powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code), (xv) entry of an order granting or Borrower or any Guarantor seeking the entry of an order granting, any other superpriority claim, modifying the DIP Credit Facility, the Interim DIP Order or the Final DIP Order, or granting relief from the automatic stay to permit any secured creditor (other than the Agents and the DIP Lenders) to enforce or otherwise take action with respect to any Collateral, or any breach by Borrower or any Guarantor of any provision of either DIP Order, (xvi) the payment by any Debtor of any pre-petition claim without the prior written consent of each Agent unless such payment is permitted by the Budget, (xvii) the commencement of any action against any of the Agents, the DIP Lenders, the Pre-Petition First Lien Agent and the Pre-Petition First Lien Lenders by or on behalf of Borrower or any of its affiliates, officers or employees, (xviii) the Interim DIP Order shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal, in the case of any modification or amendment, without the prior written consent of each Agent, (xix) the Final DIP Order shall not have been entered by the Bankruptcy Court on or before the date that is 30 days after the entry of the Interim DIP Order, (xx) the Final DIP Order shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated or subject to stay pending appeal, in the case of any modification or amendment, without the prior written consent of each Agent and the DIP Lenders, (xxi) the allowance of any claim under Section 506(c) of the Bankruptcy Code or otherwise against any or all of the Agents, the DIP Lenders and the Collateral, or against any or all of the Pre-Petition First Lien Agent and the Pre-Petition First Lien Lenders or the collateral securing the Existing First Lien Facility, (xxii) the filing of any plan of reorganization or any amendment thereto or related disclosure statement other than the Plan and related disclosure statement, or the entry of an order confirming any such plan of reorganization or approving any such

CH\1119037.12

disclosure statement or any such amendment, in each case that is not acceptable to the Agents and, (xxiii) any termination or modification of the exclusivity periods set forth in Section 1121 of the Bankruptcy Code, or (xxiv) any breach or termination of the Plan Support Agreement or any failure of the Plan Support Agreement to remain in full force and effect.

The Agents shall have received the Borrower's unaudited financial statements for the month most recently ending prior to the Closing Date for which financial statements are available (which shall be delivered within 30 days after the end of each month prior to the Closing Date).

Since July 31, 2009, there will have been (i) except for the commencement of the Chapter 11 Case, no material adverse change, individually or in the aggregate, in the business, financial or other condition of Borrower and Guarantors taken as a whole, or the collateral which will be subject to the security interest granted to Agents or DIP Lenders, and (ii) no litigation commenced which has not been stayed by the Bankruptcy Court and which, if successful, will have a material adverse impact on Borrower and Guarantors taken as a whole, their business or ability to repay the loans, or which will challenge the transactions under consideration.

Compliance with applicable laws, decrees, and material agreements or obtaining of applicable consents and waivers.

DIP Lender assignment rights.

Governing law: New York

CH\1119037.12

EXHIBIT A-1
PLAN OF REORGANIZATION TERMS

Attached

$12,500,000 Senior Secured Plan of Reorganization Revolving Credit Facility

Summary of Terms
September 30, 2009

This is the Exit Term Sheet described as Exhibit B in that certain letter dated September 30, 2009, of which this Exhibit B is a part. Capitalized terms used herein without definition shall have the meanings assigned to such terms in the letter referenced above.

| | |
|---|---|
| Borrower: | True Temper Sports, Inc., as reorganized, or any other entity that purchases or assumes substantially all the assets of True Temper Sports, Inc. (herein, the "Borrower"), in each case in accordance with, and upon the effective date of, the Plan (as defined herein). All of the outstanding equity interests of the Borrower will be owned by a holding company acceptable to the Agent ("Holdings" and, together with its subsidiaries, the "Group Members"), at least 75% of the outstanding capital stock of which is controlled on the Closing Date (as defined below) directly or indirectly by Newport Global Investors, the Northeast Investors, J.P. Morgan, Providence Equity, Gilbert Global (to the extent permitted by such investors) and their respective affiliates (collectively, the "Sponsor"). After the Closing Date, Sponsor shall control, directly or indirectly, at least 51% of the outstanding capital stock of Holdings and shall maintain the ability to elect a majority of the board of directors of Holdings. |
| Guarantors: | Holdings and each of Borrower's existing and subsequently acquired or formed direct and indirect domestic subsidiaries (each, a "Subsidiary Guarantor" and collectively, the "Subsidiary Guarantors"; and together with Holdings, the "Guarantors"). |
| Administrative Agents and Collateral Agents: | General Electric Capital Corporation will act as administrative agent and collateral agent for the Revolving Lenders (as defined below) under the Exit Revolving Credit Facility (as defined below) ("GE Capital" and, in such capacities, collectively, "Revolving Agent"). Credit Suisse will act as administrative agent and collateral agent for the Term Lenders (as defined below) under the Exit Term Credit Facility (as defined below) ( in such capacities, collectively, "Term Agent" and, together with the Revolving Agent, the "Agents"). |
| Lead Arranger and Book-Running Manager: | GE Capital Markets, Inc. ("GECM") |

| Lenders: | With respect to the Exit Revolving Credit Facility, Lenders under the DIP Credit Facility on the effective date of the Plan that have committed to hold commitments under the Exit Revolving Credit Facility (the "<u>Revolving Lenders</u>") and, with respect to the Exit Term Credit Facility, Lenders under the DIP Term Credit Facility and Lenders under the Existing First Lien Facility on the effective date of the Plan (collectively, the "<u>Term Lenders</u>" and; together with the Revolving Lenders, the "<u>Lenders</u>"). |
|---|---|
| Exit Credit Facilities: | Senior secured exit credit facilities (the "<u>Exit Credit Facilities</u>") consisting of the following: |

<u>Exit Term Credit Facility</u>:  On the effective date of the Plan, outstanding term loans under the DIP Term Credit Facility and outstanding obligations under the Existing First Lien Facility (after giving effect to a principal repayment of $70,000,000 made with proceeds from Sponsor's cash equity contributions) will be rolled into outstanding term loans under the Exit Credit Facilities (herein, the "<u>Term Loan</u> " and "<u>Exit Term Credit Facility</u>") on the Closing Date (as defined below) and have a term of four years from the "Closing Date" (as defined in the DIP Term Sheet), and will be repayable in equal quarterly installments of 1.0% per annum of the original principal amount of the Term Loan commencing on the first day of the first fiscal quarter beginning after the Closing Date (as herein defined) with the balance payable on the maturity date. Amounts repaid on the Term Loan may not be reborrowed.

