## EXHIBIT B

## LMM AGREEMENT

LAZARD

LAZARD MIDDLE MARKET LLC
11 WEST 42ND STREET
29TH FLOOR
NEW YORK, NY 10036
PHONE +1 212.758.8575
FAX +1 212.758.3833
www.lazardmm.com

February 20, 2009

True Temper Corporation
8275 Tournament Drive
Suite 200
Memphis, TN 38125

Attention:   Scott C. Hennessy
             President & Chief Executive Officer

Dear Ladies and Gentlemen:

This letter agreement (the "Agreement") confirms the understanding and agreement between Lazard Middle Market LLC ("LMM"), on the one hand, and True Temper Corporation and its subsidiaries True Temper Sports, Inc. and True Temper Sports – PRC Holdings, Inc. (collectively with any entity formed or used for the purposes set forth herein, the "Company"), on the other hand.

*Assignment Scope:*

The Company hereby retains LMM as its sole investment banker to provide the Company with general restructuring advice and to advise it in connection with any Restructuring, Sale Transaction and/or Financing (each as defined below) on the terms and conditions set forth herein, *provided* that the Company may retain Credit Suisse (or one of its affiliates) as the Company's advisor in connection with the Company's credit facilities. As used in this Agreement, the term "Restructuring" shall mean, collectively, any restructuring, reorganization (whether or not pursuant to Chapter 11 of the United States Bankruptcy Code) and/or recapitalization of a significant portion of the Company's outstanding indebtedness (including bank debt, bond debt, and other on and off balance sheet indebtedness), trade claims, leases (both on and off balance sheet) or other liabilities (collectively, the "Existing Obligations") that is achieved, without limitation, through a solicitation of waivers and consents from the holders of Existing Obligations (collectively, the "Stakeholders"); rescheduling of the maturities of Existing Obligations; a change in interest rates, repurchase, settlement or forgiveness of Existing Obligations; conversion of Existing Obligations into equity; an exchange offer involving the issuance of new securities in exchange for Existing Obligations; the issuance of new securities, sale or disposition of assets, sale of debt or equity securities or other interests or other similar transaction or series of transactions, *provided* that "Restructuring" shall not include any such transaction (a) the material substance of which is solely a forbearance, waiver and/or similar arrangement, (b) consisting of an extension of the expiration date of the Company's revolver credit facility, (c) consisting solely of investments in the Company by Gilbert Global Equity Partners, L.P. or any of its affiliated funds, or (d) consisting solely of one or more of the transactions described in the foregoing clauses (a), (b) and (c). By signing this Agreement, we hereby accept our

appointment as your sole investment banker under the terms hereof.

*Description of Services:*

1. LMM agrees, in consideration of the compensation provided in Section 2 ("Fees") below, to perform such of the following investment banking services as the Company may reasonably request, including:

 (a) Reviewing and analyzing the Company's business, operations and financial projections;

 (b) Evaluating the Company's potential debt capacity in light of its projected cash flows;

 (c) Assisting in the determination of a capital structure for the Company;

 (d) Assisting in the determination of a range of values for the Company on a going concern basis;

 (e) Advising the Company on tactics and strategies for negotiating with the Stakeholders;

 (f) Rendering financial advice to the Company and participating in meetings or negotiations with the Stakeholders and/or rating agencies or other appropriate parties in connection with any Restructuring;

 (g) Advising the Company on the timing, nature, and terms of new securities, other consideration or other inducements to be offered pursuant to the Restructuring;

 (h) Advising and assisting the Company in evaluating a potential Financing[1] transaction by the Company, and, subject to LMM's agreement so to act and, if requested by LMM, to execution of appropriate agreements, on behalf of the Company, contacting potential sources of capital as the Company may designate and assisting the Company in implementing such a Financing;

 (i) Assisting the Company in preparing documentation within our area of expertise that is required in connection with the Restructuring;

---

[1] As used in this Agreement, the term "Financing" means any transaction or series of transactions involving the public or private issuance, sale, or placement for cash of equity, equity-linked, or debt securities, instruments, or obligations of the Company, including any debtor-in-possession financing or exit financing in connection with a case under the Bankruptcy Code; provided, however, no Financing Fee shall be payable to LMM with respect to any part of a Financing that is provided by Gilbert Global Equity Partners, L.P. and its affiliated funds. For the avoidance of doubt, to the extent a transaction is solely an extension of the maturity of, or other modification of, any Existing Obligations, it shall not constitute a "Financing" for purposes of this Agreement.