<u>Exit Revolving Credit Facility</u>:  On the effective date of the Plan, revolving loans and letters of credit under the Exit Credit Facilities with aggregate revolving commitments of $12,500,000 (the "<u>Exit Revolving Credit Facility</u>") under which borrowings may be made from time to time during the period from the Closing Date until the date that is four years from the "Closing Date"(as defined in the DIP Term Sheet), subject to the restrictions on availability described below.

A. <u>Letters of Credit</u>.  A sub-facility of up to $5,000,000 of the Exit Revolving Credit Facility will be available for the issuance of letters of credit ("<u>Letters of Credit</u>") for the account of Borrower and the Subsidiary Guarantors, subject to the restrictions on availability described below.  No Letter of Credit will have a termination date that is later than (a) 7 days prior to the termination date of the Exit Revolving Credit Facility and (b) other than through the operation of "evergreen provisions" (which shall in no event extend beyond the date referred to in clause (a) above), one year after the date of issuance.  Any such Letters of Credit shall reduce availability under the Exit Revolving Credit Facility on a dollar-for-dollar basis.  All "Letters of Credit" (as defined in the DIP Term Sheet) outstanding as of the

effective date of the Plan will be rolled over into Letters of Credit outstanding under the Exit Revolving Credit Facility on the Closing Date.

**B.** <u>Swing Line Loans</u>.  A sub-facility of up to $2,500,000 of the Exit Revolving Credit Facility will be available to Borrower for swing line loans from GE Capital, subject to availability as described below.  Except for purposes of calculating the Commitment Fee (as defined below), any such swing line loans shall reduce availability under the Exit Revolving Credit Facility on a dollar-for-dollar basis.

Availability:

Borrowing availability under the Exit Revolving Credit Facility will be limited to the lesser of:

(a) the aggregate outstanding commitments in respect of the Exit Revolving Credit Facility; and

(b) the sum of

(i) 85% of the value of eligible accounts receivable of Borrower and domestic Subsidiary Guarantors, with such percentage to be determined by Revolving Agent in its sole discretion upon completion of its due diligence with respect to the Borrowing Base assets, <u>plus</u>

(ii) 65% of the value (stated at the lower of cost or market value) of eligible inventory of Borrower and domestic Subsidiary Guarantors with such percentage to be determined by Revolving Agent in its sole discretion upon completion of its due diligence with respect to the Borrowing Base assets; <u>less</u>

(iii) such customary reserves against availability as Revolving Agent may impose from time to time in its reasonable credit judgment

(such amount expressed in clause (b), the "<u>Borrowing Base</u>").

For purposes of this Exit Term Sheet:

"<u>Excess Availability</u>" shall mean, at any time, the remainder of (a) the lesser of (i) the aggregate outstanding commitments in respect of the Exit Revolving Credit Facility at such time and (ii) the then-applicable Borrowing Base at such time <u>less</u> (b) the aggregate amount of all loans (including swing line loans), undrawn letters of credit and unreimbursed drawings under letters of credit then outstanding under the Exit Revolving Credit Facility at such time.

Eligibility criteria will be determined by Revolving Agent in accordance with its customary practices and set forth in the Credit Facilities Documentation. Revolving Agent will retain the right from time to time to adjust standards of eligibility and to establish reserves against availability.

Cash Management:

Borrower and the Guarantors shall implement cash management procedures reasonably satisfactory to Agents, including, but not limited to, customary lockbox arrangements and blocked account agreements, which procedures will provide for control and, upon the occurrence of a Liquidity Event (as defined below) or an event of default, springing cash dominion (any such period, a "Cash Dominion Period"). During any Cash Dominion Period, funds deposited into any deposit account maintained by the Borrower or any Guarantor will be swept on a daily basis into a blocked account maintained by (and subject to the sole and exclusive control of) Revolving Agent and applied to prepay loans under the Exit Revolving Credit Facility and to cash collateralize letters of credit issued thereunder. "Liquidity Event" shall mean Excess Availability being less than an amount to be agreed upon at any time.

Use of Proceeds:

The proceeds of advances under the Exit Revolving Credit Facility made on and after the Closing Date (collectively, the "Loans") will be used solely to (a) repay all outstanding revolving loans and other obligations under the DIP Revolving Credit Facility (and, as set forth above, all outstanding letters of credit under the DIP Revolving Credit Facility will be rolled into the Exit Revolving Credit Facility), (b) pay fees and expenses incurred in connection with the Plan and with the Exit Credit Facilities (the "Transaction Costs") and (c) in the case of the Loans under the Exit Revolving Credit Facility made after the Closing Date, for working capital and general corporate purposes.

Interest:

Interest will be payable on the unpaid principal amount of all Loans at a rate per annum equal to, at the option of Borrower, (a) to the Base Rate (as defined below) plus the Applicable Margin (as defined below), payable monthly in arrears or (b) so long as no event of default then exists a rate per annum equal to the Eurodollar Rate (as defined below) plus the Applicable Margin, payable at the end of the relevant interest period, but in any event, at least quarterly.