(j) Assisting the Company in identifying and evaluating candidates for a potential Sale Transaction, advising the Company in connection with negotiations and aiding in the consummation of a Sale Transaction[2];

(k) Attending meetings of the Company's Board of Directors and its committees with respect to matters on which we have been engaged to advise you;

(l) Providing testimony, as necessary, with respect to matters on which we have been engaged to advise you in any proceeding before the Bankruptcy Court; and

(m) Providing the Company with other financial restructuring advice.

Except as otherwise agreed by the Company, LMM shall provide the services of Andrew B. Samett and Daniel T. Motulsky (the "Principal Professionals") as the principal professionals working on this engagement, so long as they remain employed by LMM or its affiliates. In the event that either of the Principal Professionals ceases to be employed by LMM or its affiliates, LMM will promptly assign another professional with appropriate experience as a replacement for such Principal Professional. LMM may use other LMM professionals as it deems appropriate in connection with this engagement.

*Fees:*

2. As consideration for the services to be provided, the Company shall pay LMM the following fees:

(a) A monthly fee of $125,000 (the "Monthly Fee"), payable on the first business day of each month, commencing with the first business day of March 2009, until the earlier of the completion of the Restructuring or the termination of LMM's engagement as provided in Section 10 ("Other") below. One hundred percent (100%) of the Monthly Fees paid with respect to the first three (3) months of this engagement and fifty percent (50%) of all Monthly Fees paid with respect to any subsequent month shall be credited (without duplication) against any Restructuring Fee or Sale Transaction Fee payable; provided, that, in the event of a Chapter 11 filing, such credit shall only apply to the extent that such fees are approved in entirety by the Bankruptcy Court, if applicable.

(b) A fee equal to $2.5 million, payable upon the consummation of a Restructuring (the "Restructuring Fee"); provided, however, that if a Restructuring is to be completed through a "pre-packaged" or "pre-arranged" plan of reorganization, the Restructuring Fee shall be earned and shall be payable upon the earlier of (i) execution of definitive

---

[2] As used in this Agreement, the term "Sale Transaction" means any transaction or series of transactions involving (a) an acquisition, merger, consolidation, or other business combination pursuant to which the business or assets of the Company are, directly or indirectly, combined with another company; or (b) the acquisition, directly or indirectly, by a buyer or buyers (which term shall include a "group" of persons as defined in Section 13(d) of the Securities Exchange Act of 1934, as amended), of equity interests or options, or any combination thereof constituting a majority of the then outstanding stock of the Company or possessing a majority of the then outstanding voting power of the Company (except as may occur with current Stakeholders as a result of a Restructuring).

agreements with respect to such plan and (ii) delivery of binding consents to such plan by a sufficient number of creditors and/or bondholders, as the case may be, to bind the creditors or bondholders, as the case may be to the plan; provided, further, that in the event that LMM is paid a fee in connection with a "pre-packaged" or "pre-arranged" plan and such plan is not consummated, LMM shall return such fee to the Company. If the Company is taking reasonable efforts to pursue a restructuring of both the Senior Subordinated Notes and the Company's credit facilities and one of the two is consummated prior to the other, then the parties agree that the Restructuring Fee shall not become payable until the earlier to occur of (x) the consummation of the other of those restructurings and (y) the Company ceasing to take reasonable efforts to pursue the remaining restructuring. Any Restructuring Fee paid shall be credited against any Sale Transaction Fee subsequently payable.

(c) If, whether in connection with the consummation of a Restructuring or otherwise, the Company consummates a Sale Transaction incorporating all or substantially all of the assets or all or a majority of the voting power of the equity securities of the Company, LMM shall be paid a fee (the "Sale Transaction Fee") equal to the greater of (A) the fee calculated based on the Aggregate Consideration as set forth in Schedule I hereto or (B) the Restructuring Fee. Any Sale Transaction Fee shall be payable upon consummation of the applicable Sale Transaction.

(d) A fee, payable upon consummation of a Financing, equal to the amount set forth in Schedule II (the "Financing Fee"). One-half of any Financing Fee(s) paid shall be credited against any Restructuring Fee or Sale Transaction Fee concurrently or subsequently payable.