"Base Rate" means a floating rate of interest per annum equal to the highest of the rate last quoted by The Wall Street Journal (or another national publication selected by the Agent) as the U.S. "Prime Rate," (b) the federal funds rate plus 300 basis points, and (c) the sum of the three-month Eurodollar Rate plus the excess of the Eurodollar Rate Applicable Margin over the Base Rate

Applicable Margin. "Eurodollar Rate" means, for each interest period, the offered rate for deposits in U.S. dollars in the London interbank market for the relevant interest period which is published by the British Bankers' Association, and currently appears on Reuters Screen LIBOR01 Page, as of 11:00 a.m. (London time) on the day which is two (2) business days prior to the first day of such interest period adjusted for reserve requirements. When selecting the Eurodollar Rate option, Borrower will be entitled to choose 1, 2 or 3 month interest periods.

All interest will be calculated based on a 360-day year (or, in the case of Base Rate Loans calculated by reference to the "Prime Rate", a 365/366-day year) and actual days elapsed. The Credit Facilities Documentation will set forth appropriate detail describing the exact method of calculation and relevant reserve requirements for the interest rates referred to above as well as Eurodollar Rate breakage provisions, Eurodollar Rate borrowing mechanics and other Eurodollar Rate definitions, provided, that at no time shall the Eurodollar Rate be deemed to be below 3.00%.

The "Applicable Margin" (on a per annum basis) means:

(a) with respect to the Term Loan, 9.00% per annum, in the case of Base Rate Loans, and 10.00% per annum, in the case of Eurodollar Rate Loans, subject to adjustment after the Closing Date as set forth below;

(b) with respect to Loans under the Exit Revolving Credit Facility, 6.00% per annum, in the case of Base Rate Loans, and 7.00% per annum, in the case of Eurodollar Rate Loans.

Adjustments in the Applicable Margins for the Exit Term Credit Facility will be implemented quarterly, on a prospective basis, on the 3rd business day after the date of delivery of quarterly or annual financial statements (and related compliance certificate) evidencing the need for such adjustments in accordance with the pricing grid set forth below (the "Pricing Grid"). Failure to timely deliver such financial statements shall, in addition to any other remedy provided for in the Credit Facilities Documentation, result in an increase of the Applicable Margins to the highest level of such pricing grid until such financial statements are delivered. Downward adjustments will only take effect (and only remain effective) provided no default has occurred and is continuing.

| Leverage Ratio | Applicable Margin for Base Rate Term Loans | Applicable Margin for Eurodollar Rate Term Loans |
|---|---|---|
| Greater than 6.00:1.00 | 9.00% | 10.00% |

CH\1121087.11

| | | |
|---|---|---|
| Less than or equal to 6.00:1.00 and greater than or equal to 3.00:1.00 | 6.50% | 7.50% |
| Less than 3.00:1.00 | 4.00% | 5.00% |

As used above, "<u>Leverage Ratio</u>" shall mean senior debt to Consolidated EBITDA (as defined herein) for the period of four consecutive fiscal quarters most recently ended on and prior to the last day of each fiscal quarter, taken as one accounting period.

**Default Rate:**

At the election of Revolving Agent or the Requisite Revolving Lenders (as defined herein) with respect to the Exit Revolving Credit Facility, and at the election of Term Agent or the Requisite Term Lenders (as defined herein) with respect to the Exit Term Credit Facility, upon the occurrence and during the continuance of a default, the obligations shall bear interest at a default rate of interest equal to an additional two percent (2%) per annum over the rate otherwise applicable and such interest will be payable on demand.

**Fees:**

In addition to the fees payable to GE Capital as specified in the Fee Letter, Borrower shall pay the following fees:

A fee ranging from of 1.00% to 2.00% per annum of the average daily balance of the unused portion of the Exit Revolving Credit Facility will be payable monthly in arrears (the "<u>Commitment Fee</u>") to the Revolving Agent, for the ratable benefit of the Revolving Lenders, which will be subject to adjustment based on utilization as follows: (a) if utilization of the Exit Revolving Credit Facility is equal to or less than 50%, 2.00%; and (b) if utilization of the Credit Facilities is greater than 50%, 1.00%.

A Letter of Credit fee (the "<u>Letter of Credit Fee</u>") will be payable on the average daily undrawn face amount of all outstanding Letters of Credit at a rate per annum equal to the Applicable Margin for Loans under the Exit Revolving Credit Facility bearing interest based on the Eurodollar Rate. Such fee will be due and payable quarterly in arrears to the Revolving Agent, for the ratable benefit of the Revolving Lenders. Borrower shall also pay certain fees, documentary and processing charges to each issuer of Letters of Credit as separately agreed with such issuer or in accordance with such issuer's standard schedule at the time of determination thereof.

All fees will be calculated based on a 360-day year and actual days elapsed.

- 6 -

| Prepayments and Commitment Reductions: | Borrower shall make the following mandatory prepayments with respect to the Exit Credit Facilities (subject to certain basket amounts and exceptions to be negotiated in the Credit Facilities Documentation): |
|---|---|

(a) <u>Excess Cash Flow</u>. Prepayments in an amount equal to 75% of Excess Cash Flow (defined below), with a reduction to 50% upon achievement and maintenance of a leverage ratio of less than 3.50:1.00.