(e) For the avoidance of any doubt, more than one fee may be payable pursuant to clauses (b), (c) and (d) above, *provided* that if a Sale Transaction Fee is paid, no Restructuring Fee shall be payable concurrently or subsequently.

(f) In addition to any fees that may be payable to LMM and, regardless of whether any transaction occurs, the Company shall promptly reimburse LMM for all: (A) reasonable expenses (including travel and lodging, data processing and communications charges, courier services and other appropriate expenditures) and (B) other reasonable fees and expenses, including expenses of counsel, if any, *provided* that (i) the aggregate amount of such fees and expenses described in (A) and (B) shall not exceed $50,000 without the Company's consent (not to be unreasonably withheld), and (ii) LMM shall provide monthly invoices of expenses for which reimbursement is requested by LMM.

(g) As part of the compensation payable to LMM hereunder, the Company agrees to the indemnification, contribution and related provisions (the "Indemnification Letter") attached to this Agreement as Addendum A and incorporated herein in their entirety.

    (h)    All amounts referenced hereunder reflect United States currency and shall be paid promptly in cash after such amounts accrue hereunder.

*Retention in Chapter 11 Proceedings:*

3. In the event of the commencement of chapter 11 proceedings, the Company agrees that it will use best efforts to obtain prompt authorization from the Bankruptcy Court to retain LMM on the terms and conditions set forth in this Agreement under the provisions of Section 328(a) of the Bankruptcy Code. Subject to being so retained, LMM agrees that during the pendency of any such proceedings, it shall continue to perform its obligations under this Agreement and that it shall file interim and final applications for allowance of the fees and expenses payable to it under the terms of this Agreement pursuant to the applicable Federal Rules of Bankruptcy Procedure, and the local rules and order of the Bankruptcy Court. The Company shall supply LMM with a draft of the application and proposed retention order authorizing LMM's retention sufficiently in advance of the filing of such application and proposed order to enable LMM and its counsel to review and comment thereon. LMM shall be under no obligation to provide any services under this agreement in the event that the Company becomes a debtor under the Bankruptcy Code unless LMM's retention under the terms of this Agreement is approved under section 328(a) of the Bankruptcy Code by final order of the Bankruptcy Court, which order is acceptable to LMM. The retention application shall note that in so agreeing to seek LMM's retention under Section 328(a) of the Bankruptcy Code, the Company acknowledges that it believes that LMM's general restructuring experience and expertise, its knowledge of the capital markets and its merger and acquisition capabilities will inure to the benefit of the Company in pursuing any Restructuring, Sale Transaction or Financing, that the value to the Company of LMM's services hereunder derives in substantial part from that expertise and experience and that, accordingly, the structure and amount of the deferred fees, including the Restructuring Fee, Sale Transaction Fee and Financing Fee is reasonable regardless of the number of hours to be expended by LMM's professionals in the performance of the services to be provided hereunder, and that the deferred Restructuring Fee, Sale Transaction Fee and Financing Fee shall not be considered to be "bonuses" or fee enhancements under applicable law.

*Other:*

4. No fee payable to any other person, by you or any other party, shall reduce or otherwise affect any fee payable hereunder to us.

5. The Company will furnish or cause to be furnished to LMM such current and historical financial information and other information regarding the business of the Company as LMM may reasonably request in connection with this engagement. The Company represents and warrants to LMM that all of the foregoing current and historical financial information and other factual information about the Company will be accurate and complete in all material respects at the time it is furnished, and agrees to keep LMM advised of all developments materially affecting the Company or its financial position that is reasonably relevant to LMM's engagement hereunder. In performing its services pursuant to this Agreement, including in connection with any valuation of the Company, LMM shall be entitled to rely upon information furnished to it by the Company or that is publicly available, may assume the accuracy and completeness of such information and shall not assume any responsibility for independent verification of any such

information. LMM will not, as part of its engagement, undertake any independent valuation or appraisal of any of the assets or liabilities of the Company or of any third party, or opine or give advice to the Board of Directors, the Company or management or shareholders with respect thereto or with respect to any issues of solvency.