"<u>Excess Cash Flow</u>" shall mean, for any fiscal year of the Borrower, the excess of (a) the sum, without duplication, of (i) Consolidated EBITDA (as defined below) for such fiscal year (calculated without giving effect to the last proviso set forth in the definition of Consolidated EBITDA) and (ii) the decrease, if any, in (y) Current Assets minus (z) Current Liabilities (each as defined in the Existing First Lien Facility) from the beginning to the end of such fiscal year over (b) the sum, without duplication, of (i) the amount of any taxes payable in cash by the Borrower and its subsidiaries with respect to such fiscal year, (ii) Consolidated Interest Expense (as defined in the Existing First Lien Facility) for such fiscal year payable in cash, (iii) the aggregate amount paid in cash in respect of Capital Expenditures (as defined in the Existing First Lien Facility), including Capital Expenditures related to the Company's $10 million capital investment to expand its Chinese operations, during such fiscal year (and including in such fiscal year, in the case of Capital Expenditures with respect to which the obligation to make payment has accrued in the last fiscal quarter of such fiscal year but such obligation is not payable in cash until the immediately following fiscal quarter, the amount to be paid in cash in such following fiscal quarter; provided that such amount, when paid in such following fiscal quarter, shall not be included in this clause (iii)), (iv) the amount of any employee pension plan expenses payable in cash by the Borrower and its subsidiaries with respect to such fiscal year, in each case, except to the extent financed with the proceeds of indebtedness, equity issuances, casualty proceeds, condemnation proceeds or other proceeds that would not be included in Consolidated EBITDA, (v) permanent repayments of indebtedness made by the Borrower and its subsidiaries during such fiscal year, but only to the extent that such prepayments by their terms cannot be reborrowed or redrawn and do not occur in connection with a refinancing of all or any portion of such indebtedness, (vi) other non-cash items added to net income to determine consolidated net income and (vii) the increase, if any, in (y) Current Assets minus (z) Current Liabilities from the beginning to the end of such fiscal year.

(b) Debt and Equity Issuances.  Prepayments (i) in an amount equal to 100% of the net cash proceeds of issuances of equity by Holdings, Borrower and its subsidiaries (other than issuances of equity to Sponsor or its affiliates on the Closing Date), and (ii) in an amount equal to 100% of the net cash proceeds of issuances or incurrences of debt obligations (other than debt permitted by the Credit Facilities Documentation) of Holdings, Borrower and its subsidiaries.

(c) Asset Sales.  Prepayments in an amount equal to 100% of the net cash proceeds of the sale or other disposition of any property or assets of Holdings, Borrower or its subsidiaries (including insurance and condemnation proceeds), subject to thresholds and reinvestment provisions to be agreed.

Mandatory prepayments described in clauses (a) and (b) above will be applied first, ratably to the remaining installments of the Term Loan and second, to pay obligations under the Exit Revolving Credit Facility, which shall not effect a permanent reduction to the Exit Revolving Credit Facility, and to cash collateralize Letters of Credit; provided, that during a Liquidity Event or the existence of an event of default, prepayments described in clauses (a) and (b) above will first be applied to pay obligations under the Exit Revolving Credit Facility and to cash collateralize Letters of Credit.  Mandatory prepayments described in clause (c) above with respect to permitted asset sales will be applied first, ratably to the remaining installments of the Term Loan and second, to pay obligations under the Exit Revolving Credit Facility, which shall not effect a permanent reduction to the Exit Revolving Credit Facility, and to cash collateralize Letters of Credit; provided, that during a Liquidity Event or the existence of an event of default or if such asset sale is with respect to accounts and inventory, prepayments described in clause (c) above will first be applied to pay obligations under the Exit Revolving Credit Facility and to cash collateralize Letters of Credit (and, to the extent such asset sale is with respect to accounts or inventory, such prepayment will equal the net asset sale proceeds in respect of such accounts or inventory, in each case with a reduction to the Borrowing Base to reflect such sale).

In addition, if at any time the aggregate amount of outstanding loans, unreimbursed letter of credit drawings and undrawn letters of credit under the Exit Revolving Credit Facility exceeds the lesser of (i) the aggregate commitments in respect of the Exit Revolving Credit Facility and (ii) the then-applicable Borrowing Base, immediate prepayments of loans under the Exit Revolving Credit Facility shall be required in an amount equal to such excess.

Mandatory prepayments shall be accompanied by (A) accrued interest on the amount prepaid to the date of prepayment and

(B) any breakage costs in connection with any prepayments of Eurodollar Rate Loans.

Voluntary prepayments of the Loans and voluntary reductions of the unutilized portion of the commitments under the Exit Revolving Credit Facility will be permitted at any time provided that Borrower's voluntary prepayments are accompanied by (A) accrued interest on the amount prepaid to the date of prepayment and (B) any breakage costs in connection with any voluntary prepayments of Eurodollar Rate Loans; provided, that no prepayments of obligations under the Exit Term Credit Facility (other than pursuant to a refinancing on terms to be mutually agreed upon which shall include the ability to increase the principal outstanding amount by no more than $10,000,000) shall be made unless and until all obligations under the Exit Revolving Credit Facility have been paid in full in cash or cash collateralized to the satisfaction of Revolving Agent and all revolving commitments terminated.

|  |  |
|---|---|
| Collateral: | All obligations of Borrower under the Exit Revolving Credit Facility and of the Guarantor under the guarantees in respect thereof will be secured by a first priority perfected security interest in all tangible and intangible assets of Borrower and the Guarantors (subject to immaterial collateral exceptions to be mutually agreed upon), whether owned on the Closing Date or thereafter acquired.  All obligations of Borrower under the Exit Term Credit Facility and of the Guarantor under the guarantees in respect thereof will be secured by a second priority perfected security interest (subject only to the security interest held by the Revolving Agent in respect of the Exit Revolving Credit Facility) in all tangible and intangible assets of Borrower and the Guarantors (subject to immaterial collateral exceptions to be mutually agreed upon), whether owned on the Closing Date or thereafter acquired. |

The relative priorities of the security interests and related creditor rights between the Exit Term Credit Facility and the Exit Revolving Credit Facility will be set forth in an intercreditor agreement in form and substance reasonably satisfactory to the Agents.