6. In performing its services pursuant to this Agreement, LMM is not assuming any responsibility for the decision of the Company or any other party to pursue (or not to pursue) any business strategy or to effect (or not to effect) any Restructuring, Sale Transaction, Financing or other transaction. LMM shall not have any obligation or responsibility to provide "crisis management" for or business consultant services to the Company, and shall have no responsibility for designing or implementing operating, organizational, administrative, cash management or liquidity improvements; nor shall LMM be responsible for providing any tax, legal or other specialist advice.

7. It is understood and agreed that nothing contained in this Agreement shall constitute an express or implied commitment by Lazard Middle Market LLC or Lazard Capital Markets LLC or any of their respective affiliates to underwrite, place or purchase any securities in a financing or otherwise, which commitment shall only be set forth in a separate underwriting, placement agency or purchase agreement, as applicable, relating to the financing.

8. Simultaneously herewith, the parties hereto are entering into the Indemnification Letter. The Indemnification Letter shall survive any termination or expiration of this Agreement.

9. In order to coordinate our efforts on behalf of the Company during the period of our engagement hereunder, the Company will promptly inform LMM of any discussions, negotiations, or inquiries regarding a potential transaction that the Company reasonably determines are relevant to LMM's engagement hereunder. In the event that LMM receives an inquiry concerning any transaction, we will promptly inform the Company of such inquiry.

10. Our engagement hereunder may be terminated by you or us at any time without liability or continuing obligation to you or us, except that following such termination and any expiration of this Agreement (a) we shall remain entitled to any fees described in Section 2 ("Fees") above accrued prior to such termination or expiration, as the case may be, but not yet paid prior to such termination or expiration, as the case may be, and to reimbursement of expenses incurred prior to such termination or expiration, as the case may be, and payable by the Company as set forth in Section 2 ("Fees") above, and (b) in the case of termination by the Company and any expiration of this Agreement, we shall remain entitled to full payment of all fees described in Section 2 ("Fees") above in respect of any Restructuring, any Sale Transaction and any Financing announced or as to which agreement is reached during the period from the date hereof until the earliest of (i) the date on which a Restructuring shall have been consummated, (ii) the date on which a Sale Transaction shall have been consummated, and (iii) the later to occur of (x) the date one year following such termination or expiration, as the case may be, and (y) the day after the Senior Subordinated Notes mature.

11. The Company recognizes that LMM has been engaged only by the Company and that the Company's engagement of LMM is not deemed to be on behalf of and is not intended to confer rights upon any shareholder, partner or other owner of the Company, any creditor, lender or any other person not a party hereto as against LMM or any of its affiliates or any of their respective directors, officers, members, agents, employees or representatives. Unless otherwise

expressly agreed, no one, other than senior management or the Board of Directors of the Company is authorized to rely upon the Company's engagement of LMM or any statements, advice, opinions or conduct by LMM. Without limiting the foregoing, any advice, written or oral, rendered to the Company's Board of Directors or management in the course of the Company's engagement of LMM are solely for the purpose of assisting senior management or the Board of Directors of the Company, as the case may be, in evaluating any Restructuring, Sale Transaction or Financing and does not constitute a recommendation to any stakeholder of the Company that such stakeholder might or should take in connection with any Restructuring, Sale Transaction or Financing. Any advice, written or oral, rendered by LMM may not be disclosed publicly or made available to third parties without the prior written consent of LMM. Notwithstanding the foregoing, nothing herein shall prohibit you from disclosing to any and all persons the tax treatment and tax structure of any transaction and the portions of any materials that relate to such tax treatment or tax structure. LMM's role herein is that of an independent contractor; nothing herein is intended to create or shall be construed as creating a fiduciary relationship between LMM and the Company or its Board of Directors or any other person or entity.

12. In connection with the services to be provided hereunder, LMM may employ the services of its affiliates and Lazard Capital Markets LLC and may share with any such entity any information concerning the Company, provided that LMM and such entities shall hold any nonpublic information confidential in accordance with their respective customary policies relating to nonpublic information. Any such entity so employed shall be entitled to all of the benefits afforded to LMM hereunder and under the Indemnification Letter and shall be entitled to be reimbursed for its costs and expenses on the same basis as LMM.