All of the above-described pledges, security interests and mortgages shall be created on terms, and pursuant to documentation, satisfactory to the Agents (including, in the case of real property, by customary items such as satisfactory title insurance and surveys), and none of the Collateral shall be subject to any other liens, claims or encumbrances, except permitted liens and encumbrances reasonably acceptable to Agents to be set forth in the Credit Facilities Documentation.

CH\1121087.11

The Credit Facilities Documentation for the Exit Revolving Credit Facility shall be separate and distinct from the Credit Facilities Documentation for the Exit Term Credit Facility.

**Conditions Precedent to Closing:** As set forth in the Commitment Letter under the heading "Conditions" and in Schedule I hereto (the date upon which all such conditions precedent shall be satisfied and the initial funding under the Exit Credit Facilities shall take place, the "Closing Date").

**Conditions Precedent to each Extension of Credit under the Exit Credit Facilities:** All of the representations and warranties in the Credit Facilities Documentation shall be true and correct in all material respects; no default or event of default shall be continuing; delivery of any relevant borrowing notices or letter of credit requests; and, in the case of the Exit Revolving Credit Facility, availability.

**Representations and Warranties:** The Credit Facilities Documentation will contain such representations and warranties applicable to the Group Members as are usual and customary for facilities of this kind (with customary exceptions and qualifications to be agreed upon) in each case taking into account prevailing market conditions at the time of closing, including, but not limited to, the following:

Valid existence, compliance with law, power to execute, authorization, execution and enforceability of the Credit Facilities Documentation and certain related documents (and accuracy of representations and warranties thereunder, status of obligations under the Exit Credit Facilities as "senior debt" and no conflict thereof with material agreements or applicable law), ownership of the Group Members, accuracy of financial statements, absence of material adverse effect, solvency, absence of material litigation, taxes, compliance with margin regulations, absence of burdensome restrictions and defaults, inapplicability of Investment Company Act, insurance, labor matters, ERISA, environmental matters, necessary rights to intellectual property, title to and ownership of properties and accuracy of all information provided.

**Affirmative Covenants:** The Credit Facilities Documentation shall contain such affirmative covenants applicable to the Group Members as are usual and customary for facilities of this kind (with customary qualifications to be agreed upon) in each case taking into account prevailing market conditions at the time of closing, including, but not limited to, the following:

Preservation of corporate existence, compliance with laws (including environmental laws), payment of taxes and other claims resulting in liens, maintenance of properties, permits,

insurance and books and records, access to books and records and visitation rights, use of proceeds, further assurances (including provision of additional collateral and guaranties consistent with the paragraph above entitled "Collateral"), maintenance of cash management systems as described above, periodic updates of field examinations and inventory appraisals and delivery of landlord, mortgagee and bailee waivers).

Financial Performance Covenants: The Credit Facilities Documentation shall contain the following financial performance covenants (the "Financial Performance Covenants") (provided, that the Maximum Leverage Ratio and Maximum Capital Expenditures will no longer be applicable upon payment in full and termination of the Exit Term Credit Facility, including any facility refinancing such Exit Term Credit Facility):

Maximum Leverage Ratio: On the last day of any fiscal quarter ("Covenant Measurement Date") ending during any period set forth below, the Borrower will not permit the ratio of senior debt to Consolidated EBITDA (for the period of four consecutive fiscal quarters most recently ended on and prior to the Covenant Measurement Date, taken as one accounting period) to be greater than the ratio set forth opposite such period below:

| Period | Ratio |
|---|---|
| 2009 | 8.50:1.00 |
| Q1 Ending March 31, 2010 | 6.50:1.00 |
| Q2 Ending June 30, 2010 | 5.00:1.00 |
| Q3 Ending September 30, 2010 | 3.75:1.00 |
| Q4 Ending December 31, 2010 | 3.00:1.00 |
| Q1 through Q4 2011 | 3.00:1.00 |
| Q1 through Q4 2012 | 3.00:1.00 |
| Q1 through Q4 2013 | 3.00:1.00 |

Fixed Charge Coverage Ratio ("FCCR"): Commencing with the first full fiscal quarter following the Closing Date, the Borrower shall not permit the FCCR on any Covenant Measurement Date during any period set forth below to be less than the ratio set forth opposite such period below:

| Period | Ratio |
|---|---|
| Q1 Ending March 31, 2010 | 0.75:1.00 |
| Q2 Ending June 30, 2010 | 0.55:1.00 |
| Q3 Ending September 30, 2010 | 0.60:1.00 |
| Q4 Ending December 31, 2010 | 0.75:1.00 |
| Q1 through Q4 2011 | 1.15:1.00 |
| Q1 through Q4 2012 | 1.25:1.00 |
| Q1 through Q4 2013 | 1.25:1.00 |

<u>Maximum Capital Expenditures</u>: The Borrower shall not permit the aggregate amount of capital expenditures (for the period of four consecutive fiscal quarters most recently ended on and prior to the Covenant Measurement Date, taken as one accounting period) on any Covenant Measurement Date during any period set forth below to be more than the amount set forth opposite such period below (plus, solely upon exhaustion of the amount set forth for each period below, the amount of unused permitted capital expenditures allotted solely for the immediately prior four fiscal quarter period (the "<u>Immediately Preceding Period</u>"), without giving effect to any unused permitted capital expenditures from any period prior to the Immediately Preceding Period):

| Period | Capital Expenditures |
|---|---|
| 2009 | $2,300,000 |
| 2010 | $9,200,000 |
| 2011 | $7,500,000 |
| 2012 | $4,000,000 |
| 2013 | $4,000,000 |

For purposes of this Exit Term Sheet:

"<u>Consolidated EBITDA</u>" shall have the meaning ascribed to such term in the Existing First Lien Facility; <u>provided</u>, <u>however</u>, that the addition of management fees (per subsection (a)(viii) of such definition) to "Consolidated Net Income" therein shall not exceed the Management Fee Cap (defined below).