13. The provisions hereof shall inure to the benefit of and be binding upon the successors and assigns of the Company, LMM and any other person entitled to indemnity under the Indemnification Letter. You agree that the Company's obligations pursuant to this Agreement shall be joint and several. This Agreement and the related Indemnification Letter embody the entire agreement and understanding among the parties hereto and supersede any and all prior agreements, arrangements, and understandings, related to the matters provided for herein.

14. This Agreement and any claim related directly or indirectly to this Agreement (including any claim concerning advice provided pursuant to this Agreement) shall be governed by and construed in accordance with the laws of the State of New York without regard to the principle of conflicts of law. No such claim shall be commenced, prosecuted or continued in any forum other than the courts of the State of New York located in the City and County of New York or in the United States District Court for the Southern District of New York, and each of the parties hereby submits to the jurisdiction of such courts. The Company hereby waives on behalf of itself and its successors and assigns any and all right to argue that the choice of forum provision is or has become unreasonable in any legal proceeding. The Company waives all right to trial by jury in any action, proceeding or counterclaim (whether based upon contract, tort or otherwise) related to or arising out of the engagement of LMM pursuant to, or the performance by LMM of the services contemplated by, this Agreement.

If the foregoing Agreement is in accordance with your understanding of the terms of our engagement, please sign and return to us the enclosed duplicate hereof.

Very truly yours,

LAZARD MIDDLE MARKET LLC

By: _____
    Andrew B. Samett
    Managing Director

Accepted and Agreed to as of the date first written above.

TRUE TEMPER CORPORATION

By._____
    Scott C. Hennessy
    President and Chief Executive Officer


TRUE TEMPER SPORTS, INC.

By._____
    Name:
    Title:


TRUE TEMPER SPORTS – PRC HOLDINGS, INC.

By._____
    Name:
    Title:

If the foregoing Agreement is in accordance with your understanding of the terms of our engagement, please sign and return to us the enclosed duplicate hereof.

Very truly yours,

LAZARD MIDDLE MARKET LLC

By: _____
    Andrew B. Samett
    Managing Director

Accepted and Agreed to as of the date first written above.

TRUE TEMPER CORPORATION

By: *Scott C. Hennessy*
    Scott C. Hennessy
    President and Chief Executive Officer

TRUE TEMPER SPORTS, INC.

By: *Scott C. Hennessy*
    Name: Scott C. Hennessy
    Title: President and Chief Executive Officer

TRUE TEMPER SPORTS – PRC HOLDINGS, INC.

By: *Scott C. Hennessy*
    Name: Scott C. Hennessy
    Title: Director

SCHEDULE I

Fees for Sale Transactions

The following table outlines the Sale Transaction fee schedule. The total fee is calculated by breaking down the Aggregate Consideration and multiplying each increment by the corresponding incremental fee. For example, for a transaction in which the Aggregate Consideration paid is $60 million, the fee would be $625,000 + $550,000 + $175,000 which totals $1.35 million.

| Aggregate Consideration ($ in millions) | Incremental Fee % |
|---|---|
| $0 - $25 | 2.50% |
| $25 - $50 | 2.20% |
| $50 - $100 | 1.75% |
| $100 - $200 | 1.30% |
| $200 - $300 | 1.10% |
| $300 - $400 | 1.00% |
| $400 - $500 | 0.90% |
| $500 - $600 | 0.86% |
| $600 - $700 | 0.82% |
| $700 - $800 | 0.78% |
| $800 - $900 | 0.74% |
| $900 + | 0.70% |

For purposes hereof, the term "Aggregate Consideration" means (x) the total amount of cash and the fair market value (on the date of payment) of all of the property paid and payable (including amounts paid into escrow) in connection with the Sale Transaction (or any related transaction), including amounts paid and payable in respect of convertible securities, preferred equity securities, warrants, stock appreciation rights, option or similar rights, whether or not vested, plus (y) the principal amount of all indebtedness for borrowed money or other liabilities of the Company or relevant Company entity, as applicable, as set forth on the most recent balance sheet, or, in case of the sale of assets, all indebtedness for borrowed money or other liabilities assumed by the third party. Aggregate Consideration shall also include the aggregate amount of any dividends or other distributions declared by the Company or relevant Company entity, as applicable, after the date hereof other than normal quarterly cash dividends, and, in the case of the sale of assets, the net value of any current assets not sold by the Company or relevant Company entity, as applicable. For purposes of calculating Aggregate Consideration, (i) all shares will be deemed transferred where a Sale Transaction is effected by the transfer of shares, (a) constituting more than 50% of the then outstanding equity securities of or equity interest in the Company or relevant Company entity, as applicable, or (b) possessing more than 50% of the then outstanding voting power of the outstanding equity securities of or equity interest in the Company or relevant Company entity, as applicable, and (ii) the value of securities (whether debt or equity) that are freely tradable in an established public market will be determined on the basis