"<u>Fixed Charge Coverage Ratio</u>" shall mean, on the date of measurement, the ratio of (a) Consolidated EBITDA (as defined

above) for the period of four consecutive fiscal quarters most recently ended on and prior to such date, taken as one accounting period, to (b) Consolidated Fixed Charges (as defined below) for the period of four consecutive fiscal quarters most recently ended on and prior to such date, taken as one accounting period; provided that for each of the first three full fiscal quarters following the Closing Date (each quarter an "Annualized Quarter"), Consolidated Fixed Charges shall be calculated on an annualized basis, and shall include the cumulative Consolidated Fixed Charges incurred during each of the Annualized Quarters prior to the measurement date.

"Consolidated Fixed Charges" shall mean, for any period, without duplication, the sum of (a) cash Consolidated Interest Expense (as defined in the Existing First Lien Facility) for such period, plus (b) the aggregate amount of scheduled principal payments (whether or not made) during such period in respect of long term indebtedness (including Capital Lease Obligations and Synthetic Lease Obligations, each as defined in the Existing First Lien Facility) of the Borrower and its subsidiaries (other than payments made by the Borrower or any of its subsidiaries to the Borrower or any of its subsidiaries), plus (c) Capital Expenditures (as defined in the Existing First Lien Facility) for such period, plus (d) the aggregate amount of income taxes paid in cash by the Borrower and its subsidiaries during such period.

| Reporting Requirements: | The Credit Facilities Documentation shall contain such financial and other reporting requirements applicable to the Group Members as are usual and customary for facilities of this kind (with customary qualifications to be agreed upon) in each case taking into account prevailing market conditions at the time of closing, including, but not limited to, the following: |
|---|---|

Delivery of monthly financial statements (together with an MD&A report on a quarterly basis) and of annual audited financial statements; delivery of management letters; delivery of an annual budget (including assumptions made in the build-up of such budget); delivery of borrowing base certificates and customary collateral reporting and back-up materials (including accounts receivable agings and inventory summaries) on a monthly basis (which shall be delivered more frequently during the continuance of a default); annual insurance reports; quarterly schedules of intercompany loan balances; copies of certain reports sent to other parties and with respect to defaults, mandatory prepayment events, litigation, taxes, labor matters, ERISA or environmental events and other information.

| Negative Covenants: | The Credit Facilities Documentation shall contain such negative covenants applicable to the Group Members as are usual and customary for facilities of this kind (with exceptions and baskets to be mutually agreed upon) in each case taking |
|---|---|

- 13 -

into account prevailing market conditions at the time of closing, including, but not limited to, the following:

Limitations on indebtedness (including guaranties and speculative hedging transactions), liens, investments (including loans), asset dispositions (including sale and leaseback transactions), restricted payments (including dividends, redemptions and repurchases with respect to capital stock and cancellation of debt), prepayments of indebtedness (including redemptions and repurchases), fundamental corporate changes (including mergers, consolidations, acquisitions, joint ventures or creation of subsidiaries), changes in nature of business, transactions with affiliates, third-party restrictions on indebtedness, liens, modification of constituent documents and certain other agreements, changes in accounting treatment, reporting practices or fiscal year, activities of Holdings, compliance with margin regulations, ERISA and environmental laws and payment of fees to the Sponsor for management services rendered, or in consideration of any other services typically and customarily associated with the payment of "management fees," not to exceed $500,000 per year in the aggregate (the "Management Fee Cap") and payable so long as no event of default has occurred and is continuing.

| Events of Default: | The Credit Facilities Documentation shall contain such events of default applicable to the Group Members as are usual and customary for facilities of this kind (with certain customary grace periods and thresholds to be agreed upon) in each case taking into account prevailing market conditions at the time of closing, including, but not limited to, the following: |

Failure to pay principal, interest or any other amount when due; representations and warranties incorrect in any material respect (or representations and warranties made in any borrowing base certificate incorrect in any respect) when made or deemed made; failure to comply with covenants in the Credit Facilities Documentation; cross-default to other indebtedness; failure to satisfy or stay execution of judgments; bankruptcy or insolvency; actual or asserted invalidity or impairment of any part of the Credit Facilities Documentation (including the failure of any lien to remain perfected); and change of ownership or control.

| Requisite Lenders: | With respect to the Exit Revolving Credit Facility, Revolving Lenders holding more than 50% of total commitments and/or Loans under the Exit Revolving Credit facility, with certain customary amendments and waivers requiring the vote of all affected Revolving Lenders. |

With respect to the Exit Term Credit Facility, Term Lenders holding more than 50% of total Loans under the Exit Term

Credit facility , with certain customary amendments and waivers requiring the vote of all affected Term Lenders.