of the average closing price in such market for the 10 trading days prior to the closing of the Sale Transaction (the "Valuation Date"); and the value of securities that have no established public market or other property will be the fair market value of such securities or other property on such Valuation Date and any restricted stock (i.e., stock in a public company not freely tradeable) received shall be valued at 85% of the public market price of such stock. Aggregate Consideration shall also be deemed to include pension liabilities and guarantees of monies borrowed assumed directly or indirectly by the third party. If the Aggregate Consideration is subject to increase by contingent payments related to future events, the portion of our fee relating thereto shall be calculated by us in good faith and paid to us upon consummation of the Sale Transaction.

## SCHEDULE II

Fees for Financings

The following table outlines the Financing Fees. For a Financing, the total Financing Fee shall be calculated by multiplying the applicable fee percentage by the total gross proceeds raised in each Financing.

| Funds Raised | Fee % |
| --- | --- |
| Senior Secured Debt & DIP Financing | 1.50% |
| Senior Debt | 2.50% |
| Subordinated Debt | 3.00% |
| Convertible Debt | 3.00% |
| Convertible Preferred Stock | 4.00% |
| Common Stock | 5.00% |

# LAZARD

LAZARD MIDDLE MARKET LLC
11 WEST 42ND STREET
29TH FLOOR
NEW YORK, NY 10036
PHONE +1 212.758.8575
FAX +1 212.758.3833
www.lazardmm.com

February 20, 2009

True Temper Corporation
8275 Tournament Drive
Suite 200
Memphis, TN 38125

Attention:    Scott C. Hennessy
              President & Chief Executive Officer

Dear Ladies and Gentlemen:

      In connection with our engagement to advise and assist True Temper Corporation and its subsidiaries True Temper Sports, Inc. and True Temper Sports – PRC Holdings, Inc. (collectively, "you") with the matters set forth in the engagement letter of even date herewith, you and we are entering into this letter agreement. It is understood and agreed that in the event that Lazard Middle Market LLC or any of our affiliates, or any of our or their respective directors, officers, members, employees, agents or controlling persons, if any (each of the foregoing, including Lazard Middle Market LLC, being an "Indemnified Person"), become involved in any capacity in any action, claim, proceeding or investigation brought or threatened by or against any person, including your securityholders, related to, arising out of or in connection with our engagement, you will promptly reimburse each such Indemnified Person for its legal and other expenses (including the cost of any investigation and preparation) as and when they are incurred in connection therewith. You will indemnify and hold harmless each Indemnified Person from and against any losses, claims, damages, liabilities or expenses to which any Indemnified Person may become subject under any applicable federal or state law, or otherwise, related to, arising out of or in connection with our engagement, whether or not any pending or threatened action, claim, proceeding or investigation giving rise to such losses, claims, damages, liabilities or expenses is initiated or brought by you or on your behalf and whether or not in connection with any action, claim, proceeding or investigation in which you or any such Indemnified Person are a party, except to the extent that any such loss, claim, damage, liability or expense is found by a court of competent jurisdiction in a judgment which has become final in that it is no longer subject to appeal or review to have resulted primarily from such Indemnified Person's bad faith or gross negligence. You also agree that no Indemnified Person shall have any liability (whether direct or indirect, in contract or tort or otherwise) to you or your securityholders or creditors related to, arising out of or in connection with our engagement except to the extent that any loss, claim, damage or liability is found by a court of competent jurisdiction in a judgment which has become final in that it is no longer subject to appeal or review to have resulted primarily from such Indemnified Person's bad faith or gross negligence. If multiple claims are brought against any Indemnified Person in an arbitration

related to, arising out of or in connection with our engagement, and indemnification is permitted under applicable law with respect to at least one such claim, you agree that any arbitration award shall be conclusively deemed to be based on claims as to which indemnification is permitted and provided for hereunder, except to the extent the arbitration award expressly states that the award, or any portion thereof, is based solely on a claim as to which indemnification is not available.