| Miscellaneous: | The Credit Facilities Documentation will include (a) standard yield protection provisions (including, without limitation, provisions relating to compliance with risk-based capital guidelines, increased costs, withholding taxes, illegality and Eurodollar Rate breakage costs), (b) a waiver of consequential and punitive damages and right to a jury trial, (c) customary agency, set-off and sharing language and (d) other provisions as are usual and customary for facilities of this kind (including voting, indemnity and expense provisions). |
|---|---|
| Expenses: | Borrower and each Guarantor shall pay or reimburse Agents and GECM for all reasonable costs and expenses incurred by Agent and GECM (including reasonable attorneys' fees and expense) in connection with (a) the preparation, negotiation and execution of the Credit Facilities Documentation, (b) the syndication and funding of the Exit Credit Facilities (including Intralinks® or expenses of a similar service) and the issuance of Letters of Credit, (c) the creation, perfection and protection of the liens on the Collateral (including all search, filing and recording fees), (d) the on-going administration of the Credit Facilities Documentation (including the preparation, negotiation and execution of any amendments, consents, waivers, assignments, restatements or supplements thereto) and (e) administration and attendance at hearings with the respect to the Bankruptcy Case. |
| | In addition, Borrower and each Guarantor further agrees to pay or reimburse Agents and each of the Lenders and issuers of Letters of Credit for all costs and expenses (including reasonable attorneys' fees and expenses) in connection with (i) the enforcement of the Credit Facilities Documentation; (ii) any refinancing or restructuring of the Exit Credit Facilities in the nature of a "work-out" or any insolvency or bankruptcy proceeding and (iii) any legal proceeding relating to or arising out of the Exit Credit Facilities, the Transaction or the other transactions contemplated by the Credit Facilities Documentation. |
| Indemnity: | The Credit Facilities Documentation will contain customary indemnification provisions (including coverage of environmental liabilities) by Borrower and each Guarantor in favor of Agents, GECM, each Lender, each issuer of Letters of Credit and each of their respective officers, directors, employees, agents, advisors, attorneys and representatives. |
| Assignments and Participations: | Lenders will be permitted to make assignments in a minimum amount of $1 million (unless such assignment is of a Lender's entire interest in a particular tranche of the Exit Credit Facilities) to other financial institutions acceptable to |

Revolving Agent, in respect of the Exit Revolving Credit Facility, and Term Agent, in respect of the Exit Term Credit Facility, and so long as no event of default has occurred and is continuing, Borrower, which acceptances shall not be unreasonably withheld or delayed; provided however, that the approval of Borrower shall not be required in connection with assignments to other Lenders (or to affiliates or approved funds of Lenders). All assignments of a Lender's interest in the Exit Credit Facilities will be made via an electronic settlement system designated by the applicable Agent. An assignment fee of $3,500 shall be payable to the applicable Agent upon the effectiveness of any such assignment.

Governing Law and Submission to Jurisdiction:    New York

Counsel to Revolving Agent:    Latham & Watkins, LLP

Counsel to Term Agent:    Gibson, Dunn & Crutcher LLP

SCHEDULE I
to
Summary of Terms

Conditions to Closing

The availability of each of the Exit Credit Facilities, in addition to the conditions set forth in the Commitment Letter and Exhibit A thereto, shall be subject to the satisfaction of the following additional conditions:

1.  Equity Structure.  Agents shall have received evidence that Sponsor and certain co-investors described in the Plan Support Agreement have made a cash equity contribution of at least $70,000,000 in the aggregate to Holdings by means of common stock or preferred stock having terms reasonably acceptable to Agents, and that all of such cash has been used in accordance with the Plan and applied first, to the payment of the outstanding Term Loans (as defined in the DIP Term Sheet) and second, to the extent of any remaining cash, to the obligations outstanding under the Existing First Lien Facility. The terms and conditions of and documentation for such equity shall be reasonably satisfactory to Agents.

2.  Absence of Litigation.  There shall not exist any action, suit, investigation, litigation or proceeding pending or threatened in any court or before any arbitrator or governmental authority that has or could reasonably be expected to have a material adverse effect on Holdings, Borrower, their respective subsidiaries, the Transactions, the Exit Credit Facilities or any of the other transactions contemplated hereby.

3.  Outstanding Debts and Liens.  Agents shall be satisfied in its reasonable judgment that (a) concurrently with the consummation of the Plan, all pre-existing indebtedness of Holdings, Borrower and their respective subsidiaries (including, without limitation, all indebtedness in respect of the DIP Credit Facility) shall have been satisfied or otherwise discharged as specified in the Plan, and all liens and security interests related thereto shall have been terminated or released, in each case, on terms satisfactory to the Agents, (b) the respective indebtedness of Holdings, Borrower and their respective subsidiaries and any liens securing same that are outstanding immediately after the consummation of the Plan shall not exceed amount agreed upon prior to the Closing Date, (c) no default shall have occurred and be continuing under the DIP Credit Facility immediately prior to the effective date of the Plan, and (d) there shall not occur as a result of, and after giving effect to, the consummation of the Transaction and the initial funding of the Exit Credit Facilities, a default (or any event which with the giving of notice or lapse of time or both will be a default) under any of Holdings', Borrower's or their respective subsidiaries' debt instruments and other material agreements.

4.  Evidence of Solvency.  Agents shall be satisfied, based on financial statements (actual and pro forma), projections and other evidence provided by Borrower, or requested by Agents, including a certificate of the Chief Financial Officer of Borrower, that Borrower and each of the Guarantors, after incurring the indebtedness contemplated by the Exit Credit Facilities, will be solvent, able to will satisfy its obligations as they mature and adequately capitalized.

5.  No Material Adverse Effect.  Since September 25, 2009, there have been no events, circumstances, developments or other changes in facts that would, in the aggregate, have a Material Adverse Effect. "Material Adverse Effect" means an effect that results in or causes, or could reasonably be expected to result in or cause, a material adverse change in any of (a) the condition (financial or otherwise), business, performance, operations or property of Holdings, Borrower and their subsidiaries, taken as a whole, (b) the ability of Borrower or any Guarantor to perform its obligations under any of the Credit Facilities Documentation and (c) the validity or enforceability of any of the Credit Facilities

Documentation or the rights and remedies of Agents, the Lenders and the other secured parties under any of the Credit Facilities Documentation.