If for any reason the foregoing indemnification is held unenforceable (other than due to a failure to meet the standard of care set forth above), then you shall contribute to the loss, claim, damage, liability or expense for which such indemnification is held unenforceable in such proportion as is appropriate to reflect the relative benefits received, or sought to be received, by you and your securityholders and creditors on the one hand and the Indemnified Persons on the other hand in the matters contemplated by our engagement as well as the relative fault of yourselves and such persons with respect to such loss, claim, damage, liability or expense and any other relevant equitable considerations. You agree that for the purposes hereof the relative benefits received, or sought to be received, by you and your securityholders and creditors and the Indemnified Persons shall be deemed to be in the same proportion as (i) the total value paid or proposed to be paid by or to you and your securityholders and creditors, as the case may be, pursuant to any transaction (whether or not consummated) for which we have been engaged to perform investment banking services bears to (ii) the fees paid or proposed to be paid to us in connection with such engagement; provided, however, that, to the extent permitted by applicable law, in no event shall we or any other Indemnified Person be required to contribute an aggregate amount in excess of the aggregate fees actually paid to us for such investment banking services. Your reimbursement, indemnity and contribution obligations under this agreement shall be joint and several, shall be in addition to any liability which you may otherwise have, shall not be limited by any rights we or any other Indemnified Person may otherwise have and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of yourselves, ourselves, and any other Indemnified Persons.

You agree that, without our prior written consent (which will not be unreasonably withheld), you will not settle, compromise or consent to the entry of any judgment in any pending or threatened claim, action, proceeding or investigation in respect of which indemnification or contribution could be sought hereunder (whether or not we or any other Indemnified Persons are an actual or potential party to such claim, action, proceeding or investigation), unless such settlement, compromise or consent includes an unconditional release of each Indemnified Person from all liability arising out of such claim, action, proceeding or investigation. No waiver, amendment or other modification of this agreement shall be effective unless in writing and signed by each party to be bound thereby. This agreement and any claim related directly or indirectly to this agreement shall be governed and construed in accordance with the laws of the State of New York (without giving regard to the conflicts of law provisions thereof). No such claim shall be commenced, prosecuted or continued in any forum other than the courts of the State of New York located in the City and County of New York or the United States District Court for the Southern District of New York, and each of us hereby submits to the jurisdiction of such courts. You hereby waive on behalf of yourself and your successors and assigns any and all right to argue that the choice of forum provision is or has become unreasonable. You (on your own behalf and, to the extent permitted by applicable law, on behalf

of your securityholders and creditors) waive all right to trial by jury in any action, proceeding or counterclaim (whether based upon contract, tort or otherwise) related to, arising out of or in connection with our engagement. This agreement shall remain in effect indefinitely, notwithstanding any termination or expiration of our engagement.

Very truly yours,

LAZARD MIDDLE MARKET LLC

By _____
Andrew B. Samett
Managing Director


AGREED TO AND ACCEPTED
as of the date first above written:

TRUE TEMPER CORPORATION

By._____
Scott C. Hennessy
President and Chief Executive Officer


TRUE TEMPER SPORTS, INC.

By._____
Name:
Title:


TRUE TEMPER SPORTS – PRC HOLDINGS, INC.

By._____
Name:
Title:

of your securityholders and creditors) waive all right to trial by jury in any action, proceeding or counterclaim (whether based upon contract, tort or otherwise) related to, arising out of or in connection with our engagement. This agreement shall remain in effect indefinitely, notwithstanding any termination or expiration of our engagement.

Very truly yours,

LAZARD MIDDLE MARKET LLC

By_____
Andrew B. Samett
Managing Director


AGREED TO AND ACCEPTED
as of the date first above written:

TRUE TEMPER CORPORATION
By: _/s/ Scott C. Hennessy_
Scott C. Hennessy
President and Chief Executive Officer


TRUE TEMPER SPORTS, INC.
By: _/s/ Scott C. Hennessy_
Name: Scott C. Hennessy
Title: President and Chief Executive Officer


TRUE TEMPER SPORTS – PRC HOLDINGS, INC.
By: _/s/ Scott C. Hennessy_
Name: Scott C. Hennessy
Title: Director