6. <u>Exit Credit Facilities</u>.  On the Closing Date no more than $8,750,000 (including issued Letters of Credit) will be drawn under the Exit Revolving Credit Facility.  Revolving Agent shall have received a borrowing base certificate for the month most recently ended prior to the Closing Date, certified by the chief financial officer of Borrower, which demonstrates Excess Availability under the Exit Revolving Credit Facility, after giving effect to the loans to be made and any letters of credit to be issued under the Exit Revolving Credit Facility on the Closing Date, is at least $3,750,000.  The Exit Term Credit Facility shall have closed simultaneously with the closing of the Exit Revolving Credit Facility consistent with the terms set forth in the Exit Term Sheet and otherwise on terms and conditions acceptable to GE Capital and its counsel.

7. <u>Cash Management.</u>  Borrower and each Guarantor shall maintain a cash management system, including blocked account agreements and lockbox arrangements, consistent with those described in the Exit Term Sheet and otherwise reasonably acceptable to Agents.

8. <u>Collateral Audits and Appraisals.</u>  Revolving Agent shall have received (a) a borrowing base audit with respect to the relevant Collateral to be included in the Borrowing Base and the relevant accounting systems, policies and procedures of Borrower and its subsidiaries by an independent third-party auditing firm satisfactory to Revolving Agent, (b) an appraisal of the NOLV of inventory by an independent third-party appraisal firm satisfactory to Revolving Agent, and (c) an environmental report in respect of such real estate by an independent third-party consulting firm satisfactory to Revolving Agent, in each case, in form and substance satisfactory to Revolving Agent.  Borrower and its subsidiaries shall have cooperated in a manner reasonably satisfactory to Revolving Agent in connection with such audits and appraisals, including by providing reasonable access to its assets.

9. <u>Receipt of Historical Financial Statements</u>.  Agents shall have received and be satisfied in form with (a) unaudited quarterly financial statements of Borrower and its subsidiaries for each subsequent fiscal quarter ended 30 days before the Closing Date and (b) to the extent available, interim unaudited monthly financial statements of Borrower and its subsidiaries for each month ended after the most recent fiscal quarter for which financial statements were received by Agents pursuant to clause (a).

10. <u>Receipt of Pro Forma Financial Statements and Business Plan</u>.  Agents shall have received and be satisfied with (a) a pro forma estimated balance sheet of Holdings and its subsidiaries at the Closing Date after giving effect to the Transaction and the other transactions contemplated thereby, and (b) Holdings' business plan which shall include a financial forecast on a monthly basis for the first twelve months after the Closing Date and on an annual basis thereafter through December 31, 2014 prepared by Holdings' management.

11. <u>Plan of Reorganization</u>.  (i) the Borrower's Plan and related disclosure statement and other solicitation materials, the Confirmation Order (as defined below) and all documents to be executed and/or delivered in connection with implementation of the Plan shall be on terms and conditions substantially the same as described in the Plan attached to the Plan Support Agreement as in effect on the date hereof, and no amendment, modification, supplement or waiver shall have been made to any or all of the Plan, the related disclosure statement and other solicitation materials, the Confirmation Order and all documents to be executed and/or delivered in connection with the implementation of the Plan, in each case, without the prior written consent of each Agent, that, in the reasonable judgment of either Agent, is adverse to the rights or interests of any or all of the Agents, the Lead Arranger and the Lenders, (ii) without limiting the generality of clause (i), the treatment of the First Lien Credit Facility Claims (as defined in the Plan attached to the Plan Support Agreement) that are not rolled up into the DIP Roll-Up Loan (as defined in the Plan attached to the Plan Support Agreement) shall be on the

terms and conditions set forth in the Plan attached to the Plan Support Agreement or on such other terms and conditions to which the class of holders of Existing First Lien Obligations have voted to accept pursuant to Sections 1126 and 1129 (a) of the Bankruptcy Code, (iii) the Bankruptcy Court shall have entered an order, in form and substance satisfactory to each of the Agents (the "Confirmation Order"), confirming the Plan and approving the Plan-related solicitation procedures, and such order shall have become final and non-appealable, (iv) the Plan shall have become effective in accordance with its terms, and all conditions precedent to the effectiveness of the Plan shall have been satisfied or waived (with the prior consent of each of the Agents if either such Agent reasonably determines such waiver is adverse to the Lenders), and (v) the transactions contemplated by the Plan to occur on the effective date of the Plan shall have been consummated on the Closing Date and substantially contemporaneously with the initial funding of the Exit Revolving Credit Facility.

12. Performance of Obligations. All amounts then due under the Commitment Letter and the Fee Letter payable to the Agents, the Arranger, or the Lenders shall have been paid. The Borrower shall have complied in all material respects with all of its other obligations under the Commitment Letter.

13. Other Customary Conditions. Other customary closing conditions, relating to delivery of satisfactory legal opinions of counsel to the Group Members, evidence of payment and discharge of existing obligations and liens, creation and perfection of liens on the Collateral as provided for in each paragraph entitled "Collateral" above, receipt of mortgage supporting documents for all properties subject to mortgage (including, without limitation, title insurance policies, current certified surveys, evidence of zoning and other legal compliance, environmental reports, certificates of occupancy, legal opinions), no conflict with applicable law or other material agreements, obtaining all necessary governmental approval and third party consents, passage of all applicable appeal periods, evidence of corporate authority, copy of organizational documents, satisfactory corporate structure, insurance reasonably satisfactory to Agents (and receipt of additional insured and loss payee insurance certificates), delivery of an initial borrowing base certificate and payment of all fees and expenses then due and owing.